# OFFICIAL REPORT OF PROCEEDINGS

## BEFORE THE

## NATIONAL LABOR RELATIONS BOARD

In the Matter of:                    Case No.:    18-CA-236643
                                                  18-CA-238989
                                                  18-CA-247528
SUNBELT RENTALS, INC.

                    **Respondent**

And

**INTERNATIONAL UNION OF
OPERATING ENGINEERS LOCAL 139,
AFL-CIO**
                    **Charging Party**

Place:      Milwaukee, WI
Date:       12/16/19
Pages:      1-250
Volume:     1

## OFFICIAL REPORTERS

**Veritext Legal Solutions
Mid-Atlantic Region
1801 Market Street – Suite 1800
Philadelphia, PA 19103
888-777-6690**

1                UNITED STATE OF AMERICA

2          BEFORE THE NATIONAL LABOR RELATIONS BOARD

3                REGION 18 - SUBREGION 30

4

5    In the Matter of:              )

6    SUNBELT RENTALS, INC.,         )

7              Respondent,          )

8      and                         )

9    INTERNATIONAL UNION OF         ) Cases 18-CA-236643

10   OPERATING ENGINEERS LOCAL 139 )      18-CA-238989

11   AFL-CIO,                       )      18-CA-247528

12             Charging Party.      )

13

14

15

16        The above-entitled matter came on for

17   hearing pursuant to notice, before

18   ADMINISTRATIVE LAW JUDGE MICHAEL ROSAS, at

19   310 West Wisconsin Avenue, Suite 450W,

20   Milwaukee, Wisconsin, on Wednesday, December 16,

21   2019, at 10:00 a.m.

22

23

24

25

```
 1              A P P E A R A N C E S

 2

 3    On behalf of the General Counsel:

 4      MR. TYLER J. WIESE
        NATIONAL LABOR RELATIONS BOARD
 5      Eighteenth Region
        Federal Office Building
 6      212 3rd Avenue S, Suite 200
        Minneapolis, Minnesota  55401
 7      (952) 703-2891
        tyler.wiese@nlrb.gov

 8

 9    On behalf of the Respondent:

10      MS. PATRICIA J. HILL
        SMITH, GAMBRELL & RUSSELL, LLP
11      50 North Laura Street
        Jacksonville, Florida  32202
12      (904) 598-6100
        pjhill@sgrlaw.com

13

14    On behalf of the Charging Party:

15      MR. PATRICK N. RYAN
        BAUM, SIGMAN, AUERBACH & NEUMAN, LTD.
16      200 West Adams Street, Suite 2200
        Chicago, Illinois  60606
17      (312) 236-4316
        pryan@baumsigman.com

18

19                   *    *    *    *

20

21

22

23

24

25
```

```
 1                    I N D E X
 2                                        VOIR
 3    WITNESS              DX   CX   RDX  RCX  DIRE
 4    Michael Ervin       22   153  --   --   29
 5              (resumed) 30   160            47
 6              (resumed) 49   221            56
 7              (resumed) 58                  65
 8              (resumed) 66                  69
 9              (resumed) 70                  107
10              (resumed) 109                 125
11              (resumed) 125                 219
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                    E X H I B I T S

2

3    EXHIBIT          FOR IDENTIFICATION   IN EVIDENCE

4    GENERAL COUNSEL

5      GCX 1A-1KK          7                    7

6      GCX 2              24                   24

7      GCX 3              26                   27

8      GCX 4              27                   27

9      GCX 5E             55                   58

10     GCX 6A             30                   31

11     GCX 6C             69                   70

12     GCX 6D             64                   66

13     GCX 6E             79                   79

14     GCX 6F             89                   89

15     GCX 6G            118

16     GCX 7A             31                   38

17     GCX 7B             46                   49

18     GCX 7C             52                   52

19     GCX 7D             59                   60

20     GCX 7E             70                   71

21     GCX 7F             80                   81

22     GCX 7G             84                   84

23     GCX 7H             99                  100

24     GCX 8              50                   50

25     GCX 9              76                   77

```
 1              E X H I B I T S

 2

 3   EXHIBIT          FOR IDENTIFICATION   IN EVIDENCE

 4   GENERAL COUNSEL

 5

 6     GCX 10               86                  87

 7     GCX 11               97                  97

 8     GCX 12               120                 122

 9     GCX 13               123                 125

10     GCX 15               28                  30

11     GCX 16               132                 135

12     GCX 17               125                 126

13     GCX 18               129                 129

14     GCX 19               129                 130

15     GCX 20               129                 130

16     GCX 21               135                 138

17     GCX 22               142                 144

18     GCX 23               147                 148

19     GCX 24               148                 151

20     GCX 38               106                 109

21     GCX 39               144                 145

22   RESPONDENT'S

23     R-1                  187                 220

24   JOINT

25     J-1                  7                   9
```

1           P R O C E E D I N G S

2                    (Time Noted:  10:00 a.m.)

3           JUDGE ROSAS:  On the record in the

4    matter of Sunbelt Rentals, Inc. and

5    International Union of Operating Engineers

6    Local 139 AFL-CIO, cases 18-CA-236643, 238989

7    and 247528.  This is a proceeding of the

8    National Labor Relations Act, before the

9    Administrative Law Judge Michael A. Rosas, from

10   Washington, DC, Division of Judge's Office.

11           Counsel for the parties state your

12   appearances.

13           MR. WIESE:  On behalf of the General

14   Counsel, Tyler Wiese, W-I-E-S-E.

15           JUDGE ROSAS:  Charging party?

16           MR. RYAN:  Patrick Ryan on behalf of

17   charging party, Local 139.

18           JUDGE ROSAS:  Address, firm?

19           MR. RYAN:  Oh, I'm sorry.  Baum,

20   Sigman, Auerbach & Neuman, 200 West Adam Street,

21   Suite 2200, Chicago, Illinois 60606.

22           JUDGE ROSAS:  Respondent?

23           MS. HILL:  Respondent's attorney is

24   Patricia Hill, H-I-L-L, with Smith Gambrell &

25   Russell, 50 North Laura Street, Suite 2600,

1  Jacksonville, Florida 32202.

2          JUDGE ROSAS:  All right.  Counsel and

3  General Counsel, you have handed up the set of

4  the formal papers.  Can you identify them for

5  the record?

6          MR. WIESE:  Yes, your Honor.  I have

7  introduced a set of the formal papers.  General

8  Counsel 1A through 1KK inclusive.  1KK being the

9  index and description of the formal documents.

10          JUDGE ROSAS:  Okay.  Has everybody had

11  an opportunity to review those?

12          MS. HILL:  I have.

13          JUDGE ROSAS:  Okay.  Any objection?

14          MR. RYAN:  No objection.

15          JUDGE ROSAS:  Okay.  So General

16  Counsel's formal papers are received into

17  evidence as stated.

18              (GCX 1A-1KK received.)

19          JUDGE ROSAS:  All right.  Before we

20  proceed, do I understand there are some

21  stipulations?

22          MR. WIESE:  Yes, your Honor.  The

23  parties were able to reach a stipulation which I

24  have marked as Joint Exhibit 1.  It resolves the

25  supervisory status issues that were raised by

1   respondent's most recent answer.  It includes

2   dates that the individuals in question had

3   the -- had their positions.  The most notable

4   change from the answer -- or excuse me -- from

5   the complaint is that the General Counsel has

6   withdrawn Michael Schwager as an individual with

7   supervisory authority.

8           JUDGE ROSAS:  Okay.  Is there anyone

9   denied in the initial complaint that is still

10  denied supervisory allegations?

11          MR. WIESE:  No.  No, your Honor.  This

12  resolves all supervisory status allegations.

13          MS. HILL:  One exception is that

14  especially for Mr. Bogard -- Bogardus, excuse

15  me, that his time frame is a little different

16  from originally stated if I am not mistaken,

17  correct?  And the same for Mr. Pender.  He just

18  said -- you know, I just want to make sure that

19  you know, the parties acknowledge the fact that

20  the time frame for these supervisory status is

21  different from what was in the complaint, okay.

22          MR. WIESE:  That's correct.  This is

23  the parties' agreement as to the positions that

24  these individuals held during the time frames

25  indicated in the stipulation and that during

1    those times that these individuals held 211

2    authority.

3            JUDGE ROSAS:  Okay.  So that's noted.

4    All right.  Before we proceed, is there going to

5    be a request for a sequestration order in this

6    case?

7            MR. WIESE:  Yes, your Honor.

8            JUDGE ROSAS:  All right.  So counsel

9    having invoked that rule, it will be invoked and

10   requiring the witnesses be sequestered.  Meaning

11   that all persons who are going to testify in

12   these proceedings, specific exceptions, may only

13   be present in hearing when they are giving

14   testimony.

15           The exceptions are alleged

16   discriminatee, natural persons who are parties,

17   representatives of natural parties and a person

18   who is shown by party to be essential to the

19   presentation of the party's cause.  They may

20   remain in the hearing room even if they are

21   going to testify or have testified; however,

22   such individuals may not remain in the hearing

23   room when other witnesses are being called by

24   the same party to testify to matters that are in

25   dispute that those witnesses will be expected to

1    testify about.

2          Okay.  I believe we addressed some of
3    that in the conference call.  We can go over it
4    again as the issues come up.  There is certain
5    exceptions that I have granted over the years
6    with respect to complex matters; but otherwise,
7    if it's someone that you are going to be calling
8    that your designated individual is also going to
9    follow and testify about, corroborating or
10   accumulatively or whatever the case may be and
11   the matter is something that I will need to make
12   credibility resolution about, that individual
13   will be expected to step out.  Someone else on
14   behalf of the party can be designated for that
15   individual in lieu thereof while that is
16   transpiring.

17         Okay.  So from this point on until the
18   hearing is finally closed, no witness may
19   discuss with other potential witnesses either
20   the testimony that they have given or that they
21   intend to give.  The best way to avoid any
22   problems is simply not to discuss the case with
23   any other potential witnesses until after the
24   hearing is completed under the rule as applied
25   by the Board with one exception.  Counsel for a

1   party may not in any way manner including the

2   showing of transcripts inform a witness about

3   the content of testimony given by a preceding

4   witness without my express permission.

5          The exception is that counsel may

6   inform a witness' -- counsel's own witness of

7   the content of testimony including the showing

8   of transcripts given by a witness for the

9   opposing side in order to prepare for rebuttal

10  of such testimony.  Counsel are expected to

11  police the rule, bring any violations or issues

12  with respect to it to my attention immediately.

13         It is the obligation of counsel to

14  inform potential witnesses who are not now

15  present in the hearing room of their obligations

16  under the rule.  Any questions?

17         MR. RYAN:  No.

18         MS. HILL:  Yes.  All right.  You have

19  two witness rooms over there.  Have they been

20  designated?

21         JUDGE ROSAS:  Let's go off the record.

22              (Whereupon, a discussion was had

23               off the record.)

24         JUDGE ROSAS:  All right.  Back on the

25  record.  So before we continue, we have had the

1   matter of petition to revoke subpoena --

2   subpoenas served by the General Counsel and by

3   the Charging Party.  The matter was referred to

4   Judge Sharon Steckler for ruling,

5   recommendation, special master report.  She

6   issued a first part thus far.

7          My understanding is she is going to

8   continue to work on it to the best of her

9   ability based on the volume and from what it

10  sounds like, it's going to take some time.  I

11  appreciate her working over the weekend to do

12  that in order for us to try to make some gains

13  and progress in this case.

14         Is there anything -- so my

15  understanding from reading the first part of her

16  report is that there are no issues with respect

17  to the production by the Charging Party for the

18  allegedly privileged material on their part;

19  however, respondent there is some issues there

20  that Judge Steckler has.  That is still

21  outstanding.

22         Now I don't know what's your position,

23  General Counsel, at this juncture?  You may

24  recall my initial conference call that, you

25  know, it's my cardinal rule to proceed.  I don't

1  make these rules up.  They don't always work in

2  great synchronicity but this is what it is and

3  you are entitled to all of the documentation

4  before you close your prime facia case; so

5  that's the best I can tell you.

6        And as far as any other requests, you

7  know, everything would be reserved at this

8  juncture and you have to proceed the best you

9  can and when you get to a juncture where you

10 believe you may have a problem with proceeding

11 further, obviously you'll raise that and I'll

12 make a determination at that point.  All right.

13        Are you ready to call your first

14 witness or you are ready for an opening?  Do you

15 have an opening?

16        MR. WIESE:  I do have an opening, your

17 Honor, but before I proceed to my opening, just

18 a point of clarification with regard to the

19 subpoenas.  To the extent there are production

20 issues not related to privilege but documents

21 that we believe exist that were not -- may not

22 have been provided pursuant to the subpoena, do

23 you want me to raise those issues with you or

24 are those issues appropriately raised with Judge

25 Steckler?

1          JUDGE ROSAS:  That has nothing to do

2     with privilege, correct?

3          MR. WIESE:  That's correct.

4          JUDGE ROSAS:  So that's before me.

5          MR. WIESE:  Okay.  Okay.

6          JUDGE ROSAS:  Okay.

7          MR. WIESE:  Well, your Honor, with

8     respect to that point, we have received some

9     initial production from respondent.  It's being

10    reviewed by my colleagues on the other side of

11    the door.  We -- you know, my intent is once

12    that initial review is completed to raise, you

13    know, any issues if they exist with regard to

14    production at that time.

15          JUDGE ROSAS:  Okay.  All right.  So,

16    General Counsel, you can give a brief opening,

17    Charging Party, you can follow.  Respondent, you

18    would follow Charging Party.  Both of you can

19    opt to waive or reserve until the opening of

20    your respective cases, if any, so that's where

21    we are.  General Counsel?

22          MR. WIESE:  Thank you, your Honor.

23    Your Honor, this is a case with two parts.  The

24    first part of this case involves respondent's

25    surface bargaining and with respect to the

1  surface bargaining in this case.  This isn't a

2  classic proposals based surface bargaining case.

3  The reason for this is, as the evidence will

4  demonstrate, is the respondent so frustrated the

5  bargaining by its continual delays in scheduling

6  negotiations and its delays during the parties'

7  negotiations, that the parties could not even

8  get to a point where they could engage in an

9  honest exchange of proposals.

10        The evidence will demonstrate that the

11  bargaining began on May 22nd of 2018 and

12  concluded with regard to collective bargaining

13  negotiations on July 9th of 2019.  During this

14  period of time, respondent thwarted the

15  potential for any productive negotiations

16  through a pattern of delay and unresponsiveness.

17  The evidence will show that this delay began at

18  the very outset of bargaining.

19        The union in this case was certified in

20  March of 2018, and after being certified, the

21  union sent an initial request for bargaining

22  shortly thereafter.  Respondent's response to

23  that initial request for bargaining was that it

24  can only begin bargaining on May 22nd of 2018.

25  Its justification for doing so was that it was

1  too busy to meet.

2          This too busy excuse, as the evidence

3  will demonstrate, became a mantra for

4  respondent, one that it relied on continuously

5  in response to the union's request to engage in

6  more frequent bargaining.  When the union would

7  propose to meet the week following that session,

8  respondent would state that it was too busy.

9  When the union would propose to meet on

10  consecutive days to accommodate respondent's

11  travel schedules, the evidence will demonstrate

12  again that respondent claimed it was too busy.

13          When respondent would agree to

14  sessions, its negotiators would often show up

15  late or cancel sessions with little notice for

16  suspicious reasons; and in the end, the evidence

17  will demonstrate that between the union's

18  March 2018 certification and July 2019,

19  respondent only attended 13 bargaining sessions

20  with the union.  Over a period of 17 months,

21  only 13 bargaining sessions took place,

22  justified by a facially unlawful busy negotiator

23  defense.

24          The evidence will further demonstrate,

25  your Honor, that when respondent did actually

Page 17

1  appear for bargaining, it engaged in conduct

2  that demonstrated an unwillingness to bargain in

3  good faith.  The evidence will show that this

4  included taking lengthy and unproductive

5  caucuses in which respondent would be away from

6  the table for hours and come back with no new

7  proposals.

8  During these lengthy caucuses, the

9  evidence will demonstrate that members of the

10  union's bargaining team routinely saw members of

11  respondent's negotiating team engaged in their

12  day-to-day work.  The evidence will show that

13  respondent often ended sessions early claiming,

14  again, that it was too busy to continue

15  negotiating.

16  At later sessions as the union

17  attempted to transition discussion toward more

18  substantive issues such as wages, respondent

19  repeatedly stated that it was unwilling to

20  discuss these items until, quote, "all language

21  issues were figured out."  When the union

22  subsequently tried to resolve language issues,

23  respondent's chief negotiator, Pat Hill, stated

24  that there were unwritten articles missing from

25  the union's proposals and then failed to

1    identify what those articles were.

2           Finally, the evidence will demonstrate

3    that respondent, without any justification

4    whatsoever, refused to agree to dues checkoff.

5    These are all classic indicia of surface

6    bargaining will be proven by clear evidence in

7    the record in this case.

8           The second half of this case, your

9    Honor, rests on respondent's unilateral

10   elimination of the entire bargaining unit at

11   issue in August of 2019.  The termination of

12   this unit was unlawful under two separate

13   theories.  First, that it was unlawfully

14   motivated by union animus and the union's charge

15   filing activities with the Board; and second,

16   because respondent engaged in this conduct

17   without producing notice and an opportunity to

18   bargain with the union.

19          With regard to the motive analysis, the

20   evidence will demonstrate that in response to

21   respondent's unlawful conduct at the table, the

22   union engaged in a publicity campaign involving

23   bannering at customers' job sites and picketing

24   at other Sunbelt locations.  These economic

25   weapons, as respondent will undoubtedly know,

1   were effective in putting pressure on Sunbelt at

2   the bargaining table; however, rather than

3   exercising any lawful response, the evidence

4   will demonstrate that Sunbelt simply eliminated

5   the bargaining unit and respondent's

6   justification for this was that it was due to

7   the union's activity and its effect on the

8   employer.

9         In other words, because of the union's

10  conduct, respondent terminated the represented

11  employees who never engaged in any of the

12  union's publicity campaigns.

13        The evidence will further demonstrate

14  that this elimination of the unit was driven by

15  animus toward the union employees.  Respondent

16  has numerous facilities all of which have

17  allegedly been affected by the union's publicity

18  campaign, yet despite supposedly heavy losses,

19  respondent only chose to target the two

20  represented employees in the union's

21  jurisdiction.

22        The evidence will further demonstrate

23  that there is little to no explanation as to why

24  these two employees were targeted as opposed to

25  the many other unrepresented Sunbelt employees

1   and that since these employees were terminated,

2   that respondent has continued to do the same

3   work using nonbargaining unit employees at the

4   facility at issue in this case and at other

5   nearby facilities.

6          The evidence will further demonstrate

7   that respondent's termination of the unit

8   independently violated the Act because of

9   respondent's failure to bargain about the

10  decisions.  The type of transition here is

11  clearly amenable to the bargaining process.

12  Respondent continues to engage in the same work

13  and is simply using different nonunion

14  employees.

15         There was no large scale restructuring

16  of the business nor did it amount to closure of

17  the facility.  It simply amounted to the

18  transfer of work from union employees to

19  nonunion employees, an action that triggers

20  respondent's legal obligations to bargain with

21  the union that represents its employees.

22         The evidence will show that respondent

23  ignored this obligation, that it announced the

24  decision on August 7, 2019 as a fait accompli

25  and thereafter implemented it on August 8th of

1    2019.  Accordingly, under either a motive base

2    theory or a bargaining theory the evidence will

3    demonstrate that respondent's elimination of the

4    bargaining unit was unlawful.  Thank you.

5              JUDGE ROSAS:  Charging party, anything?

6              MR. RYAN:  Your Honor, I had a short

7    opening statement but general counsel's was much

8    more detailed so I will just opt out at this

9    time.

10             JUDGE ROSAS:  What's your pleasure?

11             MS. HILL:  Waive also for the record.

12             JUDGE ROSAS:  You are waiving or

13   reserving?

14             MS. HILL:  Reserving.

15             JUDGE ROSAS:  Reserving until the

16   opening of your case.  Is there anything else

17   before you call your first witness?

18             MR. WIESE:  No, your Honor.

19             JUDGE ROSAS:  Okay.  Let's do it.

20             MR. WIESE:  Counsel for the General

21   Office calls Michael Ervin to the stand.

22                  (Witness sworn.)

23             JUDGE ROSAS:  Please have a seat and

24   state and spell your name and provide us with an

25   address.

 1           THE WITNESS:  Michael Ervin,

 2    M-I-C-H-A-E-L, last name E-R-V-I-N.

 3           JUDGE ROSAS:  Address?

 4           THE WITNESS:  8449 Westminster Drive,

 5    Sturtevant, Wisconsin 53177.

 6                   MICHAEL ERVIN,

 7    after being first duly sworn, deposeth and saith

 8    as follows:

 9                 DIRECT EXAMINATION

10    BY MR. WIESE:

11        Q.    Mr. Ervin, what is your current

12    occupation?

13        A.    I am an organizer for the Operating

14    Engineers Local 139.

15        Q.    And what do you do as an organizer for

16    Local 139?

17        A.    Basically trying to gain more

18    membership, market share whether it be through

19    individuals and/or contractors and employers.

20        Q.    As an organizer, do you have any role

21    in collective bargaining negotiations?

22        A.    Yes.

23        Q.    Can you explain what that role is?

24        A.    With the units that I have obtained, I

25    am involved in those negotiations.

 1    Q.   How long have you been an organizer

 2  with Local 139?

 3    A.   A little over six years.

 4    Q.   Do you hold any other positions with

 5  Local 139?

 6    A.   I do not.

 7    Q.   And during your time working for

 8  Local 139, how many collective bargaining

 9  agreements have you been involved with?

10    A.   Three.

11    Q.   Are you familiar with the respondent in

12  this case Sunbelt Rentals, Inc.?

13    A.   Yes.

14    Q.   How are you familiar with them?

15    A.   The Franksville location is the

16  location that voted the union in back in March

17  of 2018.

18    Q.   Were you involved in organizing that

19  unit?

20    A.   Yes.

21    Q.   And have you participated in collective

22  bargaining negotiations with respect to the

23  Franksville unit?

24    A.   Yes.

25    Q.   Let me show you what's been previously

1  marked as General Counsel Exhibit 2.

2          JUDGE ROSAS:  Let's go off the record.

3                (Whereupon, a discussion was had

4                 off the record.)

5          JUDGE ROSAS:  All right.  Back on the

6  record.

7  BY MR. WIESE:

8      Q.   Mr. Ervin, I'd like to direct your

9  attention to what's previously been marked as

10  General Counsel Exhibit 2.  Do you recognize

11  that document?

12      A.   Yes.

13      Q.   What is it?

14      A.   It's the certification of the

15  Franksville -- Sunbelt Franksville bargaining

16  unit.

17          MR. WIESE:  I'll offer General Counsel

18  Exhibit 2.

19          JUDGE ROSAS:  Any objection?

20          MS. HILL:  No.

21          JUDGE ROSAS:  General Counsel's 2 is

22  received.

23                (GCX 2 received.)

24  BY MR. WIESE:

25      Q.   Mr. Ervin, have you participated in

1    collective bargaining negotiations with Sunbelt

2    for this unit?

3        A.   Yes.

4        Q.   In what capacity?

5        A.   Pretty much the lead spokesperson.

6        Q.   How many of the party's bargaining

7    sessions have you attended?

8        A.   13.

9        Q.   Have you missed any sessions?

10       A.   Yes.

11       Q.   How many have you missed?

12       A.   Two.

13       Q.   At the sessions you have attended, who

14   served as the primary negotiator for the

15   employer?

16       A.   Pat Hill.

17       Q.   Who else was present for the employer?

18       A.   Regional vice president Jason Mayfield,

19   regional manager Robert Bogardus and the profit

20   center manager Brian Anderson.

21       Q.   Did any of these individuals that you

22   named take an active role in negotiations?

23       A.   A little bit.

24       Q.   Who?

25       A.   Mostly Jason Mayfield.

1      Q.   Who was in attendance from the union
2    besides yourself?
3      A.   Our chief of staff, Steve Buffalo; our
4    district manager, Greg West; our business rep,
5    Dan Marsolek, and bargaining unit member, Jamie
6    Smith.
7      Q.   Who served as the chief note taker for
8    the union?
9      A.   Greg West.
10     Q.   I'd like to direct your attention now
11   to General Counsel Exhibit 3.  Do you recognize
12   this document?
13     A.   Yes.
14     Q.   What is it?
15     A.   It's the letter that I sent to regional
16   manager Bo Bogardus, Robert Bogardus, asking for
17   negotiation dates starting the 9th of
18   April 2018.
19     Q.   Why was the union requesting to begin
20   negotiations at this time?
21     A.   To get the process started.
22          MR. WIESE:  I'll offer General Counsel
23   Exhibit 3.
24          MS. HILL:  No objection.
25          JUDGE ROSAS:  Respondent's

1   3 -- General Counsel's 3 is received.

2              (GCX 3 received.)

3   BY MR. WIESE:

4       Q.   I'd like to direct your attention to

5   General Counsel Exhibit 4.

6       A.   Uh-huh.

7       Q.   Do you recognize this document?

8       A.   Yes.

9       Q.   What is it?

10      A.   It's the E-mail from Pat Hill letting

11  us know that they will not be able to

12  negotiate -- start negotiations until May 22nd

13  of 2018.

14      Q.   And was this the first communication

15  that you received from the employer regarding

16  scheduling negotiations?

17      A.   Yes.

18           MR. WIESE:  I'll offer General Counsel

19  Exhibit 4.

20           MS. HILL:  No objection.

21           JUDGE ROSAS:  GCX 4 is received.

22              (GCX 4 received.)

23  BY MR. WIESE:

24      Q.   Mr. Ervin, did the parties end up

25  meeting on May 22nd of 2018?

```
 1      A.   Yes.  Yes.

 2      Q.   Did the parties meet on time that day?

 3      A.   Yes.

 4      Q.   Approximately what time did the

 5 negotiations begin?

 6      A.   8:00 o'clock.

 7      Q.   I'd like to direct your attention to

 8 General Counsel Exhibit 15 which is going to be

 9 down in the stack a little bit buried.  It's

10 about two-thirds of the way through the stack.

11      A.   I got it.

12           MR. WIESE:  Does everybody else have

13 15?

14           MS. HILL:  Yes.  I just noticed I don't

15 have a 14.

16           MR. WIESE:  Right.

17           MS. HILL:  All right.  I just want to

18 be sure first time I noticed there wasn't one.

19           MR. WIESE:  Uh-huh.

20 BY MR. WIESE:

21      Q.   Mr. Ervin, do you recognize this

22 document?

23      A.   Yes.

24      Q.   Okay.  What is it?

25      A.   It's negotiating committee ground rules
```

1    that we proposed to Sunbelt on May 22, 2018.

2        Q.    When did the union propose these ground

3    rules during negotiations?

4        A.    At the beginning of the session.

5        Q.    Who presented these proposed rules?

6        A.    I did.

7        Q.    What response, if any, do you recall

8    the employer having when you presented these

9    ground rules?

10       A.    That they will not enter into any

11   negotiating ground rules.

12             MR. WIESE:  I'll offer General Counsel

13   Exhibit 15.

14             MS. HILL:  I just want to be sure --

15             JUDGE ROSAS:  Voir dire?

16             MS. HILL:  Yes.

17                  VOIR DIRE EXAMINATION

18   BY MS. HILL:

19       Q.    This No. 3 on here says that the

20   meetings will alternate between Janesville Sand

21   & Gravel and the union's location of choice?

22       A.    Yes.  It was a typo back then that you

23   referenced.

24             MS. HILL:  Okay.  I just want to be

25   sure.  No objection.

1          JUDGE ROSAS:  General Counsel's 15 is

2    received.

3                    (GCX 15 received.)

4              DIRECT EXAMINATION (resumed)

5    BY MR. WIESE:

6       Q.   Mr. Ervin, after the union presented

7    these ground rules, what do you recall the

8    parties discussing next?

9       A.   We discussed or I gave them our

10   comprehensive proposal without economics.

11      Q.   And if you direct your attention to

12   General Counsel Exhibit 6A, do you recognize

13   this document?

14      A.   Yes.

15      Q.   Okay.  And what is it?

16      A.   It's the comprehensive proposal that

17   Dan Marsolek and myself put together with

18   similar language from other locals that Sunbelt

19   is assigned to.

20      Q.   And who presented this proposal to the

21   employer during bargaining?

22      A.   I did.

23      Q.   And when you presented this proposal to

24   the employer in bargaining, what, if any,

25   response did they have to it?

1       A.   That they needed time to go through it.

2       Q.   Who said that?

3       A.   Pat Hill.

4            MR. WIESE:  I'll offer General Counsel

5    Exhibit 6A.

6            MS. HILL:  No objection.

7            JUDGE ROSAS:  General Counsel 6A is

8    received.

9                 (GCX 6A received.)

10   BY MR. WIESE:

11      Q.   I am going to show you what's been

12   marked as or I'd like to direct your attention,

13   actually to General Counsel Exhibit 7A.

14      A.   Okay.

15      Q.   Okay.  Do you recognize this document?

16      A.   Yes.

17      Q.   What is it?

18      A.   It's some proposals that Pat Hill gave

19   us on behalf of Sunbelt.

20      Q.   When were these proposals given?

21      A.   May 22, 2018.

22      Q.   Whose handwriting is on this document?

23      A.   Mine.

24      Q.   Okay.  And looking in the upper

25   left-hand corner of the pages of this exhibit, I

1   see some underlying numbers and some other

2   numbers that aren't underlined.  Do you see

3   those numbers?

4       A.   Yes.

5       Q.   What do those numbers signify?

6       A.   Those numbers signify the article that

7   the proposal from Sunbelt was originally from

8   our proposal.

9       Q.   And when you say your proposal, are you

10  talking about General Counsel Exhibit 6A?

11      A.   Yes.

12      MS. HILL:  Okay.  I have a bit of a

13  concern.  I see a reference to Mr. Ryan on 3 of

14  4.  I want to make sure that this is not to be

15  considered privileged.

16      MR. RYAN:  Correct.  I mean, to the

17  extent that it was privileged, we produced them

18  to the Region as part of our case so we are not

19  asserting --

20      MS. HILL:  Okay.  I just want to be

21  sure.

22      MR. RYAN:  Thank you.

23      JUDGE ROSAS:  You are talking about 7A?

24      MS. HILL:  Yes.  It's on Page 3 of 4,

25  just about the middle of the page it references

1   Mr. Ryan out of abundance of caution.

2            MR. RYAN:  Thank you.

3            MS. HILL:  Go ahead.

4            JUDGE ROSAS:  Are you finished with

5   the --

6            MS. HILL:  It was clarified.

7            MR. WIESE:  No, your Honor.  I do have

8   a few more things I'd like to clarify in this

9   document.

10  BY MR. WIESE:

11       Q.   Sir, if you go to Page 1 of the

12  document, the letters TA, what do those signify?

13       A.   Tentatively agreed upon.

14            JUDGE ROSAS:  Hold on one second.  Just

15  so we can get a ground rule down, when you have

16  enough of a foundation as to what a document is,

17  without actually describing the content of it,

18  which may or may not be an issue, it needs to be

19  offered at that time because I don't want

20  matters being read into the record that are not

21  going to be going into evidence, so you are

22  offering this document?

23            MR. WIESE:  Understood.  Yes, I am,

24  your Honor.

25            JUDGE ROSAS:  Okay.  Any objection,

1  Counsel, to 7A?

2        MS. HILL:  No objection.  Other than

3  this was not in the format that Sunbelt had

4  given it to the --

5        JUDGE ROSAS:  Go ahead.  Do you want to

6  ask the witness a question or --  Counsel?

7        MS. HILL:  Okay.  I can ask Mr. -- Mr.

8  Ervin, when Sunbelt presented this document that

9  has been marked as General Counsel Exhibit 7A,

10  was it a two-sided document?

11        THE WITNESS:  No.

12        MS. HILL:  Did it have any of the

13  handwriting that you see on there?

14        THE WITNESS:  No.  That's my

15  handwriting.

16        MS. HILL:  Okay.  All right.  Thank

17  you.  Oh, and by the way, this is cut off at the

18  top in the upper right.  What does that say?

19        THE WITNESS:  Sunbelt's.

20        MS. HILL:  Thanks.

21        JUDGE ROSAS:  So you are offering this

22  for what purpose?  For the original version

23  without the writing or the writing to reflect

24  something documented by the witness you need to

25  when you completed your questioning -- well,

1  actually you need to tell me now.

2          MR. WIESE:  Okay.

3          JUDGE ROSAS:  What are you offering

4  this for?  Is the writing important?

5          MR. WIESE:  Yes, it is, your Honor.  I

6  am offering it with respect to the entire

7  document including the handwriting on the

8  document.

9          JUDGE ROSAS:  Okay.  Counsel, do you

10  have an issue with that?  He says that's what

11  this witness wrote on there.  Do you want to

12  question him about that?

13          MS. HILL:  Question which one?  If this

14  is going to be offered for purposes of

15  refreshing the recollection of the witness, I

16  mean, that's one thing.  We have produced the

17  original of all of these proposals, these four

18  and everything else, so I am not exactly sure

19  what the purpose is for having this handwriting

20  on it.

21          MR. WIESE:  Well, as we'll get into

22  later and -- well, let me ask you, your Honor,

23  do you want me to make relevance arguments in

24  front of the witness or how do you like that

25  issue being handled?

 1          JUDGE ROSAS:  No.  I think it's simply

 2   a question.  I mean, this happens all the time

 3   but the question becomes because oftentimes it's

 4   a matter of the document being received, deemed

 5   in its original version without the writing,

 6   just ignore the writing, okay.  In this

 7   instance.  You want the writing considered.

 8          MR. WIESE:  Yes, your Honor.

 9          JUDGE ROSAS:  Okay.  What's the purpose

10   of that?  As counsel indicated, is it for past

11   recollection recorded?

12          MR. WIESE:  No.  It's for -- it's

13   relevant evidence that will be established

14   through later testimony and documents.  The fact

15   that --

16          MS. HILL:  I'm sorry.  I apologize.

17          MR. WIESE:  Is that there is article

18   numbers being written, you know, that all of

19   this is needing to be recorded as bargaining is

20   occurring is something that is important.

21          JUDGE ROSAS:  Sir, when did you make

22   these notations on this document?

23          THE WITNESS:  During our caucus.

24          JUDGE ROSAS:  Okay.  And was this

25   something that you routinely do?

1                    THE WITNESS:  Uh-huh.

2                    JUDGE ROSAS:  During bargaining?

3                    THE WITNESS:  Yes, sir.

4                    JUDGE ROSAS:  Write on the proposal

5      that's been given to you?

6                    THE WITNESS:  Yes, sir.

7                    JUDGE ROSAS:  All right.  So it sounds

8      like the witness has established a foundation

9      for it essentially being in the context of

10     bargaining a business record, if you will,

11     contemporaneous business record, okay, as close

12     as those come under 803(6) Federal Rules of

13     Evidence so I am going to receive it.  Do you

14     have an objection?

15                    MS. HILL:  For that purpose, no

16     objection, your Honor.  However --

17                    JUDGE ROSAS:  He says it's

18     contemporaneous with the meetings.

19                    MS. HILL:  But the best evidence based

20     on what the General Counsel's attorney said it

21     appears they want to show all the many, many

22     written proposals that Sunbelt gave to the union

23     over the course of the negotiation sessions and

24     the best evidence of that would be the clean

25     copies so if it's going to be his notes,

1   something different --

2            JUDGE ROSAS:  If they don't put in a

3   clean copy you will, right?

4            MS. HILL:  Yes, sir.

5            JUDGE ROSAS:  All right.  So General

6   Counsel 7 is received.

7            MR. WIESE:  7A.

8            JUDGE ROSAS:  7A.

9                 (GCX 7A received.)

10  BY MR. WIESE:

11      Q.   Mr. Ervin, going back to the

12  handwriting on this document, the letters TA

13  what does that signify?

14      A.   Tentatively agreed upon.

15      Q.   Okay.  And the date next to that, what

16  does that signify?

17      A.   That was the date it was tentatively

18  agreed upon.

19      Q.   Okay.  And when did you add those

20  notations?

21      A.   That notation was added on 6 -- that's

22  a typo -- 6/26 of '18.

23      Q.   Okay.  And what happened that day?

24      A.   That's the day that we agreed upon this

25  document here that was given to us on May 22,

1    2018.

2         Q.    So besides these two proposals that we

3    discussed, what else do you recall the parties

4    discussing at the beginning of the negotiations

5    on May 22nd?

6         A.    They originally wanted us to caucus in

7    our cars.

8         Q.    And how did that topic come about?

9         A.    Pat Hill had said that they didn't have

10   the room and we had originally caucused in our

11   cars until Steve Buffalo raised the issue and

12   then they went to another location to caucus.

13        Q.    Did the -- in response to that, did

14   anyone from the union raise an issue with

15   changing the bargaining location?

16        A.    Yes.  Steve Buffalo.

17        Q.    What did Mr. Buffalo say?

18        A.    He had said that we should have neutral

19   locations going forward for bargaining sessions.

20        Q.    Did the employer have a response to

21   that?

22        A.    Yep.  Pat Hill stated that this place

23   would be fine.  We will only bargain here.

24        Q.    Besides the discussion of bargaining

25   locations, do you recall any other discussions

1   at the outset of the May 22nd negotiations?

2       A.   Yes.  We were asking for the following

3   weeks to bargain and Pat Hill had stated that

4   they were too busy to -- Sunbelt to was too busy

5   to bargain until June 26, 2018.

6       Q.   Did the union accept that date?

7       A.   Yes.

8       Q.   Why?

9       A.   Because we figured if we didn't accept

10  that date it would only be further than that,

11  later than that.

12      Q.   Did either party declare any caucuses

13  during those negotiations on May 22nd?

14      A.   Yes.

15      Q.   Who?

16      A.   Sunbelt.

17      Q.   Do you recall approximately how long

18  that caucus lasted?

19      A.   Maybe an hour.

20      Q.   Okay.  And what happened after the

21  employer came back to the table from its caucus?

22      A.   Pat Hill had stated that they needed

23  more time to go through our proposal so we ended

24  the session.

25      Q.   And approximately how long were the

1   parties at the bargaining table at the time of

2   the negotiations ended?

3        A.   Hour and a half.

4        Q.   Were you in attendance at the parties'

5   negotiating session?

6        A.   Yes.

7        Q.   And when did that session take place?

8        A.   June 26, 2018.

9        Q.   How do you recall that session

10  beginning?

11       A.   It stared with a --

12            THE REPORTER:  I'm sorry.  Your Honor,

13  I didn't hear that.

14            JUDGE ROSAS:  Can you repeat that?  It

15  started with --

16            THE WITNESS:  A safety moment.

17            THE REPORTER:  Oh, thank you.

18            THE WITNESS:  Yes, sir.  You're

19  welcome.

20  BY MR. WIESE:

21       Q.   Who requested to hold the safety

22  moment?

23       A.   Pat Hill.

24       Q.   What is a safety moment?

25       A.   Sunbelt uses that time to discuss

1  safety concerns to be well aware of that to move

2  forward and be safe.

3      Q.   And what did the safety moment at the

4  beginning of the negotiations on June 26th what

5  was that safety moment about?

6      A.   Brian Anderson the profit center

7  manager had referenced being cautious while

8  driving with deer running rampant.  Something

9  that you would typically not think too much of

10 in the summer.  You'd think about that more or

11 less in the fall when the deer rut season was

12 going on.

13     Q.   And did that safety moment have any

14 relevance to the negotiation of terms and

15 conditions of employment?

16     A.   Nope.

17     Q.   How often did you have safety moments

18 going forward at negotiations?

19     A.   A handful, not every time.  A handful

20 of times.

21     Q.   Can you be any more specific?

22     A.   Five times.

23     Q.   How long did the safety moment on

24 June 26th take?

25     A.   Five plus minutes.

1     Q.   And what about going forward, how long

2   did the safety minutes typically take?

3     A.   5 to 10 minutes was pretty common.

4     Q.   After the safety moment on June 26th,

5   what do you recall the parties discussing next?

6     A.   Steve Buffalo again asked for neutral

7   locations and Pat Hill again stated that we were

8   not going to meet anywhere else.

9     Q.   Was there any discussion about future

10  negotiating dates at that time?

11    A.   Yes.

12    Q.   And what do you recall from those

13  discussions?

14    A.   We were asking for consistent weeks to

15  work with Pat Hill's travel from Florida, so...

16    Q.   Who requested that specifically from

17  the union?

18    A.   I did.

19    Q.   Okay.  And when you say consecutive

20  weeks, can you recall any more specifically what

21  you had requested?

22    A.   The following week.

23    Q.   And what response, if any, did the

24  employer negotiators have?

25    A.   Pat Hill stated they were too busy to

1    meet.

2        Q.    Okay.  Did you make any other offers to

3    try to accommodate Ms. Hill's travel schedule?

4              MS. HILL:  Objection.  Form.

5              JUDGE ROSAS:  What as to form?  More

6    specific.

7              MS. HILL:  He said it was that it was

8    Sunbelt was too busy.  He is making the leap

9    that it was based on my schedule.

10             JUDGE ROSAS:  Okay.  Rephrase.

11   BY MR. WIESE:

12       Q.    All right.  Do you recall any other

13   discussions about the frequency of negotiations

14   at the outset of the June 26th negotiations?

15       A.    Just that Sunbelt was too busy.

16       Q.    Do you recall anything else?

17       A.    I do not.

18       Q.    Okay.  Is there a document that would

19   help you refresh your recollection?

20       A.    My affidavit.

21             MR. WIESE:  Okay.  And, your Honor,

22   would you like exhibits marked that are used for

23   refreshing recollection?

24             JUDGE ROSAS:  Only if counsel requires

25   it.

1  BY MR. WIESE:

2      Q.   Let the record reflect I am showing the

3  witness a copy of his affidavit.  Mr. Ervin, I'd

4  specifically like to direct you to on Page 5

5  Paragraph 13 --

6           JUDGE ROSAS:  Do you want to show

7  counsel what you are showing him?

8           THE WITNESS:  You said 5 through 13?

9  BY MR. WIESE:

10     Q.   Page 5, Paragraph 13.

11     A.   Oh.  Thank you, sir.

12     Q.   Please peruse that document and let me

13  know when you are ready.

14     A.   Okay.

15     Q.   Mr. Ervin, is your recollection now

16  refreshed as to the other discussions around

17  scheduling?

18     A.   Yes.

19     Q.   Okay.  And what do you recall?

20     A.   The union had asked for negotiation

21  sessions on back-to-back days to help with Pat

22  Hill's schedule seeing that she is flying in

23  from Florida.

24     Q.   Who offered this from the union?

25     A.   I did.

1    Q.   What, if any, response did the employer

2  have?

3    A.   Pat Hill stated that Sunbelt was too

4  busy to meet that frequent.

5    Q.   Did the parties eventually agree to

6  dates for future negotiations?

7    A.   Yes.

8    Q.   And what dates did they agree to?

9    A.   July 30th and August 30th.

10    Q.   Who proposed those dates?

11    A.   Pat Hill.

12    Q.   Why did the union agree to those dates?

13    A.   Again, because if we didn't accept

14  those, we were concerned they would be pushed

15  back even farther.

16    Q.   I'd like to direct your attention to

17  what's been marked as General Counsel

18  Exhibit 7B.

19    A.   I am good.

20    Q.   Okay.  Mr. Ervin, do you recognize this

21  document?

22    A.   Yes.

23    Q.   Whose handwriting is on this document?

24    A.   Mine.

25    Q.   And what is this document?

1    A.   It's more proposals for -- that Pat

2  Hill gave us on behalf of Sunbelt.

3         MS. HILL:  And again, your Honor, just

4  double checking with Mr. Ryan, if you would

5  please look at 4 of 12, there is a reference

6  there of a communication with Mr. Ryan.  I just

7  want to be sure that privilege has not been

8  waived inadvertently.

9         MR. RYAN:  To the extent that there was

10  a privilege and we produced it, so we accept

11  that.

12         MS. HILL:  Okay.

13         MR. WIESE:  I'll offer General Counsel

14  Exhibit 7B.

15         MS. HILL:  Okay.  Voir dire?

16             VOIR DIRE EXAMINATION

17  BY MS. HILL:

18    Q.   Okay.  12 of 12, sir.

19    A.   Yes.

20    Q.   What is this?

21    A.   That's the safety sheet that you gave

22  us about in reference to your safety.

23    Q.   Sunbelt's safety you are saying?

24    A.   Yes Sunbelt's safety.

25    Q.   Was Page 12 of 12 a proposal for the

1   collective bargaining agreement or

2   informational?

3       A.   Just informational to my knowledge.

4       Q.   And 11 of 12, what is the

5   multi-circular drawing of --

6       A.   I was fiddling.  Nothing.

7       Q.   Okay.  Nothing relating to

8   negotiations?

9       A.   No.  No.

10          MS. HILL:  No objection, your Honor.

11          JUDGE ROSAS:  Okay.  And that is

12  General Counsel 7 constituting respondent's

13  proposal with the witness' handwriting at the

14  meeting contemporaneous with the meeting?

15          THE WITNESS:  Yes, sir.

16          JUDGE ROSAS:  It is received in

17  evidence.

18          MS. HILL:  With the exception, as he

19  admitted, the last page was not a proposal.  It

20  was informational.

21          JUDGE ROSAS:  My understanding is it

22  was handed to him during the meeting so he just

23  put it all together.

24          MS. HILL:  Okay.  Your Honor, thank

25  you.

 1                    (GCX 7B received.)

 2           THE WITNESS:  Yes, sir.

 3             DIRECT EXAMINATION (resumed)

 4   BY MR. WIESE:

 5      Q.   Mr. Ervin, with respect to the

 6   proposals in General Counsel Exhibit 7B, how did

 7   the employer initially present those proposals?

 8      A.   Some of them were verbally.

 9      Q.   And how did the union respond to the

10   employer's verbal proposals?

11      A.   Greg West stated that he liked all

12   proposals in writing.

13      Q.   Did the employer address these

14   concerns?

15      A.   Yes.

16      Q.   How did they address them?

17      A.   They took a caucus.

18      Q.   And did you receive these written

19   proposals then after the caucus?

20      A.   Yes.

21      Q.   What time -- How long do you recall the

22   negotiations lasting?

23      A.   Until around 1:30.

24      Q.   P.m. or a.m.?

25      A.   P.m. I'm sorry.

1      Q.    Thank you.  I'd like to direct your

2    attention now to General Counsel Exhibit 8.  Do

3    you have the document, Mr. Ervin?

4      A.    Yes.

5      Q.    Okay.  Do you recognize this document?

6      A.    Yes.

7      Q.    Okay.  What is it?

8      A.    It's correspondence from Pat Hill

9    stating that they could not attend the July 30th

10   meeting due to a funeral in the Sunbelt family.

11     Q.    Did this document lead to negotiations

12   being rescheduled?

13     A.    Yes.

14     Q.    To what date?

15     A.    August 8th.

16     Q.    Of what year?

17     A.    2018.

18           MR. WIESE:  I'll offer General Counsel

19   Exhibit 8.

20           MS. HILL:  No objection.

21           JUDGE ROSAS:  General Counsel's 8 is

22   received.

23                 (GCX 8 received.)

24   BY MR. WIESE:

25     Q.    Mr. Ervin, were you able to attend the

1  parties' bargaining on August 8th?

2      A.   No.

3      Q.   To your knowledge, did the parties

4  still meet for bargaining on that day?

5      A.   Yes.

6      Q.   After August 8th, when was the parties'

7  next bargaining session?

8      A.   August 30th.

9      Q.   Were you in attendance at that session?

10     A.   Yes.

11     Q.   How do you recall the negotiations

12  beginning that day?

13     A.   The unit again proposed dates to meet

14  in early September.

15     Q.   And what response -- Strike that.

16          Who from the union requested those

17  dates?

18     A.   I believe I did.

19     Q.   What response, if any, did the employer

20  have to that?

21     A.   That they were too busy to meet that

22  soon.

23     Q.   And did the parties agree to any future

24  dates?

25     A.   Yes.

1    Q.    And what dates did the parties agree

2  to?

3    A.    September 27th and October 23rd.

4    Q.    Who proposed those dates?

5    A.    Pat Hill.

6    Q.    I'd like to direct your attention now

7  to General Counsel Exhibit 7C.

8    A.    Okay.

9    Q.    Mr. Ervin, do you recognize this

10  document?

11    A.    Yes.

12    Q.    And what is it?

13    A.    It's more proposals that Pat Hill gave

14  us with my handwriting on it.

15    Q.    Were those proposals given during the

16  August 30, 2018 negotiations?

17    A.    Yes.

18         MR. WIESE:  I'll offer General Counsel

19  Exhibit 7C.

20         MS. HILL:  No objection.

21         JUDGE ROSAS:  General Counsel 7C is

22  received.

23              (GCX 7C received.)

24  BY MR. WIESE:

25    Q.    Whose handwriting is on this document,

1  Mr. Ervin?

2      A.   Mine.

3      Q.   Okay.  And the numbers in the upper

4  left-hand corner like the five underlined, eight

5  underlined, et cetera, what do those represent?

6      A.   It represents the article number that

7  was based out of our original proposal.

8      Q.   Mr. Ervin, did the employer have these

9  proposals in General Counsel's Exhibit 7C in

10 writing at the beginning of the negotiations on

11 August 30th?

12     A.   I don't believe so.

13     Q.   How did the employer initially present

14 these proposals?

15     A.   Verbally.

16     Q.   And did someone from the union raise

17 issues with how the employer was presenting

18 these proposals?

19     A.   Yes.  Greg West.

20     Q.   What do you recall Mr. West saying on

21 this topic?

22     A.   We need the proposals in writing.

23     Q.   What response, if any, did the employer

24 have to that?

25     A.   They took a caucus.

1    Q.   Did anyone from the employer say why

2    they were taking that caucus?

3    A.   I don't recall.

4    Q.   Do you recall approximately how long

5    the employer's caucus lasted?

6    A.   About an hour and a half.

7    Q.   What happened when the parties returned

8    to the table?

9    A.   That's when they -- Pat Hill gave us

10   that proposal.

11   Q.   Okay.  And when you say those

12   proposals, are you referring to the written

13   proposals in General Counsel Exhibit 7C?

14   A.   Yes.

15   Q.   And after the employer returned to the

16   table from its first caucus, how long did the

17   parties remain at the table?

18   A.   About 15 minutes.

19   Q.   And then what happened?

20   A.   They took -- Sunbelt took another

21   caucus.

22   Q.   And after Sunbelt took its second

23   caucus, how do you recall the negotiations

24   ending that day?

25   A.   Approximately two hours later, Greg

1    West said it wasn't productive for us to wait so

2    we left.

3         Q.   I'd like to direct your attention to

4    what's been marked as General Counsel

5    Exhibit 5E.

6              MR. WIESE:  Could we go off the record,

7    your Honor?

8              JUDGE ROSAS:  Off the record.

9              MR. WIESE:  Thank you.

10                  (Whereupon, a discussion was had

11                   off the record.)

12             JUDGE ROSAS:  Okay.  Back on.

13   BY MR. WIESE:

14        Q.   Mr. Ervin, do you recognize General

15   Counsel Exhibit 5E?

16        A.   Yes.

17        Q.   And what is it?

18        A.   They are my notes from the Sunbelt

19   negotiations on September 27, 2018.

20        Q.   Did you take these notes as bargaining

21   was occurring?

22        A.   Yes.  With the exception of what's in

23   the lower right-hand box that I wrote after the

24   meeting.

25        Q.   What's your process for taking

1  bargaining notes?

2      A.   Trying to write down times when things

3  have transpired and what I tried to do here is

4  write down all the articles that we were

5  discussing as we were talking that day.

6      Q.   And with respect -- with the exception

7  of the box that you indicated on the first page

8  of the document, did you change these notes in

9  any way after negotiations on September 27th?

10     A.   No.

11          MR. WIESE:  I'll offer General Counsel

12  Exhibit 5E.

13          MS. HILL:  Okay.  I am going to -- I am

14  not sure if this should be a voir dire or this

15  should be done --

16          JUDGE ROSAS:  Go ahead.  Take a crack

17  at it.

18              VOIR DIRE EXAMINATION

19  BY MS. HILL:

20     Q.   Page 1 of 3, lower left-hand corner, it

21  appears to say caucus 9/50?

22     A.   Uh-huh.

23     Q.   Verbal, please, for the court reporter,

24  sir.

25     A.   Sunbelt.

1    Q.   Yes or no?

2    A.   Yeah.  That was a caucus.

3    Q.   Okay.  What I am trying to say is

4  uh-huh and uh-uh do not work with the court

5  reporter.  You have to make it -- use it in

6  words, okay?

7    A.   Yes, ma'am.  Yeah.

8    Q.   All right.  Whose caucus?

9    A.   Sunbelt.

10    Q.   Where does it say that?

11    A.   It don't.

12    Q.   How do you know?

13    A.   Because I remember.

14    Q.   Next page.

15    A.   Uh-huh.

16    Q.   At the top, caucus, what does that

17  reflect?

18    A.   That's us, what we are discussing while

19  we are in our caucus.

20         MS. HILL:  Okay.  Now, I out of

21  abundance of caution again, Mr. Ryan, just in

22  case I don't want any inadvertent waiver of

23  privilege, I realize you produced these but

24  discussions with your partner --

25         MR. RYAN:  Yeah.  I mean, we're

1  certainly waiving any privilege that might be

2  attendant to this document but not to anything

3  that might be behind it.

4       MS. HILL:  Okay.

5  BY MS. HILL:

6    Q.  All right.  Next entry reconvene.  Is

7  that what your handwriting is?

8    A.  Yes.

9    Q.  All right.  Who requested to reconvene?

10   A.  You guys.  Sunbelt came back.

11      JUDGE ROSAS:  This is cross

12 examination.  You know what --

13      MS. HILL:  That's why I wasn't sure.

14      JUDGE ROSAS:  I am not adverse to that

15 because it obviates the need for further

16 examination later on, so...

17      MS. HILL:  Right.  And that will be a

18 lot of it.  No further questioning at least at

19 this time.  I reserve my right to question him

20 further regarding this document.

21      JUDGE ROSAS:  Okay.  General Counsel's

22 5E is received.

23              (GCX 5E received.)

24        DIRECT EXAMINATION (resumed)

25 BY MR. WIESE:

1    Q.   Mr. Ervin, going back to the first page

2  of this document, near the very top do you see

3  where it says Sunbelt negotiations there?

4    A.   Yes.

5    Q.   Okay.  And then I see a list of names

6  there, a Jamie, Steve, et cetera.  What do those

7  represent?

8    A.   Those are all the parties in attendance

9  at that meeting.

10    Q.   And then the time below that or the

11  numbers below that 8:40 underline, what does

12  that represent?

13    A.   That's when we started.  It was

14  supposed to start at 8:00 o'clock but Jason

15  Mayfield was running late so we didn't start

16  until 8:40 but he never showed up.

17    Q.   Okay.  And then going down below that

18  there is a series of number, 17.5, 17.6,

19  et cetera, on the first page.

20    A.   Uh-huh.

21    Q.   What do those numbers refer to?

22    A.   Those are the article numbers that we

23  were discussing during that negotiation session.

24    Q.   Okay.  I'd like to direct your

25  attention now to General Counsel Exhibit 7D.

1      A.    Okay.

2      Q.    Mr. Ervin, do you recognize this

3  document?

4      A.    Yes.

5      Q.    Okay.  And what is it?

6      A.    It's the proposal that Pat Hill gave us

7  on September 27, 2018.

8      Q.    Whose handwriting is on this document?

9      A.    Mine.

10     Q.    And the 15 that's underlined up top,

11 what does that represent?

12     A.    That represents the original oral

13 number from our original proposal.

14     Q.    Is that the same with regard to the 17

15 that's underlined about a third of the way down

16 that document?

17     A.    Yes.

18           MR. WIESE:  I'll offer General Counsel

19 Exhibit 7D.

20           MS. HILL:  No objection.

21           JUDGE ROSAS:  General Counsel 7D is

22 received.

23              (GCX 7D received.)

24 BY MR. WIESE:

25     Q.    Mr. Ervin, I'd like you to set aside

1  your notes and I am going to have you testify

2  independent of your notes as to your

3  recollection as to what occurred that day.  So

4  once -- what time were negotiations scheduled to

5  begin that day?

6      A.   8:00 o'clock.

7      Q.   And what time did they actually begin?

8      A.   8:40.

9      Q.   And why did negotiations begin late

10 that day?

11     A.   Jason Mayfield was running late.

12     Q.   How did you find that out?

13     A.   Pat Hill informed us of that at 8:00

14 o'clock.

15     Q.   Did Ms. Hill provide any explanation as

16 to why Mr. Mayfield was running late?

17     A.   No.

18     Q.   Did Mr. Mayfield show up for

19 negotiations at any point that day?

20     A.   Nope.

21     Q.   Once bargaining did start that day,

22 were the parties able to make progress in their

23 negotiations?

24     A.   Yes.

25     Q.   Did the parties take any caucuses that

1  day?

2      A.   Yes.

3      Q.   Who declared the caucus?

4      A.   Sunbelt.

5      Q.   How long did Sunbelt's caucus last?

6      A.   A little over an hour.

7      Q.   Did the parties return to the table

8  after the employer's caucus?

9      A.   Yes.

10     Q.   Approximately what time did bargaining

11 conclude that day?

12     A.   Around 11:30.

13     Q.   How did the bargaining at the

14 September 27th session compare to the bargaining

15 that had occurred leading up to that point?

16          MS. HILL:  Objection.  Form.  Opinion

17 rather than facts.

18          JUDGE ROSAS:  No, I'll sustain that.

19 Let's keep it a little more specific.

20 BY MR. WIESE:

21     Q.   What was different about the bargaining

22 on September 27th as opposed to the bargaining

23 that occurred on May 22nd, June 26th and

24 August -- and the parties' August session that

25 you attended?

1    A.   It was fairly productive.

2    Q.   Did you attend the parties' next

3  session after the September 27th session?

4    A.   Yes.

5    Q.   And when was that session?

6    A.   October 23, 2018.

7    Q.   Did those negotiations on October 23rd

8  start on time?

9    A.   No.

10    Q.   And why not?

11    A.   Jason -- Pat Hill informed us Jason

12  Mayfield was running behind again.

13    Q.   And what time did the negotiations

14  start or how -- Strike that.

15         How late were the negotiations in

16  starting that day?

17    A.   About 20 minutes.

18    Q.   Was Mr. Mayfield present when

19  negotiations began that day?

20    A.   I believe so.

21    Q.   What did the parties discuss at the

22  beginning of those negotiations?

23    A.   More negotiating dates.

24    Q.   And what do you recall from those

25  discussion about dates?

 1      A.   I recall we were trying to get more

 2   frequent dates than once a month but Pat Hill

 3   stated that Sunbelt was too busy to meet more

 4   than once a month.

 5      Q.   Okay.  I am going to show you what's

 6   been marked as General Counsel Exhibit 6D.  Do

 7   you have that document?

 8      A.   Yes.

 9      Q.   Okay.  Thank you.  Do you recognize

10   this document?

11      A.   Yes.

12      Q.   Okay.  And what is it?

13      A.   It's a comprehensive proposal that we

14   gave -- I gave to Sunbelt on October 23, 2018

15   with respect to where we felt things were so

16   far.

17      Q.   And with respect to the red line

18   markings on this document, what do those

19   represent?

20      A.   I believe that was the changes that

21   were made to this document from Sunbelt.

22      Q.   Okay.  And what was the purpose --

23   Well, strike that.

24           MR. WIESE:  I'll offer General Counsel

25   Exhibit 6D.

1          MS. HILL:  Okay.  A little bit of voir

2     dire.

3               VOIR DIRE EXAMINATION

4     BY MS. HILL:

5         Q.    When this was prepared?

6         A.    I gave it to you guys on October 23,

7     2018.

8          MS. HILL:  Thank you.  Sorry.  Excuse

9     me.

10    BY MS. HILL:

11        Q.    Was it in this format with draft on it

12    or was it without draft?

13        A.    I don't recall.

14          MS. HILL:  Because -- All right.  This

15    one we'll object to.

16          JUDGE ROSAS:  Because he doesn't recall

17    whether the draft stamp was on at the time?

18          MS. HILL:  Whether this was the

19    document that had been given to Sunbelt on

20    October 23rd of 2018, yes, sir.

21          JUDGE ROSAS:  Do you have any further

22    questions?

23          MR. WIESE:  Well, my response would be

24    that he authenticated it as the document that

25    was provided that day.

1    JUDGE ROSAS:  Do you recall submitting

2  to the respondent this proposal but you don't

3  recall whether the stamp draft was on it at the

4  time?

5    THE WITNESS:  Yes, sir.

6    JUDGE ROSAS:  Okay.  Counsel, your

7  objection is noted.  I am going to overrule it.

8  It's a matter that you can pursue with respect

9  to the weight, if any, that I will or will not

10  give the document.  General Counsel 6D is

11  received.

12    (GCX 6D received.)

13    DIRECT EXAMINATION (resumed)

14  BY MR. WIESE:

15    Q.   Mr. Ervin, why did the union create

16  General Counsel Exhibit 6D?  What was the

17  purpose of that document?

18    A.   We were just hoping to make sure both

19  parties were on the same page so that it would

20  make our negotiation sections going forward more

21  efficient.

22    Q.   And who presented this document to the

23  employer from the union?

24    A.   I did.

25    Q.   And what response, if any, do you

1   recall the employer having when you presented

2   General Counsel Exhibit 6D?

3       A.   I believe they took a caucus.

4       Q.   And during that caucus, did anyone from

5   the union go to see what the employer was up to?

6       A.   Yes.

7       Q.   Who?

8       A.   I did.

9       Q.   And why did you go to check on the

10  employer during that caucus?

11      A.   It was probably 30, 40 minutes in and I

12  wanted to make sure that Sunbelt knew that we

13  were ready for them, not that they would be

14  waiting for us.

15      Q.   Did you go to visit Sunbelt in their

16  caucus room?

17      A.   Yes.

18      Q.   And who did you speak to from the

19  employer?

20      A.   Pat Hill.

21      Q.   And what response did Ms. Hill have?

22      A.   That they weren't ready.

23      Q.   And after you visited the employer's

24  caucus room, what did you do?

25      A.   I went back to our caucus room.

1    Q.    And when you were in your caucus room,

2    prior to the parties returning back to the table

3    for bargaining, did you see any employer

4    representatives?

5    A.    Yes.

6    Q.    Who did you see?

7    A.    I believe it was Bo Bogardus on his

8    phone.

9    Q.    How could you see Mr. Bogardus?

10   A.    The window of negotiation/our caucus

11   room had a window in it.  I could see through

12   it.

13   Q.    And how long did you see Mr. Bogardus

14   on his phone?

15   A.    A matter of minutes.

16   Q.    Did you see any other employer

17   representatives during that caucus?

18   A.    No.

19   Q.    Did you see Mr. Bogardus on his phone

20   before or after you had visited the employer to

21   tell them you were ready to begin negotiations?

22   A.    After.

23   Q.    Did the employer eventually return to

24   the bargaining table?

25   A.    Yes.

1     Q.   All right.  How much longer after you

2 had requested or after you had told them that

3 the union was ready to resume negotiations?

4     A.   About a half hour.

5     Q.   I'd like to direct your attention to

6 General Counsel Exhibit 6C.

7     A.   Okay.

8     Q.   Mr. Ervin, do you recognize this

9 document?

10     A.   Yes.

11     Q.   What is it?

12     A.   They are the proposals that we gave

13 Sunbelt that day on October 23, 2018.

14     Q.   Did you present these proposals after

15 the employer's caucus?

16     A.   Yes.

17         MR. WIESE:  Okay.  I'll offer General

18 Counsel Exhibit 6C.

19         MS. HILL:  Another voir dire on this

20 one.

21                VOIR DIRE EXAMINATION

22 BY MS. HILL:

23     Q.   At what time did you give Sunbelt this

24 proposal?

25     A.   I don't recall the exact time of that

1    day.

2        Q.    Was it at the beginning of the

3    negotiation session, after a caucus?

4        A.    I'm sorry.  I don't recall what time it

5    was.

6            MS. HILL:  We have an objection to this

7    document, again, whether it was actually

8    presented to Sunbelt on the 23rd of October,

9    2018, sir.

10           JUDGE ROSAS:  Do you recall presenting

11   it to Sunbelt on October 23rd?

12           THE WITNESS:  Yes.  That's why I wrote

13   it on here.

14           JUDGE ROSAS:  Okay.  I am going to

15   receive it subject to that objection and any

16   weight that I may or may not give the document.

17   General Counsel 6C is received.

18                    (GCX 6C received.)

19            DIRECT EXAMINATION (resumed)

20   BY MR. WIESE:

21       Q.    Mr. Ervin, I'd like to now direct your

22   attention to General Counsel Exhibit 7E.

23       A.    Okay.

24       Q.    Do you recognize this document?

25       A.    Yes.

1     Q.   What is it?

2     A.   Sunbelt's proposals to us on

3  October 23, 2018.

4     Q.   And whose handwriting is on this

5  document?

6     A.   It's mine.

7          MR. WIESE:  I'll offer General Counsel

8  Exhibit 7E.

9          MS. HILL:  No objection, your Honor.

10         JUDGE ROSAS:  General Counsel 7E is

11 received.

12              (GCX 7E received.)

13 BY MR. WIESE:

14    Q.   Mr. Ervin, looking at the top of the

15 first page of this document, I see some numbers

16 17 equal 13, 18 equal 14, et cetera.  What do

17 those numbers represent?

18    A.   They represent the original articles

19 from ours, their 17 equals our 13 from original

20 proposal 18 is 14, 22 is 17.

21    Q.   Okay.  All right.  So after -- and the

22 employer presented this proposal to the union

23 during the bargaining on October 23rd?

24    A.   Yes.

25    Q.   And after the parties exchanged their

1    proposals that day, what happened next?

2        A.   I don't recall.

3        Q.   Do you recall that either party

4    declared a caucus at that point?

5            MS. HILL:  Objection.  Leading.

6            JUDGE ROSAS:  Sustained.

7    BY MR. WIESE:

8        Q.   What, if anything, do you recall

9    happening after the parties exchanged their

10   proposals?

11       A.   I believe Sunbelt took a caucus.

12       Q.   Do you recall how long that caucus

13   lasted?

14       A.   A little over an hour.

15       Q.   Did the parties return to the table

16   after that caucus?

17       A.   Yes.

18       Q.   And what do you recall being discussed

19   after that caucus that day?

20           JUDGE ROSAS:  Are you relying on a

21   document, sir?  You are looking at the document.

22           THE WITNESS:  No.  I don't recall.

23           JUDGE ROSAS:  Don't look at the

24   document then.

25           THE WITNESS:  Okay.  I don't recall.

1    BY MR. WIESE:

2         Q.    Do you recall is there a document that

3    would help to refresh your recollection?

4         A.    My affidavit.

5         Q.    I am going to direct the witness to

6    Page 8 of his affidavit on lines 1 through 16.

7         A.    1 through 16?

8         Q.    Yes.

9         A.    Thank you.  Okay.

10        Q.    Okay.  Is your recollection now

11   refreshed as to the discussions after the

12   employer's caucus?

13        A.    Yes.

14        Q.    Okay.  And what do you recall happening

15   at that time?

16        A.    That the blanket discussions frustrated

17   the union.

18        Q.    And the union brought this up at the

19   table?

20        A.    Yes.

21        Q.    And what response, if any, did the

22   employer have?

23             MR. WIESE:  Excuse me.  I forgot to

24   retrieve the affidavit.  And, Ms. Hill, were you

25   taking pictures of the affidavit on your camera?

1          MS. HILL:  Of those lines, yes.

2          JUDGE ROSAS:  Don't do that.

3          MR. WIESE:  You Honor, can you confirm

4  on the record that you have deleted those

5  pictures?

6          MS. HILL:  Of course, sir.

7  BY MR. WIESE:

8     Q.   So going back to that question, could

9  you --

10          MS. HILL:  By the way, I can use that

11  affidavit?

12          JUDGE ROSAS:  Absolutely.

13          MS. HILL:  Thank you very much, sir.

14          THE WITNESS:  I'm sorry.  Repeat the

15  question.

16  BY MR. WIESE:

17     Q.   With --

18          MR. WIESE:  I'm sorry.  Can you repeat

19  what the last question was?

20              (Whereupon, the record was read

21               as requested.)

22          THE WITNESS:  I believe they took a

23  caucus.

24  BY MR. WIESE:

25     Q.   And did the parties come back to the

1    party then after that caucus?

2        A.    Yes.

3        Q.    And do you recall did the union take

4    any caucuses that day?

5        A.    Yes.

6        Q.    How long was the union's caucus?

7        A.    15 minutes.

8        Q.    What was the purpose of the union's

9    caucus during the parties bargaining that day?

10       A.    To try to TA some things and go over

11   some things to show some movement.

12       Q.    Did the parties come back to the table

13   after the union's caucus?

14       A.    Yes.

15       Q.    And do you recall approximately what

16   time the bargaining concluded that day?

17       A.    I don't recall.

18       Q.    Okay.  Do you recall how long the

19   parties were at the bargaining table that day?

20       A.    Four hours.

21       Q.    So stepping away from that specific

22   bargaining session for a moment, Mr. Ervin, over

23   the course of the parties' bargaining, how would

24   you compare the union's caucuses to the

25   employer's caucuses up to this point?

1        MS. HILL:  Objection.

2        JUDGE ROSAS:  Sustained.

3        MS. HILL:  Form.  Thank you.

4   BY MR. WIESE:

5        Q.   What impact, if any, was the length of

6   the employer's caucuses having on the parties'

7   negotiations?

8        A.   It frustrated the union.

9        Q.   Besides frustrating the union, did it

10  have any other impact on negotiations?

11       A.   It slowed things down.

12       Q.   I'd like to direct the witness'

13  attention to what's previously been marked as

14  General Counsel Exhibit 9.

15       A.   Okay.

16       Q.   Do you recognize this document,

17  Mr. Ervin?

18       A.   Yes.

19       Q.   And what is it?

20       A.   It's correspondence between Pat Hill

21  and myself in reference to the cancellation of

22  the November 13th session 2018.

23       Q.   And did this document lead to

24  negotiations being cancelled in November?

25       A.   Yes.

1      Q.   Did the parties hold a make-up session

2  in December to make up for the cancelled

3  November session?

4      A.   We met on December 12, 2018.

5      Q.   Did you meet again in December?

6           MS. HILL:  Leading.

7           JUDGE ROSAS:  I will allow that.

8           THE WITNESS:  I misspoke.  December 10,

9  2018 we met.

10 BY MR. WIESE:

11     Q.   Okay.  Okay.  Did you have a second

12 meeting in December?

13     A.   No.

14     Q.   Why not?

15     A.   They were too busy.

16          MR. WIESE:  I'll offer General Counsel

17 Exhibit 9.

18          MS. HILL:  No objection, your Honor.

19          JUDGE ROSAS:  General Counsel 9 is

20 received.

21                 (GCX 9 received.)

22 BY MR. WIESE:

23     Q.   Mr. Ervin, were you in attendance at

24 the parties' next bargaining session?

25     A.   Yes.

1    Q.   And how did that bargaining session

2  begin?

3    A.   The union proposed our health

4  insurance, our pension and our dues checkoff.

5    Q.   And before the discussion of those

6  items, do you recall any other discussions

7  occurring?

8         MS. HILL:  Objection.  Leading.

9         JUDGE ROSAS:  I'll allow that if you

10  recall.

11         THE WITNESS:  If I recall, us talking

12  about more bargaining sessions.

13  BY MR. WIESE:

14    Q.   Now, what dates did the union propose

15  for future negotiations?

16    A.   Early January.

17    Q.   Okay.  And what response, if any, did

18  the company have to those dates?

19    A.   That they were too busy to meet until

20  January 28th.

21    Q.   And who proposed the early January

22  dates for the union?

23    A.   I believe it was myself.

24    Q.   And who responded from the employer?

25    A.   Pat Hill.

1    Q.    Did the union end up agreeing to that

2    late January date?

3    A.    Yes.

4    Q.    Why?

5    A.    We were concerned that we wouldn't get

6    anything -- whatever we agreed -- if we didn't

7    agree to that it would have been later, sorry.

8    Q.    I'd like to direct your attention to

9    General Counsel Exhibit 6E.

10    A.    Okay.

11    Q.    Do you recognize this document?

12    A.    Yes.

13    Q.    And what is it?

14    A.    It's a dues check off/administration

15    dues language that we proposed to Sunbelt on

16    December 10, 2018.

17    Q.    Do you recall who presented this to the

18    employer from the union?

19    A.    Yes, it was me.

20         MR. WIESE:  I'll offer General Counsel

21    Exhibit 6E.

22         MS. HILL:  No objection.

23         JUDGE ROSAS:  General Counsel 6E is

24    received.

25                   (GCX 6E received.)

1  BY MR. WIESE:

2      Q.   What, if any, response did the employer

3  have when you presented General Counsel

4  Exhibit 6E at the table?

5      A.   They declined all three insurance,

6  pension and admin dues.

7      Q.   And with respect to the administrative

8  dues proposal, what, if any, justification did

9  the employer provide for rejecting that

10  proposal?

11      A.   None.

12      Q.   I'd like to direct your attention to

13  General Counsel Exhibit 7F.

14      A.   Okay.

15      Q.   Do you recognize this document?

16      A.   Yes.

17      Q.   And what is it?

18      A.   Sunbelt's proposal that they gave to us

19  on December 10, 2018.

20      Q.   Whose handwriting is on this document?

21      A.   Mine.

22          MR. WIESE:  I'll offer General Counsel

23  Exhibit 7F.

24          MS. HILL:  No objection.

25          JUDGE ROSAS:  General Counsel 7F is

1  received.

2                    (GCX 7F received.)

3  BY MR. WIESE:

4       Q.   So with respect to General Counsel

5  Exhibit 7F, who from the employer presented this

6  proposal to the union?

7       A.   Pat Hill.

8       Q.   And when the employer presented this

9  proposal to the union, what response did the

10  union have?

11       A.   I don't recall.

12       Q.   Did the union raise any issues about

13  the form of the proposal in General Counsel

14  Exhibit 7F?

15            MS. HILL:  Objection.

16            JUDGE ROSAS:  Sustained.

17  BY MR. WIESE:

18       Q.   Is there a document that would help to

19  refresh your recollection as to the discussions

20  around this proposal?

21       A.   My affidavit.

22       Q.   Mr. Ervin, I am going to show you a

23  copy of your first affidavit in this case and

24  direct you to Page 9 on Paragraph 26.

25            MS. HILL:  All of 26?

1          MR. WIESE:  Yes.

2          THE WITNESS:  Okay.

3    BY MR. WIESE:

4      Q.   Is your recollection now refreshed as

5    to the discussions regarding Employer Exhibit --

6    or excuse me -- General Counsel Exhibit 7F, the

7    employer's proposal?

8      A.   Yes.

9      Q.   Okay.  And so what do you recall from

10   those discussions?

11     A.   The unit had asked for counterproposals

12   to what we already proposed.

13     Q.   Is there anything else you recall from

14   those discussions?

15     A.   We asked Sunbelt for the comprehensive

16   proposal so we could see where we were so we

17   were hoping to further things along to be on the

18   same page with them.

19     Q.   Did the employer present a

20   comprehensive proposal at this session?

21     A.   No.

22     Q.   All right.  Did either party declare a

23   caucus during those December negotiations?

24     A.   Yes.

25     Q.   Who?

1    A.   Sunbelt.

2    Q.   Do you recall approximately when the

3  employer declared its caucus?

4    A.   After this discussion on all the

5  counters.

6    Q.   Did the employer return to the

7  bargaining table that day?

8    A.   No.

9    Q.   How long did the union representatives

10  wait for the employer to return to the table?

11    A.   Close to two hours.

12    Q.   After waiting for that period of time,

13  what did the union do?

14    A.   We decided after -- Greg West decided

15  after two hours it wasn't productive to sit

16  there so we left.

17    Q.   Did anyone from the union go to talk to

18  the employer before leaving?

19    A.   Yes.

20    Q.   Who?

21    A.   Me.

22    Q.   And what do you recall from your

23  discussions with the employer at that time?

24    A.   I just let them know that we were going

25  to be leaving for the day.

1      Q.   And what response did the employer have

2   to that?

3      A.   That they were still in their caucus.

4      Q.   Okay.  Mr. Ervin, I'd like to direct

5   your attention to General Counsel Exhibit 7G.

6      A.   Okay.

7      Q.   Do you recognize this document?

8      A.   Yes.

9      Q.   Okay.  What is it?

10     A.   It's the comprehensive proposal that

11  Pat Hill sent me on January 16, 2019.

12     Q.   And so is the proposal following Page 1

13  of this document was this attached to Ms. Hill's

14  E-mail?

15     A.   Yes.

16          MR. WIESE:  Okay.  I'll offer General

17  Counsel Exhibit 7G.

18          MS. HILL:  No objection.

19          JUDGE ROSAS:  General Counsel 7G is

20  received.

21                (GCX 7G received.)

22          JUDGE ROSAS:  Counsel, how much longer

23  do you have on direct?

24          MR. WIESE:  Probably less than halfway

25  through to be honest.

1           JUDGE ROSAS:  Okay.  Why don't we take

2   a five-minute recess?

3                (Whereupon, a short recess was

4                 taken.)

5           JUDGE ROSAS:  Back on the record.

6           MR. WIESE:  Could, you repeat where I

7   was at?

8                (Whereupon, the record was read

9                 as requested.)

10  BY MR. WIESE:

11      Q.   Mr. Ervin, why were you requesting a

12  comprehensive proposal from the employer?

13      A.   So we could better prepare for the next

14  session and again try to move things along.

15      Q.   After you received General Counsel

16  Exhibit 7G, did you review that document?

17      A.   Yes.

18      Q.   When did you review the document?

19      A.   Probably the next day Dan Marsolek and

20  myself started going through it.

21      Q.   As you and Mr. Marsolek went through

22  the document, did you have any concerns about

23  the employer's proposal?

24      A.   Yes.

25      Q.   What concerns?

1    A.   The article numbers didn't match up
2  with our originals.
3    Q.   When you say originals, what are you
4  talking about?
5    A.   Our original proposal that was given on
6  May 22, 2018.
7    Q.   Mr. Ervin, I'd like to direct your
8  attention to General Counsel Exhibit 10.
9    A.   Okay.
10   Q.   Do you recognize this document?
11   A.   Yes.
12   Q.   What is it?
13   A.   Correspondence between myself and Pat
14  Hill and it was from Pat Hill stating that they
15  had to cancel the January 28, 2019 session
16  because regional manager Bo Bogardus had a
17  custody battle with his grandson.
18   Q.   Did this notice lead to those
19  negotiations being cancelled?
20   A.   Yes.
21        MR. WIESE:  I'll offer General Counsel
22  Exhibit 10.
23        MS. HILL:  No objection.
24        JUDGE ROSAS:  General Counsel 10 is
25  received.

 1              (GCX 10 received.)

 2  BY MR. WIESE:

 3      Q.   Mr. Ervin, did the parties hold

 4  negotiations in February?

 5      A.   Yes.

 6      Q.   And were you in attendance at the

 7  parties next negotiation?

 8      A.   Yes.

 9      Q.   Do you recall when those negotiations

10  were?

11      A.   February 8, 2019.

12      Q.   What time were those negotiations

13  scheduled to begin that day?

14      A.   8:00 o'clock.

15      Q.   And did those negotiations begin on

16  time?

17      A.   Nope.

18      Q.   What time did the negotiations begin?

19      A.   9:30.

20      Q.   Why did the negotiations begin late?

21      A.   Pat Hill had stated that Jason Mayfield

22  was running behind.

23      Q.   While you waited for the employer that

24  day, what did the union do?

25      A.   We waited in the caucus room and that

1   particular delay was below zero or single digits

2   outside and the caucus room was also very cold.

3       Q.   Was it just the union in the caucus

4   room during that time?

5       A.   Yes.

6       Q.   Okay.  And when the employer

7   representatives arrived, what, if any, issues

8   did the union raise about the temperature?

9       A.   Greg West stated it was very cold in

10  here.  He asked if we could rent a heater.

11      Q.   And how did the employer respond?

12      A.   That they were unaware that it was so

13  cold in that room.

14      Q.   Did they do anything to address the

15  temperature in the room?

16      A.   Yeah.  They got a portable heater.

17      Q.   Was that heater in the room the entire

18  time during the bargaining?

19      A.   Yes.

20      Q.   Okay.  Once the employer

21  representatives arrived, how did the meeting

22  begin?

23      A.   With a safety moment.

24      Q.   After the safety moment, what do you

25  recall the parties discussing next?

1      A.    We provided our proposal on wages.

2      Q.    I am going to show you what's been

3    marked as General Counsel Exhibit 6F.  Do you

4    recognize this document?

5      A.    Yes.

6      Q.    And what is it?

7      A.    It's the proposal that I gave to

8    Sunbelt at the start of that meeting on

9    February 8, 2019 for our wages.

10     Q.    Was this the union's first wage

11   proposal?

12     A.    Yes.

13     Q.    What, if any, response do you recall

14   the employer having when you presented this wage

15   proposal to them?

16     A.    That they weren't going to get into any

17   economic discussions.

18     Q.    Who stated this for the employer?

19     A.    Pat Hill.

20           MR. WIESE:  I'll offer General Counsel

21   Exhibit 6F.

22           MS. HILL:  No objection.

23           JUDGE ROSAS:  General Counsel 6F is

24   received in evidence.

25                   (GCX 6F received.)

1  BY MR. WIESE:

2      Q.    After the employer came to the table

3  that day, did the parties discuss any other

4  economic items?

5      A.    Yes.

6      Q.    Okay.  And what did they discuss?

7      A.    We reproposed our health, our pension

8  and our dues checkoff.

9      Q.    What response did the employer have to

10  these proposals?

11      A.    They declined with no counteroffer.

12      Q.    And then after the employer declined

13  these proposals, what do you recall happening

14  next?

15      A.    I believe Sunbelt took a caucus.

16      Q.    Do you recall how long the parties were

17  at the table before Sunbelt took a caucus?

18      A.    10, 15 minutes.

19      Q.    How long did this caucus last?

20      A.    Hour and a half plus.

21      Q.    And during this caucus, did anyone from

22  the union go to check on the employer?

23      A.    Yes.

24      Q.    Who?

25      A.    Me.

1    Q.   Why did you go to check on the

2  employer?

3    A.   I, again, wanted to make sure that they

4  knew that we were ready when they were ready.

5    Q.   And when you went to go check on the

6  employer during that caucus, what were their

7  representatives doing?

8    A.   I happened to see some representatives

9  socializing with some vendors.

10    Q.   Do you recall who from the Sunbelt

11  negotiating team you saw?

12    A.   Jason Mayfield for sure.

13    Q.   How could you tell that Mr. Mayfield

14  was speaking to a vendor?

15    A.   Just based on how they were dressed and

16  the fact that it wasn't any of the bargaining

17  unit negotiating -- or excuse me -- the

18  negotiating team from Sunbelt.

19    Q.   How long did you see Mr. Mayfield

20  socializing with the vendor?

21    A.   A few minutes.

22    Q.   Okay.  Did the employer return to the

23  table after that caucus?

24    A.   Yes.

25    Q.   What did the parties discuss when the

1   employer returned?

2      A.   Sunbelt again turned down or declined

3   the proposals that we had given them.

4      Q.   Okay.  Do you recall any other

5   discussions immediately after that caucus?

6      A.   I don't recall.

7      Q.   Okay.  Is there a document that would

8   help to refresh your recollection?

9      A.   My affidavit.

10     Q.   Okay.  I am going to direct your

11  attention to Page 10 of your affidavit

12  Paragraph 32.

13     A.   Okay.

14     Q.   Mr. Ervin, is your recollection

15  refreshed as to the parties other discussions

16  after that caucus?

17     A.   Yes.

18     Q.   Okay.  And what else did the parties

19  discuss at that time?

20     A.   More future bargaining session dates.

21     Q.   What dates did the union propose?

22     A.   We were hoping for subsequent weeks to

23  originally proposed dates that we already had.

24     Q.   And what dates did the employer counter

25  propose with?

1      A.    The February 21st and that was already

2  scheduled on March -- and March 21st.

3      Q.    The after discussing dates, what do you

4  recall the parties discussing next?

5      A.    I recall Greg West stating that his

6  frustration in reference to the lack of

7  counterproposals.

8      Q.    And what response did the employer have

9  to that?

10     A.    They took a caucus.

11     Q.    And after the caucus, was there any

12  discussion about General Counsel Exhibit 7G, the

13  comprehensive proposal that had been E-mailed to

14  the union?

15     A.    Yes.

16     Q.    Okay.  And what do you recall from the

17  discussions around that topic?

18     A.    We had told them -- we had told Sunbelt

19  going forward we'll work off of their numbers on

20  their proposals so that way there is no

21  confusion.

22     Q.    Who said this for the union?

23     A.    I did.

24     Q.    Did you explain why you were going to

25  work off of their numbers?

1      A.    Yes.

2      Q.    And what did you tell them?

3      A.    That way there is no confusion and we

4   can move forward efficiently.

5      Q.    And how did the employer respond to

6   that?

7      A.    Pat Hill stated that that's what they

8   would do then.

9      Q.    And after the parties reached that

10  agreement, what do you recall happening next?

11     A.    I believe Sunbelt took another caucus.

12     Q.    And during that caucus, did you see any

13  representatives of the employer?

14     A.    Yes.

15     Q.    Who did you see?

16     A.    I saw Bo Bogardus, Robert, on his

17  computer at the counter.

18     Q.    Where were you when you saw Mr. Robert

19  Bogardus?

20     A.    In our caucus room.

21     Q.    How long did you see Mr. Bogardus at

22  his computer?

23     A.    5, 10 minutes.

24     Q.    Did it appear to you that he was doing

25  work related to bargaining during that time?

1          MS. HILL:  Objection.

2          JUDGE ROSAS:  Sustained.

3   BY MR. WIESE:

4     Q.   Were there -- While Mr. Bogardus was at

5   his computer were there other Sunbelt employees

6   around?

7     A.   Yes.

8     Q.   Were those other Sunbelt employees

9   members of the employer's negotiating team?

10    A.   No.

11    Q.   How long did the employer's caucus

12  last?

13    A.   Over an hour.

14    Q.   Did the employer come back to the table

15  after that caucus?

16    A.   Yes.

17    Q.   Did the employer come back with any new

18  proposals after that caucus?

19    A.   I don't believe so.

20    Q.   And after that caucus, what, if any,

21  discussions do you recall around economic items?

22    A.   Greg West had stated that he would like

23  to see a counterproposal to our economics.

24    Q.   And what response did the employer have

25  to that?

1    A.    Pat Hill declined because she said we

2  were not at that stage in the negotiations yet

3  even though everything was on the table.

4    Q.    Did someone from the union state that

5  everything was on the table?

6    A.    Yes.

7    Q.    Who stated that?

8    A.    I did.

9    Q.    And after you stated that, what do you

10  recall happening next?

11    A.    Dan Marsolek got a little frustrated

12  because of the fact that they weren't counter

13  proposing anything, they were just declining

14  everything and because of that Greg West had

15  figured that we should just end the session for

16  the day due to the frustration on the union's

17  part or on the union because of the lack of

18  counterproposals.

19    Q.    Was it agreed by the parties to end

20  negotiations at that time?

21    A.    I believe so.

22    Q.    Okay.  Why was the union so frustrated

23  at that point in negotiation?

24    A.    We believed that we were doing our

25  homework in between sessions to try to prepare

1   for the sessions and make it more efficient and

2   we didn't feel that Sunbelt was doing the same.

3      Q.  I am going to direct your attention to

4   General Counsel Exhibit 11.  Do you recognize

5   this document?

6      A.  Yes.

7      Q.  Okay.  What is it?

8      A.  It's the E-mail from Pat Hill stating

9   that she couldn't get the comprehensive proposal

10  done.

11       MS. HILL:  Objection.  Misstatement.

12       JUDGE ROSAS:  It's an E-mail exchange

13  between you and Ms. Hill.  Next question.

14  BY MR. WIESE:

15      Q.  Did the union get an updated collective

16  bargaining agreement from the employer prior to

17  the next negotiations?

18      A.  No.

19       MR. WIESE:  I'll offer General Counsel

20  Exhibit 11.

21       MS. HILL:  No objection.

22       JUDGE ROSAS:  General Counsel 11 is

23  received.

24           (GCX 11 received.)

25

1  BY MR. WIESE:

2      Q.    Mr. Ervin, why were you requesting an

3  updated collective bargaining agreement at this

4  time?

5      A.    To prepare for the next session.

6      Q.    Any other reasons?

7      A.    To make the next session more efficient

8  and productive.

9      Q.    Were you in attendance at the parties

10  next bargaining session?

11      A.    Yes.

12      Q.    And when did that session take place?

13      A.    February 21, 2019.

14      Q.    Did the union have any additional

15  representatives with it at the bargaining table

16  that day?

17      A.    Yes.

18      Q.    Who?

19      A.    Our president and business manager

20  Terrence T. McGowan.

21      Q.    Does Mr. McGowan particularly

22  participate in collective bargaining

23  negotiations?

24      A.    Not at this level, no, not typically.

25      Q.    When you say "not at this level," what

1  do you mean?

2      A.    For shop-based agreements.  He only

3  works and negotiates with the master agreements

4  with our associations.

5      Q.    Why was Mr. McGowan at the session that

6  day?

7      A.    Because he wanted to see what was going

8  on for himself.

9      Q.    How do you recall the negotiations

10  beginning that day?

11      A.    With a safety moment.

12      Q.    I am going to show you what's been

13  marked as General Counsel Exhibit 7H.  Do you

14  have that document?

15      A.    Yes.

16      Q.    Do you recognize this document?

17      A.    Yes.

18      Q.    Okay.  And what is it?

19      A.    It's the proposals that Sunbelt gave us

20  on February 21, 2019.

21      Q.    And the handwriting on this document,

22  whose handwriting is that?

23      A.    Mine.

24           MR. WIESE:  I will offer General

25  Counsel Exhibit 7H.

1          MS. HILL:  No objection.

2          JUDGE ROSAS:  General Counsel 7H is

3    received.

4                    (GCX 7H received.)

5    BY MR. WIESE:

6       Q.   After the employer presented this

7    proposal at negotiations, and I'm talking about

8    specifically on Page 1 of this document, what

9    discussions do you recall having around that

10   item?

11      A.   Terry McGowan had mentioned that they

12   do have the dues checkoff, Sunbelt does, and

13   other locals where they are assigned to and why

14   we couldn't have it here.

15      Q.   What response, if any, did the employer

16   have to Mr. McGowan's remarks?

17      A.   They just weren't going to do it.  They

18   declined.

19      Q.   Did the employer provide any reason as

20   to why they were declining dues checkoff?

21      A.   No.

22      Q.   And after the discussions around dues

23   checkoff, what happened next?

24      A.   I believe Sunbelt took a caucus.

25      Q.   Are you certain that it was Sunbelt?

1       A.    No.

2       Q.    Is there a document that would help to

3   refresh your recollection as to who took that

4   caucus?

5       A.    My affidavit.

6       Q.    Okay.  I am going to direct your

7   attention to Page 12, Lines 19 through 23.

8           MS. HILL:  12, lines 19 through 23?

9           MR. WIESE:  That's correct.

10          THE WITNESS:  Thank you.  Okay.

11  BY MR. WIESE:

12      Q.    Is your recollection now refreshed as

13  to who declared that caucus at that time?

14      A.    Yes.

15      Q.    Who did?

16      A.    We did.

17      Q.    Why did the union declare a caucus at

18  that time?

19      A.    We wanted to go over some of their

20  proposals to accept.

21      Q.    How long did the union's caucus last?

22      A.    About 15 minutes.

23      Q.    After the parties returned to the

24  table, were there any discussions about the

25  remainder of the proposals in General Counsel

1   Exhibit 7H on Pages 2 and 3?

2       A.   Yes.

3       Q.   Okay.  What do you recall from those

4   discussions?

5       A.   That we, again, stated that we want to

6   go through the article numbers that she proposed

7   that way there is no confusion instead of our

8   originals.

9       Q.   Was there -- why were you bringing up

10  confusion about proposals?

11          MS. HILL:  Objection.

12          JUDGE ROSAS:  Sustained.  Rephrase.

13  BY MR. WIESE:

14      Q.   What had occurred at the table that

15  caused you to bring up the confusion around the

16  proposals?

17      A.   Pat Hill had asked which articles

18  numbers we were working off of.

19      Q.   And what response did you have to that?

20      A.   I said that we would work off their

21  article numbers going forward to minimize

22  confusion.

23      Q.   And what did the employer do in

24  response?

25      A.   I believe then they took a caucus.

1    Q.   Did you see anyone from the employer

2  during that caucus?

3    A.   Yes.

4    Q.   Who did you see?

5    A.   I saw someone out of the caucus room.

6  I don't recall who it was.

7    Q.   Okay.  Did anyone from the employer

8  come to visit your caucus room during that

9  caucus?

10    A.   Yes.

11    Q.   Who?

12    A.   It was Pat Hill.

13    Q.   Why did -- What was Ms. Hill doing in

14  your caucus room?

15    A.   She came back and asked again which

16  article numbers we were supposed to work off of.

17    Q.   Did Pat -- how many times did Pat Hill

18  visit your caucus room during that caucus?

19    A.   Twice.

20    Q.   Did any other members of the employer's

21  negotiating team join Ms. Hill when she came to

22  your caucus room?

23    A.   No.

24    Q.   How long did the employer's caucus last

25  that day?

1    A.   It went about two hours and then Greg

2  West at 11:40 figured we should break for lunch.

3  We came back from lunch at 12:40.  Sunbelt was

4  still not back until 1:30.

5    Q.   All right.  Did Sunbelt eventually come

6  back to the table?

7    A.   Yes.

8    Q.   And when Sunbelt came back to the

9  table, did they have any new proposals?

10   A.   I don't recall.

11   Q.   What do you recall the parties

12 discussing when Sunbelt came back to the table?

13   A.   The union was frustrated with the lack

14 of counterproposals.

15   Q.   What proposals were discussed?

16   A.   The dues checkoff, the health, pension,

17 and wages.

18   Q.   And with regard to wages, what do you

19 recall from the discussions around that topic?

20   A.   That they weren't -- Pat Hill had

21 stated they are not going to get into any

22 economics yet.

23   Q.   And after the discussion around wages,

24 what do you recall happening next?

25   A.   Sunbelt took another caucus.

1    Q.   And did the parties return to the table

2  from that caucus?

3    A.   No.

4    Q.   How did negotiations end that day?

5    A.   About half hour after the caucus or

6  into their caucus Pat Hill came out and stated

7  that we had to end the session because Jason

8  Mayfield had to leave.

9    Q.   How did the union respond to that?

10   A.   We agreed.

11   Q.   Who stated that for the union?

12   A.   I believe it was Greg West.

13   Q.   Are there any other discussions that

14  you recall occurring at the end of the session

15  that day?

16   A.   Greg West did state that we could go

17  longer.  We were able to continue on and Pat

18  Hill stated that we had to end it.

19   Q.   Were you able to attend the parties

20  next bargaining session?

21   A.   No.

22   Q.   Did the parties -- Do you recall when

23  that session was scheduled?

24   A.   March 21, 2019.

25   Q.   Did the parties still meet on the

1  March 21st session?

2       A.   Yes.

3       Q.   I'd like to direct your attention now

4  to General Counsel Exhibit 39 or 38, excuse me.

5       A.   Okay.

6       Q.   Mr. Ervin, do you recognize this

7  document?

8       A.   Yes.

9       Q.   And what is it?

10      A.   It's the RD petition that Brian

11  Anderson drew up for one of our members named

12  Mariano Rivera.

13           MR. WIESE:  I'll offer General Counsel

14  Exhibit 38.

15           MS. HILL:  Objection.  I think there is

16  going to have to be some voir dire or cross

17  examination or something for him to say that

18  this was what Mr. Anderson drew up.

19           JUDGE ROSAS:  Well, he says he knows

20  what it is.  It's being offered now.

21           MR. WIESE:  Yes.

22           JUDGE ROSAS:  No other questions in

23  that regard, so...

24           MS. HILL:  But he volunteered in

25  response to the question said it was drafted by

1  Mr. Anderson.

2          JUDGE ROSAS:  Right.

3          MS. HILL:  So we have the right to know

4  what's the basis of that before this can get

5  even entered for the purpose of what their --

6          JUDGE ROSAS:  You have the right to ask

7  him whatever you want before it gets entered.

8  Go ahead.

9              VOIR DIRE EXAMINATION

10 BY MS. HILL:

11     Q.   Okay.  General Counsel's Exhibit 38,

12 you saw Mr. Anderson draft this?

13     A.   No.  His name is on it.

14     Q.   Do you know whose handwriting that is?

15     A.   No.

16     Q.   Did you ask Mr. Rivera if Mr. Anderson

17 drafted this?

18     A.   No.

19     Q.   Who is Mr. Rivera?

20     A.   Mr. Rivera is the bargaining unit

21 member that signed the bottom of this.

22     Q.   Okay.  So he was in the bargaining

23 unit.  Did you know if he voted in favor of the

24 union back in March?

25          MR. WIESE:  Objection.  Relevance.

1          JUDGE ROSAS:  As to whether he voted in

2     favor of the union?  I am going to sustain that.

3     Next question.

4     BY MS. HILL:

5       Q.   Okay.  But as far as you know, Mr.

6     Anderson did not draft this?

7       A.   I just know his name is at the top from

8     employer representative so that's the way I take

9     it is him drafting it because his name is on it

10    from employer representative at the top right

11    Line 3.

12      Q.   I see the handwriting there, but I am

13    trying to understand how you can make that leap

14    that this is something Mr. Anderson drafted.

15      A.   I just know that his name is on there.

16    I don't know who drafted it.

17          MS. HILL:  Thank you.

18          JUDGE ROSAS:  All right.  It's being

19    offered nevertheless.  Any objection?

20          MS. HILL:  It is being offered.  It can

21    be entered but not based on Mr. Anderson

22    drafting this.

23          JUDGE ROSAS:  Well, the testimony is

24    what it is.  So but --

25          MS. HILL:  Yes, sir.

1      JUDGE ROSAS:  There is no objection to

2  the document being what it purports to be so I

3  am going receive General Counsel's 38.

4           (GCX 38 received.)

5           DIRECT EXAMINATION (resumed)

6  BY MR. WIESE:

7      Q.  Mr. Ervin, are you aware of what

8  happened with the decertification petition?

9      A.  Yes.

10     Q.  And what happened with it?

11     A.  Mariano Rivera signed it.  His name is

12  on the bottom.  I did not see him sign it but

13  his name is on there.  And it was filed and then

14  eventually pulled.

15     Q.  Okay.  Pulled by?

16     A.  I'm assuming Sunbelt.  I don't know.

17     Q.  Okay.

18     A.  It never went through.

19     Q.  After March -- the March 21st session,

20  were you an attendance at the parties next

21  session?

22     A.  Yes.

23     Q.  When did that session take place?

24     A.  April 30, 2019.

25     Q.  Was the employer on time for these

1  negotiations?

2       A.   No.

3       Q.   What time were the negotiations

4  supposed to be done?

5       A.   8:30.

6       Q.   What time did they actually begin?

7       A.   9:00 o'clock.

8       Q.   Did the employer provide any

9  explanation as to why it arrived late?

10      A.   Yes.  Pat Hill stated that Jason

11  Mayfield was running late.

12      Q.   Once the negotiations started, how do

13  you recall them beginning?

14      A.   With a safety moment.

15      Q.   After the safety moment, what do you

16  recall the parties discussing next?

17      A.   We reproposed our wages, health,

18  pension and admin dues.

19      Q.   And with respect to the wages, to the

20  wage proposal how did the employer respond?

21      A.   They declined with no counters.

22      Q.   Did someone from the union request that

23  the employer provide a counter?

24      A.   Yes.  Greg West.

25      Q.   Did the employer provide any counter

1  offers on any of the other items that the union

2  proposed at the beginning of that session?

3     A.   No.

4     Q.   And what do you recall the parties

5  discussing after that?

6     A.   I remember Terry McGowan stating that

7  he felt that Sunbelt wasn't bargaining in good

8  faith with everything going on and Pat Hill had

9  stated that they believed they were bargaining

10  in good faith.

11     Q.   Was there any discussion around the

12  topic of dues checkoff at that time?

13     A.   Yes.

14     Q.   And what do you recall from the

15  discussions around that item?

16     A.   Terry McGowan had stated he wasn't

17  understanding why they would not enter into an

18  agreement when they have it in other locals that

19  they are assigned to nearby.

20     Q.   And what response did the employer

21  have?

22     A.   That they just weren't going to enter

23  into admin dues checkoff.

24     Q.   Did the employer provide any further

25  explanation?

1    A.    Just that they weren't going to do it.

2    Q.    What happened after this discussion

3  over dues checkoff?

4    A.    I believe at that point we took a

5  caucus.

6    Q.    And how long did the union's caucus

7  last?

8    A.    20 minutes.

9    Q.    Did the union come back to the

10  bargaining table with any new proposals after

11  that caucus?

12    A.    Yes.

13    Q.    And what was the union's new proposal?

14    A.    We proposed a reduced pension, reduced

15  wages.  I think that was it at that point.

16    Q.    What response did the employer have to

17  the union's proposal?

18    A.    I believe then they took a caucus.

19    Q.    How long did the employer's caucus

20  take?

21    A.    About an hour.

22    Q.    Did the employer have a new proposal

23  when they came back to the bargaining table?

24    A.    Yes.  I believe at that point they

25  changed their 1.35 premium pay to 1.4.

1      Q.   Okay.  What about on the -- did that

2  proposal address anything with regard to wages?

3      A.   Not at that time.

4      Q.   And what about with regard to dues

5  checkoff?

6      A.   Just that they were declining it.

7      Q.   Did the employer provide any

8  explanation as to why it was declining dues

9  checkoff at that time?

10     A.   No.

11     Q.   After the employer presented this

12  proposal, what did the parties do?

13     A.   Then we caucused.

14     Q.   What was the purpose of that caucus for

15  the union?

16     A.   We wanted to make some more concessions

17  and accept some of their proposals to show

18  movement.

19     Q.   Approximately how long did that caucus

20  last?

21     A.   15, 20 minutes.

22     Q.   Did the union come out of that caucus

23  with any updated proposals?

24     A.   Yes.

25     Q.   And what do you recall the union moving

1   on out of that caucus?

2       A.   We omitted the national training fund

3   proposal that we had and we also changed our

4   original overtime after eight hours a day to

5   overtime after ten hours a day.

6       Q.   Besides the union presenting this

7   proposal after the caucus, what else do you

8   recall the parties discussing?

9       A.   Future dates.

10      Q.   And what do you recall from the

11  discussion around future dates at that time?

12      A.   Pat Hill stated that Sunbelt was too

13  busy to meet until June 5, 2019.

14      Q.   Had the proposed -- had the union

15  proposed dates prior to that day?

16      A.   Yeah.  We were hoping for the following

17  week or earlier weeks.

18      Q.   And who made that proposal for the

19  union?

20      A.   I did.

21      Q.   Did the parties agree to meet on

22  June 5th?

23      A.   Yes.

24      Q.   Why did the union agree to meet on

25  June 5th?

1    A.   We were afraid if we didn't accept that

2   date that it would just be pushed back even

3   further and prolong everything.

4    Q.   And after the discussion around dates,

5   what happened next in the bargaining unit?

6    A.   I believe then Sunbelt took a caucus.

7    Q.   How long was Sunbelt's caucus?

8    A.   Roughly 45 minutes.

9    Q.   Did the employer come back to the table

10  from that caucus with a new proposal?

11   A.   I don't recall.

12   Q.   Is there a document that would help to

13  refresh your recollection?

14   A.   My affidavit.

15   Q.   I am going to direct the witness'

16  attention to Page 4 of the affidavit

17  Paragraph 13 and I should reflect in the record

18  this is the witness' supplemental affidavit

19  given in this case.

20   A.   I'm sorry.  What numbers?

21        MR. WIESE:  It was Page 4 I believe

22  Paragraph 13.

23        MS. HILL:  Paragraph 13.  Yep.

24        THE WITNESS:  Thank you.  Okay.

25

1    BY MR. WIESE:

2         Q.   Is your recollection now refreshed?

3         A.   Yes.

4         Q.   Okay.  So what, if any, changes did the

5    employer's proposal have?

6         A.   They changed their 1.35 for premium pay

7    to 1.4.

8         Q.   Were there any other changes in that

9    proposal?

10        A.   They had no counters for the admin dues

11   and health and pension.

12        Q.   With respect to the administrative

13   dues, what, if anything, do you recall from the

14   discussions around that topic?

15        A.   Terry McGowan just again stated that

16   they have it in other locations why can't they

17   have it here.

18        Q.   How did the employer respond to

19   Mr. McGowan's remarks?

20        A.   Just that we weren't going to enter

21   into that agreement.

22        Q.   And what happened next after that

23   discussion?

24        A.   I believe then we took a caucus.

25        Q.   Did the parties come back to the table

1  from the union's caucus?

2      A.   No.

3      Q.   What happened?

4      A.   We had recommended a lunch break and

5  Pat Hill had stated that we had to end the

6  session because Jason Mayfield had a lot of

7  calls to make.

8      Q.   And was that the end of the session?

9      A.   Yes.

10     Q.   Were you in attendance at the parties

11 next bargaining session after April 30th?

12     A.   Yes.

13     Q.   When was that session?

14     A.   June 5, 2019.

15     Q.   Had the union filed unfair labor

16 practice charges against the employer prior to

17 that session?

18     A.   Yes.

19     Q.   Were you aware of any developments in

20 the investigation of the unfair labor practice

21 charges prior to that June 5th session?

22     A.   The Labor Board found merit to our

23 charge.

24     Q.   Who was in attendance at this session

25 for each party?

1    A.    June 5th it was for us, it was Steve

2  Buffalo, Greg West, Dan Marsolek, myself and

3  bargaining member Jamie Smith.  For Sunbelt it

4  was Pat Hill, Jason Mayfield, Bo Bogardus and

5  Brian Anderson.

6    Q.    Did the negotiations that day begin on

7  time?

8    A.    Yes.

9    Q.    How do you recall the negotiations

10  beginning on June 5th?

11    A.    I handed out our comprehensive proposal

12  on what we believed had been TA'd and what had

13  been open.

14    Q.    I'd like to direct your attention to

15  General Counsel Exhibit 6G.

16    A.    Okay.

17    Q.    Do you recognize this document?

18    A.    Yes.

19    Q.    Okay.  What is it?

20    A.    It's the comprehensive proposal signoff

21  that I gave out at the start of the meeting on

22  June 5, 2019.

23        MR. WIESE:  I'll offer General Counsel

24  Exhibit 6G.

25        THE WITNESS:  Sir, I apologize.

1    Drinking all this water, I really got to go

2    again.  Maybe for two seconds.  Sorry.  Sorry.

3    I'll try not to drink any more water.

4              JUDGE ROSAS:  We'll take two seconds.

5                   (Whereupon, a short recess was

6                    taken.)

7              JUDGE ROSAS:  Back on the record.

8    BY MR. WIESE:

9        Q.   With respect to General Counsel

10   Exhibit 6G, what was the purpose of this

11   document?

12       A.   Greg West and I put this together to

13   minimize the confusion so we could hand it to

14   him on that session and go through the entire

15   docket and make sure that we all agreed on

16   everything consistently or disagreed to

17   everything consistently basically to move us

18   forward because at this point, it's been over a

19   year and we still haven't gotten anywhere.

20       Q.   Before we get into the discussions

21   around this document, do you recall whether the

22   employer had any new proposals at this session?

23       A.   Yes.

24       Q.   And what do you recall the employer

25   proposing?

1    A.    They proposed a wage freeze.  The first

2  year and a wage reopener the second and third

3  year and they again declined our health pension

4  and admin dues.

5    Q.    With respect to the wage freeze, what,

6  if any, explanation did the employer provide for

7  why it was offering a wage freeze?

8    A.    Pat Hill had stated it was due to the

9  economic downturn.

10    Q.    And turning back now to General Counsel

11  Exhibit 6G, the signoff document, when you

12  handed this document out, what response did the

13  employer have?

14    A.    At that point they took a caucus.

15    Q.    Okay.  And did the parties return to

16  the table after that caucus?

17    A.    Yes.

18    Q.    Okay.  What discussions occurred after

19  the parties returned to the table?

20    A.    Pat Hill had stated that the article

21  numbers -- some of the article numbers were off

22  and that there were some proposals not reflected

23  in our proposal.

24    Q.    I am going to direct your attention to

25  General Counsel's Exhibit 12.

 1      A.    Okay.

 2      Q.    Do you recognize this document?

 3      A.    Yes.

 4      Q.    What is it?

 5      A.    It's the table of contents that Pat

 6   Hill had said was wrong due to the -- off

 7   articles and then on the bottom its got

 8   signatures for Steve Buffalo, our chief of staff

 9   signed it rejecting it asking Sunbelt to agree

10   to that.

11      Q.    Do you know whose signature that is for

12   Sunbelt on the document?

13      A.    We didn't see it signed but Pat Hill

14   stated it was Jason Mayfield's.

15            MR. WIESE:  I'll offer General Counsel

16   Exhibit 12.

17            MS. HILL:  Objection.  Question, whose

18   handwriting is it at the bottom with the name of

19   the respondent over on the left-hand side?

20            THE WITNESS:  The writing of Sunbelt?

21            MS. HILL:  Yes.

22            THE WITNESS:  That's Steve's.  I

23   believe it's Steve's.  Steve wrote out the whole

24   entire thing and then you guys told us Jason

25   Mayfield signed it.

1      MS. HILL:  Okay.  No objection.

2      JUDGE ROSAS:  General Counsel's 12 is

3  received.

4                 (GCX 12 received.)

5  BY MR. WIESE:

6      Q.  After the parties signed off on General

7  Counsel Exhibit 12, what do you recall the

8  parties discussing next in negotiations?

9      A.  Greg West asked Pat Hill to put

10  whatever articles that weren't reflected in ours

11  in writing for us.

12      Q.  What response did Ms. Hill have?

13      A.  She said she wasn't going to do that.

14      Q.  And how did the negotiations conclude

15  that day?

16      A.  We settled on a July 9th session date.

17      Q.  Were the parties able to confirm any

18  tentative agreements?

19      A.  Just this General Counsel Exhibit 12.

20      Q.  Okay.  Did the parties meet for

21  negotiations on July 9th?

22      A.  Yes.

23      Q.  What -- how do you recall those

24  negotiations beginning?

25      A.  At the start of that negotiations, we

1   brought up the fact that bargaining unit member

2   and negotiating team member Jamie Smith was

3   fired for not taking the safety quiz, and I

4   wanted to show them where we have it in our

5   notes that they said that there weren't going to

6   be any reprimands prior to at negotiations

7   sessions for that and Bo Bogardus had stood up

8   and said that we were lying and then at that

9   time Dan got excited and then Pat Hill pulled

10  Sunbelt out of the room.

11      Q.   Were all members of the employer's

12  negotiating team present at the beginning of

13  those negotiations?

14      A.   No.

15      Q.   Who was missing?

16      A.   Jason Mayfield.

17      Q.   How long were the parties at the table

18  before the employer took a break?

19      A.   Ten minutes.

20      Q.   And did the parties come back to the

21  table after that break?  Did the parties discuss

22  a future negotiating date?

23      A.   August 8, 2019.

24      Q.   All right.  I'd like to direct your

25  attention to General Counsel Exhibit 13.

1     A.    Okay.

2     Q.    Do you recognize this document?

3     A.    Yes.

4     Q.    And what is it?

5     A.    It's the E-mail that I sent to Pat Hill

6    that afternoon with this particular document

7    General Exhibit -- General Counsel Exhibit 6G

8    electronically.  She had asked for it during

9    that session.

10    Q.    So General Counsel Exhibit 6G was

11   attached to this E-mail chain?

12    A.    Yes.

13          MR. WIESE:  I will offer General

14   Counsel Exhibit 13.

15          MS. HILL:  Could the court reporter

16   mind reading back his response, please?

17              (Whereupon, the record was read

18               as requested.)

19          MS. HILL:  Okay.  Just one question.

20          VOIR DIRE EXAMINATION

21   BY MS. HILL:

22    Q.    During the July 9th session, correct?

23    A.    Yes.

24    Q.    Had it been requested prior to

25   July 9th?

1      A.   Yes.

2      Q.   And had you sent it?

3      A.   No.

4      Q.   So there is no E-mail prior to this

5   July 9th afternoon E-mail, correct?

6      A.   You are correct.

7           MS. HILL:  No objection.

8           JUDGE ROSAS:  General Counsel 13 is

9   received.

10               (GCX 13 received.)

11           DIRECT EXAMINATION (resumed)

12   BY MR. WIESE:

13      Q.   I'd like to direct your attention now,

14   Mr. Ervin, to General Counsel Exhibit 17.

15      A.   Okay.

16      Q.   Do you recognize this document?

17      A.   Yes.

18      Q.   What was is it?

19      A.   It was an E-mail that was sent to our

20   chief of staff Steve Buffalo on August 7th.  He

21   said he received it later afternoon and it was

22   stating that the August 8th bargaining session

23   was just going to be about the reorganizing of

24   that profit center 776 in Franksville.

25           MS. HILL:  I apologize.  My copy isn't

1    an E-mail.  It's a letter.  He just said it's an

2    E-mail.  Do I have the wrong document?

3              MR. WIESE:  No.  You have the correct

4    document.

5              MS. HILL:  Oh, okay.

6    BY MR. WIESE:

7        Q.   How did you receive this letter?

8        A.   Steve Buffalo received it in E-mail

9    form and then we printed it.

10       Q.   Was this the first notice that the

11   union received of the reorganization of the

12   Franksville profit center?

13       A.   Yes.

14             MR. WIESE:  I'll offer General Counsel

15   Exhibit 17.

16             MS. HILL:  No objection.

17             JUDGE ROSAS:  General Counsel 17 is

18   received.

19                      (GCX 17 received.)

20   BY MR. WIESE:

21       Q.   Did the parties meet for bargaining as

22   scheduled on August 8th?

23       A.   Yes.

24       Q.   How did that meeting begin?

25       A.   It started with a safety moment.

1    Q.    After the safety moment, what did the

2  parties discuss next?

3    A.    Pat Hill turned it over to Jason

4  Mayfield who stated that they were reorganizing

5  that profit center 776 to a will call and

6  customer pickup site only and they would no

7  longer need the services of the two remaining

8  bargaining union mechanics one Alan Romanowski

9  and Kyle McKellips and they were going to be

10  laid off effective the end of the business day.

11    Q.    Okay.  Did Mr. Mayfield explain why

12  they were being laid off that you can recall?

13    A.    Just they said they wouldn't need them

14  based on the reorganizing of the shop to a will

15  call/customer pickup only.

16    Q.    Did he explain what he meant by it

17  being a will call/customer pickup only facility?

18    A.    Yeah.  Just when a customer would come

19  in, they would have to -- there would be no like

20  deliveries or work on stuff.  They would just

21  have small tools there.  If they wanted bigger

22  items, they'd have to go to another shop.

23    Q.    Okay.  And after these remarks from

24  Mr. Mayfield, what do you recall the parties

25  discussing next?

1      A.    The union took a caucus.

2      Q.    And after that caucus, what happened?

3      A.    The union Steve Buffalo asked if he

4  could see numbers for other shops in Wisconsin

5  and Illinois.  I had asked if the two

6  individuals could be transferred and Jason

7  Mayfield said they did not have those skills to

8  be transferred to another shop, that I seen some

9  online even though Mariano Rivera who filed the

10  RD petition was going to be getting transferred

11  at that time.

12      Q.    Did the parties discuss dates for

13  future negotiations?

14      A.    Yes.

15      Q.    Okay.  And what did the union propose

16  for dates?

17      A.    I proposed the week of August 19th.

18      Q.    And how did the employer respond?

19      A.    They responded with wanting to meet on

20  Friday, August 16, 2019.

21      Q.    Did you agree to this date?

22      A.    Yes.

23      Q.    Did the parties meet on August 16th as

24  scheduled?

25      A.    Yes.

1    Q.   What was the focus of the parties

2  discussions on August 16th?

3    A.   Effects bargaining.

4    Q.   I am going to show you what's been

5  marked as -- I'd like to direct your attention

6  to General Counsel Exhibit 18.

7    A.   Okay.

8    Q.   Do you recognize this document?

9    A.   Yes.

10    Q.   What is it?

11    A.   It's the proposal that we gave Sunbelt

12  on August 16, 2019 for severance package.

13           MR. WIESE:  I'll offer General Counsel

14  Exhibit 18.

15           MS. HILL:  No objection.

16           JUDGE ROSAS:  General Counsel 18 is

17  received.

18                (GCX 18 received.)

19  BY MR. WIESE:

20    Q.   At the parties meeting on August 16th,

21  were you able to reach a severance agreement

22  with the employer?

23    A.   Yes.

24    Q.   I'd like to direct your attention to

25  General Counsel's Exhibits 19 and 20.  Do you

1   have those documents?

2       A.   Yes, I am.

3       Q.   Do you recognize this documents?

4       A.   Yes.

5       Q.   What are they?

6       A.   It's the release agreements and

7   severance agreement for Alan Romanowski and Kyle

8   McKellips, the last two remaining bargaining

9   unit employees.

10          MR. WIESE:  I'll offer General

11  Counsel's Exhibits 19 and 20.

12          MS. HILL:  No objection.

13          JUDGE ROSAS:  General Counsel's 19, 20

14  received.

15                  (GCX 19-20 received.)

16  BY MR. WIESE:

17      Q.   What process did the parties follow in

18  reaching the severance agreements in General

19  Counsel's Exhibits 19 and 20?

20      A.   Based on their years of service, they

21  had a payout, they got any left over vacation

22  days they hadn't used and then somehow agreed to

23  pay COBRA for two months and then also agreed to

24  pay them through that date which they were

25  originally laid off on August 8th.

1    Q.   And over the course of negotiating

2  these agreements, was there any discussion of

3  the unfair labor practices or unfair labor

4  practices?

5    A.   I believe so.

6    Q.   What do you recall from those

7  discussions?

8    A.   I don't recall which session it was but

9  I do recall that we brought that to Sunbelt's

10  attention.

11    Q.   Right.  I am talking specifically as

12  you were negotiating these severance agreements,

13  was there a discussion of unfair labor

14  practices?

15    A.   I don't recall.

16    Q.   Did the parties reach any other

17  agreements besides the severance agreements

18  during the August 16th session?

19    A.   No.

20    Q.   Was that the last time that you met

21  with Sunbelt, August 16th?

22    A.   Yes.

23    Q.   Based on your time spent in

24  negotiations with Sunbelt, did the employer

25  appear to be bargaining in good faith with the

1  union?

2      A.   No.

3      Q.   Why not?

4          MS. HILL:  By the way, objection.

5          JUDGE ROSAS:  I am going to sustain

6  that.  We don't need to get into the legal

7  conclusions that I have to arrive at.

8          MS. HILL:  Thank you.

9  BY MR. WIESE:

10     Q.   When did the company terminate the

11 remaining bargaining unit members?

12     A.   August 8, 2019.

13     Q.   Were there any bargaining unit members

14 employed after that date?

15     A.   I don't believe so because they said

16 Mariano -- the bargaining unit members said

17 Mariano was transferred to another shop.

18     Q.   I'd like to direct your attention to

19 General Counsel Exhibit 16.

20     A.   Okay.

21     Q.   Do you recognize this?

22     A.   Yes.

23     Q.   What is it?

24     A.   It's a map of the area where Sunbelt's

25 Profit Center 776 is located.

 1          MR. WIESE:  I will offer General

 2    Counsel Exhibit 16.

 3          MS. HILL:  Okay.  First of all, to lay

 4    a better foundation, did you prepare this map

 5    and this is more along the lines of asking for

 6    judicial notice of what the facility looks like

 7    so how do you want to handle this?

 8          JUDGE ROSAS:  Is it a fair and accurate

 9    representation as far as you are concerned as

10    far as what it looks like overhead or do you

11    need to inquire?

12          MS. HILL:  As of what particular date?

13          JUDGE ROSAS:  Okay.

14          MS. HILL:  This doesn't look like --

15          JUDGE ROSAS:  Sir, it's your testimony

16    that this is a fair and accurate representation

17    overhead of the location?

18          THE WITNESS:  Yes, sir.

19          JUDGE ROSAS:  As of what date?

20          THE WITNESS:  It would have been

21    sometime in November.  I don't know the exact

22    date.

23          MS. HILL:  November of 2019?

24          THE WITNESS:  Yes.

25          MS. HILL:  Okay.  And there is no

 1    construction here, no nothing blocked off here,

 2    correct?

 3            THE WITNESS:  That's when I -- but I

 4    got this off of Google Maps.  Google Maps isn't

 5    updated.  I take it off of Google Maps.  In

 6    November I took this from Google Maps.

 7            MS. HILL:  Okay.  So maybe Mr. Wiese

 8    can answer this.

 9            JUDGE ROSAS:  The relevance?

10            MS. HILL:  Yes.

11            MR. WIESE:  It's just to show the

12    facility and the surrounding area of the

13    facility.  It will help explain evidence that's

14    going to be coming into the record shortly.  I

15    am not -- so I understand what you are getting

16    at, Ms. Hill, with respect to, you know, this

17    being a representation of what sort of equipment

18    was at the facility on a given day, that's not

19    what it's being offered for.

20            MS. HILL:  And also it has somebody's

21    trailer sales, things like that, it doesn't look

22    like what the profit center looked like during

23    the relevant time period of March 1st of 2018 to

24    August 8th of 2019.

25            JUDGE ROSAS:  Does it or does it not?

1          THE WITNESS:  No.  It's a Google map

2     that I took a picture of --

3          JUDGE ROSAS:  Recently?

4          THE WITNESS:  In November.  I took it

5     from Google in November.  If Google wasn't

6     updated, I apologize for that.

7          JUDGE ROSAS:  It is what it is.  As of

8     Google November 2019.  I'll receive it for

9     whatever purpose General Counsel is going to try

10    to tie it into and obviously, respondent, you

11    can provide any perspective that you need to as

12    well.  So General Counsel 16 is received.

13               (GCX 16 received.)

14    BY MR. WIESE:

15    Q.   Mr. Ervin, I'd like to direct your

16    attention to General Counsel Exhibit 21.

17    A.   Okay.

18    Q.   Do you recognize this document?

19    A.   Yes.

20    Q.   And what is it?

21    A.   They are pictures that I took on

22    August 19, 2019 around 2:00 p.m.

23    Q.   And that would be in the first page of

24    the document; is that right?

25    A.   Yes.

1    Q.   Okay.  And so I notice there is

2  timestamps on each page of these documents.  Do

3  those timestamps reflect when the pictures were

4  taken?

5    A.   Yes.

6         MR. WIESE:  I will offer General

7  Counsel Exhibit 21.

8         MS. HILL:  For what purpose?

9         JUDGE ROSAS:  I assume are these a fair

10  and accurate representation of what that

11  equipment looked like on that location on

12  August 19, 2019?

13         THE WITNESS:  Yes and a nonbargaining

14  unit member working out of that facility.

15         MS. HILL:  Yeah, but there are other

16  dates on here, too, and he only said that he

17  only --

18         THE WITNESS:  They are all time stamped

19  accordingly.

20         MS. HILL:  He stated he took the

21  picture on August 19, 2019 in the afternoon.  I

22  haven't heard anything about September 6th.

23         JUDGE ROSAS:  Okay.  Go ahead.

24         MS. HILL:  October 24th, et cetera, now

25  if he wants to break these down into separate

1   exhibits --

2           JUDGE ROSAS:  Well, let's cut to the

3   chase.  You took pictures and they are dated.

4           MS. HILL:  Did he take all these

5   pictures?

6           THE WITNESS:  Yes, ma'am.

7           MS. HILL:  Sunbelt objects to these.

8           JUDGE ROSAS:  What grounds?

9           MS. HILL:  Relevancy.  Lack of

10  foundation.  All right.  That should do it.

11          JUDGE ROSAS:  He said he took them so

12  what's the relevance?

13          MR. WIESE:  The relevance is that it

14  shows individuals doing bargaining unit work at

15  the Franksville facility after the bargaining

16  unit employees were all fired.

17          MS. HILL:  I know you are smiling with

18  the thumbs-up but -- that's the witness over

19  there -- but, your Honor, this -- we haven't had

20  a foundation as to who the individual was.  Also

21  the two individuals who were laid off, contrary

22  to his statement, terminated, were mechanics so

23  we don't have a foundation as to how mechanics

24  should be doing this work that allegedly is

25  being done here and in some of these pictures,

1   there is no one --

2           THE WITNESS:  I can explain.

3           JUDGE ROSAS:  All right.  So the

4   pictures are going in at a minimum as according

5   to the witness his statement, his testimony that

6   they are fair and accurate representation of the

7   equipment at the location and there is some

8   references to individuals.  Now, that's good

9   enough to get this stuff into evidence.

10          Counsel is -- he elaborated on his

11  proffer.  You can address it further on voir

12  dire but perhaps it's something for cross

13  examination.

14          MS. HILL:  I will leave it for cross

15  examination, your Honor.

16          JUDGE ROSAS:  And also, Counsel, what

17  counsel represents maybe what you are pointing

18  out maybe in the end doesn't suffice.  I don't

19  know but it's certainly enough to get these

20  pictures into evidence.  Overruled General

21  Counsel's 21 are received.

22                  (GCX 21 received.)

23          MS. HILL:  Thank you, your Honor.

24          JUDGE ROSAS:  And this is a compilation

25  of 12 photographs different dates.

1           MR. WIESE:  That's correct.  I am going

2    to run through them.

3    BY MR. WIESE:

4        Q.   So, Mr. Ervin, I'd like to have you

5    take a look at Pages 1 through 3 of the exhibit.

6        A.   Okay.

7        Q.   Where did you take these pictures from?

8        A.   From the road that's in front of the

9    Sunbelt shop's yard.

10       Q.   Do you recognize the individual in the

11   picture on Page 1 of the exhibit?

12       A.   Yes, I do.

13       Q.   Who is that?

14       A.   It's Gary Stamm.

15       Q.   Who is Gary Stamm?

16       A.   He was the dispatcher at one point.

17   Somebody had said he was an operations manager,

18   too, but he was initially in our election he was

19   contested because he -- we wanted him in the

20   election because he was a -- he did bargaining

21   unit work.  He drove but Sunbelt, Pat Hill,

22   requested he not be in it and since we won seven

23   to nothing, they let it go but at this point at

24   the time they were -- in the past, they were

25   showing he wasn't eligible to be doing

1  collective bargaining work and now here he is

2  doing collective bargaining unit work.

3       Q.   Was Mr. Stamm part of the union at the

4  time this picture was taken?

5       A.   No.

6       Q.   What was notable from your perspective

7  about these pictures?

8            MS. HILL:  Objection.  Form.

9            JUDGE ROSAS:  Rephrase that.

10 BY MR. WIESE:

11      Q.   Why did you take these pictures?

12      A.   These pictures were taken after I

13 followed him to the shop returning this delivery

14 and, again, because he was a nonbargaining unit

15 member doing bargaining unit work after Jason

16 Mayfield stated that they were going to be a

17 customer pickup shop only.

18      Q.   I'd like to turn now to Page 4 of the

19 exhibit.  Where did you take this picture from?

20      A.   Again, from the street right in front.

21      Q.   Do you recognize the individual in this

22 picture?

23      A.   I do not.

24      Q.   Why did you take this picture?

25      A.   Because, again, they are as you can see

1  in the sequence some subsequent pictures he is

2  hooking up a load, he is delivering it

3  somewhere.  I did not follow him and, again,

4  those are things that Jason Mayfield was not

5  going to happen out of that shop.

6      Q.   And with respect to the subsequent

7  pictures that you are talking about, which pages

8  of the exhibit?

9      A.   So it would be 4, 5 and 12 all on

10 September 6, 2019.

11     Q.   4, 5 and what page?

12          MS. HILL:  12 you said?

13          THE WITNESS:  6 of 12.

14 BY MR. WIESE:

15     Q.   And with respect to the remaining

16 pictures in the exhibit on Pages 7 through 12,

17 where did you take these pictures from?

18     A.   Again, from the road out in front of

19 their shop.

20     Q.   And why did you take these pictures?

21     A.   On October 24, 2019 I took these

22 pictures because it clearly shows that there is

23 larger equipment there that would be different

24 to what Mayfield stated as being a small tool

25 customer pickup only shop.

1     Q.   I'd like to direct your attention to

2   General Counsel Exhibit 22.

3     A.   Okay.

4     Q.   Do you recognize this document?

5     A.   Yes.

6     Q.   And what is it?

7     A.   On December 3rd, I took these pictures

8   off the website.  You'll see the first couple

9   pages show the Franksville location so I went

10   online and you can access the Franksville shop

11   Profit Center 776, there was supposed to be a

12   small tool shop and it shows you can get various

13   large equipment.  That wouldn't reflect a small

14   tool and then if you move forward to Page 4,

15   that shows the same equipment available at the

16   Waukesha shop.

17     Q.   And when you say Page 4, are you

18   certain that was on Page 4 of the document or is

19   that a different --

20     A.   I apologize.  It is Page 5 of 44.

21     Q.   And as you go through the remainder of

22   the document, Pages 9, through 11, is that also

23   equipment from the Franksville facility or that

24   you accessed through the Franksville facility?

25     A.   Yeah.  The Franksville website, yeah.

1   Every couple of pages I added a couple more

2   things like dozers and whatnot.  Clearly not

3   small equipment and then, like I said, if you

4   move forward, you can get the same thing at the

5   Waukesha shop.  I just replicated everything

6   that you can get from Franksville as you can at

7   Waukesha, large equipment.

8       Q.   And how can you tell which facility the

9   equipment is accessed from?

10      A.   For example, if you look at the top of

11  Page 1 it shows Franksville, Wisconsin location.

12      Q.   Okay.  And all of the -- did you access

13  all of these web pages on December 3rd?

14      A.   Yes.

15      Q.   2019?

16      A.   Yes.

17           MR. WIESE:  I'll offer General Counsel

18  Exhibit 22.

19           MS. HILL:  Objection as to relevancy.

20           MR. WIESE:  Well, this is large

21  equipment that Mr. Ervin testified to that you

22  could access through the Franksville website.  I

23  mean, the document essentially speaks for itself

24  but it has order rates for, you know, large

25  equipment here.  I mean, you are talking about

1  full size bulldozers and things likes that that

2  are nowhere near what respondent represented

3  they would be holding at the Franksville

4  facility.

5          MS. HILL:  Is he testifying also as to

6  whether that same equipment is at the facility

7  as of December 3, 2019, so what's the relevance?

8          MR. WIESE:  His testimony speaks for

9  itself.  I mean --

10          JUDGE ROSAS:  Well, maybe his testimony

11  is lacking.

12          MS. HILL:  Right.  Right.

13          JUDGE ROSAS:  He got it off the website

14  and I am going to receive it.  Overruled.

15  General Counsel 22 is received.

16                  (GCX 22 received.)

17  BY MR. WIESE:

18      Q.  I'd like to direct your attention to

19  General Counsel Exhibit 39.

20      A.  Okay.

21      Q.  Do you recognize this document?

22      A.  Yes.

23      Q.  What is it?

24      A.  It is the unfair labor charge that we

25  filed on behalf of Jamie Smith and Ramon

 1  Gutierrez.

 2          MR. WIESE:  I'll offer General Counsel

 3  Exhibit 39.

 4          MS. HILL:  Objection.  Relevancy.  This

 5  is on appeal if I am not mistaken.  Mr. Ryan

 6  could probably testify as to that.

 7          MR. RYAN:  Actually, I believe they

 8  denied -- they denied our appeal.

 9          MS. HILL:  Denied their appeal, so it's

10  completely irrelevant.  I apologize.  I started

11  to draw a blank.  There have been so many.

12          MR. RYAN:  There have been a few.

13          MR. WIESE:  Your Honor, it's included

14  in the complaint as part of the payday 884

15  allegation.

16          JUDGE ROSAS:  It's relevant to the 884

17  allegation.  All right.  Overruled.  I'll

18  receive it, General Counsel's 39.

19              (GCX 39 received.)

20          MR. WIESE:  Your Honor, so the

21  remaining exhibits that I need to enter are

22  videos that I was intending to show on the smart

23  board over there so I would like three minutes

24  to set it up.

25          JUDGE ROSAS:  Okay.  We will -- and how

1    much time do you have with that?

2              MR. WIESE:  So the videos themselves

3    one of them is a minute, the other one is

4    approximately six minutes.  With regard to the

5    six-minute video, there is only portions of it

6    that I think are necessary to show.

7              JUDGE ROSAS:  That concludes your

8    questioning?

9              MR. WIESE:  Yes.  That's correct.

10             JUDGE ROSAS:  All right.  Let's get it

11   done.

12             MR. WIESE:  Before we show the videos

13   and authenticate them, very important piece of

14   information for the record, so the videos are

15   encrypted, they are password protected and the

16   password is Section 7 ending in the number seven

17   all one word capital S, so...

18             JUDGE ROSAS:  Okay.

19             MS. HILL:  And no space.

20             MR. WIESE:  That's correct.  No space.

21             JUDGE ROSAS:  All right.  I assume,

22   Madam Court Reporter, we are going to go offline

23   at this point.

24                  (Whereupon, videos shown.)

25             MR. WIESE:  So this is General Counsel

1  Exhibit 23.

2           JUDGE ROSAS:  Back on.

3  BY MR. WIESE:

4      Q.  Mr. Ervin, we just watched the video

5  that's been previously identified as General

6  Counsel Exhibit 23.  Did you take that video?

7      A.  Yes.

8      Q.  And when did you take that video?

9      A.  On that August -- I don't recall

10  exactly.  August 9, 2019.

11          MR. WIESE:  I'll offer General Counsel

12  Exhibit 23.

13          MS. HILL:  So I want to be sure his

14  testimony is what is going to be the date for

15  that.

16          MR. WIESE:  Well, the video.

17          JUDGE ROSAS:  That was your voice

18  speaking?

19          THE WITNESS:  That is my voice in the

20  video.  I'm sorry.  I don't recall it right here

21  but that is my voice in that video.

22          JUDGE ROSAS:  Okay.  And you ascribe to

23  everything you said at that time is true and

24  accurate as to what you were perceiving at the

25  time?

1          THE WITNESS:  Yes, sir.

2          JUDGE ROSAS:  Any voir dire?

3          MS. HILL:  I have a lot on cross

4    examination on this one.  But with respect to

5    this one, again, Sunbelt objects as to

6    relevancy.

7          JUDGE ROSAS:  General Counsel's 23 is

8    received over objection.

9               (GCX 23 received.)

10         MR. WIESE:  For purposes of the record,

11   do we need to clarify on the record the date

12   that's mentioned in the video?

13         JUDGE ROSAS:  There is a -- is the date

14   shown on there?

15         MR. WIESE:  No, it wasn't.

16         MS. HILL:  No.  He is just claiming the

17   date.

18         JUDGE ROSAS:  He mentioned it at the

19   time and he is testifying that he ascribes to

20   everything he said on there.  So, okay.  Off the

21   record.

22               (Whereupon, a discussion was had

23                off the record.)

24         JUDGE ROSAS:  All right.  Back on the

25   record.  That's General Counsel's 24.

1    BY MR. WIESE:

2         Q.   Mr. Ervin, with regard to General

3    Counsel Exhibit 24, where did you take that

4    video from the first portion of that video?

5         A.   Sunbelt's shop on right off of Fuhrman

6    Road and located at the Profit Center 776.

7         Q.   And is there a cut in that video?

8         A.   Yes.

9         Q.   And where is the second portion of that

10   video taken from?

11        A.   The second portion of the video is when

12   I picked him up again we were driving around for

13   a while and he tried to drive in circles and

14   stuff like that and I shut it off.  I have

15   everything recorded but I recorded or given you

16   guys what was relevant and basically that is

17   following him to a job site in Racine.

18        Q.   So is that the same truck in the second

19   and first part of that video?

20        A.   Yes.

21        Q.   With regard to the date the video was

22   taken, is the information that you convey in

23   that video is that accurate as to your

24   recollection today?

25        A.   Yes.  Directly as it was happening.

 1              MR. WIESE:  Okay.  I'll offer General

 2    Counsel Exhibit 24.

 3              MS. HILL:  Objection.  Relevancy.

 4              JUDGE ROSAS:  Do we have a date?

 5              MR. WIESE:  I believe.

 6              THE WITNESS:  I stated it in there.

 7              MR. WIESE:  It was stated in there.

 8              THE WITNESS:  November 7th.

 9              MS. HILL:  November 7, 2019 allegedly

10    at 6:00 a.m.  No digital recording on the video.

11              JUDGE ROSAS:  No digital recording?

12              MS. HILL:  No digital date.

13              JUDGE ROSAS:  Oh.

14              MS. HILL:  No digital timestamp.

15              JUDGE ROSAS:  Counsel proffers that it

16    depicts equipment that is different from the

17    equipment that was at that facility.

18              MR. WIESE:  No.  That it depicts

19    equipment that would be handled by bargaining

20    unit employees due to its size and type of work

21    that was being done.  That's what all of this.

22              MS. HILL:  But they haven't laid that

23    foundation yet.  This was being delivered by an

24    outside hauler.  This facility used outside

25    haulers.

1          JUDGE ROSAS:  Counsel is articulating

2     that that's what the relevance is of that photo

3     hasn't proven that completely but --

4          MS. HILL:  Correct.

5          JUDGE ROSAS:  But there may or may not

6     be other testimony to tie that together.  But

7     based on the proffer and the foundation provided

8     by the witness, I am going to receive it over

9     objection.  General counsel's 24.

10                    (GCX 24 received.)

11          MR. WIESE:  Nothing further at this

12     time, your Honor.

13          JUDGE ROSAS:  Charging Party, are you

14     going to have any questions at this point?

15          MR. RYAN:  Probably just a few.

16     Nothing extensive if I can take a few minutes to

17     review.

18          JUDGE ROSAS:  Why don't we do that when

19     we resume.  How much time do you think you are

20     going to need to prepare for your cross?

21          MS. HILL:  Several hours.

22          JUDGE ROSAS:  You'll have cross for

23     several hours?

24          MS. HILL:  Yes, sir.

25          JUDGE ROSAS:  How much time are you

1 going to need for a brief lunch recess?

2         MS. HILL:  I'll leave that up to you

3 gentlemen.  Just tell me how much time I get and

4 we'll take it from there.

5         JUDGE ROSAS:  All right.  I don't know.

6         MR. WIESE:  Do you want to break for an

7 hour?

8         JUDGE ROSAS:  Okay.  Let's resume at a

9 quarter to 3:00.

10                 (Whereupon, a lunch recess was

11                  taken.)

12         JUDGE ROSAS:  Go ahead.

13         MR. WIESE:  I'd just like to know while

14 we were off the record counsel for respondent

15 Pat Hill requested copies of Mr. Ervin's

16 affidavits which I did provide to her consisting

17 of the initial affidavit in case 18-CA-236643,

18 the supplemental affidavit in that same case and

19 then a third affidavit in case 18-CA-247528.

20         JUDGE ROSAS:  Okay.  All right.

21 Charging Party?

22         MR. RYAN:  Thank you, your Honor.  Good

23 afternoon, Mr. Ervin.  I just have a few

24 follow-up questions from what General Counsel

25 had asked.

1                    CROSS EXAMINATION

2   BY MR. RYAN:

3       Q.   If I could just direct your attention

4   to General Counsel Exhibit 6A.

5       A.   Okay.

6       Q.   Were you involved in preparing this

7   document?

8       A.   Yes.

9       Q.   Was it based on something, an existing

10  collective bargaining agreement?

11          MS. HILL:  Objection.  Leading.

12          JUDGE ROSAS:  Was it based on what?

13          MR. RYAN:  An existing collective

14  bargaining agreement.

15          MS. HILL:  It's leading.

16          JUDGE ROSAS:  Where did it come from?

17  They are born from -- All right.  I'll allow it.

18  I'll allow it.

19          THE WITNESS:  Yes.

20          JUDGE ROSAS:  What did it come from?

21          THE WITNESS:  It was based off of our

22  original.  We were revising it.

23  BY MR. RYAN:

24      Q.   But from a different agreement?

25      A.   Yes.

1    Q.    Okay.  Was it from another local union?

2    A.    Yes.  It was a combination of Local 234

3  Michigan and Local 150 in Illinois both were

4  signatory to Sunbelt Rentals in those respective

5  areas.

6    Q.    Why did you base that to work off of?

7    A.    One, based off the local areas and two,

8  it was a similar language to what they were

9  already a party to.

10   Q.    Thank you.  And then you also testified

11  about the April 30, 2019 bargaining session and

12  discussion regarding the administrative duties

13  provisions.  You said that that was similar or

14  Sunbelt had such an agreement in the nearby

15  area.  Can you specify that?

16   A.    Right over the border and Local 150

17  they have it and also across the lake in

18  Local 134 which is Michigan they have it.

19   Q.    So by across the border you meant

20  Illinois?

21   A.    Yes, sir.

22   Q.    And was any explanation given by

23  Sunbelt as to why it was acceptable in Illinois

24  and Michigan but not in Wisconsin?

25   A.    No.

1    Q.   If you could take a quick look for me

2    at General Counsel Exhibit 21.  Specifically the

3    first three pages of that.

4    A.   Okay.

5    Q.   Were these photographs taken the same

6    time as the video of that was introduced as

7    General Counsel's Exhibit 23 which was the Gary

8    Stamm?

9    A.   Yes.

10   Q.   I believe you testified that the video

11   was on August 9th; is that the correct date?

12   A.   No.  The correct date is August 19th.

13   I misspoke.

14   Q.   And I just want to talk a little about

15   we'll start with Page 1 of General Counsel

16   Exhibit 21.  In addition to the person there who

17   you -- I think you testified was Mr. Stamm, what

18   else do you see when you look at this

19   photograph?

20   A.   If you look at the left middle of the

21   picture, you'll see an aerial lift along with

22   the same thing on the right middle side of the

23   picture and those are units that would have to

24   be towed behind and I wouldn't count those as

25   small tools as Mr. Mayfield stated the shop was

1  going to turn into.

2      Q.    Okay.  And on the next page Page 2 of

3  General Counsel Exhibit 21, what is that on the

4  flatbed?

5      A.    That's an industrial sized forklift.

6      Q.    And would that be the type of small

7  tool that you would expect at a will call

8  center?

9      A.    No.

10     Q.    And if you could look at Page 7 of

11  General Counsel Exhibit 21.

12     A.    Okay.

13     Q.    Could you describe some of the

14  equipment that you see in that photograph?

15     A.    Yes.  In the middle the picture

16  directly behind the yellow gas marking, there is

17  a skid-steer that probably weighs around

18  8,000 pounds because I used to operate those

19  when I worked in the field.  Next to it you see

20  a couple of industrial size forklifts and to the

21  right of that skid-steer there is more aerial

22  lift that, again, I wouldn't consider a small

23  tool like Mr. Mayfield related to.

24     Q.    And if we could skip over to Page 11 of

25  General Counsel Exhibit 21.

1    A.    Okay.

2    Q.    Could you describe the equipment that

3  you are seeing in that photograph?

4    A.    If you look just right of the telephone

5  pole you see an orange piece of equipment.  It's

6  what we call a tractor loader backhoe.  It's got

7  a scooping bucket on the front and a hoe on the

8  back.  Just right of that you see three

9  mid-sized mini excavators or what we call hoes

10  that, again, are definitely not small equipment;

11  and if you look in the background just to the

12  left of the Sunbelt sign you can see a larger

13  size excavator that is even bigger than the ones

14  in the forefront of the picture.

15    Q.    And just flipping through the last page

16  Page 12 of General Counsel Exhibit 21, aside

17  from the stuff to the left of the Sunbelt sign,

18  is there anything else you see in that picture

19  of note?

20    A.    I just got to find that page.  Okay.

21  Yes.  If you look to the far right in the middle

22  of the page, you'll see a telehandler.  I used

23  to run those quite a bit at the company I work

24  for and those are definitely 30, 40,000 pound

25  machines.

1    Q.   Just to get a little perspective on

2  where you took those photographs if we can take

3  a quick look at General Counsel Exhibit 16.

4    A.   Yes.

5    Q.   Just the first page of that.

6    A.   Uh-huh.

7    Q.   So where approximately would these

8  series of photographs have been taken?

9    A.   They would be on the West Frontage Road

10  just a little to the upper right of where it

11  says Javier Trailer Sales, between there and

12  west the -- where the verbiage or the front that

13  says West Frontage Road, it would be right in

14  that spot.

15    Q.   And I think I just want a couple quick

16  questions on General Counsel Exhibit 22.  It's

17  this packet.

18    A.   Oh, okay.  I'm sorry.  It's over here.

19  Okay.

20    Q.   If I could actually have you turn

21  towards the back of that document page, we'll

22  start with Page 42.

23    A.   I'm sorry.  What?

24    Q.   Page 42 of General Counsel Exhibit 22.

25    A.   Okay.  Okay.

1      Q.   So when you accessed Sunbelt's website
2  to obtain this screen shot, how did you -- what
3  did you click on to say get to the part that
4  starts on Page 1 that shows Franksville with the
5  backhoe orders?
6      A.   You can go to Sunbelt's location and
7  you can itemize whatever location you want and I
8  picked the Franksville location.
9      Q.   And from there you clicked on a link to
10 see what equipment was?
11         MS. HILL:  Objection.  Leading.
12         JUDGE ROSAS:  Sustained
13 BY MR. RYAN:
14     Q.   Once you found the Franksville
15 location, what did you do next?
16     A.   I clicked on equipment for rent.
17     Q.   Okay.  And then if you turn back to
18 Page 41, what did you do on that page to get to
19 the document say like the one on Page 12 listing
20 Waukesha equipment?
21     A.   I clicked on the Waukesha location at
22 the website.
23     Q.   Okay.  And what did you do from there?
24     A.   Then I clicked on equipment for rent.
25         MR. RYAN:  I don't think I have

1    anything further, your Honor.  Thank you.

2              JUDGE ROSAS:  Okay.  Respondent, are

3    you ready?

4              MS. HILL:  Yes.

5              JUDGE ROSAS:  All right.

6              MS. HILL:  All right.  Let's go off the

7    record for a little bit.

8              JUDGE ROSAS:  Sure.

9                   (Whereupon, a discussion was had

10                   off the record.)

11                   CROSS EXAMINATION

12   BY MS. HILL:

13      Q.   Mr. Ervin, please look at General

14   Counsel Exhibit 4.

15      A.   Okay.

16      Q.   Are they in order?

17      A.   Not anymore because when I was done

18   with them, I put them aside.

19              MS. HILL:  Okay.  Can we take a few

20   minutes just for him because I think it will

21   save us time.

22              JUDGE ROSAS:  Sure.

23              THE WITNESS:  I am good.

24   BY MS. HILL:

25      Q.   Thank you, sir.  All right.  Directing

1   your attention to General Counsel Exhibit 4, and

2   I'll try to ask my questions in order.

3       A.   Okay.

4       Q.   What is Sunbelt's fiscal year?

5       A.   I believe it ends in March.  I don't

6   know.

7       Q.   Did you ever ask Sunbelt when did its

8   fiscal year end?

9       A.   No.

10      Q.   Would you please look at the next

11  Exhibit 5E?

12      A.   5E.

13      Q.   Yes, sir.

14      A.   Okay.

15      Q.   All right.  Are these your only notes

16  from September 27, 2018?

17      A.   Yes.

18      Q.   Did you prepare notes like this where

19  you had time in, time out for any other

20  negotiation session?

21      A.   No.  This session Greg West was not

22  there so I was the primary note taker.

23      Q.   So if you wanted to know starting times

24  and ending times for any of the negotiation

25  sessions, that Mr. West attended would you have

1   to go to his notes, correct?

2       A.   We use his notes for everything except

3   for the one that he wasn't at, yes.

4       Q.   And did you use his notes to prepare

5   your initial affidavit for 236643?

6       A.   Yes.

7       Q.   Okay.  So it wasn't based on your

8   knowledge, correct?

9       A.   It was based on our notes, his notes.

10      Q.   On his notes?

11      A.   Yes.

12      Q.   Dates and times that you have in your

13  affidavit, correct?

14      A.   Yes.  Yes.

15      Q.   Please look at 6A.

16      A.   Forgive me.  It must be messed up a

17  little in here.  6A.

18      Q.   Yes, sir.

19      A.   Okay.  I apologize.  It must be --

20      Q.   It's the draft CPA with the word draft

21  across it.

22      A.   Okay.

23      Q.   14 pages.

24      A.   Uh-huh.  You said A.  I have D here.

25      Q.   I have 6A.  Just to help you a bit it's

1    the one that has a -- does your say 6A?

2        A.   There was two of them so I just got to

3    find the other one.

4        Q.   When did you provide this to Sunbelt?

5        A.   I believe at the October 23, 2018

6    meeting.

7        Q.   You didn't send an electronic version,

8    correct?

9        A.   No.

10       Q.   Did you ever send a proposal to Sunbelt

11   electronically prior to negotiation sessions?

12       A.   No.

13       Q.   And why not?

14       A.   Greg West had stated he didn't want me

15   to do that.

16       Q.   Wouldn't it have made the negotiation

17   processing a little faster?

18       A.   Yeah.

19       Q.    In the first negotiation session,

20   wasn't the union told by Sunbelt that it was the

21   first time they had never received an electronic

22   set of proposals from the union prior to the

23   first negotiation session?

24       A.   Yeah.  I believe so.

25       Q.   And this proposal even though its

1  October 23, 2018 did not contain any wages,

2  correct?

3      A.   Correct.

4      Q.   Now this proposal you said was a

5  compilation of the Operating Engineers 324 out

6  of Michigan, correct?

7      A.   This particular one that you have is

8  basically -- yes, it is.  I'm sorry.  Yes.

9      Q.   Okay.  Which of the 324 is in Michigan?

10     A.   The larger shops they have two separate

11  agreements, there is large shops and there is

12  small shops and I received those from the

13  individuals over there based on the large shop

14  because this is a large shop.

15     Q.   Okay.  In your opinion Franksville is a

16  large shop.  Okay.  Now you received the

17  collective bargaining agreements from John

18  Sarafin?

19     A.   Yes.

20     Q.   Anyone else with the 324?

21     A.   No.

22     Q.   All right.  Now you do know that the

23  324 has half a dozen eight separate collective

24  bargaining agreements, correct?

25     A.   I am being told they have four or five.

1   They are working on five or they are working on

2   six but I was told they have four or five.

3        Q.   But they have more than just one,

4   correct?

5        A.   Yes.

6        Q.   And you claim that it was your belief

7   that there is a large -- they have a contract

8   for a large operation and a contract for a small

9   operation in Michigan, correct?

10       A.   Based on the equipment size, not the

11  shop itself.

12       Q.   Just equipment size?

13       A.   Yes.  Yes, ma'am.

14       Q.   Only for general tool, correct?

15       A.   Yes.

16       Q.   Now, perhaps you ought to explain to

17  the judge the difference among the divisions.

18       A.   So you got -- Sunbelt has the general

19  tools which is what you see in some of those

20  pictures, telehandlers, excavators, loaders and

21  then they have the smaller shops which is I

22  think they call them pump and power where they

23  have small hand tools and stuff like that.  I am

24  not completely aware of exactly all that the

25  smaller shops have.  I just know that what John

1   had said from Local 324.

2           MS. HILL:  Objection.  Hearsay.

3           JUDGE ROSAS:  Who is John?

4           MS. HILL:  Move to strike.  Serafin.

5           JUDGE ROSAS:  John is --

6           MS. HILL:  With the 324.

7           JUDGE ROSAS:  Okay.  So you can't refer

8   to something you are told by someone else.

9           THE WITNESS:  Okay.

10          JUDGE ROSAS:  However, you can allude

11  to conversations with individuals if it's part

12  of the chronology so after I spoke to John, for

13  example, I did this or did that what you did,

14  what you saw but not what someone heard unless

15  it's someone who is going to testify here.  No?

16  Okay.  Who can be cross examined or opposing

17  party's statement which is not the case, so,

18  okay.  With that clarification, proceed.

19  Continue.

20          THE WITNESS:  All I got -- received

21  from him was a copy of their collective

22  bargaining agreement.  I did not see the shops

23  that they were a party to but I just was told

24  this was what we had for those kinds of facility

25  and that's what we worked off of.

1  BY MS. HILL:

2      Q.   So you have no idea whether Sunbelt has

3  a different contract for Detroit compared to

4  Novi, Michigan, compared to Sterling Heights,

5  Michigan, compared to it's in Lansing, Michigan,

6  correct?

7      A.   No.

8      Q.   And the 150 out of Illinois, correct?

9      A.   Yes.

10     Q.   What percentage of the 150's contract

11 is in here?

12     A.   Probably a smaller portion because 324

13 is more compatible to what we are.

14     Q.   What do you mean by compatible?

15     A.   Size and market share.

16     Q.   That's the second time you have used

17 market share.  Do you want to define that,

18 please?

19     A.   They have -- In Local 150 they have a

20 very, very upper 90, maybe a hundred percent of

21 the market share.  In Michigan they do not.

22     Q.   The 324 doesn't have --

23     A.   That's Michigan, yep.

24     Q.   Right.  Now, during any of the

25 negotiations, does Sunbelt ever tell you that

1    each profit center stands alone?

2         A.    Yep.

3         Q.    Did Sunbelt tell you during

4    negotiations that the budget for each profit

5    center is separate from the budget for another

6    profit center?

7         A.    I believe so.

8         Q.    Did you hear during negotiations that

9    Sunbelt's territory for a profit center differs

10   from profit center to profit center?

11        A.    Uh-huh.

12        Q.    Verbal for the court reporter.

13        A.    Yes.

14        Q.    Thank you.  Are you aware that Sunbelt

15   also has contracts, several contracts, with

16   Operating Engineers in southern Illinois?

17        A.    Yes.

18        Q.    Did you contact them for some sample

19   language?

20        A.    Nope.

21        Q.    Why not?

22        A.    I took what was closest to us.

23        Q.    Now, during negotiations, didn't

24   Sunbelt tell you during discussions --

25

1          (Whereupon, a discussion was had

2              off the record.)

3      MS. HILL:  Are we okay?  All right.

4      JUDGE ROSAS:  Back on the record.

5  BY MS. HILL:

6      Q.   Going my last question to him was that

7  it has contracts where Sunbelt does not deduct

8  the dues from the employee's paychecks?

9      A.   I don't recall that.

10     Q.   You don't recall Sunbelt referencing

11 you to its contract -- one of its contracts in

12 St. Louis?

13     A.   I'm sorry.  I don't recall.

14     Q.   And you don't recall Sunbelt also

15 referring you to a contract it has with

16 teamsters out on the east coast in which it does

17 not have dues deductions?

18     A.   I don't recall.

19     Q.   Now for purposes of this agreement, you

20 didn't even go to the Operating Engineers 513

21 out of St. Louis, correct?

22     A.   You are correct.

23     Q.   And why not?

24     A.   Again, I went from with the closest

25 facilities to us.

1    Q.   Did you even contact them?

2    A.   I know they signed with you guys.  I

3  didn't contact them about any agreements because

4  they are a little farther away than the two that

5  we referenced.

6    Q.   Just because they are farther away but

7  you are not driving to them.  You are just

8  picking up a phone or sending an E-mail, right?

9    A.   At one point you guys -- guys

10  referenced in the negotiations that it's all

11  based on the areas so I utilized that to take

12  that into consideration.

13    Q.   Well, in answer to my question, you

14  could have just picked up the phone or sent an

15  E-mail to any of the organizers or the president

16  or vice president of any of those unions, too,

17  correct?

18    A.   Sure.

19    Q.   And you failed to do so, correct?

20    A.   Yeah.

21    Q.   You have mentioned several times in

22  response to questions from the general counsel's

23  attorney about safety moments.

24    A.   Uh-huh. Yes.  Sorry.

25    Q.   Okay.  Did the union have an objection

1  to the safety moment?

2      A.    Initially Greg West had asked why we

3  needed to do it and you guys said it's something

4  you always do even though you only did it five

5  out of the, well, 13 sessions that I was at.

6      Q.    If Sunbelt disagrees with your

7  statement about five out of whatever number you

8  were there, would you agree that it was done

9  more often?

10     A.    No.  Because we have it in our notes.

11     Q.    In your notes or someone else's notes?

12     A.    Greg's notes.

13     Q.    And his notes are perfect, correct?

14     A.    He is the primary note taker.

15     Q.    My question was his notes are perfect?

16     A.    I don't think anybody's are perfect,

17  no.

18     Q.    With respect to the safety moment --

19     A.    Uh-huh.

20     Q.    -- any objection from the union

21  regarding having it?

22     A.    Just what I just stated.

23     Q.    Did the union ever provide the safety

24  moment?

25     A.    Yeah because you asked us to.

1    Q.   And did the union object to it?

2    A.   No because we wanted to move forward.

3    Q.   Would you agree that safety is a number

4  one concern for Sunbelt?

5    A.   I don't know.  That's your business.

6    Q.   Well, during one of the negotiation

7  sessions didn't Sunbelt discuss a recent death

8  of a Florida employee?

9    A.   Yes.

10    Q.   And didn't the union want to know why

11  Sunbelt had safety quizzes?

12    A.   Yes.

13    Q.   And didn't Sunbelt provide you a

14  justification for the safety quizzes?

15    A.   Yes.

16    Q.   And was the union satisfied with its

17  justification of having safety quizzes?

18    A.   I don't know if we were satisfied.  We

19  just wanted to move forward.

20    Q.   Did the union ask for a copy of a

21  safety quiz?

22    A.   Yes.

23    Q.   Did Sunbelt provide it?

24    A.   Yes.

25    Q.   Now, isn't -- you had an objection

1  about Mr. Ryan Anderson having a safety moment

2  discussing deer but it wasn't just deer,

3  correct?

4      A.  No.  He talked about the concern of

5  deer running around and cars running into them

6  in the middle of the summer.

7      Q.  No.  Well, I'm sorry.  Middle of the

8  summer.  What's the Wisconsin definition of

9  middle of summer?

10     A.  June 26, 2018 is when that happened.

11     Q.  And that negotiation, though, I thought

12 you said was May 22, 2018.

13     A.  No.  Our first safety moment was not

14 until June 26, 2018.  We did not have a safety

15 moment on May 22, 2018.  We started on June 26,

16 2018.

17     Q.  Did Sunbelt explain that Sunbelt has

18 safety moments for any meeting in which there

19 are four or more attendees?

20     A.  Yes, you did.

21     Q.  And did Sunbelt also explain to you

22 that the safety moment can be for

23 teleconferences also with four or more

24 employees?

25     A.  I believe so.

1      Q.   You mentioned several times under

2   examination by the general counsel's attorney --

3           MS. HILL:  And excuse me Judge Rosas, I

4   just mentioned -- realized am I talking too fast

5   for your notes?

6           JUDGE ROSAS:  No.  You are fine.  No.

7   You are fine.  I am not keeping up with you guys

8   anyway typing wise.

9           MS. HILL:  Okay.  Thank you.

10  BY MS. HILL:

11     Q.   You mentioned several times about my

12  travel from Florida.  Did Sunbelt ever raise

13  that as a concern during negotiation sessions?

14     A.   No.  We were just trying to accommodate

15  you.

16     Q.   Okay.  Would you please look at 6G?

17     A.   Okay.

18     Q.   When was 6G given to Sunbelt?

19     A.   June 5, 2019.

20     Q.   How was it given to Sunbelt?

21     A.   In person at our negotiation session.

22     Q.   And explain because I am not sure if it

23  all came out during direct examination, what was

24  the purpose of 6G?

25     A.   Yes.  The purpose was for us to move

1  forward together and either accept or reject or

2  show table the signoff so that we know exactly

3  where we were because there was a lot of

4  confusion on where we were, this way there will

5  be no confusion and everybody will know where we

6  are at.

7      Q.   Why didn't you send this to Sunbelt

8  electronically before the June 5, 2019

9  negotiation session if you really wanted

10 negotiations to move forward?

11     A.   Greg West told me not to.

12     Q.   Did you specifically ask if you could

13 send this electronically?

14     A.   Yes.  Yes, I did.

15     Q.   Now, in response to seeing this, what

16 did Sunbelt ask?

17     A.   You guys wouldn't go through with it

18 until we countered the proposals that you gave

19 us previously.

20     Q.   Well, with respect to this, did the

21 union gave Sunbelt directions to review this to

22 make sure that it was accurate and to sign off

23 on it, correct?

24     A.   Yes.

25     Q.   I apologize for the compound question;

1  but, anyway, you got it.  With respect to that

2  request from the union, did Sunbelt caucus?

3      A.   Yes.

4      Q.   And then did Sunbelt come back with a

5  request?

6      A.   Yeah.  You had asked me to E-mail or to

7  send it to you and Steve told me I could so I

8  did that afternoon.

9      Q.   All right.  No.  We are talking June 5,

10  sir.

11      A.   That's the same -- oh, yes, ma'am.

12  Yes.

13      Q.   June 5th?

14      A.   Yep.  Yep.  There is 13 sessions.  I

15  apologize if I can't remember every one of them.

16      Q.   Sir, I can understand.  With respect to

17  June 5th, Sunbelt requested an electronic

18  version, correct?

19      A.   Yes.

20      Q.   And Sunbelt's justification for asking

21  for an electronic version so that it could

22  review as requested by the union the TA'd

23  provisions to make sure everything was accurate,

24  correct?

25      A.   Yes.

1    Q.    Between June 5th and the morning of

2  July 9th, did you do what was requested of you,

3  sir?

4    A.    No.

5    Q.    And why not?

6    A.    Greg West told me not to.

7    Q.    So when Sunbelt and the union had sort

8  of what you described a very briefly negotiation

9  session on July 9th, would you agree part of the

10  reason for the shortness of the negotiation

11  session was because you, the union, had not

12  forwarded as promised the electronic version of

13  this so Sunbelt could review it?

14    A.    Not completely.

15    Q.    There was another issue?  You said -- I

16  said part of the reason --

17    A.    Right.

18    Q.    -- the other reason was we'll get to

19  it, Mr. Smith, correct?

20    A.    That was on July 9th but on July 5th,

21  we wanted to go through this line by line item

22  by line item and you wouldn't at the table.

23    Q.    Because we wanted to review it with the

24  TA'd provisions, correct?

25    A.    We wanted to review it in person and

1  you wouldn't do it.

2      Q.    Did we say it would take less time if

3  we could do a red line comparison of the two

4  Word versions and get it done and be able to

5  respond to you at the July 9th negotiation

6  session?

7          MR. WIESE:  Objection, your Honor.

8  Vague.  I mean, these questions are all being

9  phrased in terms of we and Sunbelt and I would

10 appreciate if the speaker in all these questions

11 that are being asked to Mr. Ervin if that person

12 could be identified if respondent knows who that

13 is.

14         JUDGE ROSAS:  Can you answer that?

15         THE WITNESS:  Yeah.  Pat Hill was

16 basically the main spokesperson for Sunbelt.

17 She did ask me after June 5th if I could provide

18 this electronically but what the union wanted --

19 BY MS. HILL:

20     Q.    Just a moment.  Not after June 5th.  On

21 June 5th, correct?

22     A.    Yes.  To give it to you after the

23 session before the July 9th session, yes.

24     Q.    And Mr. West wouldn't let you do that?

25     A.    No because we had wanted to go through

1  it with you individually together so there would

2  be no confusion because we have had other times

3  where we did red lining and it was back and

4  forth and back and forth.  We wanted to sit down

5  at the table productively go through it

6  together.

7      Q.   But, sir, you -- we also said we

8  tried -- did Sunbelt try to caucus and go

9  through it line by line?

10     A.   Yeah but all you said was the table of

11  contents was wrong.  We wanted to go through it

12  with you.

13     Q.   And if the witnesses for Sunbelt say

14  that you didn't want to sit there and go line by

15  line during negotiation session but rather have

16  Sunbelt do it during a caucus, would that be an

17  incorrect statement?

18     A.   No.  That's what you wanted.  What we

19  wanted to go through it right there.  You,

20  Sunbelt, did not want to go through it at the

21  table and that was Steve Buffalo's argument that

22  no.  We are not going to move forward until we

23  go through it at the table.

24     Q.   And did Sunbelt and did the union agree

25  to Sunbelt's request to send it electronically?

1      A.   Yeah.  Eventually.

2      Q.   Between June 5th -- excuse me --

3  June 5th and July 9th, the union had time to

4  electronically send a request for more documents

5  to Sunbelt, correct?

6           JUDGE ROSAS:  I think you need to move

7  on to the next sequence.  That's asked and

8  answered twice.  I got the picture.

9           MS. HILL:  No.  Request for additional

10  documents, sir.  This is a different.

11           JUDGE ROSAS:  Go ahead.  Go ahead.

12  BY MS. HILL:

13      Q.   So between June 5th and July 9th, the

14  union sent a request for additional documents to

15  Sunbelt, correct?

16      A.   We sent you a request?

17      Q.   Uh-huh.

18      A.   I don't recall that.

19      Q.   Okay.  We'll get that out later then.

20  Looking at 7A.

21           JUDGE ROSAS:  Let me get that back.

22           THE WITNESS:  What was it 6A?

23           MS. HILL:  No.  7A.

24           THE WITNESS:  Yeah.  That was for him.

25  Okay.

1  BY MS. HILL:

2      Q.   And you testified that all the

3  handwriting on this is yours, correct?

4      A.   Yes.

5      Q.   And pension and admin 1 of 4, there is

6  a star up there it says Pat Hill says there is

7  new NLRB rules?

8      A.   Yes.

9      Q.   Was that a justification for presenting

10  this proposal to the union?

11      A.   No.  That was my notes.

12      Q.   Do you know if the union asked why

13  Sunbelt had this proposal?  I am just talking

14  about 1, Page 1.

15      A.   No.

16      Q.   Why did you write the note there?

17      A.   Because that's what you told me.

18      Q.   Okay.  So I explained to you or the

19  union why this proposal was being made?

20      A.   Yeah.  You did.

21      Q.   Page 2, this now this provision page,

22  excuse me, Page 1 and Page 2 were TA'd on

23  June 28th, correct?

24      A.   Yes.  June 26th.  It was a typo.

25      Q.   Okay.  So it was 26th.  Thank you.

1    A.    Uh-huh.

2    Q.    A handwritten mistake.  Okay.  What do

3  you mean by your handwriting Sunbelt's add to

4  issued May 22, 2018?

5    A.    That's when you gave it to us.

6    Q.    Add to, issued?

7    A.    Add to 7.1 issued on that day.  They

8  are separate, add to 7.1.  You were adding this

9  language into 7.1 of our agreement.  Issued is a

10  separate writing as far as whether it was issued

11  to us.

12    Q.    Okay.  So Sunbelt was using the

13  original document that you had forwarded to it

14  and adding some supplemental language to it,

15  correct?

16    A.    Yes.  And the reason why I have that

17  number underlined is because you didn't put that

18  on there, you didn't put what article it was

19  from so we had to filter through and figure out

20  what article number it was from.

21    Q.    Well, isn't it true that the parties

22  had discussed having a general article for some

23  of the provisions that didn't catch all of the

24  other articles?

25    A.    I believe that was at a later date.

1      Q.    You believe but sitting here today,

2  sir, are you positive?

3      A.    I am pretty positive, yes.

4      Q.    In any of the notes that you wrote that

5  you see in front of you?

6      A.    No.

7      Q.    Looking at Page 3 of 4, is this

8  provision was this a provision that was

9  ultimately TA'd?

10     A.    I believe it was.

11     Q.    All right.  And this one you had to

12 talk to Mr. Ryan, correct?

13     A.    We talked about it.

14     Q.    For approval?

15     A.    Yeah.  We talked to him about it.

16     Q.    All right.  With respect to other

17 proposals from Sunbelt, the parties could not

18 discuss them until Mr. Ryan or someone from his

19 firm had reviewed the proposals, correct?

20     A.    Not every time, no.

21     Q.    Did my question ask every time or did I

22 say were there provisions, proposals that the

23 union could not discuss until after they had run

24 them past Mr. Ryan?

25     A.    Yes.  Some of them.

1     Q.    Thank you.  Greg, union reserves the

2   right to grieve.  What does that mean?

3     A.    That's just our -- my notes and our

4   caucus.  Basically that's Greg stating that we

5   have the right -- we reserve the right to

6   grieve, to file a grievance.

7     Q.    Okay.  Was that a counterproposal to

8   this language?

9     A.    No.

10    Q.    Did the union ever make that proposal?

11    A.    That's just my notes of me talking at

12  our caucus being productive.

13    Q.    Okay.  But you discussed it but did you

14  make it a proposal?

15    A.    I don't recall.

16    Q.    In red, what does that mean?

17    A.    Those are the red lines that you guys

18  had.

19    Q.    Changing allegation up to and including

20  arbitration.  Was that supposed to be another

21  revision to this proposal?

22    A.    No.  This proposal describes GPS.  This

23  is just my notes on what you guys gave me when I

24  was sitting there in our caucus.  Allegations up

25  to including arbitration has nothing to do with

1    GPS installed on equipment.

2        Q.   Well, because there is that language in

3    the second line it says GPS to discipline

4    employees up to and including termination.

5        A.   Uh-huh.

6        Q.   So were you going to counter and say

7    this would then be open to arbitration?

8        A.   I don't know.  Sorry.

9        Q.   All right.  Looking at 4 of 4, sir.

10       A.   Yes.

11       Q.   This, again, has your handwriting on

12   it, correct?

13       A.   Yes.

14       Q.   Add to, again, this is supposed to be

15   for Article 18?

16       A.   Yes.

17       Q.   Did the parties negotiate where some of

18   these proposals from Sunbelt were to be

19   included?

20       A.   I think so.  That's pretty hard to

21   remember over a year ago.

22       Q.   And this proposal on Page 4 of 4 was

23   TA'd on June 26th of 2018, correct?

24       A.   Yes.

25       Q.   Other than the draft agreements that we

1    have seen as exhibits, any counterproposals made

2    by the union were they made verbally?

3        A.    They had to be when we were in session

4    because we had nowhere to print them.  You

5    wouldn't allow us to use your printer so we had

6    to do it verbally at that session.

7        Q.    Did you ask to use Sunbelt's printer?

8        A.    No.

9        Q.    And if Sunbelt had negotiation sessions

10   at the union hall in Pewaukee, they would have

11   to use the union's printer, correct?

12       A.    Yes.

13       Q.    Now, just for the benefit of the judge,

14   and maybe the two attorneys over there, do you

15   want to describe the negotiation room and then

16   maybe a little bit of the front office of

17   Sunbelt at Franksville where Sunbelt negotiated

18   or caucus -- excuse me -- caucused.  Okay.

19       A.    The union caucused in the same

20   negotiations room which was your Sunbelt's

21   conference room.  Directly outside of that room.

22       Q.    Okay.  Just a minute.  The size of the

23   conference room --

24       A.    Very small.

25       Q.    About the --

 1      A.   Like -- right.

 2      Q.   A third --

 3      A.   Yes.

 4      Q.   -- of this, had a conference table?

 5      A.   Yes.

 6      Q.   Everyone had a chair?

 7      A.   Yes.

 8      Q.   Okay.  It had two walls of windows?

 9      A.   Yes.

10      Q.   And then the door into and out of it

11 went into you might say the store room, the

12 store of the profit center, correct?

13      A.   Yes.

14           JUDGE ROSAS:  Hold on one second.  You

15 can't just leave it at quote, unquote this.  You

16 guys are all going to have to converge to have

17 some sort of an approximation here.

18           MS. HILL:  Okay.  I was thinking.

19           JUDGE ROSAS:  Off the record.

20                (Whereupon, a discussion was had

21                 off the record.)

22 BY MS. HILL:

23      Q.   All right.  Mr. Ervin, is Respondent's

24 Exhibit 1 a fair representation of the front of

25 the property center in Franksville along with

1    the conference room where the restrooms are and

2    the front counter and Mr. Anderson's office?

3        A.   Yes.

4        Q.   What was Mr. Anderson's office used

5    for?

6        A.   The caucus room for Sunbelt.  I didn't

7    know that was his office but that's where you

8    guys caucused.

9        Q.   And was his computer used for purposes

10   of drafting the written proposals?

11       A.   I would assume so.  I didn't see that.

12   You are in that room, how would I know that?

13       Q.   The window in front.

14       A.   I could see out of our conference

15   people in the general area by the counter and

16   the tools.  We could not see what you were doing

17   inside of that room unless I came --

18       Q.   And you came to that office at least

19   twice, correct?

20       A.   Yes.

21       Q.   All right.  Because you already

22   testified that you saw allegedly saw something

23   going on there, correct?

24            MR. WIESE:  Objection, your Honor.

25   Mischaracterizes prior testimony.

 1           JUDGE ROSAS:  I'll let it stand.  The

 2    record will speak for itself.

 3           MS. HILL:  Okay.  And by the way, your

 4    Honor, at this point, I was going to save this

 5    until the end but I want to make sure I don't

 6    miss it in my notes.  I wish to move to strike

 7    all of Mr. Ervin's testimony relating to times

 8    other than what appears on Exhibit 5E because

 9    his affidavit was used to refresh his

10    recollection but everything from that affidavit

11    with respect to time was based on Mr. West's

12    notes.

13           JUDGE ROSAS:  Well, you got to cross

14    examine him, right, with respect to his prior

15    statement in the affidavit or you will.

16           MS. HILL:  I haven't gone into it but I

17    will.  But he just admitted all the times in

18    there for the different negotiation sessions

19    that at least he attended were based on

20    Mr. West's notes.

21           JUDGE ROSAS:  Yeah.  I don't strike

22    testimony in mass during hearings.  I wait until

23    I review the record in the entirety but

24    obviously you'll set up the predicate for your

25    application in that regard.

 1          MS. HILL:  Thank you, sir.

 2    BY MS. HILL:

 3      Q.   Now, with respect to your testimony

 4    about a member the Sunbelt team being at the

 5    counter.

 6      A.   Yes.

 7      Q.   Okay.  And who was that, sir?

 8      A.   That was Bo.

 9      Q.   Mr. Bogardus?

10      A.   Bogardus.

11      Q.   Could you hear what he was saying?

12      A.   No.

13      Q.   You have no clue whether he was calling

14    someone to get information regarding anything to

15    be placed in a proposal, correct?

16      A.   No.  He had -- he was working with

17    other Sunbelt employees not relating to

18    negotiation team were talking to him so that's

19    what led me to believe and us to believe that

20    that wasn't involved in negotiations.

21      Q.   So did all the other team members hear

22    what he said, is that what you are saying?

23      A.   No.  No.  No.  What I am saying is when

24    I seen him doing that -- when we seen him doing

25    that, he was around other office help or I don't

1  know who they were but they weren't part of the

2  negotiating team.  They were support staff, what

3  have you so that would lead me to believe that

4  that's not relevant to negotiations because he

5  was talking with his support staff.

6      Q.   But you couldn't hear what he was

7  saying?

8      A.   I could see his mouth moving.

9      Q.   But you could not understand what he

10  was saying?

11      A.   No.

12      Q.   And so you were just guessing?

13          MR. WIESE:  Objection.  Argumentative.

14          JUDGE ROSAS:  I will sustain that.

15  BY MS. HILL:

16      Q.   But you have no evidence to support the

17  statement that you made?

18          MR. WIESE:  Objection.  Argumentative

19  again.

20          JUDGE ROSAS:  Rephrase that.

21  BY MS. HILL:

22      Q.   Okay.

23          JUDGE ROSAS:  Because the evidence is a

24  little conclusory.

25

1  BY MS. HILL:

2     Q.   Well, I could lead on this one.  Do you

3  have any evidence to support your statement that

4  he was not working on proposals on behalf of

5  Sunbelt?

6     A.   The best evidence is that he was with

7  people that were not involved in negotiations so

8  that's the best evidence that I have.

9     Q.   The only evidence, correct?

10    A.   Yes.

11    Q.   Now, if you would please look at 7B, B

12  as in boy.

13    A.   Yep.  Got it.

14    Q.   Okay.  These typed proposals.  Those

15  are from Sunbelt, correct?

16    A.   Yes.

17    Q.   And would you agree that the paid time

18  off proposal was a significant proposal for

19  purposes of the Collective Bargaining Agreement?

20    A.   Yes.

21    Q.   The discrimination proposal, and by the

22  way, again, the handwriting on Page 3, this is

23  yours, correct?

24    A.   Yes.

25    Q.   And the dates are incorrect?

1    A.   I fixed the top one but the bottom one

2  is inaccurate.  It was June 26, 2018.

3    Q.   Thank you.  And this was a proposal to

4  change or revise the union's proposal regarding

5  discrimination, correct?

6    A.   Yes.

7    Q.   Because the union -- the union agreed

8  that the law of Michigan or the law of Illinois

9  was not applicable to the Law of Wisconsin,

10  correct?

11    A.   I don't know that that's why we agreed

12  to it, but -- I don't recall that that's why we

13  agreed to that.

14    Q.   Now, Page 4, is this one of the

15  proposals that the union could not respond to

16  until it had discussed it with its attorney?

17    A.   Yes, but we discussed it with them

18  during our caucus as you can see underneath.

19    Q.   But -- Okay.  But it says 7/16 Pat Ryan

20  good with.  I thought you said this was from

21  June 26th.

22    A.   I must have gotten that wrong.

23    Q.   What part of it is wrong?

24    A.   If I wrote 7/16 of '18 Pat Ryan good

25  with that must have been --

1      Q.   When you had the discussion with

2   Mr. Ryan?

3      A.   Yes, ma'am.

4      Q.   So it was not during the caucus on

5   June 26, 2018, correct?

6      A.   Yes.

7      Q.   All right.  Page 5 of 12.  This typed

8   proposal is from Sunbelt on June 26, 2018,

9   correct?

10     A.   Yep.

11     Q.   And this -- and there was some

12  negotiating back and forth as to the location of

13  the bulletin board?

14     A.   Yes, there was.

15     Q.   But ultimately the parties agreed to

16  have it on a board by the lockers, correct?

17     A.   Yes.

18     Q.   And that was decided and agreed to on

19  June 26th, correct?

20     A.   Yes.

21     Q.   Okay.  Now looking at 6 of 12,

22  handwriting all yours?

23     A.   Yes.

24     Q.   Okay.  Can you explain what was TA'd

25  here?

1    A.    We eventually TA'd going weekly, or

2  excuse me, biweekly we originally were not good

3  with biweekly and then we eventually TA'd

4  biweekly.

5    Q.    And it was TA'd on June 26, 2018,

6  correct?

7    A.    I believe so, yes.

8    Q.    And the additional language that

9  Sunbelt had regarding the pay stubs, Sunbelt was

10  good -- excuse me -- the union was good with

11  that language, correct?

12    A.    Yes.

13    Q.    Management writes provision, proposed

14  on Page 7 of 12 of this document.  Do you see

15  that, sir?

16    A.    Yep.

17    Q.    And this one again you could not TA it

18  on June 26th because you had to discuss it with

19  Mr. Ryan, correct?

20    A.    Yes.

21    Q.    And that did not happen, that

22  discussion with Mr. Ryan did not happen until

23  July 16th of 2018, correct?

24    A.    Yes.

25    Q.    Page 8 of 12 this, again, was another

1   proposal by Sunbelt on June 26th, correct?

2       A.   Yes.

3       Q.   Okay.  Explain -- no offense to your

4   handwriting, sir.

5       A.   That's not my handwriting on this one.

6       Q.   Where, at the top?

7       A.   On the top of Page 7B, that's not my

8   writing.

9       Q.   Top of 7 --

10      A.   7B.

11      Q.   Okay.

12      A.   Page 9.  I'm sorry.  Page 9 of 7B.  I'm

13  not --

14      Q.   Hold on.  I am still on 8.

15      A.   You are on Page 8?

16      Q.   Yes.

17      A.   Oh, I'm sorry.

18      Q.   We were on 7.  I am going to 8.  Okay.

19  No offense to your handwriting.  Is that your

20  handwriting below the typed version?

21      A.   Yes.

22      Q.   All right.  What does that say?

23      A.   We were looking at diverting to your

24  handbook.  We were going to ask legal if we

25  could divert to your handbook because you had

1   asked if you could have some of your handbook

2   that is in our contract that is not typical to

3   what we do but we decided to talk to legal about

4   that.

5       Q.   Prior to negotiations, did Sunbelt give

6   you a copy of the handbook?

7       A.   Yes.

8       Q.   Did Sunbelt even before the first

9   negotiation session give you copies of its 401K

10  plan?

11      A.   Yes.

12      Q.   Did Sunbelt give you a copy of its

13  health plan and the summary plan description?

14      A.   Yes.

15           MR. WIESE:  Objection, your Honor

16  relevance.  There aren't any information request

17  allegations in the complaint.

18           JUDGE ROSAS:  Hold on.  Do you want him

19  to step outside or do you just want to

20  articulate in general the relevance?

21           MS. HILL:  Okay.  The relevance of this

22  is that the union and the Board have indicated

23  that we did not give any proposals to the union.

24  Part of what we gave them at the very beginning

25  included all the benefits.  The handbook, as

1    things came up, for example, the union asked for

2    premiums.  In fact, in the July letter that was

3    referenced a few minutes ago for supplemental

4    information from Mr. Ervin, he specifically

5    asked for the newer premium payments.  That was

6    submitted in response to Mr. Ervin.

7           MR. WIESE:  But there is a difference

8    between proposals being in writing and responses

9    to information requests.  They are two

10   completely different items.

11          MS. HILL:  But the handbook all the

12   planned descriptions, summary plan, full plan

13   documents were not requested.  They were

14   provided to the union because, as Sunbelt

15   indicated, and he can testify, Sunbelt and some

16   of his notes even indicate, Sunbelt wanted to

17   use their own plans for health insurance, 401K.

18          JUDGE ROSAS:  Well, I am going to

19   overrule the objection.  Oftentimes, and I am

20   not exactly sure how it's all going to factor in

21   here, but oftentimes we have alleged requests

22   for -- failures to provide information requested

23   during bargaining which is pertinent.  Here

24   counsel is arguing that there is some points to

25   be made by virtue of the fact that the

1    respondent voluntarily without being requested

2    provided information that was pertinent, it

3    should have been considered in the generation of

4    the collective bargaining agreements so see how

5    it all filters out.  Next question.

6    BY MS. HILL:

7        Q.   All right.  Next question, sir, would

8    you agree that Sunbelt and the union did

9    negotiate whether the bargaining unit employees

10   would be on Sunbelt's 401K or the union's

11   retirement pension plan?

12       A.   You guys just declined our proposal

13   every time with no counter.

14       Q.   Did we give you the planned document

15   for the 401K?

16       A.   Yes.

17       Q.   All right.  Now I think what you said

18   for Page 9 of 12, this is not your handwriting.

19   Do you recognize it?

20       A.   I don't know if it's Greg's but I

21   apologize.  It's not mine.

22       Q.   Okay.  And I apologize.  I thought you

23   said early on that all the handwriting on this

24   entire exhibit was yours.  All right.  So this

25   one I save for Mr. West?

1    A.   I don't know.  It's not mine.  That

2  particular page everything else is mine and

3  that's not my writing.

4    Q.   Moving on to 10, those marks are not

5  yours?

6    A.   No.

7    Q.   Okay.  And Page 11, even what you

8  called I think you called it a doodle and all

9  the handwriting is yours on this page?

10    A.   That is mine.

11    Q.   The handbook that Sunbelt gave to you

12  also the handbook contained Sunbelt's

13  volunteerism policy, correct?

14    A.   Yes.

15    Q.   The handbook contained the funeral

16  leave policy, correct?

17    A.   Yes.

18    Q.   The handbook contained the jury duty

19  policy, correct?

20    A.   Yes.

21    Q.   The handbook included the victims of

22  domestic violence policy, correct?

23    A.   Yes.

24    Q.   And the Sunbelt handbook also included

25  the time off for voting policies, correct?

1    A.   Yes.

2    Q.   Okay.  Page 12 of 12, are you there,

3  sir?

4    A.   Yes.

5    Q.   Okay.  Handwriting on this document is

6  yours?

7    A.   Yes.

8    Q.   This was -- this proposal or this

9  document was given to you on June 26th, correct?

10    A.   Yes.

11    Q.   And the union waited until July 16th to

12  discuss this document with Mr. Ryan?

13    A.   Yes.  Prior to our July 28th meeting

14  preparing for it.

15    Q.   And the suggestion was to add this

16  safety it's what we do as an appendix to the

17  CBA, correct?

18    A.   Yes.

19    Q.   And did the union make that proposal to

20  Sunbelt?

21    A.   I do not know.  I wasn't at the next

22  session.

23    Q.   Do -- and you have nothing in your

24  affidavit regarding that, correct?

25    A.   You are correct because I wasn't at

1  that session.

2      Q.   Looking at 7C, sir.

3      A.   Okay.

4      Q.   Now, this was from the second

5  negotiation session in the month of August,

6  correct?

7      A.   Yes.

8      Q.   And look at all the pages just to be

9  sure, all the handwriting on this yours?

10     A.   Yes.

11     Q.   Page 1 of 7, Sunbelt's proposal was

12  TA'd as it stands?

13     A.   Yes.

14     Q.   And would you agree that this grievance

15  procedure is an important aspect of the

16  Collective Bargaining Agreement between Sunbelt

17  and 139?

18     A.   Yes.

19     Q.   All right.  Page 2 of 7 this is another

20  proposal from Sunbelt on August 30, 2018?

21     A.   Yes.

22     Q.   And with the one revision it looks like

23  handwritten note last regular workday, is that

24  your handwriting for business?

25     A.   Yes.

1    Q.   Is that -- that word was part of the

2    TA'd agreement?

3    A.   Yes.

4    Q.   And would you agree payday language is

5    an important aspect of the agreement between

6    Sunbelt and 139?

7    A.   Uh-huh.  Yes.

8    Q.   Verbal, please.

9    A.   Yes.  Yes.

10   Q.   Page 3 of 7.  This, again, was a

11   proposal from or a counterproposal from Sunbelt

12   to the union's initial proposal, correct?

13   A.   Yes.

14   Q.   And does the bold language highlight

15   the revisions that Sunbelt made to the union's

16   proposals?

17   A.   I believe so.

18   Q.   And August 30, 2018, the two sides

19   agreed to this, correct?

20   A.   Yes.

21   Q.   And would you agree that strikes and

22   lockouts is a very important section of any

23   Collective Bargaining Agreement?

24   A.   Yes.

25   Q.   Now, Pages 4, 5, and it goes on to six

1    appears to be all of Article 18, correct?

2        A.   Yes.

3        Q.   And this is what I refer to earlier as

4    sort of a catch-all general article for the

5    agreement, correct?

6        A.   Yeah.

7        Q.   Now, looking at 18.2, did you see 18.2

8    in any contract with the 324 or the 150?

9        A.   Yes.

10       Q.   Which one?

11       A.   I believe it was 324.

12       Q.   And what was the dollar amount for

13   that?

14       A.   150 dollar.

15       Q.   Was that for the boot allowance or was

16   that for the coupon?

17       A.   I believe it was the boot allowance.

18       Q.   Okay.  So the coupon is a very

19   different thing, correct, from the boot

20   allowance?

21       A.   Yeah.

22       Q.   Because did the union indicate that

23   some of the members prefer Red Wing boots to

24   what Sunbelt provided on their website?

25       A.   I know there was discussion about the

1  kinds of boots.  I don't recall.  I just know --

2  I do recall that Greg West said that not all our

3  guys like Red Wing.  They like various boots.

4      Q.   And those boots there was a discussion

5  of how many different boots Sunbelt has on its

6  website, correct?

7      A.   Yes.

8      Q.   And Sunbelt paid the whole amount based

9  on whatever the employee picked out from the

10  online selection?

11      A.   I believe so.  I don't recall that.

12      Q.   So instead of just giving 150 dollar

13  boot allowance, Sunbelt for this contract was

14  giving the members free boots if they select

15  from online and then a hundred dollar coupon if

16  they wanted to go to Red Wing or in this case

17  you changed it to a store?

18      A.   I recall Jamie Smith telling us that

19  the selection that you guys had which you guys

20  would pay for was very minimal and not the

21  greatest.

22      Q.   Did Mr. Anderson counter that by

23  listing all the different boots that were online

24  and that if there was a defect in any boot, that

25  Sunbelt would give that employee upon showing

1  the defective boot a new pair of boots?

2      A.   I believe he did.

3      Q.   So 18.1 was TA'd and does this indicate

4  that 18.2 was TA'd or is that just for 18.3?

5      A.   That's for 18.3.

6      Q.   Okay.  So 18.5 was TA'd on the -- on

7  August 30th?

8      A.   Yes.

9      Q.   18.6 was TA'd on August 30th?

10      A.   Yes.

11      Q.   And the highlighting in 18.6 indicates

12  the revised language from Sunbelt to the union's

13  proposal?

14      A.   Yes.

15      Q.   Now, looking at 18.10, is that your

16  handwriting for ERT?

17      A.   Yes.

18      Q.   What -- do you remember the

19  significance of that?

20      A.   I'm sorry.  I do not.

21      Q.   Okay.  And for 18.13, did Sunbelt

22  provide an explanation for one of the NLRB

23  rulings that caused Sunbelt to make this

24  proposal?

25      A.   I believe so, yes.

1     Q.   Let's go to 7 of 7 now, okay.  This

2  article it looks as if it was discussed in the

3  afternoon on August 30th; is that correct?

4     A.   Yes.

5     Q.   17.2 was that one TA'd?

6     A.   Yes.

7     Q.   Now, your TA below for 17.5, does that

8  indicate TA for the whole section?

9     A.   Nope.  Only Section E.

10    Q.   17E.  And did the parties discuss 17.7?

11    A.   Yes.

12    Q.   There was a discussion of 17.6

13  regarding posting electronically all new jobs,

14  correct?

15    A.   Yes.

16    Q.   Please now pick up 7D as in dog.

17    A.   Okay.

18    Q.   All right.  Is the handwriting on this

19  one yours?

20    A.   Yes.

21    Q.   Okay.  Upper left-hand corner 15

22  Sunbelt, what does that represent?

23    A.   As I stated earlier your Article 20 was

24  technically our Article 15.

25    Q.   Because some articles were deleted,

1  correct?

2    A.   Not full articles.  I believe it was

3  just a section of articles.

4    Q.   All right.  These proposals were made

5  August 30th of 2018?

6    A.   Yes.

7    Q.   And when were Sections 20.2, 22.1,

8  22.2, TA'd.

9    A.   I believe those were on 9/27/18.

10    Q.   And then 22.3 was TA'd on December 28,

11  2018?

12    A.   Another typo.  That was December 10,

13  2018.

14    Q.   And, so, okay.  22.4 as of September

15  27th was TA'd, correct?

16    A.   Yes.

17    Q.   And the deletion of 22.5 was TA'd?

18    A.   Yes.

19    Q.   Now 22.6 was open as of September 27,

20  2018, correct?

21    A.   Yes.

22    Q.   You discussed it with Pat Ryan when?

23    A.   Before our next session on October 23,

24  2018.

25    Q.   And how do you know you discussed it

1 before October 23, 2018?

2     A.    Because I tried to always prepare to

3 get the answers before the next session so we

4 were prepared.

5     Q.    Okay.  But you were given this

6 August 30th?

7     A.    Uh-huh.

8     Q.    2018, correct?

9     A.    Yes.

10     Q.    And why wasn't this discussion before

11 September 27, 2018?

12     A.    I don't recall.

13     Q.    Thank you.  Would you please go to 7E?

14     A.    Okay.

15     Q.    The handwriting on is this document and

16 it's three pages, is this all yours?

17     A.    Yes.

18     Q.    Okay.  It indicates for 18.11 Sunbelt

19 to print off quiz to look at.  And Sunbelt did

20 it, correct?

21     A.    Yes.

22     Q.    Was 22.6 open?

23     A.    22.6 was TA'd.

24     Q.    Okay.  Then looking at 2 of 3, you

25 indicate here Sunbelt to massage this language

1    and did Sunbelt do so?

2        A.    I don't recall.

3        Q.    Well, looking at 3 of 3, is that the

4    revised language based on the union's request?

5        A.    Yes.

6        Q.    And so ultimately on what on

7    October 23rd at some point Article 24 was TA'd,

8    correct?

9        A.    Yes.

10       Q.    And would you agree that a drug and

11   alcohol testing program is an important aspect

12   of the agreement between Sunbelt and the 139?

13       A.    Yes.

14       Q.    To the best of your knowledge, sir, is

15   there any requirement of an employer to

16   negotiate wages before any other part of a

17   Collective Bargaining Agreement?

18       A.    No.  We do that once everything is on

19   the table.

20       Q.    What do you mean once everything is on

21   the table?

22       A.    Once everything has been proposed like

23   we proposed it on February 8, 2019.

24       Q.    Once it's proposed or once everything

25   else is TA'd?

1     A.   Once it's proposed.

2     Q.   But to the best of your knowledge,

3  there is no requirement for that.  It's just

4  your practice, correct?

5     A.   Yeah.

6     Q.   All right.  If you would look at 2 of 3

7  your handwriting there, discharge discipline,

8  are you saying the second paragraph there would

9  go to 15.1, 15.2?

10     A.   I believe so.

11     Q.   And was the union's suggested

12  additional language for the next paragraph as

13  long as the policy is consistent for all

14  visitors?

15     A.   Yes.

16     Q.   And that paragraph and that language

17  from the union was agreed to by Sunbelt,

18  correct?

19     A.   I believe so.

20     Q.   Okay.  If you would please look at 7F,

21  sir.

22     A.   7F.

23     Q.   Yes.  It's just a one-page front and

24  back?

25     A.   Yes, got it.

1    Q.   Is the handwriting on this document

2  yours?

3    A.   Yes.

4    Q.   Would you identify, please, the -- Let

5  me do it this way instead, I'm sorry.

6  Article 17.1, the printed language that you have

7  at the end of the fourth line, is that your --

8  the union's proposal?

9    A.   Yes.

10   Q.   And that was Sunbelt agreed to it?

11   A.   Yes.

12   Q.   17.3 was TA'd on December 10th?

13   A.   Yes.

14   Q.   Articles 14.7 through 7 those were all

15  deleted, correct?

16   A.   Where are you?

17   Q.   17.4 and then there is a dash and a 7

18  do you see that?

19   A.   Okay.  Yes.

20   Q.   And the proposal was to delete it.

21   A.   Yes.

22   Q.   And that was TA'd, correct?

23   A.   Yes.

24   Q.   Article 18 was TA'd, correct?

25   A.   Yes.

1     Q.   20.1 was TA'd, correct?

2     A.   Yes.

3     Q.   And it was TA'd with the union's

4  additional language with preapproved PTO,

5  correct?

6     A.   Yes.

7     Q.   Okay.  20.3, 20.4 were TA'd as

8  proposed, correct?

9     A.   Yes.

10     Q.   20.5, the union's proposal was to

11  delete the last sentence?

12     A.   Yes.

13     Q.   What was TA'd, both sentences 1 and 2?

14     A.   I don't recall.

15     Q.   20.7 TA'd because it was already

16  handled in another article?

17     A.   Yes.

18     Q.   21.1 was it the union's proposal to

19  delete the last sentence?

20     A.   Yes.

21     Q.   And was it TA'd with the last sentence

22  deleted?

23     A.   Yes.

24     Q.   So Sunbelt agreed to the proposal from

25  the union, correct?

1      A.    On that one, yes.

2      Q.    And would you agree that hours of work

3   is an important article of the Collective

4   Bargaining Agreement between Sunbelt and the

5   union?

6      A.    Yes.

7      Q.    21.3, 21.4, 21.5 TA'd on December 10th,

8   2018, correct.

9      A.    Yes.

10      Q.    21.6 and 21.7 it appears that there was

11   some discussion about alternative language for

12   those two sections, correct?

13      A.    Yes.

14      Q.    But as of December 10, 2018, you don't

15   believe it was TA'd, correct?

16      A.    Correct.

17      Q.    7H, sir.

18      A.    Okay.

19      Q.    Okay.  This is a three-page document

20   and these were Sunbelt's proposals for

21   September -- excuse me -- February 21, 2019?

22      A.    Yes.

23      Q.    At some point during negotiations, did

24   Sunbelt present to the union a copy of Sunbelt's

25   accommodation form?

1      A.    I don't know.

2      Q.    You know, for when an individual has a

3   medical issue and needs to be accommodated?

4      A.    I don't recall.

5      Q.    Okay.  Page 2 of 3.  So 13, 15.2, 15.3,

6   15.5 were all TA'd by the parties, correct?

7      A.    Yes.

8      Q.    18.1 and you have two TAs for that one.

9   What does that mean?

10     A.    I don't recall.

11     Q.    Okay.  18.5 Sunbelt's proposal was TA'd

12  for that proposal?

13     A.    Yes.

14     Q.    18.6, 18.7 were TA'd.  I'm sorry.

15  Going to the third of three.

16     A.    Uh-huh.

17     Q.    Is that correct?

18     A.    Yes.

19     Q.    Now, for 19.1 it appears that there was

20  some negotiation because the union proposed 21.1

21  with 15 cents per hour but the parties did not

22  agree to it.  At least as of February 21, 2019,

23  correct?

24     A.    Yes.

25     Q.    19.3, the parties agreed was Sunbelt's

1   proposal, correct?

2       A.   Yes.

3       Q.   And you would agree that a proposal

4   regarding lunch period is an important proposal

5   for Collective Bargaining Agreement between

6   Sunbelt and the union, correct?

7       A.   Yes.

8       Q.   21.4 that was TA'd?

9       A.   Yes.

10      Q.   19.7, that one was TA'd, correct?

11      A.   Yes.

12      Q.   And this is a proposal that was

13  different from the 324 and the 150, correct?

14      A.   I don't recall that.

15      Q.   And 20.5, 21.6, 21.7, TA'd because they

16  were addressed in different provisions, correct?

17      A.   Yes.

18           MS. HILL:  We have been going at it for

19  quite some time, your Honor.  Perhaps a short

20  break for the parties to stretch.

21           JUDGE ROSAS:  Do you need a break?

22           THE WITNESS:  Sure.

23           JUDGE ROSAS:  Okay.  Let's take five.

24           MS. HILL:  Thank you.

25

```
 1                    (Whereupon, a short recess was

 2                     taken.)

 3          JUDGE ROSAS:  All right.  Back on.

 4          MS. HILL:  All right.  First, I do

 5   still have a subpoena up for this witness for

 6   later in the week so I still reserve the right

 7   to ask him for questions based on our case in

 8   chief.  I am trying to get rid of as much as

 9   possible in cross examination.  No?

10          JUDGE ROSAS:  You subpoenaed him so you

11   are an officer of the court.  He has to listen

12   to you.

13          MR. RYAN:  Subpoena for Mr. Ervin?

14          MS. HILL:  Yes.

15          MR. RYAN:  There was a subpoena for

16   documents, not for testimony.

17          MS. HILL:  Yeah.  There was also for

18   him to present documents and also for him.  For

19   the 21st -- hang on.  Pause.  He has to at least

20   to testify and required to bring --

21          JUDGE ROSAS:  Let's -- that's not -- we

22   are not dealing with that right now.

23          MS. HILL:  Okay.  Sorry, sir.

24          JUDGE ROSAS:  That's fine.

25
```

1  BY MS. HILL:

2     Q.   Looking at Respondent's Exhibit 1, the

3  drawing that you made, sir.

4     A.   Yes.

5     Q.   All right.  You made a statement about

6  the union had asked for a room to caucus in,

7  correct?

8     A.   Yes.

9     Q.   Did the union not want to caucus in the

10  conference room?

11    A.   No.  Originally on May 22nd, you wanted

12  us to caucus in our cars that's why we asked for

13  a caucus room.

14    Q.   No.  That isn't my question, sir.  Did

15  you ask for a room other than the conference

16  room to caucus in?

17    A.   No.

18    Q.   And Sunbelt had been using

19  Mr. Anderson's office, the one that you have on

20  that drawing, correct?

21    A.   Yes.

22    Q.   Okay.

23         JUDGE ROSAS:  By the way, does everyone

24  concur with this general drawing?

25         MS. HILL:  I was going to ask that.

1           JUDGE ROSAS:  That's not to scale but

2    just for the purposes of the configuration of

3    what's located next to what and so on for

4    purposes of reference, any objection?

5           MR. RYAN:  No objection.

6           MR. WIESE:  I just have a

7    clarification.  I guess it would be within the

8    scope of voir dire.

9                VOIR DIRE EXAMINATION

10   BY MR. WIESE:

11      Q.   Between -- so do you see where you have

12   SB caucus room in the upper left-hand corner

13   there?

14      A.   Yes.

15      Q.   Okay.  That's where Sunbelt was taking

16   its caucuses?

17      A.   Yes.

18      Q.   Okay.  And then -- and then there

19   appears to be a wall between that and the office

20   below that; is that correct?

21           MS. HILL:  Next to it.

22           THE WITNESS:  You are referencing where

23   I have written counter?  Oh, between.

24   BY MR. WIESE:

25      Q.   Yes.  So from Sunbelt caucus room if

1  you go directly below that it says office.  Do

2  you see that?

3      A.   Yes.  They are separate.

4      Q.   By a wall.

5      A.   Yes.

6      Q.   And you have been talking about

7  Mr. Anderson's office, is that office as written

8  on the map is that Mr. Anderson's office or do

9  you know whose office that is?

10     A.   I don't know whose office that is.  I

11 just know that's where they went.

12     Q.   Okay.  Well, did they go to the area

13 marked SB caucus room or the area marked office?

14     A.   No.  They always went to the Sunbelt

15 caucus room.  I nor we knew who whose office

16 that was.  We just knew that's where they

17 caucused.

18     Q.   And they those are two separate rooms?

19     A.   Yes.

20          MR. WIESE:  With the understanding that

21 the map isn't to scale, General Counsel has no

22 objection.

23          JUDGE ROSAS:  Okay.  So Respondent's 1

24 is in evidence.  Go ahead.

25               (Respondent's 1 received.)

```
 1          CROSS EXAMINATION (resumed)

 2    BY MS. HILL:

 3        Q.    You testified on direct examination

 4    that you had looked into what you have marked as

 5    a Sunbelt caucus room and saw someone on his

 6    phone?

 7        A.    Wrong.  I looked out our door and could

 8    see someone on their phone in the general area

 9    by the counter.  I did not say that I looked in

10    your conference room.

11        Q.    Okay.  Because there is a window on

12    that for that office, correct?

13        A.    When I went to that office, I just

14    knocked on the door.  I didn't look in to give

15    you your privacy.

16        Q.    Okay.  With respect to Mr. Mayfield,

17    where was he when you saw him with some people

18    who you thought were vendors?

19        A.    By the counter.  If you look -- if you

20    look at the diagram that I have there --

21        Q.    Yes, sir.

22        A.    -- on the bottom right-hand side in the

23    conference room I was the third X.  I could see

24    directly out that door at an angle to the

25    counter and that's where I seen him.
```

1          JUDGE ROSAS:  Sir, I am going to give

2     you a defining instruction now so counsel know I

3     am not picking on witnesses down the line.  This

4     is what I do with everybody, okay, when the

5     question kind of goes on for a while, counsel is

6     asking you questions that literally when they

7     literally seek to elicit a yes or no, that's

8     what I am expecting you to give.  Anything

9     beyond that is technically subject to being

10    stricken.

11          Let her ask you the questions.  If you

12    don't like the way the question is supposed,

13    counsel on your side perhaps may rephrase it

14    when it's their turn.  Okay?  But I am giving

15    you that instruction at this time to kind of

16    moving things along because maybe you are giving

17    counsel what she doesn't want to hear and what

18    she is looking for.  She will ask you the next

19    question.  You don't have to help anybody here,

20    okay.  Go ahead, Counsel.

21          THE WITNESS:  Yes, sir.

22    BY MS. HILL:

23    Q.  You already testified that you saw

24    Mr. Mayfield at the counter, correct?

25    A.  Yes.

 1    Q.    You saw him talking to some people?

 2    A.    Uh-huh.

 3    Q.    Verbal, please.

 4    A.    Yes.

 5    Q.    Were they on the right or left side of

 6  the counter looking at your diagram?

 7    A.    They would have been on the right-hand

 8  side between the counter and the shelving tools

 9  that are there.

10    Q.    And you didn't recognize him?

11    A.    The individuals, no.

12    Q.    So you were just speculating that they

13  were vendors?

14    A.    Yeah.  Yes.

15    Q.    Thank you.  You testified that

16  Mr. McGowan attended two sessions that you

17  attended, correct?

18    A.    Yes.

19    Q.    Do you recall Mr. McGowan stating that

20  he would not agree to Sunbelt's proposals until

21  they had been verified?

22    A.    Please rephrase.  I'm sorry.  I don't

23  understand.

24    Q.    Would you -- do you recall Mr. McGowan

25  in response to some proposals from Sunbelt

1  stating that he would not agree to them until he

2  had verified them and then he also said, you

3  know, trust that they are accurate but verified.

4  Do you recall that?

5      A.   I don't recall that.

6      Q.   Oh, and with respect to Mr. Mayfield's

7  alleged conversation with some individuals on

8  the right side of the counter, you never heard

9  what the conversation was?

10      A.   No.

11      Q.   Do you recall for the December

12  negotiation session Mr. West saying that he had

13  another obligation to attend to that day?

14      A.   I think I do.

15      Q.   And do you recall if that was a funeral

16  he had to attend to?

17      A.   No.  That was the day of our Christmas

18  union meeting.

19      Q.   And he asked to leave early, correct?

20      A.   I don't recall if it was that day or a

21  different day because Greg West missed the

22  meeting and he was at a different funeral a

23  different day.

24      Q.   Okay.  It wasn't the December 10, 2018

25  meeting at about 12:25 and he said he had to

1    leave for a funeral?

2         A.    I don't believe so.

3         Q.    And for Exhibit 12, General Counsel's

4    Exhibit 12, you did not write any of the

5    handwriting on this, correct?

6         A.    No.

7         Q.    Looking at Exhibit 13, sir --

8         A.    Yes.

9         Q.    -- now, this E-mail was sent after the

10   conclusion of the negotiations on July 9th,

11   correct?

12        A.    Yes.

13        Q.    This was -- the attachment was the

14   document that you were supposed to send to me

15   between the last negotiation and before

16   July 9th, correct?

17             MR. WIESE:    Objection.    Asked and

18   answered.

19             JUDGE ROSAS:    Sustained.

20   BY MS. HILL:

21        Q.    Exhibit 15, do you have that?

22        A.    Yes.

23        Q.    Okay.    Do you recall any of the

24   discussion with Sunbelt regarding the ground

25   rules document?

1      A.    Yes.  You had stated that No. 3, the

2    name was wrong and we stated that we would

3    change that.

4      Q.    Did Sunbelt also object to being

5    limited to 20 minutes for caucuses?

6      A.    Yes.

7      Q.    And did they give a reason why?

8      A.    Nope.

9      Q.    Did they explain if any proposals had

10    to be prepared that it may take longer than

11    20 minutes?

12      A.    Yes.

13      Q.    Negotiation session should average

14    around two hours or not to exceed three hours.

15    Did Sunbelt also object to that because it

16    wanted longer negotiation sessions?

17      A.    I don't recall.  I just for the most

18    part recall you guys rejecting it in its

19    entirety.

20      Q.    Did Sunbelt -- so in response to that

21    you say no, you don't remember that, correct?

22      A.    Correct.

23      Q.    Did Sunbelt in response to this ground

24    rules document Exhibit 15 inform you that the

25    Local 150 and Local 324 for all of the 324

1  contracts had never ever seen a ground rules

2  document?

3      A.   I believe so.

4      Q.   During one of the times that you had --

5  during one of the negotiation sessions were you

6  told when that -- when the union was finished

7  with its caucus to let Sunbelt's negotiating

8  team know?

9      A.   Yes.

10     Q.   And did you contact one of the

11  individuals -- one of the Sunbelt employees

12  working at the counter that the union was ready?

13     A.   Yeah or I went to your room to let you

14  know.

15     Q.   Okay.  But do you recall the time when

16  you went to one of the people at the counter?

17     A.   Yes, I do.

18     Q.   And were you later informed that the

19  negotiating team for Sunbelt had not been

20  informed by the counter person that the union

21  was ready?

22     A.   I believe so.

23     Q.   Did Sunbelt apologize for the lack of

24  knowledge that the union was ready?

25     A.   Yes.

1    Q.   Now, in addition to seeing Mr. Bogardus

2    on his telephone, did you also testify you saw

3    him on his computer?

4    A.   At a different session, yes.

5    Q.   Okay.  And do you know what he was

6    doing?

7    A.   No.

8    Q.   Did you ask him what he was doing?

9    A.   Nope.

10    Q.   Did you raise an objection during the

11    negotiation session subsequent to seeing him

12    working on the computer that you thought it was

13    a waste of time?

14    A.   I believe Greg West raised the concern.

15    Q.   Specifically about Mr. Bogardus?

16    A.   I don't recall which of the three

17    times, but it was one of the times, yes.

18    Q.   Okay.  You mentioned Mr. Mariano Rivera

19    being transferred.  Do you know when he

20    requested the transfer?

21    A.   No.  The bargaining unit employees that

22    were there before we got laid off said that I

23    believe August 8th was to be his last day but he

24    got hurt on August 7th the night before.

25    Q.   Okay.  But the bargaining unit members

1   didn't tell you when he requested the transfer,

2   correct?

3       A.   No.

4       Q.   Did you ask Mr. Rivera when he

5   requested the transfer?

6       A.   No.

7       Q.   And why not?

8       A.   Because he didn't want to talk to us

9   anymore.

10      Q.   Did he tell you that?

11      A.   Yeah, he did.

12      Q.   And when was that?

13      A.   I apologize.  He told the bargaining

14  unit members that right around the time that he

15  filed the D cert.

16      Q.   Okay.  So we are talking about hearsay.

17  All right.  With respect to your statement that

18  Mr. McKellips and Mr. Romanowski were terminated

19  on August 8th, they were laid off, correct?

20      A.   Yeah.  I don't remember saying

21  terminated.  I said laid off.

22      Q.   I just want to make sure that the

23  record is clear and they had rehire privileges,

24  correct?

25      A.   Yes.

1    Q.   Oh, what is your definition of small

2  tool?

3    A.   Small tool is anything that you don't

4  need to pull with a trailer.  Like the way

5  Mr. Mayfield described it was I believe he said

6  stuff that they would -- the customers would

7  pull off the shelf to rent so I guess I would

8  say your small pumps, drills, saws, stuff like

9  that that could be on the shelf in that area

10  that you see that I have drawn out.

11    Q.   Okay.  Did Mr. Mayfield refer to it as

12  small equipment?

13    A.   Nope.  No, he did not.

14    Q.   Did he describe it as Sunbelt rental

15  equipment that was 10,000 pounds or less?

16    A.   No.

17    Q.   Did he say that -- did he give any

18  examples as best you can recall what type of

19  equipment?

20    A.   No.

21    Q.   Did the union negotiate what would

22  happen to Sunbelt's equipment that was in the

23  yard?

24    A.   I don't believe so.

25    Q.   And why not?

1    A.   That's Sunbelt's business not ours.

2    Q.   Did the union ask questions whether the

3  equipment -- the big equipment would be moved

4  out of Sunbelt's yard?

5    A.   I don't recall.

6    Q.   You mentioned that there was a cut I

7  think it was -- that was your word in the video?

8    A.   Yes.

9    Q.   Video No. 2?

10    A.   Uh-huh.

11    Q.   Could you give me the definition of

12  cut?

13    A.   There was four videos to that and the

14  two videos in between were just the driver

15  driving around stopping and driving around and

16  stopping so nothing was relevant there.  I was

17  just following him driving around as he was

18  circling and trying to either play games or lose

19  me.

20    Q.   Did you ask the driver of that truck

21  what he was doing?

22    A.   No.

23    Q.   Did you have any conversation with that

24  person?

25    A.   No.

```
 1      Q.   Do you know if when Sunbelt had drivers

 2   at the Franksville location whether Sunbelt also

 3   used outside haulers?

 4      A.   I was told by the drivers only in an

 5   overflow situation when the drivers couldn't

 6   handle the loads or were too busy.

 7      Q.   And which drivers are you referring to?

 8      A.   Jamie Smith, Mark Richter, and Troy

 9   Scholz.

10      Q.   Now, Mark Richter was on a medical

11   leave of absence.  Don't describe anything

12   regarding that for the purposes of this hearing,

13   but he had not been at the profit center for

14   over a year during the negotiations, correct?

15      A.   I was -- he told me that he was there

16   the previous fall so that would have been --

17      Q.   Fall of 2017?

18      A.   Yes.  Six months prior to the election.

19   Five, six months.

20      Q.   And Troy, when did Troy work there?

21      A.   Troy worked there until he was

22   terminated in September of '18.

23      Q.   Now the skid-steer that you referred to

24   as 8,000 pounds, correct?

25      A.   Ball park, yes.
```

1    Q.   So that's something that could be towed

2  on the back of an F150 on up?

3    A.   That's not with the trailer, no.  Not

4  an F150, maybe a 250.

5    Q.   250?

6    A.   Sure.

7    Q.   Mr. Mayfield's position as regional

8  vice president, do you know how many locations

9  he covers?

10    A.   No.

11    Q.   Did the 324 tell you how many contracts

12  they were negotiating with him?

13    A.   Yeah.  They have done business with him

14  but he came on just before there was an

15  individual I think by the name of Brian.

16    Q.   Albert?

17    A.   Yes.  Albrect -- Albrecht prior to

18  Jason that held that title.  They dealt with him

19  and then Jason took over for him.

20    Q.   Okay.  Did the 324 tell you that or the

21  150?

22    A.   I know 150 did for sure.  I thought 324

23  said the same.

24    Q.   Okay.  Do you know how many states

25  Mr. Mayfield covers?

1    A.   I do not.

2    Q.   And I am looking if you want to look, I

3  guess I am suppose to give copies of this to the

4  judge and to the witness.

5         JUDGE ROSAS:  On cross you don't have

6  to worry about it at this time.  Just show

7  counsel what you are showing the witness.

8         MS. HILL:  Okay.  All right.  Let's go

9  back.

10        JUDGE ROSAS:  We can make copies later.

11        MS. HILL:  Are you okay?

12        MR. WIESE:  Yeah.  I gave you all my

13  copies.  I'd appreciate if you have an extra one

14  floating around so I can follow.

15        MS. HILL:  Pass it down to Mr. Ryan,

16  please, unless he has one.

17        MR. RYAN:  I probably have it.

18        MS. HILL:  Okay.

19  BY MS. HILL:

20    Q.   And it's my understanding this is your

21  first one and there is a supplement to this one;

22  is that correct.

23        JUDGE ROSAS:  These are Jencks

24  affidavits?

25        MS. HILL:  Yes.

 1          JUDGE ROSAS:  Oh, I don't see those.

 2    Unless there is a reason to.

 3    BY MS. HILL:

 4        Q.    Looking at your Page 5, I believe this

 5    is for Paragraph 14.

 6        A.    Yes.

 7        Q.    Okay.  I believe you were asked about

 8    part of this -- tell me if I am wrong, Mr. Wiese

 9    -- about part of this paragraph on direct

10    examination.  Did you ever ask Sunbelt why they

11    made the proposals that they did?

12        A.    Verbally or what do you mean?

13        Q.    You with respect to this particular

14    paragraph, this session?

15        A.    Greg West just always asked you guys to

16    put it in writing because you had proposed some

17    of the proposals verbally and Greg asked if you

18    would please put it in writing.

19        Q.    Okay.  Looking at this particular

20    paragraph it talks about the first proposal

21    presented by the employer presented for this

22    particular session was a PTO and the union

23    attempted to go through its proposals in the

24    order we had them in our package proposed --

25          MR. WIESE:  Objection, your Honor.  I

1  mean, counsel is just reading the affidavit into

2  the record.

3          MS. HILL:  Well --

4          JUDGE ROSAS:  Why don't you establish

5  what he previously testified to and what you are

6  trying to impeach him with now?

7  BY MS. HILL:

8     Q.   It's based on my notes, and I

9  apologize, but it appears that you were saying

10  that Sunbelt was going back and forth and

11  Sunbelt you claim Sunbelt was too busy for

12  certain dates?

13     A.   Yes.

14     Q.   So back and forth meaning on its

15  proposal?

16     A.   Back and forth meaning that we wanted

17  to go through the Proposal 1, 2, 3 in

18  consecutive order and you would jump around and

19  go to 4, go to 12, go to whatever, making it

20  slower and making it more confusing.

21     Q.   The subsections for the proposal?

22     A.   Yes.

23     Q.   Was Sunbelt trying to explain or

24  justify its proposal?

25     A.   I don't know.

1     Q.   Oh.  Okay.  Now go to Page 8 and this

2 is where you were asked questions on direct

3 between Line 1 and Line -- Line 16?

4     A.   1 through 16.

5     Q.   Correct.  You were asked questions

6 about it?

7     A.   Uh-huh.

8     Q.   All right.  We have already gone over

9 what you saw going on with Mr. Mayfield talking

10 to people but this also appears to say that you

11 saw Mr. Ryan Mayfield taking calls.

12     A.   No.  That's Brian Anderson.

13     Q.   Well, it says, During the -- Let's see,

14 we noticed that during some of the caucus breaks

15 that day, regional vice president Jason Mayfield

16 and profit center manager Brian Anderson were on

17 the phone apparently taking calls and doing

18 day-to-day business as opposed to discussing and

19 formulating bargaining proposals.

20          So are you saying Mr. Mayfield and

21 Mr. Anderson were on the phone?

22     A.   I believe so.

23     Q.   And what is the -- I mean, how do you

24 know what they were discussing on the phone?

25     A.   I don't.

1      Q.   So you are just guessing or speculating

2   that they were not getting information to

3   formulate bargaining proposals?

4      A.   Yeah.

5      Q.   All right.  Who had ultimate

6   authority -- Who were you told had ultimate

7   authority to bind Sunbelt with respect to

8   negotiations?

9      A.   I'm sorry.  To what?

10      Q.   Who on Sunbelt's negotiation team had

11   the ultimate authority to bind Sunbelt?

12      A.   To mind?

13      Q.   Bind.  I'm sorry.

14      A.   Oh, bind.  Okay.  Jason Mayfield I

15   believe.

16      Q.   Now, there is -- I apologize.  It's one

17   of these.  Perhaps Mr. Wiese can help.  The

18   one -- the E-mail regarding fleet issues.

19          MR. WIESE:  I believe that's General

20   Counsel Exhibit 9.

21   BY MS. HILL:

22      Q.   Thank you.  If you would pull that one

23   up.

24          MR. WIESE:  That is the correct

25   E-mail.

1        THE WITNESS:  9.  Got it.

2  BY MS. HILL:

3        Q.    Okay.  This one I believe has to do

4  with Mr. Bogardus, correct?  He had a conflict.

5  He had an adoption hearing?

6        A.    This one this one looks like when he

7  had to cancel November 13th.

8        Q.    Due to Mr. Bogardus -- oh, I am looking

9  at the wrong one, I apologize.  No.  I am on 9.

10  Okay.  This one has to do with fleet issues.

11        A.    Right.

12        Q.    Did you ask anyone what the fleet

13  issues were?

14        A.    No.

15        Q.    But you assumed that there were other

16  reasons for cancelling?

17        A.    You didn't give us any other reasons

18  besides that.

19        Q.    Did you believe -- Did the union

20  speculate that it was because of another NLRB

21  election?

22        A.    No.  We had stated that we wished you

23  could have met a week later on November 20th

24  because that other Sunbelt election was finished

25  at 7:00 a.m.

1    Q.   But did -- I'm sorry.  But are you

2  saying that the union told Sunbelt that the

3  parties should have met on November 20th after

4  the union election at the Climate Control

5  facility?

6    A.   We didn't tell you that, no.

7    Q.   Now, does Mr. Mayfield have any

8  responsibilities with respect to Climate

9  Control?

10   A.   Nope.

11   Q.   And at that time did Mr. Bogardus have

12  any responsibilities with respect to Climate

13  Control?

14   A.   No.

15   Q.   Did Mr. Anderson have any

16  responsibilities with respect to Climate Control

17  at that time?

18   A.   Nope.

19   Q.   So are you saying that the fleet issues

20  were actually because of the election?

21   A.   Yeah.  We believe so.  But we never

22  speculated that to you.  We never told you guys

23  that.

24   Q.   You just speculated to yourself?

25   A.   Uh-huh.  Yes.

1      Q.   Even on the first day of negotiations,

2   the parties agreed to at least one proposal,

3   correct?

4      A.   Yes.

5      Q.   For the negotiations on June 26, 2018,

6   did the union state that it wanted to take a

7   closer look at Sunbelt's paid time off policy?

8      A.   I believe so.

9      Q.   During that same negotiation session,

10  did the union discuss the funeral leave policy

11  that Sunbelt has with respect to who is covered,

12  which family member is covered for purposes of

13  being able to take funeral leave?

14     A.   Yes.  I believe so.

15     Q.   And did the union ultimately decide

16  that its attorneys had to look at Sunbelt's

17  proposals for management rights, just cause, and

18  paid time off and this is just for that

19  particular the June 26th negotiation?

20     A.   Yes.

21          JUDGE ROSAS:  Ms. Hill, are you going

22  on to another area at this time?

23          MS. HILL:  No, sir.

24          JUDGE ROSAS:  Are you in the same area?

25  Why don't you tell me when you are finished with

1    that area that you are working on.

2              MS. HILL:  Okay.  All right.  Just --

3              JUDGE ROSAS:  Before you go on to a

4    different idea.

5              MS. HILL:  Okay.  It's going to be a

6    different negotiation session, is that okay or

7    do you want to take --

8              JUDGE ROSAS:  Same concept, right?

9              MS. HILL:  Same concept, yes, sir.

10   BY MS. HILL:

11       Q.   And then it was August 8th of 2018 when

12   near the very end of the negotiation session

13   that the union had agreed to the management

14   rights proposal and the original proposal for

15   paid time off, correct?

16       A.   I was not there.

17       Q.   You were on vacation then, right?

18       A.   No.  I wasn't on vacation.  I was doing

19   something else.

20       Q.   Then apparently some of the other

21   people at the table said something differently

22   regarding where you were.

23       A.   Sure.

24       Q.   Oh, you mentioned that for the

25   September 27, 2018 negotiations you were there

1  along with Mr. Buffalo, correct?

2      A.   Yes.

3      Q.   But Mr. Anderson was not there,

4  correct?

5      A.   Yes.  Correct.

6      Q.   Because he was on paternity leave,

7  correct?

8      A.   I don't know why.

9      Q.   Okay.  And Jason ultimately was not

10  there at negotiations, correct?

11      A.   You said he was running late.  We

12  started 40 minutes late and he never showed up.

13      Q.   And Sunbelt gave you a reason for it,

14  correct?

15      A.   Yes, you did.

16      Q.   And it was?

17      A.   Just stuck in traffic and wasn't going

18  to make it.

19      Q.   Was he trying to get to Franksville

20  during an acquisition meeting?

21      A.   I don't recall that.  I just remember

22  you always stating when Mr. Mayfield was late

23  that it was due to traffic usually.

24      Q.   Usually but not always.  You mentioned

25  in direct examination that the union withdrew

1   its proposal regarding the national training

2   contribution, correct?

3       A.   Yes.

4       Q.   Did Mr. Mayfield provide you with an

5   explanation as to what kind of training Sunbelt

6   provides either directly from Sunbelt or through

7   Sunbelt's vendors?

8       A.   Yes.

9       Q.   Did it also discuss with you that the

10  members could be eligible for vocational school

11  scholarship?

12      A.   I believe so.

13      Q.   So Sunbelt did provide other avenues

14  for training for the bargaining unit members,

15  correct?

16      A.   Yes.

17      Q.   Did Sunbelt also make a proposal

18  regarding shipments of personal items directly

19  to the profit center that it was going to

20  prohibit bargaining unit members from doing

21  that?

22      A.   Yeah.

23      Q.   And do you recall what the reason was

24  for that?

25      A.   So they are not deemed liable for any

1  damage to the product.

2      Q.   Did it -- was it also because did

3  Sunbelt give you the example of one of the

4  bargaining unit members having fish -- for his

5  fish business being delivered directly to the

6  profit center?

7      A.   I know Jamie Smith did have a fish

8  business.  I don't recall that discussion.

9      Q.   Also do you recall after that short

10  negotiation session in July of 2019 that

11  involved in part the union's failure to provide

12  Sunbelt with electronic version of that document

13  that you apologized to Sunbelt for forgetting to

14  do that?

15      A.   Yes, I did.

16      Q.   Thank you.  February 21, 2019, you

17  provided the safety moment, correct?

18      A.   I know for sure I did it on August 8th.

19  I know there was another session that you guys

20  had asked us to do so I did another one.  I

21  don't remember if it was that date or not.

22      Q.   Was that the date involving when you

23  said that last week one of your members was

24  killed, highway work was reduced to 60 miles per

25  hour and people go too fast.

1    A.    That sounds accurate.

2    Q.    So do you agree that safety moments can

3  be beneficial to in this case it was only to the

4  bargaining unit members, correct, bargaining

5  team?

6    A.    Yeah.

7    Q.    Are you aware that Sunbelt or do you

8  remember Sunbelt offered the two mechanics

9  Mr. McKellips and Mr. Romanowski assistance in

10  looking for other posted jobs within Sunbelt?

11    A.    I don't recall that.  I recall Jason

12  Mayfield saying something other than that.

13    Q.    All right.  Do you recall any

14  discussion about providing the union members

15  with a reference letter?

16    A.    Yes.  I do recall that.

17    Q.    And did the parties -- did Sunbelt

18  explain how references were provided to

19  employees for former employees?

20    A.    I believe so.

21    Q.    Okay.  And was there any additional

22  information that the union wanted Sunbelt to

23  provide with respect to references for these two

24  individuals?

25    A.    Where they can transfer to.

1     Q.   Did you ask for a list of open

2  positions?

3     A.   I would online while we were in a

4  caucus and informed you guys that there were job

5  openings and those job openings Jason Mayfield

6  stated they weren't qualified for even though

7  the same one Mariano Rivera was in the same

8  position as those other two guys was transferred

9  to one of those locations.

10    Q.   Okay.  And which position are you

11  referring to?

12    A.   The HVAC.

13    Q.   Okay.  And which of the two individuals

14  had the certifications?

15    A.   I don't know.

16    Q.   Do you know if Mr. Mariano Rivera had

17  the certifications for the HVAC?

18    A.   No.  I don't know.

19    Q.   Do you know whether Mr. Rivera applied

20  for that HVAC position?

21    A.   No.  I don't.

22    Q.   Do you know how many years of

23  experience Mr. Rivera had in HVAC?

24    A.   No.

25    Q.   Do you know how much experience Mr.

1  Romanowski or Mr. McKellips had in HVAC?

2     A.  No.

3       MS. HILL:  You Honor, I think at this

4  time I think that's the end of my cross

5  examination but I reserve the right, No. 1, if

6  they ask follow-up questions and, No. 2, to be

7  able to ask him.

8       JUDGE ROSAS:  You think that's the end

9  of your cross examination at this point subject

10  to -- I'll give you some leeway on any other

11  additional questions you might have before we

12  resume tomorrow.

13      MS. HILL:  Do you want me to try to be

14  able to ask him additional questions that I was

15  going to be asking later on in the week?

16      JUDGE ROSAS:  That's up to you.

17      MS. HILL:  Okay.  Because I tried to

18  stay within --

19      JUDGE ROSAS:  You can.  We will talk

20  about it.

21      MS. HILL:  I don't want to go beyond

22  the scope.

23      JUDGE ROSAS:  You'll make that

24  application.  If that's what you should choose

25  to do, and I'll hear from General Counsel and

1    the Charging Party.  Generally I don't have a

2    problem with it; but, in theory, there might be

3    some -- maybe there is a time constraint.  Maybe

4    you got witnesses.  Maybe there is -- sometimes

5    there might be some confusion although that

6    should not happen, right, in one of these cases

7    but -- in terms of the proof.  I don't know, but

8    it's very possible you can proceed in that

9    fashion tomorrow morning.  So we'll pick up with

10   where you want to go.  Great.  If not, we'll

11   then go to redirect.

12             MS. HILL:  Thank you very much.

13             JUDGE ROSAS:  Off the record.

14         (Proceedings adjourned at 5:18 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE

2

3

4

5          This is to certify that the attached

6    proceedings before the National Labor Relations

7    Board (NLRB), Region 18 - Subregion 30, in the

8    matter of SUNBELT RENTALS, INC., Case Nos.

9    18-CA-236643 and 18-CA-238989, in Milwaukee,

10   Wisconsin, on December 16, 2019, was held

11   according to the record, and that this is the

12   original, complete, and true and accurate

13   transcript that has been compared to the

14   recording, at the hearing, that the exhibits are

15   complete and no exhibits received in evidence or

16   in the rejected exhibit files are missing.

17

18          PAULA ERICKSON, CSR, RPR

19          License No. 084-003899

20

21

22

23

24

25

# OFFICIAL REPORT OF PROCEEDINGS

## BEFORE THE

## NATIONAL LABOR RELATIONS BOARD

In the Matter of:                                        Case No.:    18-CA-236643
                                                                      18-CA-238989
                                                                      18-CA-247528
SUNBELT RENTALS, INC.

                            **Respondent**

And

INTERNATIONAL UNION OF
OPERATING ENGINEERS LOCAL 139,
AFL-CIO
                            **Charging Party**

Place:     Milwaukee, WI
Date:      12/17/19
Pages:     251-568
Volume:    2

## OFFICIAL REPORTERS

### Veritext Legal Solutions
Mid-Atlantic Region
1801 Market Street – Suite 1800
Philadelphia, PA 19103
888-777-6690

1                UNITED STATES OF AMERICA

2          BEFORE THE NATIONAL LABOR RELATIONS BOARD

3                REGION 18 - SUBREGION 30

4

5   In the Matter of:              )

6   SUNBELT RENTALS, INC.,         )

7            Respondent,           )

8     and                          )

9   INTERNATIONAL UNION OF         ) Cases 18-CA-236643

10  OPERATING ENGINEERS LOCAL 139  )       18-CA-238989

11  AFL-CIO,                       )       18-CA-247528

12           Charging Party.       )

13

14

15

16        The above-entitled matter came on for

17  hearing pursuant to notice, before

18  ADMINISTRATIVE LAW JUDGE MICHAEL ROSAS, at

19  310 West Wisconsin Avenue, Suite 450W,

20  Milwaukee, Wisconsin, on Tuesday, December 17,

21  2019, at 8:18 a.m.

22

23

24

25

1            A P P E A R A N C E S

2

3   On behalf of the General Counsel:

4     MR. TYLER J. WIESE
      NATIONAL LABOR RELATIONS BOARD
5     Eighteenth Region
      Federal Office Building
6     212 3rd Avenue S, Suite 200
      Minneapolis, Minnesota  55401
7     (952) 703-2891
      tyler.wiese@nlrb.gov

8

9   On behalf of the Respondent:

10     MS. PATRICIA J. HILL
      SMITH, GAMBRELL & RUSSELL, LLP
11     50 North Laura Street
      Jacksonville, Florida  32202
12     (904) 598-6100
      pjhill@sgrlaw.com

13

14   On behalf of the Charging Party:

15     MR. PATRICK N. RYAN
      BAUM, SIGMAN, AUERBACH & NEUMAN, LTD.
16     200 West Adams Street, Suite 2200
      Chicago, Illinois  60606
17     (312) 236-4316
      pryan@baumsigman.com

18

19                  *    *    *    *

20

21

22

23

24

25

1                    I N D E X

2                                              VOIR

3    WITNESS              DX  CX  RDX  RCX  DIRE

4    Michael Ervin       --  255 280  282   --

5    Gregory West        285 338 469  478

6                            471

7    Daniel Marsolek     507 547           514

8              (resumed) 520

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               E X H I B I T S

2

3  EXHIBIT          FOR IDENTIFICATION  IN EVIDENCE

4  GENERAL COUNSEL

5    GCX 5A              288                292

6    GCX 5B              293                296

7    GCX 5C              293                296

8    GCX 5D              293                296

9    GCX 5F-O            293                296

10   GCX 6B              301                303

11   GCX 14              330                333

12   GCX 25              513                520

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   P R O C E E D I N G S

2                         (Time Noted:  8:18 a.m.)

3              JUDGE ROSAS:  Play ball.

4              MS. HILL:  Thank you.

5                   CONT'D CROSS EXAMINATION

6    BY MS. HILL:

7         Q.   Mr. Ervin, you are still under oath,

8    sir.

9         A.   Yes, ma'am.

10        Q.   All right.  You mentioned yesterday

11   that there was only one time when the conference

12   room did not have adequate heat you believe for

13   the bargaining team, correct?

14        A.   Yes.

15        Q.   Was it so cold that you could see your

16   breath?

17        A.   It was close to that, yeah, yeah.

18        Q.   But could you see your breath, sir?

19        A.   I don't recall.

20        Q.   Since -- Could you please define what

21   is the shop area for Sunbelt's Franksville

22   profit center?

23        A.   The shop area would be where they work

24   on equipment.  I have never been in the shop,

25   though.

1    Q.   Okay.  So when you say work on

2  equipment meaning the bargaining unit mechanics,

3  correct?

4    A.   Yes, ma'am.

5    Q.   All right.  There is an allegation in

6  the complaint that since on or about August 29,

7  2018 Sunbelt's bargaining team members performed

8  work in the shop.  When did that occur, sir?

9    A.   I have some pictures but another

10  witness has more pictures.

11    Q.   And who is that witness?

12    A.   Dan Marsolek.

13    Q.   And this was during the bargaining?

14    A.   Not during the bargaining, no.

15    Q.   Okay.  And these were bargaining team

16  members meaning Mr. Bogardus, Mr. Anderson and

17  Mr. Mayfield or yours truly were performing work

18  in the shop?

19    A.   No.  Not the bargaining team.

20    Q.   So who do you have photographs of?

21    A.   I do not.  Not -- I have photographs of

22  people from across the street, but I don't have

23  the in-depth photographs that someone else does.

24    Q.   Okay.  People from across the street,

25  what do you mean?

1    A.    I can see people in there doing stuff

2    that were non-bargaining unit members.  I

3    couldn't see who they were.  Explicitly but,

4    again, someone else has better pictures.

5    Q.    All right.  And when you are talking

6    about pictures, are you talking about you were

7    able to take photographs through one of the bays

8    that led into the shop area for the mechanics?

9    A.    I am referencing when I was outside on

10    the road.  I am not talking about being inside

11    the shop.

12    Q.    Okay.  Not that you were inside the

13    shop but were your photographs of the inside the

14    shop?

15    A.    From the outside.

16    Q.    Okay.  And did you produce those?

17    A.    I don't recall.

18    MS. HILL:  I apologize, your Honor.  I

19    was just double checking because I don't

20    remember seeing any photographs in the

21    production.

22    BY MS. HILL:

23    Q.    Okay.  Thank you.  But at least during

24    bargaining sessions, you did not see any of the

25    bargaining team members performing work in the

1    shop, correct?

2         A.   Correct.

3         Q.   Did Sunbelt provide the union

4    negotiating team with a copy of the Take 10?

5         A.   I believe so.

6         Q.   And could you describe for the judge

7    what the Take 10 is?

8         A.   I believe it's taking ten minutes of

9    time to go over safety to make sure that

10   everybody is cognitive of what safety hazards

11   could be out there to be concerned of.

12        Q.   And did Sunbelt give that to the union

13   negotiating team in an effort for the union to

14   understand some of the job requirements of the

15   bargaining team members, excuse me, of the

16   bargaining unit members?

17        A.   I believe so.

18        Q.   Did the union find it objectionable to

19   receive a copy of the Take 10?

20        A.   No.

21        Q.   Did Gary -- and Gary Stamm worked in

22   the office next to the room Sunbelt used for

23   caucuses, correct?

24        A.   I don't know that.

25        Q.   Do you know who typed Sunbelt's

1    proposals to the union?

2        A.   You said you did.

3        Q.   Did you ever ask me how fast I could

4    type?

5        A.   No.

6        Q.   Did anyone from the bargaining union's

7    bargaining team ask me that?

8        A.   No.

9        Q.   Do you know that -- Are you aware that

10   Chris Pender allegedly told employees on or

11   about December of 2018 or January of 2019 that

12   the union was not going to get in?

13       A.   Yes.

14       Q.   And how do you know that, sir?

15       A.   One of the bargaining unit members told

16   me.

17       Q.   Who?

18            MR. WIESE:  Objection, your Honor.

19            JUDGE ROSAS:  Try it another way.

20   BY MS. HILL:

21       Q.   So how did you learn about Mr. Pender

22   allegedly telling I assume bargaining unit

23   members that the union was not going to get in?

24       A.   A bargaining unit member told me.

25       Q.   And do you -- and is that bargaining

1    unit member a former employee of Sunbelt?

2         A.   He is now.

3         Q.   Was he terminated or laid off?

4         A.   I believe terminated.

5         Q.   And why are you reluctant to provide me

6    with the name of the individual?

7              MR. WIESE:  Objection, your Honor.

8              MS. HILL:  May I have the basis for the

9    objection?

10             JUDGE ROSAS:  Section 7 protected

11   "chill" activity whether he is or she is or is

12   not still an employee.  I mean, the downside is

13   he doesn't have corroboration for the hearsay,

14   but you know.

15             MS. HILL:  Correct.

16             JUDGE ROSAS:  That's the way the cake

17   is baked here.

18             MS. HILL:  Right, but that's why I laid

19   the foundation for former employee, terminated

20   versus laid off.

21             JUDGE ROSAS:  It applies to current and

22   former.  It implies to current and former.

23   Never say never as far as a former employee

24   might come back.  I don't know.  I am not going

25   to give you the rationales over the years but --

 1          MS. HILL:  Well, I understand the

 2    rationale, sir, but --

 3    BY MS. HILL:

 4      Q.    Did you see a termination employee

 5    separation notice, sir?

 6      A.    No.

 7      Q.    And did you also learn from the same

 8    terminated employee that Mr. Chris Pender said

 9    on or about December of 2018 or January of 2019

10    that the union was not going to happen?

11          MR. WIESE:  Objection, your Honor.  The

12    same objection.  I mean, she is just trying

13    to --

14          JUDGE ROSAS:  Repeat the question.

15    BY MS. HILL:

16      Q.    Yeah.  Did the same terminated employee

17    form you -- this is a different question from

18    the first one.  The first one I asked that the

19    union was not going to get in.  They had a

20    compound allegation.  Okay.

21          JUDGE ROSAS:  So counsel's question

22    phrases it in terms of an unidentified employee.

23    What's your objection?

24          MR. WIESE:  That, I mean, the impact on

25    employees' Section 7 rights and their ability to

1  participate in board investigations.  I mean,

2  this is how --

3          JUDGE ROSAS:  But there is an

4  allegation.

5          MR. WIESE:  There is an allegation, I

6  mean, and the testimony is going --

7          JUDGE ROSAS:  So in that effect,

8  counsel has asked the witness what the basis is

9  for that allegation.  The witness has

10  articulated that but not revealed the source of

11  his information, right?

12          MR. WIESE:  Right but these

13  questions --

14          JUDGE ROSAS:  So counsel is entitled to

15  beat the horse -- beat the bush a couple of

16  times on this but you can't get the information

17  at least from him that way.

18          MS. HILL:  I understand.  That wasn't

19  my question.

20          JUDGE ROSAS:  Good.  So it's overruled.

21  So he can answer.

22  BY MS. HILL:

23      Q.  All right.  Thank you.  Let me finish

24  the question.  You probably got lost in all the

25  legalese there, but anyway, were you informed by

1   someone that on or about December 28 -- 2018 or

2   January 2019 that Chris Pender told an employee

3   that the union was not going to happen?

4      A.   Yes, I believe so.

5      Q.   And was this information provided to

6   you by the same terminated employee who you

7   referenced for the earlier question regarding

8   feudal for them to select the union?

9      A.   Yes.

10     Q.   And when did you receive that

11   information, sir?

12     A.   I don't recall.  It was a long time

13   ago.  I don't recall.  During the process of

14   negotiations in between.

15     Q.   In between negotiation sessions you are

16   saying?

17     A.   Throughout the year and a half that we

18   have been negotiating, yes.

19     Q.   Okay.  So obviously you were told

20   because the allegation is December of 2018 or

21   January of 2019 that it occurred, the

22   information was provided to you after that

23   period of time?

24     A.   Yes.

25     Q.   And before August of 2019, correct?

```
 1      A.    Yes.

 2      Q.    Thank you.  Did you know that on or

 3  about December 2018 or January 2019 that Chris

 4  Pender threatened its employees that it would be

 5  feudal for them to select the union as their

 6  bargaining representative?

 7      A.    Yes.

 8      Q.    And how did you learn about that

 9  allegation?

10      A.    I was informed by a bargaining unit

11  member.

12      Q.    And was it the same terminated employee

13  who you referenced a few minutes ago?

14      A.    I don't recall.  There was more than

15  one person that were saying various things in

16  reference to Chris Pender.

17      Q.    All right.  Did I just cover all of

18  the, as you call it, various things about Chris

19  Pender that you know about?

20      A.    I believe so.

21      Q.    Now, just for the Judge's purpose, what

22  position did Mr. Pender have in on or about

23  December 2018 or January of 2019?

24            MR. WIESE:  Objection.  Your Honor,

25  this is part of the stipulation.  I mean, we
```

1  have stipulated his position.

2        JUDGE ROSAS:  I'll take it.  I'll take

3  it.

4        THE WITNESS:  I was told that he was

5  like a shop supervisor, but I never knew what

6  his position was outside of what I was being

7  told.

8  BY MS. HILL:

9    Q.   And were you told that Mr. Pender

10 allegedly said this only to bargaining unit

11 members or to anyone outside of the bargaining

12 unit?

13   A.   I don't know who all he told besides

14 the individuals that told me.

15   Q.   Okay.  There was more than one

16 individual who told you about these allegations

17 that -- regarding Mr. Pender, correct?

18   A.   Yes.

19        JUDGE ROSAS:  Just for your

20 information, the stipulation refers to

21 Mr. Pender as service manager from -- for the

22 period of July 2, 2018 to November 11, 2019,

23 correct?

24        MS. HILL:  That is correct, sir, and

25 that's just for the Franksville location.

 1          JUDGE ROSAS:  Okay.

 2   BY MS. HILL:

 3       Q.   And these statements alleged --

 4   allegedly said by Mr. Pender, did they occur at

 5   the Franksville profit center?

 6       A.   Yes.

 7       Q.   Are you aware that on or about

 8   April 22nd or 23rd of 2019 Mr. Anderson

 9   allegedly interrogated employees about their

10   union sympathies?

11       A.   Yes.

12       Q.   And when did you learn about that?

13       A.   Around that time.  I don't recall.

14       Q.   And what did he allegedly ask the

15   employees?

16       A.   It was something -- it's been a while.

17   I don't recall.  It was something referenced to

18   the fact that why do you guys want the union.

19   We'll take care of you.

20       Q.   Did he -- Mr. Anderson allegedly say

21   this just to bargaining unit members or to

22   anyone else?

23       A.   I don't know.  I wasn't there.

24       Q.   And the individual was it one

25   individual who informed you or more than one?

1    A.    I don't recall if that was the same two

2  or not and I believe it was one of the same guys

3  and a different individual both bargaining unit

4  members.  So not the exact same two as the first

5  case with Chris Pender.

6    Q.    Did you take notes of any of the

7  conversations you had with bargaining unit

8  members regarding the Chris Pender allegations?

9    A.    I believe so.

10    Q.    And did you produce those?

11    A.    No.

12    Q.    With respect to the allegations

13  involving Mr. Anderson interrogating employees

14  about their sympathies, did you take notes about

15  that?

16    A.    I don't recall if I did or not.

17    Q.    There is a separate allegation.  Are

18  you aware that the separate allegation about

19  Mr. Anderson alleges that on or about April 22nd

20  or 23rd of 2019 Mr. Anderson interrogated

21  employees about their activities?

22    A.    I believe so, yeah.

23    Q.    Are you -- you believe so, do you

24  recall with certainty, sir?

25    A.    Yes.  Yes.

1    Q.   And how many people informed you about

2  that?

3    A.   I'd say two.

4    Q.   And when did you receive that

5  information?

6    A.   Probably around late April like you

7  discussed.

8    Q.   Did you take notes?

9    A.   I believe I have it somewhere.

10    Q.   Did you produce them to your attorney,

11  or excuse me, attorneys?

12    A.   I don't recall.

13         JUDGE ROSAS:  Counsel, let me just

14  interject at this point.  I know you are going

15  beyond the scope of direct which is fine in the

16  instance in which you would be putting on

17  evidence or addressing this with this witness on

18  your case.

19         MS. HILL:  Right.

20         JUDGE ROSAS:  I don't see that that

21  would be the case.  I think it's fine that

22  you're establishing from this witness the

23  possible existence of notes to which I then ask

24  counsel you have witnesses that are going to

25  testify to these statements -- these alleged

1    statements?

2              MR. WIESE:  Yeah.  Yes.  Directly.

3              JUDGE ROSAS:  So these will individuals

4    testify.  I am directing you to preserve those

5    records and to provide them to counsel during

6    this hearing should that be requested by counsel

7    for respondent once those witnesses testify so

8    we can have those available for her for cross

9    examination as prior statements, okay?

10             THE WITNESS:  Yes, sir.

11             JUDGE ROSAS:  Unless somebody objects

12   to the documents as privileged at that point.

13             MR. RYAN:  No.

14             MR. WIESE:  I wouldn't be.

15             JUDGE ROSAS:  Okay.  All right.  So but

16   at this point, I think you need to move through

17   this because he is not your best witness on this

18   stuff.

19   BY MS. HILL:

20      Q.    Correct.  That was the last of those

21   allegations involving those two individuals.

22   Sir, you indicated that you took some

23   photographs of Sunbelt employees working at the

24   Franksville profit center after the

25   reorganization.  Have those photographs been

1  posted on social media?

2      A.   No.

3      Q.   Have those photographs been produced on

4  paper for Local 139's use?

5      A.   No.

6      Q.   During the negotiation session --

7  excuse me -- during a negotiation session, did

8  you -- you discussed how you taught a labor

9  history course, correct?

10      A.   Yes.

11      Q.   And that was not relevant to the

12  negotiations going on at the time, correct?

13      A.   That was during a certain time when you

14  guys were discussing training and I brought that

15  up about the training that we do.

16      Q.   So labor history training was relevant

17  to Sunbelt's work?

18      A.   It's related to safety training and

19  education, yes.

20      Q.   What personal matters were discussed by

21  Sunbelt during negotiation sessions?

22      A.   I don't recall.

23      Q.   Do you recall during a negotiation

24  session that Mr. West informed the Sunbelt

25  negotiation team that the union was busy in

1  December because it met all of its members

2  during that month?

3      A.   Yes.

4      Q.   And that the union negotiating team

5  would not be available for several weeks during

6  December of 2018, correct?

7      A.   No.

8      Q.   You don't recall that, correct?

9      A.   No.  We were available on December 10th

10 and December 18th I believe.

11     Q.   But other weeks you were not available,

12 correct, because of meeting with the union

13 members?

14     A.   Yeah.

15     Q.   Throughout the state?

16     A.   Yes.

17     Q.   During a negotiation session, did

18 Mr. West also discuss that he was a marine?

19     A.   Yes.

20     Q.   Was that relevant to negotiations?

21     A.   No.

22     Q.   Did Mr. West during negotiations also

23 state that Sunbelt did not show respect to him?

24     A.   Yes.

25     Q.   And was Sunbelt's response to him that

1    because he was a marine, Sunbelt respected him?

2        A.    Yes.

3        Q.    And was that statement by Mr. West

4    relevant to any of the negotiations?

5        A.    No.

6        Q.    At any time between March 1st of 2018

7    and the present, were you ever told that Sunbelt

8    did not have an intention of reaching an

9    agreement with Operating Engineers 139?

10       A.    I was not told that.

11       Q.    What percentage of the business at the

12   Franksville profit center before the

13   reorganization came from walk-in customers?

14       A.    I have no knowledge of that.

15       Q.    What percentage of the business at the

16   Franksville profit center after the

17   reorganization comes from walk-in customers?

18       A.    I have no knowledge of that.

19       Q.    How many days did you spend taking

20   photographs at the profit center after the

21   reorganization?

22       A.    Myself, I was pretty busy doing other

23   things, so, myself, half a dozen to ten maybe.

24       Q.    And how much -- and how much of the

25   time per day of those half a dozen to ten?

```
 1      A.   I'd say an hour or two.

 2      Q.   And who else was there taking

 3  photographs?

 4      A.   Dan Marsolek.

 5      Q.   And how many days did the other -- did

 6  Mr. Marsolek spend taking photographs at the

 7  Franksville profit center after the

 8  reorganization?

 9      A.   Exactly, I don't know.

10      Q.   Approximately.

11      A.   A few times a week.

12      Q.   Did you take photographs at the

13  Waukesha general tool location for Sunbelt?

14      A.   No.

15      Q.   Did Mr. Marsolek take photographs at

16  the Waukesha general tool facility?

17      A.   I don't recall.

18      Q.   What facts do you have that prove that

19  non-bargaining employees at the Franksville

20  profit center were assigned to do bargaining

21  unit work?

22      A.   I'm sorry.  Say that again.

23      Q.   What facts do you have that prove

24  non-bargaining employees at the Franksville

25  profit center were assigned to bargaining unit
```

 1   work?

 2        A.   We have pictures and videos showing

 3   that.

 4        Q.   Okay.  You showed a video yesterday of

 5   an outside hauler, correct?

 6        A.   Yes.

 7        Q.   Okay.  My question was non-bargaining

 8   employees at the profit center?

 9        A.   The pictures show that.

10        Q.   Okay.  And you indicated that you knew

11   there was one non-bargaining unit employee,

12   Mr. Stamm, who was at the profit center?

13        A.   Yes.

14        Q.   Doing what you allege was bargaining

15   unit work?

16        A.   Yes.

17        Q.   And how much time did he spend?

18        A.   I was only there for about an hour.

19   The time that I was there and followed him into

20   the shop.

21        Q.   Now, when you say the shop, are you

22   referring to --

23        A.   The yard.

24        Q.   Into the yard?

25        A.   Yes.

1    Q.   And that's separate from where the

2  mechanics work?

3    A.   Yes.

4    Q.   So you only saw him in the yard for

5  maybe one hour?

6    A.   That day.

7    Q.   Did you see him any other day?

8    A.   I don't recall.

9    Q.   Any other non-bargaining employees

10 doing bargaining unit work at the Franksville

11 profit center?

12    A.   I seen other employees.  I just didn't

13 know who they were.  They had Sunbelt vests on

14 so they were I'm assuming an employee.

15    Q.   The high viz vests?

16    A.   Yes.

17    Q.   But sitting here today, you don't know

18 whether they were outside haulers or Sunbelt

19 employees?

20    A.   They were driving the same trucks like

21 everybody else that worked there.

22    Q.   Okay.  I thought you said that they

23 were in the yard.

24    A.   They were in the yard picking up

25 equipment to deliver.

1    Q.   And were they delivering transferring

2  the equipment to other Sunbelt profit centers?

3    A.   No.

4    Q.   Do you have photographs of that, sir?

5    A.   No.

6    Q.   Then where was the equipment delivered?

7    A.   Various job sites.

8    Q.   And you followed them there?

9    A.   Some of them.

10    Q.   Do you have notes?

11    A.   I'd have to go back.  I don't know.

12    Q.   Which job sites?

13    A.   I'd have to check.  I don't recall.

14    Q.   Do you have -- but you have to check.

15  What do you have to check?

16    A.   To see if I have it in my notes.

17    Q.   These notes were not produced to your

18  attorney?

19    A.   Yes.

20    Q.   They were produced?

21    A.   Were not.

22    Q.   Were not produced.  And you do not know

23  if those non-bargaining employees who were

24  transferring equipment from the Franksville yard

25  to a job site were from other profit centers

1  within Wisconsin, correct?

2      A.   You are correct.

3      Q.   Was the union ever unprepared for

4  negotiation, sir?

5      A.   Just the one time where we didn't get

6  you those sign-off E-mail.

7      Q.   The sign-off E-mail?  You mean the

8  electronic?

9      A.   G6 or General Exhibit G6, yeah.

10     Q.   Okay.  Was there also a day when

11 Mr. Steve Buffalo stated that he did not have

12 the draft CBA that everyone was referring to?

13     A.   I don't recall.

14     Q.   And was there a second incident when

15 the union identified 13 provisions of the CBA

16 that it believed to be revised only to be told

17 that many of those provisions had already been

18 TA'd?

19     A.   Yeah.  I remember you saying that.

20     Q.   And was there also a situation in which

21 Mr. Buffalo asked Sunbelt for a clean copy of

22 Sunbelt's February 21, 2019 proposals because he

23 did not have one?

24     A.   I don't recall that.

25     Q.   And there is no requirement that all

1  CBAs that the 139 negotiates must be identical,

2  correct?

3      A.   You are correct.

4      Q.   But there was -- the union took the

5  position on several occasions that it would not

6  agree to Sunbelt's proposal because it was not

7  the same as other CBAs, correct?

8      A.   That's not exactly how it was put, no.

9      Q.   Well, how was it put, sir?

10     A.   It was put we'd like to keep it the

11  same.  We want our insurance and part of our

12  pension in there.  That's how we said it.

13     Q.   But there were other proposals that you

14  said these are not identical to what you had --

15  what Sunbelt had in other CBAs, correct?

16     A.   Yes.

17     Q.   And you objected to any revision to any

18  other CBA, correct?

19     A.   Repeat that question.

20     Q.   The union negotiating team objected to

21  any revision that Sunbelt had to provisions that

22  existed in the 150 contract that the union

23  proposed and the 324 contract that the union

24  proposed?

25         MR. WIESE:  Objection, your Honor.  I

1  mean, why are we talking about 150 and 324

2  contracts?  I mean, this is a --

3      MS. HILL:  Do you want me to answer

4  that because he recognized that yesterday he

5  said that the contract that he made had

6  provisions that Sunbelt already agreed to with

7  the 150 and 324.  He mentioned John Sarafin so I

8  believe that opens the door for questioning

9  regarding that.

10      JUDGE ROSAS:  Limited question.  You

11  can answer that one.  Go ahead.

12      THE WITNESS:  Rephrase -- say it again,

13  please.  I'm sorry.

14      MS. HILL:  I'll ask the court reporter

15  to do that, please.

16          (Whereupon, the record was read

17           as requested.)

18      THE WITNESS:  I don't recall that.

19  BY MS. HILL:

20   Q.  Okay.  Just to follow up on one more

21  item.  You sent a letter to the Sunbelt

22  negotiating team in June of 2019 that requested

23  hourly rates, health insurance premiums, 401K

24  contributions for all facilities in Wisconsin,

25  correct?

1       A.   Yes.

2       Q.   The letter gave Sunbelt a ten-day

3   deadline to respond, correct?

4       A.   I believe so.

5       Q.   And did Sunbelt respond to that letter?

6       A.   I don't recall.  I'm sorry.

7            MS. HILL:  Okay.  No further questions

8   at this time.  We reserve the right --

9            JUDGE ROSAS:  Redirect?

10            MR. WIESE:  Could I have a couple

11   minutes to review my notes?

12            JUDGE ROSAS:  Sure.  Off the record.

13            MR. WIESE:  Just give me five.

14                 (Whereupon, a short recess was

15                  taken.)

16            JUDGE ROSAS:  Okay.  Cross -- redirect?

17                  REDIRECT EXAMINATION

18   BY MR. WIESE:

19       Q.   Thank you.  Mr. Ervin, I'd like to

20   direct your attention to General Counsel

21   Exhibit 7A.

22       A.   Okay.

23       Q.   So there was some discussion about the

24   note in the upper right-hand corner of this

25   document.  Pat Hill says this is new NLRB rules.

1    Do you recall that?

2        A.   Yes.

3        Q.   Okay.  Was this an explanation for why

4    Sunbelt was making this proposal?

5        A.   Yes.

6        Q.   Okay.  Were there other proposals where

7    Sunbelt did not provide an explanation for why

8    they were making those proposals?

9        A.   Yes.

10       Q.   Okay.  What are some of those?

11       A.   Why they would refuse to pay the

12   admin -- or do the dues checkoff.  They

13   initially refused the wages or declined the

14   wages.

15       Q.   Was this a notable event for Sunbelt to

16   be explaining why it was making a proposal?

17            MS. HILL:  Objection.  Form.  Opinion.

18   Relevancy.

19            JUDGE ROSAS:  Rephrase it slightly, the

20   "notable."

21   BY MR. WIESE:

22       Q.   Why did you mark this in your

23   notes this specific notation here?

24       A.   Just for our own preparation and

25   knowledge of why they did what they did.

1      Q.   Was this something that Sunbelt was

2  routinely doing at the bargaining table?

3      A.   No.

4      Q.   Okay.

5           MR. WIESE:  No further questions.

6           JUDGE ROSAS:  Charging Party, anything?

7           MR. RYAN:  Just a couple clarifying

8  things.

9                 RECROSS EXAMINATION

10  BY MR. RYAN:

11      Q.   Mr. Ervin, could you find in front of

12  you General Counsel Exhibits 6A and 6D?

13           MS. HILL:  Is that D?

14           MR. RYAN:  Yes.  A and D as in dog.

15           THE WITNESS:  Yes.

16  BY MR. RYAN:

17      Q.   Do you have those two documents?

18      A.   Yes, I do.

19      Q.   I think it was clear on cross but it

20  might have gotten a little confused or clear on

21  direct but might have gotten a little confused

22  on cross.  What is 6A in comparison 6D?

23      A.   6A in comparison to 6D is an update

24  like a revised edition of 6D.

25      Q.   Do you maybe have that reversed?

1          MS. HILL:  Objection.  Leading.

2          JUDGE ROSAS:  I'm sorry.  Repeat that

3     question.

4          MR. RYAN:  I asked if maybe that order

5     was reversed.

6          JUDGE ROSAS:  Sustained.  Rephrase.

7     BY MR. RYAN:

8       Q.   Okay.  If you look at 6D the first page

9     Section 1.2, what's notable about that paragraph

10    just looking at it without --

11      A.   It is the revised.

12      Q.   How do you know that?

13      A.   Because of the crossed outlines.

14      Q.   Okay.  And if you looked at Section 1.2

15    of 6A?

16      A.   It is not -- I misspoke on which draft

17    was which.  I apologize.

18      Q.   I just want the record to be clear.

19      A.   Yes, sir.

20      Q.   So what is 6A?

21      A.   6A is our original draft, 6D is our

22    revised draft.

23      Q.   And the original draft you mean the one

24    from May of 20th -- May 22nd?

25      A.   Yes.

1    Q.   And the revised one, when was that?

2    A.   I think we produced it to them in

3  October.

4    Q.   Okay.  Thank you.  One other question.

5  Who for Local 139 sitting at the bargaining

6  table had authority to accept any proposals that

7  were on the table from Sunbelt?

8    A.   Greg or I along with Steve Buffalo.

9         MR. RYAN:  Okay.  Nothing further.

10  Thank you.

11         MS. HILL:  No further questions.

12         JUDGE ROSAS:  Okay.  Thank you.  Sir,

13  you are excused.  Do not discuss your testimony

14  with anyone except with counsel and except as

15  otherwise instructed, all right?

16         THE WITNESS:  Yes, sir.  I am just

17  going to put these in order for you.

18         JUDGE ROSAS:  Ready with your next

19  witness?  Off the record.

20              (Whereupon, a short recess was

21               taken.)

22         JUDGE ROSAS:  All right.  On the

23  record.  Next witness.

24         MR. WIESE:  Your Honor, counsel for the

25  General Counsel calls Greg West to the stand.

 1          (Witness sworn.)

 2          JUDGE ROSAS:  Please have a seat and

 3     state and spell your name and provide us with an

 4     address.

 5          THE WITNESS:  Gregory West,

 6     G-R-E-G-O-R-Y.  W-E-S-T, 2461 South 95th Street,

 7     West Allis, Wisconsin 53227.

 8                    GREGORY WEST,

 9     after being first duly sworn, deposeth and saith

10     as follows:

11               DIRECT EXAMINATION

12     BY MR. WIESE:

13          Q.   Mr. West, where do you currently work?

14          A.   I work for the International Union of

15     Operating Engineers Local 139 at their Pewaukee

16     headquarters.

17          Q.   What's your position with Local 139?

18          A.   I am the District A manager.

19          Q.   What do you do in this position?

20          A.   I oversee the day-to-day operation

21     between the administrative staff at the office

22     as well as the activities of the business

23     representatives taking care of southeastern

24     Wisconsin.

25          Q.   In your position, do you have any role

1  in negotiating CBAs?

2      A.   I do.

3      Q.   And what is your role with respect to

4  negotiations?

5      A.   I have negotiated multiple Collective

6  Bargaining Agreements.

7      Q.   Who do you report to in the union?

8      A.   Steve Buffalo, chief of staff, Terry

9  McGowan business manager, president of

10  Local 139.

11      Q.   And who reports to you?

12      A.   The district day staff would be three

13  administrative ladies would handle dues, admin

14  dues, day-to-day activities at the office and

15  the business representatives.

16      Q.   How long have you worked as a District

17  A manager?

18      A.   Since April of 2015.

19      Q.   And how long have you worked for

20  Local 139 in total?

21      A.   February 12, 2007.

22      Q.   And during your time working for

23  Local 139, how many Collective Bargaining

24  Agreements have you negotiated?

25      A.   Roughly 50.

1    Q.    Are you familiar with the respondent in

2    this case, Sunbelt Rentals, Inc.?

3    A.    Yes.

4    Q.    How are you familiar with them?

5    A.    We are currently trying to negotiate a

6    first time Collective Bargaining Agreement.

7    Q.    And have you participated in those

8    negotiations?

9    A.    I have.

10    Q.    Who served as the lead note taker for

11    the union during those negotiations?

12    A.    Generally speaking, it was myself.

13    Q.    How many times have you served as a

14    lead note taker in collective bargaining

15    negotiations?

16    A.    A lot.

17    Q.    Can you quantify that?

18    A.    35, 40 times.

19    Q.    What's your process for taking notes

20    during negotiations?

21    A.    Well, I try to document where, what,

22    when.

23    Q.    Do you take your notes as bargaining is

24    occurring?

25    A.    Yes.

1     Q.   Do you modify them in any way after the

2   bargaining sessions conclude?

3     A.   No.

4     Q.   And was that the practice that you

5   followed with regard to Sunbelt?

6     A.   Yes.

7     Q.   Okay.  I'd like to direct your

8   attention to General Counsel Exhibit 5A.  That

9   will be up in that stack there.  The documents

10   should be in order.

11     A.   Okay.

12     Q.   Do you recognize this document?

13     A.   I do.

14     Q.   What is it?

15     A.   It's my notes from the Sunbelt

16   negotiations dated May 22, 2018.

17     Q.   And up top in the upper right-hand

18   corner of the document, May 22, 8:00 a.m. what

19   does that indicate?

20     A.   Those were the participants for the

21   company and then for the union.

22     Q.   Okay.  And were the participants for

23   the company are those listed up top?

24     A.   They are.

25     Q.   And then below that are the

1   participants for the union?

2      A.   Correct.

3      Q.   And above all of that I see a date and

4   time.  What does that date and time indicate?

5      A.   That indicates the date and the time of

6   the negotiations that were scheduled to begin.

7      Q.   And is this something that you tried to

8   do consistently throughout your notes?

9      A.   Yes.

10      Q.   And the same with regard to

11  participants?

12      A.   Yes.

13      Q.   If you turn to Page 2 of these notes --

14      A.   Yes.

15      Q.   -- I see near the bottom of those

16  notes, time 8:20 and then company caucus.  Do

17  you see that?

18      A.   I do.

19      Q.   What does that signify?

20      A.   I try to document when one party or the

21  other will take a caucus and at what time the

22  negotiations reconvene.

23      Q.   Okay.  And the time below that 8:38,

24  does that indicate when the negotiations

25  reconvened?

 1      A.   It indicates when Pat Hill returned to

 2   the room.

 3            JUDGE ROSAS:  Okay.  Let's put a pause

 4   for a second.  So again, we are not to read from

 5   any documents unless they are in evidence.

 6            MR. WIESE:  Thank you, your Honor.  My

 7   apologies.

 8            JUDGE ROSAS:  Just because I think we

 9   are going to have a bunch of these so I am

10   pretty religious about belaboring documents that

11   speak for themselves, especially in these kind

12   of cases.  It's not going to happen.

13            MR. WIESE:  Right.

14            JUDGE ROSAS:  Okay.  I'll let you all

15   know that right here.  The notes appear to have

16   a style of pros English, understandable to a

17   great extent so I am going to be very tight

18   about what needs to be elaborated on as in what

19   does something mean that is clearly written.

20            MR. WIESE:  Okay.

21            JUDGE ROSAS:  Unless it's not clearly

22   written.

23            MR. WIESE:  Okay.

24            JUDGE ROSAS:  Or not clearly obvious.

25            MR. WIESE:  Okay.

```
 1              JUDGE ROSAS:  So I hate to cut off the

 2    lot of the questioning you might have otherwise

 3    planned on direct or on cross examination for

 4    that matter.  Okay.  These notes are what they

 5    are.  Unless, Counsel, you can have a voir dire

 6    at this time because you are intending to offer

 7    these, correct?

 8              MR. WIESE:  I am, your Honor.

 9              JUDGE ROSAS:  You can have a voir dire

10    at this time and I can also anticipate, Counsel,

11    from the previous cross examination that you are

12    very thorough.  You are going to be very

13    thorough about what's transpired in this case so

14    I am going to hold you in contrast with my usual

15    rule of allowing for expanded voir dire that

16    might otherwise suffice for subsequent cross

17    examination.  I don't think it's going to have

18    that effect here, so I am going to hold you to

19    the just basic questions of whether or not this

20    should go into evidence and whether it is --

21    what it appears to be or whether there is some

22    other basis for an objection.

23              So go ahead.  Do you have any objection

24    to the introduction of General Counsel's 5A?

25              MS. HILL:  The only question I had
```

1    because it wasn't asked on direct was are there

2    any notations on this five-page document, sir,

3    that are not your notes?  Meaning not your

4    handwriting?

5              THE WITNESS:  No.

6              MS. HILL:  Okay.  Thank you.  That's

7    it, your Honor.

8              JUDGE ROSAS:  Any objection?

9              MS. HILL:  No objections.

10             JUDGE ROSAS:  Okay.  General Counsel's

11   5A is in evidence.

12                  (GCX 5A received.)

13             MR. WIESE:  And, your Honor --

14             JUDGE ROSAS:  You know what, Counsel,

15   we have got a bunch of these that were all lined

16   up.

17             MR. WIESE:  Yep.

18             JUDGE ROSAS:  Why don't you just deal

19   with them all in mass and then proceed from

20   there?  See what are not going to qualify and

21   which do and see if you have any actual

22   questions of any of them.

23             MR. WIESE:  Yes.  I will have a couple

24   of follow-up questions.  Please let me know if

25   you think they are cumulative of the document.

1          JUDGE ROSAS:  Very good.  So ask him

2     about the group.

3     BY MR. WIESE:

4          Q.   There is a whole stack of notes

5     following General Counsel Exhibit 5A, there is

6     5B, please go through them with me as I do.

7          A.   Uh-huh.

8          Q.   And then 5C.

9          A.   Yep.

10         Q.   And then after that is General Counsel

11    Exhibit 5D.

12         A.   Yep.

13         Q.   And then after that is General Counsel

14    Exhibit 5F and after General Counsel Exhibit 5F

15    it goes to I believe General Counsel Exhibit 5O

16    inclusive.

17         A.   I have a 5G here.

18         Q.   Right.  But if you continue all the way

19    to the end of the notes.

20         JUDGE ROSAS:  So just G, H, I, J, K.

21         MR. WIESE:  L, M, N and O inclusive.

22         JUDGE ROSAS:  Okay.

23         THE WITNESS:  Yes.  I have them here.

24    BY MR. WIESE:

25         Q.   And do you recognize these documents?

1     A.   Yes.

2     Q.   What are they?

3     A.   They are the notes that I took during

4  the negotiation sessions with Sunbelt Rentals.

5     Q.   Are these all the notes that you took

6  during those negotiation sessions?

7     A.   I guess I didn't go through all of

8  them.  Can I go through all of them?

9          MR. WIESE:  Yes.

10         MS. HILL:  And, your Honor, perhaps to

11  speed things up if we could also ask him if

12  there is anything -- any handwriting other than

13  his own, would that be appropriate during his

14  inspection.

15         JUDGE ROSAS:  You heard counsel just --

16         THE WITNESS:  I did.

17         MS. HILL:  Is that okay, Mr. Wiese?

18         MR. WIESE:  Yes.

19         THE WITNESS:  Okay.  I have reviewed

20  them all.

21  BY MR. WIESE:

22     Q.   Okay.  And are these your bargaining

23  notes from those negotiations?

24     A.   They are.

25     Q.   And did you take these notes as

1    bargaining was occurring?

2         A.    Yes.

3         Q.    Okay.  Did you modify them in any way

4    that you can recall?

5         A.    No.

6         Q.    So with regard to the handwriting,

7    there is one place that I'd like to direct you.

8    If you go to General Counsel Exhibit 5B, Page 1

9    of that document.

10        A.    Okay.

11        Q.    About two-thirds of the way down the

12   page above July 30th where it says cancelled --

13   excuse me, your Honor.  That was -- Strike that

14   line of questioning.

15             MR. WIESE:  I'll offer General Counsel

16   Exhibit 5B, C, D, and then F through O

17   inclusive.

18             MS. HILL:  Just the one question that

19   he didn't ask.  Any of the handwriting on those

20   documents that you reviewed, Mr. West, not

21   yours?

22             THE WITNESS:  No.

23             MS. HILL:  Thank you, sir.  No

24   objection, sir.

25             JUDGE ROSAS:  Okay.  So General

1  Counsel's 5B through 5O are received in

2  evidence.  Go ahead.

3          (GCX 5B-5D, 5F-5O were received.)

4  BY MR. WIESE:

5     Q.   With the exception of 5B which was

6  already in evidence.  So there is just a couple

7  of things, Mr. West, that I'd like to ask you

8  about in these notes.  So if you go back to the

9  very beginning, General Counsel Exhibit 5A, your

10 notes from the first session.

11    A.   Yes.

12    Q.   The first page the very bottom of that

13 page, the notation never have rules, do you see

14 that there?

15    A.   I do.

16    Q.   Okay.  Whose position was that?

17    A.   That was the employer Sunbelt.

18    Q.   Do you recall who stated that position

19 for the employer?

20    A.   Pat Hill.

21    Q.   And if you go over to the second page

22 of those notes, General Counsel Exhibit 5A,

23 about a third of the way down the page where it

24 says proposed week of the 11th of June, do you

25 see that line?

 1      A.   I do.

 2      Q.   Whose position was that?

 3      A.   The union's.

 4      Q.   And who stated that position for the

 5 union?

 6      A.   I believe it was me.

 7      Q.   Okay.  If you go a little bit further

 8 down the page, where it says Steve passed around

 9 suggestions we sit in cars, do you see that?

10      A.   Yes.

11      Q.   What was the context of that note?

12      A.   Well, we got to the point where the

13 company was going to caucus and it was suggested

14 that we sit in our cars during that caucus.

15      Q.   And who suggested that?

16      A.   The -- Pat Hill for the company.

17      Q.   Going over to General Counsel

18 Exhibit 5B, I notice there aren't any

19 participants listed at the top of these notes.

20 Do you recall who was in attendance at those

21 negotiations?

22      A.   Yes.

23      Q.   Who was in attendance?

24      A.   For the company it would have been Pat

25 Hill, Jason Mayfield, Bo Bogardus and Bryan

1    Anderson.

2        Q.   What about for the union?

3        A.   Steve Buffalo, Dan Marsolek, Mike

4    Ervin, Jamie Smith, the bargaining unit employee

5    participating and myself.

6        Q.   If you go about a third of the way down

7    the first page where it says the notation

8    July 31st, is the only available date, do you

9    see that?

10       A.   I do.

11       Q.   Whose position was that?

12       A.   The company's.

13       Q.   Who stated that position for the

14   company?

15       A.   Pat Hill.

16       Q.   If you go over to the second page of

17   General Counsel Exhibit 5B.

18       A.   Yes.

19       Q.   About two-thirds of the way down the

20   page, there is a notation ask for

21   counterproposals in writing.  Do you see that?

22       A.   Maybe three-quarters of the way down

23   the page, yes.

24       Q.   Whose position was that?

25       A.   The union's.

 1      Q.   And who stated that position?

 2      A.   I did.

 3      Q.   Then if you go over to Page 5 of the --

 4   of General Counsel Exhibit 5B.

 5      A.   Yep.

 6      Q.   So there is a time of 11:45, company

 7   policy, do you see that?

 8      A.   Yes.

 9      Q.   And then below that a time 12:43

10   meaning reconvene, do you see that?

11      A.   Yes.

12      Q.   And the notes between those two

13   meetings, what do those notes represent?

14      A.   That was the time frame between during

15   a caucus where we discussed some of the issues

16   that were presented and possible resolutions to

17   some of the proposals or counterproposals.

18      Q.   And between the notes where you have

19   notes between a caucus beginning and end time,

20   does that refer to discussions that occurred

21   during caucus?

22      A.   It does.

23      Q.   If you go over to General Counsel

24   Exhibit 5C --

25      A.   Yes.

1       Q.    -- so who was in attendance at these

2   negotiations?

3       A.    For Sunbelt it would have been Pat

4   Hill, Jason Mayfield, Bo Bogardus, Bryan

5   Anderson.  For the union it would be Gregory

6   West, Terry McGowan, Steve Buffalo, Dan Marsolek

7   and Jamie Smith the bargaining unit employee.

8       Q.    And looking at the left-hand side of

9   those notes, there is some numbers that are

10  circled?

11      A.    Yes.

12      Q.    Do you see those numbers?

13      A.    Yes.

14      Q.    What do those numbers represent?

15      A.    Those were bullet points as part of one

16  of the many proposals that had been discussed.

17      Q.    If you go to Page 4 of those notes.

18      A.    Yes.

19      Q.    About a third of the way down the page,

20  the notation 8-30-18, 8:00 a.m., do you see

21  that?

22      A.    Yes.

23      Q.    What does that represent?

24      A.    That would be the next scheduled

25  negotiations.

1    Q.    And who would have proposed that date?

2    A.    The company.

3    Q.    Do you recall who from the company?

4    A.    Pat Hill.

5    Q.    So I am going to direct your attention

6    to a different document now.  You are going to

7    have to dig through the stack for General

8    Counsel Exhibit 6B as in boy.

9    A.    Okay.

10    Q.    Do you recognize this document?

11    A.    I do.

12    Q.    Okay.  What is it?

13    A.    This is one of the proposals that was

14    being discussed.

15    Q.    Whose proposal was this, do you recall?

16    A.    This was the union's proposal.

17    Q.    And the handwriting on the document, do

18    you recognize that?

19    A.    Yes.

20    Q.    Whose is it?

21    A.    Mine.

22    Q.    And if you go over to Page 2 of the --

23    of the document, there is some red line markings

24    on that proposal.  Do you see those?

25    A.    Yes.

1      Q.    Okay.  And then those continue onto

2  Page 3 of the document; is that right?

3      A.    Yes.

4      Q.    Okay.  And what do those red line

5  markings represent?

6      A.    Modifications to the proposal.

7      Q.    By who?

8      A.    The union.

9      Q.    Then if you go over to Page 4 and 5 of

10  the proposal and I guess over to Page 6 as well.

11  Is that the same with respect to the red line

12  markings on those pages of the document?

13            MS. HILL:  Objection.  Form.

14            THE WITNESS:  Yes.

15            JUDGE ROSAS:  I'm sorry.  Repeat the

16  question.

17  BY MR. WIESE:

18      Q.    Did the red line -- I mean, I can

19  rephrase.  I don't recall exactly how I phrased

20  the question.

21            JUDGE ROSAS:  Go ahead.

22  BY MR. WIESE:

23      Q.    Did the red line markings on Pages 4, 5

24  and 6 of General Counsel Exhibit 6B, were those

25  also changes presented by the union?

 1     A.   Yes.

 2          MR. WIESE:  I'll offer General Counsel

 3    Exhibit 6B.

 4          JUDGE ROSAS:  Voir dire?

 5          MS. HILL:  Are any of the notes,

 6    handwritten notes, on this exhibit not yours?

 7          THE WITNESS:  No.

 8          MS. HILL:  Thank you.  No objection.

 9          JUDGE ROSAS:  General Counsel

10    Exhibit 6B is received.

11                    (GCX 6B received.)

12    BY MR. WIESE:

13     Q.   I'd like you to set a side your notes

14    now and also that proposal unless I reference

15    you to it and I am just going to ask you to

16    testify about your recollection from that

17    section.

18     A.   Uh-huh.

19     Q.   Was Mr. Ervin present at the bargaining

20    on August 8th of 2018?

21     A.   No.

22     Q.   How do you recall negotiations

23    beginning that day?

24     A.   They began at 8:00 a.m.  As was the

25    company's request, we had a safety moment.  We

1    discussed various safety issues.  We discussed

2    past negotiations, hoping to kind of get a feel

3    for where we have been and where we hoped to get

4    to by the end of this session, and then we the

5    company took a caucus.

6        Q.   Okay.

7            MS. HILL:  I'm sorry.  I couldn't hear

8    the last response.

9            JUDGE ROSAS:  The company took a

10   caucus.

11           MS. HILL:  Thank you.

12           MR. WIESE:  I'll ask you to speak up a

13   little bit, Mr. West.

14           THE WITNESS:  Uh-huh.  Be careful what

15   you ask for.

16   BY MR. WIESE:

17       Q.   As you were going through the past

18   negotiations before the company took a caucus,

19   what items do you recall the parties discussing?

20       A.   As I recall, we were discussing PTO,

21   FMLA.

22       Q.   Was there any discussion about table of

23   contents?

24       A.   Yes.

25       Q.   And what do you recall from the

1 discussion around that item?

2     A.    I believe we tentatively agreed to it.

3     Q.    Okay.  And what occurred that created

4 that belief?

5     A.    We generated what we believed to be a

6 relatively accurate table of contents based on

7 the provisions contained within the Collective

8 Bargaining Agreement.

9     Q.    And who from the employer stated that

10 it was tentatively agreed to?

11     A.    Pat Hill.

12     Q.    And who from the union stated that it

13 was tentatively agreed to?

14     A.    I did.

15     Q.    How long were the parties at the

16 bargaining table before the employer took a

17 caucus?

18     A.    Roughly 20 minutes.

19     Q.    Do you recall approximately how long

20 the employer's caucus lasted?

21     A.    Hour and a half.

22     Q.    Did the employer come back to the table

23 with any new proposals after that caucus?

24     A.    We were discussing, again, I guess we

25 were talking the PTO, FMLA language.  They had a

1   policy that called -- they called use it or lose

2   it and we wanted to verify if we have a program

3   of use it and lose it, are the employees offered

4   the opportunity through the 12-month period to

5   be able to use their time.

6       Q.   And did the company's position coming

7   out of that first caucus was it different in any

8   respect with regard to the PTO policy that you

9   can recall?

10      A.   No.

11      Q.   Okay.  And after these discussions

12  about the PTO policy of the employer's caucus,

13  what happened next?

14      A.   As I recall, the union took a caucus I

15  want to say it was about 10:30.

16      Q.   Okay.  And how long was that union

17  caucus?

18      A.   About a half hour.

19      Q.   What was the purpose of that caucus?

20      A.   To try to come up with modifications

21  that would be acceptable to both parties in

22  regards to the PTO use it or lose it and the

23  subjects that we were discussing.

24      Q.   Did the employer come back to the

25  bargaining table after that caucus?

1      A.   Once we called them back, it was a

2  little bit of time.  I want to say about

3  15 minutes.

4      Q.   And who called back, the employer?

5      A.   I did.

6      Q.   And who did you speak to from the

7  employer's negotiating team when you called them

8  back?

9      A.   The whole company negotiating team had

10  an office that they were caucusing in so I guess

11  ultimately I was speaking to all of them.

12      Q.   Who responded from the company when you

13  called them back?

14      A.   Pat Hill.

15      Q.   And what did Ms. Hill say?

16      A.   They'd be --

17           THE REPORTER:  I'm sorry, your Honor.

18  I didn't hear that.

19           THE WITNESS:  They'd be right in.

20  BY MR. WIESE:

21      Q.   Did they come back to the table after

22  that?

23      A.   After about 15 minutes.

24      Q.   And after that caucus, did the employer

25  come back to the table with any new proposals?

1    A.    We started discussing some issues as it

2  related to just cause.

3    Q.    Was there any modification that you can

4  recall the employer's proposals on just cause?

5    A.    Well, they had some unique language

6  that they wanted to incorporate in this

7  Collective Bargaining Agreement which we tried

8  to reason with the company that really were

9  covered by state statute.  They had a couple.

10  If an employee knew of another employee doing

11  something wrong legally, that it was their

12  obligation by company rule to turn them in.

13        Now, I mean, that's covered by state

14  law as well.  I mean, it's called obstruction of

15  justice but they were relatively insistive and

16  in a spirit of moving forward, we reluctantly

17  came up with something that would work for both

18  parties.

19    Q.    Besides the discussion of the just

20  cause provision, what else do you recall the

21  parties discussing after the union's caucus?

22    A.    I believe that the conversation

23  continued on the PTO and the FMLA.

24    Q.    Do you recall was there any discussion

25  about future dates for negotiations?

 1      A.    Yes.

 2      Q.    Okay.  And what do you recall from

 3  those negotiations?

 4      A.    They were available about 30 days from

 5  then.

 6      Q.    Who said that?

 7      A.    Pat Hill.

 8      Q.    And what was the union's response to

 9  that?

10      A.    Well, the union was ready to negotiate

11  at any time so we would take whatever we could

12  get I guess.

13      Q.    Did someone state that from the union?

14      A.    Pretty much all of us, really.

15      Q.    Okay.  Can you recall who stated that

16  specifically at the August 8th session?

17      A.    I did.

18      Q.    Okay.  And do you recall approximately

19  how long were the parties at the table that day?

20      A.    Generally speaking it was four hours

21  that day.  It was roughly the same, 8:00 until

22  about noon.

23      Q.    Thank you.  So I am going to -- We are

24  going to go back to your notes now, Mr. West.

25  I'd like to look at General Counsel Exhibit 5D.

1    A.   Okay.

2    Q.   So starting from the top of those

3 notes, where it says Pat Hill, were there other

4 employer negotiators there that day besides

5 Ms. Hill?

6    A.   I would say yes.

7    Q.   Okay.  Can you recall who was there?

8    A.   Jason Mayfield, Bo Bogardus, Bryan

9 Anderson.

10    Q.   And if you go a third of the way down

11 the page, where it says dates hyphen, do you see

12 that at those notes there?

13    A.   I do.

14    Q.   And who -- whose position was that?

15    A.   The union was trying to establish more

16 than once a month for the purpose of

17 negotiating.

18    Q.   And who stated that position for the

19 union?

20    A.   I did.

21    Q.   And then the series of times below that

22 September 27th, October 23rd, November 13th,

23 et cetera, who proposed those dates?

24    A.   That was what the company was available

25 for.

1    Q.   So if you go to the bottom of Page 2 of

2   General Counsel Exhibit 5B --

3    A.   Yep.

4    Q.   -- where it says company caucus

5   10:25 --

6    A.   Yes.

7    Q.   -- do you recall when the company came

8   back from that caucus?  I don't see it indicated

9   anywhere in the notes.

10    A.   I would have to say that it was right

11   around noon.

12    Q.   What's the basis for that?

13    A.   Well, at the top of the Page 3, I had

14   taken the time to point out that there was three

15   hours of caucus out of a four-hour session.

16    Q.   Okay.  All right.  Let's go on to

17   General Counsel Exhibit 5F.

18    A.   Okay.

19    Q.   So looking at the very top of the

20   notes, it looks like they are cut off a little

21   bit.  Do you know what that says up there?

22    A.   Yeah.  That Dino, too, was at the

23   negotiations.

24    Q.   Okay.

25    A.   Oh, actually, it states that myself and

1  Dan Marsolek had been absent from Session 5.  We

2  had a very young member died unexpectedly and we

3  attended his funeral.

4      Q.   Did negotiations still take place at

5  that session?

6      A.   They did.

7      Q.   Do you recall who was in attendance at

8  these negotiations?

9      A.   Yes.

10      Q.   Who was there?

11      A.   Pat Hill, Jason Mayfield, Bo Bogardus,

12  Bryan Anderson.  For the union Steve Buffalo,

13  Dan Marsolek, Mike Ervin, Jamie Smith and

14  myself.

15          JUDGE ROSAS:  Hold on a second.  Is

16  this Session 5 that you are absent at?

17          THE WITNESS:  No.  This would be

18  Section 6 then.

19          JUDGE ROSAS:  What were you absent at?

20          THE WITNESS:  Session 5.

21          JUDGE ROSAS:  What was that?  What date

22  was that?

23          THE WITNESS:  That would have been the

24  August 30th session.

25          MR. WIESE:  Well, I mean, it's

1    reflected in the notes.  I don't know if you

2    want him to testify independently as to the date

3    that he recalls the session that he wasn't at

4    but --

5              JUDGE ROSAS:  You weren't present on

6    August 30th?

7              THE WITNESS:  That's correct.

8              JUDGE ROSAS:  Whose notes are these?

9              MR. WIESE:  Those are --

10   BY MR. WIESE:

11       Q.   So if you look at General Counsel

12   Exhibit 5E --

13             MS. HILL:  Is that D or B?

14             MR. WIESE:  E, E as in eagle.

15             MS. HILL:  Sorry.

16             MR. WIESE:  No.  That's okay.  There is

17   some close letters.

18             JUDGE ROSAS:  Okay.

19   BY MR. WIESE:

20       Q.   So, Mr. West, are these your bargaining

21   notes?

22       A.   For which one?

23       Q.   General Counsel Exhibit 5E.

24       A.   They are not.

25       Q.   Okay.  Were you at the negotiations at

1  that session?

2      A.   If that was Session 5, it was, no, I

3  was not.  I was attending a funeral.

4          JUDGE ROSAS:  Okay.  So that's in

5  between August 30th and October 23rd.  Okay.

6          MR. WIESE:  Yes.  Yes.

7          JUDGE ROSAS:  Okay.

8  BY MR. WIESE:

9      Q.   So going do you have General Counsel

10  Exhibit 5F in front of you?

11     A.   I do.

12     Q.   I know we jumped around a little bit.

13  Okay.  So going down to the bottom of Page 1 of

14  those notes, the notation 9:37 meeting

15  reconvene, we are shorthanded.  These two guys

16  are answering phones.  Do you recall who those

17  two guys were?

18     A.   Yes.  Bo Bogardus and Bryan Anderson.

19     Q.   If we go over to General Counsel

20  Exhibit 5G --

21     A.   Okay.

22     Q.   -- looking at the first page of that

23  document, there is about a third of the way down

24  below where it says Mike Ervin, dates, do you

25  see that?

 1     A.   Yes.

 2     Q.   Okay.  The date is January 28th of 2019

 3  and February 1st of 2019.  Who proposed those

 4  dates?

 5     A.   Those were the dates that the company

 6  provided us that they were available.

 7     Q.   So if you go to the very end of these

 8  notes in General Counsel Exhibit 5G --

 9     A.   Yes.

10     Q.   -- the very last notation is 10:46

11  company caucus and then 12:30 leave, company

12  still in caucus?

13     A.   Yes.

14     Q.   Okay.  Do you recall what was going on

15  at that time?

16     A.   Well, the company obviously was

17  caucusing, they were taking an extremely long

18  time during their caucus and we left.  We

19  announced that we left of course.

20     Q.   Who announced that?

21     A.   It was me.  I'm sure it was me.  I am

22  sure.

23          MS. HILL:  Thank you.

24  BY MR. WIESE:

25     Q.   Then if we go to General Counsel

1  Exhibit 5H.

2       A.   Yes.

3       Q.   Who was in attendance at these

4  negotiations?

5       A.   For the company it would be Pat Hill,

6  Jason Mayfield, Bo Bogardus, Bryan Anderson.

7  For the union it would be Steve Buffalo, Mike

8  Ervin, Dan Marsolek, Jamie Smith, and myself.

9       Q.   If you turn over to the second page of

10 your notes, next to the notation 10:25 asked to

11 reconvene.  Company socialized with vendor while

12 we wait.  Do you see that?

13      A.   Yes.

14      Q.   Do you recall who from the company was

15 socializing with the vendor?

16      A.   Pretty much the whole negotiating team.

17      Q.   Okay.  If you go over to Page 4 of your

18 notes in General Counsel Exhibit 5H...

19      A.   Yes.

20      Q.   Okay.  The notation at the very bottom

21 of that page next to 12:16, do you see that?

22      A.   Yes.

23      Q.   It looks like it's cut off.  Can you

24 read what that says?

25      A.   Oh.  Yeah.  The company was still

1  caucusing but Bo was attending his day-to-day

2  duties at the counter.

3      Q.   If you go over to Page 6 of those notes

4  from that session --

5      A.   Yes.

6      Q.   -- where it says resubmit proposals as

7  is.  No movement.  Whose position was that?

8      A.   Could you say that again, please?

9      Q.   Sorry, yes.  Yes.  I'll speak up.

10  Resubmit proposals as is.  No movement, do you

11  see that?

12      A.   I see where I and Dan pointed out that

13  there was no movement, yes and then we

14  resubmitted the proposals as is with no

15  movement.

16      Q.   Okay.  Was that something that the

17  union did?

18      A.   Yes.

19      Q.   Okay.  If you go over to General

20  Counsel Exhibit 5I --

21      A.   Yes.

22      Q.   -- about a third of the way down the

23  page, the notation TM there --

24      A.   Yes.

25      Q.   -- what does that stand for?

```
 1      A.   Terry McGowan.

 2      Q.   So looking at Page 3 of these notes

 3   now --

 4      A.   Yes.

 5      Q.   -- if you go to see where it says 9:17

 6   company caucus about three quarters of the way

 7   down the page --

 8      A.   Yes.

 9      Q.   -- and then if you look at the notes on

10   the bottom of Page 3, about Pat Hill coming back

11   to the room.

12      A.   Yes.

13      Q.   Was she joined by any other members of

14   the employer's negotiating team at that time?

15      A.   No.

16      Q.   Okay.  Were the parties actually in

17   negotiation during that time?

18      A.   Well, they were in their caucus.

19      Q.   But were the parties meeting

20   face-to-face?

21      A.   No.

22      Q.   And how long after that 9:17 caucus was

23   it until the parties met face-to-face again?

24      A.   1:00 in the afternoon.

25      Q.   Okay.  And where do your notes indicate
```

1  that?

2     A.   Well, we went to lunch at 11:46 because

3  the company was still caucusing.  We returned

4  from lunch at 12:40.  Sunbelt was gone.  And at

5  12:56 I asked for 139 caucus so right around

6  1:00 we reconvened, 5 to 1:00.

7     Q.   Let's go over now to General Counsel

8  Exhibit 5J.

9     A.   Okay.

10    Q.   And, actually, well, I do have one

11 question for you with regard to these notes.  If

12 you go over to Page 6 of the notes --

13    A.   Yes.

14    Q.   -- about a third of the way down the

15 page, the letters NTF, what does that stand for?

16    A.   National Training Fund.

17    Q.   And then two lines below that the

18 letter CPF, what do those stand for?

19    A.   Central Pension Fund.

20    Q.   Okay.  Thank you.  And, Mr. West, I am

21 again going to ask you to put your notes away

22 and have you testify independent of your

23 recollection as to what occurred at that

24 session.

25    A.   Okay.

1    Q.    How do you recall the negotiations

2  beginning on March 21st?

3    A.    Well, we began at 8:30 that morning.

4  The union began by offering condolences to the

5  Sunbelt team as a result of a fatality which

6  occurred in the Florida area.

7    Q.    And after that initial offering of

8  condolences, what do you recall the parties

9  discussing next?

10    A.    I, on behalf of the union, pointed out

11  that the union was tired of the company's stall

12  tactics.

13    Q.    And what response, if any, did the

14  employer have to that?

15    A.    Not positive.

16    Q.    Can you be more specific?

17    A.    They suggested they weren't stalling.

18    Q.    Who suggested that?

19    A.    Pat Hill.

20    Q.    What, if any, substantive topics do you

21  recall being discussed at the beginning of that

22  bargaining session?

23    A.    We were discussing on call, on call

24  status, the conditions around an on call and if

25  you get called back to work.

1    Q.   Was there any discussion about wages at

2  the beginning of that session?

3    A.   Yes.  We asked for --

4         MS. HILL:  Objection.  Leading.

5         JUDGE ROSAS:  Sustained.  No leading.

6  BY MR. WIESE:

7    Q.   What do you recall from the discussion

8  around wages?

9    A.   Well, obviously we were still waiting

10  on a counterproposal from our February 8th wage

11  proposal which included health, pension and a

12  wage proposal.

13    Q.   Who brought up that proposal for the

14  union?

15    A.   We proposed it on February 8th.

16    Q.   Okay.  But with regard to the

17  February -- or excuse me -- the March 21st

18  negotiations, who brought that up for the union?

19    A.   The union.  I did.

20    Q.   Okay.  And who responded for the

21  employer?

22    A.   Pat Hill.

23    Q.   And what did Ms. Hill say?

24    A.   They didn't have one.

25    Q.   Are there any other items you recall

1   being discussed at the beginning of those

2   negotiations?

3       A.   Not offhand.

4       Q.   Is there a document that would help to

5   refresh your recollection?

6       A.   My affidavit.

7       Q.   I am going to direct you to paragraph

8   or to Page 5 on Paragraph 16 of your affidavit.

9   Actually 16 and 17.

10      A.   Which paragraph?

11      Q.   16 and 17.

12      A.   Uh-huh.   Okay.

13      Q.   Is your recollection now refreshed as

14  to the other items discussed at the beginning of

15  those negotiations?

16      A.   Yes.

17      Q.   And what items do you recall being

18  discussed?

19      A.   We discussed the pension.   The company

20  was adamant to keep the 401K.   We indicated that

21  the bargaining unit employees who had voted to

22  have the union represent them really wanted the

23  decentral pension fund.

24      Q.   After these initial discussions, did

25  either party declare a caucus?

1      A.   Yes.

2      Q.   Who declared the first caucus?

3      A.   The company.

4      Q.   How long did that caucus last?

5      A.   Roughly an hour and a half.

6      Q.   Did the parties return to the table

7   after that caucus?

8      A.   Yes.

9      Q.   What happened when the parties returned

10   to the table?

11      A.   We continued our discussion as it

12   related to on-call status.

13      Q.   Was there any discussion about wages?

14      A.   We discussed a proposal that they put

15   together at 1.25 percent.

16      Q.   Okay.  And what do you recall from

17   those discussions?

18      A.   I found that 1.25 percent was a

19   peculiar formula and asked where that may have

20   been used before or where they derived such a

21   formula from.

22      Q.   And do you recall what the 1.25 wage

23   rate was for, what --

24      A.   Well, if you got called into work in an

25   on-call setting, obviously the union had

1   proposed one and a half times the regular wage

2   rate and the company's counterproposal was 1.25.

3       Q.   Was this discussed or referred to by

4   the parties as premium pay?

5           MS. HILL:  Objection.  Leading.

6           MR. WIESE:  I am just trying to --

7           JUDGE ROSAS:  I'll allow that.

8           THE WITNESS:  Yes.

9   BY MR. WIESE:

10      Q.   Okay.  So turning away from the

11  discussions around premium pay, what other

12  discussions do you recall returning after that

13  caucus?

14      A.   Asked for a counterproposal to our wage

15  proposal.

16      Q.   What did the -- what response did the

17  company have to that?

18      A.   After discussing the premium pay, we

19  were told we weren't going to discuss economics.

20      Q.   Who stated this from the company?

21      A.   Pat Hill.

22      Q.   After this exchange, what do you recall

23  happening next at negotiations?

24      A.   As I recall, the union took a caucus

25  ourselves.

1    Q.    How long did that caucus last?

2    A.    Roughly a half an hour.

3    Q.    Did the parties take any lunch breaks

4    that day?

5    A.    We did.

6    Q.    How long was that lunch break?

7    A.    Hour.

8    Q.    And what happened after the parties

9    returned from the lunch break?

10   A.    That's when we took our caucus to

11   discuss the on-call and tried to come up with a

12   modification which would be acceptable by both

13   parties.

14   Q.    Oh, okay.  And after the union returned

15   from its caucus that afternoon, what do you

16   recall being discussed at the table?

17   A.    We discussed -- we continued the

18   discussion of on-call and we were still looking

19   for a counterproposal to our wage proposal.

20   Q.    Is there anything else that you recall

21   coming up at the table at that time?

22   A.    I don't recall.

23   Q.    Is there a document that would refresh

24   your recollection?

25   A.    My affidavit.

1    Q.   I am going to direct your attention to

2  Page 6 and 7 of your affidavit Paragraph 22.

3  There is a blank page.

4    A.   Which paragraph?

5    Q.   Paragraph 22 which goes from the bottom

6  of Page 6 over to Page 7.

7    A.   Okay.

8    Q.   Is your recollection now refreshed as

9  to the other items that the parties discussed

10  after the lunch break?

11    A.   Yes.

12    Q.   Okay.  And so what items do you recall

13  being discussed?

14    A.   Again, we discussed wages, health fund,

15  pension.

16    Q.   Okay.  What else besides those terms?

17    A.   The next meeting date.

18    Q.   Okay.  And what do you recall from the

19  discussions about the next meeting date?

20    A.   They were very busy.  The next date was

21  the end of April as I recall.

22    Q.   Who stated that the company was very

23  busy?

24    A.   Pat Hill on behalf of the company.

25    Q.   And who offered the date at the end of

1   April?

2        A.   Pat Hill.

3        Q.   Are there any other discussions that

4   you can recall?

5        A.   The meeting needed to come to an end at

6   2:00 o'clock because Jason Mayfield had to

7   leave.

8        Q.   Who stated that?

9        A.   Pat Hill.

10       Q.   And after those discussions, do you

11   recall any discussions about substantive matters

12   that afternoon during the March 21st

13   negotiations?

14       A.   Not offhand.

15       Q.   What about with respect to dues

16   checkout?

17       A.   We did talk about dues checkoff, yes.

18   Admin dues.

19       Q.   And what do you recall from the

20   discussions around those topics?

21       A.   The company was not willing to have

22   admin dues check off as part of the Collective

23   Bargaining Agreement.

24       Q.   Who brought up dues checkoff?

25       A.   The union.

1    Q.   And who brought that up from the union?

2    A.   Myself.

3    Q.   What do you recall saying as you

4  brought that up?

5    A.   Well, we have always had part of our

6  Collective Bargaining Agreement admin's dues

7  checkoff as part of all of our agreements.

8    Q.   Who responded from the company?

9    A.   Pat Hill.

10   Q.   What did Ms. Hill say in response to

11  that?

12   A.   That they weren't willing to do so for

13  this Collective Bargaining Agreement.

14   Q.   Did she provide any explanation at that

15  time as to why they weren't willing to do so?

16   A.   No.  They just didn't want to

17  participate.

18   Q.   And after the discussion about dues

19  checkoff, what do you recall the parties doing

20  next?

21   A.   Well, we did ask, you know, there are

22  other locals that when they do have admin dues

23  checkoff, Local 324 is in Michigan, a market

24  very similar to the Wisconsin market.  Local 150

25  in Illinois has dues checkoff a little different

1    market than the Wisconsin market.

2        Q.   Okay.  Did the company have any

3    response to those remarks that you can recall?

4        A.   No.

5        Q.   And after that exchange over dues

6    checkoff, what do you recall the parties doing

7    next?

8        A.   The meeting came to an end at 2:00 per

9    the company's request.

10       Q.   During the caucus that you discussed

11   earlier, did you see any members of the

12   employer's negotiating team?

13       A.   I believe I seen Bo and Bryan working

14   the counter.

15       Q.   How long did you see -- Strike that.

16            Were Bo and Bryan together working the

17   counter?

18       A.   No.

19       Q.   So you saw them separately working the

20   counter?

21       A.   Well, they had separate workstations.

22       Q.   Okay.  Were they at their separate

23   workstations at the same time?

24       A.   I don't recall.

25       Q.   Okay.  Where were you when you saw

1  Mr. Bogardus and Mr. Anderson?

2       A.   I was in the negotiating room which was

3  our caucus room at the time of the caucuses.

4       Q.   Do you recall how long you saw

5  Mr. Anderson at his computer?

6       A.   I do not recall exactly.

7       Q.   And what about Mr. Bogardus?

8       A.   I don't recall exactly.

9       Q.   Mr. West, I'd like to direct your

10  attention now to General Counsel Exhibit 14

11  which is going to be buried under that stack of

12  documents there.

13            JUDGE ROSAS:  What number?

14            MR. WIESE:  14, one, four.

15            THE WITNESS:  Yes.

16  BY MR. WIESE:

17       Q.   Do you recognize this document?

18       A.   I do.

19       Q.   Okay.  What is it?

20       A.   These are my notes dated March 22,

21  2019.

22       Q.   And what are these notes from?

23       A.   These are the notes that I took during

24  the meeting that I had with our negotiating team

25  the next day in regard to the March 21st

1  negotiation session.

2      Q.   Do you recall who was in attendance at

3  that meeting?

4      A.   Myself, Steve Buffalo, Dan Marsolek and

5  Mike Ervin.

6      Q.   What was the purpose of this March 22nd

7  meeting?

8      A.   To try to come up with modifications to

9  our original proposal which would be acceptable

10  to both parties in an effort to move forward.

11         MR. WIESE:  I'll offer General Counsel

12  Exhibit 14.

13         MS. HILL:  Same question, any of the

14  handwriting on both pages of Exhibit 14 not

15  yours, sir?

16         THE WITNESS:  No.

17         JUDGE ROSAS:  Hold on one second.

18         MS. HILL:  Go ahead.

19         JUDGE ROSAS:  Any objection?

20         MS. HILL:  No objection.

21         JUDGE ROSAS:  Okay.  So what's the

22  difference between 5J and General Counsel's 14?

23         MR. WIESE:  Well, they are from

24  separate days so the negotiations were on

25  March 21st --

1          JUDGE ROSAS:  General Counsel's

2     Exhibit 5J are the witness' notes from March 21,

3     2019, correct?

4          MR. WIESE:  Right.  Correct.

5          JUDGE ROSAS:  So what is General

6     Counsel's 14?

7          MR. WIESE:  General Counsel's --

8          THE WITNESS:  These are my notes that I

9     took during the course of a meeting that we had

10    the day after the March 2 --

11         JUDGE ROSAS:  So the meeting that you

12    had was on March 22nd when you generated these

13    notes at that time?

14         THE WITNESS:  These are meeting notes

15    from my meeting with my negotiation team -- our

16    negotiating team.

17         JUDGE ROSAS:  On March 22nd?

18         THE WITNESS:  Right.  The negotiation

19    was March 21st.  I and Local 139's negotiating

20    team got together to try to come up with a

21    resolution.

22         JUDGE ROSAS:  So this is a

23    strategizing?

24         THE WITNESS:  Right.

25         JUDGE ROSAS:  Okay.  Go ahead.  General

1    Counsel's 14 is received.

2                         (GCX 14 received.)

3    BY MR. WIESE:

4        Q.   So directing your attention to General

5    Counsel Exhibit 5K.

6        A.   Okay.

7        Q.   Going about a third of the way down the

8    page, the first page of the document it says

9    open wage proposal?

10       A.   Yes.

11       Q.   Do you see that?

12       A.   I do.

13       Q.   What is that note in reference to?

14       A.   We still had not received a

15   counterproposal to our February 8th wage

16   proposal.

17       Q.   Who from the union brought up that the

18   wage proposal was open?

19       A.   I did.

20       Q.   If you turn over to General Counsel

21   Exhibit 5L now --

22       A.   Okay.

23       Q.   -- looking at Page 1 of that

24   document --

25       A.   Uh-huh.

1      Q.    -- the notation refuse to answer

2  whether Illinois and then pay OT not in

3  Illinois, whose position was that?

4      A.    The company wouldn't answer our

5  question.  We were discussing adamantly the

6  union's proposal for two and a half after eight

7  and on Saturdays, double time on holidays.  The

8  company adamantly refused.

9      Q.    And who refused from the company?

10     A.    Pat Hill on behalf of the company.

11     Q.    And if you go down to the middle of

12  that page, the note says wage freeze and then

13  down to based off of economic downturn.  Do you

14  see that block of notes?

15     A.    I do.

16     Q.    Whose position was that?

17     A.    That was the company's position or

18  their counterproposal to our February 8th wage

19  proposal.  They proposed a wage freeze and a

20  wage reopener for years two and three based on

21  what they believed to be an economic downturn.

22     Q.    If you go down to the bottom of Page 3

23  of your notes --

24     A.    Yes.

25     Q.    -- so the block of notes -- actually,

1    the two notes at the very bottom.  Pat refuses

2    to put left out articles in writing.  What are

3    those left out articles in reference to?

4         A.   I am failing to see where you are at.

5         Q.   So I am --

6         A.   Down at the bottom here.

7         Q.   At the bottom of Page 3 of General

8    Counsel Exhibit 5L.

9         A.   Yep.

10        Q.   Are you there?

11        A.   Yep.

12        Q.   Okay.  If you look at the very bottom

13   of that page the last two lines of the notes, do

14   you see those notes?

15        A.   Uh-huh.  Yes.

16        Q.   Okay.  And so the left out articles

17   there, what are those in reference to?

18        A.   Well, we had a -- we had a signoff for

19   the tentatively agreed articles which we on a

20   regular basis continue to revisit things that we

21   believed were tentatively agreed upon and then

22   they weren't tentatively agreed upon to the

23   point where our original proposal had article

24   such and such from each one of the articles as

25   we went through the Collective Bargaining

1  Agreement as things were modified as we went

2  along.

3        The company's interpretation of those

4  articles became confused with the actual

5  original article designation that we had given

6  it so what we had tried to do on this particular

7  day is to create in its entirety article by

8  article everything that had been tentatively

9  agreed upon and we had such documents that we

10  wanted to sign off on so we could quit reviewing

11  the same things time and time again.

12    Q.    Be with -- and with respect to these

13  notations here at the bottom of Page 3, are

14  those reflecting discussions regarding that

15  signoff document?

16    A.    Well, the company was not willing to go

17  through the signoff document.  They first

18  suggested that it wasn't necessary but then they

19  suggested that there were articles that we had

20  left out which in my opinion only solidified the

21  need for such a document to see where we have

22  been, what we've agreed upon, where we need to

23  go to get to its completion.  Pat refused to put

24  in writing the left out articles that we were

25  suggesting for her having left out.

1    Q.   And during those discussions that you

2  just referenced, who is stating the positions

3  for the company?

4    A.   Pat Hill.

5    Q.   Okay.  If you go, we'll skip General

6  Counsel Exhibit 5M, but if you go to General

7  Counsel Exhibit 5N.

8    A.   Yep.

9    Q.   I'd like to draw your attention to

10  Page 2 of that document.

11    A.   Okay.

12    Q.   The note at the very top layoff

13  bargaining unit member for lack of work, who

14  stated or whose position was that?

15    A.   Sunbelt's position was that they were

16  laying off the bargaining unit member for the

17  lack of work.

18    Q.   And who stated that for Sunbelt?

19    A.   Pat Hill.

20        MR. WIESE:  No further questions at

21  this time.

22        JUDGE ROSAS:  Charging Party?

23        MR. RYAN:  I don't think I have any at

24  this point either, your Honor.

25        JUDGE ROSAS:  Okay.  Cross, do you need

1   a few minutes?

2          MS. HILL:  Yes, sir.  I need a few

3   minutes.

4          JUDGE ROSAS:  Okay.  Off the record.

5              (Whereupon, a short recess was

6               taken.)

7          JUDGE ROSAS:  On the record.  Cross

8   examination?

9              CROSS EXAMINATION

10  BY MS. HILL:

11     Q.   Mr. West, there is -- I understand on

12  the table there is -- yes R1.  If you would look

13  at that, sir.

14     A.   Yes.

15     Q.   Just to give you a little background to

16  it, if the judge permits, that was drawn by

17  Mr. Ervin.  It's not to scale but is that an

18  accurate description or drawing of the

19  Franksville profit center where offices and the

20  conference room for negotiations are located?

21     A.   Yes.

22     Q.   Now, looking at the conference room

23  that was used for negotiations, is that also the

24  conference room where the union caucused?

25     A.   Yes.

1     Q.   All right.  On the first day of

2   negotiations, did the union raise the issue of

3   where they were going to caucus, correct?

4     A.   It was suggested by the company that we

5   take our caucus in our cars.

6     Q.   Did -- my question, sir, was:  Did the

7   union ask where they could caucus?

8     A.   After it was apparent that you were

9   going to sit in the negotiations room for your

10   caucus, yes.

11     Q.   Didn't we -- All right.  At the point

12   that the discussion was held about the caucusing

13   for the union, Sunbelt had already asked for a

14   caucus and went to, if you look at the

15   description there, do you see the little office,

16   and that's Mr. Anderson's office?

17     A.   Marked as SB caucus room?

18     Q.   Yes.

19     A.   Yes.

20     Q.   And that's when we -- where we went for

21   our first caucus, correct?

22     A.   No.  That's not correct.  You and your

23   company or the negotiating team intended to have

24   your caucus in the negotiations room and when it

25   was brought to light where should we take our

1  caucus, that's when it was presented we should

2  caucus in our cars.

3      Q.   Did Sunbelt ask if any -- Did Sunbelt

4  or the union ask were there any other offices at

5  the profit center that could be used for

6  caucusing?

7      A.   Not that I recall.

8      Q.   And your notes that you have just

9  testified to based on direct examination, these

10 are not word for word, correct?

11     A.   No.  It's pretty hard to document

12 everything word for word while you are doing the

13 speaking as well.

14     Q.   And speaking of speaking, who was the

15 union's spokesperson during negotiations?

16     A.   Primarily it was me but Mike Ervin also

17 got involved quite a bit as well.

18     Q.   And Mr. Buffalo spoke, too?

19     A.   On occasion, he did.

20     Q.   And Mr. McGowan spoke, too, correct?

21     A.   He did.

22     Q.   Who had authority -- I want to make

23 sure that this was clear on the record.  Who had

24 authority to bind the union to proposals?

25     A.   I did.  Mike Ervin, Steve Buffalo,

1  Terry McGowan.

2     Q.   So Mr. Marsolek had no authority to

3  bind?

4     A.   Not necessarily but his opinion

5  mattered greatly.

6     Q.   So he was involved at least in

7  preparing proposals to Sunbelt?

8     A.   Absolutely.

9     Q.   All right.  It will help the court

10 reporter if you wait until I am finished with my

11 questions.  I know I am a little slow, but it

12 might help for a nice clean record, okay?  Thank

13 you.

14    A.   Okay.

15    Q.   The first day of negotiations was you

16 have identified who attended on behalf of

17 Sunbelt.  Did Sunbelt identify who was going to

18 be the spokesperson for the negotiation team?

19    A.   No.  Not specifically.  It was apparent

20 that you were going to be the spokesperson.

21    Q.   Did Sunbelt identify who was going to

22 have the authority to bind Sunbelt to the

23 proposals?

24    A.   No, not necessarily but you did the

25 speaking.

 1    Q.   All right.  At some point during any of

 2  the negotiations, did Sunbelt identify who had

 3  the authority to bind Sunbelt to the proposal?

 4    A.   You did not.

 5    Q.   Okay.

 6    A.   Jason Mayfield was identified as the

 7  vice president of regional directions but it

 8  wasn't specifically -- it wasn't specifically

 9  clarified that Jason would bind the company or

10  that Bo would bind the company to any of the

11  provisions.  Jason was identified as the vice

12  president of the regional area.

13    Q.   Did -- The union did not ask Mr.

14  Mayfield how many states he covered, did it?

15    A.   I don't recall that we did.

16    Q.   And the union did not ask Mr. Mayfield

17  how many profit centers he was responsible for?

18    A.   Not that I recall.

19    Q.   Now, looking at 5A?

20    A.   Do you want me to look at 5A?

21    Q.   Yes.  Please.  Page 3.

22    A.   Okay.

23    Q.   There is a what appears to be a star in

24  the left column?

25    A.   Which page?

1    Q.    Page 3 of 5.  This is 5A, Page 3 of 5.

2    A.    Yes.

3    Q.    Do you see the star, sir?

4    A.    I do.

5    Q.    It indicates, if I read your writing

6    correctly, I suggest we don't negotiate via

7    E-mail.  You instructed Mr. Ervin not to send an

8    electronic version of the union's list of TA'd

9    proposals, correct?

10    A.    Not at this point.

11    Q.    Not on this day.  I am just saying at

12    any time during the time that the union and

13    Sunbelt were negotiating contracts?

14    A.    Are we referring to what was written on

15    this proposal or this date?

16    Q.    Later on, sir.

17    A.    Okay.  So you are asking me what is

18    written here, right?

19    Q.    No, sir.  Let me step back.  On this

20    particular day, you informed Sunbelt that there

21    would be no proposals from the union or from

22    Sunbelt via E-mail, correct?

23    A.    Yes.  That's what the note says.

24    Q.    And that was in response to Sunbelt

25    saying that it was the first time it had been

1  involved in negotiations with the union where

2  the union had not provided its first proposals

3  to Sunbelt prior to negotiation sessions,

4  correct?

5      A.   You did raise that issue.

6      Q.   And so at that point, the union was

7  refusing to have anything relating to

8  negotiations exchanged via E-mail, correct?

9      A.   I pointed out that Local 139 was not

10  going to negotiate via E-mail, yes.

11      Q.   And you would agree that providing

12  proposals via E-mail before a session might

13  speed up the amount of time spent in

14  negotiations, correct?

15      A.   It might, as well as being timely on

16  showing up and not caucusing for an hour and a

17  half.

18      Q.   But, sir, you never participated in

19  any -- in the caucus room with Sunbelt, correct?

20      A.   No, I did not.

21      Q.   Did the union require -- and I am

22  saying the union because you were the

23  spokesperson for the union.  Did the union

24  require that every proposal from Sunbelt would

25  be in writing, correct?

```
 1      A.   That was our intention.
 2      Q.   And by in writing, you meant had to be
 3  typed, correct?
 4      A.   No.  Not necessarily.
 5      Q.   Did the union provide anything in
 6  handwriting to Sunbelt?
 7      A.   We did, as negotiations moved forward.
 8      Q.   When?
 9      A.   Throughout the negotiations session.
10      Q.   When?
11      A.   I don't recall exactly.
12      Q.   And with respect to the proposals that
13  Sunbelt gave the union, did Sunbelt attempt to
14  make a verbal proposal to the union?
15      A.   Yes.
16      Q.   And did the union refuse to listen to
17  any of those verbal proposals?
18      A.   We didn't refuse but we asked that they
19  be put in writing so we could keep track of
20  where we were and what it was exactly that you
21  were proposing.
22      Q.   In other words, the union would not
23  consider any verbal proposals at all, correct?
24      A.   No.  That's not correct.
25      Q.   So for this negotiation session on the
```

1    1st, did you take any verbal proposals?

2        A.   We listened.

3        Q.   Did you accept any of them?

4        A.   We asked for them in writing.

5        Q.   During this first negotiation session,

6    did the union have copies of the plan documents

7    for Sunbelt's benefits, meaning the 401K, the

8    health insurance, the accident insurance, the --

9    and not just the plan documents but also the

10   summary plan documents?

11       A.   I believe Mike had them, yes.

12       Q.   And Sunbelt had given Mr. Ervin the all

13   of the plan documents, correct?

14       A.   That's my understanding, yes.

15       Q.   And did Sunbelt indicate that those

16   documents, the plan documents, the summary plan

17   documents, for all of Sunbelt's benefits would

18   be helpful for negotiations?

19       A.   They did.

20       Q.   And all of those were in writing,

21   correct?

22       A.   Company policy, yes.

23       Q.   And all of those were not sent via

24   E-mail, correct?

25       A.   Not to my knowledge.

```
 1      Q.    Okay.  Looking at this is 5B.

 2      A.    Yes.

 3      Q.    For this negotiation on June 26, 2018,

 4  Sunbelt discussed or had a safety moment,

 5  correct?

 6      A.    Yes.

 7      Q.    Did the union believe that the safety

 8  moment was a waste of time?

 9      A.    No.  Not in a job site scenario.  I

10  felt it was unproductive for negotiation, but

11  it's what the company wanted so we went along

12  with it.

13      Q.    Did Sunbelt indicate that it has a

14  safety moment for every meeting it holds if

15  there are four or more people?

16      A.    That was your indication.

17      Q.    It also indicates here near miss cards.

18  Was that a document, safety document, that

19  Sunbelt provided to the union?

20      A.    Yes.

21      Q.    Did Sunbelt also discuss the

22  requirement of employees to participate in

23  stretch and flex?

24      A.    Yes.

25      Q.    Did the union -- and that was a
```

1    discussion, correct?

2        A.    It was.

3        Q.    Was that to emphasize Sunbelt's -- how

4    Sunbelt believes that safety is a No. 1 priority

5    for it?

6        A.    Yes.

7        Q.    Was the discussion of the stretch and

8    flex and providing the near miss cards a waste

9    of the union's time during the negotiation

10   session?

11       A.    No.  We had indicated that stretch and

12   flex, Take 10 or near miss cards were something

13   that was employed on job sites pretty much

14   throughout our area.

15       Q.    In different formats, though?

16       A.    Yeah.  But it's something that's

17   becoming commonplace within the industry and

18   certainly necessary.

19       Q.    And did Sunbelt explain also that if an

20   employee failed to -- or refused to fill out the

21   Take 10 card or participate in the stretch and

22   flex that it could result in discipline?

23       A.    Yes.

24       Q.    And that is a topic that is necessary

25   for discussion with the union, correct?

1    A.   It's company policy.

2    Q.   And the union needed to know about it,

3  correct?

4    A.   We needed to know about it, but it

5  wasn't necessarily a subject of the bargaining.

6    Q.   All right.  Because this was the first

7  time that 139 had negotiated any contract with

8  Sunbelt, correct?

9    A.   Yes.

10    Q.   And looking at your notes for 5A and

11  also for 5B, at this point at least, the union

12  didn't even know how to spell Sunbelt's name,

13  correct?

14    A.   No.

15    Q.   You have it with a capital B.

16    A.   So that's not misspelled.  It may be

17  incorrectly documented but it's not misspelled,

18  is it?

19    Q.   Well, it is with a capital B and having

20  both of them connected like that, yes, sir.

21    A.   Point taken.

22    Q.   With respect to 5B where you have

23  substitute contractor to employer throughout

24  CBA.  Do you see that, Page 1, 5B there is a

25  little star there?

1        A.    Yes.

2        Q.    And that's because the union and

3   their -- in their draft agreement to Sunbelt had

4   referenced employer as contractor, correct?

5        A.    Correct.

6        Q.    And Sunbelt usually is not a contractor

7   on any of the job sites, correct?

8        A.    Correct.

9        Q.    The Sunbelt had provided the union with

10  a GPS proposal in writing, correct?

11       A.    Yes.

12       Q.    And did Sunbelt discuss why it had the

13  GPS policy and also the anti GPS jamming device

14  policy?

15       A.    Yes.

16       Q.    And was Sunbelt's justification for

17  those policies, did the union believe it was a

18  waste of its negotiation time?

19       A.    No.  It's something that contractors

20  are utilizing more and more.

21       Q.    Did Sunbelt explain that union members

22  were purchasing GPS jamming devices that were

23  illegal and that could result in a fine by the

24  FTC?

25       A.    No.  You indicated that you did not --

1  that you wanted to make a rule that it was

2  against company rules to utilize such a jamming

3  device.

4      Q.   Okay.  A rule meaning a provision of

5  the CBA?

6      A.   Correct.

7      Q.   And but did Sunbelt also indicate that

8  part of the reason was because the FTC could

9  fine the employer and the employee?

10     A.   Yes.  I'm sure that was part of the

11 discussion.

12     Q.   Did Sunbelt also provide the union by

13 the time of this negotiation session a copy of

14 its handbook?

15     A.   Yes.

16     Q.   And this was the first time that the

17 union had seen the employee handbook for

18 Sunbelt, correct?

19     A.   Yes.

20     Q.   Sunbelt indicated during that -- during

21 the negotiation session that the handbook would

22 be updated, correct?

23     A.   Yes.

24     Q.   And Sunbelt informed the union that the

25 updated handbook would be provided to the union

1  in advance of it being presented to the members

2  for review, correct?

3      A.   Yes.

4      Q.   Was that discussion a waste of the

5  union's time?

6      A.   No.

7      Q.   During negotiations?

8      A.   No.

9      Q.   But on Page 2 of 7, if you look and I

10 am going to refer to the lines, the sixth line

11 down it starts with the word ask, could you

12 please explain what that meant?

13     A.   Yeah.  We were asking the employer to

14 concentrate on negotiating the Collective

15 Bargaining Agreement and not necessarily the

16 company policy which is not a subject of

17 bargaining.

18     Q.   But those provisions that Sunbelt had

19 given you were to be included in the collective

20 bargaining agreement?

21     A.   No.  They weren't.  They were going to

22 be company policy which the company has the

23 right to create whatever policy they desire as

24 many of our contractors or employers do, but

25 they are not necessarily a subject for

1 bargaining.

2     Q.   Sir, didn't Sunbelt -- wasn't Sunbelt's

3 -- one of Sunbelt's proposals to include in the

4 Collective Bargaining Agreement, a provision

5 about GPS being installed on the company

6 vehicles and if they were disengaged, it would

7 result in discipline up to including termination

8 and that was to be in the Collective Bargaining

9 Agreement?

10     A.   That may have been one of your

11 proposals, yes.

12     Q.   And wasn't another proposal of

13 Sunbelt's to include in the Collective

14 Bargaining Agreement a provision that if an

15 employee used a jamming device for the GPS, that

16 it could result in discipline up to and

17 including termination?

18     A.   I'm sure that was your discussion.

19     Q.   With the union?

20     A.   Yes.  And I am sure our response was

21 that that could also be covered under what we

22 had proposed as union security or it could be

23 miss -- or considered as misconduct or gross

24 misconduct which would be just cause for

25 immediate termination.

1    Q.   But, sir, sitting here today, do you
2  see that what you just relayed here?
3    A.   No.
4    Q.   And sitting here today, do you have any
5  independent knowledge of that kind of discussion
6  or information provided by the union?
7    A.   Not necessarily, no.
8    Q.   Did Sunbelt also provide in writing to
9  the union during their negotiation session a
10  copy of the paid time off policy also referred
11  to as PTO?
12    A.   Yes.
13    Q.   And that policy or that proposal was to
14  be included in the Collective Bargaining
15  Agreement, correct?
16    A.   That was your proposal.
17    Q.   And that proposal Sunbelt indicated to
18  the union was slightly different than the policy
19  that was in the handbook, correct?
20    A.   I don't recall specifically.
21    Q.   If you look at Page 3 of 7, this would
22  be I believe it's the seventh line down discuss
23  inaccuracy of GPS.  Do you see that line, sir,
24  Page 3?
25    A.   I am looking at Page 3 but I don't --

1  oh, yeah.

2      Q.    Okay.  Discuss inaccuracies of GPS

3  Sunbelt discussed that with the union, correct?

4      A.    That was a concern that the union had

5  presented, yes.

6      Q.    And who on Sunbelt's team discussed the

7  GPS for the vehicles?

8      A.    I don't recall.  I want to say it was

9  probably Bo, maybe Jason.

10      Q.    And was it -- was the union told by

11  Sunbelt that there are reports that are issued

12  to management of Sunbelt that they can review

13  GPS?

14      A.    Yes.

15      Q.    And did Sunbelt indicate that it

16  realizes that sometimes GPS may indicate a

17  driver was speeding in order to pass an

18  individual?

19      A.    Yes.

20      Q.    And did Sunbelt indicate in those type

21  of situations where a driver was not speeding

22  for a long period of time, that that driver

23  would not be disciplined?

24      A.    I don't recall specifically.

25      Q.    But that discussion regarding GPS, was

1  that a waste of the union's time?

2      A.   No.

3      Q.   Did the union ask questions regarding

4  the use of GPS?

5      A.   Yeah.  I am sure we did.

6      Q.   But sitting here today, sir, you don't

7  recall that, do you?

8      A.   I know that we discussed a GPS in

9  pretty great detail.

10     Q.   And do you recall who from the union's

11 team asked the questions regarding the GPS?

12     A.   As I recall, it was Steve Buffalo,

13 myself and Mike Ervin.

14     Q.   If you would look, I believe it's seven

15 lines down from discussing inaccuracy of GPS, it

16 looks to be four and then the letters T and A?

17     A.   Uh-huh.

18     Q.   Could you please explain what that is?

19     A.   I couldn't tell you.  I don't know.  I

20 would imagine that is for TA that we came to

21 that day or by that point.

22     Q.   Now, it also indicates two lines down

23 in the 3 and 4 a discussion regarding getting

24 documents in Word.

25     A.   Yes.

1    Q.   Okay.  With respect to that, did the

2   Sunbelt negotiation team want to have the

3   documents in order to be able to make written

4   proposals, revisions to the union's proposals?

5    A.   What they wanted to do was be able to

6   manipulate the proposal that we had sent, yes.

7    Q.   You use the word manipulate.  Did

8   Sunbelt use that word during negotiations, sir?

9    A.   No.

10   Q.   So that's just your opinion, sir?

11   A.   Yes.

12   Q.   Did Sunbelt want to move the

13  negotiations along by being able to at least

14  have a Word document that it could make

15  revisions to for later negotiations?

16   A.   Yes.

17   Q.   And Mr. -- and you report to Mr.

18  Buffalo, correct?

19   A.   I do.

20   Q.   And Mr. Buffalo told -- agreed to send

21  that document, correct?

22   A.   Yes.

23   Q.   But you disagreed about it, correct?

24   A.   I did.

25   Q.   What was the end result, sir?

1      A.    Mr. Buffalo said to go ahead and send

2   the document in Word.

3      Q.    And who sent that document?

4      A.    Mike Ervin.

5      Q.    We also discussed that day Article 5

6   but then, again, you wanted the proposal to be

7   in writing for that, correct?  I am still going

8   down this same page, sir.

9      A.    I am there.  Yes.

10     Q.    So Sunbelt could not verbally discuss

11  that one.  It had to be in writing, correct?

12     A.    We did discuss it verbally, but I did

13  ask for the proposal in writing.

14     Q.    Article 9, this involved direct

15  deposit, correct?

16     A.    Uh-huh.

17     Q.    Verbal please for the purpose of the

18  court reporter.

19     A.    Yes.

20     Q.    Okay.  Just a little background, she

21  can't take down uh-huh and uh-uh.

22           JUDGE ROSAS:  Counsel, just ask me to

23  instruct the witness.  I really don't want a

24  dialog.  This is not a deposition.  This is not

25  an arbitration mediation.  You got a problem, we

1    can strike the testimony.  Go ahead.

2              MS.  HILL:  Thank you, sir.

3    BY MS. HILL:

4         Q.   Next is discussion of payday, correct,

5    that was biweekly or weekly?

6         A.   Yes.

7         Q.   And was there a resolution of that,

8    sir?

9         A.   Not at that point.

10        Q.   But later it was, correct?

11        A.   Much later, yes.

12        Q.   And then on Page 4 of 7, again, it asks

13   apparently Mr. Marsolek asks for all other

14   articles, good.  What was that about, sir?

15        A.   Dan asked about company rules.

16        Q.   Safety rules?

17        A.   Oh, okay.  Yes.  He asked if all the

18   other articles were good.

19        Q.   Okay.  And then, again, any of the

20   other proposals for Article 10, 9.3, 9.4, they

21   had to be in writing per the instruction from

22   the union, correct?

23        A.   That's -- yes.

24        Q.   Then there was a discussion regarding

25   the Gary Sinese program, also hiring of

 1   veterans, correct?

 2      A.   Yes.

 3      Q.   Was that a waste of Sunbelt's and the

 4   union's time during negotiations?

 5      A.   No.

 6      Q.   And Steve meaning Mr. Buffalo?

 7      A.   Yes.

 8      Q.   Asked to replace Article 10 with

 9   Sunbelt's PTO policy, correct?

10      A.   Yes.

11      Q.   And then there is also a notation can't

12   grieve company policies.  What was that with

13   respect to?

14      A.   Well, because the company policies is

15   generally not part of the Collective Bargaining

16   Agreement.  We can't necessarily grieve it

17   unless it becomes an unjust termination.

18      Q.   But the provision that Sunbelt was

19   proposing for PTO that was going to be part of

20   the Collective Bargaining Agreement and could be

21   grieved if there was a misapplication of it,

22   correct?

23      A.   Yes.

24      Q.   The same day that Sunbelt and the union

25   negotiated the bulletin board provision,

1  correct?

2      A.  Yes.

3      Q.  Was that a waste of the union's

4  bargaining time?

5      A.  No.

6      Q.  Article 13, the parties negotiated the

7  language regarding tools, correct?

8      A.  Yes.

9      Q.  And the union's proposal regarding

10 tools and what would happen if tools were broken

11 or were stolen or lost differed from Sunbelt's

12 proposal because Sunbelt suggested having an

13 inventory with a photo of the equipment,

14 correct?

15     A.  Restate that, please.

16     Q.  Sure.  Sunbelt's proposal regarding

17 tools and having an inventory, the union's

18 proposal required only a written inventory list

19 from the employee, correct?

20     A.  No.  Not necessarily.

21     Q.  We'll get to that later then but

22 Sunbelt's proposal was to also permit the

23 employees to use their iPhone provided by the

24 company to take photos of their tools, correct,

25 and submit that?

1      A.   Yes.

2      Q.   Did the union have a -- think that that

3  discussion of how to keep an inventory was a

4  waste of its time?

5      A.   No.  Not at all.

6      Q.   The Article 14, Management Rights?

7      A.   Uh-huh.  Yes.

8      Q.   Pardon?

9      A.   Yes.

10      Q.   Was that a waste of the union's time to

11  discuss?

12      A.   No.

13      Q.   Article 15, Just Cause proposal from

14  Sunbelt was that a waste of the union's

15  negotiating time?

16      A.   No.

17      Q.   Were any of the proposals that Sunbelt

18  had provided to the union that day to be

19  provided to the union's attorney for review?

20      A.   Yes.

21      Q.   And which ones were that -- were they,

22  excuse me?

23      A.   Management's Rights clause and Just

24  Cause.

25      Q.   And I don't want you to identify any

1  discussions you had with the your attorney but

2  those provisions were ultimately approved,

3  correct?

4      A.  Eventually, yes.

5      Q.  And when you say eventually yes, did

6  the proposals -- did you come back with

7  counterproposals after the discussion with your

8  attorney?

9      A.  Yes.

10     Q.  And was -- and then were those two

11 proposals approved?

12     A.  Yes.

13     Q.  Article 13, the parties discussed the

14 company providing computer and diagnostic tools

15 for the members, correct?

16     A.  Where are you at?

17     Q.  Page 6, middle of the page.

18     A.  Yep.  I got it.  Yes.

19     Q.  Was that a waste of the union's time

20 for negotiations?

21     A.  No.

22     Q.  Just below that, you have bulletin

23 board suggest lunchroom and then Pat too busy

24 with HR com?

25     A.  Uh-huh.

1    Q.   What is that?  What does that mean?

2    A.   Well, the bulletin board was TA'd.  It

3  was going to be placed in the laundry room.  I'm

4  not sure exactly what you had going on.

5  Something with HR com.  I don't recall.

6    Q.   That same day there was a discussion

7  for a general or sort of a catchall provision

8  for the Collective Bargaining Agreement that was

9  going to be Article 18 that would include

10  something about uniforms, correct?

11    A.   Yes.

12    Q.   Was that a waste of the union's time to

13  negotiate that, sir?

14    A.   No.

15    Q.   Then there was also a discussion during

16  negotiations about the boot allowance, correct?

17    A.   Yes.

18    Q.   Was that a waste of the union's time?

19    A.   No.

20    Q.   Now, the agreement that the union

21  provided to Sunbelt, you said under direct

22  examination came from the 150, correct?

23    A.   No.  I didn't.

24    Q.   Pardon?  Well, excuse me.  Part of it

25  came from the 150 and part of it came from the

1   324 in Michigan?

2       A.   We tried to mirror the 324 agreement

3   more closely than the Local 150 agreement given

4   the similarities of the markets between Michigan

5   and Wisconsin as opposed to Wisconsin and

6   Illinois.

7       Q.   Okay.  Which of the Michigan locations?

8       A.   I don't know.

9       Q.   You didn't ask?

10      A.   It was a statewide agreement.

11      Q.   All right.  When you got the -- did you

12  get a hard copy of the agreement?

13      A.   Yes.  Mike Ervin did.

14      Q.   And did you look to see which of the

15  many agreements that Sunbelt has in Michigan

16  that particular one covered?

17      A.   No.  I did not.

18      Q.   Did that particular agreement provide

19  for the Sunbelt employees to be under Sunbelt's

20  benefits rather than the union's benefits?

21      A.   I don't recall.

22      Q.   Did the union's proposal for the

23  initial draft agreement, did it have anything

24  from the 150 agreement?

25      A.   Not specifically that I recall.

1     Q.   And you know that the 150 agreement was

2  a contract that was inherited by Sunbelt when it

3  acquired the company, correct?

4     A.   That's my understanding.

5     Q.   So Sunbelt also and the union also

6  negotiated safety glasses for employees; is that

7  correct, sir?

8     A.   Yes.

9     Q.   Was that a waste of negotiating time?

10    A.   No.

11    Q.   On this particular day you also have a

12  notation in the middle of Page 7 of 7 of a

13  reference to the 150 PPE requirement.  Was that

14  something that Sunbelt suggest proposed or was

15  that something that the union proposed?

16    A.   No.  That was something that you had

17  proposed.

18    Q.   And did the union think that that was a

19  waste of the negotiating time?

20    A.   No.

21    Q.   It also indicates members comply with

22  site specific requirements.  Was that a waste of

23  the union's bargaining time?

24    A.   No.

25    Q.   It also indicates a discussion of New

1  Hampshire.  Do you recall what that was about,

2  sir?

3      A.   Not specifically just that New

4  Hampshire had an agreement for Sunbelt.

5      Q.   Was that a topic that was brought up by

6  Sunbelt or by the union?

7      A.   I believe it was Sunbelt.

8      Q.   Was that discussion a waste of the

9  union's negotiating time, sir?

10     A.   No.

11     Q.   If you would please turn to 5C, sir.

12     A.   Yes.

13     Q.   You have already said that you did not

14  include the names of the individuals for the two

15  negotiating teams, correct?

16     A.   That is correct.

17     Q.   And the 11 points that you have listed

18  here, those are all topics that the parties had

19  negotiated and some of them were TA'd and some

20  were still open, correct?

21     A.   Correct.

22     Q.   And this is a negotiation session that

23  Mr. McGowan attended?

24     A.   Yes.

25     Q.   There was as -- you testified there,

1  was a lot of discussion regarding FMLA and PTO,
2  correct?
3       A.   Correct.
4       Q.   And Sunbelt at some point during the
5  negotiation sessions provided the union with a
6  copy of an accommodation form, correct?
7       A.   Yes.
8       Q.   Was providing that form to the union a
9  waste of the union's time, sir?
10      A.   No.
11      Q.   There is a notation the middle of
12  Page 204, TA coercion?
13      A.   Yes.
14      Q.   Okay.  Could you please explain that
15  notation there, sir?
16      A.   We tentatively agreed something with
17  the word coercion in a just cause type of a
18  termination.
19      Q.   Okay.  So during this negotiation with
20  Mr. McGowan, articles were TA'd, correct?
21      A.   Yes.
22      Q.   And it indicates at 10:25 the 139
23  caucused, correct?
24      A.   Correct.
25      Q.   And then would the return of the union

1    occur based on the time frame on Page 3 of 4?

2         A.   Could you state that again, please?

3         Q.   Okay.  It indicates that at 10:25,

4    middle of Page 2 of 4, Local 139 caucuses,

5    correct?

6         A.   Uh-huh.  Yes.

7         Q.   And everything under this entry for

8    10:25, that's what was discussed during the

9    caucus?

10        A.   Yes.

11        Q.   Turning the page then the union called

12   back the company and was finishing with its

13   caucus at 1:05?

14        A.   Yes.

15        Q.   And it says company busy.  Would you

16   please explain your notation there?

17        A.   The company was busy at that moment.

18        Q.   Doing what, sir?

19        A.   I want to say that Bo and Bryan were

20   working the counter.

21        Q.   The counter is identified on R1,

22   correct?

23        A.   Yes.

24        Q.   How many employees usually worked at

25   the counter?

1    A.    When I was there, I would see two.

2    Q.    And did Sunbelt at some point discuss

3    with the union having negotiations at the

4    union's Pewaukee office?

5    A.    Not very detailed, but, yes.

6    Q.    Okay.  And what was Sunbelt's position

7    about the Pewaukee office?

8    A.    They didn't want to negotiate there.

9    Q.    And Sunbelt give a reason?

10    A.    No.  Not necessarily.  We also

11    suggested meeting in a neutral location and that

12    was also denied.

13    Q.    Okay.  Let's start off with just the

14    union's -- the union hall.  Did Sunbelt indicate

15    that the -- that it did not want to be there

16    because the profit center in Franksville was

17    very small and there may be times when Mr.

18    Anderson, the profit center manager, or Mr.

19    Bogardus, the district manager, might have to

20    work the counter?

21    A.    Not specifically.  I know the distance

22    was discussed.

23    Q.    Because the distance to Pewaukee from

24    Franksville was approximately 33.4 miles,

25    correct?

 1    A.    Yes.   It was the same distance for us

 2  coming from Pewaukee to the Franksville

 3  location?

 4    Q.    But it was the union's -- Strike that.

 5          The union had decided to organize the

 6  Franksville location, correct?

 7    A.    The bargaining unit employees and your

 8  employees had decided to contact the union in an

 9  effort to become more organized.

10    Q.    And the union decided to facilitate

11  that, correct?

12    A.    Yes.

13    Q.    All right.  All your points that you

14  see six bullet points discussed on Page 3 of 4,

15  these were all TA'd?

16    A.    The ones that have TA next to them,

17  yes.

18    Q.    There was another discussion regarding

19  felonious acts?

20    A.    Yes.

21    Q.    And the union's proposal was just

22  criminal?

23    A.    That was one of the ideas we had, yes.

24    Q.    And was that ultimately TA?

25    A.    Eventually, yes.

1    Q.    Does the -- Does local Union 139

2    require that all of its contracts be identical?

3    A.    No.

4    Q.    And by the way, did you say you also

5    received a copy of the 150 contract?

6    A.    Mike Ervin did, yes.

7    Q.    Okay.  And did you see a difference

8    between the 150 contract and the 324 contract?

9    A.    Yes.

10    Q.    And Sunbelt during negotiations at some

11    point informed you that every profit center is

12    different?

13    A.    Yes.

14    Q.    Did Sunbelt inform you that the fleet

15    for each profit center, general tool profit

16    center, is different?

17    A.    I don't recall.

18    Q.    Did Sun -- and Sunbelt also told you

19    that the territory and the budget for each

20    profit center is different?

21    A.    I don't recall that either.

22    Q.    Did you provide your negotiation notes

23    to Mr. Ervin so he could prepare his affidavit

24    that was provided to the union -- excuse me --

25    to the NLRB?

1      A.    Yes.

2      Q.    And the reason for that was because Mr.

3  Ervin only had notes for one negotiation

4  session, correct?

5            MR. WIESE:  Objection, your Honor.

6  Calls for speculation as to why Mr. Ervin --

7            JUDGE ROSAS:  If you know.

8  BY MS. HILL:

9      Q.    If you know.

10     A.    Do you want me to --

11           JUDGE ROSAS:  Do you know?

12           THE WITNESS:  Mr. Ervin was taking his

13  own notes.

14  BY MS. HILL:

15     Q.    Were they as comprehensive as your

16  notes, sir?

17     A.    I don't know.

18     Q.    You didn't look at his?

19     A.    No.

20     Q.    But did he ask for your notes in order

21  to prepare that affidavit or did you volunteer

22  to give them to him?

23     A.    I volunteered to give them to him.

24     Q.    All right.  Looking at the last Page 4

25  of 4, does this accurately identify which

1    provisions had been TA'd during session No. 3

2    that was held on 8/8 of 2018?

3        A.   If they have a TA next to them, yes,

4    that does indicate the ones that were

5    tentatively agreed upon.

6        Q.   Okay.  Now there are a couple of

7    indications on this page that indicate TA of

8    2013, correct?  I am looking at Page 4 of 4.

9        A.   Yes.

10       Q.   Is that your handwriting there where it

11   says TA on 8/30/18?

12       A.   8/30/18, 8:00 a.m. would be the next

13   negotiation session.

14       Q.   All right.  And grievance procedure

15   Article 5 it says TA on 8/30/18?

16       A.   No.

17       Q.   It doesn't?  What does it say there,

18   sir?

19       A.   Where is Article 5?

20       Q.   All right.  If you look in the

21   left-hand column, it looks as if you have

22   written Art 5?

23       A.   Yes.

24       Q.   Okay.  Grievance Procedure?

25       A.   Okay.  I see where it says that.

1      Q.   Okay.  So did you go back to your notes

2  for August 8th of 2018 and include when these

3  provisions were TA'd?

4      A.   On 8/30/2018?  I don't recall.

5      Q.   And just above that same type of

6  notation, correct?

7      A.   Yes.

8      Q.   That is your handwriting, correct?

9      A.   I don't recall.

10     Q.   So you're not sure if on 8/30/18 is

11  your handwriting?

12     A.   No.  The TA is mine.

13     Q.   I'm sorry.  Pardon?

14     A.   The TA is mine.

15     Q.   How about on 8/30/18, is that your

16  handwriting?

17     A.   I don't really recall.

18     Q.   How about the next line?

19     A.   I still don't recall.

20     Q.   And the line after that?

21     A.   I don't really recall.

22     Q.   Looking down at Article 13, it

23  indicates TA on 8/8 of '18?

24     A.   Yes.

25     Q.   Is that your handwriting?

1    A.    The proposal on table is mine.

2    Q.    But you are not sure about the

3  handwriting?

4    A.    I am not sure if TA on 8/18 is mine.

5    Q.    So, sir, who else would have -- because

6  I had asked the question is all the handwriting

7  on these proposals yours and you testified that

8  it was.

9    A.    Uh-huh.

10    Q.    Who else?

11    A.    These notes have been moved around a

12  little bit since this all began.

13    Q.    Okay.  So sitting here today, you do

14  not know who else had input on your notes here?

15    A.    The negotiating team.

16    Q.    All right.  So everyone on the

17  negotiating team could have written that.  Okay.

18  Is that correct?

19    A.    It's possible.  This was a

20  reproduction.

21    Q.    Looking at 5D --

22    A.    Where are we at?

23    Q.    First page.

24    A.    Page 1.

25    Q.    Page 1.  Page 1 of 3.  5D as in dog.  D

1    as in dog.

2        A.   Okay.

3        Q.   Who else from the company attended?

4        A.   Jason Mayfield, Bo Bogardus and Bryan

5    Anderson.

6        Q.   Jason Mayfield?

7        A.   Correct.

8        Q.   For this negotiation, which articles

9    were TA'd?

10       A.   Article 5 Grievance, TA three step.

11   Article 16, ruling 2 TA'd with primary to

12   lawful.  Article 9, 9.3.  Article 16.

13   Article 17.2.  That's all I see.

14       Q.   And would you agree that the grievance

15   procedure was an important article for the

16   Collective Bargaining Agreement?

17       A.   Yes.

18       Q.   And did the negotiation session reduce

19   the number of steps for the grievance down to

20   three rather than from a larger number?

21       A.   Could you restate that, please?

22       Q.   Did the negotiations result in fewer

23   steps for the grievance procedure?

24       A.   Yes.

25       Q.   Okay.  This is going to be Exhibit 6B

1    as in boy.

2         A.   Which one?

3         Q.   B.  6B.

4         A.   6B.

5              JUDGE ROSAS:  It follows 50.

6              THE WITNESS:  I got it.  I have it.

7    BY MS. HILL:

8         Q.   Is the handwriting -- all the

9    handwriting on this document yours, sir?

10        A.   Pardon?

11        Q.   Is all the handwriting on this exhibit

12   yours?

13        A.   Yes.

14        Q.   You also testified that there was red

15   lining that occurred with this, correct?

16        A.   Yes.

17        Q.   And red lining is when -- is where some

18   of the wording has a line through the middle,

19   correct?

20        A.   Either that or highlighted.

21        Q.   In order to have red lining, did the

22   union receive an electronic version of this

23   proposal?

24        A.   Yes.

25        Q.   Did that red lining occur at the

1   union's union hall?

2        A.   I believe it did.

3        Q.   Were you involved in preparing the red

4   lining?

5        A.   No.

6        Q.   Page 1 of 6.  There appears to be a

7   handwritten strike through.  Second to the last

8   line on the first paragraph there.

9        A.   Yes.

10       Q.   What was it replaced with?

11       A.   Bargaining unit member, BUM.

12       Q.   Now this proposal was given to Sunbelt

13  on August 8th of 2018, was that your testimony?

14       A.   I believe it was.

15       Q.   So were all of the provisions that are

16  indicated with a TA, did those tentative

17  agreements occur on August 8th or was it

18  August 18th?

19       A.   I believe it was August 18th.  I'm not

20  sure.

21       Q.   Looking at Page 6 of 6.

22       A.   Yes.

23       Q.   At the very top, is that your

24  handwriting?

25       A.   It is not.

1    Q.   Do you recognize it?

2    A.   No.

3    Q.   Part of -- Exhibit 5F, whose notes are

4    these, sir?

5    A.   Give me one minute.  These are my

6    notes.

7    Q.   Okay.  At the very top note Greg West

8    and Dan Marsolek absent from Session 5.  That's

9    in your handwriting, correct?

10   A.   Yes.

11   Q.   It indicates about quarter of the way

12   down, pat announces Jason late.  Another excuse

13   for delaying negotiations.

14   A.   Yes.

15   Q.   Did I indicate that Jason was late and

16   was delaying negotiations?

17   A.   No.  I wrote that in the note.

18   Q.   Your interpretation?

19   A.   Yes.

20   Q.   The safety moment, again that -- did

21   you believe that that was a waste of negotiation

22   time?

23   A.   No.

24   Q.   Sunbelt provided the union with a drug

25   policy, correct, at this session?

1    A.   Yes.

2    Q.   And that was after the union had

3  requested it, correct?

4    A.   Yes.

5    Q.   And Sunbelt during this negotiation

6  session indicated that Sunbelt's customers might

7  have other drug testing and alcohol testing

8  requirements, correct?

9    A.   Yes.

10   Q.   And did that discussion of the drug

11  policy or the customers' drug policy was that a

12  waste of the union's time?

13   A.   No.

14   Q.   Now, in these notes, you don't indicate

15  Sunbelt's discussion regarding its customers'

16  drug policy, correct?

17   A.   Pardon?

18   Q.   In these notes of yours, sir --

19   A.   Yes.

20   Q.   -- for Exhibit 5F, do you see a

21  reference to the discussion regarding the

22  customers' requirements for drug and alcohol

23  testing?

24   A.   No.

25   Q.   And why is that?

1      A.   I was writing and talking.

2      Q.   So you were --

3      A.   It's pretty hard to keep up.

4      Q.   So you were talking about the

5   customers' requirements?

6      A.   No.  You were but that's not uncommon

7   for our industry that if you go to a location to

8   work, you may be subjected to any site specific

9   regulations as it relates to either drugs or

10  safety.  I worked in the rental crane industry;

11  and I was subjected to multiple criteria so far

12  as certification and/or drug and alcohol

13  testing.

14     Q.   During this negotiation session, the

15  parties discussed the safety quiz, correct?

16     A.   Which session are you referring?

17     Q.   This one reflected in 5F, sir.

18     A.   Yes.

19     Q.   Was that a waste of the negotiation

20  time?

21     A.   No.

22     Q.   And the union, in fact, asked for a

23  copy of the safety quiz, correct?

24     A.   Yes.

25     Q.   And Sunbelt provided it, correct?

1      A.   Yes.

2      Q.   On Page 2 of 4, Article 18.13, do you

3   recall what this discussion regarding the

4   article was about?

5      A.   18.13?

6      Q.   Yes, sir.  18.13 or 18.13?

7      A.   It had something to do with the

8   bargaining unit employees/employees being

9   questioned about something and Local 139 was

10   indicating that the union rep would need to be

11   present if so desired by the employee/bargaining

12   unit member.

13      Q.   And was that discussion about one of

14   Sunbelt's proposals?

15      A.   Yes.

16      Q.   And was that a waste of the union's

17   negotiating time?

18      A.   No.

19      Q.   18.14, you have a note there ask for

20   consistency with all providers, et cetera.  What

21   did you mean by that, sir?

22      A.   As we were discussing the need for the

23   bargaining unit employees possibly being

24   subjected to various site specific whether it's

25   drug testing or rules or whatever, we wanted to

1 make sure that our members working for Sunbelt

2 were being subjected to the same as any other

3 subcontractors or providers on that site

4 specifically but we wanted to make sure that

5 there was no special criteria that the Sunbelt

6 employees had to --

7    Q.    And Sunbelt asked the union at that

8 point how was it supposed to make that

9 determination that Sunbelt wasn't being

10 discriminated against versus all the other

11 vendors?

12    A.    The policy should be in writing, right.

13    Q.    But you were referring to the vendors

14 doing the discrimination.

15    A.    No.  I was suggesting that the site

16 specific policy should be in writing to all

17 vendors and/or subcontractors.

18    Q.    Was that discussion a waste of the

19 union's negotiating time?

20    A.    No.

21    Q.    There was also a discussion of FMLA,

22 correct?

23    A.    Yes.

24    Q.    Was that a waste of the union's

25 negotiating time?

1    A.    No.

2    Q.    On Page 3 of 4, there was a discussion

3  regarding the national training fund, correct?

4  It's about the fourth line down.

5    A.    Yes.

6    Q.    Okay.  And Sunbelt discussed the type

7  of training that it provided to its employees,

8  correct?

9    A.    Yes.

10    Q.    And it also discussed the training that

11  its vendors provide to the Sunbelt employees,

12  correct?

13    A.    Yes.

14    Q.    Was that a waste of the union's

15  negotiating time?

16    A.    No.

17    Q.    And Article 24, again, Drug and

18  Alcohol, you have indicated that this was not a

19  waste of the negotiating time, correct?

20    A.    Yes.

21    Q.    Okay.  This also indicates that the

22  company caucused from looking at probably the

23  bottom one quarter of the page, company caucused

24  from 10:12 to 10:59 and TA'd multiple provisions

25  with revisions, correct?

 1    A.   With changes, yes.

 2    Q.   With changes, correct?

 3    A.   Yes.

 4    Q.   But your notes don't reflect which

 5  articles had been TA'd, correct?

 6    A.   No.

 7    Q.   All right.  Back page.  There was also

 8  a discussion about religious accommodations,

 9  correct?

10    A.   Yes.

11    Q.   Was that a waste of the union's time?

12    A.   No.

13    Q.   There was also a discussion of posting

14  jobs electronically and also on the union's

15  bulletin board.  Was that a waste of the union's

16  time from negotiations?

17    A.   No.  No.

18    Q.   Okay.  Now 18.2 you have several notes

19  going down about for about a third of the way

20  down to about two-thirds of the way down

21  regarding boots.  Was that a waste of the

22  union's negotiating time?

23    A.   No.

24    Q.   That provision -- this states Dan

25  refers to the IUOE, 324 contract was 125.  $125,

 1   correct?

 2        A.   Yes.

 3        Q.   And there was a question about the $50,

 4   correct?

 5        A.   Yes.

 6        Q.   But the $50 coupon was for Red Wings,

 7   correct?

 8        A.   Yes.

 9        Q.   And for Michigan you didn't know what

10   if it was for a Red Wing coupon or for what,

11   correct?

12        A.   Right.

13        Q.   Eventually the parties did TA the boots

14   provision, correct?

15        A.   Yes.

16        Q.   All right.  You may put 5F on your done

17   list.  5G, sir.

18        A.   5G?

19        Q.   Yes, sir.

20             JUDGE ROSAS:  All right.  Let's take

21   five minutes.

22             MS.  HILL:  Thank you, sir.

23                  (Whereupon, a short recess was

24                   taken.)

25             JUDGE ROSAS:  Okay.  Back on.

1    BY MS. HILL:

2        Q.    Okay.  Sir, would you please look at

3    5G?

4        A.    I am here.

5        Q.    Thank you, sir.  For this negotiation

6    session, Sunbelt provided the union with some

7    proposals, correct?

8        A.    I see where we had discussed recently

9    or previously discussed revisions.

10        Q.    For this particular session, had

11    Sunbelt provided the union with -- excuse me.

12    Let me strike that and put it this way:

13            For this particular negotiation session

14    December 10, 2018, Sunbelt provided the union

15    with proposals for the Collective Bargaining

16    Agreement, correct?

17        A.    Do you have anything specific that you

18    are referring to?

19        Q.    Looking at 17.1 on Page 3, 18.4 on

20    Page 3.

21        A.    These actually look like articles or

22    provisions that we had already recently

23    discussed.

24        Q.    But sitting here today, sir, you don't

25    know based on your notes whether a proposal had

1    been given to the union, correct?

2        A.    No.  Given the fact that it was denoted

3    by bullet point, this is something that would

4    have already been discussed.

5        Q.    I'm sorry, sir?  Explain that.

6        A.    We would have already discussed it.

7    Article 9.  TA'd biweekly.  Biweekly pay and

8    then we continued --

9        Q.    I'm sorry.  Just a moment.  Which page

10   are you looking at?  I was looking at Page 3.  I

11   had directed you to Page 3.

12       A.    Yes.  I am on Page 3.  At the top of

13   the page it says Article 9, TA'd biweekly.  Then

14   it goes on to 17.1, company counterproposal, so

15   that indicates that we had already discussed it.

16   17.5 --

17       Q.    I'm sorry.  How does it indicate that

18   you that already discussed it?

19       A.    How can you counter propose something

20   that is being originally discussed at this

21   point?

22       Q.    Sunbelt provided a counterproposal to

23   the union's proposal?

24       A.    So then it had been discussed

25   previously, correct?

1     Q.    But it was discussed again and the

2   union was provided with a proposal as basically

3   what you are calling a counterproposal?

4     A.    Yeah.  It was a counterproposal.

5     Q.    That Sunbelt presented on this

6   particular negotiation session?

7     A.    Was something that had already been

8   discussed, yes.

9     Q.    But -- All right.  Some proposals from

10   the union and from Sunbelt were discussed on

11   more than one negotiation session, correct?

12     A.    Yes.

13     Q.    Do you recall a negotiation session

14   that had to end early because you had to attend

15   a funeral?

16     A.    No.  I know of a negotiation session

17   that I did not attend because of a funeral.

18     Q.    Do you recall a negotiation session

19   that had to end at about 12:25 p.m. with the

20   stated reason that you had to go to a funeral?

21     A.    Not specifically but I wouldn't say

22   that it would be outside of character.  We have

23   a lot of members who die along the way and we

24   try to attend each one of those member's

25   funerals.

1    Q.   You also stated in direct examination

2    that Sunbelt had offered I think your testimony

3    was a date, it might have been more than one

4    date, 30 days from the negotiation session and

5    you stated we will take what we can get.

6         Now was that your statement during the

7    negotiation sessions -- session in which the

8    date was discussed or was that just your thought

9    process, sir?

10    A.   No.  We tried getting multiple dates

11    throughout the process and we were only offered

12    dates that generally were 30 days apart.

13    Q.   Okay.  For the particular date that you

14    were talking about, you stated this is when you

15    were discussing PTO and FMLA and you were asked

16    a direct question about the dates that had been

17    offered to -- by Sunbelt to the union and you

18    said that we will take what we can get.

19         Was that the statement you made to

20    Sunbelt during the negotiation sessions?

21    A.   No.

22    Q.   At the -- During the negotiation No. 7

23    that is reflected in your notes for 5G, did the

24    union request Sunbelt prepare a document that

25    included all of the TA'd provisions?

1    A.    Yes.

2    Q.    Did the union request that Sunbelt

3  prepare that document and E-mail it to the

4  union?

5    A.    I don't recall that we asked for it to

6  be E-mailed specifically.  We were trying to

7  facilitate the confusion that was being

8  generated from session to session as the result

9  of the original proposal offered by the union

10  and the article numbers for each one of the

11  provisions contained within and the references

12  that the company was making on behalf of their

13  consideration of the proposal.

14    Q.    So did -- in answer to my question,

15  sir, did Sunbelt provide that document that had

16  all the TA'd provisions to the union via E-mail?

17    A.    I don't recall if it was sent E-mail or

18  not.

19    Q.    Was it provided to the union before the

20  next negotiation session?

21    A.    I don't know that either.

22    Q.    Do you recall looking at that document

23  prior to the negotiation session in January

24  of 2019?

25    A.    I don't recall specifically.

```
 1      Q.   Did that document not only list the
 2 TA'd provisions but also the open provisions?
 3      A.   I would imagine that it did, yes.
 4      Q.   When -- Was that document discussed at
 5 the January negotiation session?
 6      A.   I don't know.  Are we going to look at
 7 those notes?
 8      Q.   Looking at the next set of notes, it
 9 appears to be 5H, it was February of 2019.  Do
10 you see that, sir?
11      A.   I do.
12      Q.   Okay.  Was that document the list
13 prepared by Sunbelt of all the TA'd provisions
14 available to the union as of this negotiation
15 session?
16      A.   No.  Actually, I see here where it says
17 Pat Hill issues counterproposal and at 9:40
18 Local 139 had a proposal.
19      Q.   So, sir, sitting here today, you don't
20 remember when that list of TA'd provisions was
21 provided to the union?
22      A.   I would say that it was at this
23 meeting.
24      Q.   But you don't know if it was at this
25 meeting or before this meeting?
```

1    A.   I don't recall.

2    Q.   Okay.  About the middle of the Page 5H

3  it refers -- it says we started out bull

4  shitting about our safety members.  What are you

5  referring to there, sir?

6    A.   We had a safety moment and then the

7  company wanted to generate a conversation other

8  than bargaining about what we were doing with

9  safety and how we handle it and everything else.

10  So, again, we were diverting from the purpose of

11  negotiating and we were generating conversation.

12  That didn't really relate to the purpose of

13  negotiating an agreement.

14    Q.   But wasn't safety one of the -- several

15  of provisions in the Collective Bargaining

16  Agreement?

17    A.   Right, but it didn't relate to how our

18  members are dealing with safety out on other job

19  sites.  I mean, we had provisions contained

20  within the Collective Bargaining Agreement, but

21  the conversation generated by the company which

22  went on for, I don't know, 10 or 15 minutes

23  which was taken from the valuable bargaining

24  time was more about what are we doing and how

25  are we handling different things at different

1   levels and, again, it was not towards the

2   purpose of negotiating the agreement.

3       Q.   Well, right below about the middle of

4   the page you have a 9:34 begin safety moment.

5       A.   Uh-huh.

6       Q.   Discuss cold weather hazards.

7       A.   Yep.

8       Q.   Now was that appropriate for a

9   discussion February of 2019?

10      A.   Yes.

11      Q.   And didn't the union and Sunbelt

12  discuss the type of cold weather uniforms that

13  Sunbelt would provide to the union members?

14      A.   I am sure that we did.

15      Q.   Sitting here today, sir, you don't

16  remember that, correct?

17      A.   No.  No.  Not specifically.

18      Q.   And your notes here failed to identify

19  that discussion, correct?

20      A.   Yes.

21      Q.   And, again, here you have that Sunbelt

22  provided the union with the safety quizzes,

23  correct?

24      A.   Yes.

25      Q.   And both the union requested some

 1    counterproposals and that Sunbelt provided

 2    counterproposals but your notes don't reflect

 3    what those proposals were, correct?

 4        A.   What specifically are you referring?

 5        Q.   If you look at the bottom of this page

 6    of this exhibit --

 7        A.   Page 1.

 8        Q.   -- Page 1 of 6, 5H the last handwriting

 9    I believe it's yours.

10        A.   Yes.

11        Q.   I ask for counterproposals, correct,

12    meaning you, Mr. West, correct?

13        A.   Right.

14        Q.   And then on the next page, it indicates

15    that counterproposals were issued; is that

16    correct?

17        A.   That is correct.

18        Q.   So Sunbelt did what the union, you,

19    wanted, correct?

20        A.   What the union wanted, yes.

21        Q.   You indicate about a quarter of the way

22    down 10:25, company socialized with vendor while

23    we wait.  Could you please explain what you mean

24    in those notes?

25        A.   One of your vendors was in the office

1  and the negotiating team was socializing with

2  that individual.

3      Q.   All right.  First, who was the vendor?

4      A.   I don't know.

5      Q.   How do you know it was a vendor?

6      A.   Because you indicated it when you came

7  in the meeting.

8      Q.   Okay.  And so who on the negotiating

9  team was talking to the vendor?

10     A.   The whole negotiating team was standing

11 there.

12     Q.   All right.  And you said socializing

13 but the statement made by Sunbelt about the

14 vendor was not socializing, correct?

15     A.   Not specifically.

16     Q.   The statement was that the vendor had a

17 question about something business related,

18 correct?

19     A.   No.  Not specifically.

20     Q.   But you don't remember and your notes

21 don't reflect it, correct?

22     A.   My notes don't reflect it; that is

23 correct.

24     Q.   With respect to you testified regarding

25 dues deductions.  Admin dues deductions.  During

1    the discussions, any of the discussion regarding

2    dues deductions, did Sunbelt explain that it had

3    other contracts that did not provide for the

4    company handling the dues deduction?

5        A.   Yes.

6        Q.   Did Sunbelt indicate that there was a

7    contract in the St. Louis area that did not

8    require Sunbelt to handle dues deductions?

9        A.   Yes.

10       Q.   Did Sunbelt also indicate that it had a

11   contract on the east coast with another union

12   that did not require Sunbelt to handle dues

13   deductions?

14       A.   I don't recall specifically the east

15   coast but Sunbelt had indicated that there were

16   other locations where dues deduction was not

17   part of the Collective Bargaining Agreement.

18       Q.   And did Sunbelt also indicate that

19   there is a cost associated for all of the

20   deductions that must be made pursuant to a union

21   contract?

22       A.   Yes.

23       Q.   And were those reasons given to -- that

24   Sunbelt gave to the union regarding dues

25   deduction, was that a waste of negotiating time?

 1      A.   No.

 2      Q.   With respect to the pension that was

 3  proposed by the union --

 4      A.   Uh-huh.  Yes.

 5      Q.   -- and I believe you have there are

 6  some notes on page -- if you are looking Page 3

 7  of 6.

 8      A.   Yes.

 9      Q.   Okay.  Was there a discussion regarding

10  the pension plan that the 324 had in Michigan

11  that was to use the expression in serious

12  underfunding?

13      A.   Yes.  There was also a discussion in

14  regards to the solidity or the strength of

15  Local 139 and its central pension.

16           MS. HILL:  And, your Honor, if you

17  could instruct the witness just to answer my

18  question.

19           JUDGE ROSAS:  Move to strike when it's

20  not responsive.  When counsel asks you a

21  question that seeks to elicit yes or no, try to

22  answer it yes or no.  It may not be phrased the

23  way you wanted to which means your attorneys

24  will have their chance and do it, this way we

25  can move on.  So subject to being stricken, it's

1    not technically a response.  You don't have to

2    volunteer or help anybody.  Go ahead.

3              MS.  HILL:  Thank you.

4    BY MS. HILL:

5        Q.    With respect to the 139's pension plan,

6    did Sunbelt respond to the suggestion that it

7    was in good financial shape, that it might be in

8    good shape today but it might not be in the

9    future?

10       A.    Yes.

11       Q.    Was that discussion regarding the

12   pension plan a waste of the union's negotiating

13   time?

14       A.    No.

15       Q.    The articles that you have referenced

16   on Pages 3 of 6 and 4 of 6, these were based on

17   proposals from Sunbelt?

18       A.    Yes.

19       Q.    Looking at Page 4 of 6, almost at the

20   middle of the page, there is a reference to

21   Article 21.2 Overtime.

22       A.    Yes.

23       Q.    And Mr. Ervin discussed the history of

24   Hay Market Square and the Bay View Massacre at

25   this time, correct?

1    A.   Yes.

2    Q.   Was that necessary for the negotiation

3  session, sir?

4    A.   Yes.

5    Q.   Why?

6    A.   To give the history of why overtime or

7  time and a half is important.

8    Q.   A history lesson in the middle of

9  negotiations that you think are not moving along

10  fast enough is appropriate?

11    A.   Yes.

12    Q.   If you would look at the same page,

13  there is a star Article 21.6, counter propose.

14  Could you explain what that meant?  Was that

15  from the union or was that from Sunbelt?

16    A.   This is where we were discussing I

17  believe it was on-call or shift times and this

18  was for on-call discussing how many hours would

19  be paid in a five-day period for being in an

20  on-call status.

21    Q.   And looking at the contracts for the

22  150 and the whichever 324 contract you received,

23  they differed on on-call, correct?

24    A.   Yes.

25    Q.   And so the union was aware of the fact

 1  that Sunbelt did not have identical contracts

 2  for all of the unions, correct?

 3      A.   Yes.

 4      Q.   Now, at the very bottom of this page,

 5  could you please indicate what was cut off there

 6  at the very bottom?

 7      A.   Yeah.  At 12:16 I denote that the

 8  company is still caucusing while Bo is attending

 9  his day-to-day activities or duties.

10      Q.   Duties.  Page 5 of 6 there is a star

11  there for Article 15.1.

12      A.   Yes.

13      Q.   Are you asking Sunbelt to resubmit

14  original proposal or is the union stating its

15  resubmitting?

16      A.   I am stating that we are resubmitting

17  our original proposal.

18      Q.   The last page of this exhibit, you

19  indicate me and Dan point out no movement on

20  company's behalf.  With respect to what?

21      A.   The resubmitted proposals.

22      Q.   Which were?

23      A.   Wages, benefits, pension, NTF, time and

24  a half.

25      Q.   And but at some point Sunbelt did

1    provide some alternative -- some

2    counterproposals for the overtime, correct, and

3    for the on-call?

4        A.   Yes.

5        Q.   Was there a negotiation at which the

6    union provided Sunbelt with a list of what it

7    considered to be the open, you know, nonTA'd

8    provisions of the Collective Bargaining

9    Agreement?

10       A.   Yes.

11       Q.   And did Mr. Ervin provide that to

12   Sunbelt?

13       A.   I believe he did.

14       Q.   And Sunbelt caucused after it received

15   that?

16       A.   Yes.

17       Q.   And was that the session in which I

18   went back to just by myself to the -- to your

19   conference room to ask for clarification on a

20   couple of points?

21       A.   That was the session where we were

22   working off of your revision of the TA'd items,

23   yes.

24       Q.   So you are referring to the long list

25   of TA provision and open provisions, correct?

```
 1      A.   We were looking at your revision of our
 2  original proposal, yes.
 3      Q.   Okay.  But now I'm referring to just
 4  when the union had provided a list of what it
 5  considered to be the open provisions.
 6      A.   Yes.
 7      Q.   All right.  Was there a question about
 8  whether that list of open provisions was
 9  accurate?
10      A.   Yes.
11      Q.   Did Sunbelt raise a question?
12      A.   Yes.
13      Q.   And Sunbelt during negotiations pointed
14  out that several of the allegedly open
15  provisions had already been TA'd, correct?
16      A.   Sunbelt indicated that they felt that
17  there was some of the provisions not included.
18      Q.   Did Sunbelt also -- and I am going to
19  move to strike your response just now as
20  nonresponsive to my question, sir.
21           JUDGE ROSAS:  Stricken.
22  BY MS. HILL:
23      Q.   Did Sunbelt indicate to the union
24  during the negotiation session that some of the
25  allegedly open provisions had actually been
```

1    TA'd?

2       A.   Yes.

3       Q.   Thank you, sir.  If you would please

4    put 5H to the side, sir, and pick up 5I.

5       A.   I have it.

6       Q.   Thank you.  And this was a second

7    session for February of 2019, sir?

8       A.   Yes.

9       Q.   And this one Mr. McGowan again

10   attended, correct?

11      A.   Yes.

12      Q.   And what was the purpose of his

13   attending this?

14      A.   He wanted to be involved.

15      Q.   To do what?

16      A.   He is the business manager.

17      Q.   But did he make any of the proposals?

18      A.   Yes.

19      Q.   Which proposals?

20      A.   Discussion about the dues checkoff.

21      Q.   And did he also say that the union was

22   going to go to the labor board?

23      A.   Yes.

24      Q.   Now, looking at Page 2 of 6, sir,

25   indicates -- well, let's see.  Near the fourth

1  line down from the top, no give on your side.

2  What's the -- what do you have after that?

3      A.   No give on your side, I have denoted

4  Illinois/Michigan agreements.  Treating

5  Local 139 like crap.

6      Q.   But Sunbelt provided for -- at least

7  for the boots an alternative to what was being

8  provided to Michigan in their Collective

9  Bargaining Agreement, correct?

10     A.   Yes.

11     Q.   And was there absolutely no give on

12  Sunbelt's side for any of the provisions?

13     A.   Not towards the union's consideration,

14  no.

15     Q.   All right.  All right.  Which

16  proposals, specific proposals, are you saying

17  Sunbelt did not agree with?

18     A.   You pointed out the boots, Local 324

19  was getting $125 for a boot allowance.

20  Local 139 was offered $50.

21     Q.   But that was negotiable, correct?

22     A.   Yes.

23     Q.   And it did go up, correct?

24     A.   Pardon?

25     Q.   The dollar amount did go up, correct?

1    A.    No.  Actually, it went down.

2    Q.    Excuse me, sir.  It went from $50 to

3  what?

4    A.    I don't recall.

5    Q.    Then with respect and for boots also

6  Sunbelt proposed that the company would provide

7  the members, the bargaining unit members, with

8  any of the boots that were available online,

9  correct?

10   A.    Yes.

11   Q.    Free of charge, correct?

12   A.    Yes.

13   Q.    And if there was a defect, it would --

14  the company would get it replaced, correct?

15   A.    Yes.

16   Q.    Okay.  Further down about a third of

17  the way down it says contends ULP.  What are you

18  referring to there?

19   A.    I'm not sure.  I notice that we are

20  still waiting for the wages.

21   Q.    Okay.  Do you recall any discussion

22  regarding the proposal that Sunbelt gave the

23  union of all of the TA'd provisions?

24   A.    Yes.

25   Q.    And during that discussion, was the

1    union informed that some of the articles from

2    the union's proposed Collective Bargaining

3    Agreement had been deleted because they had been

4    moved around into other articles?

5         A.   Yes.

6         Q.   And did Sunbelt explain that that

7    resulted in a change of the article numbers?

8         A.   Yes.

9         Q.   Did Sunbelt also explain that it was

10   not including the page numbers or the article

11   numbers in the table of contents until the

12   entire Collective Bargaining Agreement was

13   finalized?

14        A.   Yes.

15        Q.   Did you hear any Sunbelt employee state

16   that it had no intention of reaching a

17   Collective Bargaining Agreement with the 139?

18        A.   No.

19        Q.   Now this was the negotiation session in

20   which I by myself went into the conference room

21   where you and the rest of the union negotiating

22   team was located, correct?

23        A.   Yes.

24        Q.   To discuss some of the provisions on

25   the union's proposal, correct?

1      A.   At this point, we were working off of

2   your revision of the original proposal, yes.

3      Q.   But also -- but the union was working

4   off of its own version of the Collective

5   Bargaining Agreement, correct?

6      A.   No.  We were working off of your

7   revision.

8      Q.   This also indicates on 5/6 that the

9   negotiations reconvened at 1:35; is that

10  correct?

11     A.   Where are you at?

12     Q.   Page 5 of 6.

13     A.   Yes.

14     Q.   Okay.  Review company policy of what?

15     A.   I am not sure at this point.

16     Q.   15.5 about four lines down in entirety.

17     A.   Yes.

18     Q.   What is meant by that?

19     A.   Article 15 of your revision of the

20  proposal, Article 15.5.

21     Q.   In entirety, is that meaning TA'd or

22  not TA'd?

23     A.   I'm not sure.

24     Q.   So you don't know what in entirety

25  meant?

1      A.    Well, I know what entirety meant.

2  There was -- in 15.5, as I recall, there were

3  multiple subsections to it so requiring A, B, C,

4  whatever.

5      Q.    Decline Article 17.  That's the union

6  declining Sunbelt's proposal?

7      A.    Yes.

8      Q.    And that's because it's inconsistent

9  with 2,000 other contractors, correct?

10      A.    Yes.

11      Q.    But Sunbelt was not a contractor,

12  correct?

13      A.    Per your interpretation, yes.

14      Q.    18.1, so the union verbally agreed to

15  vacation?

16      A.    That's what it indicates, yes.

17      Q.    Okay.  But holiday not denied.  What do

18  you mean by that, sir?

19      A.    I think we were discussing how a

20  holiday would be paid in regards to a vacation.

21  If I take my vacation during the 4th of July

22  week or the Christmas week, would I still get my

23  vacation time, would that go towards my PTO

24  time, so the discussion was revolving around if

25  I take my vacation or my PTO, do I lose part of

1  my PTO or do I lose my vacation or not.

2      Q.   So based on that discussion, that
3  provision was TA'd, correct?

4      A.   Yes.

5      Q.   And that provision does the union
6  consider that to be an important provision for
7  the Collective Bargaining Agreement?

8      A.   Yes.

9      Q.   So the discussion regarding that
10 provision was not a waste of the union's time,
11 correct?

12     A.   Correct.

13     Q.   And the -- you have further down here
14 is that 18.5 TA'd?

15     A.   Yes.

16     Q.   And another provision is TA'd right
17 after that; is that correct?

18     A.   Yes.  You'll notice that there is
19 20.5/18.5 and that was TA'd and then you'll
20 notice that underneath that is 18.6/20.6, again
21 it was TA'd.  This is an indication as to the
22 differences between the two original proposals.
23 The original proposal from Local 139 and your
24 revision of where we were at.

25     Q.   What you call the revision which was a

1   request by the union to prepare a list of all

2   the TA'd provisions but also indicate which ones

3   were open, correct?

4       A.   Yes.

5       Q.   So the parties were comparing the

6   union's original version to the requested list

7   of TA'd provisions, correct?

8       A.   Yes.

9       Q.   The last page of this exhibit, it

10  indicates at the very bottom Pat Hill announces

11  she can't respond to our proposal.  Which

12  proposal is that?

13      A.   Our wage proposal.

14      Q.   But where -- how do you make -- how do

15  you know that's what it was about?

16      A.   Because it says no wage

17  counterproposal.

18      Q.   But that's before the company caucus,

19  correct?

20      A.   Right.

21      Q.   And there were other proposals that

22  were also discussed above that?

23      A.   About what?

24      Q.   Well, looking here, the overtime

25  proposal, the lunch, you know, working through

1   lunch proposal, the two, 10-minute breaks, now

2   those were -- two were TA'd, correct?  19.3,

3   19.4?

4      A.   Yes.

5      Q.   19.5 was still open, correct?

6      A.   Correct.

7      Q.   19.6 was still open, correct?

8      A.   Correct.

9      Q.   19.7, and 20.5 were TA'd, correct?

10     A.   Yes.

11     Q.   So there were several proposals that

12  were not responded to at the conclusion of that

13  negotiation session, correct?

14     A.   There were some that were still open

15  including the wage counterproposal, yes.

16     Q.   Right.  So it wasn't as you had stated

17  earlier just the wage proposal.  There were

18  other proposals, correct?

19     A.   There were still open ended items, yes.

20     Q.   Do you know who had to type all the

21  written proposals that the union demanded from

22  Sunbelt?

23     A.   I don't know for a fact, but I assume

24  that it was you, Pat Hill.

25     Q.   All right.  Would you put 5I to the --

1    over on the completed side and now go to 5J?

2        A.    Yes.

3        Q.    Was this the negotiation session in

4    which Mr. Buffalo indicated that he did not have

5    the February 21, 2019 proposal even though the

6    union had -- the remaining members of the union

7    had it?

8        A.    I don't recall.

9        Q.    For this, if you would please look at

10   your notes here, did Sunbelt provide the union

11   with counterproposals during this session?

12       A.    We discussed open ended proposal, yes.

13       Q.    Was holiday pay negotiated between the

14   parties?

15       A.    Yes.

16       Q.    And would you consider that to be an

17   important part of the Collective Bargaining

18   Agreement?

19       A.    Yes.

20       Q.    And the parties negotiated daily

21   overtime, correct?

22       A.    We discussed it, yes.

23       Q.    All right.  Did you negotiate it, sir?

24       A.    Yes.

25       Q.    And did Sunbelt and the union also

1    negotiate overtime rate for weekends and

2    holidays?

3        A.    Yes.

4        Q.    And you would consider that -- those

5    negotiations to be an important part of the

6    Collective Bargaining Agreement, correct?

7        A.    Yes.

8        Q.    You state at the bottom of Page 1 of 6

9    argue pension fluidity.  Could you explain that,

10   sir?

11       A.    Yeah.  We were discussing the central

12   pension fund and its strength financially.

13       Q.    And that was from the union discussing

14   it, correct?

15       A.    Yes.

16       Q.    But the specifics of it, you don't

17   remember?

18       A.    So far as what?

19       Q.    What you said.

20       A.    Yeah.  We discussed how financially

21   solvent central pension fund was.

22       Q.    Sir, you did not provide any specifics

23   of how sound the financial situation was for the

24   139's pension, correct?

25       A.    Actually, we did.

1      Q.   Okay.  Then, sir, as I asked a couple

2  questions before, what specifically did you say?

3      A.   It was discussed that the central

4  pension fund had -- was 96 percent funded.

5      Q.   And that was it?

6      A.   I'm not sure.

7      Q.   Looking at Page 2 of 6, the parties

8  continued to discuss on-call pay, correct?

9      A.   Where do you see that?

10      Q.   Page 2 of 6.

11      A.   Yeah.

12      Q.   Approximately the start on the fourth

13  line down to about almost the middle of the

14  page.

15      A.   Yeah.

16      Q.   Okay.  So this was still an outstanding

17  provision of the Collective Bargaining Agreement

18  and the parties were still negotiating, correct?

19      A.   Yes.

20      Q.   Sunbelt caucused, came back and

21  provided all of the counterproposals that you

22  see -- that you have written in from about

23  middle of the page down to the end, correct?

24      A.   Yes.

25      Q.   Then the union caucused, correct?

1    A.   Yes.

2    Q.   For how long?

3    A.   Roughly a half an hour.

4    Q.   And would you please point out which

5    lines and pages that is indicated?

6    A.   Well, we have the meeting reconvening

7    at 10:52.  The company came back at 10:25 from

8    their caucus so between those two timeframes is

9    when we took our caucus.

10    Q.   Okay.  So I'm looking at Page 3 of 6,

11    so about a third of the way down it says 139

12    counters.

13    A.   Yes.

14    Q.   And those were the counter to the

15    proposals that Sunbelt had just provided to them

16    starting at 10:25, correct?

17    A.   Correct.

18    Q.   So you did not caucus to come up with

19    those counterproposals?

20    A.   Yeah.  I believe we did.

21    Q.   After Sunbelt came back with its

22    proposals?

23    A.   What do you mean?

24    Q.   Well, okay.  Sunbelt gave you

25    proposals.

1      A.   Yeah.

2      Q.   And are you saying the union did not

3  caucus and just automatically had

4  counterproposals to those?

5      A.   No.  It suggests here that the meeting

6  reconvened at 10:52.

7      Q.   So the union caucused from 10:25 to

8  10:52 and what is above that line of 10:52, that

9  is what was discussed in your caucus?

10     A.   Yeah.  I would say that would be an

11  accurate statement.

12     Q.   And those same provisions were then

13  provided to Sunbelt, correct?

14     A.   Correct.

15     Q.   You have a note here about the fifth

16  line from the bottom, Sunbelt questions me about

17  escalation statement.  Could you please explain

18  that?

19     A.   Yeah.  When we were discussing being

20  tired of the stall tactics, obviously there are

21  protected activities that could be engaged by

22  the union in an effort to rethink the law and

23  that would be what I would consider to be the

24  escalated activity statement.

25          THE REPORTER:  I'm sorry, your Honor.

1  Could I have that repeated, please?

2          THE WITNESS:  So at the beginning of

3  the negotiation session, we indicate that we are

4  tired of the stall tactics.  We indicated also

5  that we wouldn't want to see Local 139 have to

6  engage in escalated activities.

7  BY MS. HILL:

8      Q.   Escalated activities meaning what, sir?

9  You identified those during negotiations,

10 correct?

11     A.   Well, obviously per the Act we are able

12 to banner or picket if we choose.

13          MS. HILL:  Okay.  Move to strike his

14 statement.

15          JUDGE ROSAS:  He is going to have to

16 repeat.

17          THE WITNESS:  Restate the same way I

18 said it?

19          JUDGE ROSAS:  Yes.  What did you say?

20          THE WITNESS:  I said we could picket or

21 banner.

22          JUDGE ROSAS:  And what was the

23 question?

24 BY MS. HILL:

25     Q.   My question was:  Did you identify what

1    you were going to be doing?

2              JUDGE ROSAS:  Yes or no?

3              THE WITNESS:  Yes.

4    BY MS. HILL:

5        Q.    What did you tell Sunbelt that the

6    union was going to be doing.

7        A.    That we could either banner or picket

8    which was protected activity.

9        Q.    Did you say and it's protected

10   activity?

11       A.    Yes.  That's what my notes indicated.

12   Bottom of the page.

13       Q.    So everything -- but it says I

14   explained protected activities.  It doesn't say

15   and I identified picketing and bannering and

16   stated it was protected activities.

17       A.    Okay.

18       Q.    Correct?

19       A.    If you say so.

20       Q.    So sitting here today, sir, do you even

21   remember what you identified as protected

22   activities during that negotiation session?

23       A.    Bannering and picketing.

24       Q.    Looking at Page 4 of 6, Sunbelt again

25   made counterproposals, correct, for 18.4?

1      A.    Yes.

2      Q.    And also a guarantee in addition to

3    eight hours of holiday pay, correct?

4      A.    Yes.

5      Q.    Then 19.5, Sunbelt made a proposal

6    regarding that also, correct?

7      A.    Yes.

8      Q.    On the back of this is 6 of 6 for 5J,

9    it appears your notes reflect some sort of

10   discussion regarding administrative dues, the

11   NTF, health fund, the pension, CPF and wages.

12   Did you explain what CPF was?

13     A.    Yes.

14     Q.    And what did you explain CPF was?

15     A.    Central pension fund.

16     Q.    Did Sunbelt at this point discuss that

17   it would not contribute to the national training

18   fund because it supplied adequate training to

19   its employees including the bargain unit

20   members?

21     A.    Yes.

22     Q.    During this session, was it explained

23   to the union that Bo had to work the rental

24   counter because it was -- the company was short

25   on staff?

1    A.    Yes.

2    Q.    And was it -- sitting here today, you

3    don't know how much walk-in business Sunbelt

4    gets?

5    A.    No.

6    Q.    With respect to working the counter, do

7    you know what the employees who worked the

8    counter do?

9    A.    No.

10    Q.    Do you know if the people working the

11    counter handle orders from customers?

12    A.    I assume that they do.

13    Q.    And would you say getting a customer's

14    orders is important for keeping the business

15    going at the Franksville profit center for all

16    of the employees including the bargaining unit

17    members?

18    A.    Yes.

19    Q.    Okay.  About a little bit below the

20    middle of the page you have some notes about

21    offer counterproposals.  Are those from the

22    union or from Sunbelt?

23    A.    That's from the union.  If you'll

24    notice that we call for the company at 1:45 p.m.

25    which meant we were on our caucus.  Bo is

1   working the counter.  Pat announces that Bo is

2   working the counter at which point when the

3   meeting reconvened, we offered our

4   counterproposal to 18.4, 19.1, 19.2, 19.5, 19.6,

5   17.1 and we reproposed a national training fund,

6   the health, the pension, CPF and we indicated

7   that the wages had not yet been addressed.

8       Q.   Thank you.  Would you please return 5J

9   to the pile that has been discussed?

10      A.   Yes.

11      Q.   Now, if you would please pick up 5K,

12  sir.

13      A.   I have it.

14      Q.   Thank you.  All of the handwriting on

15  this document, and this is 5 of 5 pages, all of

16  it yours, sir?

17      A.   Yes.

18      Q.   And this meeting started with a safety

19  moment?

20      A.   Yes.

21      Q.   Was that a waste of the negotiation

22  time?

23      A.   No.

24      Q.   Okay.  It also indicates open wage

25  proposal.  Is that -- so the information after

1    that, is that from the union or from Sunbelt?

2         A.   No.  That's the fact that the wage

3    proposal was still open.

4         Q.   Okay.  You have some numbered items, 1

5    through 5 on this page, sir?

6         A.   Yes.

7         Q.   What do those reflect?

8         A.   Those reflect open items for

9    discussion.

10        Q.   And for this negotiation, Mr. McGowan

11   again attended?

12        A.   Yes.

13        Q.   Then looking at Page 2 of 5, middle of

14   the page it states company walks out at 9:15?

15        A.   Yes.

16        Q.   Was that for a caucus?

17        A.   I assume it was.

18        Q.   And then Sunbelt you have some numbered

19   provisions here.  It's 1 through 10 instead of

20   the 1 through 5 that you have on Page 1,

21   correct?

22        A.   Yes.

23        Q.   So Sunbelt had additional proposals

24   compared to what the union had?

25        A.   It doesn't indicate that but them are

1    proposals that are open for discussion, yes.

2         Q.   Now, are these proposals 1 through 10

3    from the union or from Sunbelt?

4         A.   They are open proposals for discussion.

5         Q.   And this is what the union had

6    identified?

7         A.   Yeah.

8         Q.   Okay.  Could you explain meeting

9    reconvenes at 9:30 a.m.  Offer 139

10   counterproposal.  What happened then?

11        A.   Well, that's these counterproposals

12   that we were just discussing.

13        Q.   Okay.  1 through 10 that's when the

14   union made?

15        A.   Right.

16        Q.   And at 9:33 the company walks out.  Was

17   that for a company caucus?

18        A.   I believe it was.

19        Q.   So was the company walking out at 9:15

20   on Page 2 of 5 was that for the union caucus?

21        A.   I don't know.  It doesn't say.

22        Q.   And sitting here today, you don't

23   remember?

24        A.   Not specifically.

25        Q.   All right.  The proposals that you have

1  on Page 3 of 5 that you have numbered 1

2  through 6, those are from Sunbelt, correct?

3      A.   Yes.

4      Q.   Okay.  Then you have a time entered of

5  10:33.  That reflects what?

6      A.   I believe that's when the union asked

7  for a caucus.

8      Q.   So the information that is listed below

9  10:33 on Page 3 of 5 that is what was discussed

10  during the union's caucus, correct?

11      A.   Yes.

12      Q.   And then looking at Page 4 of 5, at

13  10:39 called the company back, correct?

14      A.   Yes.

15      Q.   Then were those four proposals verbally

16  given to Sunbelt by the union?

17      A.   I don't recall.

18      Q.   Do you recall if the union gave Sunbelt

19  any proposals that were in writing on this day?

20      A.   No.  We responded to your

21  counterproposals.

22      Q.   And you responded verbally, correct?

23      A.   Correct.  Actually, it's denoted right

24  here after we came up with another date June 5th

25  at noon --

```
 1      Q.    Just a moment.  I apologize.  Which
 2   page are you looking at?
 3      A.    Page 4.
 4      Q.    Okay.  June 5th.  Next meeting.
 5      A.    And there is the counterproposal.
 6      Q.    Okay.  That is from the union?
 7      A.    Local 139 to the employer, yes.
 8      Q.    But, again, verbally not written?
 9      A.    It's written here but, yes, it was
10   verbal.
11      Q.    But you gave the proposal to Sunbelt
12   verbally, correct?
13      A.    Yes.  Verbally, yes.
14      Q.    Company caucused from 10:48 to 11:09;
15   is that correct?
16      A.    Yes.
17      Q.    And those four points that you have
18   numbered there, then those were Sunbelt's
19   proposals?
20      A.    Yes.
21      Q.    Was Sunbelt permitted to provide the
22   proposals in this situation verbally rather than
23   in writing?
24      A.    They were.
25      Q.    And two minutes later the proposal was
```

1   finished and it indicates that the company walks

2   out.  Was that so that the union could caucus?

3       A.   Yes.

4       Q.   And the union called the company back

5   at 11:20, correct?

6       A.   Yes.

7       Q.   And below there, it states Local 139

8   proposals as written above.  Okay.  Are you

9   indicating that any of those proposals had been

10  given to the company in writing?

11      A.   No.

12      Q.   No.  Just verbally written as written

13  here?

14      A.   As written here, yes.

15      Q.   Please return 5K to your finished pile.

16          MS.  HILL:  Your Honor, we have been

17  going for I believe a little bit over an hour.

18  Or am I incorrect?  Should we take another

19  break?

20          JUDGE ROSAS:  Do you want to take a

21  break at this point?  Off the record.

22              (Whereupon, a lunch recess was

23              taken.)

24          JUDGE ROSAS:  Back on the record.

25

1  BY MS. HILL:

2      Q.   Yes.  Please look at General Counsel

3  Exhibit 1 or it might be 5L.

4      A.   Yes.

5      Q.   5L.  Middle of the page I believe you

6  indicated that this was a counterproposal from

7  Sunbelt?

8      A.   You're referring to the middle of the

9  first page, wage freeze, wage reopener?  Yes.

10     Q.   There was also discussion during the

11  negotiations regarding the forecasted economic

12  downturn, correct?

13     A.   Sunbelt's perception, yes.

14     Q.   Did Sunbelt say it was perception or

15  did Sunbelt provide the union with information

16  from some economic experts?

17     A.   Yes.

18     Q.   It was from experts, correct?

19     A.   Your perception.

20     Q.   Sir --

21         MS. HILL:  Your Honor, would you please

22  direct the witness.

23         JUDGE ROSAS:  That's a yes or no or you

24  can't answer that or you don't know, one of

25  those four.

1         THE WITNESS:  Yes.

2  BY MS. HILL:

3      Q.   Page 2 of 4 of 5L.

4      A.   Yes.

5      Q.   What are you referring to signoff?

6      A.   That's the document that we provided

7  asking to sign off on all of the tentatively

8  agreed upon items which you refused to sign.

9      Q.   Excuse me.  Sunbelt did not wish to

10 sign it at that time, correct?

11     A.   Correct.  Yes.

12     Q.   Did Sunbelt state to the union --

13 excuse me.  Sunbelt stated to the union that it

14 wished to do a red line comparison of what was

15 presented on June 5, 2019 to what it had in its

16 records, correct?

17     A.   You'll have to rephrase that.  That was

18 a little jumbled.

19     Q.   Did Sunbelt tell the union that it

20 wanted instead of I guess you would say

21 eyeballing the two documents, the signoff

22 document that the union had presented to Sunbelt

23 and then the tentatively agreed to provisions

24 that Sunbelt had prepared, that it wanted to do

25 a red line comparison of the two documents?

1    A.   Yes.

2    Q.   And did Sunbelt explain that it did not

3    have an electronic version of the union's

4    signoff document?

5    A.   Yes.

6    Q.   Did Sunbelt request the electronic

7    signoff document from the union?

8    A.   Yes.

9    Q.   And at negotiations, the union, in

10   particular Mr. Ervin, said that he would forward

11   the electronic version of the signoff, correct?

12   A.   Yes.

13   Q.   And subsequent to that negotiation

14   session, you told Mr. Ervin not to send the

15   electronic version, correct?

16   A.   Initially, but it was determined that

17   you would get the electronic version.

18   Q.   But it is also correct that Mr. Ervin

19   forgot to forward that electronic version of the

20   signoff agreement before the next negotiation

21   session, correct?

22   A.   Yes.  But you were also offered a

23   physical copy at that time.

24        MS. HILL:  Your Honor, move to strike.

25        JUDGE ROSAS:  Move to strike after yes.

 1    Okay.

 2              MS.  HILL:  Thank you.

 3    BY MS. HILL:

 4        Q.   And Sunbelt stated to the union during

 5    this negotiation session on June 5th that there

 6    were a series of articles from the union's

 7    original proposal that had been either deleted

 8    completely or incorporated into other articles,

 9    correct?

10        A.   Yes.

11        Q.   And Mr. Buffalo indicated that he might

12    not be available for the next negotiation

13    session after the June 5th session, correct?

14        A.   Is it documented here?

15        Q.   Look at the bottom of Page 4 of 4.

16        A.   Yes.

17        Q.   And so independently you could not

18    remember that, correct?

19        A.   Not necessarily, no.

20        Q.   And the -- and Sunbelt asked the union

21    during this negotiation session why it did not

22    request the parties to -- I'm sorry.

23        A.   Go head.  I am done, I hope.

24        Q.   And Sunbelt during negotiation sessions

25    on June 5th asked the union why it did not ask

1   Sunbelt earlier to initial each of the TA'd

2   provisions, correct?

3       A.   Well, we had.

4            MS. HILL:  Sir, move to strike.  Your

5   Honor, would you --

6            JUDGE ROSAS:  Sir, yes or no.

7            THE WITNESS:  No.

8   BY MS. HILL:

9       Q.   At some point during the negotiation

10  session, did -- Strike that.

11           All of the handwriting on this

12  Exhibit 5L yours, sir?

13      A.   Yes.

14           MS. HILL:  Excuse me.  Mr. Wiese, his

15  affidavit so I can cross.

16           MR. WIESE:  I am refusing turn that

17  document over given that cross examination has

18  already started.

19           JUDGE ROSAS:  Overruled.  Hand it over.

20           MR. WIESE:  All right.

21           MS.  HILL:  Now did you keep a copy of

22  this one?

23           MR. WIESE:  What?

24           MS.  HILL:  Do you have?

25           MR. WIESE:  I have my copy, yes.

1        MS. HILL:  Does Mr. Ryan have a copy?

2        MR. RYAN:  I do have a copy.

3        MS. HILL:  Okay.  May I approach?  Are

4   these all the same because you have them folded

5   over.

6        MR. WIESE:  I don't know why they are

7   like that but they should all be the same.

8        MS. HILL:  They are all the same?

9        MR. WIESE:  Yes.  Yes.

10        MS. HILL:  Okay.

11   BY MS. HILL:

12      Q.   All right.  Directing your attention,

13   sir, to five -- Page 5 Paragraph 16 --

14   Paragraph 16 and 17, sir.

15      A.   Yes.

16      Q.   Okay.  Both of these -- let's start

17   with 16.  The pension provision, you indicated

18   that you had -- you have negotiated you think

19   maybe 40, 50 Collective Bargaining Agreements?

20      A.   Correct.

21      Q.   And every single one of those include

22   the 139's pension?

23      A.   Yes.

24      Q.   Did Sunbelt indicate to you during

25   negotiations that not all of Sunbelt's

 1    Collective Bargaining Agreements have the

 2    union's pension or retirement plan?

 3         A.   Yes.

 4         Q.   Now, are you saying that Sunbelt's

 5    position on the 401K was a waste of the union's

 6    negotiation time?

 7         A.   No.

 8         Q.   Paragraph 17 on-call language for

 9    Section 21.6.  I'll give you a moment to review

10    your -- that provision.

11         A.   Yes.

12         Q.   Okay.  Did -- And Sunbelt negotiated

13    the ultimate language that was provided for this

14    provision, this article, in the Collective

15    Bargaining Agreement, correct?

16         A.   For hours of work?

17         Q.   For on-call language.

18         A.   Yes.

19         Q.   Is the union claiming that Sunbelt

20    wasted negotiation time regarding the

21    negotiations relating to on-call language?

22         A.   No.

23         Q.   If you would please turn to Page 6 and

24    it's Paragraph 22 and it goes onto Page 7.

25         A.   Yes.

1    Q.   All right.  With respect to the wage

2  proposal -- oh, excuse me.  With respect to the

3  health insurance proposal from the union,

4  Sunbelt did provide a counterproposal to the

5  union regarding that, correct?

6    A.   Yes.

7    Q.   And, in fact, Sunbelt, as indicated

8  earlier, had provided the union with details of

9  Sunbelt's health insurance plan, correct?

10   A.   Yes.

11   Q.   And Sunbelt pointed out to the union

12  during negotiation sessions that which of the

13  employees participated in the 401K, correct?

14   A.   Yes.

15   Q.   And this is bargaining -- excuse me --

16  bargaining unit members who participated in the

17  plan as of the date of the negotiation session,

18  correct?

19   A.   Yes.

20   Q.   And Sunbelt also pointed out which of

21  the bargaining unit members participated in

22  Sunbelt's health insurance plan along with their

23  dependents, correct?

24   A.   Yes.

25        MS. HILL:  All right.  I think those

1   were the only paragraphs that you had discussed

2   on direct, correct?

3           MR. WIESE:  I believe so.

4   BY MS. HILL:

5       Q.   All right.  Directing your attention,

6   sir, to Exhibit 5M.

7       A.   I have it right here.

8       Q.   Thank you, sir.  All the handwriting on

9   this document yours, sir?

10      A.   Yes.

11      Q.   There is an arrow in the left-hand

12  column.  What does that reflect, sir?

13      A.   I am not sure.  It looks like it's

14  going towards the safety moment which was

15  hydration sunscreen protection, but I'm not

16  exactly sure.  It may be just a doodle.

17      Q.   It indicates here Mike E., that stands

18  for Mike Ervin, correct?

19      A.   Yes.

20      Q.   It also states that Sunbelt never

21  received the electronic version of the previous

22  proposal from the unit, correct?

23      A.   The signoff, yes.

24      Q.   The signoff document.  Was anything

25  else discussed other than the signoff document?

1      A.   Not that I recall.

2      Q.   Was there a discussion regarding Mr.

3  Smith's termination?

4      A.   Yeah.  I believe there might have been.

5      Q.   And during that discussion regarding

6  Mr. Smith's termination, the union asked for

7  specifics as to why he was terminated?

8      A.   Generally speaking the union asked for

9  any termination or layoff to be in writing.

10          MS. HILL:  Sir, move to strike.

11          JUDGE ROSAS:  Stricken.  Yes, no or you

12  don't know or don't recall.

13          THE WITNESS:  Okay.

14          JUDGE ROSAS:  What's the answer?

15          THE WITNESS:  Reask the question.

16              (Whereupon, the record was read

17               as requested.)

18          THE WITNESS:  Yes.

19  BY MS. HILL:

20     Q.   And Sunbelt provided the reasons,

21  correct?

22     A.   Verbally, yes.

23     Q.   But the union did not ask for written

24  explanation of why he was terminated, correct?

25     A.   Yes, we did.

1      Q.    Near -- The union asked for copies of

2    his disciplinary records at the end of the

3    negotiation session, correct?

4      A.    That may be, yes.

5      Q.    And Sunbelt provided those disciplinary

6    action forms and his ultimate termination form,

7    correct?

8      A.    Yes.

9      Q.    All right.  I keep seeing you looking

10   over in Mr. Ervin's direction.  Are you getting

11   information from Mr. Ervin?

12     A.    No, I am not.  No, I am not.

13     Q.    Why did the negotiations end at 9:12?

14     A.    They were nonproductive and the

15   conversation got adversarial.

16     Q.    Please explain "adversarial."

17     A.    There was a heated discussion between

18   Bo and Dan Marsolek about the progress of the

19   negotiation.

20     Q.    And who asked to have the negotiations

21   ended?

22     A.    I believe it was mutually agreed upon.

23     Q.    Were discussions held outside of the

24   conference room as indicated on that

25   Respondent's 1?

1      A.    Not between the union and the company.

2      Q.    Okay.  Were there discussions between

3  the union, Mr. Buffalo, and Sunbelt rentals in

4  the office next to the Sunbelt's caucus room?

5      A.    At that point, I was standing in the

6  parking lot so I don't know.

7      Q.    The negotiations reconvened at 10:09

8  and to set the next negotiation session,

9  correct?

10      A.    Yes.

11      Q.    And that was set for what time?

12      A.    9:00 a.m.

13      Q.    And it was also the union also said

14  that it would forward electronically the signoff

15  document to Sunbelt, correct?

16      A.    Yes.

17      Q.    All right.  Please return 5M to your

18  done pile.  Now, if you would look at 5N.

19      A.    Yes.

20      Q.    Prior to this negotiation session, did

21  you see a -- any letter from Jason Mayfield

22  regarding negotiations on the 8th?

23      A.    Yes.

24      Q.    And what do you recall seeing in the

25  letter, sir?

1    A.   The letter suggested that the

2  operations at the Profit Center 776 were going

3  to change and that they essentially would be

4  closing their business as it was currently.

5    Q.   Did it also then -- did it indicate

6  anything else regarding the business at

7  Franksville location 776?

8    A.   I'm sure it did.  I don't recall

9  specifically.

10    Q.   At this negotiation session, Mr.

11  Mayfield, Mr. Anderson, Mr. Bogardus were there

12  with me for the -- for Sunbelt, correct?

13    A.   Yes.

14    Q.   And Mr. Smith was also there along with

15  you, Mr. Ervin, Mr. Marsolek and Mr. Buffalo,

16  right?

17    A.   Correct.

18    Q.   There was a safety moment?

19    A.   Yes.

20    Q.   And that was directed from whom?

21    A.   The union.

22    Q.   Now, at this time, what was the --

23  Okay.  What was the safety moment raised by the

24  union?

25    A.   There was some threats of well-being to

1    the union reps from one of the employees at

2    Sunbelt.

3        Q.   And when did those threats occur?

4        A.   I can't say specifically because I

5    didn't personally witness them but prior to the

6    negotiations.

7        Q.   Months prior to the negotiations?

8        A.   No.  I believe it was pretty close to

9    that time frame.

10       Q.   But -- and who heard about the threats?

11       A.   Mike Ervin.

12       Q.   Anyone else?

13       A.   Dan Marsolek.

14       Q.   And Mr. Marsolek was asked during

15   negotiations when did these occur, correct?

16       A.   Yes.

17       Q.   And Mr. Marsolek was also questioned

18   why didn't you report this immediately, correct?

19       A.   Yes.

20       Q.   And Mr. Marsolek did not have an answer

21   for Sunbelt with respect to why he didn't

22   answer -- why he didn't report it immediately,

23   correct?

24       A.   Yes.

25       Q.   And your notes indicate Mario.  Do you

1   know Mario's last name?

2       A.   I do not.

3       Q.   But he was the bargaining unit member,

4   correct?

5       A.   Yes.

6       Q.   And then it also indicates Steve was

7   weighing in about, about what, sir?

8       A.   I'm not sure.  I am sure it was

9   discussing --

10          MS. HILL:  Move to strike.

11          JUDGE ROSAS:  I'm sorry.  Repeat the

12  question.

13  BY MS. HILL:

14      Q.   Steve was weighs in about, what was he

15  weighing in about?

16          JUDGE ROSAS:  So the answer is I don't

17  recall.  Next question.

18          MS. HILL:  Thank you.

19  BY MS. HILL:

20      Q.   It also indicates Mike, Mike Ervin,

21  elaborates on Sunbelt's knowledge.  Sunbelt's

22  knowledge of what, sir?

23      A.   The apparent threat.

24      Q.   And your question at this point was

25  about what?

1  A. How to handle such a threat.

2  Q. And Sunbelt's response was to have

3 human resources investigate it, correct?

4  A. You referred to the policy handbook and

5 then, yes, ultimately HR.

6  Q. Because this was the first time Sunbelt

7 had heard this allegation about Mario, correct?

8  A. To my knowledge, yes.

9  Q. And did you -- you didn't expect

10 Sunbelt at that moment to start questioning

11 Mario about the threats, correct?

12  A. No.

13  Q. Then the next entry is Dan brings up

14 third-party vendors not using safety policy

15 specifically.  Tie off loading and unloading.

16 Which vendor was this?

17  A. I'm not sure.  That would be a question

18 to ask Dan.

19  Q. Because during the negotiations

20 Mr. Marsolek did not give the specifics as to

21 who the vendor was, correct?

22  A. Yes.

23  Q. And Mr. Marsolek did not give specifics

24 as to where this occurred, correct?

25  A. Not to my knowledge.

1    Q.  All right.  So during in negotiations

2  that were supposed to be about the closing of

3  this location, the parties were discussing

4  safety issues, correct?

5    A.  Yes.

6    Q.  All right.  With respect to the

7  continued negotiations this day, Sunbelt then

8  raised the fact that two bargaining unit members

9  were going to be laid off, correct?

10    A.  Yes.

11    Q.  For lack of work, correct?

12    A.  Yes.

13    Q.  And the lack of work was because the

14  union -- Sunbelt told the union that the

15  bannering and the inflatables and the picketing

16  were reducing Sunbelt's business out of this

17  location, correct?

18    A.  I don't recall that being discussed,

19  but yeah.  You had said that the work was low.

20    Q.  And the union asked for a specific

21  written notice regarding laying off the two

22  individuals, correct?

23    A.  Yes.

24    Q.  And did Sunbelt then inform you that

25  the two individuals were going to be informed of

1    the layoff that day of negotiation August 8th?

2         A.   Yes.

3         Q.   And that after they were informed, the

4    union would receive a copy of the two layoff

5    notices, correct?

6         A.   Yes.

7         Q.   And then the parties negotiated a

8    severance for the two individuals, correct?

9         A.   Yes.

10        Q.   And Sunbelt made the initial offer of

11   severance, correct?

12        A.   Yes.

13        Q.   And the union made a subsequent

14   offer --

15        A.   Yes.

16        Q.   -- severance.  And Sunbelt also by the

17   end of the negotiations indicated that because

18   the parties needed more time to negotiate the

19   severance for the two individuals that those two

20   individuals were going to be paid straight time

21   from August 8th through August 16th, correct?

22        A.   Yes.

23        Q.   And did the union disagree with that

24   offer from Sunbelt?

25        A.   No.

```
 1      Q.   Did the union on August 8th attempt to
 2  negotiate how the location that Franksville was
 3  requesting to be reorganized?
 4      A.   We had questions about how the
 5  reorganization would occur, yes.
 6      Q.   You had questions but did the union
 7  attempt to negotiate how it was going to be
 8  reorganized?
 9      A.   No.
10      Q.   Did the union -- and the union did not
11  ask any questions as to when the equipment at
12  the location was going to be transferred
13  elsewhere, correct?
14      A.   I don't recall that.
15      Q.   I'm sorry.  Move to strike.  And my
16  question was a yes or no and it required a yes
17  or no.
18      A.   I thought it was yes, no or I don't
19  know.
20          JUDGE ROSAS:  I'll allow that one.
21  Overruled.
22  BY MS. HILL:
23      Q.   Okay.  So you don't know when Sunbelt
24  had made that offer?
25      A.   I don't know.
```

1     Q.   Okay.  Did Sunbelt indicate that the

2  Franksville location was not closing?

3     A.   Yes.

4     Q.   And Mr. Mayfield indicated that the

5  Franksville location become a will-call

6  location, correct?

7     A.   Yes.

8     Q.   And that the Franksville location was

9  going to have customers who could pick up

10  equipment, correct?

11     A.   Yes.

12     Q.   And Mr. Mayfield referred to the

13  equipment that was going to be at the

14  Franksville location as being small equipment,

15  correct?

16     A.   Yes.

17     Q.   And Mr. Mayfield defined what small

18  equipment was, correct?

19     A.   Yes.

20     Q.   Now, you have a line on Page 2 of 3

21  just about in the middle of the page.  It looks

22  like Mike I ask.  Could you read that, please?

23     A.   What page are you on?

24     Q.   Page 2 of 3.  Just about the middle of

25  the page it looks like Mike.

1      A.   Mike and I asked about just two union
2 members so we were down to two bargaining unit
3 employees at the time.
4      Q.   And those two bargaining unit employees
5 were mechanics, correct?
6      A.   Yes.
7      Q.   One was a road mechanic, correct?
8      A.   Yes.
9      Q.   And one was a shop mechanic, correct?
10      A.   Yes.
11      Q.   No offense to your handwriting, sir,
12 but just two lines down from there you have
13 9:17, Local 139, what's the word after that?
14      A.   Caucus.
15      Q.   Thank you.  And then after that you
16 have the union requested staffing at other
17 locations statewide and northern Illinois?
18      A.   Yes.
19      Q.   And Sunbelt's response to that request
20 was that it is available electronically,
21 correct?
22      A.   Yes.
23      Q.   And at 9:38, was it Mr. Ervin who asked
24 if the two sides could meet again to discuss
25 severance?

1    A.   Yes.

2    Q.   Now, Mr. Buffalo according to Page 3 of

3  3 asked for the staffing level statewide?

4    A.   Statewide and northern Illinois, yes.

5    Q.   And in response -- and then Mr. Ervin

6  elaborates on staffing for where?

7    A.   Well, the line before that states Mike

8  points out openings online and then elaborates

9  on the staffing.

10   Q.   But staffing for Franksville, for the

11 state or what?

12   A.   No.  Statewide.

13   Q.   And the union was requested to put in

14 writing what documents it wanted, correct?

15   A.   Yes.

16   Q.   And then Mr. Ervin asked for

17 negotiations sometime during the week of the

18 19th, correct?

19   A.   Yes.

20   Q.   And the parties agreed to August 16th,

21 starting at 11:00 a.m., correct?

22   A.   Yes.

23   Q.   Please return that to one of your piles

24 and then go to Exhibit 50 or 5, 0, excuse me.

25   A.   Yes.

1    Q.   And this was for the August 16th

2  negotiations regarding severance, correct?

3    A.   Yes.

4    Q.   The union was informed how the members

5  could apply for any posted electronic -- excuse

6  me -- electronically posted job online, correct?

7    A.   Yes.

8    Q.   And Sunbelt explained to the union how

9  references from prospective employers are

10 handled at Sunbelt, correct?

11   A.   Yes.

12   Q.   And union was informed that it's an

13 outside vendor who handles all references,

14 correct?

15   A.   Yes.

16   Q.   The union did not request anything

17 differently to be done with respect to

18 references for these two laid off employees,

19 correct?

20   A.   Yes.

21   Q.   These two employees did -- were

22 eligible for rehire, correct?

23   A.   Yes.

24   Q.   Mr. Ervin provided the severance

25 proposal from the union, correct?

1    A.   Yes.

2    Q.   And that proposal indicated a request

3  for two years of severance; is that correct?

4    A.   Yes.

5    Q.   Mr. Mayfield questioned the union

6  regarding why two years, correct?

7    A.   Yes.

8    Q.   And the union's response to that was

9  what, sir?

10    A.   We have done it in the past with other

11  companies.

12    Q.   The union was also asked if the two

13  individuals had already had new jobs, correct?

14    A.   Yes.

15    Q.   And did they two individuals already

16  have new jobs?

17    A.   I believe they did.

18    Q.   And the union was informed that Mr.

19  Anderson was no longer the profit center manager

20  at Franksville, correct?

21    A.   Yes.

22    Q.   On Page 2 of 4, you have numbered 1

23  through 5 and these are proposals to the union

24  regarding the severance for these two

25  individuals, correct?

```
 1      A.   Yes.

 2      Q.   Sunbelt agreed to pay for COBRA for one

 3   month?

 4      A.   Yes.

 5      Q.   And Sunbelt explained to the union how

 6   the employees could get their -- roll over their

 7   401K or take out a loan from their 401K,

 8   correct?

 9      A.   Yes.

10      Q.   And a release was given to the union

11   regarding the severance package, correct?

12      A.   Yes.

13      Q.   The parties also negotiated earned but

14   unused vacation time that the two employees had,

15   correct?

16      A.   Yes.

17      Q.   Was there anything that the union

18   requested topics to be negotiated for these two

19   individuals that were not negotiated?

20      A.   No.

21      Q.   All right.  And are you aware if the

22   two individuals did sign off on the release

23   agreements?

24      A.   It's my understanding that they did.

25      Q.   Oh, and Sunbelt explained that the
```

1  severance agreement was subject to taxes and any

2  other withholdings, correct?

3       A.   Yes.

4       Q.   Sunbelt also explained that one of the

5  individuals was the age of 40 so his severance

6  agreement was going to have different language

7  than the individual who was under 40, correct?

8       A.   Yes.

9       Q.   The union requested and received what

10 the vacation totals were for the two

11 individuals, correct?

12      A.   Yes.

13      Q.   And Sunbelt also identified the human

14 resources person who would be handling all of

15 the severance information for the two employees,

16 correct?

17      A.   Yes.

18      Q.   All right.  Please return 50 to the

19 pile.  And the union did not argue with Sunbelt

20 at that negotiation session about Sunbelt's

21 statement that there was a lack of work or

22 business for Franksville, correct?

23      A.   We asked to have verification but we

24 didn't argue it, no.

25      Q.   And did -- and Mr. Mayfield did provide

1  some statistics regarding year over year

2  business for that location, correct?

3      A.   Yes.

4      Q.   And I'm sorry to ask you to go back to

5  50 but do you see any of Mr. Mayfield's

6  statistics in this document, sir?

7      A.   No.

8      Q.   And do you see in 5N, this is from the

9  August 8th negotiation, any statistics provided

10 by Mr. Mayfield in those notes?

11     A.   No.

12     Q.   And why is that, sir?

13     A.   None were provided to my knowledge.

14     Q.   But verbally they were provided?

15     A.   Verbally, yes.

16     Q.   And General Counsel Exhibit 14, this is

17 whose handwriting?

18     A.   Mine.

19     Q.   And this -- all of it is your

20 handwriting, correct?

21     A.   Yes.

22     Q.   And this was -- these notes were based

23 on a strategy meeting with just the union team

24 on the day after the March 21, 2019

25 negotiations, correct?

1      A.   Yes.

2      Q.   All of these -- and all of these

3  proposals were then provided to Sunbelt in the

4  next negotiation session, correct?

5      A.   I believe so, yes.

6      Q.   But they were -- were they -- they were

7  given to Sunbelt verbally, correct?

8      A.   I believe they were referred to in

9  previously written documents.

10      Q.   But these proposals on this exhibit are

11  different from earlier proposals from the union,

12  correct?

13      A.   They fall under the same article with

14  the manipulations or the modifications that we

15  would hold would get the deal done.

16      Q.   But, sir, when you presented these

17  proposals to Sunbelt after March 22, 2019, the

18  union made these proposals verbally, correct?

19      A.   We did not generate a piece of paper

20  with these proposed provisions specifically.

21      Q.   And you did not provide these proposals

22  to Sunbelt electronically in advance of the next

23  negotiation session, correct?

24      A.   No, we did not.

25      Q.   And there were no telephone calls from

 1  the union negotiating team to anyone on the

 2  Sunbelt negotiating team to provide Sunbelt with

 3  these new proposals prior to the next

 4  negotiation session, correct?

 5      A.   They weren't new proposals.  They were

 6  modifications to existing proposals but, no.

 7  There was no advanced notification to any

 8  modification that we discussed at this strategy

 9  meeting.

10      Q.   Well, sir.  You can use the term

11  modification.  But also modification did result

12  in a new proposal, correct?

13      A.   It changed the proposal.

14          MS. HILL:  All right.  So move to

15  strike.

16          JUDGE ROSAS:  Stricken.  Next question.

17  BY MS. HILL:

18      Q.   Again, the modification resulted in a

19  new proposal to Sunbelt, correct?

20      A.   No.

21      Q.   So even though you had a strategy

22  meeting, you didn't have any new proposals for

23  Sunbelt at the next negotiation session?

24      A.   We had modifications to the proposals

25  that were being discussed.

1    Q.   The union and Sunbelt met twice in

2  August of 2018, correct?

3    A.   Yes.

4    Q.   And the union and Sunbelt met twice in

5  February of 19th for negotiations, correct?

6    A.   Yes.

7    Q.   Now, in addition to the union not

8  liking the temperature in the conference room

9  where negotiations were being held, the union

10 complained about something else about the

11 facility at Sunbelt, correct?

12   A.   Yes.

13   Q.   And what was that, sir?

14   A.   On one particular negotiation session

15 that Terry McGowan attended, the rest room

16 facilities were not operating correctly.

17   Q.   When you say -- you made it plural,

18 facilities, or just the men's restroom?

19   A.   The men's room I mean.  None of us went

20 in the female's restroom to check it.

21   Q.   And the men's restroom who notified

22 Sunbelt of an issue?

23   A.   I believe it was me.

24   Q.   And how quickly was it corrected?

25   A.   Before the session was over.

1    Q.    Would you agree that it was -- Well,

2  Mr. Anderson fixed the problem?

3    A.    I believe he did.  I didn't watch him.

4    Q.    And that repair was because a chain had

5  fallen off of the flush arm of the toilet?

6    A.    Again, I wasn't involved in the repair,

7  but the situation was rectified.

8    Q.    But Mr. Anderson did discuss it during

9  the negotiation session, correct?

10    A.    Yes.

11    Q.    When did Sunbelt's bargaining team

12  members perform work in the shop?

13    A.    I don't recall that it was suggested

14  they did.

15    Q.    Did you ever observe anyone from

16  Sunbelt's bargaining team performing work in the

17  shop during negotiations?

18    A.    I did not.

19    Q.    Are you aware of any union negotiating

20  team member observing Sunbelt's bargaining team

21  member performing work in the shop?

22    A.    I don't know.

23    Q.    And you're not aware of Sunbelt

24  discussing any personal things during Sunbelt's

25  caucuses, correct?

1    A.   So far, yes.

2    Q.   I couldn't hear the last part, sir.

3    A.   I don't know what you are referring.

4    Q.   Are you aware of Sunbelt discussing any

5  personal things during Sunbelt's caucuses?

6    A.   Not that I'm aware of, no.

7    Q.   Are you aware of an allegation that

8  Chris Pender told employees that the union was

9  not going to get in at Sunbelt?

10    A.   It was my understanding that there was

11  a rumor going around that it was clearly -- made

12  clear by Sunbelt management that the union was

13  not going in but it was an innuendo.  I didn't

14  hear it personally.

15    Q.   You said management, but I am referring

16  to Mr. Pender.

17    A.   Through Mr. Pender.

18    Q.   Okay.  Do you know who Chris Pender is?

19    A.   I don't.

20    Q.   Okay.  Did you hear any as you call it

21  innuendo or rumors about a Mr. Chris Pender?

22    A.   Not necessarily Chris Pender but that

23  it was discussed management stated clearly that

24  the union would not get in there.

25    Q.   All right.  But when did you hear this

1    innuendo or rumor?

2         A.   I don't recall.

3         Q.   But it was after the certification of

4    the union by the NLRB?

5         A.   Yes.

6         Q.   Did you investigate the rumor?

7         A.   I did not personally.  I suggested that

8    Mike Ervin or Dan Marsolek do so.

9         Q.   Do you know who did?

10        A.   I believe both of them did.

11        Q.   Did you hear that Mr. Pender threatened

12   employees that it would be feudal for them to

13   select the union as their bargaining

14   representative?

15        A.   Not necessarily, no.

16        Q.   Well, okay.  Not necessarily.  Does

17   that mean you heard something similar to that?

18        A.   I heard that threats were put out

19   there, yes.

20        Q.   And who did you hear about the threats

21   from?

22        A.   The negotiating team, Mike and Dan.

23        Q.   Just those two because the negotiating

24   team also included Mr. Buffalo, correct?

25        A.   Yes.  Just Mike and Dan.

1     Q.   Did you ask them to investigate that

2  rumor?

3     A.   Yes.

4     Q.   And did they give you a report?

5     A.   Nothing that was substantiated.

6     Q.   And did Mr. Marsolek and Mr. Ervin give

7  you a report regarding the other rumor about Mr.

8  Pender stating that the union was not going to

9  get in?

10    A.   Yes.

11    Q.   And what was that report?  What did it

12  state?

13    A.   Nothing that was substantiated.

14    Q.   These reports that you received from

15  Mr. Marsolek and Mr. Ervin, were they verbal or

16  in writing?

17    A.   Verbal.

18    Q.   Did you hear -- did you hear that Mr.

19  Anderson allegedly interrogated employees about

20  their union sympathies?

21    A.   No.

22    Q.   Did you hear that Mr. Anderson

23  allegedly interrogated employees about their

24  union activities?

25    A.   No.

1    Q.   What is Sunbelt's fiscal year?

2    A.   Pardon?

3    Q.   What is Sunbelt's fiscal year?

4    A.   I want to say it's June to June but I'm

5  not sure.

6    Q.   And there is no requirement for Sunbelt

7  to negotiate wages before negotiating the

8  noneconomic provisions of a Collective

9  Bargaining Agreement, correct?

10   A.   Yes.

11   Q.   And what is that?

12   A.   What is what?

13   Q.   What prohibition is there?

14   A.   There is none.

15   Q.   There is none.  During one of the

16  negotiation sessions, did you mention that you

17  were a marine?

18   A.   Yes.

19   Q.   And in response to that, did Mr.

20  Mayfield thank you for your service there?

21   A.   Yes.

22   Q.   Do you believe that that was a waste of

23  negotiation time?

24   A.   No.

25   Q.   All right.  Also, during negotiations,

1    did you state that Sunbelt did not respect you?

2         A.    Yes.

3         Q.    And in response to your statement, did

4    Sunbelt say, sir.  You are a marine.  Sunbelt

5    respects you?

6         A.    Yes.

7         Q.    Was that a waste of negotiation time?

8         A.    No.

9         Q.    And the union did not ask Sunbelt for

10   justifications for each of its proposals,

11   correct?

12        A.    Which proposals?

13        Q.    Each of its, all of its.

14        A.    The whole thing?

15        Q.    Each of its proposals, correct.

16        A.    I don't know what you are referring.

17        Q.    Okay.  Sunbelt made proposals for the

18   Collective Bargaining Agreement, correct?

19        A.    You made multiple proposals, yes.

20        Q.    And the union did not ask Sunbelt to

21   provide it with a reasoning or a justification

22   for that proposal, correct, for each of those

23   proposals?

24        A.    No.  Actually, we did.

25        Q.    For every single one of them?

```
 1      A.    Not every single one, no.

 2      Q.    Did Sunbelt ever refuse to provide an

 3  explanation or justification for any of its

 4  proposals?

 5      A.    Yes.

 6      Q.    And which one, sir?

 7      A.    Overtime, dues checkoff, boots.  Those

 8  come to mind.

 9      Q.    But I thought you already testified

10  that when it came to dues Sunbelt explained that

11  for Sunbelt to handle any kind of deduction,

12  whether it's dues or anything else, there is a

13  cost associated with it, correct?

14      A.    Yes.

15      Q.    And that that was a cost that Sunbelt

16  at that point was not willing to incur, correct?

17      A.    For this location.

18      Q.    For that location, correct?

19      A.    Yes.

20      Q.    That was part of the reasoning,

21  correct?

22      A.    Yes.

23      Q.    And Sunbelt also, and I'm sorry to go

24  over this again, but pointed it out to two other

25  unit contracts that did not have Sunbelt
```

1    handling the dues deduction, correct?

2        A.    Yes.

3        Q.    And those were provided to the union as

4    explanations or justification for its position,

5    correct?

6        A.    Yes.

7        Q.    And with respect to boots, Sunbelt did

8    negotiate provision regarding the boots

9    allowance, correct?

10       A.    Yes.

11       Q.    And Sunbelt also explained that in some

12   locations the Red Wing boots were the preferred

13   boot for the employees and, therefore, there was

14   a coupon available, correct?

15       A.    Yes.

16       Q.    And that was part of the justification

17   for Sunbelt's position on the boots provision,

18   correct?

19       A.    Yes.

20       Q.    And with respect to overtime, Sunbelt

21   also explained to the union about the financial

22   situation for that profit center, correct?

23       A.    Verbally, yes.

24       Q.    Based on what you just said, are you

25   saying that the union demanded from Sunbelt in

1   writing justifications for each of its

2   proposals?

3       A.   Not every one, no.

4       Q.   Did the union ever demand from Sunbelt

5   a justification in writing for any of its

6   proposals?

7       A.   Some.

8       Q.   Which ones?  If you need to look at

9   your notes, please do so.

10      A.   No.  I don't need to look at them.  I

11  don't recall.

12      Q.   And I want to be sure that my notes are

13  correct.  You never were told that Sunbelt had

14  no intention of reaching an agreement with

15  Local 139, correct?

16      A.   Not directly.

17      Q.   All right.  Indirectly, what are you

18  talking about?

19      A.   We discussed the rumors that had been

20  overheard by the agent and the organizer.

21      Q.   What are you referring to there, sir?

22      A.   The discussion we just had about the

23  rumors that we had heard that the organizer and

24  Dan Marsolek were told to investigate which I

25  claimed was not substantiated.

1    Q.   Okay.  But you did not raise those

2  rumors during any of the negotiation sessions?

3    A.   No.

4    Q.   Okay.  So based on those two

5  investigations, you did not have any hard

6  evidence that Sunbelt had no intentions of

7  reaching an agreement with Local 139, correct?

8    A.   Correct.

9    Q.   Were you involved in taking any of the

10  photographs or videos of the Franksville

11  location?

12    A.   No.

13    JUDGE ROSAS:  This is beyond the scope

14  of direct, right, Counsel?  I mean --

15    MS. HILL:  Correct.

16    JUDGE ROSAS:  He is not here for a

17  deposition.  I don't see the need -- Are you

18  subpoenaing him to appear in your case?

19    MS. HILL: Yep.  Yes, sir.  Yep.  Yes,

20  sir.  Excuse me.  Sorry.  I thought I was given

21  the latitude yesterday in an effort to try to

22  move things.  I'll hold off.  I'd be more than

23  happy to have him come back.  Thank you.  Do you

24  want to ask follow-up questions?  That's fine.

25    JUDGE ROSAS:  Yeah.  I don't think it

1    makes sense in this scenario.

2            MS. HILL:  All right.  And then the

3    union will agree that because of the language I

4    have in the subpoena, it can be continued to

5    whatever day this week, Mr. Ryan?

6            JUDGE ROSAS:  It continues.

7            MS. HILL:  It continues.  Thank you.

8            JUDGE ROSAS:  You are under subpoena by

9    the company in coordination with the attorneys

10   and the company.

11           THE WITNESS:  I understand.

12           MS. HILL:  So he does not stay --

13           JUDGE ROSAS:  Redirect?

14           MR. WIESE:  Could I have five minutes?

15           JUDGE ROSAS:  Sure.  Off the record.

16                  (Whereupon, a short recess was

17                   taken.)

18           JUDGE ROSAS:  Okay.

19                  REDIRECT EXAMINATION

20   BY MR. WIESE:

21      Q.   Mr. West, I'd like to direct your

22   attention to General Counsel Exhibit 5J.

23      A.   Okay.

24      Q.   And if you turn over to Page 2 of that

25   document.

1    A.   Yes.

2    Q.   Okay.  If you -- do you see the

3  notation 10:25 meeting reconvenes?

4    A.   Yes.

5    Q.   And then below that it looks like Pat

6  H, do you see that?

7    A.   Yes.

8    Q.   Do those reflect discussions that

9  occurred at the bargaining table?

10   A.   Yes.

11   Q.   And then when did those -- based off of

12 your notes if you can tell, when did those

13 discussions cease?

14   A.   I'm not really sure.

15   Q.   Okay.  I'd like to stay with this

16 document.  Direct your attention to Page 6.

17   A.   Yes.

18   Q.   So where it says call for company 145

19 there?

20   A.   Yes.

21   Q.   Okay.  Who called for the company?

22   A.   Me.

23   Q.   And did the company come back at that

24 time?

25   A.   Not immediately but shortly thereafter.

1    Q.   Do the notes explain why the company

2    did not come back?

3    A.   Bo was working the counter.

4         MR. WIESE:  Nothing further.

5         JUDGE ROSAS:  Charging Party?

6         MR. RYAN:  Just a couple quick

7    questions.

8                   CROSS EXAMINATION

9    BY MR. RYAN:

10   Q.   Ms. Hill asked at various times whether

11   discussions about specific proposals were a

12   waste of the union's time.  Do you recall that?

13   A.   I do.

14   Q.   And you indicated that discussions of

15   specific proposals were not a waste of the

16   union's time, correct?

17   A.   Yes.

18   Q.   Is there anything you would classify as

19   a waste of the union's time?

20   A.   Not necessarily, no.

21   Q.   Anything in the context of the

22   individual bargaining sessions hot topics?

23   A.   I can't specifically say that I agree

24   with having a safety moment at the beginning of

25   each session given the fact that we were working

1   in an administrative role more than an active in

2   the field role.

3       Q.    You were also asked about Mr. Mayfield

4   defining what small equipment is in the

5   reorganization?

6       A.    Yes.

7       Q.    Do you recall what he explained?

8       A.    Generators.  I don't know.  Small

9   equipment.  In my opinion that would be not

10  skid-steers or backhoes or bulldozers.  Air

11  compressors, generators, pumps, jackhammers,

12  hammer drills.

13      Q.    Okay.

14            MR. RYAN:  I don't have anything

15  further.  Thank you.

16            JUDGE ROSAS:  Any follow up?

17            MS. HILL:  No, your Honor.

18            JUDGE ROSAS:  Sir, you are excused.  Do

19  not discuss your testimony with anyone about

20  this case until you are advised otherwise by

21  counsel, okay?

22            THE WITNESS:  Yes.

23            JUDGE ROSAS:  Have a good day.

24            MS.  HILL:  Your Honor, based on your

25  instruction regarding having him called back for

1  purposes of the subpoena, he may not stay in the

2  courtroom as Mr. Ervin did, correct?

3          MR. RYAN:  He is not planning to.

4          JUDGE ROSAS:  They can designate

5  whomever they want to be in the courtroom.

6          MS. HILL:  Right but I mean sitting

7  back there.

8          JUDGE ROSAS:  Oh, the fact that he may

9  be a witness again?

10          MS. HILL:  Yes, sir.

11          JUDGE ROSAS:  You may be calling him on

12  rebuttal or you may be called by respondents.

13          MR. RYAN:  We weren't planning --

14          MS. HILL:  He doesn't have to be here

15  for this but with respect to the subpoenaed

16  testimony, respondent is permitted to continue

17  to use the affidavit, correct, because we did

18  not go beyond the scope for purposes of the

19  affidavit for him.  We did for purposes of Mr.

20  Ervin.

21          JUDGE ROSAS:  I'll take argument about

22  that at that time.  Let me see exactly what the

23  testimony is and what the purpose is.

24          MS. HILL:  Okay.  Thank you.  Thank

25  you, sir.

 1              JUDGE ROSAS:  Okay.

 2              MR. WIESE:  Are you speaking with

 3      respect to the affidavits that --

 4              MS. HILL:  Just his that brought up

 5      because I believe everyone will agree I only

 6      refer to the three paragraphs that Mr. Wiese had

 7      directed questions regarding.  I didn't go

 8      beyond that.  Once -- because in Mr. Ervin's

 9      situation we were able to get him in for

10      additional.

11              JUDGE ROSAS:  Hold on a second.  Let me

12      just check that.  If you are calling him on your

13      case, have a seat for a minute.

14              MS. HILL:  I am not saying that I will,

15      sir.  I am just asking for -- and, sir, while

16      you are doing that, if I could use the time are

17      you going to be calling in No. 3 right now?

18              MR. WIESE:  So I have one more witness

19      that I am going to call before the three.  I

20      think his testimony is -- it really depends on

21      how late everybody wants to go today and there

22      is a lot of variables.

23              MS. HILL:  I am just asking so I can

24      tell them, yes, stay here or what.

25              MR. WIESE:  It depends on how long we

 1  want to go today, so...

 2          JUDGE ROSAS:  Well, see, I just

 3  reviewed the case law that we have available on

 4  this and yeah.  The case law doesn't appear to

 5  be favorable to the production of Jencks

 6  material by witnesses called by the respondent.

 7  It would be called by the respondent as opposed

 8  to the General Counsel.

 9          I understand the witness is here today

10  and you have an opportunity to question the

11  witness.  The problem is that the scope of the

12  General Counsel's questioning you are entitled

13  to prior statements in connection with that.

14          If you are getting into photographs of

15  the yard and the coercive statements, I mean,

16  this witness' testimony is basically limited as

17  I generally recall to the bargaining, right?

18          MS. HILL:  Yes, sir.

19          MR. WIESE:  Yes.

20          JUDGE ROSAS:  The bargaining.  So these

21  other aspects, I mean, hopefully you had the

22  affidavit and you had an opportunity to look at

23  it.

24          MS. HILL:  For those provisions.

25          JUDGE ROSAS:  In connection with the

1    bargaining.  You had an opportunity to look at

2    the entire affidavit, right?

3            MS. HILL:  No, sir.

4            JUDGE ROSAS:  Did you give her the

5    entirety of the affidavit?

6            MR. WIESE:  I did during the course of

7    the examination when she requested it.

8            MS. HILL:  Right but to read, I mean,

9    the entire thing I was --

10           JUDGE ROSAS:  Okay.  All right.

11           MS. HILL:  And he gave me the paragraph

12   and then the paragraphs for the particular ones

13   that he was asking.  I have not seen the entire.

14           JUDGE ROSAS:  All right.  So from here

15   on out, ask for the affidavit before the cross

16   examination starts, okay?

17           MS. HILL:  Okay.

18           JUDGE ROSAS:  All right.  Give counsel

19   the affidavit.  Let her look at it to see if

20   there is anything else that she may have left

21   out in connection with bargaining in terms of

22   prior statements relating to bargaining, but

23   that's it.

24           If you subpoena this witness back on

25   some other matters, you can -- you can make that

1   application again and with any case law that you

2   think is favorable but I don't think there is

3   based upon what I know at this time.

4           MS. HILL:  Okay.  Or if on cross Mr.

5   Wiese starts asking questions bringing in the

6   affidavit with respect to that.

7           JUDGE ROSAS:  Oh, theoretically --

8   well, I don't know.

9           MS. HILL:  It's theoretically.

10          JUDGE ROSAS:  That's an interesting

11  question.  We will see.

12          MS. HILL:  Yes, sir.

13          JUDGE ROSAS:  We will deal with that if

14  and when that happens but have some case law.

15          MR. WIESE:  So, your Honor, just to

16  clarify, you want me to give her the affidavit

17  right now, give her a chance to review it and

18  then ask any follow-up questions with respect

19  to --

20          JUDGE ROSAS:  Yeah.

21          THE WITNESS:  So am I staying?

22          JUDGE ROSAS:  Just for a moment, see if

23  there is any additional questions.

24          THE WITNESS:  While Ms. Hill reviews, I

25  am going to go to the bathroom.

1              JUDGE ROSAS:  Yes.  Yes.  Off the

2    record.  Let's try to keep something that hasn't

3    been asked and answered at this point just

4    something that you might see as an inconsistent

5    statement in connection with the bargaining

6    testimony.

7                   (Whereupon, a short recess was

8                    taken.)

9              JUDGE ROSAS:  Are you ready?

10             MS. HILL:  Paragraph 6 Page 2.

11             JUDGE ROSAS:  Hold on.  We are on the

12   record now.

13             MS. HILL:  Yes.

14             JUDGE ROSAS:  Okay.

15                 RECROSS EXAMINATION

16   BY MS. HILL:

17        Q.   Okay.  Page 2, Paragraph 6.

18        A.   Yes.

19        Q.   In Paragraph 6 it states that you did

20   not like the agenda for the bargaining sessions,

21   correct?

22        A.   Where does it say that?

23        Q.   Well, basically you didn't like the way

24   the topics on -- I am trying not to read it,

25   your Honor, into evidence so I am trying to

1   basically summarize it.  The first couple

2   sentences you indicate, sir, that the agenda or

3   the pattern of discussion you didn't care for,

4   correct?

5       A.   I don't see where that's stated at all.

6       Q.   You claim that the agenda was

7   unorganized?

8       A.   Where does it say that?

9       Q.   In the first line you said you used the

10  word unorganized.  In fact, you had a modifier,

11  very unorganized.

12      A.   You said Paragraph 6 of Page 2,

13  correct?

14      Q.   Yes, sir.

15      A.   So you said present for the employer

16  at --

17           MS.  HILL:  Did you give me the wrong

18  affidavit?

19           MR. WIESE:  I may have given the wrong

20  affidavit.

21           MS. HILL:  I'm sorry, sir.  I just took

22  what he handed to me and gave it to you.  I

23  sincerely apologize.

24           MR. WIESE:  Do you want me to go get

25  it?

1          MS. HILL:  I'm sorry.  I didn't even

2     verify it was.  This is 43.

3          MR. WIESE:  This should be the correct

4     document.

5          MS. HILL:  Page 2, right?

6     BY MS. HILL:

7          Q.   Line 14, Paragraph 6, all right.

8          A.   Yes.

9          Q.   You use the words very unorganized,

10    correct?

11         A.   Yes.

12         Q.   All right.  You are referring to the

13    agenda, the process of the negotiations,

14    correct?

15         A.   Yes.

16         Q.   And then in Line 15 you indicate that

17    you believed it was done intentionally to delay

18    the process?

19         A.   Yes.

20         Q.   And this is -- your opinion is based

21    just on your opinion that you thought the

22    negotiations were very unorganized?

23         A.   Yes.

24         Q.   However, during the negotiations, you

25    never told Sunbelt that it was unorganized,

1  correct?

2      A.   No.  I did.

3      Q.   And which negotiation session?

4      A.   I don't recall specifically, but I do

5  recall to you specifically that we were not

6  moving in a very productive manner.

7      Q.   But you did say it was unorganized,

8  correct?

9      A.   Yes.

10     Q.   In lines 17 and 18 you refer again to

11 the safety moment, but you also have indicated

12 that the safety moments were short, correct?

13     A.   Sometimes.

14     Q.   Approximately five minutes?

15     A.   Generally, yes.

16     Q.   And to the extreme, how long were they?

17     A.   Sometimes they carried on 15,

18 20 minutes.

19     Q.   Which topic?

20     A.   When an employer wanted to discuss with

21 us in detail about what we were doing on our end

22 for safety and our members and --

23     Q.   Which negotiation session was this,

24 sir?

25     A.   I don't recall specifically but we did

1    discuss that today.

2        Q.   And you saw it in your notes?

3        A.   I did.

4        Q.   Okay.  Do you want to look at your

5    notes to see which session it was?

6        A.   Not necessarily.

7        Q.   But you have a vague recollection?

8        A.   Yes.  We discussed it today.  We

9    discussed it today.

10       Q.   Okay.  And this was -- Was this with

11   respect to the training or was that with respect

12   to safety?

13       A.   More along the lines of safety.

14       Q.   You also state that you are a big

15   proponent of safety and discussing safety you

16   consider it to be Sunbelt's tactic to waste

17   time.

18       A.   Yes.  For negotiation.

19       Q.   However, you had -- you had several

20   bargaining unit members who were terminated for

21   violating safety policies and procedures,

22   correct?

23       A.   Yes.

24       Q.   You had one individual who was

25   terminated because he failed to wear the harness

1   and the tether in a piece of equipment that had

2   a hydraulic arm to it, correct?

3       A.   I don't know that specifically, but,

4   yes.

5       Q.   And would you agree, sir, that not

6   wearing a harness and a theater to a piece of

7   equipment that has a hydraulic arm to it when

8   you are in the piece of equipment, it can be a

9   very unsafe procedure?

10          MR. WIESE:  Objection, your Honor.

11  Relevance and scope.

12          MS. HILL:  With respect to this, he is

13  complaining about safety.  He says it's

14  important and yet he says it was a waste of

15  time.  He is contraindicating himself, sir.  He

16  had members who apparently were not aware of

17  some of these safety issues.

18          JUDGE ROSAS:  The statement in the

19  affidavit says what?

20          MS. HILL:  It says I am a big proponent

21  of safety but we are negotiating -- oh, should

22  this be off the record?  We are negotiating the

23  contract in the conference room and not out on

24  the road and it seems to be another company

25  tactic to waste time.

1          JUDGE ROSAS:  Okay.  So that was

2   your -- that was your previous statement, right?

3          THE WITNESS:  Yes.

4          JUDGE ROSAS:  Sworn in that affidavit?

5   Correct?  Okay.  It's in the record.  That's it.

6   All right.  Next question.  You can compare that

7   in the record when you brief this case to his

8   testimony previously.  Okay.  Go ahead.

9   BY MS. HILL:

10     Q.   Okay.  You also complain in this

11  affidavit about discussing what portions or

12  proposals have been tentatively agreed to and

13  which have not.  That did not occur in every

14  negotiation session, correct?

15     A.   Generally speaking our negotiation

16  sessions began with a recap of where we have

17  been and where we hoped to be.

18     Q.   Generally or every single time, sir?

19     A.   Every time.

20     Q.   So now you are changing your testimony

21  from generally to every single time?

22     A.   No.  I am answering your question.

23     Q.   Sir, are you changing your testimony

24  from --

25     A.   I am not.

1    Q.   -- generally to every single time?

2    A.   No.

3    Q.   With respect to your affidavit, you

4    also state that employer has been very reluctant

5    to provide written proposals or written

6    counterproposals but Sunbelt provided you

7    proposals the very first day of negotiation?

8         JUDGE ROSAS:  Hold on one second.  The

9    first part of that question was what he said in

10   the affidavit?

11        MS. HILL:  Correct.

12        JUDGE ROSAS:  Is that what you said?

13        THE WITNESS:  Yes.

14        JUDGE ROSAS:  Now follow up.

15   BY MS. HILL:

16   Q.   And then follow-up question isn't it

17   true, sir, that Sunbelt provided you even on the

18   first day of negotiations written proposals?

19   A.   No.

20   Q.   They -- all of the benefits

21   information, sir?

22   A.   That wasn't a proposal.  That was a

23   company policy.

24   Q.   Sir, Sunbelt presented the information

25   to the union and stated this is Sunbelt's

1   proposal regarding the benefits, correct?

2       A.   For its union and nonunion members or

3   employees.

4       Q.   Sir, were we negotiating for the

5   nonunion members?

6       A.   No.

7       Q.   So those were proposals only for the

8   bargaining unit members, correct, sir?

9       A.   No.  They were not.  That was company

10  policy.

11      Q.   Sir, you have indicated that the

12  handbook contained policies, correct?

13      A.   Yes.

14      Q.   Benefits are not policies, correct?

15      A.   Not necessarily, no.

16      Q.   Okay.  And you have no recollection as

17  to how many written proposals Sunbelt provided

18  to the union, correct?

19      A.   On the first session?

20      Q.   For any of the sessions.

21      A.   Total, no.

22      Q.   More than 5?

23      A.   Yes.

24      Q.   More than 20?

25      A.   Yes.

1    Q.   More than 30, sir?

2    A.   No.

3    Q.   And your notes don't reflect how many

4    written proposals, correct?

5    A.   No.

6    Q.   Okay.  Let's try that one again.  I am

7    sorry if I didn't understand.  Perhaps my -- and

8    I know my question was poorly worded.  Did --

9    I'll let that stand.

10          And there were times when the union

11   refused to consider any verbal counterproposals

12   from Sunbelt, correct?

13   A.   No.  We asked to have them put in

14   writing.  We never refused to consider any of

15   them.

16   Q.   But only if they were in writing,

17   correct?

18   A.   No.  We took them into consideration,

19   but we wanted them in writing so at a later date

20   it couldn't be argued that we didn't talk about

21   it.

22   Q.   But, sir, for the verbal proposals, the

23   union did not make any counterproposals to

24   Sunbelt's proposals that were verbal, correct?

25   A.   No.  That's incorrect.  My notes

1   indicate that during caucus, we discussed those

2   proposals.

3       Q.   The verbal ones?

4       A.   Whatever ones we were discussing, yeah.

5       Q.   But your notes don't indicate whether

6   they were written or verbal, correct?

7       A.   No.

8       Q.   Thank you.  Your affidavit also

9   complains that the union and the employer have

10  not been signing off on written tentative

11  agreements at the time that they were reached.

12  Now --

13          JUDGE ROSAS:  Did you say that?

14          THE WITNESS:  I didn't call it a

15  complaint.

16          JUDGE ROSAS:  Well, confront him with

17  the prior statement.

18  BY MS. HILL:

19      Q.   Sure, if you would look at Line 30,

20  Page 2 because of that, the union and employer

21  have not been signing off on tentative

22  agreements at the time that they are reached.

23      A.   That would be an accurate statement.

24      Q.   Did you ask Sunbelt to sign off on

25  tentative agreements each time prior to, you

1 know, the union presented that signoff agreement

2 as you called it, did you ever -- you never ever

3 asked Sunbelt prior to that to sign off on a

4 tentative agreement?

5     A.   We were having trouble establishing

6 written --

7     Q.   Sir, move to strike.

8         JUDGE ROSAS:  Yes or no?

9         THE WITNESS:  No.

10        MS. HILL:  Would you repeat my

11 question, please?

12             (Whereupon, the record was read

13              as requested.)

14        THE WITNESS:  No.

15 BY MS. HILL:

16    Q.   Okay.  My question was poor.  Prior to

17 the signoff agreement that we discussed earlier,

18 did the union ever ask Sunbelt to sign off on a

19 tentative agreement as that -- after the

20 tentative agreement was reached?

21    A.   No.

22    Q.   All right.  If you look at Page 3, sir,

23 you make a statement here that from Line 1 to

24 Line 4 hope to go in order of the articles from

25 the comprehensive proposal that we have provided

1    to the provider in the first session but the

2    employer did not want to do that and so it was

3    jumping around from one article another with no

4    real order or organization.

5           However, sir, let's just look at

6    General Counsel Exhibit 5J.  It should be right

7    at the top.

8    A.    What about 5J?

9    Q.    Okay.  I was waiting for you to find

10   it, sir.  Looking at Page 3 of 6, it appears

11   that the parties discussed looking at about a

12   the third of the way down 19.1 and it went to

13   three lines -- four lines down, excuse me, 19.2,

14   then second line down 19.5, then 19.6.

15          Do you agree that that was in somewhat

16   of an order for that particular article?

17   A.    Yes.

18   Q.    Sir, would you also agree if you would

19   pull General Counsel Exhibit 5K --

20   A.    Okay.

21   Q.    -- and just start on Page 1.  Again,

22   looking at Page 1, you say on the first page

23   about midpoint 19.1 --

24          MR. WIESE:  Objection, your Honor.

25   These notes, I mean, speak for themselves.

1  Whether the numbers are following each other in

2  order --

3            JUDGE ROSAS:  Your questioning at this

4  point, Counsel, is limited to inconsistent

5  statements with what's in his affidavit?

6            MS. HILL:  Correct.  And I am trying to

7  point that out, sir, for the record because

8  that's what everything is going to be based on,

9  correct?

10            JUDGE ROSAS:  Uh-huh.

11            MS. HILL:  Thank you, sir.

12            MR. RYAN:  Your Honor, I'll offer

13  further objection.  The section of the affidavit

14  being quoted concerns these notes June 26, 2018

15  bargaining sessions.  These notes are from March

16  21, 2019 and April 30, 2019.

17            MS. HILL:  Where does it say that?

18            JUDGE ROSAS:  Reread the section that

19  you are asking the witness to acknowledge.

20  BY MS. HILL:

21     Q.   Okay.  I am looking at Paragraph 6 and

22  this one -- I'm sorry.  I don't see where it

23  states that it's specifically --

24            JUDGE ROSAS:  What's the statement?  Go

25  ahead and read it into the record.

 1          MS. HILL:  Paragraph 6, The employer

 2    has caused the bargaining process to unfold in a

 3    very unorganized fashion which I believe they

 4    have done intentionally to delay the process and

 5    drag it out as long as possible.  The bargaining

 6    sessions generally follow the same pattern.  The

 7    employer starts out the session with the safety

 8    moment.  This takes up about five minutes of

 9    time while the employer talks about some safety

10    issue or another.  I am a big proponent of

11    safety but we are negotiating a contract in a

12    conference room and not out -- oh, I am sorry --

13    and not out on the road and so it seems to me to

14    be another company tactic to waste time.

15          However, if talking about safety is how

16    the employer wants to start every meeting, I get

17    it and have not fought them on that even though

18    a lot of the safety moments end up being

19    repetitive.  The first 15 to 20 minutes of each

20    session generally involve us discussing what

21    portions or proposals have been tentatively

22    agreed to, TA'd, and which have not.

23          Throughout the negotiations, the

24    employer has been very reluctant to provide

25    written proposals or written counterproposals.

1  That has continued throughout all of the

2  sessions -- excuse me -- all the sessions even

3  though I have repeatedly asked the employer to

4  provide counterproposals in writing.

5          The employer has provided a number of

6  counterproposals in writing after the union

7  requested it but still provides certain

8  proposals and counterproposals verbally.

9  Because of that, the union and employer have not

10 been signing off on written tentative agreements

11 at the time they are reached.  This has caused

12 confusion as the employer has at times told us

13 we do not have a TA on items that the union

14 already has noted have been tentatively agreed

15 to.  The union had hoped to go in order of the

16 articles from the comprehensive proposal that we

17 provided to the employer at the first session,

18 but the employer did not want to do that and so

19 the employer has been jumping around from one

20 article to another with no real order or

21 organization.

22          Now, I thought this -- to justify why I

23 was going over some of the sessions, sir, is

24 because the word sessions was used in this

25 particular paragraph.

 1            MR. RYAN:  I was mistaken about it

 2    being specific to that but I would point out

 3    that the affidavit is dated April 18th so

 4    anything after that.

 5            JUDGE ROSAS:  April 18th --

 6            MR. RYAN:  2019.

 7    BY MS. HILL:

 8        Q.    All right.  Then let's go to 5I.  This

 9    is --

10        A.    Okay.

11        Q.    Looking at -- let's look at Page 5 of 6

12    of your notes, sir.

13        A.    Okay.

14        Q.    About a little past halfway down it

15    states 18.1, 18.3, 18.4, 18.5, 18.6, 18.7.  Sir,

16    would you agree that those appear to be in order

17    based on your notes?

18        A.    I would disagree.

19        Q.    How would you disagree, sir?

20        A.    If you look at just above that, we had

21    discussed 15.5 then we discussed 18.1 then we

22    discussed what was 20.3 per your agreement, 20.4

23    per your agreement, 18.5 per your agreement,

24    20.6 per your agreement, 20.7 per your

25    agreement, 19.1 per your agreement.

 1          If you'll notice on each one of those

 2    next to that with a slash is another designation

 3    18.3, 18.4, 20.5, 18.6, 18.7, and 21.1 which

 4    would be indicative of what was the designation

 5    in the original proposal provided by Local 139.

 6       Q.   Sir, but the proposals that we were

 7    discussing during this negotiation session were

 8    the ones that are indicated in your notes of

 9    18.1, et cetera, the notes indicate that at

10    least for the document requested by the union of

11    Sunbelt that these were the numbers assigned to

12    those articles and were being negotiated,

13    correct?

14       A.   Yes.

15       Q.   Turning the page to 6.6.

16       A.   Page 6?

17       Q.   6 of 6, sir.

18       A.   Okay.

19       Q.   All right.  And starting about the

20    third line down now granted in the far left-hand

21    corner I believe -- column -- excuse me -- you

22    had already testified that these numbers reflect

23    the union's original proposal, correct?

24       A.   Correct.

25       Q.   So even looking at those, sir, it says

1    21.2, 21.3, 21.4, 21.5, 21.6, 21.7, correct?

2         A.   And 22.5.

3         Q.   Correct.  Sir.

4         A.   Yes.

5         Q.   But those appear -- at least the first

6    five numbers appear to be in numerical order for

7    that article, correct?

8              MR. WIESE:  Objection, your Honor.

9    Same objection, I mean, as I made earlier.  I

10   mean, just reading numbers into the record that

11   are easily readable.

12             JUDGE ROSAS:  The problem that I have,

13   Counsel, is that we are now dealing with

14   impeachment and you are not contrasting it with

15   any of his -- any specific testimony he has

16   given today.  You are drawing attention to

17   entries in the bargaining notes.

18             MS. HILL:  That he already testified

19   to.

20             JUDGE ROSAS:  He has adopted the notes,

21   sure.  I am just not seeing the value of the

22   impeachment here, unless you are, you know, if

23   you are trying to draw an inconsistency with a

24   previous statement with something that is

25   reflected in his notes, I mean, that's --

1          MS. HILL:  Yes, sir.

2          JUDGE ROSAS:  I don't know why you need

3    to do that because you had comprehensive

4    examination as to what the notes reflect and

5    what they don't reflect, right?

6          MS. HILL:  Correct.

7          JUDGE ROSAS:  Okay.  All right.

8          MS. HILL:  And now you are giving me

9    permission to go look at the affidavit that he

10   had presented because the union attorney pointed

11   out he only used the --

12         JUDGE ROSAS:  For the purpose of

13   establishing that something that he has

14   testified to with respect to his notes is not

15   credible.

16         MS. HILL:  Or what he testified put

17   into a signed affidavit to the Board is not

18   credible either, sir.

19         JUDGE ROSAS:  You know, if there is a

20   statement in there --

21         MS. HILL:  Yes, sir.

22         JUDGE ROSAS:  -- about, you know, how

23   many times he went to the ball park in 2019 is a

24   lie but it has nothing to do with what's in his

25   bargaining notes, it has limited utility.

1          MS. HILL:  Well, for purposes of the

2   charges that Sunbelt is dealing with, for

3   example, I mean, the biggest one is that Sunbelt

4   was wasting time.

5          JUDGE ROSAS:  Well, the charges

6   ultimately have to be supported by evidence but

7   we are not dealing with the charges.  The

8   charges are this amorphous concept, legal

9   argument if you will, ultimately based on the

10  facts.  So I just need you to be clear about

11  what it is that you need to distill from that

12  affidavit while this witness is still here to

13  establish that it is inconsistent with his

14  testimony today.

15         MS. HILL:  And that's what I was

16  attempting to do.

17         JUDGE ROSAS:  And at the same time,

18  Counsel, you -- look, at this point look you are

19  going to have to brief this case.

20         MS. HILL:  Yes, sir.

21         JUDGE ROSAS:  And you have been very

22  comprehensive going through all the notes with

23  this witness.  What I am going to do at this

24  point is if you feel that there is anything

25  important in that affidavit, at this point you

1  bring those out through the witness and let's

2  try to just move on because you are going to --

3          MS. HILL:  Correct.

4          JUDGE ROSAS: -- you are going to tie it

5  together later.  I mean --

6          MS. HILL:  And I appreciate you letting

7  me for this witness read the whole paragraph.

8          JUDGE ROSAS:  I don't want to go

9  through the notes again.  I don't want to go

10  through the notes again.

11          MS. HILL:  I agree, sir.  But I was

12  trying to point out a document he signed under

13  oath to support the charge filed by the union

14  that is inconsistent not only with his statement

15  but also with the notes that he had prepared

16  earlier.

17          JUDGE ROSAS:  Okay.

18          MS. HILL:  Earlier to this affidavit.

19          JUDGE ROSAS:  Okay.  Then --

20          MS. HILL:  I think, sir, just with --

21          JUDGE ROSAS:  It's -- you see it's a

22  general statement.  You know, this is not about

23  whether the light was green or red at the

24  intersection when the two cars collided.  Okay.

25  This is not, you know, specific to a specific

1  instance.  It's a general -- it's a general

2  assertion that he made in that affidavit, right?

3          MS. HILL:  A very incorrect general

4  assertion.

5          JUDGE ROSAS:  About what the company

6  was and was not doing, what their routine was,

7  what they are doing as a delay tactic and what

8  was their methodology.  I understand that.  So

9  that's general.

10          MS. HILL:  This supposedly along with

11  the other affidavits I am assuming is what the

12  NLRB found sufficient to draft a complaint,

13  correct?

14          MR. WIESE:  I am not going to answer

15  that question.

16          JUDGE ROSAS:  You know --

17          MS.  HILL:  One would make that

18  argument.

19          MR. WIESE:  One would hope so, right?

20          MS. HILL:  One would hope so.

21          JUDGE ROSAS:  But, again, this is --

22          MS. HILL:  This is significant.

23          JUDGE ROSAS:  This is not about whether

24  I saw, you know, the witness, you know, beat the

25  complaining witness over the head with a bat at

1   a particular time at a particular location.

2   This is a general statement assertion by the

3   witness that you read about the respondent's

4   alleged dilatory tactics and so on, so we are

5   not going to go back into the treasure trove of

6   information to argue whether, you know,

7   statements that he made in his bargaining notes

8   on particular dates are consistent or not

9   consistent with that assertion that he made at

10  that time.

11          MS. HILL:  Not consistent.

12          JUDGE ROSAS:  And this is all very

13  general stuff.

14          MS. HILL:  No.  It's very specific,

15  sir, and I respectfully disagree.

16          JUDGE ROSAS:  I am sure you can get

17  into specific stuff but that statement is

18  general.  That statement is general.

19          MS. HILL:  I respectfully disagree with

20  you, sir.

21          JUDGE ROSAS:  Okay.  Tell me what's

22  specific there about a specific date or a

23  specific incident.

24          MS. HILL:  You are asking for a

25  specific -- he is putting them all together,

1   sir.

2           JUDGE ROSAS:  Right.  Right.

3           MS. HILL:  All together, sir.

4           JUDGE ROSAS:  Right.  Right.

5           MS.  HILL:  Every single one.

6           JUDGE ROSAS:  You get that in his

7   record as his prior statement and you have a

8   record that you already made, correct?  Did you

9   leave something out before when you cross

10  examined from day one through the last day of

11  bargaining?

12          MS. HILL:  Well, because we didn't have

13  this at the time I was doing the cross

14  examination of him regarding alleged

15  disorganized and dilatory tactic apparently that

16  he is outlining Paragraph 6 here, no, sir.  I

17  did not go into it that way, sir.

18          JUDGE ROSAS:  Into which way?

19          MS. HILL:  Saying that we jumped from

20  article to article disorganized.  Here in this,

21  this particular paragraph, he makes that

22  allegation.  I just pointed out how in at least

23  one session prior to this affidavit he -- his

24  notes clearly reflect that we went article --

25  you know, through the subsections of a

1 particular article.  We can do it for all of

2 them but your Honor doesn't want to do that at

3 this time.  For briefing --

4          JUDGE ROSAS:  But you examined him

5 about each of those notes, right?

6          MS. HILL:  As I said before, sir, not

7 for purposes of saying that --

8          JUDGE ROSAS:  Is the note not -- and

9 again, and I said this at the outset, I

10 cautioned the General Counsel and I said that it

11 also applied to cross examination and I gave you

12 a lot of leeway because I know you were building

13 on some questions as you went through these

14 notes with the witness as you had him read the

15 notes unnecessarily but at the same time for

16 your purposes getting to the point that you

17 needed to get to.

18          MS.  HILL:  Correct.

19          JUDGE ROSAS:  You know, the thought

20 process is oftentimes working in these cases,

21 you know, I understand that, you know, the

22 immediate moment, you know, and you build on the

23 previous thought I am sure; so I gave you some

24 leeway but, again, if there is at this point

25 something specific in the notes that you think

1  you need to bring out at this point that you

2  haven't already discussed before, okay, in terms

3  of what's not clear from his notes, I mean, his

4  notes are his notes.  They are in evidence.

5  They weren't questioned.

6          Now what you can do is -- what you can

7  do is you can try to attack the veracity of the

8  notes that they are inaccurate but at this

9  point, we are into argument.  We are into

10  argument.  You know, your version of what are

11  proposals.  Their versions of what are proposals

12  and are not proposals.  I mean, this is a lot of

13  argument.  I am seeing very little factual

14  dispute here.

15          MS. HILL:  Sir, I respectfully disagree

16  with your position on this and it's because this

17  particular paragraph out of this particular

18  affidavit, I understand there are other

19  affidavits, that was not something that had been

20  brought up during direct examination and was not

21  brought up on cross examination.  I'm not going

22  to go any further than this February 21st

23  because I think it proves the point that this

24  rash generalization that he made in Paragraph 6

25  is not supported.  As you said, this can be

1  pointed out in the post hearing briefs regarding

2  his notes.

3       JUDGE ROSAS:  Okay.  You are asking at

4  this point about this February 21st set of

5  notes?

6       MS. HILL:  Right because it was based

7  on the objection --

8       JUDGE ROSAS:  Hold on.  Hold on.  And

9  you would limit your questioning to that set of

10  notes as an example of any other notes that are

11  similarly structured would make the point that

12  you are trying to establish here.

13       MS.  HILL:  Right.

14       JUDGE ROSAS:  Okay.  I am going to

15  overrule.  I am going to give counsel the

16  limited leeway to pursue that with respect to

17  the February 21st notes.

18  BY MS. HILL:

19     Q.   And after that discussion, I'm sorry.

20  Mr. West, looking at and I apologize, I am not

21  sure if you had -- if I had asked the question

22  and you had answered it, for Page 6 of 6, the

23  articles -- subarticles that I had identified in

24  your notes from about quarter of the way --

25  well, from 19.2 down, those are -- appear to be

1  in chronological order, correct?

2      A.   Up to the point of 19.7 to 20.5, yes.

3      Q.   To 20.5.  And if I am not mistaken, you

4  had testified earlier that this section of your

5  notes was from Sunbelt's proposal, correct?

6      A.   Page 6?

7      Q.   Page 6 of 6 from at 19.2 down.

8      A.   Yes.

9          MS. HILL:  Thank you, sir.  All right.

10  No further questions.

11          JUDGE ROSAS:  Okay.  Any follow up?

12          MR. WIESE:  Not from the General

13  Counsel, your Honor.

14          JUDGE ROSAS:  Charging Party?

15          MR. RYAN:  No, your Honor.

16          JUDGE ROSAS:  Thank you, sir.  You are

17  excused at this time.  Please do not discuss

18  your testimony with anyone you previously made.

19  All right.  Next witness.  Off the record.

20              (Whereupon, a short recess was

21               taken.)

22          JUDGE ROSAS:  On the record.  Next

23  witness.

24          MR. WIESE:  Your Honor, at this time

25  counsel calls Dan Marsolek to the stand.

1          JUDGE ROSAS:  Sir, please raise your

2     right hand.

3                    (Witness sworn.)

4          JUDGE ROSAS:  Please have a seat, state

5     and spell your name and provide us with an

6     address.

7          THE WITNESS:  My name is Daniel,

8     Marsolek, D-A-N-I-E-L.  M-A-R-S-O-L-E-K.  Home

9     address?

10          JUDGE ROSAS:  Business or home is fine.

11          THE WITNESS:  33719 Lynn Lane.  That's

12     Burlington, Wisconsin.

13          JUDGE ROSAS:  Burlington, Wisconsin?

14          THE WITNESS:  Yes, sir.

15                    DANIEL MARSOLEK,

16     after being first duly sworn, deposeth and saith

17     as follows:

18                    DIRECT EXAMINATION

19     BY MR. WIESE:

20          Q.   Mr. Marsolek, what's your current

21     occupation?

22          A.   I am a business agent for the Operating

23     Engineers Local 139.

24          Q.   What do you do as a business agent with

25     Local 139?

1      A.   I go out in the field and I represent

2  the members.  Make sure that the contract is

3  being upheld and that if they have any questions

4  or issues with pay or anything related to that I

5  guess.

6      Q.   How long have you been a business agent

7  with Local 139?

8      A.   Three years.

9      Q.   Have you held any other positions with

10  Local 139 besides being a business agent?

11      A.   Prior to being a business agent, I was

12  the crane instructor at our formal training

13  center for two years.

14      Q.   Prior to that, any positions?

15      A.   Certified crane operator in the field.

16  Been with the Union 16 years total.

17      Q.   As a crane operator, were you a union

18  member?

19      A.   Yes, sir.

20      Q.   Okay.  When you are a crane operator,

21  what sort of equipment did you work with?

22      A.   Mostly heavy equipment, large hydraulic

23  cranes, crushing cranes, power driving

24  equipment, excavators, dozers, backhoes, aerial

25  lifts.  All that stuff.

1      Q.    Okay.   And when you had to move

2  equipment using your crane or the cranes that

3  you operated, was the weight of the equipment

4  that you worked with important?

5      A.    Yes, very much so.

6      Q.    Why is that?

7      A.    If I don't know the weight of the

8  equipment I could very easily cause catastrophic

9  failure of the crane causing it to tip over or

10 possibly hurt somebody.

11     Q.    What were the types of equipment that

12 you moved as a crane operator?

13     A.    Again, aerial lifts, excavators,

14 dozers, gang forms, concrete buckets, I mean,

15 large wooden panels.

16     Q.    Are you familiar with the respondent in

17 this case Sunbelt Rentals?

18     A.    Yes, sir.

19     Q.    How are you familiar with them?

20     A.    I know they are a rental company in the

21 area and that we have been negotiating with them

22 for 15 months or whatever.

23          JUDGE ROSAS:   Sir, keep your voice up.

24 BY MR. WIESE:

25     Q.    Are you the business agent for any

1  bargaining units at Sunbelt?

2      A.   Yes, I was.  For the seven members that

3  were there.

4      Q.   And which unit was that?

5      A.   Franksville shop.

6      Q.   Are you aware of Sunbelt's decision to

7  terminate the entire bargaining unit at the

8  Franksville facility?

9          MS. HILL:  Objection.  Form.

10          JUDGE ROSAS:  I'll allow that.

11          THE WITNESS:  Yes.

12  BY MR. WIESE:

13      Q.   How are you aware of this decision?

14      A.   It was decided at negotiating -- at the

15  end of negotiations that they decided to just --

16  well, I guess I don't know exactly how I was

17  told it happened but it happened through -- I

18  guess I don't know.  I don't know how to respond

19  to that.

20      Q.   I'd like to direct your attention to so

21  if you go into that, there is going to be a

22  stack of documents there.  If you dig down a

23  ways into it, there is a document marked at the

24  bottom GCX 17.  They should be in numerical

25  order.

1          JUDGE ROSAS:  Sir, here you go.

2          MR. WIESE:  Thank you.

3    BY MR. WIESE:

4        Q.   That was 17?

5        A.   Yep.

6        Q.   Okay.  Do you recognize this document?

7        A.   Yes.  It looks familiar.

8        Q.   Okay.  And was this document how you

9    discovered the --

10          MS. HILL:  Objection.  Leading.

11          JUDGE ROSAS:  Sustained.

12   BY MR. WIESE:

13       Q.   Have you seen this document?

14       A.   Yes, I have.

15       Q.   Prior to the -- so you can set that

16   document aside.  Prior to the elimination of the

17   bargaining unit at the Franksville facility, had

18   you visited that facility?

19       A.   No.

20       Q.   You had never been to the Franksville

21   facility prior to that date?

22       A.   Not prior to negotiations, no.

23       Q.   But I am talking about prior to the

24   date of that letter on August 7th.

25       A.   Oh, yes.  Yes.  I was.  I'm sorry.  I

1  misunderstood you.

2      Q.   And I'll just ask you please let me

3  finish talking before you start answering

4  otherwise it will cause issues, okay?

5          In what capacity have you visited that

6  facility?

7      A.   As part of the negotiating committee.

8      Q.   And after the elimination of the

9  bargaining unit, did you continue to visit the

10 Franksville facility?

11     A.   Not on the property, no.

12     Q.   Did you continue to monitor the

13 facility?

14     A.   Yes.  Yes, I did.

15     Q.   Why did you continue to monitor the

16 facility?

17     A.   At the end of negotiations, they

18 decided to, as the letter stated, to change the

19 role of the shop and we wanted to make sure that

20 that if it was -- if indeed it was going to

21 happen, we wanted to make sure it happened.

22     Q.   And when did you start monitoring the

23 operations at the Franksville facility?

24     A.   Within -- I'd say within two weeks

25 after that last negotiation session, middle of

1    Augustish.

2        Q.   How often have you visited the

3    Franksville facility since that time since the

4    middle of August?

5        A.   I don't know if I can give you an

6    accurate number on how many times; but being

7    that it's in my area that I monitor as a

8    business agent, I would make trips there weekly.

9        Q.   Okay.  When you would check on the

10   Franksville facility, did you have a process

11   that you followed?

12       A.   I did.  I did.  I would come in cross

13   the frontage road between the Franksville shop

14   of Sunbelt's and Ahern.  I would pull to the

15   back of the building, take a picture of the

16   vehicles on site just to see to try to build

17   that who is there, what's going on and then I

18   proceed to go across the street on Fuhrman Drive

19   and watch the facility from there.

20       Q.   Was there a specific time when you

21   visited the facility?

22       A.   No, sir.  The times would vary

23   throughout the day.

24       Q.   I'll show the witness what's been

25   marked as General Counsel Exhibit 25.

1  Mr. Marsolek, do you recognize this document

2  here and take a moment to review it.

3      A.   Yes.  It appears to be pictures that I

4  took.  I couldn't tell you if all of them are

5  but it appears to be pictures.

6      Q.   Okay.  And the numbers in the bottom

7  right-hand corner of the photos, do you see

8  those numbers starting on the first page?

9      A.   Yes, I do.

10      Q.   Okay.  Continuing throughout the

11  document.  Based off of your review, do those

12  times indicate when the pictures were taken?

13      A.   Yes, they do.

14          MR. WIESE:  I'll offer General Counsel

15  Exhibit 25.

16          JUDGE ROSAS:  Voir dire?

17          MS. HILL:  Yes, sir.

18              VOIR DIRE EXAMINATION

19  BY MS. HILL:

20      Q.   Mr. Marsolek, did you take all of these

21  photos yourself, sir?

22      A.   Without reviewing all of them, it

23  appears I did, yes.

24      Q.   Well, if you would please review them

25  so we don't have an issue later on.

1    A.   Yes.  It appears I did.

2    Q.   And because there is a variety of dates

3  and times where it's styled, how did those dates

4  and times get put on these photos?

5    A.   The red ones I believe were put on by

6  our -- one of the gals in the office that helped

7  put these pictures together.  And the yellow

8  ones were the date stamp from my camera.

9    Q.   So how -- if the red ones to use your

10  words were done by the gals in the office, did

11  those dates and times reflect when they

12  processed this photo?

13    A.   Yes.  The date stamp reflected the

14  digital timestamp that's on the picture itself.

15  At the time when the pictures were taken, the

16  date stamp was not on the camera.  It was not

17  turned on.

18    Q.   So how do those red dates and times

19  get -- do they reflect accurately when you took

20  the photos?

21    A.   Yes, they do.  There is a digital date

22  stamp with every picture that was taken.  The

23  digital date stamp is then put on there.

24    Q.   The camera can automatically if you

25  press the right button have the date stamp on

1   the time on it, correct?

2       A.   Yes.

3       Q.   All right.  Now the ones that are in

4   red differ from if you look at 37 of 45 and that

5   it appears at least on 37 of 45 to be in

6   military time, correct?

7       A.   Yes.

8       Q.   But No. 1 appears what time is

9   reflected there, sir?

10      A.   It appears to be 2:03.

11      Q.   Morning or afternoon, sir?

12      A.   It's light out.  I would assume

13  morning.  It's light out.  I would say it's

14  afternoon.

15      Q.   Afternoon.  Okay.  So did you press a

16  button on your camera in order to have military

17  time for some of the photos and then nonmilitary

18  time for other photos?

19      A.   No.  I just -- once we figured out how

20  to do a time stamp on it is when I put the time

21  stamp on.  I had to click a button that said

22  time stamp on and time stamp off.

23      Q.   And when did you press that button?

24      A.   September 6th at 7:44.

25      Q.   So I am still trying to figure out how

1  can the times and dates on the previous photos
2  be accurate as to when you took them.
3      A.    The photo -- like I said, the photo has
4  a digital stamp.  It may not be on the picture
5  at first but it has an actual --
6      Q.    Okay.  Sir, I don't want to -- Well,
7  I'll lead you, okay.  Did you give the camera to
8  the as you said the gals in the office?
9      A.    What I gave her was the memory card
10 from my camera.
11     Q.    And then did she then place it into her
12 computer?
13     A.    I think it was done -- What happened
14 was I have the memory card and the memory card
15 then was placed into my phone and then it was
16 sent over the airwaves digitally to her because
17 it came in the memory card, I'm sorry.  That's
18 how it went.
19     Q.    And did you verify that the dates and
20 times on Pages 1 through 5 were correct as to
21 when you took these photos?
22     A.    Yes, I did.
23     Q.    And when did you do that, sir?
24     A.    I don't remember the exact date it was
25 done on.  Whenever we printed these pictures

1  out.  Maybe when we were subpoenaed for it.

2      Q.  Okay.  When the subpoena from Sunbelt

3  was issued?

4      A.  I couldn't accurately tell you.  I

5  don't know.  I don't know for sure.

6          MS. HILL:  All right.  Your Honor, my

7  objection is going to be with respect to the

8  first five pages of this exhibit, I don't seem

9  to hear enough of a foundation to accurately

10 reflect that the times as questioned on direct

11 examination are accurate.

12         MR. WIESE:  Well, your Honor, the

13 witness testified that to his knowledge the

14 stamps on those photos is coming from digitally

15 encoded information that's in the file.  He has

16 also independently testified at the very

17 beginning of his testimony that the time and

18 date stamps in all of these pictures that he

19 went back and reviewed all of them is accurate

20 based off of his independent recollection of

21 when he took the pictures so I believe that

22 there has been sufficient foundation laid.

23         JUDGE ROSAS:  Okay.  The witness has

24 testified that is the date and times reflected

25 on these documents you are just referring to 1

1    through 5 or all of them?

2            MS. HILL:  Yes, sir, that is the

3    question because different color, different

4    person handled them.

5            JUDGE ROSAS:  Sir, I don't recall if

6    this was explained for the record, just to make

7    sure, so the first set of numbers reflect what?

8            THE WITNESS:  That would be the date.

9            JUDGE ROSAS:  And then the second set

10   of numbers?

11           THE WITNESS:  Would be the time.

12           JUDGE ROSAS:  8:08 is the time?

13           THE WITNESS:  No.  The first set of

14   numbers would be the 29th of August.

15           JUDGE ROSAS:  Yep.

16           THE WITNESS:  2019.

17           JUDGE ROSAS:  Okay.  The 29th then 08

18   stands for what?

19           THE WITNESS:  Would be the month of

20   August.

21           JUDGE ROSAS:  You'd have 2019 and then

22   the four numbers that follow that are the time?

23           THE WITNESS:  Correct, sir.

24           JUDGE ROSAS:  Okay.  Counsel, I am

25   going to overrule the objection.  Based on the

1    testimony, there is sufficient foundation

2    indicating that it is more likely than not that

3    these documents were generated by the witness'

4    operation of a camera and their transmission

5    with date stamps -- date and time stamps on them

6    to someone to then produce them.  Like I said,

7    there is sufficient information there for their

8    receipt.

9            If you want to probe it on cross

10   examination further or submit any other proof to

11   show that they are not reliable for whatever

12   reason, you're free to do so as far as the

13   weight, if any, that I should give these

14   documents but I am going to receive Pages 1

15   through 45 of GC 25 over objection.

16                      (GCX 25 received.)

17           MR. WIESE:  So, Mr. Marsolek --

18           JUDGE ROSAS:  Off the record for a

19   minute.

20                  (Whereupon, a short recess was

21                   taken.)

22           JUDGE ROSAS:  Back on.

23            DIRECT EXAMINATION (resumed)

24   BY MR. WIESE:

25       Q.   Mr. Marsolek, I'd like to have you look

1   at starting off with Pages 1 through 4 as a set

2   of General Counsel Exhibit 25.

3       A.   Okay.

4       Q.   Where did you take these pictures from?

5       A.   So I would be on the northwest corner

6   of Fuhrman and the west frontage road facing the

7   Sunbelt shop.

8           MS. HILL:  Excuse me.  Objection to the

9   question.  I see the witness looking at the

10  corner.  Is there a map or something there, sir?

11          THE WITNESS:  There is a map right

12  here.

13          MS. HILL:  Oh, okay.  So he is

14  referencing that.  I didn't know you had

15  requested him to look at that, too.

16          THE WITNESS:  When I took those papers

17  away, that was there.

18          MS. HILL:  Okay.

19  BY MR. WIESE:

20      Q.   Well, the document is in evidence.  If

21  you are -- I mean, if you'd like to indicate on

22  General Counsel Exhibit 16 as you are -- as I

23  asked you where pictures are taken --

24      A.   Sure.

25      Q.   -- you're welcome to do so.  You'll

1    just have to describe it in such a way that it

2    makes sense because nobody is going to be

3    actually seeing -- seeing you point to anything.

4          So can you explain where you took the

5    pictures from in Pages 1 through 4 of General

6    Counsel Exhibit 25?

7       A.   On Pages 1 through 4, I parked my

8    vehicle on the northwest corner of Fuhrman and

9    the west frontage road.  I was facing northwest

10   at the front of the Sunbelt facility in

11   Franksville.

12      Q.   And what is -- what are these pictures

13   showing at the Franksville facility?

14      A.   This picture shows --

15      Q.   If you are referring to a specific

16   picture --

17      A.   We'll start with picture one.  In the

18   center of the picture, there is a skid loader, a

19   Trak skid loader.  It's a piece of heavy

20   equipment.  There is a gentleman there appears

21   to be a Sunbelt employee.  I never seen this

22   individual before.  He was not part of the

23   bargaining unit and he appears to be working on

24   a piece of Sunbelt equipment.  He has a grease

25   gun.

1    Q.    In which picture does he have a grease

2  gun?

3    A.    In picture No. 2 there is a grease gun,

4  in 3 and 4.  The reason he would have a grease

5  gun is to do preventive maintenance on a piece

6  of equipment very similar to what the bargaining

7  unit members would have done while they were

8  working there.

9    Q.    So let's -- The piece of equipment

10  that's being worked on in those pictures, what

11  type of equipment is that?

12    A.    Commonly referred to as a skid loader

13  or a skid-steer.  There is a Trak machine.

14    Q.    I'd like to direct your attention now

15  to on Page 5 of that exhibit.  Where did you

16  take this picture from?

17    A.    This picture again was at the same

18  location on this northwest corner of Fuhrman and

19  the west frontage road also known as 27th

20  Street.  You can see in the center of the

21  picture there the street sign, there is a stop

22  sign there.  It's a dead end road so there is

23  not much traffic there.  Again, facing towards

24  the Sunbelt facility in Franksville.

25    Q.    What led you to take this picture here?

1      A.   So at the last negotiation session or

2   one of the last negotiation sessions Jason

3   Mayfield indicated that this shop would only be

4   an -- it would be something -- a shop of just a

5   small drop-off or a pick-up for just your

6   average household usage.  They wouldn't need

7   drivers, they wouldn't need mechanics anymore

8   and this is the Sunbelt lowboy that picks up

9   heavy equipment.

10     Q.   Was this Sunbelt lowboy at the --

11     A.   Yes.

12          THE REPORTER:  I'm sorry.  Could I get

13   the question repeated, your Honor?

14   BY MR. WIESE:

15     Q.   Was this Sunbelt lowboy leaving the

16   Franksville facility?

17          MS. HILL:  Objection.  Leading.

18          JUDGE ROSAS:  Was this --

19   BY MR. WIESE:

20     Q.   Was this Sunbelt lowboy truck in the

21   picture leaving the facility?

22          JUDGE ROSAS:  Or entering the facility.

23          THE WITNESS:  Yes.

24          MS. HILL:  So objection.  Leading.

25          JUDGE ROSAS:  Which one what was it

1    doing?

2          THE WITNESS:  It was leaving.

3    BY MR. WIESE:

4       Q.   If you go on to General Counsel, or

5    excuse me, Page 6 of General Counsel Exhibit 25,

6    do you recall where you took this picture from?

7       A.   Yes, I do.  This was if Fuhrman were to

8    continue between Sunbelt and the Ahern facility

9    there, it goes back to a dead end road.  That

10   road leads you up to Ahern's facility or down to

11   a fill site where AW Oaks would drop off

12   material to -- they are making a pad back there

13   for another, I don't know, it's another project.

14         Right back there there is an -- it's

15   the back side of Sunbelt facility so I'd be

16   facing -- I would be facing east on the back

17   side of the building.

18      Q.   So you would be -- just to clarify, so

19   you would be facing towards the Interstate 94

20   and Interstate 41 right there?

21      A.   Correct.

22      Q.   Okay.

23      A.   Behind the facility.

24      Q.   And what does this picture show?

25      A.   In this picture, it's a picture of a

1   Sunbelt's mechanics' truck.  I don't know for

2   sure if this is the exact same mechanics' truck

3   that was given to one of our -- or that our

4   bargaining members drove.  It's very similar and

5   at this point in this picture we no longer had

6   mechanics at that facility.

7       Q.   How could you identify it as a

8   mechanic's truck?

9       A.   You can see there are air tanks on the

10  back.  It's got the side compartments for tools

11  and things like that and I have also spoke with

12  the member that used to work on this piece of

13  equipment when he was in that truck when he was

14  a member or still working at the facility.

15  Maybe not this truck but a truck exactly like

16  this truck in the field.

17      Q.   I'd like to have you look at General

18  Counsel's Exhibits 7 through 10.  Actually,

19  start 7 through 9 first of all.  Where did you

20  take these pictures from?

21      A.   This would be at the northwest corner

22  of Fuhrman and the west frontage road facing the

23  Sunbelt facility.

24      Q.   And what do those pictures in General

25  Counsel -- on Pages 7 through 9 of General

1   Counsel's Exhibit 25 what are they showing?

2       A.   These pictures show a Sunbelt lowboy

3   leaving the facility with equipment.

4       Q.   Do you recognize the individual driving

5   the truck in Pages 7 and 8?

6       A.   I do not.

7       Q.   Would you recognize him if it he was a

8   member of the bargaining unit at Franksville?

9       A.   Yes, I would.

10      Q.   What was his truck doing as you were

11  taking these pictures?

12      A.   Still on 7 through 9?  Leaving the

13  facility.

14      Q.   Yes.  7 through 9.

15      A.   Came in, unloaded and left loaded.

16      Q.   And going on to Page 10 of General

17  Counsel Exhibit 25.

18      A.   Okay.

19      Q.   Where did you take this picture from?

20      A.   This was the same location, northwest

21  corner Fuhrman and west frontage road.  These

22  pictures actually kind of go together -- go

23  together.  They were right at the same time.

24      Q.   Okay.  Was this the truck -- which

25  truck came first?

1      A.    The Sunbelt one.   This is a third-party

2   trucking company that they have used in the

3   past.

4      Q.    And what was the truck doing in Page 10

5   of General Counsel Exhibit 25?

6      A.    Leaving the facility loaded with heavy

7   equipment, a job that the bargaining members

8   unit did prior to being laid off.

9      Q.    If you go to Page 11 of General Counsel

10  Exhibit 25, where did you take this picture

11  from?

12     A.    This was at the northwest corner of

13  Fuhrman and the west frontage road facing the

14  front side of the Sunbelt facility.

15     Q.    And what does this picture show?

16     A.    This just shows the activity in the

17  shop and outside the shop that there is actually

18  so much going on, there is things outside.  You

19  can see on the far left side of the picture

20  there appears to be a gentleman inside the shop.

21  I don't know what he is doing but he is a

22  Sunbelt -- I would only assume a Sunbelt

23  employee.  No one else should really be in

24  there.

25              Again, it just shows what's in front

1    and inside the shop, that work is going on.

2    Work that was done prior to the gentlemen being

3    laid off that were part of the bargaining

4    members.

5        Q.   Go to pages 12 and 13 of the same

6    exhibit.  Where did you take these pictures

7    from?

8        A.   This is the northwest corner of Fuhrman

9    and west frontage road facing the Sunbelt

10   facility.

11       Q.   And what do these pictures show?

12       A.   It's just -- it's a Sunbelt state truck

13   in the center of the picture with a piece of

14   Sunbelt equipment on it, on the trailer, on the

15   back coming to the facility, turning onto

16   Fuhrman Street.

17       Q.   Which picture shows the truck coming

18   into the facility?

19       A.   This would be Page 12 of 45.

20       Q.   What about 13 of 45, what does that

21   show?

22       A.   This is a picture of that same vehicle

23   leaving the facility.

24       Q.   Go to 14 and 15 now.  Starting with 14,

25   where did you take this picture from?

1      A.    This is the northwest corner of Fuhrman

2    and west frontage road.

3      Q.    What does this picture show?

4      A.    In the center of the picture there is a

5    piece of equipment that's inside the shop.  In

6    some of these other pictures, if you look at the

7    time stamp, you'll see that these are pictures

8    of the front garage door buildings or front of

9    the garage doors, there is different equipment

10   in front of these doors all the time meaning

11   that things are continuing to take place there

12   whether it's working on or checking in or

13   checking out or refurbishing.

14     Q.    And when you were there, was this

15   machine being worked on?

16     A.    Yes, it was.  If you look at the very

17   bottom of the picture right below that piece of

18   equipment, it appears there is a rag or

19   something, there is some tools around.  People

20   are walking around it at times.

21     Q.    And when you are talking about the

22   piece of equipment, just to clarify, which piece

23   of equipment are you talking about?

24     A.    On Page 14 in the center of the garage

25   door, it's a wood chipper.

1    Q.   Is that the green piece of equipment?

2    A.   Yes, it is.

3    Q.   Going on to General Counsel Exhibit 15,

4  where did you take this picture from?

5    A.   This is the northwest corner of Fuhrman

6  and the west frontage road facing the Sunbelt

7  facility, in the front of side of the Sunbelt

8  facility.  This vehicle left Sunbelt and was

9  heading north on the west frontage road.

10   Q.   Is that a Sunbelt truck towing the

11  equipment there?

12   A.   Yes.  I believe it is.

13   Q.   How can you tell?

14   A.   I have seen this vehicle quite often at

15  the facility through my time coming and going.

16  I believe it's maybe a salesman or somebody that

17  works there.

18   Q.   What type of equipment is that on the

19  back?

20   A.   To tell you the truth, I don't know

21  what it is.  It could be a floor scrubber, but I

22  don't have extensive knowledge of what that is.

23  I know it's used in an industrial setting inside

24  a building.

25   Q.   So I'd like to look at Pages 16

 1    through 20 as a set now.  Where did you take

 2    these pictures from?

 3        A.    This was at the northwest corner of

 4    Fuhrman Street and west frontage road facing the

 5    Sunbelt facility.

 6        Q.    And what are these pictures showing?

 7        A.    Once again, it's showing that there is

 8    work being done inside the Sunbelt facility.

 9    Whether it's preventive maintenance or

10    maintenance or testing or something along those

11    lines with a mechanic very similar to the type

12    of work that the bargaining unit members did

13    while they were employed with Sunbelt.

14            If you look at the time stamps, they

15    are a couple minutes apart to show the movement

16    of equipment and things of that nature.  Not

17    that it just sat there all day.

18            So in the first picture, you can tell

19    that the center of the picture there is a

20    gentleman in a green shirt below the aerial

21    lift, the aerial lift is extended up and that

22    was at 9:35; and then the second picture 9:36,

23    he is still doing the same thing and if you get

24    to Exhibit No. 19 or Page 19, that aerial lift

25    is down a little bit and to 20 it's all the way

1  down to the ground.

2      Q.   Do you recognize the individual in

3  those pictures?

4      A.   I don't know that individual, no, sir.

5      Q.   Is that individual a member of the

6  bargaining unit?

7      A.   No, he is not.  I do know the

8  bargaining members and that's not one of them.

9      Q.   What about in Page 18 of that exhibit,

10 is that a different -- what is that showing?

11     A.   It's just another piece of equipment

12 inside the shop.  There is a gentleman standing

13 there as well.  Sunbelt employee, showing that

14 there is different pieces of equipment inside

15 the shop and different dates at times throughout

16 this process.

17     Q.   I'd like to look at Pages 21 and 22.

18 Where did you take these pictures from?

19     A.   The northwest corner of Fuhrman and the

20 west frontage road facing the Sunbelt facility.

21     Q.   What do these pictures show?

22     A.   Sunbelt lowboy leaving the facility

23 with the truck driver and Sunbelt employee, not

24 one of the bargaining members.

25     Q.   Looking at Page 23, where did you take

1  this picture from?

2      A.   This is the northwest corner of Fuhrman

3  and the west frontage road facing the Sunbelt

4  facility.

5      Q.   On Page 23?

6      A.   Right in the center of the picture is

7  the actual wooden post of the stop sign that's

8  right there.

9      Q.   Okay.  What does this picture show?

10     A.   I believe it to be a salesman's truck

11  or Sunbelt employee's vehicle with a Sunbelt's

12  light plant on the back of it.  Maybe delivering

13  something.

14          JUDGE ROSAS:  A light what?

15          THE WITNESS:  A light plant.  They use

16  it for night work on construction sites,

17  sometimes a generator as well, maybe both.

18  BY MR. WIESE:

19     Q.   What leads you to believe that it's a

20  Sunbelt truck towing that piece of equipment?

21     A.   I have seen this vehicle at the site

22  quite often again as well so it could be a

23  salesman or somebody that works there.

24     Q.   Looking at Page 24 of the exhibit,

25  where did you take this picture from?

1      A.    This was on the west frontage road a

2  little bit down it would be north of Fuhrman

3  Street more directly in front of the facility to

4  get a better shot inside the garage to show that

5  there is work being done on various pieces of

6  equipment inside there.  It's kind of hard to

7  tell but in the center of the picture, I believe

8  there is a mechanic standing there it would be

9  on the left side of that piece of equipment.

10  The hood is kind of angled upward.  Generally

11  the only time you would be doing stuff like that

12  is if you are working on a piece of equipment.

13  It's very vague but it's there.

14      Q.    And where is the individual located in

15  the picture?

16      A.    Just off center of the garage door.

17  There is a set of gauges directly in the center

18  just to the left of those gauges, you can kind

19  of make out a shirt and there is a hand down at

20  the bottom just below that cyclone fence.

21          JUDGE ROSAS:  Can you show me?

22          THE WITNESS:  The top rail of the

23  cyclone fence, here is the gentleman's hand,

24  here's his shoulder, there is his head, there is

25  his hood.

1           JUDGE ROSAS:  Show counsel what you

2    were just referring to.  Turn it around.

3           THE WITNESS:  So right here in the

4    center of the picture, there is the gauges for

5    the piece of equipment, there is the shoulder of

6    the gentleman and his head, here's his hand,

7    here's the hood that's up.  It's hard to tell

8    because of the shadowing but that is what I

9    believe to be the mechanic working on a piece of

10   equipment there.  It was easier to see when I

11   was standing there opposed to the picture or

12   sitting in my car.

13   BY MR. WIESE:

14       Q.   On Page 25, where did you take this

15   picture from?

16       A.   This picture was taken from my vehicle

17   heading south on the west frontage road.  It

18   would be on the northern side of the property

19   heading south on the frontage road looking at

20   their lot.  Their lot where all the equipment is

21   kept.

22       Q.   And what does this picture show?

23       A.   This picture shows it's a tractor

24   loader backhoe of Sunbelt's.  It's a different

25   color from the rest of their equipment.  I did

1   notice that some of the equipment started to

2   show up as different colors but what caught my

3   eye about this picture is back to the date when

4   Jason Mayfield said they were going to move on

5   with the shop to just a will-call facility, no

6   longer a delivery center, he did let us know

7   that it would be small equipment being picked up

8   by homeowners and things like that.

9         Well, this is a very large piece of

10  heavy equipment that needs specialty tooling to

11  pick up. Your average homeowner is not going to

12  be able to pick that piece of equipment up on

13  his trailer in a standard pickup truck. You are

14  going to need extensive knowledge to be able to

15  pick this thing up, tie it down and travel down

16  the road with it.

17     Q. Going on now to Pages 26 through 28 of

18  the exhibit, where did you take these pictures

19  from?

20     A. These pictures would be taken on the

21  back side of the facility facing east towards

22  the interstate. I pulled my vehicle in there

23  and turned around, very similar to where I took

24  the pictures of the parking lot at times to

25  document the vehicles that were there.

1    Q.    And what do these three pictures show?

2    A.    These pictures show in Picture 1 of 26

3  there is a gentleman that's bent down doing some

4  work to a skid loader.  You know, it's a --

5  being in heavy equipment my whole life, it's

6  very similar to a position you would take to

7  grease or work on a piece of equipment, not so

8  much the skid loaders themselves but the

9  excavator in the middle, the yellow one with the

10  large boom on it, again, that's a very large

11  piece of heavy equipment.  That's not something

12  your homeowner is just going to go rent to do

13  some work at his house.  That's pretty big

14  equipment, so, again, I was just documenting

15  that this facility is still continuing to hold

16  on to or carry heavy equipment.

17    Q.    And going on to Page 29 of the exhibit,

18  where did you take this picture from?

19    A.    This was at the northwest corner of

20  Fuhrman and west frontage road.

21    Q.    And what does this picture show?

22    A.    It shows a very large excavator similar

23  to the size of the one in the last picture.  In

24  the center of the picture, you can just make out

25  the boom.  It says Deere on it with the Sunbelt

1   logo.  That's a pretty good size excavator but

2   what caught my eye more so in this picture on

3   the far left you can see the what's known in the

4   industry as a telehandler.  It's a piece of off

5   road.  It's very -- it's an off road forklift

6   basically is what it is.  It's right here.  It's

7   right there on the left.  It's got the rubber

8   tires.

9       Q.  Let the record reflect that the witness

10  is pointing to the piece of equipment with

11  Skytraks?

12      A.  Yep.  Skytraks.  It's a JLG.  It's,

13  again, a very large piece of equipment.

14  Something that a homeowner is not going to come

15  rent for a business.  It's just too big.  I

16  would assume that's about a 10,000 pound machine

17  as far as its lifting capacity.

18      Q.  Looking at Pages 30 through 32 of the

19  exhibit, where did you take these pictures from?

20      A.  This is the northwest corner of Fuhrman

21  and west frontage road as well facing the front

22  of the building.

23      Q.  And what do these pictures show?

24      A.  This is a third party that is

25  delivering equipment for bringing equipment back

1    to the Sunbelt facility in Franksville.  This is

2    also the work that was being done by bargaining

3    unit members when there is no work at the

4    facility.

5         Q.   If you look at Page 33 of the exhibit,

6    where did you take this picture from?

7         A.   This was the northwest corner of

8    Fuhrman and west frontage road facing the front

9    of the Sunbelt facility.

10         Q.   What does this picture show?

11         A.   It's two employees of Sunbelt bringing

12    equipment to the garage doors.  They were

13    bringing things into the shop.  They are not

14    bargaining unit members.  This is the work that

15    the bargaining unit members used to do when they

16    worked there.

17         Q.   Page 24 of 34 of the exhibit, where did

18    you take this picture?

19         A.   This was the northwest corner of

20    Fuhrman and the west frontage road as well.

21         Q.   And what does this picture show?

22         A.   This is documenting another large piece

23    of Sunbelt equipment at the facility.  It could

24    be a mechanic or a truck driver in a piece of

25    equipment, something that Sunbelt employees used

1   to do when they were bargaining unit members

2   there.

3       Q.   Is the individual in that picture a

4   member of the bargaining unit?

5       A.   He is not, no.

6       Q.   And going on to Page 35, where did you

7   take this picture from?

8       A.   This is the northwest corner of Fuhrman

9   and west frontage road.

10      Q.   What does this picture show?

11      A.   It shows the large excavator in the

12  back.  The yellow one on the right-hand side it

13  says Deere across the boom.  There is also a

14  different colored gen -- or air compressor

15  there.  It's not green like the rest of the

16  Sunbelt equipment.  It's orange.  It's just

17  showing the different -- the whole time it's

18  always had green equipment and now they are

19  starting to get into equipment that's no longer

20  green.  It has very small little Sunbelt decals

21  on them.

22      Q.   If you go over to Pages 36 through 39

23  of the exhibit, where did you take these

24  pictures from?

25      A.   This is northwest corner of Fuhrman and

1    the west frontage road as well.  This 36

2    through 39, if we can jump back to 34 all kind

3    of coincide.  That is the excavator that is on

4    the back of this Sunbelt vehicle.

5           If you go to Page 34, that is the same

6    excavator.  They put it on that vehicle.  I

7    watched it happen.  I was there in person to see

8    it.  That's how those pictures kind of go

9    together.

10    Q.   And what was this truck doing Pages 36

11    through 39?

12    A.   The truck -- the Sunbelt truck lowboy

13    entered the facility empty and then loaded that

14    piece of equipment -- those two pieces of

15    equipment on and then left the facility to make

16    a delivery.  As you can see, it requires a large

17    truck and lowboy to haul that type of equipment.

18    It's, again, something you are not going to get

19    from a homeowner.

20    Q.   What's the other piece of equipment on

21    that trailer?

22    A.   On the front side of the truck it says

23    it's a Skyjack.  It's an aerial lift basket used

24    to reach higher elevations like construction

25    sites.  It's much safer than a ladder.

1    Q.    If you go now to General Counsel

2    Pages 40 through 45 of the exhibit, where did

3    you take these pictures from?  Were they all

4    taken from the same location?

5    A.    Yes, sir.  They were both all taken

6    from the northwest corner of Fuhrman and west

7    frontage road.  These pictures all coincide

8    together as well going back to 34.

9    Q.    And can you explain what's going on in

10   these pictures?

11   A.    It's just, again, showing that this

12   third-party company is hauling equipment out of

13   the Sunbelt facility and Sunbelt themselves is

14   hauling equipment out of the facility where we

15   were told that it would no longer happen.

16   That's one of the reasons they didn't need the

17   bargaining members anymore.

18   Q.    And the piece of equipment on the back

19   of the truck, I think the best picture is on

20   Page 43 of the exhibit.  What type of equipment

21   is that?

22   A.    It's a fairly large John Deere

23   excavator.  It's a 135G Trak machine.  It's a

24   fairly good size for construction equipment.

25   It's not the biggest I have seen but it's

1   definitely not a mini excavator as the terms go.

2       Q.   And if you go to Pages 44 and 45 of the

3   exhibit the last two pages --

4       A.   Yes.

5       Q.   -- there is another truck -- there is

6   another -- there is two trucks in the picture,

7   right?

8       A.   Yes.  Both these vehicles came in empty

9   and they left loaded for delivery or wherever

10  they were going.

11      Q.   And the green truck on the right-hand

12  side of the picture, is that the same truck that

13  was shown in on Pages 36 through 39 of the

14  exhibit?

15      A.   Yes.  Yes.

16      Q.   Okay.

17      A.   What happened -- what happened was the

18  green truck left first, came back and then they

19  teemed up and left together.

20      Q.   Mr. Marsolek, do these pictures in

21  General Counsel Exhibit 25 represent all the

22  pictures that you have taken of the Sunbelt

23  facility?

24      A.   No.  They do not.

25      Q.   How many pictures in total have you

1  taken of that facility?

2      A.   Quite a few.  An exact number, probably

3  over a thousand.

4      Q.   And are the pictures in General Counsel

5  Exhibit 25 are they representative of the

6  thousand plus pictures that you have taken at

7  the Sunbelt facility?

8      A.   Yes, sir.

9      Q.   Over what period of time would you have

10 taken those pictures?

11     A.   It would have started shortly after mid

12 August I would say until I could have been out

13 there yesterday taking pictures because it's

14 still going on.  When I drove to my -- I had an

15 appointment in town, I drove past the facility.

16 One of the third-party trucks that was in this

17 picture -- in these pictures was on site getting

18 loaded up.

19     Q.   And when did you do that?

20     A.   This was yesterday.  It was -- what was

21 the date?  Whatever the date was yesterday.

22 We'll say around 3:00 o'clock.

23          JUDGE ROSAS:  Are you testifying to

24 something you saw that we don't have a picture

25 for?

1          THE WITNESS:  That's correct.

2          JUDGE ROSAS:  All right.  Are you going

3    to put a picture in for that?

4          MR. WIESE:  I didn't want to overburden

5    the record with photographs.

6          JUDGE ROSAS:  That's not the best

7    evidence.

8          MR. WIESE:  Okay.  No further

9    questions.

10          JUDGE ROSAS:  Charging Party, anything?

11          MR. RYAN:  No.  No.  Thank you, your

12    Honor.

13          JUDGE ROSAS:  Okay.  Respondent, cross?

14    Let's deal with that at the outset so there are

15    no problems.  Is there an affidavit?

16          MR. WIESE:  Yes.

17          JUDGE ROSAS:  How many?  Off the

18    record.

19               (Whereupon, a discussion was had

20                off the record.)

21          JUDGE ROSAS:  Respondent, cross?

22          MS.  HILL:  Thank you, sir.

23                    CROSS EXAMINATION

24    BY MS. HILL:

25      Q.  Sir, when did you start taking

1   photographs of vehicles entering and leaving the

2   Sunbelt facility at Franksville?

3      A.   It would have been mid August of this

4   year.

5      Q.   Of 2019?

6      A.   Yes, ma'am.

7      Q.   So but you had taken pictures of the

8   facility and vehicles entering and leaving the

9   facility prior to that, correct?

10     A.   I don't believe so, no.

11       MS. HILL:  Okay.  Does he have a copy

12  of this?

13       MR. WIESE:  No.

14       MS. HILL:  May I approach, your Honor?

15  Do you want a copy of this, too, your Honor?

16  BY MS. HILL:

17     Q.   All right.  Would you please review it

18  starts Line 13, Paragraph 4 and continues to

19  Page 2 all the way down to Line 27.

20     A.   Okay.

21     Q.   All right.  Does that refresh your

22  recollection as to when you started taking

23  photographs of vehicles entering or leaving the

24  Franksville profit center location?

25     A.   I did not take a picture of that

1   leaving the Franksville facility.  I took a

2   picture using my cell phone.  It doesn't say I

3   have taken a picture of it leaving or entering

4   the facility in Franksville.  I was taking

5   pictures of it on job sites.

6       Q.   Let's see.  The first line Line 13 at

7   about 12:04 a.m. on April 2, 2019 a third-party

8   truck left the Sunbelt facility --

9            MR. WIESE:  Objection, your Honor.  The

10  time in the affidavit is 10:04 a.m.

11           MS.  HILL:  Excuse me.  10:04 a.m., a

12  third-party truck left the Sunbelt facility.

13  BY MS. HILL:

14      Q.   Are you referring to the Franksville

15  Sunbelt facility?

16      A.   Yes, I am.

17      Q.   I followed that truck in my vehicle.

18  Is that a correct statement, sir?

19      A.   Yes, ma'am.

20      Q.   The truck was a flatbed, a blue flatbed

21  truck, with and then your insert is a Sunbelt

22  aerial lift on it.  Is that a correct statement,

23  sir?

24      A.   Yes, ma'am.

25      Q.   I took a picture of the truck using my

1  cell phone.

2      A.   Yes, I did.

3      Q.   Now, the truck, this third-party truck

4  was leaving the Sunbelt facility, correct, in

5  Franksville?

6      A.   Yes, I did.

7      Q.   And you took a picture of it, correct?

8      A.   Yes, I did.  I didn't take a picture of

9  it leaving the facility.

10     Q.   But --

11     A.   I took a picture of it at some point,

12  yes, I did.

13     Q.   And at what point, sir?

14     A.   When it got to a job site that I could

15  then relay the information to my organizing

16  staff that we could then go banner the facility.

17     Q.   Okay.  But, sir, based on your

18  statement here, it appears that you took a

19  picture of it before the first stop --

20          MR. RYAN:  Object.

21          JUDGE ROSAS:  Hold on.  Finish your

22  question.

23  BY MS. HILL:

24     Q.   Contrary to what you just said, you

25  took the picture prior to the first stop the

1    truck made at a FedEx location, correct?

2              JUDGE ROSAS:  You object to that?

3              MR. RYAN:  I object to the relevance of

4    this line of questioning, your Honor.  I mean,

5    this is an event that occurred in April and

6    Mr. Marsolek testified about photographs --

7              JUDGE ROSAS:  April of --

8              MR. RYAN:  2019.

9              JUDGE ROSAS:  2019.

10             MR. RYAN:  But Mr. Marsolek's testimony

11   here today was about photographs he took after

12   Sunbelt announced the reorganization in August

13   of 2019 so we are three or four months prior to

14   that with this incident.  I don't see the

15   relevance at all here.

16             JUDGE ROSAS:  Okay.  His testimony was

17   that he started taking pictures in mid August

18   of 2019.

19             MS. HILL:  Correct and I am

20   concentrating on this one, your Honor, because

21   of your comments.

22             JUDGE ROSAS:  Yep.  Yep.  And so what

23   you are focusing on here is what's the context

24   of the pictures that he was taking in mid

25   August 2019.  Now, go ahead.

1  BY MS. HILL:

2      Q.   But you were actually taking -- you

3  took at least one photograph prior to mid August

4  of a vehicle leaving the Sunbelt facility,

5  correct?

6      A.   I clearly remember leaving the Sunbelt

7  facility following that truck.  When that truck

8  got to a stop, I would photograph it wherever it

9  was and then I would relay that information to

10  the organizing staff.

11      Q.   Sir, I am not talking about trucks.  I

12  am referring to this particular incident.

13      A.   If you read on Line 13 it says I

14  followed the truck in my vehicle, meaning we

15  were leaving and we proceeded to down the road.

16  Once we proceeded down the road and it got to

17  its first stop is when I would photograph it and

18  document where it was and send it to my

19  organizing staff.

20      Q.   But you said would take a photograph of

21  it at the first stop.

22      A.   Would and did.

23      Q.   But, sir, it's you talk about the

24  picture prior to the first stop.

25      A.   Yes, ma'am.

1          MR. WIESE:  Objection.  Your Honor,

2     this is improper impeachment.  The affidavit is

3     not clear as to when or where.

4          JUDGE ROSAS:  Hold on.  No.  No.  No.

5     Don't.  Let me be clear about because I don't

6     have that before me.

7          MS.  HILL:  Do you want it back?

8          JUDGE ROSAS:  No.  No.  No.  That's for

9     you all to obviously make clear as to what he

10    previously swore to and what he's testified to

11    today.  Now, if there is some inconsistency,

12    someone needs to educate me about that.  You

13    know, you all are objecting to the relevance and

14    I am trying to understand first what counsel is

15    asking the witness.

16          The testimony was, and maybe I needed

17    to have taken more detail, but the testimony was

18    that he started taking pictures in mid

19    August 2019.  Now what is your understanding as

20    to what he testified to?

21          MS. HILL:  That was mid August 2019

22    that he started taking photographs of vehicles

23    entering and leaving the facility.

24          JUDGE ROSAS:  Okay.  Now you need to

25    pose a question that you believe relates to

1  inconsistent prior testimony, okay?  Go ahead.

2  Confront him with that.

3  BY MS. HILL:

4      Q.   Okay.  And based on this affidavit in

5  Paragraph 4, sir, you actually took photographs

6  of vehicles leaving the facility prior to August

7  of 2019, correct?

8      A.   I couldn't tell you if I took pictures

9  of vehicles leaving the facility at that time.

10  I do not remember if I did.  I do remember

11  taking pictures -- actually, I did not take a

12  picture of the vehicle leaving the facility.  I

13  took a picture of it when it got to the job

14  site.

15      Q.   What you are saying, sir, is

16  Paragraph 4 is incorrectly drafted?

17      A.   No, ma'am.  I did take a picture using

18  my cell phone.

19          MR. RYAN:  I think this is

20  mischaracterizing what's in this affidavit.

21          JUDGE ROSAS:  No.  No.  No.  You can

22  characterize it properly from my understanding

23  on your questioning but I'm not exactly sure

24  what's going on here but that's for you guys to

25  clarify if you feel that it's not being

1    correctly interpreted here.  Okay.

2    BY MS. HILL:

3        Q.    All right.  In your testimony on direct

4    examination, sir, and you can put down the

5    affidavit, sir.  Just put it down for the

6    moment, sir.  Thank you.  You indicated that

7    bargaining unit members were terminated in

8    August of 2019; however, they were -- there were

9    two bargaining unit members who were laid off in

10   20 -- in August of 2019, correct?

11       A.    Yes.

12       Q.    Those -- there were only two bargaining

13   unit members at the Franksville profit center in

14   August of 2019, correct?

15       A.    Yes, ma'am.

16       Q.    And both of those individuals were

17   mechanics, correct?

18       A.    Yes, they were.

19       Q.    One was a road mechanic and one was a

20   shop mechanic, correct?

21       A.    Yes.

22       Q.    In August prior to those two

23   individuals being laid off, there were no

24   drivers in the bargaining unit working at Profit

25   Center 776, Franksville, Wisconsin, correct?

1    A.   Correct.

2    Q.   The last two drivers had been

3    terminated earlier in the year because of

4    several serious safety violations, correct?

5    A.   That was the writeup, correct.  Yes.

6    Q.   With respect to the two individuals --

7    the two mechanics who were laid off in August

8    of 2019 by Sunbelt, they were eligible for

9    rehire, correct?

10    A.   I'm sorry.  Could you say that again,

11    please?

12    Q.   The two individuals who were laid off

13    in August of 2019, the mechanics were eligible

14    for rehire, correct?

15    A.   I don't believe they were, no. I don't

16    know that for sure.

17    Q.   Okay.  The first five pictures that you

18    have in Exhibit 25, sir, how much time did you

19    spend observing the Franksville profit center?

20    A.   For the first five pictures?

21    Q.   Yes, sir.

22    A.   I don't have that documented of how

23    long I was there.  My time varied.  Some days it

24    could be as short as 20 minutes and as long as a

25    couple hours.  But I never -- I didn't document

1   the time of how long I was there and what I did

2   and what they did.

3          It was more just I am taking care of

4   some of my business, my day-to-day business in

5   front of this facility and I am documenting what

6   I am seeing through photographs.

7       Q.   And the remaining approximately, yeah,

8   I think you said you had a thousand photographs

9   of the Franksville facility?

10      A.   Roughly, yeah.  I have quite a few.

11      Q.   And all of those photographs were taken

12  from August to the present I believe you

13  testified to, correct?

14      A.   Yes, ma'am.

15      Q.   But the photographs, by the way, you

16  indicated in your affidavit that you used your

17  cell phone.  Did you use your cell phone for all

18  of these photographs?

19      A.   No, ma'am.

20      Q.   What type of camera did you use then

21  sir?

22      A.   It was a digital camera.  My own

23  personal digital camera.

24      Q.   What type of lens?

25      A.   I don't know.  It's a Cannon.

1          THE REPORTER:  I'm sorry, your Honor.

2  I didn't get the ending.

3          JUDGE ROSAS:  Can you repeat that?

4          THE WITNESS:  I am not a photographer.

5  I don't know much about cameras.

6  BY MS. HILL:

7     Q.    And you don't know what this individual

8  in the high viz shirt and vest was doing with

9  this piece of equipment, correct?

10    A.    He was doing preventive maintenance.

11 He is carrying a grease gun in his hand.  There

12 is no reason you'd carry a grease gun and if you

13 actually look at photo No. 3, you can clearly

14 see he is greasing a pin or bushing in that

15 photo.

16    Q.    You can see the pin or the bushing from

17 this photo?

18    A.    With my experience in construction, I'd

19 grease machines on a daily basis, I can tell you

20 there is a pin and a bushing right there and

21 that's what he is doing with that grease gun.

22    Q.    But you didn't talk to this individual,

23 did you?

24    A.    No, ma'am.

25    Q.    Do you know what happened with this

1   piece of equipment after this?

2       A.   No, ma'am.  I do not.

3       Q.   Did you ask anyone at Sunbelt what went

4   on with this piece of equipment after you took

5   the photograph?

6       A.   No, ma'am.  I did not.

7       Q.   Did Sunbelt indicate during the -- Were

8   you present for the negotiations regarding the

9   severance for the two mechanics?

10      A.   Yes, I was.

11      Q.   Was there any discussion about Sunbelt

12  was prevented from performing what you have

13  referred to as PM or preventive maintenance on

14  equipment?

15      A.   In that meeting it was -- I am not sure

16  if that was the meeting or the meeting after it

17  was talked about the reorganization of that shop

18  and we no longer needed to have mechanics on

19  site or drivers, so...

20      Q.   Did that location have any yard

21  associates?

22      A.   I don't know for sure.  It may have.  I

23  don't know.  I am not sure.

24      Q.   Okay.  Looking at --

25      A.   I believe one of our guys was a yard

1    associate, but I don't know that for sure.  If I

2    could review some documents, I could tell you

3    for sure.

4          JUDGE ROSAS:  There is no question.  No

5    question.

6          MS. HILL:  No question pending.

7    BY MS. HILL:

8      Q.    And you stated that Page 5 was you took

9    the picture because is this was a small drop-off

10   or pick-up.  You weren't sure which, correct?

11     A.    I believe I stated that this is just a

12   Sunbelt lowboy coming into the facility after

13   the date of the reorganization.

14     Q.    And this was how many days after the

15   reorganization?

16     A.    I believe the reorganization was

17   sometime in early August and this is late

18   August.

19     Q.    Did the union negotiate how quickly it

20   would take for Sunbelt to move certain pieces of

21   equipment out of the Franksville location to

22   other profit centers in Wisconsin?

23     A.    It did not, ma'am.  No.

24     Q.    Do you know why it did not negotiate

25   that?

 1      A.   I don't know.

 2      Q.   Did you follow this particular vehicle

 3  in Photograph 5 to see where it went?

 4      A.   I do not believe I did.  I couldn't

 5  tell you for sure.

 6      Q.   Do you know if this piece of equipment

 7  had been dropped off by a customer at the

 8  Franksville location?

 9      A.   We are still talking about Picture 5?

10      Q.   Picture 5, sir.  Yes, sir.

11      A.   I don't even see a piece of equipment

12  in Picture 5.

13      Q.   So this is just a flatbed truck that

14  was leaving the profit center?

15      A.   Yes, ma'am.

16      Q.   And it shouldn't -- you are saying that

17  even an empty flatbed truck should not be

18  leaving the profit center?

19      A.   I did not say that, no.

20      Q.   Well, what's wrong with what's

21  happening in this picture?

22      A.   It's just a picture of a Sunbelt lowboy

23  at a Sunbelt shop after the reorganization.

24  That's all it is.

25      Q.   Okay.  Am I looking at the same one you

1   are, 5?

2       A.   Page 5?  Is that what you got?

3       Q.   Okay.  All right.  And so you are

4   saying that this vehicle should not have been

5   leaving this facility?

6       A.   I never said that.

7       Q.   Okay.  Well, what's the significance of

8   it?

9       A.   It's a lowboy at the Sunbelt shop after

10  the reorganization.  That's all it is.  Just

11  taking a picture.  I never said -- I don't

12  believe I ever said it was wrong that it was

13  there.

14      Q.   And why did you take the picture of it?

15      A.   I just took a picture of it.  I wanted

16  to document it was there.

17      Q.   So you don't think there is any issue

18  with having this lowboy at this facility?

19      A.   According to Jason Mayfield, the shop

20  was being reorganized.  It would no longer need

21  drivers or mechanic.  This is a driver for

22  Sunbelt driving a Sunbelt vehicle at the Sunbelt

23  shop that he no longer needs drivers or

24  mechanics at.  That's what I was documenting.

25      Q.   But you don't know what this particular

1  driver was doing at this Franksville location,

2  correct?

3     A.   No, ma'am.  I never had any contact

4  with the driver.

5     Q.   Page 6.

6     A.   Yes, ma'am.

7     Q.   You said that this is a photo of a road

8  tech's truck and you spoke to a member a

9  bargaining unit member regarding this photo; is

10 that correct?

11    A.   No, ma'am.  I said that this is a road

12 tech's truck at the Sunbelt facility at

13 Franksville and if it's not the same, it's very

14 similar to the vehicle that the road tech had

15 when he was a bargaining unit member that worked

16 at that facility; and I spoke with him while he

17 was driving this vehicle prior to being laid off

18 at Sunbelt.

19    Q.   Okay.  So did you verify the number on

20 the door as being the vehicle that he used?

21    A.   I believe I specified in my description

22 of this picture that I wasn't sure if it was

23 exactly this truck but it was a truck very

24 similar.

25    Q.   So just because there is a service

1  truck at this facility that may or may not have

2  been assigned to the profit center, you took a

3  picture of it but you don't know the

4  significance of it?

5      A.    I do know the significance that this

6  picture was taken after the reorganization

7  stated by Jason Mayfield.  It's the same

8  vehicle, maybe not the same number but the same

9  vehicle that one of the bargaining unit members

10 operated when he worked there.

11     Q.    I apologize.  I am confused by what you

12 just said.  You are not sure if this is the

13 exact same truck that the bargaining unit member

14 had at this profit center, correct?

15     A.    Can I clarify?

16          JUDGE ROSAS:  Just answer if you can

17 yes, no or I can't answer that.

18          THE WITNESS:  Can you repeat the

19 question?

20          MS. HILL:  All right.  Court reporter,

21 please.

22              (Whereupon, the record was read

23               as requested.)

24          THE WITNESS:  The vehicle is equipped

25 the exact same way that Kyle or one of the

1  bargaining unit members had when he worked

2  there.  I cannot tell you for sure if the number

3  on the side is the exact same, but it is the

4  exact same setup and same color and same

5  everything in the vehicle that the bargaining

6  unit member once operated when he worked there.

7  BY MS. HILL:

8      Q.   Do you know that this particular

9  service truck was assigned to the Franksville

10  profit center?

11      A.   That, I could not tell you, no.

12      Q.   Did you follow this vehicle entering

13  the profit center?

14      A.   I did not.

15      Q.   Did you follow this vehicle when it

16  exited the facility?

17      A.   I do not believe I did, no.

18      Q.   Okay.  Page -- you testified regarding

19  Pages 7 through 9 as a group.  This was a -- now

20  this particular lowboy was loaded with

21  equipment, correct?

22      A.   You said 7 through 9?

23      Q.   Yes, sir.

24      A.   Yes, ma'am.

25      Q.   And did -- And you did not know this

1   particular individual, correct?

2       A.   Correct.

3       Q.   Did you -- And you didn't follow this

4   particular individual, correct?

5       A.   I did not, no.

6       Q.   So you don't know if this particular

7   driver and Sunbelt vehicle was delivering it to

8   a job site or to another profit center, correct?

9       A.   This particular load, I do not know.

10      Q.   Do you know if equipment on this

11  particular truck, this lowboy, had been dropped

12  off at the Franksville facility by a customer?

13      A.   I don't know, ma'am.

14      Q.   Do you know if Sunbelt customers hire

15  outside haulers to pick up or to return pieces

16  of equipment that they are renting?

17      A.   Are we referring to a picture or just a

18  question?

19      Q.   Just a question, sir.

20      A.   I do not know.

21      Q.   Page 10, you testified this was a

22  third-party truck and third-party driver,

23  correct?

24      A.   Yes, ma'am.

25      Q.   Sunbelt used third-party trucks and

1  drivers prior to the reorganization, correct?

2      A.   That's what I understand, correct.

3  Yes.

4      Q.   And during negotiations, the union

5  never objected to Sunbelt using outside haulers

6  for its equipment, correct?

7      A.   I don't believe we did, no.

8          MS. HILL:  And, your Honor, I want to

9  stop at this point.  I just glanced at the

10  clock.  I know you had a cut off.

11          JUDGE ROSAS:  No.  I'd like you to

12  finish and get through this unless --

13          MR. WIESE:  I mean, I have a lot of

14  work to do tonight with subpoenaed documents

15  but --

16          JUDGE ROSAS:  Off the record.

17              (Whereupon, a discussion was had

18                off the record.)

19          JUDGE ROSAS:  All right.  Back on the

20  record.  All right.  At this point we are going

21  to adjourn until tomorrow at 8:15.  Sir, do not

22  discuss your testimony with anyone, okay?  I'll

23  remind you you are under oath, all right?

24          THE WITNESS:  Yes, sir.

25          JUDGE ROSAS:  Thank you.

1          (Proceedings adjourned at 5:45 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 568

1                        CERTIFICATE

2

3

4

5          This is to certify that the attached

6    proceedings before the National Labor Relations

7    Board (NLRB), Region 18 - Subregion 30, in the

8    matter of SUNBELT RENTALS, INC., Case Nos.

9    18-CA-236643 and 18-CA-238989, in Milwaukee,

10   Wisconsin, on December 17, 2019, was held

11   according to the record, and that this is the

12   original, complete, and true and accurate

13   transcript that has been compared to the

14   recording, at the hearing, that the exhibits are

15   complete and no exhibits received in evidence or

16   in the rejected exhibit files are missing.

17

18          PAULA ERICKSON, CSR, RPR

19          License No. 084-003899

20

21

22

23

24

25

# OFFICIAL REPORT OF PROCEEDINGS

## BEFORE THE

## NATIONAL LABOR RELATIONS BOARD

In the Matter of:                       Case No.:     18-CA-236643
                                                       18-CA-238989

SUNBELT RENTALS, INC.                                 18-CA-247528

                        **Respondent**

**And**

**INTERNATIONAL UNION OF**
**OPERATING ENGINEERS LOCAL 139,**
**AFL-CIO**
                        **Charging Party**

| | |
|---|---|
| **Place:** | **Milwaukee, WI** |
| **Date:** | **12/18/19** |
| **Pages:** | **569-854** |
| **Volume:** | **3** |

## OFFICIAL REPORTERS

**Veritext Legal Solutions**
**Mid-Atlantic Region**
**1801 Market Street – Suite 1800**
**Philadelphia, PA 19103**
**888-777-6690**

1                 UNITED STATES OF AMERICA

2          BEFORE THE NATIONAL LABOR RELATIONS BOARD

3                  REGION 18 - SUBREGION 30

4

5   In the Matter of:              )

6   SUNBELT RENTALS, INC.,         )

7              Respondent,         )

8      and                         )

9   INTERNATIONAL UNION OF         ) Cases 18-CA-236643

10  OPERATING ENGINEERS LOCAL 139 )       18-CA-238989

11  AFL-CIO,                       )       18-CA-247528

12              Charging Party.    )

13

14

15

16          The above-entitled matter came on for

17  hearing pursuant to notice, before

18  ADMINISTRATIVE LAW JUDGE MICHAEL ROSAS, at

19  310 West Wisconsin Avenue, Suite 450W,

20  Milwaukee, Wisconsin, on Wednesday, December 18,

21  2019, at 8:15 a.m.

22

23

24

25

```
 1              A P P E A R A N C E S

 2

 3   On behalf of the General Counsel:

 4     MR. TYLER J. WIESE
       NATIONAL LABOR RELATIONS BOARD
 5     Eighteenth Region
       Federal Office Building
 6     212 3rd Avenue S, Suite 200
       Minneapolis, Minnesota  55401
 7     (952) 703-2891
       tyler.wiese@nlrb.gov

 8

 9   On behalf of the Respondent:

10     MS. PATRICIA J. HILL
       SMITH, GAMBRELL & RUSSELL, LLP
11     50 North Laura Street
       Jacksonville, Florida  32202
12     (904) 598-6100
       pjhill@sgrlaw.com

13

14   On behalf of the Charging Party:

15     MR. PATRICK N. RYAN
       BAUM, SIGMAN, AUERBACH & NEUMAN, LTD.
16     200 West Adams Street, Suite 2200
       Chicago, Illinois  60606
17     (312) 236-4316
       pryan@baumsigman.com

18

19              *    *    *    *

20

21

22

23

24

25
```

```
 1                 I N D E X

 2                                         VOIR

 3   WITNESS              DX  CX  RDX  RCX  DIRE

 4   Daniel Marsolek      --  573 612   --   --

 5   Jason Mayfield       624 692 695

 6                            695

 7   Robert Bogardus, III 698 727 731

 8                            729

 9   Rebel Strohmeyer     733 753

10   Jamie Smith          756 764

11   Ramon Gutierrez      769 781      794

12                            792

13   Katherine Torgerson  797 809 814  817

14                            816

15   Kyle McKellips       819 838  850

16                            851

17

18

19

20

21

22

23

24

25
```

```
 1                 E X H I B I T S

 2

 3   EXHIBIT            FOR IDENTIFICATION   IN EVIDENCE

 4   GENERAL COUNSEL

 5     GCX 26               720                  721

 6     GCX 27               656                  660

 7     GCX 28               660                  661

 8     GCX 29               665                  666

 9     GCX 30               668                  668

10     GCX 31               635                  635

11     GCX 32               636                  638

12     GCX 33               742                  745

13     GCX 40               722                  723

14     GCX 46               747                  747

15     GCX 47               685

16     GCX 53               726                  726

17     GCX 55               686                  687

18     GCX 56               687                  689

19     GCX 57               748                  749

20     GCX 58               689                  691

21     GCX 59               683                  684

22

23

24

25
```

1                P R O C E E D I N G S

2                    (Time Noted:  8:15 a.m.)

3          JUDGE ROSAS:  On the record.  Counsel?

4          MS. HILL:  Thank you.

5           CROSS EXAMINATION (resumed)

6  BY MS. HILL:

7      Q.   Mr. Marsolek, would you, please, look

8  at Page 11 of 45 of Exhibit 25, sir.  Okay.  For

9  this particular photo --

10          MR. WIESE:  One moment, please.

11          MS. HILL:  Oh, I'm sorry.

12          MR. WIESE:  That's okay.  Okay.  I'm

13  ready.

14          MS. HILL:  And, your Honor, you are

15  ready?

16  BY MS. HILL:

17      Q.   All right.  Page 11, sir.

18      A.   Yeah.

19      Q.   Now for this particular photo, you do

20  not see any Sunbelt employees here, correct?

21      A.   No, ma'am.  That's incorrect.  I

22  believe there is a Sunbelt employee on the far

23  left side of the page right near the -- what

24  appears to be an aerial lift and right behind

25  the aerial lift, there looks to be someone

1    standing there in the green shirt.

2        Q.    The has mat -- excuse me -- high vis

3    shirt?

4            JUDGE ROSAS:  Can you point to where,

5    please?

6            THE WITNESS:  It's on the left side of

7    this picture right behind this lift, you can see

8    the high vis shirt there.

9    BY MS. HILL:

10       Q.    Do you know who that individual is?

11       A.    No, ma'am.

12       Q.    Do you know what work is being done?

13       A.    No, ma'am.

14       Q.    Do you know how this equipment got to

15   these bays?

16       A.    No, ma'am.

17       Q.    If I use the expression work bays for

18   these two locations, these two doors that are

19   open, you understand what I am talking about?

20       A.    Yes.

21       Q.    Of all the photographs you took, and

22   granted we only have here 45 of you said

23   approximately a thousand pictures you took,

24   correct?

25       A.    Yes.

1    Q.    Did you take any pictures of the front

2  door or doors of the profit center?

3    A.    I would have to review the pictures but

4  there may be some, yes.

5         MS. HILL:  Okay.  If we could receive

6  those, sir, Mr. Ryan, at some point have them

7  produced based on the subpoena that we had

8  issued.  I think it's broad enough that might

9  cover it but week discuss that.

10        MR. RYAN:  I don't believe it is but we

11  can discuss that off the record.

12  BY MS. HILL:

13    Q.    All right.  Did you get any photographs

14  of customers walking into the front section of

15  the profit center?

16    A.    I wouldn't know if they were customers

17  or employees, no.

18    Q.    All right.  Now, when I say the front

19  part of the profit center, do you know what I am

20  referring to?

21    A.    Yes, ma'am.

22    Q.    Okay.  And do you have R1 in front of

23  you, too.  It's the drawing that Mr. Ervin

24  created.

25    A.    There is a lot of paperwork.

1    Q.    So do you have any photographs and if I

2  may approach the witness, your Honor.  Okay.  Do

3  you have any photographs of this entrance area?

4    A.    In these pictures or all the

5  photographs?

6    Q.    In all of the photographs.

7    A.    Yes.  I am quite sure I do.

8    Q.    Do you have any photographs of the

9  parking lot?

10   A.    Yes, ma'am.

11   Q.    Now the parking lot is sort of a

12  wraparound, correct?

13   A.    Yes.

14   Q.    It would wrap around from approximately

15  where the R is on this exhibit, correct, to

16  approximately the corner of this conference

17  room, correct, permissible parking.

18        Now let the record reflect that the

19  witness is looking at 16.  It's that aerial

20  photograph the Google one, Mr. Wiese?

21   A.    Yes.  You are correct.

22   Q.    Okay.  Now this -- granted this aerial

23  is not accurate, correct, for today's profit

24  center?

25   A.    Things have changed from that picture,

1  yes.

2      Q.   Okay.

3          MR. WIESE:  Your Honor, I am going to

4  object at this point.  I don't think it's

5  appropriate for counsel to be standing over the

6  witness while questioning.

7          MS. HILL:  I was just trying to point

8  to it.

9          JUDGE ROSAS:  Well, you know what,

10 Counsel, Counsel, refer to your R1 so everybody

11 can see.  He can see what you are referring to.

12 I think it's a large enough diagram that

13 everybody can see what we are talking about.

14 BY MS. HILL:

15     Q.   Correct and it's --

16          JUDGE ROSAS:  Do you have it?

17          MS. HILL:  Yes, I do.

18          JUDGE ROSAS:  All right.  So when you

19 refer to it, refer to yours.

20          MS. HILL:  Right.

21          JUDGE ROSAS:  Okay.

22 BY MS. HILL:

23     Q.   So with respect to the front part of

24 the profit center, would you say that that is --

25 the inside part, that is where there is a rental

1  counter?

2      A.   There is a rental counter inside, yes.

3      Q.   Did you take any pictures from the

4  outside of the profit center so you could get

5  pictures of the counter?

6      A.   No.  No, I did not.  It would be very

7  difficult to see inside through the windows with

8  the camera.  It's not like I could take pictures

9  of the counter.

10     Q.   Why not, sir?

11     A.   It's very -- it's pretty dark.

12     Q.   Did you try?

13     A.   No, I did not.  I am just speaking in

14  general terms.

15     Q.   Did you take any photographs of the

16  parked vehicles in the wraparound parking lot

17  for customers?

18     A.   I believe there would be some

19  photographs, yes.  It's not -- Go ahead.  I'm

20  sorry.

21     Q.   I'm sorry for interrupting.  Go ahead.

22     A.   The photos I was taking were very

23  generalized of the facility so there is various

24  pictures of what could be customers' cars or

25  employees' cars, could be customers walking in

1   and out.  I wouldn't know if they are customers

2   or employees.

3       Q.   Did you take any photographs of license

4   plates of vehicles?

5       A.   Yes.

6       Q.   Okay.  And any of the pictures in this

7   Exhibit No. 25, any of these photographs of

8   license plates?

9       A.   I would have to look at all the

10  pictures.  I don't know if there is license

11  plates in there or not.  Actually, in this

12  picture right here No. 11 --

13      Q.   Yes, sir.

14      A.   On the bottom corner of the right side

15  of the page appears to be a front end of a car

16  and that is a license plate.

17      Q.   A legible license plate perhaps I

18  should say that.

19      A.   Right here there is not, no.

20      Q.   And did you in your efforts to take

21  pictures of the vehicles entering, leaving and

22  located at the Sunbelt facility, did you take

23  photographs of any of the license plates so that

24  they would be legible?

25      A.   Not intentionally.  If they were

1    legible they were in the picture legible.  Most

2    of my pictures were pictures of vehicles so

3    there is going to be license plates in the

4    pictures.  Legible or not it depends on the

5    focus and things of that nature.  I didn't

6    intentionally go out to take pictures of the

7    license plates.

8        Q.   For -- If you would turn to Page 12,

9    the questioning for this picture was combined

10   with Page 13 so my questions will be regarding

11   both of them also.

12       A.   Yes, ma'am.

13       Q.   These two photographs, they are of the

14   same vehicle pulling the same piece of

15   equipment?

16       A.   Yes, it appears.

17       Q.   Did you follow this vehicle?

18       A.   I did not, no.

19       Q.   And why not?

20       A.   I didn't feel it necessary to do so at

21   the time.  I was preoccupied with looking at the

22   facility and doing some other things, notes.

23       Q.   So you don't know where this vehicle

24   ultimately ended up?

25       A.   No, ma'am.

1    Q.   Did you direct anyone else from the
2  union to follow this particular vehicle?
3    A.   No.
4    Q.   So for did you check any type of
5  documents to determine whether this particular
6  vehicle that was towing a piece of Sunbelt
7  equipment if it ended up at a customer location?
8    A.   No, ma'am.
9    Q.   Do you know how this piece of equipment
10 ended up at the Franksville profit center?
11   A.   On the back of this truck but other
12 than that, no.
13   Q.   Oh, so you are saying -- I apologize.
14 I didn't realize from your testimony that this
15 piece of equipment was delivered by the same
16 vehicle to the Franksville location and then was
17 taken away by the same vehicle.  Is that what
18 you are saying?
19   A.   If you look at the time stamp, this is
20 the same vehicle, the same day and the same time
21 it entered the property at 10:53 and left at
22 11:31.
23   Q.   So Page 12 was it entering the profit
24 center?
25   A.   Yes, ma'am.

1      Q.   And 11:31 was it leaving the profit

2  center?

3      A.   Yes.

4      Q.   You mentioned a couple times in your

5  testimony the name Ahern.  This particular

6  photograph does it show an Ahern sign?

7      A.   Yes, ma'am.

8      Q.   And it is located right across the

9  street from Sunbelt, correct?

10      A.   Yes.

11      Q.   And the 139?

12           MR. WIESE:  Objection.  Your Honor, I

13  don't know if it's an objection but can we

14  clarify which picture we are talking about here,

15  which number?

16           MS. HILL:  Well, if you'd look at No.

17  12 and if you'd look at No. 13.

18           MR. WIESE:  Okay.

19  BY MS. HILL:

20      Q.   Would you agree the Ahern sign is in

21  both of the photographs that we're discussing

22  right now?

23      A.   Yes.

24      Q.   Okay.  And Ahern is not represented by

25  the 139 as of today?

1    A.    Yes, ma'am.  They are not represented.

2    Q.    Did you take pictures of any of Ahern's

3  vehicles coming and going?

4    A.    In some of my photos there may be Ahern

5  vehicles in that because of the location is so

6  close to the Sunbelt profit.

7    Q.    And did you take photographs and follow

8  Ahern vehicles to see where their equipment was

9  going?

10         MR. WIESE:  Objection, your Honor.

11  Relevance.

12         JUDGE ROSAS:  What's the relevance,

13  Counsel?

14         MS. HILL:  To see if any of the

15  equipment that was going from Ahern was going to

16  the same location that Sunbelt equipment was

17  going to or that the equipment coming back to

18  Sunbelt was then being replaced by the Ahern

19  equipment.

20         JUDGE ROSAS:  Sustained as to Ahern

21  vehicles.

22  BY MS. HILL:

23    Q.    Then looking at Pages 14 and 15.  Both

24  of these pictures you were questioned about it

25  together so I will do the same.  Are you at 14

1  and 15, sir?

2     A.  Yes, ma'am.

3     Q.  The piece of equipment at 14, do you

4  know how this wood chipper got here?

5     A.  I do not know.  I do not see it placed

6  there.

7     Q.  Do you know what happened to this piece

8  of equipment after you took this photograph?

9     A.  I do not know.

10     Q.  Now you mentioned that there was a rag

11  and a tool underneath this wood chipper,

12  correct?

13     A.  Yes.

14     Q.  Did you -- did you see anyone working

15  on this piece of equipment?

16     A.  I do not recall if I saw them working

17  on it that day.

18     Q.  Okay.

19     A.  I do know that I can see the rag,

20  though.  That would indicate that there was work

21  being done.

22     Q.  I believe you thought you said that the

23  red colored object sort of to the left on the

24  ground which is what you deemed to be a rag,

25  correct?

1    A.    Correct.  A shop rag or something of

2  the sorts.

3    Q.    And do you have independent knowledge

4  of seeing anyone from Sunbelt working on this

5  piece of equipment?

6    A.    I don't recall.

7    Q.    And you don't know if someone was just

8  cleaning off some of the wood chips or the dust

9  from this piece of equipment, correct?

10    A.    Yeah.  I don't know for sure, no.

11    Q.    Looking at 15, sir.  You testified that

12  in 15 that this white vehicle was towing a piece

13  of equipment away from Sunbelt, correct?

14    A.    Yes.

15    Q.    But you don't know if it was being

16  driven by a Sunbelt employee, correct?

17    A.    I do not know.

18    Q.    And you don't have a picture -- a

19  legible picture of the driver's -- the license

20  plate on this vehicle, correct?

21    A.    Not in this stack of photos, no.

22    Q.    Oh, do you have a photograph of this

23  particular license plate in with the other

24  photos?

25    A.    There is quite a few photos that in

1    that group of photos there may be a license

2    plate in there, yes.

3         Q.    Okay.  Do you know what -- this is a

4    Ford vehicle, the white vehicle.  Do you know

5    what size it is?  F250?

6         A.    I believe it's an F150.

7         Q.    F150.  So F150 could pull this piece of

8    equipment on a trailer, correct?

9         A.    I would assume so, yes.

10         Q.    And do you know if the outside sales

11    representatives or the profit center manager at

12    Franksville prior to the reorganization had ever

13    used their personal vehicles or a Sunbelt pickup

14    truck to haul any small pieces of equipment to

15    customers or for their own personal use?

16              MR. WIESE:  Objection.  Form.

17              JUDGE ROSAS:  Do you understand that

18    question?  Can you answer it?

19              THE WITNESS:  I believe so, yeah.

20              JUDGE ROSAS:  Okay.

21              THE WITNESS:  Yes.  I do know that they

22    did haul these vehicles -- haul this equipment

23    with their company or personal vehicle for

24    customers or personal use.

25

1  BY MS. HILL:

2      Q.    And Sunbelt employees are permitted to

3  rent equipment from Sunbelt, correct?

4      A.    I'm not sure if that's one of your

5  policies or not.  I don't know.

6      Q.    Do you recall that being discussed

7  during negotiations?

8      A.    Vaguely, yes.  I remember there was

9  talk.

10      Q.    And was there a discussion that

11  bargaining unit members could rent equipment

12  from Sunbelt at a discount?

13      A.    I believe so, yes.

14      Q.    And, sir, I'm sorry.  One more question

15  about 15 and you don't know what this piece of

16  Sunbelt equipment is used for; is that correct?

17      A.    I don't have intimate knowledge of this

18  piece of equipment.  I believe it's some type of

19  industrial floor cleaning device.  Something

20  that's used inside of a large warehouse or

21  something.

22      Q.    But that's just a guess?

23      A.    Yes, ma'am.  It's not -- I don't have

24  much knowledge of that piece, no.

25      Q.    Did you post any of the 1,000 pictures

1   on social media?

2      A.   No, ma'am.

3      Q.   Did you ask anyone from the 139 to post

4   any of the 1,000 pictures on social media?

5      A.   No, ma'am.

6      Q.   Do you know if anyone from the 139

7   posted any of your 1,000 pictures on social

8   media?

9      A.   There may be some of my photos that

10   were posted on the 139 Facebook page of

11   protected activities, yes.

12      Q.   So the 1,000 photographs that you took,

13   included photographs of bannering?

14      A.   Yes.

15      Q.   The 1,000 photographs included pictures

16   of the inflatables?

17      A.   Yes.

18      Q.   The only picketing that was done was in

19   the Chicago district. Do any of your 1,000

20   photographs include the picketing of the Chicago

21   area?

22      MR. RYAN:  I think I want to object on

23   relevance at this point, your Honor.

24      JUDGE ROSAS:  This sounds like a

25   deposition.

1         MS. HILL:  Well, sir --

2         JUDGE ROSAS:  Like a very comprehensive

3   opening deposition.  Counsel, the photographs --

4   you have gotten information from this witness on

5   direct examination, the context of which was

6   photographs allegedly depicting the location,

7   equipment there at, equipment leaving, coming to

8   the location.

9         You have elicited some information

10  regarding additional pictures that the witness

11  has taken and what they might involve.  There

12  was some discussion, I don't know if it was on

13  the record or off the record, about a subpoena

14  that you may have served, whether it encompasses

15  any of that stuff, that's not before me at this

16  time.  You need to start bunkering down on the

17  photographs that are before us.

18        MS. HILL:  Well, your Honor, in our

19  case in chief, we will be asking questions --

20  more questions about those photographs because

21  there is a state law regarding those type of

22  photographs.

23        JUDGE ROSAS:  Okay.  That's your case.

24  What I'd like to do is complete this witness'

25  testimony.

1    BY MS. HILL:

2        Q.    On Page 16 through 20, you were asked

3    about these all at once, sir, all in a group.

4        A.    Yes.

5        Q.    All right.  Page 16, you do not -- you

6    testified you do not know what this gentleman

7    was doing, correct?

8        A.    No, ma'am.

9        Q.    And you don't know for sure if he is a

10   Sunbelt employee, correct?

11       A.    I know he is not a bargaining unit

12   member.

13       Q.    Sir, I believe my question was you do

14   not know if this individual was a Sunbelt

15   employee, correct?

16       A.    Well, if you look on the side of the

17   photograph you can see a Sunbelt shirt on him.

18       Q.    I see a high vis shirt on him, sir.

19       A.    In the center of his back you can see

20   the Sunbelt logo.

21            JUDGE ROSAS:  Can you point to it?

22            THE WITNESS:  Right in the center.

23            MS. HILL:  I see the black spot.

24            THE WITNESS:  Here's a black spot.

25   BY MS. HILL:

1    Q.   You believe it to be the Sunbelt --

2    A.   I know the Sunbelt logo when I see it,

3 so...

4    Q.   But the high vis vest that Sunbelt has

5 that anyone can use if they are on the property

6 has the Sunbelt logo, correct?

7    A.   Yes, ma'am.

8    Q.   Do you know how this piece of equipment

9 arrived into this bay?

10   A.   I don't have firsthand knowledge of how

11 it got there, no.

12   Q.   Do you know where this piece of

13 equipment went after it was in this bay?

14   A.   No, ma'am.

15   Q.   Page 18.  You did not -- do you know

16 how this piece of equipment, the blue genie,

17 arrived in this bay?

18   A.   I do not know.

19   Q.   And you don't know where this piece of

20 equipment went after it was in this bay,

21 correct?

22   A.   No, ma'am.

23   Q.   Now, this picture of a gentleman

24 standing to the left of the piece of equipment,

25 you don't have -- do you have a picture in this

1   group of him doing anything to this piece of

2   equipment?

3        A.   No, ma'am.

4        Q.   Did you personally observe him doing

5   anything to this piece of equipment?

6        A.   I don't recall offhand if he did or

7   not.

8        Q.   And do you recognize the gentleman in

9   the photograph?

10       A.   No, ma'am.

11       Q.   19.  This is a picture of both of the

12  bays you just saw.  There appears to be a person

13  in the window of the door, correct?

14       A.   Yes.

15       Q.   Do you know if that's a Sunbelt

16  employee?

17       A.   I believe that to be the same person

18  that's in picture 20 and in 16 as well.

19       Q.   But sitting here today, do you remember

20  watching him go from the bay to the door or the

21  door to the bay?

22       A.   Yes, ma'am.

23       Q.   So you did see him move between the two

24  locations?

25       A.   Yes.

1    Q.   You didn't question him?

2    A.   I was several hundred feet away from

3    him.

4    Q.   Did you ever question -- speak to him?

5    A.   No, ma'am.

6    Q.   And for our photograph 20, what was he

7    doing to this piece of equipment?

8    A.   At this point, the equipment went from

9    fully extended or at least extended in prior

10   pictures to down on the ground and for him to

11   reach in there and work on something.

12   Q.   You are saying work on something.  Did

13   you see him working on something?

14   A.   Well, he has his hands on the piece of

15   equipment.  He is clearly doing something to it.

16   Working -- what he is doing, I don't know.

17   Q.   Thank you.  That's what I wanted to

18   know, sir.  And did you see him operate this

19   piece of equipment to lower it?

20   A.   Yes.

21   Q.   Do you know what happened to this piece

22   of equipment after it was in this bay?

23   A.   I do not know, ma'am.

24   Q.   You can put those four pages away, sir.

25   And now the next group is 21 to 22.  You stated

1   that this was not a bargaining unit employee in

2   this vehicle, correct?

3       A.   Yes, ma'am.

4       Q.   Who is this person?

5       A.   I don't know.

6       Q.   And let's see.  Was this person

7   entering or leaving the profit center?

8       A.   This person would be leaving the profit

9   center.

10      Q.   Was he hauling any equipment?

11      A.   I do not recall to this day what he was

12  doing.

13      Q.   What type of vehicle was he driving?

14      A.   That would be a Sunbelt semi.

15      Q.   And you don't know -- did you follow

16  this particular vehicle?

17      A.   I did not.

18      Q.   And why not?

19      A.   At the time I must have felt it wasn't

20  necessary.

21      Q.   Why wasn't it necessary?

22      A.   My day-to-day business kept me down in

23  the area.  I didn't need to.

24      Q.   You can put those two away.  The next

25  photograph you had a question about was 23.  Now

1  you refer to the piece of equipment on the

2  that's being hauled by this pickup as a night

3  plant, correct?

4      A.   I believe I called it a light plant.

5      Q.   Light?

6      A.   Yeah.

7      Q.   Sorry.  I couldn't hear you.  Sunbelt

8  lists this piece of equipment as a light tower,

9  correct?

10     A.   I don't know for sure what they

11 classify it as.  In construction we call it a

12 light plant.

13     Q.   Did you see this -- see where this

14 light tower came from?

15     A.   From the Franksville yard.  It was

16 taken out of the backyard and brought up front.

17     Q.   Did you see where it went?

18     A.   After it left my live view from where

19 he was sitting, no.

20     Q.   You didn't follow it?

21     A.   No, ma'am.

22     Q.   Did you request any 139 employee to

23 follow it?

24     A.   I don't have the authority to tell

25 people to do that, but no, I did not.

1          JUDGE ROSAS:  Look, Counsel, I am going

2     to streamline here.  I am going to marshal the

3     evidence to the extent that if you don't ask

4     him, I will as to his methodology with respect

5     to any of these photographs.

6          The sense I get is one where he just

7     took photographs.  He may or may not have

8     followed so you can ask him that.  Right now as

9     to whether he did with respect to any of the

10    vehicles, any of the individuals depicted, any

11    of the vehicles, whether he followed or talked

12    to anybody, all right.  Because --

13         MS. HILL:  I may or may not.

14         JUDGE ROSAS:  It's just a repetitive

15    waste of time to ask it over and over again if

16    it's going to be if there is one answer every

17    time.  Do you understand what I am saying?  So

18    why don't you ask him a general question.

19         MS. HILL:  Sir, I respectfully disagree

20    because you gave Mr. Wiese the opportunity to go

21    through these in some times in groups of two,

22    sometimes groups of four, sometimes a single

23    photograph and he was able to ask his questions.

24         JUDGE ROSAS:  Okay.  You are to ask him

25    that question generally.  If not, I will sustain

1    the objection.  I will give you one shot to ask

2    it in the entirety.  If there is anything that

3    opens up with respect to any of them, I'll give

4    you some leeway but I'd like to streamline this.

5            MS. HILL:  Okay.  What objection was

6    raised by Mr. Wiese.  I'm sorry.  I missed it.

7            JUDGE ROSAS:  No.  Your -- it's my

8    objection.

9            MS. HILL:  Oh, thank you, sir.

10           JUDGE ROSAS:  My objection is that you

11   are asking the same question with respect to

12   every photograph.  There are certain questions

13   that you are asking with respect to every

14   photograph following of, talking to are all the

15   same.  I'd like to know if the answer is going

16   to be the same with respect to all of the

17   photographs so you can just ask the questions

18   you need to ask with respect to the photographs

19   that are of some relevance.

20           MS. HILL:  I'm sorry, sir, which

21   photographs are of some relevance?

22           JUDGE ROSAS:  1 through 45.

23           MS. HILL:  Okay.  Oh so you are saying

24   anything of the remaining 955, I don't ask

25   questions about, correct?

 1          JUDGE ROSAS:  That's not before me.

 2          MS. HILL:  Okay.

 3          JUDGE ROSAS:  That's you all are going

 4   to discuss that.  Maybe that's another

 5   controversy that I'll have to rule on but if and

 6   when it does arise --

 7          MS. HILL:  What I am doing now is

 8   appropriate about these?

 9          JUDGE ROSAS:  I'd like you to ask him

10   one question with respect to whether he spoke to

11   anyone in any of these photographs.

12          MS. HILL:  Okay.

13          JUDGE ROSAS:  And whether he followed

14   any of these vehicles that he took pictures of.

15   These are still pictures.  I think it's a simple

16   question to just ask did you follow or talk to

17   anyone depicted in that picture.

18          MS. HILL:  Pictures.

19          JUDGE ROSAS:  Pictures.  The remaining

20   pictures or if you want to go back to your

21   comprehensive.

22          MS. HILL:  Okay but I may have

23   additional questions.

24          JUDGE ROSAS:  Absolutely.

25          MS. HILL:  All right, sir.

1    BY MS. HILL:

2        Q.    Now, I want you to look at starting at

3    Page 23, sir, and look at 23 through 45 pursuant

4    to the judge's request, did you look to see --

5    did you speak to any of the individuals in the

6    photographs, where there are individuals, and I

7    think the parties will agree that some of the

8    photographs do not have individuals, so look at

9    those and then let me know did you speak to any

10   of the individuals in those photographs?  We are

11   look only looking at 23 through 45.

12       A.    Okay.  Give me a moment, please.  I

13   have a question actually about one.  If I have

14   ever spoke to this person ever or the day of

15   this picture was taken?

16       Q.    Well, your Honor, it's your objection

17   so...

18           JUDGE ROSAS:  Go ahead.  Ask him what

19   picture, sir, are you referring to?

20           MS. HILL:  And you just look at the

21   page number.

22           THE WITNESS:  I can tell you it would

23   be Page 31, a picture of the putters or the

24   third-party lease truck.

25

1  BY MS. HILL:

2      Q.   Is there a person on this one?

3      A.   Well, it's a truck so someone is

4  driving it.

5      Q.   Well, I didn't see it moving.  I

6  thought maybe it's parked.

7      A.   No, ma'am.  The vehicle is being driven

8  by a person.

9      Q.   Okay.

10      A.   I have spoke to there individual in the

11  past.  Not this day in question but I have spoke

12  to him before.

13      Q.   And who is this individual?

14      A.   I don't know his name.  I just ran into

15  him on a job site one day and we got to talking

16  a little bit.

17      Q.   Okay.  And what did you talk about?

18      A.   I just was letting him know that we

19  have a labor dispute with Sunbelt Rentals and I

20  believe I gave him a handbill.

21      Q.   Anything else?

22      A.   That was it.

23      Q.   Did you continue to follow him?

24      A.   The day we spoke, no.  It was by chance

25  that we ran into each other.

1    Q.   Okay.  Continue from 31 on to 45.

2    A.   In picture 45 I have also spoke to this

3  individual in the third-party lease truck and

4  let him know that we did have a labor dispute

5  with Sunbelt Rentals in the past.

6    Q.   You said third-party what?

7    A.   Third-party truck that Sunbelt uses or

8  third-party leased truck.

9    Q.   I'm sorry.

10   A.   However it works.  It's a non-Sunbelt

11 vehicle hauling Sunbelt equipment.  I have spoke

12 to that individual as well in the past.

13   Q.   And when?

14   A.   This goes pretty far back.  I couldn't

15 tell you the time or date.

16   Q.   Was it during the negotiations with

17 Sunbelt?

18   A.   Yes, ma'am.

19   Q.   And did you provide him with a

20 handbill?

21   A.   Yes, ma'am.

22   Q.   Anything else?

23   A.   That's it.

24   Q.   Did you follow him?

25   A.   When there was Sunbelt equipment on his

1  vehicle, yes, I did.  Two job sites.

2      Q.    And those job sites?

3            JUDGE ROSAS:  You are referring to that

4  date that's depicted in that photograph?

5            THE WITNESS:  Not this day, no.

6  BY MS. HILL:

7      Q.    So the two job sites you referenced?

8            MR. WIESE:  Objection.  Relevance.

9            MS. HILL:  He raised it.

10           JUDGE ROSAS:  Sustained.

11  BY MS. HILL:

12     Q.    Sir, with respect to Pages 23

13  through 45, did you follow, and granted I

14  believe your testimony is some of these pieces

15  of equipment were going into the lot, some were

16  going out of the Sunbelt lot?

17     A.    Yes, ma'am.

18     Q.    For 23 through 45, did you follow any

19  of these vehicles that were leaving the lot.  If

20  so, please identify the photograph.

21     A.    All the pictures in this group I

22  believe I did not follow any of these vehicles

23  the day the picture was taken.

24     Q.    So you followed them later?

25     A.    I have followed vehicles that have left

1    that lot.

2        Q.    Okay.  I mean, of the vehicles you took

3    a picture of, did you later follow them?

4        A.    Yes, ma'am.  Maybe not the day of but

5    there was times and dates where I did follow

6    them, yes.

7        Q.    Okay.  Now with respect to 23, you do

8    not know if this is a Sunbelt vehicle that is

9    hauling the light tower, correct?

10       A.    I do know that vehicle is at the profit

11   center quite often.  I don't know if it's a

12   Sunbelt vehicle but it's there very -- quite

13   often on a daily basis or every time I have been

14   there I have noticed it.

15       Q.    But you weren't at the profit center on

16   a daily basis per your testimony, correct?

17       A.    I misspoke with daily.  But any time I

18   would be there I would happen to notice a lot of

19   the same vehicles in the parking lot of Sunbelt.

20       Q.    But many of the Sunbelt employees have

21   the same type of vehicle, correct?

22       A.    Similar, yes.  They are half ton pickup

23   trucks that I have noticed, yes.

24       Q.    And either Ford or Chevy, correct?

25       A.    Not always.

1      Q.    But they are white vehicles, correct?

2      A.    Yes.   They are white.

3      Q.    And for Photograph 24 you used the term

4    "maybe" this is a mechanic, correct?

5      A.    I don't know his official title, yes.

6      Q.    And you are not sure if it's even a

7    Sunbelt employee, correct?

8      A.    I am pretty positive it is but --

9            JUDGE ROSAS:  Again, you are referring

10   to an individual in this photograph?

11           THE WITNESS:  It's real dark inside the

12   shop.

13           MS. HILL:  This is the one you asked

14   him about before, your Honor.

15           JUDGE ROSAS:  Just, again, so he

16   is showing me.

17           THE WITNESS:  In the center of the

18   photo you can see a set of gauges, maybe it

19   appears to be a hand, a shoulder.  It's very

20   dark you can tell the hood on the machine is up

21   as if someone is working on it.

22   BY MS. HILL:

23      Q.    And for Picture 25, you didn't follow

24   any of this equipment going into the Sunbelt

25   lot, correct?

```
 1      A.   No, ma'am.

 2      Q.   And you didn't follow any of the

 3 equipment when it left the Sunbelt lot, correct?

 4      A.   Are we speaking of the day in question

 5 of the photo?

 6      Q.   25, day in question or later.

 7      A.   Yes.  Later I did follow vehicles out

 8 of that lot.

 9      Q.   I am not talking about -- If you look

10 at 25, I see equipment here, correct?

11      A.   Yes.

12      Q.   Did you see any of this equipment

13 getting hauled out?

14      A.   There is a lot of equipment in that

15 photo.  I couldn't tell you if I saw that

16 particular piece being hauled out.  Did I see

17 equipment from Sunbelt be hauled out, yes.  This

18 particular stuff, I don't know.

19      Q.   So you don't know if a customer dropped

20 it off there or was going to pick it up there?

21      A.   I don't.  I believe we have a photo of

22 this tractor loader backhoe being hauled out in

23 one of these.

24      Q.   Okay.  Do you want to look for that,

25 sir?
```

1    A.   Yes.  I could be wrong.  I apologize.

2  On Page 7, it's a smaller version of that piece.

3    Q.   So it wasn't that piece of equipment?

4    A.   No, ma'am.  It was not.

5    Q.   All right.  You mentioned in your

6  direct examination a couple times that you saw

7  several pieces of orange Sunbelt equipment among

8  the green, and I didn't hear any -- your

9  explanation as to why you found that to be

10  significant to testify about it.  Why is that

11  significant to you?

12    A.   It's significant to me because the

13  whole time we have had negotiations and this

14  labor dispute that it's always been green and it

15  was more and more often we started to see some

16  of this stuff that was no longer green.  It was

17  more natural factory colors with Sunbelt logos

18  on them.

19    Q.   But it still has Sunbelt's logos on it,

20  correct?

21    A.   Yes.  It's just not as eye popping to.

22    Q.   Did you ask anyone why it wasn't

23  painted green yet?

24    A.   No.

25         MR. WIESE:  Objection.  Relevance.

1    MS. HILL:  He brought it up on direct.

2    JUDGE ROSAS:  All right.  Do you want

3 to know?  You want to probe the colors?  Go

4 ahead.

5    MS. HILL:  Yes.  He said it was

6 significant.

7    JUDGE ROSAS:  Go ahead.

8    THE WITNESS:  I had a personal feeling

9 that these pieces of equipment were put on job

10 sites to still use Sunbelt equipment yet to

11 somewhat camoflage themselves to the rest of the

12 rental equipment on sites.  This was a personal

13 feeling.

14 BY MS. HILL:

15    Q.   But, again, I believe my question

16 before the objection and everything was did you

17 ask anyone at Sunbelt why the equipment was

18 still orange and not painted green yet?

19    A.   I never spoke to anybody at Sunbelt,

20 no. I can even broaden that.  As of --

21    JUDGE ROSAS:  No question, sir.  No

22 question.

23 BY MS. HILL:

24    Q.   With respect to 26, your testimony was

25 it looks like he is greasing.  Now do you base

1    that on this picture, sir, or something that you

2    witnessed before or after taking this photo?

3        A.    I believe I mentioned greasing on

4    another photo he was working on he was doing

5    something with this piece of equipment whether

6    it was -- he has that stance of working on a

7    piece of equipment.

8        Q.    Well, I apologize.  My notes may be in

9    error but it states looks like he is greasing.

10       A.    He has that position where he is

11   bending down to do some kind of work, whether

12   it's greasing or some type of preventive

13   maintenance, cleaning.  I don't know.  It's not

14   a normal posture to stand over something like

15   that.

16       Q.    And 26, 27, 28 are the same gentleman,

17   correct?

18       A.    Yes, ma'am.

19       Q.    But you extended your lens to get a

20   more close-up photo, correct, by the time you

21   got to 28, correct?

22       A.    Yes.

23       Q.    Okay.  Page 30, and excuse me, I should

24   say this is going to be Group 30 through 32.

25   That's how you were questioned.  And, again, you

 1  have no idea whether a Sunbelt customer had

 2  retained the services of this outside hauler to

 3  deliver this equipment, correct?

 4      A.   No, ma'am.

 5      Q.   Okay.  For photo 33, I said that there

 6  are two Sunbelt employees bringing equipment to

 7  the shop.  That's how you testified.  Are you

 8  referring to the equipment that they are

 9  driving, they are putting it in one of the bays?

10      A.   Yes, ma'am.

11      Q.   Did you see any work being done on

12  those pieces of equipment?

13      A.   No, ma'am.

14      Q.   And, again, now, there is one person in

15  the front vehicle wearing the high vis vest but

16  the other individual is not so you don't know if

17  either of them are Sunbelt employees?

18      A.   No, ma'am.

19      Q.   And Photo 34, you simply stated that

20  this was a large piece of equipment that you did

21  not believe should have been at the Franksville

22  location but did you see what this individual

23  was doing with this piece of equipment?

24      A.   Yes, ma'am, I did.

25      Q.   And what did you see this individual

1   doing?

2       A.   This individual put this piece of

3   equipment onto a lowboy and he left with it.

4       Q.   Is that in another photograph?

5       A.   36.

6       Q.   So this was the later reference when

7   you said 34 was on 36.  Thank you.  And 35 this

8   is where you again made a reference that you saw

9   a piece of orange equipment?

10      A.   Yes.  It's a yellow generator.

11      Q.   All right.  Yellow.

12      A.   Excavator on a lowboy.

13      Q.   For No. 35?

14      A.   Yes, ma'am.

15      Q.   Okay.  How many pieces of green

16  equipment do you see?

17      A.   Would you like me to count?

18      Q.   Do you see more than five?

19      A.   Yes, ma'am.

20      Q.   36 is what you referred to a moment ago

21  and you don't know where it went.  36

22  through 39, correct?

23      A.   Yes.  36 through 39 are all the same.

24      Q.   Now, Photo 40 through 45, you said that

25  this was a third party who was hauling equipment

1  out.  It was 43 is a John Deere excavator.  44

2  through 45 there were two trucks, but you don't

3  know if these were third party being requested

4  by a customer to haul equipment, correct?

5      A.  There is one third-party truck there

6  and, no.  I do not know.  The other vehicle in

7  question is a Sunbelt truck.

8      Q.  And that is in which photograph?

9      A.  44.

10      Q.  And in 45, that's the outside hauler.

11  You mentioned a moment ago that you did speak to

12  him later and the vehicle next to it is it a

13  customer vehicle?

14      A.  I don't know.  I spoke with the

15  gentleman earlier, not later.

16      Q.  Oh, excuse me.  Earlier.

17      A.  Yes.

18          MS. HILL:  No further questions of this

19  witness at this time.  He is going to be

20  testifying in Sunbelt's case in chief.  We

21  reserve the right of course for recross.

22          JUDGE ROSAS:  Okay.  Redirect?

23          MR. WIESE:  May I have a couple

24  minutes, your Honor?  Thank you.

25          JUDGE ROSAS:  Off the record.

1          (Whereupon, a short recess was

2              taken.)

3          JUDGE ROSAS:  Okay.  On the record.

4              REDIRECT EXAMINATION

5   BY MR. WIESE:

6      Q.   Mr. Marsolek, I am going to start by

7   going back to your affidavit on this matter.  So

8   I am going to show you a copy of your affidavit

9   which was discussed earlier during cross.

10          JUDGE ROSAS:  Wait.  What's the

11  question before you show him his affidavit?

12  What are you trying to refresh.

13          MR. WIESE:  I am trying to -- I am

14  trying to clear up the attempted --

15          JUDGE ROSAS:  Ask the question.

16  BY MR. WIESE:

17      Q.   Do you recall being asked -- Thank you.

18          MS. HILL:  Sorry.

19  BY MR. WIESE:

20      Q.   Do you recall from your testimony

21  yesterday being asked some questions about

22  whether you took a picture referred to in your

23  affidavit?

24      A.   Yes.

25      Q.   And do you recall where you were when

1  you took that picture referenced in your

2  affidavit?

3      A.   Yes.

4      Q.   Okay.  And where were you when you took

5  that picture referenced on Page 1 of your

6  affidavit?

7      A.   I took the picture at the FedEx

8  facility when the vehicle got there.  It

9  unloaded and then as it left, so I took a

10  picture of it entering the facility with the

11  machine on it and then when it left with the

12  machine off of it indicating that it was dropped

13  off there.

14      Q.   So I'd like to go back in the pictures

15  now for a second.  If you look at Pages 1

16  through 4 of the exhibit.

17      A.   Okay.

18      Q.   Thank you.  Do these pictures show some

19  work bays?

20      A.   Yes.  In the background there is work

21  bays in the picture.

22      Q.   Okay.

23      A.   Pictures.

24      Q.   And if you go -- and sorry.  I am going

25  to be -- is your document -- is your exhibit in

1    order by page number?

2        A.   I don't know if I somehow end up with

3    two sets here now but I can get it in order here

4    shortly.  There is lots of layers of photos up

5    here, so...

6        Q.   Yeah.  Your Honor, in the interest of

7    time may I approach the witness and help?

8        A.   I got so many pictures up here.

9            MR. WIESE:  Let me --- Can I take --

10           THE WITNESS:  Yeah.  Go ahead.

11           MR. WIESE:  So you need 30 on.

12           THE WITNESS:  I started putting them in

13   two separate piles.  I apologize.

14   BY MR. WIESE:

15       Q.   Do you have other pictures that aren't

16   stacked up there?

17       A.   Do I have other pictures?  Yes.  There

18   are some other pictures here I thought but they

19   are not mine.  It's another pile.  This is 1

20   through -- 1 through 29.  Yep.  Perfect.  Thank

21   you.

22       Q.   Yep.

23       A.   I apologize for that.

24       Q.   Thank you, your Honor.

25           With so if we look at Pages 1 through 4

1  of the exhibit again, do those pictures show

2  work bays?

3       A.   Yes, they do, in the background.

4       Q.   Okay.  And then if you go to Page 11 of

5  the exhibit --

6       A.   Okay.

7       Q.   -- does this picture show those same

8  work bays as was in 1 through 4?  Are these the

9  same work bays?

10      A.   I don't believe they are the same.

11  They are the same building but I believe these

12  are further down the building.  I believe there

13  is if I remember right there is four, maybe five

14  doors.

15      Q.   Uh-huh.

16      A.   These would be the furthest north

17  doors, northeast doors.

18      Q.   And if you go -- if you look a couple

19  pictures down and go to Page 14 --

20      A.   Yes.

21      Q.   -- is the work bay in Page 14 of the

22  exhibit shown in Page 11 of the exhibit if you

23  can tell?

24      A.   Yes, it is.

25      Q.   And which work bay is that in Page 11

1   is shown in Page 14 of the exhibit?

2        A.   Which one is it?

3        Q.   Which work bay from Page 11?  The left

4   work bay or the right work bay is shown in

5   Page 14?

6        A.   Oh, okay.  It's the left work bay from

7   Page 11 in Page 14.  The far left side of the

8   picture.

9        Q.   And if you compare Page 11 with

10  Pages 16 through 20 --

11       A.   16 through 20 you said?

12       Q.   Yes.

13       A.   Okay.

14       Q.   Are these are the work bays in Pages 16

15  through 20 of the exhibit the same as the work

16  bays shown in Page 11, the same work bays?

17       A.   Yes.

18       Q.   If you go to Page 24 of the exhibit.

19       A.   Yes, sir.

20       Q.   Is this -- if you can tell, is this the

21  same work bay as on Page 11 of the exhibit?

22       A.   Yes.  I believe it's one of them.

23       Q.   Going -- You can put Page 11 back in

24  the stack.  You were questioned on cross

25  examination about Page 25 of the exhibits.

1     A.   Yes, sir.

2     Q.   And you had started to answer a

3   question and then there was an objection and you

4   weren't able to finish your answer.  Do you

5   recall what you were going to say at that time?

6     A.   I don't quite remember the question.

7         MR. WIESE:  Okay.  No further

8   questions.

9         JUDGE ROSAS:  Charging Party, anything?

10        MR. RYAN:  No, your Honor.

11        JUDGE ROSAS:  Any follow up, Counsel?

12        MS. HILL:  No, your Honor.  Thank you.

13        JUDGE ROSAS:  Okay.  Sir, you are

14   excused.  Do not discuss your testimony with

15   anyone until you are advised otherwise by

16   counsel, all right?

17        THE WITNESS:  All right.  Thank you.

18        JUDGE ROSAS:  Are you ready with the

19   next witness?

20        MR. WIESE:  Your Honor, before we

21   proceed with the next witness, there are a

22   couple of outstanding subpoena issues that I

23   don't know if you'd like to discuss now or --

24        JUDGE ROSAS:  Okay.

25        MR. WIESE:  Okay.  So with respect to

1    the subpoena documents that I have received,

2    there are several redactions in those documents

3    which I have forwarded Ms. Hill to.  There are

4    also the documents are not organized pursuant to

5    request as was clearly instructed in the

6    subpoenas themselves.  There also appear to be

7    documents missing although it's very difficult

8    to tell, again, because the documents are not

9    organized by request again pursuant to my

10   instructions.

11            And finally, with regard to subpoena

12   production, and I don't know if this is the

13   appropriate form to make this argument or if

14   it's in front of the special master, but there

15   are a large number of documents that are still

16   subject to review and the reason that that

17   review is taking so long is because of the

18   deficiencies in respondents privilege log which

19   are indicated in the first special master's

20   report.

21            And so in light of all of those

22   deficiencies and others which may as of now be

23   undiscovered, I am requesting the -- that -- so

24   these next witnesses that I am calling are all

25   611(c) witnesses.  There is a group of three

1    witnesses.  I am requesting that I be allowed to

2    recall these witnesses on rebuttal to address

3    the deficiencies in respondent's subpoena

4    production to the extent that other documents

5    are produced after I close my case in chief, to

6    the extent that there is ongoing production

7    during the week after I rest my case in chief, I

8    would respectfully request that I be allowed to

9    recall these witnesses and address the

10   outstanding documents with them in order frankly

11   for efficiency so we can get as much done as we

12   can this week.

13           JUDGE ROSAS:  Well, technically what

14   you are talking about is reserving the right to

15   recall them as part of your prime facia case,

16   not on rebuttal.

17           MR. WIESE:  Well, correct.

18           JUDGE ROSAS:  And my understanding is

19   that Judge Steckler has a long way to go --

20           MR. WIESE:  Right.

21           JUDGE ROSAS:  -- in review and I assume

22   there is going to be production requirements on

23   your part or review -- review of the documents

24   on your part and my sense is that's probably not

25   going to be accomplished this week.

```
1              MR. WIESE:  I am trying to get it done

2    this week, your Honor, but --

3              JUDGE ROSAS:  I don't see how she is

4    going to get it accomplished this week.

5              MR. WIESE:  Right, and the reason for

6    that is due to the deficiencies in respondent's

7    privilege log.

8              MS. HILL:  Objection to that.

9              JUDGE ROSAS:  Go ahead counsel.

10             MS. HILL:  First of all, I think Mr.

11   Wiese and I already discussed, I think Mr. Ryan

12   was there, when we were having the discussion I

13   said yes, you can recall Mr. Bogardus, Ms.

14   Strohmeyer and Mr. Mayfield for rebuttal

15   purposes.  We'll have them available.

16             Secondly, the issues -- and I haven't

17   seen an update from the special master whether

18   she did get called for jury duty.  Did anybody?

19   So I don't know if that's the issue.

20             JUDGE ROSAS:  She is continuing on,

21   yeah.

22             MS. HILL:  But she also has -- we

23   provided to her that certain documents have the

24   I guess watermark across them indicating they

25   are privileged -- that Sunbelt considers them to
```

1  be privileged, okay.  That is a clear indication

2  to the special master that they are something

3  that we consider to be subject to as our log

4  says to attorney/client privilege.

5          With respect to the documents that we

6  provided to the NLRB, we gave them today a chart

7  indicating his request with match up.  Now, yes,

8  as I told him yesterday or the day before, I

9  apologize, I can't remember which day, the --

10  there are -- so we don't have any documents.

11  You know, I started off by indicating we don't

12  have an org chart and things like that.  And so

13  I have tried by with this chart to indicate what

14  we were able to find.

15          I did tell him yesterday that I was

16  pleased and surprised to find out that Mr.

17  Mayfield after a lot of searching, and you can

18  cross examine him about his search, was finally

19  able to find the remainder of his negotiation

20  notes.  He also downloaded his calendar.  I

21  understand that the front is very small, but

22  that was the best that he could do in being able

23  to provide that.

24          We have attempted to provide everything

25  and it's not just asking these three witnesses

1    for documents.  We have -- Sunbelt has asked

2    numerous people for documents in order to supply

3    them.  Some of the documents I suspect are --

4    can only be available if other outside entities

5    are subpoenaed for documents but we have tried

6    very, very hard.

7              JUDGE ROSAS:  All right.  So you are

8    going to call these witnesses.

9              MR. WIESE:  Correct, your Honor.

10             JUDGE ROSAS:  Then we are going to this

11   deal with the completion of the document

12   production and see where we are at that point.

13             MR. WIESE:  Correct.  Correct.

14             JUDGE ROSAS:  So --

15             MS. HILL:  Thank you, your Honor.

16             JUDGE ROSAS:  So get on with the

17   witnesses.

18             MR. WIESE:  Okay.  Okay.  I mean --

19             JUDGE ROSAS:  You do the best you can

20   and you'll be entitled to recall them with

21   respect to documents -- with respect to any

22   questions you may have with respect to documents

23   that are subsequently provided.

24             MR. WIESE:  As part of my case in chief

25   or --

 1              JUDGE ROSAS:  As part of your case in

 2     chief.  Right.  I think given that given that we

 3     are not going to be able to get through this, I

 4     mean, there have been other occasions where I

 5     have proceeded into respondent's case and

 6     whether it's retroactively calling witnesses as

 7     part of the General Counsel's case or

 8     interspersing it amongst the Respondent's case

 9     or as part of rebuttal, that's not going to

10     happen this week.  It doesn't make sense to do

11     that since this is not going to get done.

12              I think we can keep it clean.  We can

13     keep it with the General Counsel and Charging

14     Party's cases before the Respondent's case can

15     start.  Okay.  So call your next witness.

16              MR. WIESE:  Okay.  Counsel for the

17     General Counsel calls Jason Mayfield to the

18     stand.

19                    (Whereupon, a discussion was had

20                      off the record.)

21              JUDGE ROSAS:  On the record.  Next

22     witness.

23              MR. WIESE:  Your Honor, General Counsel

24     calls Jason Mayfield to the stand.

25              JUDGE ROSAS:  Sir, can you please raise

1    your right hand?

2                      (Witness sworn.)

3              JUDGE ROSAS:  All right.  Please have a

4    state and spell your name and provide us with an

5    address.

6              THE WITNESS:  Jason Mayfield, 679

7    Heartland Drive, Sugar Grove, Illinois.

8              JUDGE ROSAS:  Spell your name, please.

9              THE WITNESS:  J-A-S-O-N,

10   M-A-Y-F-I-E-L-D.

11                    JASON MAYFIELD,

12   after being first duly sworn, deposeth and saith

13   as follows:

14                  DIRECT EXAMINATION

15   BY MR. WIESE:

16       Q.   Mr. Mayfield, my name is Tyler Wiese.

17   I am an attorney with the National Labor

18   Relations Board.  I am going to be asking you

19   some questions today related to the Franksville

20   facility, Franksville Sunbelt facility.  These

21   are a stack of documents that we'll be going

22   through.  You don't need to look at them right

23   now.  Ill direct your attention when we are --

24       A.   This stuff here, too?

25       Q.   Those documents have been entered into

1  evidence and I will direct your attention to the

2  specific documents when and if we need to.

3  　　　　So, Mr. Mayfield, what is your position

4  with Sunbelt Rentals?

5  　　A.　Regional vice president.

6  　　Q.　How long have you been in that position

7  for?

8  　　A.　A year and ten months now.

9  　　Q.　And what area are you the regional vice

10  president for?

11  　　A.　For Region 9.

12  　　Q.　And what geographic area is Region 9?

13  　　A.　As far west as the Dakotas, as far east

14  as Michigan and everything in between.

15  　　Q.　Is the Franksville facility within

16  Region 9?

17  　　A.　It would be.

18  　　Q.　Okay.　Who reports to you from Sunbelt?

19  　　A.　The district managers do.

20  　　Q.　And how many district managers are

21  there in Region 9?

22  　　A.　Seven.

23  　　Q.　Are you familiar with an individual

24  named Bo Bogardus?

25  　　A.　I am.

1    Q.   Okay.  Did Mr. Bogardus report to you

2  at some point?

3    A.   Yes, he did.

4    Q.   Okay.  And what period of time did

5  Mr. Bogardus report to you?

6    A.   For roughly one year and seven months.

7    Q.   Do you recall what months and year that

8  was?

9    A.   It would have been January 2018 to the

10  first week of July 2019.

11    Q.   Besides the district managers, are

12  there any other individuals who report to you?

13    A.   Yeah.  I have a region director of

14  operations and a regional sales director.

15  That's pretty much it.

16    Q.   Is there anybody from human resources

17  who reports to you?

18    A.   Yes.

19    Q.   Who from human resources?

20    A.   Rebel Strohmeyer.

21    Q.   Has Rebel Strohmeyer been your human

22  resources report during the entire time you have

23  been a regional vice president?

24    A.   Correct.

25    Q.   And what's her position?

```
 1      A.    Regional HR manager.

 2      Q.    Okay.  Who do you report to?

 3      A.    My executive vice president.

 4      Q.    What's that individual's name?

 5      A.    Tim Robinette.

 6      Q.    In your position as regional vice

 7  president, is that the correct title regional

 8  vice president?

 9      A.    Yes.

10      Q.    Okay.  Thank you.  Do you have any

11  involvement in collective bargaining

12  negotiations?

13      A.    I do.

14      Q.    Could you describe that involvement?

15      A.    The primary -- the ultimate decision

16  maker of what we agree to TA through the

17  negotiation.

18      Q.    And have you been involved in

19  collective bargaining negotiations?

20      A.    Yes.

21      Q.    How many?

22      A.    Just over 60.

23      Q.    Have you been involved in the

24  Franksville negotiations?

25      A.    I have.
```

```
 1       Q.   Okay.  In what capacity?

 2       A.   As a regional vice president.

 3       Q.   As a regional vice president in the

 4   Franksville negotiations, what have you been

 5   doing?

 6       A.   Negotiating through a CBA, potential

 7   CBA.

 8       Q.   And what is your role specifically in

 9   the negotiations at the CBA or for the CBA at

10   the Franksville facility?

11       A.   Well, one of the decision makers and

12   the ultimate decider.

13       Q.   So you are the one with the authority

14   to sign off on tentative agreements?

15       A.   Correct.

16       Q.   Okay.  Do you have disciplinary

17   authority as the regional vice president?

18       A.   I do.

19       Q.   Who do you have discipline authority

20   over?

21       A.   The district managers.

22       Q.   As the regional vice president, do you

23   have authority to lay off employees?

24       A.   A district manager.

25       Q.   A district manager has that authority?
```

1     A.    Well, the district manager would be

2   directly responsible for the profit centers,

3   PCs.  The PCs would have direct authority over

4   those employees that work within the PC.

5     Q.    And so if there were a layoff at a

6   profit center, that would be decided at the

7   district manager level?

8     A.    The profit center would be the primary

9   and then obviously an influencer would be the

10  district manager, the DM.

11          JUDGE ROSAS:  You know, Counsel, this

12  is a 611(c) witness, is it not?

13          MR. WIESE:  That's correct.

14          JUDGE ROSAS:  So you are entitled to

15  lead.

16          MR. WIESE:  Okay.  I was establishing

17  the authority for 611(c), but I'll request -- I

18  request to examine this witness under 611(c).

19          JUDGE ROSAS:  It's granted.

20  BY MR. WIESE:

21    Q.    Okay.  So with respect to a layoff at a

22  profit center, what authority does district

23  manager have in that process?

24    A.    The district manager would be brought

25  in to table the discussion on a potential

1  termination and/or layoff.

2      Q.   And then with respect to your role in

3  that process, do you have any role?

4      A.   No.  They could -- If they decided to

5  do a layoff determination, they could make that

6  determination on their own.

7      Q.   So is your testimony that you have

8  never been involved in a layoff or termination

9  decision at a profit center?

10     A.   That would usually be left to a

11  district manager or a PCM and a district

12  manager.

13     Q.   Okay.  That's the usual case but have

14  you ever been involved in those decisions?

15     A.   I have been notified of a decision

16  being made.

17     Q.   Have you made that decision to lay off?

18     A.   I haven't made that decision.

19     Q.   I am going to show you a copy of your

20  affidavit which was given to the NLRB on

21  October 30th of 2019.  I am just going to have

22  you read along silently while I read out loud

23  and confirm if I have read this statement

24  correctly:  So starting on Page 1 lines 9

25  through 10, do you see where I am at?

1    A.    Uh-huh.

2    Q.    And this is your affidavit; is that

3  correct?

4    A.    Yes.

5    Q.    And if you turn to the last page, it's

6  your signature on the document?

7    A.    Yes.

8    Q.    So, again, turning back to the first

9  page and I apologize, lines 9 and 10, I was the

10  sole person who made the decision to reorganize

11  the Franksville and into a will-call facility.

12  I made that decision on August 5, 2019.

13          Did I read that correctly?

14    A.    You did.

15    Q.    Okay.  Thank you.  I am going to

16  retrieve that from you.  And the decision to lay

17  off the bargaining unit employees at the

18  Franksville facility that was made on August 5,

19  2019 to your knowledge?

20    A.    The decision was made on August 5th,

21  the layoff was not.

22    Q.    Right.  The layoff was a couple days

23  after, correct?

24    A.    Correct.  It would have been on the

25  8th.

1    Q.    And we are talking about 2019 here,

2    correct?

3    A.    Yes.

4    Q.    And the layoff at the Franksville

5    facility, the bargaining unit that was being

6    laid off that consisted of mechanics; is that

7    correct?

8    A.    Correct.

9    Q.    And prior to August of 2019, the unit

10   also included some drivers; is that correct?

11   A.    Yes.

12   Q.    Do you recall when the last driver was

13   terminated in the unit?

14   A.    I do not.

15   Q.    Okay.  And the unit -- and I have the

16   unit description up there if you want to

17   reference it.

18   A.    Okay.

19   Q.    That's in General Counsel Exhibit 2 up

20   there.  So it will actually be in a different

21   area.  I can direct your attention to it.

22   A.    That's fine.

23   Q.    Okay.  So the unit consisted of all the

24   mechanics at the Franksville facility, correct?

25   A.    The unit prior to August or the unit at

1  the time of August?

2      Q.   Yes.  Yes.  Yes.  Thank you.  Right.

3  Right.  Right.  Before the elimination of the

4  unit, the unit consisted of all the mechanics at

5  the Franksville facility?

6      A.   Yes.

7      Q.   And all of the drivers at that

8  facility?

9      A.   Prior to the decision on August 5th?

10     Q.   Yes.

11     A.   Yes.

12     Q.   With respect to the layoff or the

13  elimination of unit, why -- why August 5th of

14  2019?

15     A.   Why August 5th?

16     Q.   Yeah.

17     A.   The business at that point was down

18  31 percent from where it was the prior year.

19     Q.   Okay.  And that would be reflected in

20  the documents?

21     A.   Yes.

22     Q.   Like a consolidated income statement?

23     A.   Correct.

24     Q.   Did you review those documents then?

25     A.   I did.

1    Q.   When did you review them?

2    A.   Prior to August 5th.

3    Q.   Can you recall when?

4    A.   Anywhere from a week to four weeks

5    prior to that.

6    Q.   Is it routinely part of your job to

7    review consolidated income statements for

8    facilities?

9    A.   Yes.

10   Q.   Okay.  So if we go to the stack of

11   documents that I had handed you that are paper

12   clipped together and we are going to be going a

13   little bit out of order but if you go to --

14        MR. WIESE:  Actually, your Honor, could

15   we go off the record for a second?

16        JUDGE ROSAS:  Sure.

17            (Whereupon, a short recess was

18             taken.)

19   BY MR. WIESE:

20   Q.   Thank you for your patience, Mr.

21   Mayfield.

22   A.   Yeah.

23   Q.   So if you go through again the stack of

24   documents that I handed you, if you look it's

25   probably about four pages in, there is an E-mail

1    that's marked General Counsel Exhibit 31.

2       A.   Yep.

3       Q.   Do you recognize this document?

4       A.   Yes.

5       Q.   And what is it?

6       A.   This is the framework for generating a

7    layoff letter.

8       Q.   Was this -- were you involved in

9    requesting these layoff letters?

10      A.   I was.

11      Q.   Okay.  And do you recall when you made

12   that request?

13      A.   That would have been on the 7th.

14      Q.   Okay.  But the E-mail --

15      A.   Sorry.  Sorry.  August 5th.

16      Q.   No.  That's okay.

17           MR. WIESE:  I'll offer General Counsel

18   Exhibit 31.

19           MS. HILL:  No objection.

20           JUDGE ROSAS:  General Counsel's 31 is

21   received.

22                         (GCX 31 received.)

23   BY MR. WIESE:

24      Q.   And, Mr. Mayfield, with respect to the

25   upper left-hand corner of that exhibit, it looks

1  like there is a blocked out area.  Do you see

2  that?

3      A.   Yes.

4      Q.   Okay.  Does that appear to be redacted

5  information?

6      A.   I couldn't tell you.

7      Q.   Okay.

8          MS. HILL:  If, your Honor, we have had

9  permission in courts and the NLRB whenever staff

10 members have to print out these documents that

11 have been requested to redact the name of the

12 staff member and that's purely all that it was,

13 so...

14         MR. WIESE:  Okay.  If the record

15 reflects that that's what it is, then I don't

16 have any issue.

17         MS. HILL:  That's what it is, sir,

18 because it then causes more subpoenas for people

19 to show up.

20         MR. WIESE:  Understood.  Understood.

21 BY MR. WIESE:

22     Q.   Mr. Mayfield, I'd like to now direct

23 your attention in General Counsel Exhibit 32.

24     A.   Uh-huh.

25     Q.   Do you recognize these documents?

1      A.   I do.

2      Q.   And were these letters attached to the

3  E-mail in General Counsel Exhibit 31?

4      A.   I would be inferring that based off of

5  what is written but I don't recall.

6      Q.   Okay.  Okay.  But there were layoff

7  letters attached to the E-mail in General

8  Counsel Exhibit 31?

9      A.   You are inferring that and I am

10  inferring it based on what I read but I can't I

11  don't recall, so...

12      Q.   But if you look at general back at

13  General Counsel Exhibit 31, do you see about

14  five lines down it says attachments there?

15      A.   I do.

16      Q.   Okay.  And then it has three layoff

17  letters there; is that correct?

18      A.   Yes.

19      Q.   Okay.  And is it your experience when

20  dealing with Outlook that if an E-mail says

21  attachments and has attachments indicated that

22  there are attachments to that E-mail?

23      A.   Yes.

24      Q.   So going back to General Counsel

25  Exhibit 32, these are the layoff letters for

1   three Sunbelt employees, correct?

2       A.   Yes.

3       Q.   And these three employees all worked at

4   the Franksville facility, correct?

5       A.   Correct.

6       Q.   And they were all part of the

7   bargaining unit?

8       A.   Correct.

9           MR. WIESE:  I'll offer General Counsel

10  Exhibit 32.

11          MS. HILL:  No objection, your Honor.

12          JUDGE ROSAS:  General Counsel's 32 is

13  received.

14                      (GCX 32 received.)

15  BY MR. WIESE:

16      Q.   So there should be a separate stack of

17  documents next to you.  There is going to be a

18  document marked GENERAL counsel Exhibit 17.  I

19  believe I pulled that out and set it to -- Okay.

20  Do you have that document?

21      A.   I do.

22      Q.   Okay.  Do you recognize this document?

23      A.   I do.

24      Q.   Okay.  And was this the letter that you

25  sent to the union indicating the decision you

1    had made to lay off the employees at the

2    Franksville facility?

3        A.    Well, the reorganization of Profit

4    Center 776.

5        Q.    Okay.  And Profit Center 776 is the

6    Franksville facility, correct?

7        A.    Yes but it's the statement of the

8    reorganization, not necessarily the layoffs.

9    The layoffs still had to be negotiated.

10       Q.    Okay.  So it was an open decision in

11   your mind then at that point whether employees

12   were being laid off?

13       A.    It was a statement that we were

14   reorganizing the PC and that's what the

15   conversation would be under negotiations would

16   be on Thursday.

17       Q.    But you had made the decision to lay

18   off employees before that date correct?

19       A.    We had put together the layoff

20   paperwork to have that discussion as part of our

21   negotiation on Thursday.

22       Q.    And you had already drafted the

23   letters?

24       A.    The letters were drafted, correct.

25       Q.    And as we discussed earlier, you gave a

1  sworn statement in which you made the decision

2  to lay off the employees on August 5th, correct?

3      A.   Well, there is a negotiation still has

4  to take place on Thursday, so the letters were

5  prepared for those negotiations to happen on

6  Thursday.

7      Q.   And in your letter, you stated that you

8  were bargaining the impact of that reorganized,

9  correct?

10     A.   Sure.

11     Q.   It doesn't mention anything about

12  bargaining the decision for that reorganization,

13  does it?

14     A.   Bargaining -- it says that bargaining

15  the impact for our reorganization.  What is the

16  impact to the reorganization?

17     Q.   Are you asking me?

18     A.   Well, I mean, that's what it says here.

19  Bargaining the impact for the reorganization so

20  that means on that Thursday, that's when the

21  negotiations take place.

22     Q.   And those negotiations were regarding

23  the impact?

24     A.   Yes.

25          JUDGE ROSAS:  What calendar day is

1  Thursday?

2          THE WITNESS:  It would have been the

3  8th.

4  BY MR. WIESE:

5      Q.   Mr. Mayfield, this exhibit in General

6  Counsel 17, was this was your first

7  communication to the union regarding the

8  reorganization?

9      A.   Correct.

10      Q.   The purpose of this letter was to

11  notify the union of the decision to reorganize

12  the facility, correct?

13      A.   Correct.

14      Q.   And the reorganization of the facility

15  involved the layoff of the bargaining unit

16  employees, is that correct?

17      A.   That would have been part of Thursday's

18  negotiation.

19      Q.   So you had not made the decision to lay

20  off employees, that's your sworn testimony

21  today?

22      A.   Well, the decision was to have a

23  discussion on Thursday about what the

24  reorganization was going to be.

25      Q.   And the reorganization was involving

1  the layoff of bargaining unit parties, correct?

2      A.   That would have been negotiable.

3      Q.   So it was an open topic of negotiation

4  in your view?

5      A.   That was the time to have it.

6      Q.   Despite the fact that you had already

7  requested layoff letters for all of those

8  employees prior to that day?

9      A.   Yes but I think you have to be

10  prepared.  It's negotiations.

11      Q.   And if you look at the layoff letters

12  in General Counsel Exhibit 32, if you look at

13  the first letter, this is a letter directed to

14  Mr. Rivera.  He is a bargaining unit employee,

15  correct?

16      A.   Correct.

17      Q.   And if you go two lines down into the

18  letter it says your last day will be Wednesday,

19  August 7, 2019, correct?

20      A.   Yes.

21      Q.   That indicates that he is being laid

22  off on that day?

23      A.   That's what it would have indicated,

24  yes.

25      Q.   Okay.  And that letter was drafted

1  before August 8th of 2019?

2      A.    Correct.

3      Q.    Mr. Mayfield, in your position as

4  regional vice president, have you laid off

5  employees in the past prior to the Franksville

6  layoffs?

7      A.    Over my career or with Sunbelt?

8      Q.    With Sunbelt.  Thank you.

9      A.    No.

10     Q.    And when you explained the layoff

11  decision to the union at the bargaining on

12  August 8th, you referred to the reorganization

13  as changing the Franksville facility to a

14  will-call facility; is that accurate?

15     A.    A small equipment facility, so

16  will-call and small tool.

17     Q.    How many other will-call or small tool

18  facilities are there in your region?

19     A.    Well, we have smaller locations so

20  there is a handful of smaller locations.

21     Q.    But are those smaller locations are

22  those considered will-call/small tool locations?

23     A.    I wouldn't necessarily define them as

24  will call and small tool locations.

25     Q.    So the Franksville facility is the only

1   will-call and small tool location in your

2   region?

3      A.   Yep.

4      Q.   Does Sunbelt maintain any policies that

5   govern the procedures for layoffs?

6      A.   They would be ran through human

7   resources.

8      Q.   Did you run this layoff through human

9   resources?

10     A.   Yes.

11     Q.   When did you do that?

12     A.   That would have been on the date of the

13   August 5th.

14     Q.   Who did you speak to?

15     A.   Vicky Gibson.

16     Q.   And what do you recall from your

17   conversation with Ms. Gibson?

18     A.   That we would be reorganizing Profit

19   Center 776.

20     Q.   Any written communications with Ms.

21   Gibson?

22     A.   No.

23     Q.   Do you typically communicate with Ms.

24   Gibson in writing?

25     A.   It's a mix.  It's both.

1      Q.   Is there a reason you didn't put these

2  communications with Ms. Gibson in writing?

3      A.   No particular reason.

4      Q.   This was the first time laying off

5  employees at Sunbelt and you didn't feel the

6  need to put any communications with Ms. Gibson

7  in writing?

8      A.   Ms. Gibson is highly professional as a

9  seasoned human resource manager.  I would think

10 something of this nature is probably something

11 she has experienced over the years.

12     Q.   Did you ask her if she had done layoffs

13 in the past?

14     A.   In this specific conversation, I can't

15 say that I asked her.

16     Q.   With respect to a will-call facility --

17 or let's back up for a second.  You talked about

18 the Franksville facility being turned into a

19 small equipment/will-call facility.  Am I

20 referring to that correctly?

21     A.   Yes.

22     Q.   Okay.  And with respect to a small

23 equipment, how would you define that?

24     A.   Anything that could be hauled on an

25 anything less than a CDL required license, so

1  basically a Class C license with a gross vehicle

2  weight rating of less than 10,000 pounds.

3      Q.   Did you communicate this to the union

4  during bargaining?

5      A.   Yes.

6      Q.   And what does a will-call facility mean

7  or was what is the will-call portion of this

8  statement?

9      A.   Are you asking me to define will-call?

10     Q.   With respect to the Franksville

11 facility, yes.

12     A.   So we have a lot of locations that are

13 will-call.  In essence it's where a customer

14 picks up the equipment themselves.

15     Q.   So because you had only small equipment

16 at that facility, there was no need for

17 mechanics, correct?  That's what you told the

18 union?

19     A.   Correct.

20     Q.   What happens if a small piece of

21 equipment breaks down?

22     A.   It would be checked in by one of our

23 customer supporting reps on the counter and if

24 it was any major or extensive repairs, we would

25 probably sell it and just replace it.  And the

1    description I gave was similar to like a Home

2    Depot.

3        Q.   Let's say I was a customer and I called

4    the Franksville facility and I wanted to order a

5    piece of large equipment, okay, how would that

6    situation -- and I am talking again post

7    August 8th post reorganization, how would that

8    situation be handing?

9        A.   I'd be speculating stating that I know

10   specifically how the individual is going to

11   handle it but I would hope --

12            JUDGE ROSAS:  No speculating, sir.

13   Only if you know.

14            THE WITNESS:  I don't know a hundred

15   percent.  I don't know.

16   BY MR. WIESE:

17       Q.   Okay.  Okay.  Did you provide any

18   direction to the employees at the Franksville

19   facility or the managers at that facility as to

20   how to handle orders for large equipment that

21   are made at that facility?

22       A.   Yeah.  Equipment that could be hauled

23   and a gross vehicle rating of less than 10,000

24   pounds is how that store would be equipped.

25       Q.   But let's say I called -- if someone

1  called Franksville and tried to order something

2  that was larger than 10,000 pounds, how would

3  that be handled, do you know?

4  A.  Yeah.  They could take the order and

5  pass it on to another location.

6  Q.  Are there policies governing that?

7  A.  No.

8  Q.  Did you tell anyone that that's what

9  they should do?

10  A.  What I did state is I stated what we

11  could do based on your ability to service the

12  customer at that location.

13  Q.  Who did you state that to?  Do you

14  recall?

15  A.  That would have been stated to the

16  manager at the time.

17  Q.  And who is that individual?

18  A.  Tito.

19  Q.  What was that?

20  A.  Robert.

21  Q.  What's Robert's last name?

22  A.  I can't say his last name now.

23  Q.  Does Rivera sound --

24  A.  Rivera.  Thank you.

25  Q.  Does Mr. Rivera is related to any

1  bargaining unit employees do you know or former

2  in bargaining unit you employees?

3      A.   Yes.

4      Q.   Who is he related to?

5      A.   Mario Rivera.

6      Q.   Thank you.  I'd like to direct your

7  attention now to a document that's already been

8  entered into evidence, general Counsel

9  Exhibit 22.  It's going to look like a picture

10 of the Sunbelt site.

11     A.   So which stack would that be in?

12          MR. WIESE:  May I approach, your Honor?

13 BY MR. WIESE:

14     Q.   So, Mr. Mayfield, there is several

15 different ways to order equipment from Sunbelt,

16 isn't there?

17     A.   Yes.

18     Q.   And one of those ways is by calling the

19 Sunbelt store?

20     A.   Correct.

21     Q.   And another way would be walking into

22 the store and just talking to someone at the

23 counter?

24     A.   Yes.

25     Q.   And then you also have an online

1    ordering portal for equipment; is that correct?

2         A.    Correct.

3         Q.    So if you will direct your attention to

4    General Counsel Exhibit 22, this appears to be

5    and, again, correct me if I am wrong, but there

6    appears to be the online ordering portal for

7    Sunbelt; is that correct?

8         A.    It looks to be that way, yeah.

9         Q.    And at Page 1 of this document, this

10   appears to be the online ordering part portal

11   for the Franksville facility; is that correct?

12        A.    Well, the online portal is for Sunbelt.

13   They would have delineated those for

14   Franksville, yes.

15        Q.    And that's indicated on the document?

16        A.    Oh, there you go.

17        Q.    Yeah.

18        A.    Yep.

19        Q.    Correct?

20        A.    Yep.

21        Q.    In the upper corner of the document

22   middle of the page job site location,

23   Franksville, Wisconsin?

24        A.    Yes.

25        Q.    And information that's indicated in

1  that location on the website, that indicates the

2  site that the equipment is being ordered from,

3  correct?  So if you go over to Page 5 of the

4  document --

5       A.   Okay.

6       Q.   -- so that would be equipment that

7  would be ordered from the Waukesha location; is

8  that correct, Page 5?

9       A.   Yeah.  Based on the top of the page,

10  Waukesha.

11       Q.   Okay.  So Sunbelt rents skid-steers,

12  right?

13       A.   Yes.

14       Q.   And skid-steers break down, don't they?

15       A.   Yes.

16       Q.   And Sunbelt also rent scissor lifts; is

17  that right?

18       A.   Yes.

19       Q.   And that equipment breaks down as well?

20       A.   Yes.

21       Q.   And Sunbelt represents, or excuse me,

22  rents what are called UTVs; is that right?

23       A.   Yes.

24       Q.   Okay.  And what is a UTV?

25       A.   An all-terrain vehicle or utility

1  vehicle.

2      Q.   And those pieces of equipment also

3  break down; is that right?

4      A.   You hope not, but yes.

5      Q.   Sometimes they do, right?

6      A.   Sure.

7      Q.   And after August 8th of 2019, there is

8  still repair work being done on these types of

9  vehicles at the Franksville facility, correct?

10     A.   I don't know.

11     Q.   So you aren't aware of that?

12     A.   No.

13     Q.   Would it surprise you to know that

14 there is repair work being done on those

15 vehicles at that facility?

16     A.   No, because that's within that criteria

17 of under 10,000 pounds.

18     Q.   Do you know who is doing work at that

19 facility?

20     A.   It would either be one of the

21 coordinators, an outside service or a service

22 manager.

23     Q.   So as we discussed a little bit

24 earlier, you met with the union on August 8th

25 to --

 1      A.    Yes.

 2      Q.    -- discuss the reorganization, correct?

 3      A.    Yes.

 4      Q.    And then you met again with the union

 5  on August 16th of 2019; is that right?

 6      A.    Correct.

 7      Q.    And the focus of that meeting on

 8  August 16th was to negotiate severance

 9  agreements for two of the three bargaining unit

10  employees; is that right?

11      A.    Yes.

12      Q.    Okay.  And that was Mr. Romanowski and

13  Mr. McKellips?

14      A.    Yes.

15      Q.    At that meeting on August 16th, there

16  was no discussion about reaching an actual

17  Collective Bargaining Agreement with the union,

18  was there?

19      A.    The store was being reorganized.  They

20  would not have had the quantity of members or

21  quantity of bargaining unit required to have a

22  negotiation.

23      Q.    Okay.  So there were no collective

24  bargaining negotiations that day?

25      A.    Just the negotiating the

1  reorganization.

2      Q.   Okay.  And during that session on

3  August 16th, the parties were able to negotiate

4  some severance agreements; is that right?

5      A.   Yes.

6      Q.   Covering both employees?

7      A.   Yes.

8      Q.   And as of August of 2019, the parties

9  have been attempting to negotiate a Collective

10  Bargaining Agreement for over a year; is that

11  accurate?

12      A.   Yes.

13      Q.   Since May of 2018; does that sound

14  about right?

15      A.   Yes.  Uh-huh.

16      Q.   And between May of 2018 and August

17  of 2019, the parties have met less than once a

18  month on average, does that sound about right?

19      A.   Right at once a month.

20      Q.   So there are I believe 15 months

21  between May of 2018 and August of 2019, does

22  that sound right?

23      A.   Yes.

24      Q.   So you believe that the parties had 15

25  bargaining sessions during that time?

1    A.   If I recall, it was 13 bargaining

2    sessions and the last two were for the

3    reorganization and then in two months we had --

4    in two different months we had two different

5    bargaining sessions.

6    Q.   Right.  But there were other months

7    where you didn't have bargaining sessions,

8    right?

9    A.   Correct.

10   Q.   Do you recall during bargaining the

11   union requesting to meet sooner than what

12   Sunbelt agreed to, correct?  Do you recall that

13   being brought up?

14   A.   I don't recall that.

15   Q.   You never recall the union asking to

16   meet the week following a bargaining session?

17   A.   The week following, I do not.

18   Q.   What about two weeks following a

19   session?

20   A.   I don't.

21   Q.   Do you ever recall the union asking to

22   meet on consecutive days?

23   A.   No.

24   Q.   Do you ever recall any Sunbelt

25   representatives stating that they were too busy

1  to meet more frequently with the union during

2  collective bargaining negotiations?

3       A.   Not too busy.  There were events that

4  were happening, justified events.

5       Q.   When those events were explained -- Or

6  let's back up.

7            Do you recall any of those events being

8  explained at the bargaining table?

9       A.   I do.

10      Q.   I'd like to direct your attention now

11 to a -- to General Counsel Exhibit 27 which is

12 going to be, again, I apologize for jumping

13 around, it should be the top document in the

14 stack of exhibits that I handed to you.  Not

15 that stack.  It's --

16      A.   I got it.

17      Q.   It has a list of names.  Thank you.

18 Thank you.

19           MS. HILL:  Just for purposes of

20 organizing everything, Mr. Wiese, do you want

21 him to start putting what you have handed to him

22 and that you are questioning him about, put that

23 in the big stack now?

24           MR. WIESE:  Sure.  That would be fine.

25           JUDGE ROSAS:  Let's just -- we'll deal

1  with that after he gets off.  It's probably not

2  all in order.

3           MS. HILL:  Okay.

4  BY MR. WIESE:

5      Q.   Mr. Mayfield, do you recognize this

6  document in General Counsel Exhibit 27?

7      A.   I recognize -- excuse me.  I recognize

8  what's here.

9      Q.   Okay.

10     A.   That's the extent of it.

11     Q.   Okay.  Do you recognize the names on

12 this document?

13     A.   I do.

14     Q.   And do you recognize not necessarily

15 this specific document but what this document is

16 showing?

17     A.   Yes.

18     Q.   Okay.  What is that?

19     A.   Hours work.

20     Q.   And is this something that Sunbelt

21 keeps in the regular course of its business?

22     A.   The data frame like this?

23     Q.   Yes.

24     A.   No.

25     Q.   Are you regularly tracking hours?

1    A.   Hours are reviewed by the profit center

2  managers.

3    Q.   So this would be -- If you know, is

4  this a document that a profit center manager

5  would be familiar with?

6    A.   This specific document, no.  Would they

7  be reviewing hours, yes.

8         MR. WIESE:  Well, your Honor, I don't

9  know how you like to handle this issue.

10         JUDGE ROSAS:  This was produced by

11  respondent.

12         MR. WIESE:  Yes.

13         JUDGE ROSAS:  I'll take by counsel what

14  it is, if you know.

15         MS. HILL:  It was in response to a

16  document request for unfair labor practice

17  charges, hence, if you look at the charge number

18  down there.

19         JUDGE ROSAS:  Is it a business record?

20         MS. HILL:  Compilated based on the

21  request from the NLRB for specific information

22  so it was created for purposes of exactly what

23  the NLRB agent wanted.

24         JUDGE ROSAS:  Okay.  So is there any

25  objection to the accuracy of this document, what

1  it purports to represent?

2          MS. HILL:  I trust that my client took

3  the information from the bigger report and

4  accurately put it into this.  This came directly

5  from the client, sir.  Okay.  If you are asking

6  did anyone from my office create it, no, sir.

7          JUDGE ROSAS:  Okay.  Do you know what

8  this chart means.

9          MR. WIESE:  Well, I believe based

10  off --

11          JUDGE ROSAS:  It's an employee roster.

12  What else does it depicts?

13          MR. WIESE:  It depicts hours worked by

14  employees.

15          MS. HILL:  Regular and overtime hours.

16          JUDGE ROSAS:  Totals for the year

17  stated.

18          MS. HILL:  Yes, sir.

19          MR. WIESE:  Up to a certain date.

20          JUDGE ROSAS:  Okay.  I am going to

21  receive this in evidence.

22          MS. HILL:  No objection, your Honor.

23  We produced it for the --

24          JUDGE ROSAS:  I understand.

25          MR. WIESE:  Thank you.

 1                    (GCX 27 received.)

 2    BY MR. WIESE:

 3        Q.   And, Mr. Mayfield, I assume that you

 4    don't know what date this chart runs through, do

 5    you?

 6        A.   I don't.

 7        Q.   In 2019?

 8        A.   I don't.

 9        Q.   Okay.  Thank you.  But you would agree

10    that all of the employees listed on here are

11    bargaining unit employees, is; is that correct?

12        A.   Yes.

13        Q.   And that with the exception of

14    Mr. Richter who was on leave, all of those

15    bargaining unit employees were working overtime

16    in 2019; is that accurate?

17        A.   Yes.

18        Q.   I'd like to go to the next document in

19    the exhibit General Counsel Exhibit 28.  Do you

20    recognize this document?

21        A.   Yes.

22        Q.   And let's start what is this document?

23        A.   This was curated for the NLRB.

24        Q.   Do you know who curated it?

25        A.   This would be curated by a Bo Bogardus.

1          MR. WIESE:  I'll offer General Counsel

2  Exhibit 28.

3          MS. HILL:  No objection, your Honor.

4  It was produced in response again to an unfair

5  labor practice charge.

6          JUDGE ROSAS:  General Counsel 28 is

7  received.

8                    (GCX 28 received.)

9  BY MR. WIESE:

10     Q.   Mr. Mayfield, starting with the

11  left-hand column on this document below PC.

12     A.   Uh-huh.

13     Q.   Do you see that, PC column?

14     A.   Yes.

15     Q.   Okay.  And there is a series of numbers

16  below that PC column 365, 366, et cetera.  Can

17  you identify that those numbers are referring

18  to?

19     A.   The profit center numbers, the

20  locations.

21     Q.   Okay.  And which -- can you identify

22  what Profit Center 365 is?

23     A.   365 is Waukesha.

24     Q.   And what about 366?

25     A.   Madison.

1    Q.   And 367?

2    A.   Green Bay.

3    Q.   776?

4    A.   Franksville.

5    Q.   And 789?

6    A.   Wausau.

7    Q.   And 1006?

8    A.   Fond du Lac.

9    Q.   What information is redacted on this

10   chart?

11   A.   I don't know.

12   Q.   You weren't involved in redacting it?

13   A.   I don't know what was redacted, no.

14        JUDGE ROSAS:  By counsel same at the

15   top next to loss revenue?

16        MS. HILL:  I believe -- I am trying to

17   remember what it is.  I am not going to state

18   for the record what it was but yeah.  This

19   was -- I didn't get an objection from the NLRB

20   when we submitted it to it for the unfair labor

21   practice charge.  It was just some irrelevant

22   information as I recall there, but I am trying

23   to remember.

24        JUDGE ROSAS:  Well, if you can make a

25   note and just get some clarification on that and

1  let counsel know.

2        MS. HILL:  Okay.

3        JUDGE ROSAS:  Obviously not the

4  identifying information.  What the nature of the

5  redaction is.

6        MS. HILL:  Okay.

7  BY MR. WIESE:

8     Q.   Mr. Mayfield, do you know who created

9  this chart?

10     A.   Bo Bogardus.

11     Q.   Did you direct Mr. Bogardus to create

12  this chart?

13     A.   I think it was at the request of the

14  NLRB.

15     Q.   So you believe that the NLRB talked to

16  Mr. Bogardus directly?

17     A.   I don't know the answer to that.

18     Q.   All right.  But with respect to your

19  actions and your knowledge, did you direct him

20  to create this chart?

21     A.   Not that I recall.

22     Q.   Okay.  Do you know when this chart was

23  created?

24     A.   I do not.

25     Q.   Do you know what methodology was used

1    to create this chart?

2        A.    I do.

3        Q.    Okay.  And can you explain why that

4    methodology in the second column loss due to

5    returned equipment only has round numbers?

6        A.    No.

7        Q.    Okay.  And what about with respect to

8    the loss due to 139 threats to customers, can

9    you explain why that customer only has round

10   numbers?

11       A.    The formula in excess, I don't know.

12       Q.    Do you know that formula?

13       A.    I don't.

14       Q.    Do you know how the loss due to 139

15   threats to customers was calculated?

16       A.    From the influence from the Local 139.

17       Q.    But do you know how that influence was

18   translated into the numbers on this chart?

19            MS. HILL:  I am going to object to this

20   line of questioning.  I think the witness made

21   it very clear that Mr. Bogardus created this

22   document.  Perhaps to speed things along, sir.

23            JUDGE ROSAS:  Well, if you don't know,

24   you don't know.

25            MS. HILL:  Okay.  Thank you, sir.  So

1    what's the --

2    BY MR. WIESE:

3        Q.   The question is:  Do you know how the

4    numbers in the chart below the column loss due

5    to 139's threats to customers do you know how

6    those numbers were derived from the threats?

7        A.   Well, those numbers in that column

8    appear ton the total or the aggregate from the

9    prior two columns that's how that number was

10   derived.  So 362,670 plus 314.

11       Q.   Is 787,000?

12       A.   I guess not.

13       Q.   Okay.  To your knowledge, was this

14   chart relied on in any way in transitioning the

15   Franksville facility to a small equipment

16   facility?

17       A.   I don't know.

18       Q.   Did you rely on it in any way?

19       A.   I did not.

20       Q.   I'd like to direct your attention to

21   General Counsel Exhibit 29.  Do you recognize

22   this document?

23       A.   Yes.

24       Q.   Did you create this document?

25       A.   I did not.

1    Q.   Do you know who created it?

2    A.   Bo Bogardus.

3    Q.   Do you know when Mr. Bogardus created

4  the document?

5    A.   I do not.

6    Q.   And what does this document show?

7    A.   Estimated loss rental.

8         MR. WIESE:  I'll offer General Counsel

9  Exhibit 29.

10         MS. HILL:  No objection, sir.

11         JUDGE ROSAS:  General Counsel's 29 is

12  received.

13                   (GCX 29 received.)

14  BY MR. WIESE:

15    Q.   Do you have any idea of what period of

16  time these estimated losses and forecast losses

17  are over?

18    A.   I don't.

19    Q.   Is this a document that Sunbelt keeps

20  in the regular course of its business?

21    A.   Not that I'm aware of.

22    Q.   Can you explain the difference between

23  the EST dollars lost column and the forecast

24  lost dollars column?

25    A.   Yeah.  Estimated dollars lost are from

1  the equipment being called offline at that time,

2  at that moment in time and the forecasted lost

3  is the multiple from when it was called off to

4  the expected length of rental.

5      Q.   Can you explain why all the numbers in

6  this chart are round numbers?

7      A.   I cannot.

8      Q.   And if you add up all the estimated

9  dollars lost in this chart, what do you get to

10 in that column?

11     A.   66,000 roughly.

12     Q.   Okay.  Right.  And if you add up the

13 forecast dollars lost, approximately what do you

14 get to that that column?

15     A.   355,000.

16     Q.   You'd agree with me that $66,000 is

17 quite a bit less than a million dollars; is that

18 correct?

19     A.   Sorry.  455,000.

20     Q.   Okay.  With respect to the estimated

21 loss column you'd agree with me that 66,000 is

22 significantly less than a million dollars; is

23 that right?

24     A.   Yes.

25     Q.   Okay.  And even $300,000, there is a

1  significant difference between that number and a

2  million dollars; isn't that right?

3      A.  300,000 to a million, yes.  Yes.

4      Q.  I think we'd all agree with that.  I am

5  going to direct your attention now to General

6  Counsel Exhibit 30.  Mr. Mayfield, do you

7  recognize this document?

8      A.  Yes.

9      Q.  Okay.  And this is the consolidated

10  income statement for the Franksville facility,

11  correct?

12      A.  Yes.

13      Q.  And this document shows the money

14  coming into the Franksville facility, correct?

15      A.  Yes.

16      Q.  Okay.  It doesn't show the expenses for

17  that facility, does it?

18      A.  Correct.

19          MR. WIESE:  Okay.  I'll offer General

20  Counsel Exhibit 30.

21          MS. HILL:  No objection, sir.

22          JUDGE ROSAS:  General Counsel's 30 is

23  received.

24                          (GCX 30 received.)

25

 1  BY MR. WIESE:

 2     Q.   So this is the -- this is a document

 3  that you did rely on in making the decision to

 4  transition Franksville to a will-call facility,

 5  small equipment facility?

 6     A.   This specific document, no.

 7     Q.   Okay.  Did you rely on any consolidated

 8  income statement to making that decision?

 9     A.   Yes.

10     Q.   Okay.  So, and I understand that this

11  goes past the date of August of 2019, but did

12  you rely on a document similar to this through

13  August of 2019 in making that decision?

14     A.   Yes.

15     Q.   All right.  So I want to go through the

16  items on the left-hand side of the document

17  below revenue, okay?  Okay.

18     A.   Okay.

19     Q.   So rental revenue, what does that

20  display?

21     A.   What the customer was invoiced for.

22     Q.   And then rerental income, what does

23  that represent?

24     A.   That's if we have to source a piece of

25  equipment from a third party.

1    Q.   And transportation?

2    A.   What we would charge for delivery and

3  pick-up.

4    Q.   And the transportation surcharge?

5    A.   That's a percentage of the

6  transportation.

7    Q.   Is there a reason that that's broken

8  up?

9    A.   It's a surcharge based on what we

10  charge for delivering and pick up.  It's an

11  additional charge.

12    Q.   And then environmental?

13    A.   It's what we charge for environmental

14  use of the equipment.

15    Q.   Can you explain any more, like when you

16  say environmental use?

17    A.   Sure.  Whether does it accumulate from

18  the waste when you wash a piece of equipment or

19  the disposal of oil, things of that nature.

20    Q.   And the rental protection plan?

21    A.   Yes.  It's what covers the customer in

22  the event of there being an incident.

23    Q.   And then fuel?

24    A.   What's consumed at the time of rental

25  with the fuel.

 1     Q.    And what about E&D labor?

 2     A.    Erection and dismantling.

 3     Q.    So how does that work out in practice?

 4     A.    It doesn't for these locations.  That's

 5  for scaffolding.

 6     Q.    Okay.  Thank you.  And then below that,

 7  the total rental number so that is the sum of

 8  all of those items that we just discussed,

 9  correct?

10     A.    Correct.

11     Q.    Okay.  And if we go down to the second

12  -- and so the numbers in the first row of this

13  chart below May 2018, it says actual; June 2018

14  actual, do you see all of that?

15     A.    Yes.

16     Q.    So those represent that's the actual

17  revenue coming into the Franksville facility?

18     A.    Yes.

19     Q.    And then the column, or excuse me, the

20  row below that has a budget, do you see that?

21     A.    Yes.

22     Q.    Okay.  And so the budget that's

23  indicated there, that's the -- is that the

24  projected numbers then for the facility in a

25  given month?

1      A.    Not projected, budgeted.

2      Q.    Okay.  And are you the one who creates

3  those budgets?

4      A.    No.

5      Q.    Who does create those budgets?

6      A.    The profit center manager.  The PCM.

7      Q.    Do you provide direction to PCMs on how

8  to create those budgets?

9      A.    That direction would come from the

10  district managers.

11      Q.    And do you provide direction to

12  district managers on how to direct their PCMs on

13  how to create budgets?

14      A.    Not to direct their PCMs.  For their

15  districts, for their district roll out.  They

16  have multiple profit centers in the district.

17      Q.    And so your role in this budgeting

18  process would be to monitor the budgets of the

19  district managers as opposed to the budgets of

20  the specific profit centers?

21      A.    Correct.

22      Q.    What is Sunbelt's fiscal year?

23      A.    May 1st through the end of April.

24      Q.    When are these budgets finalized?  So

25  for the fiscal year 2020, would that be from

1  March of 2019 to, or excuse me, from May 1st of

2  2019 to April 30th of 2020; is that an accurate

3  characterization?

4      A.   Yes.

5      Q.   So for the budget for the fiscal year

6  2020, when is that budget created?

7      A.   That would have been created between

8  February and March.

9      Q.   Of 2019?

10     A.   Correct.

11     Q.   And then the budget numbers for the

12 year 2019, or excuse me, for the fiscal year

13 2020, those would be starting in May of 2019 on

14 this chart, correct?

15     A.   Correct.

16     Q.   So the budgeted number for May of 2019

17 the total rental revenue for that month is

18 $750,914; is that accurate?

19     A.   Correct.

20     Q.   The actual revenue in May of 2018 was

21 only and, again, I am going to be jumping around

22 a little bit so let me know if you get lost at

23 all, but the actual revenue for May of 2018 was

24 only $576,000; is that correct?

25     A.   For total rental?

1   Q.   Yes.

2   A.   Well, from May '19 would have been

3   49,501.

4   Q.   Yeah, but I am talking back to May

5   of 2018.

6   A.   So May of 2018, 576,268.

7   Q.   Okay.  Can you explain why the budget

8   for May of 2019 is 50 percent -- it appears to

9   be a large percentage higher than the actual

10  revenue for May of 2018?

11  A.   Yeah.  That was the influence of on the

12  market for the local trades not to use us.

13  Q.   And were the trades bannering in May

14  of 2018?

15  A.   The local was bannering in the street.

16  Q.   Are you certain of that?

17  A.   In May of 2019?

18  Q.   I'm talking about -- sorry.  I know we

19  are jumping around, so I am comparing the

20  May 2018 to the budget in May of 2019.

21  A.   Okay.

22  Q.   Okay.  And so is it your testimony that

23  the -- that the union's campaign against Sunbelt

24  was occurring in May of 2018?

25  A.   Can you ask that again?

```
 1      Q.   To your knowledge, was the union's
 2  campaign against Sunbelt was that active in May
 3  of 2018, 2018?
 4      A.   No.
 5      Q.   Okay.  That campaign didn't begin until
 6  2019, correct?
 7      A.   Yes.
 8      Q.   So, again, can you explain why the
 9  budget numbers for May of 2019 are so much
10  higher than the actual numbers for May of 2018?
11      A.   That was the expectations.  The market
12  was growing.
13      Q.   Do Sunbelt facilities always budget
14  such large year over year increases in your
15  experience?
16      A.   It didn't seem unusual.  We did
17  $745,000 in August of 2018.
18      Q.   So 745,000 -- where are you deriving
19  that number from?
20      A.   744,910 in August 2018 was the budget.
21      Q.   Was the budget.  Correct.  And then the
22  actual was only 658,290; is that right?
23      A.   Uh-huh.
24      Q.   And as you testify today, can you
25  explain how the budget numbers for fiscal year
```

1  2020 were created for Profit Center 776 in

2  Franksville?

3      A.   Yeah.  Budgets would be derived by

4  taking the amount of cap ex that was expected as

5  well as the market influence of growth and then

6  coming up with an expected rental achievement.

7      Q.   What is cap ex?  I am not familiar with

8  that term?

9      A.   Capital expenditures.

10     Q.   Yeah.  Okay.  Thank you.  So the

11 bargaining unit employees as we were discussed

12 were laid off in August of 2019; is that

13 correct?

14     A.   Yes.

15     Q.   And I want to look at -- I want to

16 compare the actual numbers at the top of the

17 column here.  So if you look at the total rental

18 for June of 2018, that's $565,000 approximately,

19 correct?

20     A.   Yes.

21     Q.   Okay.  And then if you compare that to

22 June of 2019, the actual revenue was $586,684;

23 is that correct?

24     A.   Yes.

25     Q.   And you'd agree with me that the

1    June 2019 number is greater than the June

2    of 2018 number, correct?

3        A.    Yes.

4        Q.    And the same is true if you compare the

5    July 2018 number to the July 2019 number; isn't

6    this accurate?

7        A.    Yes.

8        Q.    Those are the months leading up to the

9    time when you made the decision to terminate the

10   two bargaining unit employees, correct?

11       A.    Yes.

12       Q.    And at the time in June of 2019, there

13   were actually less bargaining unit employees

14   employed at the Franksville facility than there

15   were in June of 2018; is that correct?

16       A.    Yes.

17       Q.    And this chart doesn't show labor costs

18   in any way for Sunbelt, does it?

19       A.    No.

20       Q.    So the Franksville -- You can set that

21   chart aside, Mr. Mayfield.  So the Franksville

22   facility, do you recall when that was opened?

23       A.    March 2014.

24       Q.    Do you know why the Franksville

25   facility was opened?

1      A.   The Franksville/Racine market was

2   robust.  It was a healthy construction market.

3      Q.   And the Franksville location, that's

4   located to the south of Milwaukee; is that

5   correct?

6      A.   Yes.

7      Q.   And there is several significant

8   construction projects going on south of

9   Milwaukee; isn't that correct?

10     A.   Yes.

11     Q.   And notable among those would be a

12   project called Foxconn.  Are you familiar with

13   that project?

14     A.   Yeah.  I think we are.

15     Q.   It's a multi-billion dollar project,

16   right?

17     A.   Something like that.  Small dollars.

18     Q.   And that was a project that was being

19   serviced at least for a period of time by the

20   Franksville facility, correct?

21     A.   I don't know.

22     Q.   Okay.  You aren't sure of that?

23     A.   Yeah.

24     Q.   Is there a document that would refresh

25   your recollection?  Would your affidavit help

1  you to remember if Franksville was servicing the

2  Foxconn facility?

3      A.    There was an intention.  I don't know

4  if they were specifically servicing the Foxconn.

5      Q.    So you are not sure of whether they

6  were specifically servicing Foxconn?

7      A.    I don't recall like there was open

8  contracts or who they were to.

9      Q.    Where is the closest profit center to

10  the Franksville facility?

11      A.    Milwaukee -- Waukesha.

12      Q.    Waukesha.  Okay.  Thank you.  And do

13  you know where Waukesha is located?

14      A.    In Waukesha.

15      Q.    And where is Waukesha -- Where is

16  Waukesha located relative to the City of

17  Milwaukee?

18      A.    Within minutes.

19      Q.    Which direction?

20      A.    I guess it would be west.

21      Q.    You'd agree with me that it's further

22  from Waukesha to Foxconn than it is from

23  Franksville to Foxconn, correct?

24      A.    Yes.

25      Q.    And there is other projects that are

1  serviced by Sunbelt that exist to the south of

2  Milwaukee, correct?

3       A.   Yes.

4       Q.   And so when equipment is -- so

5  customers who want large equipment who are south

6  of Milwaukee, their equipment has to travel

7  farther than it would if it were delivered from

8  the Franksville facility, correct?

9       A.   Yes.

10      Q.   Who incurs that cost?

11      A.   The PC, the profit center.

12      Q.   So the Waukesha profit center would

13  incur the increased cost of the transportation?

14      A.   Yes.

15      Q.   Okay.  That doesn't get translated to

16  the customers?

17      A.   No.

18      Q.   How many Sunbelt facilities are there

19  in Wisconsin?

20      A.   Five -- six.  Six.

21      Q.   Of the Franksville facility -- excuse

22  me.  How many employees approximately are there

23  total in Wisconsin of Sunbelt?

24           MS. HILL:  Objection.  Form.

25           JUDGE ROSAS:  Repeat the question.

1   BY MR. WIESE:

2       Q.   Approximately how many total employees

3   are there in Wisconsin from Sunbelt?

4            JUDGE ROSAS:  Counsel?

5            MS. HILL:  Objection.  Form of the

6   question.

7            JUDGE ROSAS:  How many employees?

8            MS. HILL:  Correct, because time frame.

9   You know, he is bouncing around on time and

10  everything else.

11           JUDGE ROSAS:  Okay.  At what time?

12  BY MR. WIESE:

13      Q.   In August of 2019, approximately how

14  many Sunbelt employees were there in Wisconsin?

15      A.   70.

16      Q.   And out of the Franksville facilities

17  at that time, again August of 2019, the

18  Franksville facility was the only facility with

19  union employees in Wisconsin; is that correct?

20      A.   Yes.

21      Q.   Do you know what Local 139's

22  jurisdiction is, the union's jurisdiction?

23      A.   I do not.

24      Q.   Okay.  And the layoffs that took place

25  in August of 2019, those were limited to the

1    Franksville facility, correct?

2        A.    Yes.

3        Q.    And at the Franksville facility those

4    two layoffs were limited to the two bargaining

5    unit employees; is that correct?

6        A.    Yes.

7        Q.    At that time -- Strike that.

8              Did you discuss the union's bannering

9    activity with the union?

10       A.    Yes.

11       Q.    Did the union ever tell you during any

12   of those conversations that terminating their

13   bargaining unit would cause the bannering to

14   stop?

15       A.    No.

16       Q.    Does that make sense to you that

17   terminating the two union represented employees

18   would alleviate the bannering?

19       A.    No.

20       Q.    Doesn't it seem like that would cause

21   the union to be even more upset at Sunbelt?

22       A.    I don't know.

23       Q.    You don't know whether terminating

24   their only two represented employees would upset

25   the union?

1    A.    I don't know what it would do to them.

2  That would be up to them.

3    Q.    So, Mr. Mayfield, if you go back to the

4  stack of documents that I handed you at the very

5  beginning of your examination --

6    A.    Okay.

7    Q.    -- go to General Counsel Exhibit 59.

8  Do you recognize this document?

9    A.    I recognize the names and title and

10 rate of pay.

11   Q.    And does that information the names,

12 titles and rate of pay, does that appear to be

13 accurate?

14   A.    Yes.

15   Q.    Do you know how much mechanics at

16 Sunbelt make in a given year?

17   A.    There is a range.

18   Q.    Okay.  But if you had to average it,

19 how much would you say it is?

20   A.    Again, it would be a range.  I don't --

21   Q.    So with respect --

22         MR. WIESE:  Well, let me offer General

23 Counsel Exhibit 59.

24         MS. HILL:  No objection.

25         JUDGE ROSAS:  General Counsel's 59 is

1  received.

2                        (GCX 59 received.)

3  BY MR. WIESE:

4       Q.   So this shows the wage rate of Allan

5  Romanowski, correct?

6       A.   Yes.

7       Q.   And the wage rate for Mario Rivera and

8  Kyle McKellips as well?

9       A.   Yes.

10      Q.   So how much money did you think it

11  would save Sunbelt laying off Mr. McKellips and

12  Mr. Romanowski?

13      A.   Can you repeat the question?

14      Q.   How much money would it save Sunbelt

15  laying off Mr. McKellips and Mr. Romanowski?

16      A.   It was more about aligning the store

17  with a decline in revenue.

18           MR. WIESE:  That's a nonresponsive

19  answer, your Honor.

20           JUDGE ROSAS:  Repeat the question.

21           MR. WIESE:  I asked him how much money

22  would laying off Mr. McKellips and Mr.

23  Romanowski save Sunbelt.

24           JUDGE ROSAS:  If you know.

25           THE WITNESS:  I'd be speculating.

1  BY MR. WIESE:

2      Q.   So that wasn't something that you

3  calculated before laying off the employees?

4      A.   Yeah.  It was more about aligning the

5  location with what it had become.

6      Q.   I apologize again for jumping around.

7          JUDGE ROSAS:  Let's take five minutes.

8              (Whereupon, a short recess was

9               taken.)

10         JUDGE ROSAS:  Back on the record.

11 BY MR. WIESE:

12     Q.   Mr. Mayfield, I'd like to direct your

13 attention to General Counsel Exhibit 47.  Do you

14 recognize this document at all?

15     A.   Yes.

16     Q.   It's a cover sheet to a proposed

17 Collective Bargaining Agreement between Sunbelt

18 and Local 139, correct?

19     A.   Yes.

20     Q.   For the Franksville facility?

21     A.   Yes.

22     Q.   Do you recognize the handwriting in the

23 upper right-hand corner of that document?

24     A.   I do not.

25     Q.   Okay.  That's not your handwriting?

1      A.    It's not.

2      Q.    Okay.  You don't recognize whose

3   handwriting that is based on your experience at

4   the table?

5      A.    I don't.

6      Q.    Okay.  I'll retrieve that document

7   then.

8            JUDGE ROSAS:  Do you want to -- you are

9   not going do try to put it in through somebody

10   else?

11           MS. HILL:  You took my copy, too.

12           MR. WIESE:  I'll hand it back when I am

13   entering it.

14   BY MR. WIESE:

15     Q.    Mr. Mayfield, I'd like to direct your

16   attention to General Counsel Exhibit 55.  Do you

17   have that document?

18     A.    I do.

19     Q.    Do you recognize this?

20     A.    Yes.

21     Q.    So Page 1 of this document or Pages 1

22   and 2 of this document would be position

23   descriptions for the driver at Sunbelt; is that

24   correct?

25     A.    Yes.

1      Q.   And then pages -- Page 3 of the

2   document would be a position description for a

3   Mechanic 2, correct?

4      A.   Yes.

5      Q.   Okay.  And Page 3 would be the position

6   description for a Mechanic 1, correct?

7      A.   Yes.

8      Q.   And those would be the position

9   descriptions for the bargaining unit at the

10  Franksville facility?

11     A.   Yes.

12     Q.   I'd like to direct your attention to

13  General Counsel Exhibit 56.

14          JUDGE ROSAS:  Counsel, are you offering

15  that document?

16          MR. WIESE:  Oh, thank you, your Honor.

17  I'll offer General Counsel Exhibit 55.

18          JUDGE ROSAS:  Any objection?

19          MS. HILL:  No objection.

20          JUDGE ROSAS:  General Counsel's 55 is

21  received.

22                         (GCX 55 received.)

23  BY MR. WIESE:

24     Q.   Directing your attention to General

25  Counsel Exhibit 56.  Mr. Mayfield, this appears

1    to be an E-mail chain; is that correct?

2        A.    Yes.

3        Q.    And it originates from an individual

4    named Katie Torgerson.  Do you know who she is?

5        A.    Yes.

6        Q.    Who is Ms. Torgerson?

7        A.    Former profit center manager, PCM.

8        Q.    And going up the E-mail chain to the

9    second to the first page there, there is an

10   E-mail from Bo Bogardus to yourself.  Do you see

11   that?

12       A.    I do.

13       Q.    And then above that, there is an E-mail

14   chain from Vicky Gibson to Cheryl Black.  Do you

15   see that?

16       A.    Yes.

17       Q.    And who is Ms. Gibson?

18       A.    The director of HR for the northeast

19   territory.

20       Q.    Is Ms. Gibson Rebel Strohmeyer's boss?

21       A.    Yes.

22       Q.    And who is Cheryl Black?

23       A.    Cheryl is the senior vice president of

24   HR.

25       Q.    Is Ms. Black Ms. Gibson's supervisor?

```
 1      A.   Yes.

 2           MR. WIESE:  I'll offer General Counsel

 3  Exhibit 56.

 4           MS. HILL:  No objection, your Honor.

 5           JUDGE ROSAS:  General Counsel 56 is

 6  received.

 7                         (GCX 56 received.)

 8  BY MR. WIESE:

 9      Q.   So this is an E-mail chain about the

10  Operating Engineers Local 139, correct?

11      A.   Yes.

12      Q.   And the -- this is our first in

13  Wisconsin.  Do you know what that's in reference

14  to?

15      A.   I don't.

16      Q.   Okay.  Were there any other 139

17  facilities in Wisconsin?

18      A.   No.

19      Q.   Represented facilities at that time?

20      A.   No.

21      Q.   Okay.  If you go to General Counsel

22  Exhibit 58.  Do you recognize this document?

23      A.   Yes.

24      Q.   This was a document that was handed out

25  by the union to the employer during collective
```

1    bargaining negotiations; is that right?

2         A.   Yes.

3         Q.   And it was handed out at the June 2019

4    negotiations.  Does that sound correct?

5         A.   Yes.

6         Q.   If you go to Page 3 of the document, do

7    you recognize the handwriting in this document?

8         A.   I do not.

9         Q.   That's not your handwriting?

10        A.   It is not.

11        Q.   Do you know whose handwriting that is?

12        A.   I do not.

13        Q.   Okay.  Do you recognize the initials

14   or -- the information below the date that's

15   handwritten for example next to Section 1.1, do

16   you see what I am talking about?

17        A.   I do.

18        Q.   Okay.  Do those appear to be initials?

19        A.   I don't know.

20        Q.   You don't -- Okay.  Do you recall

21   discussing this document on July 2nd of 2019?

22        A.   Yes.

23        Q.   Okay.  Did you take any notes of that

24   discussion?

25        A.   Yes.

1    Q.   And those notes aren't reflected in

2    this document here, are they?

3    A.   You are asking me if they are on this

4    document?

5    Q.   Yes.

6    A.   No.

7         MR. WIESE:  Okay.  I'll offer General

8    Counsel Exhibit 58.

9         MS. HILL:  No objections.

10        JUDGE ROSAS:  General Counsel's 58 is

11   received.

12                        (GCX 58 received.)

13   BY MR. WIESE:

14   Q.   Mr. Mayfield, are you familiar with how

15   shops work at individual Franksville profit

16   centers?  Do you spend any time in a Franksville

17   profit center, or excuse me, a Sunbelt profit

18   center shop?

19   A.   Yes.

20   Q.   Are members of the public allowed to

21   wander through Franksville, or excuse me, the

22   Sunbelt shops?

23   A.   Can you repeat the question?

24   Q.   Are members of the public allowed to

25   wander through shops at Franksville facilities?

1      A.    No.

2      Q.    Are they allowed to work on equipment

3  located in shopping at Franksville, or excuse

4  me, again, it's Sunbelt facilities?

5      A.    Can you ask the question again?

6      Q.    Yes.  I apologize.  I am getting

7  confused.

8           Are members of the public allowed to

9  work on equipment in shops at Sunbelt

10 facilities?

11     A.    No.

12           MR. WIESE:  Nothing further.

13           JUDGE ROSAS:  Charging Party, anything?

14           MR. RYAN:  If I could just have a

15 couple minutes to review.

16           JUDGE ROSAS:  Sure.  Off the record.

17                (Whereupon, a discussion was had

18                 off the record.)

19           JUDGE ROSAS:  We are on.  Go ahead.

20                CROSS EXAMINATION

21 BY MS. HILL:

22     Q.    Mr. Mayfield, just a few questions

23 because you are going to be called in Sunbelt's

24 case in chief.  You were questioned about the

25 Franksville location being reorganized to be a

1  certain type of facility.  Some of the

2  questions, subsequent questions, to your answer

3  involve just small tool equipment for that

4  facility.  I want to make sure that the record

5  is clear the Franksville location was

6  reorganized to reflect what type of equipment?

7      A.   Equipment that could be will-called or

8  equipment that could be picked up, not requiring

9  a CDL license so the Class C would be

10 10,000 pounds or less.

11      Q.   So it would be small equipment and

12 small tool?

13      A.   Yes.

14      Q.   You mentioned you were questioned about

15 other will-call locations in your region?

16      A.   Uh-huh.

17      Q.   Do you have any other -- Could you

18 identify where the other will-call locations are

19 in your region?

20      A.   Yeah.  We have locations that are high

21 in will-call that type of small tool business.

22 We have a couple in Michigan, do high volume

23 high transactions, a lot of walk-in customers is

24 just one of the examples.

25      Q.   You just mentioned the term walk-in

1  customers.  How did the Franksville location

2  compare for walk-in customers versus let's say

3  the Waukesha profit center?

4      A.   Uh-huh.  Yeah.  So Franksville is has

5  the highest volume of walk-in customers of any

6  of other location than we have in the State of

7  Wisconsin.

8      Q.   You were asked questions about

9  repairing the equipment the small equipment, the

10  small tool equipment located at Franksville and

11  you were also questioned about the negotiations

12  for the impact of the reorganization.

13          During the negotiations regarding the

14  impact of the reorganization, did the union

15  request to negotiate who would repair the

16  remaining small equipment, small tool?

17      A.   Can you repeat that last part, please?

18      Q.   Okay.  Did the union, the 139, during

19  the negotiations regarding the impact of the

20  reorganization request or ask any questions

21  about how the small equipment, small tools at

22  the Franksville location would be repaired?

23      A.   Not that I recall.

24          MS. HILL:  No further questions, your

25  Honor.

1          JUDGE ROSAS:  Any redirect?

2          MR. WIESE:  Briefly, your Honor.

3                  REDIRECT EXAMINATION

4   BY MR. WIESE:

5      Q.    You mentioned that there are I believe

6   if I heard correctly there is a few will-call

7   facilities in Michigan; is that correct?

8      A.    Yes.

9      Q.    Okay.  Do those facilities employ

10  mechanics?

11     A.    They do.

12         MR. WIESE:  Nothing further.

13         JUDGE ROSAS:  Charging Party, anything?

14                  CROSS EXAMINATION

15  BY MR. RYAN:

16     Q.    You mentioned that Franksville had the

17  highest volume of walk-ins for Wisconsin,

18  Mr. Mayfield?

19     A.    Yes.

20     Q.    Can you give me some context?

21     A.    Yeah.  The amount of customers that

22  walk in for that small tool type traffic, they

23  have a high volume, high frequency of that type

24  of customers especially with how fast that

25  market has grown over the last few years, so a

1    lot of customers come in and out, picking things

2    up themselves.  They will come in with trailers.

3    They will come in with pickup trucks, even had

4    some come in with their own rigs, their own

5    tractors and trailers.

6        Q.    But as far as the volume in contrast to

7    say Waukesha, can you give me an idea of how

8    much more Franksville is to Waukesha?

9        A.    Probably 200 percentish.  Around

10   200 percent.

11       Q.    Are there any documents that would kind

12   of crystalize the difference between the

13   facilities in Wisconsin?

14       A.    Yeah.  We can tell what equipment is

15   not delivered.

16       Q.    Do you know if any such documents were

17   produced to the region in this case?

18       A.    No.

19       Q.    No, you don't know or no, there

20   weren't?

21       A.    Not that I'm aware of.

22           MR. RYAN:  Nothing further.  Thank you,

23   your Honor.

24           JUDGE ROSAS:  Any follow up?

25           MS. HILL:  No, sir.

1          JUDGE ROSAS:  Thank you, sir.  You are

2    excused.  Please do not discuss your testimony

3    with anyone until you are advised otherwise by

4    counsel.

5          MS. HILL:  Now, you have two more

6    witnesses here.  Do you want to keep him in case

7    you want any kind of rebuttal?

8          MR. WIESE:  Not today.

9          JUDGE ROSAS:  Off the record.

10               (Whereupon, a discussion was had

11                off the record.)

12          JUDGE ROSAS:  Next witness?

13          MR. WIESE:  Your Honor, I need probably

14    five minutes to get my documents together.

15          JUDGE ROSAS:  Okay.  Off the record.

16               (Whereupon, a short recess was

17                taken.)

18          JUDGE ROSAS:  Back on the record.  Next

19    witness.

20          MR. WIESE:  Thank you, your Honor.  At

21    this time counsel for the General Counsel calls

22    Bo Bogardus to the stand.

23          JUDGE ROSAS:  Sir, please raise your

24    right hand.

25                    (Witness sworn.)

1        JUDGE ROSAS:  All right.  Please have a

2   seat.  State and spell your name and provide us

3   with an address.

4        THE WITNESS:  My given name is Robert

5   John Bogardus, the III.  R-O-B-E-R-T, J-O-H-N,

6   B-O-G-A-R-D-U-S.

7        JUDGE ROSAS:  And an address.

8        THE WITNESS:  309 Wilmont Drive,

9   Waukesha, Wisconsin.

10        ROBERT J. BOGARDUS, III,

11   after being first duly sworn, deposeth and saith

12   as follows:

13                DIRECT EXAMINATION

14   BY MR. WIESE:

15     Q.   Mr. Bogardus, do you work for Sunbelt

16   Rentals?

17     A.   Yes, sir.

18     Q.   In what capacity?

19     A.   I am market leader for Wisconsin's

20   Climate Control Group.

21     Q.   And prior to holding the position as

22   market leader for the Climate Control Group, did

23   you hold any other positions with Sunbelt?

24     A.   Yes, sir.

25     Q.   What positions what position did you

1  hold immediately prior to your current position?

2      A.   District manager for the general tool

3  locations in Wisconsin.

4      Q.   How long were you in that position for?

5      A.   24 or 27 months.

6      Q.   Can you identify which months those

7  were?

8      A.   I accepted the role in February of '17

9  and started living in the state and was

10  commuting back and forth prior to June, but I

11  started living in the state in June of '17.

12      Q.   And then how long were you in that

13  position for?  When did you stop being in that

14  position?

15      A.   July the 8th of this year.

16      Q.   What were your job duties in that

17  position?

18      A.   As a district manager?

19      Q.   Yes.

20      A.   To oversee the administrative and sales

21  operations for the six GT locations in the state

22  of Wisconsin.

23      Q.   When you say GT, what does that stand

24  for?

25      A.   General tool.

```
 1      Q.    Do you know what those locations are?

 2      A.    Do you want the PC numbers or cities?

 3      Q.    The cities would be more helpful.

 4      A.    Racine, Waukesha, Fond du Lac, Green

 5   Bay, Wausau and Sun Prairie, which is a suburb

 6   of Madison.

 7      Q.    The Racine location is that sometimes

 8   referred to as the Franksville location?

 9      A.    Yes, sir.

10      Q.    Who reports or who reported to you when

11   you were in that position?

12      A.    There were two.  In the beginning it

13   was Katie Torgerson.  Katie left the company in

14   March of '17 -- March of '18, sorry, March

15   of '18 and then Bryan Anderson assumed that role

16   in it was either late June or early July of '17.

17      Q.    Of '17 or '18?

18      A.    I'm sorry of '18.  Of '18.  Sorry.

19      Q.    Do you know why Ms. Torgerson left the

20   company?  Strike that.

21            How did her employment end?

22      A.    She was released from the company.

23      Q.    Did you make that decision?

24      A.    In conjunction with a few others, yes.

25      Q.    Who were the others?
```

1      A.   Jason Mayfield and Rebel Strohmeyer.

2      Q.   Do you have or did you have

3   disciplinary authority as a district manager?

4      A.   Yes, sir.

5      Q.   Over who?

6      A.   Mainly the PCMs.

7           MR. WIESE:  Your Honor, I request to

8   question this witness under 611(c) of the

9   Federal Rules of Evidence.

10          JUDGE ROSAS:  Granted.

11   BY MR. WIESE:

12     Q.   I'd like to direct your attention to

13   General Counsel Exhibit 27 which is going to be

14   -- it should be separated out in that stack of

15   documents.  It looks like a chart of hours

16   worked.

17     A.   Okay.

18     Q.   There should be a stack of three

19   document up there?

20     A.   Allan Romanowski at the beginning at

21   the top?

22     Q.   Yes.  That's correct.

23     A.   Okay.

24     Q.   Are you familiar with this document?

25     A.   This is the first time I have seen it.

1     Q.   Okay.  Go to the next document then,

2  General Counsel Exhibit 28.

3     A.   Yes, sir.

4     Q.   Are you familiar with this document?

5     A.   Yes, sir.

6     Q.   Did you create it?

7     A.   Yes, I did.

8     Q.   When did you create this document?

9     A.   This had to be Mayish of this year.

10  May of '19 give or take.

11     Q.   So I want to break down the columns in

12  this document, so lost due to returned

13  equipment, rental dollar sign only, what does

14  that column represent?

15     A.   That is the column for each one of the

16  PCs in the state that were impacted by the

17  bannering and picketing and threats made to our

18  customers by the gentleman from Local 139.

19     Q.   And are these -- are the numbers in

20  this column are these numbers precise numbers?

21     A.   They are within a point or two.  I

22  rounded up to make it a little simpler for us to

23  just review it.

24     Q.   You round it up to the nearest thousand

25  dollars it looks like for Profit Centers 365 and

1   366; is that accurate?

2       A.   Same with 1776 and 1006 as well.

3       Q.   Well, for Profit Center 776, it looks

4   hike you rounded up to the nearest hundred

5   thousand, does that --

6       A.   No.

7       Q.   Okay.  It just happened to end on a

8   round number?

9       A.   Yes.

10      Q.   Okay.  And then the column next to that

11  the total rental revenue lost due to equipment

12  returned by direct 139 inference.  What's that?

13      A.   I did that, yes.

14      Q.   Okay.

15      A.   That is the inclusion of the ancillary

16  charges that we charge on every contract and

17  what I did was took the gross average of what

18  was there for ease of anything to mark it up to

19  what those amounts typically would have been.

20      Q.   And so those charges, those are charges

21  that are applied to the Sunbelt facilities or to

22  the customers?

23      A.   Those would have been on the customers'

24  invoices, sir.

25      Q.   Okay.  So the invoice between the loss

1  due to equipment and total revenue loss, it's

2  that cost that's charged to the customer,

3  correct?

4      A.   Yes, sir.

5      Q.   Okay.  If you go over to the next

6  column, loss due to 139 threats to customers,

7  how did you calculate that?

8      A.   Those were the commitments that we had

9  from the customers prior to the bannering

10  picketing of 139 and the job sites threatening

11  the customers to picket their jobs until they

12  got our equipment off site.

13      Q.   And did you contact each one of those

14  customers for each of those job sites to

15  determine that the union's activity was the

16  reason they were cancelling with Sunbelt?

17      A.   I did not personally contact each one.

18  The sales reps where I couldn't get ahold or

19  where they had a better relationship with the

20  customer, I reached out to the sales rep to

21  determine what had been comitted verbal prior to

22  the union doing their thing.

23      Q.   And everything single loss on here, you

24  received information from the customer or from a

25  sales rep telling you that it was due to

1  Local 139's activity?

2      A.   Yes, sir.

3      Q.   And the round numbers on this column as

4  well, that's just a -- that was just rounding

5  up?

6      A.   Rounding up to the nearest up or down,

7  you know, if it it's five or less, you know, or

8  six or more.

9      Q.   Do you have the underlying figures that

10  you relied on in creating this chart anymore?

11      A.   That's in a file on my computer I

12  believe.

13      Q.   Do you know is that file still in

14  existence?

15      A.   I don't know for sure.

16      Q.   Do you know where it would be if it

17  were in existence?

18          MS. HILL:  Asked and answered.

19          JUDGE ROSAS:  I'm sorry.  Repeat the

20  question.

21          MR. WIESE:  I will move on, your Honor.

22  BY MR. WIESE:

23      Q.   Then with the respect to the next

24  column on your chart, Mr. Bogardus, the total

25  rental moneys lost after 139 threatened pickets

1  when Sunbelt equipment is on site?

2      A.   It was the same average ancillary

3  percentages I developed for the column, total

4  rental revenue lost, the second column.

5      Q.   Okay.  And, again, those would be

6  charges assessed to -- the difference would be

7  the charges assessed to the customers?

8      A.   Yes, sir.

9      Q.   Okay.  What are those charges?

10     A.   Freight, pick-up and delivery, the

11 environmental fee that we charge for taking care

12 of our environmental issues.  I am trying to

13 remember the fourth one off the top of my head.

14 Transportation surcharge goes along with the

15 freight.

16     Q.   And then the totals at the end those

17 are just the added up numbers for all three of

18 the -- four of the columns; is that accurate?

19     A.   Yes.  The total dollars lost and that

20 8.1 is what we believe was a result of lost

21 revenue to Sunbelt as a result of the union's

22 efforts to hurt revenue.

23     Q.   And I may have misspoke.  It looks like

24 so the total number is the combination of the

25 total revenue lost due to equipment returned

1  plus the total rental dollars lost after

2  threatened pickets, is that --

3      A.   Exactly.

4      Q.   Okay.  Thank you.  Is there a reason

5  you didn't put a date on this document?

6      A.   No.  I was asked to put it together and

7  just put it together.  There wasn't any real

8  reason not to put down.

9      Q.   Do you recall who put it together?

10      A.   I did.

11      Q.   Who asked you to put it together?

12      A.   Jason.

13      Q.   Okay.  Do you recall when Jason asked

14  you to put it together?

15      A.   The day I started which it was late

16  May, early June if I remember correctly.

17      Q.   Of what year?

18      A.   This year.

19      Q.   If you go on to the next document

20  General Counsel Exhibit 29 which would be

21  hopefully the next one in your stack.  Do you

22  recognize this document, Mr. Bogardus?

23      A.   Yes, sir.

24      Q.   Is this a document that you created?

25      A.   I am 90 percent it is, yes.

1    Q.   When you say 90 percent, was there

2  other portions of the document that you didn't

3  create?

4    A.   Not that I'm aware of, no.  I was just

5  -- looking at the numbers and it looks leaks

6  exactly like one I would set up, yes.

7    Q.   Is this a document that you create

8  during the normal course of your business?

9    A.   No.

10    Q.   Do you recall when you created this

11  document?

12    A.   It would have been about the same time

13  as the bannering and picketing started.

14    Q.   Do you recall when that was?

15    A.   Not the exact dates, no, sir.

16    Q.   To the best of your recollection today,

17  when do you recall that beginning?

18    A.   Spring of this year.

19    Q.   Early spring or late spring?

20    A.   Probably I would guess more toward the

21  latter as we got busier.

22    Q.   So looking back now at General Counsel

23  Exhibit 29, the column customers below that,

24  what do those represent?

25    A.   Names of our customers.

1    Q.   And then next to that, the project name

2  what does that represent?

3    A.   That would be the specific project on

4  which the bannering and picketing went on and

5  the customer was threatened that if they didn't

6  send our equipment back, there would be

7  additional pickets keeping --

8         MR. RYAN:  Can I just raise an

9  objection as to the characterization of

10  picketing an issue here.  There was no picketing

11  at these locations in Wisconsin.

12         JUDGE ROSAS:  Well, you can probe that

13  on cross.

14  BY MR. WIESE:

15    Q.   Mr. Bogardus, did you visit each of

16  these facilities listed on this chart?

17    A.   No, sir, I did not.

18    Q.   Did you witness what the union was

19  doing at these facilities on this chart?

20    A.   I had pictures from Riley, Children's

21  Hospital, Fiserv, and the Fond du Lac Hotel.

22    Q.   Which customer is Children's Hospital?

23  I'm sorry.

24    A.   Terry Engineering.

25    Q.   Oh, thank you.  Thank you.  The other

1  ones did you have any firsthand knowledge of

2  what was going on at those facilities?

3      A.  The information came from our local

4  sales reps covering those sites.

5      Q.  Why did you create this document?

6      A.  It would have been at the same time it

7  was before the previous document, probably two

8  weeks so in the late spring of this year.

9      Q.  Why?

10     A.  Why did I create it?

11     Q.  Yes.  Yes.

12     A.  So we could track what the union was

13  doing to us.

14     Q.  It's your testimony that General

15  Counsel Exhibit 29 was created about two weeks

16  before General Counsel Exhibit 28?

17     A.  Yes, sir.

18     Q.  And in General Counsel Exhibit 29, this

19  was your attempt to track all of the losses from

20  the union's activities; is that correct?

21     A.  To get as many documented as we could

22  internally to determine the impact.

23     Q.  So the purpose of this document was to

24  track all of the losses that you were aware of

25  due to the union's bannering activity?

1    A.   Yes, sir.

2    Q.   Okay.  Let's go over to the dollar

3  figures in this document.  So the estimated

4  dollars lost, what methodology did you use to

5  calculate that?

6    A.   Those were from the time that was on

7  the original contract out because we put an

8  estimated return date when we enter a contract,

9  so whatever the monthly rate was times the

10  number of given months per unit was what

11  generated that estimated dollars lost.

12   Q.   Okay.  And is the length of the

13  contract is that a set term or is that something

14  that you are estimating?

15   A.   The customer generally gives us an

16  estimation of how long they will have the piece.

17   Q.   Okay.  Are they free to return it

18  before --

19   A.   Yes.

20   Q.   -- that date?  Okay.  And the basis of

21  these estimated dollars lost this is based off

22  of the estimations that Sunbelt received from

23  the customers; is that accurate?

24   A.   Yeah.  These were units that were on

25  site, came off site, with the estimated

1  timeframes that the customers had shared with

2  it, yes.

3      Q.    Okay.  So the estimated loss then would

4  be the difference between the money that

5  actually came in from the customer on those job

6  sites versus the amount of time that you

7  estimated that the equipment was scheduled to

8  remain there?

9      A.    You are talking about this column,

10 right?

11     Q.    I am talking about the estimated

12 dollars lost.

13     A.    Yes.  Yes.

14     Q.    Okay.  And with respect to the next

15 column forecast dollars lost, what was your

16 methodology in creating that?

17     A.    The additional equipment that we have

18 been told that we were going to be on that site

19 had we not been interfered.

20     Q.    Who told you that information from

21 Riley Construction?

22     A.    That came from our OSR, our outside

23 sales rep.

24     Q.    Outside sales rep, is that a

25 Franksville employee, I'm sorry, a Sunbelt

1  employee?

2      A.  Yes.

3      Q.  Was there any commitment in writing to

4  support the $280,000 figure for Riley

5  Construction?

6      A.  No, sir, not that I am aware of.

7      Q.  And what about with respect to the

8  other figures in this document for forecast lost

9  numbers, is there any written document

10 supporting those numbers?

11     A.  No, sir.

12     Q.  And for the other projects besides

13 Riley Construction, were those forecast dollar

14 figures calculated in the same way?

15     A.  Yes, sir.

16     Q.  And with respect to JP Cullen, JH

17 Findorff in both bills, I notice there is no

18 numbers lost or there is no estimated revenue

19 lost; is that correct?

20     A.  That is correct.

21     Q.  And the same with forecast dollars

22 lost, there is no numbers there; is that

23 correct?

24     A.  Correct.

25     Q.  I'd like to direct your attention to

1    General Counsel Exhibit 30 now.  So this has

2    previously been identified as the consolidated

3    income statement for the Franksville Center?

4         A.   Yes, sir.

5         Q.   Okay.  And you recognize it as such?

6         A.   Yes, sir.

7         Q.   I'd like to focus on the middle row of

8    this document.  The budget items, do you see

9    where I am pointing to there?

10        A.   You are talking about the revenue

11   stream for the budgeted revenue steam for the

12   Sun Prairie?

13        Q.   Right.  Exactly.

14        A.   Okay.

15        Q.   Are you involved in calculating the

16   budgeted revenue streams for profit centers?

17        A.   Yes.  Yes, sir.  I work with the

18   individual PCM.

19        Q.   And what's the process for doing that?

20        A.   Well, we look at what the general

21   economy is going to do.  What we think we are

22   going to see and put it together in that

23   regards.  Wisconsin is I think is common

24   knowledge has been pretty active in growing and

25   we try to put a budget together the best

1  estimation based on the fleet that we have and

2  the fleet that we might buy and that coming year

3  how that will impact our revenues.

4      Q.   Okay.  And the -- so the fiscal year

5  for Sunbelt runs from May 1st of a given year to

6  April 30th of the following year.  Do I have

7  that correct?

8      A.   Yes, sir.  That is correct.

9      Q.   Okay.  And so the fiscal year for 2020

10 would be from May 1st of 2019 to April 30th of

11 2020?

12     A.   Yes, sir.

13     Q.   Okay.  So for the budget year for the

14 fiscal -- the budget for the fiscal year 2020,

15 for the Franksville profit center, were you

16 involved in calculating that budget?

17     A.   Yes, sir.

18     Q.   When did you calculate that budget?

19     A.   Budgets were completed in mid to late

20 February of this year, of '19.

21     Q.   Are there documents that exist that

22 would describe the process of how you came to

23 that budget with the Franksville center?

24     A.   I guess what are you looking for as far

25 as documents again?

1    Q.   Well, what did you look at in

2    calculating the budget?

3    A.   Well, we started off looking at what

4    the trend is going.  We started off looking and

5    we continued to look at what is forecast, you

6    know, by the Dodge -- FW Dodge seems to be the

7    norm that we all use in the business to

8    determine future activity and then, you know,

9    reach out to our sales folks, talk to our

10   customers.  Try to develop all the information

11   we can to understand what this year might look

12   like.  I'd love to have a crystal ball, but I

13   don't know anybody that's got one.

14   Q.   Right.

15   A.   And we make our best estimates from

16   there.  Try to be relatively conservative but as

17   accurate as possible.

18   Q.   What's FW Dodge, I am not familiar with

19   that term.

20   A.   FW Dodge is a company that tracks

21   bidding activity, new construction starts,

22   planning statuses, been around for -- I have

23   been in construction for almost 40 years now.

24   So it's been around that long so because I

25   started right when I got out of school.

1    Q.   And they provided documents to you to

2    use in calculating the budget?

3    A.   No.  They just provide estimates of

4    what's going to happen in any given area broken

5    down typically by zip code.

6    Q.   Are those documents, or excuse me.  Is

7    that information conveyed to you verbally only?

8    A.   No.  They have got a website.  We have

9    got E-mail deliveries that come from Dodge.  You

10   can go into their site and pull it up.

11   Q.   With respect to calculating the trends.

12   I think that was the first thing that you

13   mentioned.  What documents, if any, did you rely

14   on in ascertaining the trends for fiscal year

15   2020?

16   A.   They are forecast by county, by zip

17   code.

18   Q.   From?

19   A.   From FW Dodge.

20   Q.   Okay.  Any other documents besides FW

21   Dodge?

22   A.   No.  Not really not as far as that can

23   forecast.

24   Q.   And so is it your testimony that in

25   calculating budgets for a given fiscal year, you

1  try to remain fairly conservative in calculating

2  those budgets?

3      A.   As conservative as the Fort Mill office

4  will let us be, yes.

5      Q.   Is that the same thing that you did

6  when you were calculating the Franksville budget

7  for the fiscal year 2020?

8      A.   Actually, I was pushing to be more

9  conservative of Franksville.

10     Q.   Who pushed back against that?

11     A.   I could probably give you a hundred

12  names.

13     Q.   Okay.  Let me ask you specifically:

14  Was Mr. Mayfield involved in pushing back on

15  that number?

16     A.   Yes.

17     Q.   Did Mr. Mayfield review that budget

18  before it was finalized?

19     A.   Yes.

20     Q.   Do you know what type of a review he

21  conducts?

22     A.   Jason and I haven't sat down and done a

23  line item review on a budget in the two years we

24  have been together, no.

25     Q.   Okay.  So to answer my question, you

1    aren't sure then what type of a review he

2    conducts of the budgets?

3        A.   You'd honestly have to ask Jason how he

4    looks at it.  We went back and forth a bit, but,

5    you know, we didn't talk a whole lot about the

6    logic.  We just talked about the numbers needed

7    to look like.

8        Q.   Did Mr. Mayfield consult with you at

9    all regarding the decision to terminate or lay

10   off the union represented employees at the

11   Franksville facility?

12       A.   Yes.

13       Q.   When did he do that?

14       A.   I am trying to think of the best way to

15   answer that because at the very beginning of

16   this when the folks from 139 showed up, I was

17   ready to close the store so we had a

18   conversation about closing the store at that

19   point.

20       Q.   And you were ready to close the store

21   because the union was coming in?

22       A.   Given what we were seeing, yes.

23       Q.   Who did you have that conversation

24   with?

25       A.   Jason and I had that conversation a

 1   week or so after the election.

 2          MR. WIESE:  Your Honor, I do have a

 3   couple of documents that I want to introduce

 4   through this witness.  So I will try to hand

 5   them out as quickly as I can.

 6   BY MR. WIESE:

 7      Q.   Mr. Bogardus, I'd like to start with

 8   the document that's marked in the lower

 9   right-hand corner General Counsel Exhibit 26.

10      A.   Yes, sir.

11      Q.   Do you recognize this document?

12      A.   Yes, sir.

13      Q.   This is an E-mail chain that you

14   started on July 25, 2018; is that correct?

15      A.   Yes, sir.

16      Q.   And it's with regard to the scheduled

17   collective bargaining negotiations with

18   Local 139; is that correct?

19      A.   Yes, sir.

20      Q.   And this E-mail chain led to those

21   July 30th negotiations being cancelled to your

22   knowledge; is that correct?

23      A.   Yes, sir.

24          MR. WIESE:  I'll offer General Counsel

25   Exhibit 26.

1          MS. HILL:  No objection.

2          JUDGE ROSAS:  General Counsel's 26 is

3   received.

4                    (GCX 26 received.)

5   BY MR. WIESE:

6      Q.   Based on this document, the reason that

7   the funeral -- or excuse me -- that the

8   negotiations were cancelled for July 30th was

9   due to the funeral of an -- of somebody's

10  father-in-law; is that correct?

11     A.   Yes, sir.

12     Q.   Who is -- Jeremy's father-in-law; is

13  that correct?

14     A.   Jeremy Vessley.  He is our PCM in

15  PC789.

16     Q.   Did you attend that funeral?

17     A.   I did not.

18     Q.   Did anyone from the bargaining team

19  attend that funeral to your knowledge, Sunbelt's

20  bargaining team?

21     A.   Not that I am aware, no.

22     Q.   Did you attend the visitation?

23     A.   I did not.

24     Q.   Did anyone from the Sunbelt bargaining

25  team attend that visitation, to your knowledge?

1     A.   Not that I am aware of.

2     Q.   At the time that you sent this E-mail,

3  did you know what time the visitation and

4  funeral were scheduled during the day on

5  July 30th?

6     A.   Yes.

7     Q.   Okay.  What time if you can recall?

8     A.   The visitation I believe started at

9  10:00.  The funeral was at 2:00 and then the

10  burial was, you know, after the funeral itself.

11     Q.   That would be 10:00 a.m. and 2:00 p.m.?

12     A.   Yes, sir.

13     Q.   Okay.  Let's go to General Counsel

14  Exhibit 40.  Do you recognize this document?

15     A.   Yes, sir.

16     Q.   This E-mail is with regard to again

17  collective bargaining or reference collective

18  bargaining negotiations with Local 139?

19     A.   Yes, sir.

20     Q.   And this E-mail led to November

21  negotiations with Local 139 being cancelled; is

22  that accurate?

23     A.   I don't know that we cancelled them.  I

24  think we postponed them.

25     Q.   Okay.  But it led to the date for

1  negotiations being pushed back to a later date,

2  right?

3      A.   Yes, sir.

4          MR. WIESE:  Okay.  I'll offer General

5  Counsel Exhibit 40.

6          MS. HILL:  No objection, your Honor.

7          JUDGE ROSAS:  General Counsel's 40 is

8  received.

9                          (GCX 40 received.)

10 BY MR. WIESE:

11     Q.   And the reason that is listed in this

12 E-mail for why the negotiations were postponed

13 appears to be some number of things that are

14 pushed our fleet planning for next year back

15 further than what we had planned.  Do you see

16 that?

17     A.   Yes.

18     Q.   Okay.  What is a fleet planning

19 process?

20     A.   It's the foundational piece for the

21 budgeting.

22     Q.   So what is fleet planning I guess?

23     A.   Identifying the units that we wish to

24 either dispose of, sell, you know, move out of

25 the fleet, move to other locations in or what

1   other additional fleet we would be bringing in

2   to replace those units or are we upsizing or

3   downsizing.

4        Q.   Are there documents that you rely on

5   during the fleet planning process?

6        A.   It's a computer program that we work

7   our way through and then prior year financials

8   and fleet size.

9        Q.   The computer program that you use, what

10  program is that?

11       A.   We uploaded it into Excel but then the

12  after that it loads it into -- I don't know the

13  name of the software we use.

14       Q.   Okay.  Do you retain those Excel files?

15       A.   Those are kept on a server.  They are

16  not on my laptop, and I don't know anybody that

17  has got them on their laptop to be honest.

18       Q.   There is a centralized server where

19  those Excel spreadsheets are kept at?

20       A.   Should be, yes.

21       Q.   Do you know if those Excel spreadsheets

22  are deleted on that server, if you have any

23  knowledge?

24       A.   I don't know.

25       Q.   Do you recall what the fleet planning

1    issues were at the November of 2018?

2        A.   There were some questions about where

3    we were going, and what we are were going to do

4    and the size of the fleet.  We were looking for

5    additional information to try to firm that up

6    because that has to be done before we can go on

7    to the next level with budgeting.  We have got a

8    very disciplined approach as to how we do it.

9        Q.   When did you plan to complete the fleet

10   planning at that time?

11       A.   If I am not mistaken, it had to be

12   produced and delivered prior to the 1st of

13   December.

14       Q.   Did you exchange any E-mails with

15   anyone around that time regarding the issues you

16   were having with fleet planning?

17       A.   I honestly don't recall.

18       Q.   And which profit center was -- was it

19   one specific profit center that was having fleet

20   planning issues or was it multiple?

21       A.   This was the entire district.

22       Q.   This was the entire district.  Do you

23   know how long Sunbelt retains E-mails for?

24       A.   I have no idea.

25       Q.   Okay.  So if you went back to your

1    inbox, you are not sure how far back you can go

2    in terms of checking E-mails?

3        A.   Off the top of my head, I can't tell

4    you.

5        Q.   I am going to direct your attention to

6    General Counsel Exhibit 53.  Do you recognize

7    this document?

8        A.   Yes, sir.

9        Q.   This document led to the -- this was

10   related to the January 28th collective

11   bargaining negotiations with Local 139?

12       A.   Yes, sir.

13       Q.   And this E-mail led to those

14   negotiations being cancelled eventually; is that

15   correct or postponed?

16       A.   I prefer postponed, yes.

17            MR. WIESE:  I will offer General

18   Counsel Exhibit 53.

19            MS. HILL:  No objection.

20            JUDGE ROSAS:  General Counsel's 53 is

21   received.

22                         (GCX 53 received.)

23   BY MR. WIESE:

24       Q.   This E-mail references an adoption

25   hearing in Indianapolis?

1     A.   Yes, sir.

2     Q.   When did you become aware of that

3  adoption hearing?

4     A.   It was either the 9th or the 10th.  In

5  fact, I think it was the morning of the 10th

6  Susan called me to tell me that they had finally

7  got a date.

8     Q.   And who is Susan?

9     A.   My wife.

10         MR. WIESE:  Okay.  Nothing further.

11         JUDGE ROSAS:  Charging Party, anything?

12         MR. RYAN:  Maybe just a couple if I can

13  take a minute, your Honor.

14         JUDGE ROSAS:  Sure.

15         MR. RYAN:  I am ready, your Honor, when

16  you are.

17         JUDGE ROSAS:  Okay.  We are on.

18                 CROSS EXAMINATION

19  BY MR. RYAN:

20     Q.   Mr. Bogardus, if I could direct your

21  attention to General Counsel Exhibit 28 for a

22  minute.

23     A.   Yes, sir.

24     Q.   Can you help me understand the time

25  frame that you are representing in this

1  document?

2      A.   From the time the union started the

3  bannering and picketing, I realize you don't

4  think it's a picketing, but when you got a

5  little sign with a stake on it, to me it's

6  picketing.

7      Q.   We will reserve that argument for our

8  briefs.

9      A.   It's from the time that that started

10 until Mayish of this year.

11     Q.   Okay.  And then the same thing with

12 General Counsel Exhibit 29?

13     A.   Yes, sir.

14     Q.   I think you testified that this was

15 created roughly two weeks before 28th?

16     A.   Yes.

17     Q.   So from the start of the activity until

18 when you created it?

19     A.   Yes.

20          MR. RYAN:  I don't have anything

21 further.  Thank you.

22          JUDGE ROSAS:  Anything?

23          MS. HILL:  Yes.

24

25

```
 1                CROSS EXAMINATION

 2   BY MS. HILL:

 3       Q.   Mr. Bogardus, would you please put

 4   Exhibit 28 in front of you, sir?

 5       A.   Yes, sir.  Yes, ma'am.  Sorry.  Sorry,

 6   Pat.

 7       Q.   You have listed PC 789 you also

 8   mentioned PC 7089 in part of your discussion

 9   regarding Exhibit 26.  This one you have zero

10   dollars there.  Why is that?

11       A.   At this point they hadn't been impacted

12   the way the other PCs had been impacted.

13       Q.   And where is 789?

14       A.   Wausau.

15       Q.   Now, if you would please look at

16   Exhibit 26.

17       A.   Yes, ma'am.

18       Q.   With respect to Jeremy's father-in-law

19   dying, what, if anything, did you have to do

20   with respect to what you lay out here is this

21   people thing?

22       A.   Jeremy and his team are very close.

23   They have known each other for a lot of years,

24   worked together at other places before Sunbelt

25   and they all wanted to attend the funeral and
```

1    the visitation and the mass as well as the

2    interment.  I went up to --

3            THE REPORTER:  I'm sorry, your Honor.

4    I didn't hear that.

5            JUDGE ROSAS:  Can you repeat that?

6            THE WITNESS:  In the process of Jeremy

7    had a lot of his guys were best friends and that

8    work with them.  They all wanted to go to the

9    funeral.  That would have left the store with no

10   one there.  Two of the guys volunteered to stay,

11   one of the drivers and one of the mechanics and

12   I went up to run the office, you know, for the

13   time period they were going to be out.

14   BY MS. HILL:

15       Q.   Did you have any other employees that

16   you could have moved into those slots of PCM or

17   OSR or equipment rental specialist, anyone like

18   that?

19       A.   No.  At that point there was no way I

20   could get anybody out of the other PCs.  We were

21   in the middle of the vacation season and we are

22   not highly staffed anyway.

23           MS. HILL:  No further questions, your

24   Honor.

25           JUDGE ROSAS:  Any follow up?

 1          MR. WIESE:  Just briefly, your Honor.

 2              REDIRECT EXAMINATION

 3   BY MR. WIESE:

 4      Q.   With respect to filling in at Jeremy's

 5   store, Jeremy's profit center, I can't remember

 6   which one you said --

 7      A.   PC 789.

 8      Q.   PC 789.  Thank you.  Prior to your

 9   filling in there, did you check with any other

10   Sunbelt employees to see if they could fill in?

11      A.   I collected with the PCMs to see what

12   they are vacation schedules looked like and what

13   the depend and their time appeared to be and

14   there was nothing else that was available.

15          MR. WIESE:  Okay.  Okay.  No further

16   questions.

17          JUDGE ROSAS:  Any follow up, Charging

18   Party?

19          MR. RYAN:  No, your Honor.  Thank you.

20          JUDGE ROSAS:  Anything?

21          MS. HILL:  No, your Honor.

22          JUDGE ROSAS:  Thank you, sir.  You are

23   excused.  Please do not discuss your testimony

24   with anyone unless you are otherwise advised

25   otherwise by counsel.

1           THE WITNESS:  Yes, sir.

2           JUDGE ROSAS:  Off the record.

3                (Whereupon, a discussion was had

4                 off the record.)

5           JUDGE ROSAS:  Are we ready to go on the

6      record?  Next witness.

7           MR. WIESE:  Counsel calls Rebel

8      Strohmeyer to the stand.

9           JUDGE ROSAS:  Please raise your right

10     hand.

11                    (Witness sworn.)

12          JUDGE ROSAS:  Please state and spell

13     your name and provide us with an address.

14          THE WITNESS:  Okay.  Home address or

15     business?

16          JUDGE ROSAS:  Business is fine.

17          THE WITNESS:  My name is Rebel Lynn

18     Blake Strohmeyer.  R-E-B-E-L, L-Y-N-N,

19     B-L-A-K-E, S-T-R-O-H-M-E-Y-E-R, and my business

20     address is 679 Heartland Drive, in Sugar Grove,

21     Illinois 60554.

22

23

24

25

1          REBEL L. BLAKE STROHMEYER,

2     after being first duly sworn, deposeth and saith

3     as follows:

4               DIRECT EXAMINATION

5     BY MR. WIESE:

6          Q.   Ms. Strohmeyer, my name is Tyler Weise.

7     I am an attorney with the National Labor

8     Relations Board.  I am going to be asking you a

9     couple questions today.

10         A.   Okay.

11         Q.   What is your current -- who do you

12    currently work for?

13         A.   Sunbelt Rentals.

14         Q.   What do you do for Sunbelt Rentals?

15         A.   I am a regional HR manager.

16         Q.   How long have you been in that position

17    for?

18         A.   Three years.

19         Q.   Are you currently in that position?

20         A.   Yes.

21         Q.   And what are your job duties as a

22    regional HR manager?

23         A.   I manage the spectrum of HR functions

24    for two regions for Sunbelt, so I -- it's a lot

25    to describe.  I am trying to think where do I

1  start.  I don't -- we have recruiting and we

2  have payroll and we have these different

3  departments that are related to HR.  I kind of

4  help bridge the gap between all of those.  I do

5  a lot of any kind of disciplinary actions.  I

6  have involvement in the hiring.  I am involved

7  in all the terminations, employee relations,

8  benefits, those sorts of things.

9      Q.   And what are the two regions you are in

10 charge of HR for?

11     A.   I have Region 9 and Region 13.

12     Q.   What are those regions located

13 geographically?

14     A.   So Region 9 starts in the west at Fargo

15 and then encompasses like the Dakotas, Nebraska,

16 it comes across and it's Minnesota, Wisconsin

17 the greater Chicago area, Michigan and then just

18 touches on Indiana, Ohio, and, yeah.

19     Q.   What about Region 13?

20     A.   Region 13 is southern Illinois, the

21 entire State of Missouri, a little bit of Kansas

22 and a little bit of Kentucky.

23     Q.   Who do you report to?

24     A.   I report to one of the HR directors and

25 her name is Vicky Gibson.

1      Q.   Who reports to you?

2      A.   A generalist named Amanda Thomas.

3      Q.   Do you report to Jason Mayfield the

4  internal vice president for Region 9?

5      A.   I have a dotted line to Jason Mayfield

6  but my direct manager is Vicky Gibson.

7      Q.   Do you have disciplinary authority in

8  your position?

9      A.   Yes, I do.

10      MR. WIESE:  Your Honor, permission to

11  question the witness under 611(c).

12      JUDGE ROSAS:  Granted.

13  BY MR. WIESE:

14      Q.   Ms. Strohmeyer, how long have you been

15  in a human resources capacity?

16      A.   Probably 11 years.

17      Q.   And what are your qualifications?

18      A.   I have a bachelor's degree in

19  sociology, I have a master's degree in human

20  resource development and I am a certified senior

21  professional human resources.

22      Q.   One of your jobs in HR is to ensure

23  compliance with certain laws regarding

24  employment; is that accurate?

25      A.   Yes.

1     Q.   Including anti-discrimination laws?

2     A.   Correct.

3     Q.   Okay.  And anti-disability laws?

4     A.   Yes.

5     Q.   And the National Labor Relations Act,

6  is that also something you assure compliance

7  with?

8     A.   To the best of my ability, yes.

9     Q.   During your time working with Sunbelt,

10  have you had any prior experience with layoffs

11  prior to the Franksville layoff on August 8th of

12  2019?

13     A.   Yes.  I had one store, one satellite

14  location that we closed due to the needs of the

15  business and we did have some layoffs at that

16  location.

17     Q.   What was that location?

18     A.   In Burlington, Iowa.

19     Q.   Was that in Region 9?

20     A.   Yes, it was.

21     Q.   And who was the regional vice president

22  at the time that facility closed?

23     A.   Bryan Albrecht.

24     Q.   What role did you have in the closure

25  of that facility?

1    A.   It was a very small -- it was a
2  satellite location so not a full fledged PC and
3  it really -- the purpose of it was to service a
4  fertilizer plant and then when the job and kind
5  of the greater business of that plant went away,
6  we decided to close that facility and so I went
7  down and met with the employees and informed
8  them of the closing and the projected dates and,
9  you know, what the severance and any related
10 things like that would be for them.
11   Q.   Did you conduct any sort of that impact
12 analysis regarding protected categories like
13 age, race, anything with regard to that closure?
14   A.   No.
15   Q.   Okay.  When you met with the employees
16 for that closure what was the purpose of that
17 meeting?
18   A.   To just inform them that we were
19 closing the store.  I mean it had been rumored
20 for a while and they kind of knew that it was
21 coming and then there were a couple of them in
22 that situation that we actually had positions
23 open in stores that were at a reasonable
24 distance, so we did offer them the opportunity
25 to have a position at one of those stores but

1  they were open positions at those stores that

2  they were qualified for.

3      Q.   Did those individuals have to apply for

4  those positions or were they directly

5  transferred?

6      A.   Yes.  Yes.  We informed them that if

7  they were interested in this, there was an open

8  position.  That they could apply for it and then

9  we would facilitate that transfer.

10     Q.   Transitioning now to the Franksville

11 layoff, you are familiar with that layoff,

12 correct?

13     A.   Yes.

14     Q.   Were you involved at all in the

15 decision making process as to whether to lay off

16 the employees at the Franksville location?

17     A.   No.

18     Q.   When did you become aware that that

19 decision had been made?

20     A.   I received an E-mail from my director

21 on the afternoon of Monday, August 5th and the

22 E-mail simply said I think it was just a couple

23 of sentences but I think it said please review

24 these layoff letters and the employees -- it

25 included for three employees and then the last

1    sentence was building severance agreements too.

2    I believe Amanda has that template referring to

3    my general list.

4        Q.   Okay.  And if you direct your attention

5    to so there is a binder up there in front of

6    you.

7        A.   Okay.

8        Q.   If you flip in that binder to document

9    marked as General Counsel Exhibit 31 there

10   should be some tabs and if you look to 31, that

11   will help.  Are you there?

12       A.   Yes.

13       Q.   Is this the E-mail you were referring

14   to in your testimony?

15       A.   Yes.

16       Q.   Thank you.  And this was the first time

17   that you heard about this decision?

18       A.   Yes.

19       Q.   And at the time you received this

20   E-mail, was it your understanding that a

21   decision had been made to lay off those three

22   employees?

23       A.   Yes.  Right.  This was the first, yes.

24       Q.   And if you look at the next document in

25   that binder General Counsel Exhibit 32 --

```
 1      A.    Okay.
 2      Q.    -- if you can recall were these the --
 3  so E-mail in General Counsel Exhibit 31 has some
 4  attachments listed in it.  Do you see that?
 5      A.    Yes.
 6      Q.    Okay.  And these letters in General
 7  Counsel Exhibit 32 are these the attachments to
 8  that E-mail as best you can?
 9      A.    As best as I can recall, yes.
10      Q.    Okay.  Looking at General Counsel
11  Exhibit 32, did you send these letters to the
12  employees --
13      A.    No.
14      Q.    -- in question?
15      A.    No.
16      Q.    Do you know how they were delivered to
17  those employees?
18      A.    These letters were not delivered to the
19  employees.
20      Q.    Was there a different version of this
21  letter that was provided to the employees?
22      A.    Yes.
23      Q.    Did you draft that letter?
24      A.    I made some modifications to this
25  letter and it was delivered to the employees,
```

1    yes.

2        Q.   When did you make those modifications?

3        A.   I believe it was probably August 7th.

4        Q.   What modifications did you make?

5        A.   I included a statement that they would

6    be paid through August 16th so there was some

7    additional language about that and that was I

8    can't recall exactly but I think that that was

9    one of the primary modifications, and then the

10   rest of the language was very similar, if not

11   the same and that their last day worked would

12   have been August 8th instead of August 7th as

13   stated on this version.

14       Q.   Okay.

15       A.   And I should also say this says that a

16   severance has been included for further review.

17   That part was taken out because we were going to

18   negotiate the severance.

19       Q.   So if you go into that binder now and

20   flip over to General Counsel Exhibit 17, do you

21   recognize this document?

22       A.   Yes.

23       Q.   Okay.  Did you review this document

24   before it was sent out to the union?

25       A.   Yes, I did.

1    Q.   Do you recall when you reviewed this

2  document?

3    A.   It would have been August 6th.

4    Q.   Okay.  At the time you reviewed this

5  document, did you understand the term

6  reorganization in this letter to mean that

7  employees were being laid off at Profit Center

8  776?

9    A.   I understood from Mr. Mayfield that the

10  intent was to eliminate the service department

11  and those employees, yes.

12    Q.   And those were the union represented

13  employees who were still employed at that

14  facility, correct?

15    A.   Correct.

16    Q.   So if you look now at the documents

17  that I gave you that aren't in the binder so if

18  you pick up with the top document it should be

19  marked as General Counsel Exhibit 33.

20    A.   Okay.

21    Q.   Do you recognize this document?

22    A.   Yes, I do.

23    Q.   And what is it?

24    A.   It was an E-mail between me and several

25  other employees of Sunbelt.

1    Q.   And this E-mail is explaining the

2    employment of Mario Rivera; is that correct?

3    A.   Correct.

4    Q.   Okay.  Mario Rivera worked at the

5    Franksville location; is that correct?

6    A.   Yes.

7    Q.   And he was represented by the union?

8    A.   I mean, not officially I guess but in

9    negotiations, yes.

10   Q.   Okay.  Okay.  And do you recall why you

11   wrote this E-mail on September 16th of 2019?

12   A.   Yes.  Because he had transferred to our

13   specialty division; so at that point, he is not

14   under my umbrella anymore.  I handled the

15   general tool division and there was some

16   confusion between multiple parties about, okay,

17   what's happening with him?  He had a worker's

18   comp situation after the transfer was initiated

19   and then there was some changing of positions

20   and so I tried to get all the information

21   together and communicate to everyone that was

22   involved because like I said there was some kind

23   of confusion because the last that I had heard,

24   you know, he had applied for and had been

25   accepted into the position at what we call PC

1  1179 in Watertown as an HVAC tech and then when

2  we returned, when he got his release which again

3  I was not in the loop on because he had already

4  transferred to Climate Control, I found out that

5  he had came back and was working at the Waukesha

6  location; so I was trying to see what was going

7  on with him.

8          I also needed to issue some

9  disciplinary action to him because he failed to

10 perform some of our safety expectations which

11 ultimately resulted, you know, as part of his

12 injury and so I needed to find out who like who

13 I was delivering that to and so I sent this out

14 to these different parties that were involved so

15 that we were all on the same page about what

16 happened in Mario's transfer and where he was

17 and why.

18 Q.   Do you recall what period of time Mario

19 was working at the Waukesha location?

20 A.   I believe I think it says in here he

21 was out on worker's comp leave through

22 September 15th and then I believe when he got

23 his release to return to work from worker's

24 comp, that he was brought into the Waukesha

25 location.  That's where he began working

 1  following his release.

 2      Q.   And the Waukesha location, is that a

 3  general tool facility?

 4      A.   No.  It's a Climate Control.  We have a

 5  general tool in Waukesha but this particular PC

 6  587 that's located in Waukesha as well, separate

 7  store, separate division.

 8      Q.   Okay.

 9           JUDGE ROSAS:  Since the witness is

10  reading from the document, is there going to be

11  any objection to it going into evidence?  You

12  are offering it?

13           MS. HILL:  No.

14           MR. WIESE:  Yes.  I will offer it.

15           JUDGE ROSAS:  General Counsel's 33 is

16  received.

17                         (GCX 33 received.)

18  BY MR. WIESE:

19      Q.   If you go back to the binder of

20  exhibits now and I want to look at General

21  Counsel Exhibit 19.  Do you recognize this

22  document?

23      A.   Yes.

24      Q.   And this is the severance agreement for

25  one of the bargaining union employees at the

1    Franksville location; is that correct?

2        A.   Correct.

3        Q.   Did you present this agreement to the

4    bargaining unit employee?

5        A.   I did not.

6        Q.   Okay.  Were you there -- Did you have

7    any discussions with this bargaining unit

8    employee Mr.  Romanowski regarding this

9    agreement?

10       A.   During the -- I was on the phone for

11   the separation meetings and this was presented

12   at a later time after these were negotiated, but

13   I didn't have any conversations with Mr.

14   Romanowski about the release agreement, no.

15       Q.   And with respect to General Counsel

16   Exhibit 20, which is the same document for --

17   you can turn to that.  This is the same document

18   with another employee Kyle McKellips; is that

19   accurate?

20       A.   Yes.

21       Q.   Did you have any discussion with Mr.

22   McKellips about the release agreement?

23       A.   I did not, not about the release

24   agreement, no.

25       Q.   I am going to direct your attention now

1  to General Counsel Exhibit 46 which is it should

2  be the second document in the loose documents

3  that I gave you.

4  A.  Okay.

5  Q.  Do you recognize this document?

6  A.  Yes.

7  Q.  And this is a portion of Sunbelt's

8  policies and procedures document, correct?

9  A.  Correct.

10  Q.  Okay.

11  MR. WIESE:  And I'll offer General

12  Counsel Exhibit 46.

13  MS. HILL:  No objection, sir.

14  JUDGE ROSAS:  General Counsel 46 is

15  received.

16  (GCX 46 received.)

17  BY MR. WIESE:

18  Q.  So if you look at Policy 5.8 on the

19  first page, that deals with Separations from

20  Employment; is that correct?

21  A.  Yes.

22  Q.  And then if you go over to the third

23  page of document, the very bottom, it looks like

24  5.8.3 deals with Layoffs; is that correct?

25  A.  Yes.

1    Q.   And you'd agree with me that these

2  policies are supposed to be followed by all

3  people who work for Sunbelt?

4    A.   Yes.

5    Q.   And they are important policies?

6    A.   Yes.

7    Q.   I'd like to direct your attention now

8  to General Counsel Exhibit 57.

9    A.   Was there another question regarding

10 this?

11   Q.   No.  No more questions.  Thank you.

12 With respect to General Counsel Exhibit 57, do

13 you recognize these documents?

14   A.   Yes, I do.

15   Q.   These are separation notices, correct,

16 for Kyle McKellips and Allan Romanowski?

17   A.   Yes.

18   Q.   And these are the two -- the two union

19 represented employees for the Franksville

20 facility?

21   A.   Yes.

22   Q.   And you created -- you were the one who

23 created these separation notices?

24   A.   Yes.

25   Q.   You created them on August 8th of 2019?

```
 1      A.   Yes.

 2           MR. WIESE:  I'll offer General Counsel

 3  Exhibit 57.

 4           MS. HILL:  No objection.

 5           JUDGE ROSAS:  General Counsel 57 is

 6  received.

 7                         (GCX 57 received.)

 8  BY MR. WIESE:

 9      Q.   With respect to Mr. McKellips in the

10  top third of the document on the right-hand

11  side, there is some check boxes there is paid

12  vacation.  Do you see that?

13      A.   Yes, I do.

14      Q.   And then eligible for rehire and I want

15  to ask about the one below that, union employee.

16  Do you see that box?

17      A.   Yes.

18      Q.   Do you recall why you checked the no

19  box in that check box?

20      A.   Because he was not covered by our

21  ratified documents, so in our world that means

22  that he is not subject to any kind of contract

23  which would be reviewed as part of the

24  termination and separation process.

25      Q.   Okay.  And with respect to Mr.
```

1  Romanowski on the second page, the same

2  explanation would apply to him?

3      A.   Yes.

4      Q.   Okay.  So within region -- so you are

5  HR manager for Regions 9 and 13, correct?

6      A.   Yes.

7      Q.   And within those regions, how many

8  stores are there?

9      A.   There is 75 locations total between the

10  two regions.

11      Q.   Besides the store closure in

12  Burlington, the layoff at Franksville is the

13  only layoff that you have been a part of with

14  Sunbelt; correct?

15      A.   Correct.

16      Q.   And that layoff only affected the union

17  represented employees at the Franksville

18  facility correct?

19      A.   It involved the service department,

20  yes.

21      Q.   And those were the employees who were

22  represented by the union; is that right?

23      A.   Yes.

24      Q.   Out of the 75 stores that are under

25  your purview, none of those stores are will-call

1  facilities, are they?

2     A.   No.

3     Q.   Besides the Franksville facility now of

4  course.

5     A.   Yes.

6     Q.   And prior to the Franksville facility

7  being turned into a will-call facility, you had

8  no prior experience with that transition, did

9  you?

10    A.   I'm sorry.  I am not sure what you

11  mean.

12    Q.   The transition -- so let me back it up.

13  So the Franksville facility was changed from a

14  general tool facility to a will-call general

15  tool facility; is that accurate?

16    A.   Yes.

17    Q.   And this -- the transition that

18  occurred at the Franksville facility, this was

19  the first time in your experience working for

20  Sunbelt that a transition of this type had

21  occurred?

22    A.   From a general tool PC to a will-call

23  facility, yes.

24    Q.   Okay.  And with regard to -- you are

25  familiar with the term head count, correct?

1    A.    Yes.

2    Q.    And head count means the number of

3 people working at given store, correct?

4    A.    Right.

5    Q.    And according to Sunbelt's policies,

6 any change to the head count is supposed to be

7 run through you if it occurs in either Region 9

8 or Region 13; is that correct?

9    A.    Not necessarily.

10    Q.    Okay.  So it's your testimony today

11 that not all -- that not every change to head

12 count is supposed to be run through you?

13    A.    I have a lot of different situations

14 and different types of stores even within

15 general tool so it would depend on, you know,

16 particular situations generally.  I am involved

17 in any of those types of situations where we may

18 be adding head count, but it doesn't absolutely

19 require my approval.

20    Q.    Okay.  I am not asking about approval,

21 though.  You are involved in the process?

22    A.    I am involved in the process.

23    Q.    Okay.  Of a change in head count?

24    A.    Yes.

25    Q.    And that includes the removal of

1   employees as well as the addition of employees,

2   correct?

3       A.   What do you mean by "removal"?

4       Q.   When you are -- when you have less a

5   lower head count than you did before the

6   decision?

7       A.   Like a position elimination?

8       Q.   Yes.

9       A.   Yes.

10      Q.   And the elimination of the individual

11  employee as well, correct?

12      A.   Correct.

13          MR. WIESE:  Nothing further.

14          JUDGE ROSAS:  Charging Party, anything?

15          MR. RYAN:  Just a quick clarification

16  question.

17                 CROSS EXAMINATION

18  BY MR. RYAN:

19      Q.   In regards to the Franksville location,

20  you talked about eliminating the service

21  department.  Can you maybe expand on that a

22  little bit more?  What do you mean when you say

23  the "service department"?

24      A.   My understanding is that the

25  reorganization there was eliminating the service

1   department because there wouldn't be a need for

2   the services that are typically required in the

3   servicing of larger equipment and as part of the

4   reorganization my understanding was that they

5   were moving out the significant portion of the

6   larger equipment to just leave some of the

7   smaller general tool items that would be present

8   in a will-call facility.

9      Q.   Okay.  Thank you.  The service

10  department, though, is -- can you define your

11  understanding of service department?

12      A.   Would be those employees whose job

13  profiles would be assigned to the department

14  that provides the servicing of equipment both in

15  the location and the shop and as far as getting

16  kind of road mechanics or outside service that

17  would be tied to that particular location.

18         MR. RYAN:  Okay.  Thank you.  Nothing

19  further, your Honor.

20         JUDGE ROSAS:  Cross?

21         MS. HILL:  No, your Honor.

22         JUDGE ROSAS:  Thank you, ma'am.  You

23  are excused.  Please do not discuss your

24  testimony with anyone until you are advised

25  otherwise by counsel.

 1          THE WITNESS:  Okay.

 2          JUDGE ROSAS:  Thank you.  Have a good

 3  day off the record.

 4               (Whereupon, a lunch recess was

 5                taken.)

 6          JUDGE ROSAS:  Back on the record.  Next

 7  witness.

 8          MR. WIESE:  Your Honor, counsel calls

 9  Jamie Smith to the stand.

10          JUDGE ROSAS:  Please raise your right

11  hand.

12                        (Witness sworn.)

13          JUDGE ROSAS:  Please have a seat.

14  State and spell your name and provide us with an

15  address.

16          THE WITNESS:  State and spell my name?

17  My name is Jamie Smith spelled J-A-M-I-E and

18  then S-M-I-T-H, and my address is 2880 West

19  Southway Drive, Franklin, Wisconsin 53132.

20          JUDGE ROSAS:  Okay.  Have a seat and

21  please keep your voice up.

22

23

24

25

1                    JAMIE SMITH,

2     after being first duly sworn, deposeth and saith

3     as follows:

4                    DIRECT EXAMINATION

5     BY MR. WIESE:

6         Q.    Mr. Smith, where do you currently work?

7         A.    I am currently unemployed right now.

8         Q.    Where did you work prior to being

9     unemployed?

10        A.    I worked for Naperville Excavating and

11    before that Sunbelt Rentals.

12        Q.    What did you do for Sunbelt Rentals?

13        A.    I am a CDL driver, did pick ups and

14    deliveries throughout southeast Wisconsin.

15        Q.    How long were you employed with

16    Sunbelt?

17        A.    About a little over four years.

18        Q.    Can you identify the four-year period

19    you were a driver?  What starting when?  When

20    did you start becoming a driver?

21        A.    Well, it would be about I guess four

22    years ago.

23        Q.    Okay.  And when was had your last --

24    when was your last day working as a driver with

25    Sunbelt?

1    A.    July 1st.

2    Q.    Of what year?

3    A.    This year, 2019.

4    Q.    Who was your supervisor at Sunbelt?

5    A.    It would have been Bryan Anderson.

6    Q.    What types of equipment did you haul

7  when you worked for Sunbelt?

8    A.    I hauled everything from boomless

9  backhoes, rough terrain forks, all the way down

10  a pressure washer.

11    Q.    Did you haul equipment that weighed

12  less than 10,000 pounds?

13    A.    Yes.

14    Q.    How frequently?

15    A.    Pretty much a lot.  I mean, whatever

16  was in for rent, we could take.  It could be a

17  ladder.  It could be, what do you call them,

18  backpack vacuums.  People laugh when you bring

19  them with a semi but --

20    Q.    Besides hauling equipment, what if

21  anything, else did your job as a driver for

22  Sunbelt involve?

23    A.    As a driver for Sunbelt, pretty much it

24  was just hauling equipment.  We'd haul it, pick

25  it up and sometimes you go to other branches,

1  pick stuff up, drop stuff off.

2      Q.   Did you unload the equipment yourself

3  when you were a driver?

4      A.   Yes.  Load and unload.

5      Q.   How did your employment end with

6  Sunbelt?

7      A.   I was let go for not taking a safety

8  quiz because I had forgot about it.

9      Q.   Who made the decision to let you go?

10     A.   It would have been Bryan Anderson and

11 Bo.

12     Q.   Do you know Bo's last name?

13     A.   Bogardus.

14     Q.   During your time working at Sunbelt,

15 did hear any managers or supervisors make any

16 negative comments about the union?

17     A.   The only thing I heard was from Chris

18 the shop manager.

19     Q.   And when did you hear this statement

20 from the shop manager Chris?

21     A.   I would have to say it was probably

22 early spring this year.

23     Q.   Of what year?

24     A.   This year.

25     Q.   Do you know Chris' last name?

1      A.    Pendel, Pendle, something like that.

2  Chris Pendle.

3      Q.    Where was Mr. Pender when he made this

4  remark?

5      A.    He would have been probably right where

6  his office was in the shop, I believe.

7      Q.    And were you in the office when Mr.

8  Pender made this remark?

9      A.    Not in his office.  His office is

10  actually like part of the shop and there is

11  doors that go into the main lobby entrance from

12  the shop and I was coming out them doors.

13      Q.    Okay.  How far away from his office

14  were you when you made this remark?

15      A.    His office door, maybe ten feet.

16      Q.    Was anybody else present in the office

17  with Mr. Ryan presented Pender?

18      A.    There was a couple of shop guys.

19  Exactly who now, I don't remember.  It's been so

20  long.

21      Q.    And could you clearly hear Mr. Pender

22  make this remark?

23      A.    Yes.

24      Q.    Did you recognize his voice?

25      A.    Sure.  Yeah.

1    Q.   And what did you hear overhear Mr.

2  Pender say?

3    A.   Well, he said that the union was never

4  going to get in and it was never going to happen

5  but the thing was is the union was already voted

6  in for over a year and the contract was being

7  worked on.

8    Q.   Did you overhear Mr. Pender say

9  anything else?

10   A.   No.  I believe that was it.  I had to

11  keep going.  I was a driver it was kind of go,

12  go, go.  I was never really too much at the

13  shop.

14   Q.   How long did you listen to Mr. Pender

15  speak to the employees?

16   A.   That was maybe 5, 10 seconds.  It

17  wasn't long.

18   Q.   Did this conversation stand out to

19  you --

20   A.   Yes.

21   Q.   -- when you heard it?  Why is that?

22   A.   Because like I stated the union was

23  already voted in.  Why would it not get in now.

24   Q.   I am going to direct your attention to

25  in the exhibit binder in front of you there

1  should be a binder, black binder.  Do you see

2  that?

3      A.   I do.

4      Q.   If you turn in that exhibit, that

5  binder, to what's marked as General Counsel

6  Exhibit 25 so there should be some tabs in

7  there.  If you open it up, there should be 25.

8      A.   The picture?

9      Q.   Yeah.  It's a series of pictures and

10  I'll direct you to specific pages in there, so

11  if you look at Page 5 of that exhibit, what type

12  of truck is that?

13      A.   That's a tractor-trailer.  It's for

14  hauling equipment.

15      Q.   Is that the same type of truck that you

16  drove when you worked for Sunbelt?

17      A.   It looks identical to it, yep.

18      Q.   Did you pull trailers like that when

19  you worked for Sunbelt?

20      A.   Yep.  Same trailer, same truck.

21      Q.   What type of trailer is that?

22      A.   They call it a lowboy.  I think they

23  were Landoll.

24      Q.   If you go to Page 7 of the exhibit, do

25  you recognize what type of equipment that is on

1    the trailer back there?

2        A.   It looks like a mini backhoe.

3        Q.   Did you haul that type of equipment

4    when you worked for Sunbelt?

5        A.   Yep.

6        Q.   If you go to Page 9 of General Counsel

7    Exhibit 25, do you recognize what's on the back

8    of the trailer in that picture?

9        A.   Yeah.

10       Q.   And what's back there?

11       A.   Well, it looks like the backhoe.  It

12   looks like a roller.  I can't make out all of it

13   but it's all stuff we would haul.

14       Q.   And if you turn over to Page 10 of the

15   exhibit, did you haul the type of equipment

16   shown on the trailer in Page 10 of General

17   Counsel Exhibit 25?

18       A.   Yes.  Hauled that, too, and everything

19   you can see in the background, all that time.

20       Q.   If you go to Page 36, are you there?

21       A.   Yeah.

22       Q.   Okay.  Do you recognize the equipment

23   on the back of the trailer there?

24       A.   I do.

25       Q.   Okay.  What type of equipment is that?

1      A.   It looks like a boom lift and a

2  backhoe.

3      Q.   Did you haul that type of equipment

4  when you worked or Sunbelt?

5      A.   Yep.

6      Q.   How --

7      A.   All the way down to that little yellow

8  cart you see in the front on the ground and

9  everything.

10     Q.   If you go to Page 40 of the exhibit.

11  41 is actually better.  Go to Page 41.  Do you

12  recognize this piece of equipment?

13     A.   The one on the truck?

14     Q.   Yeah.

15     A.   Yes.

16     Q.   And did you haul this type of

17  equipment?

18     A.   We did, yeah, and everything you see in

19  front of the truck.

20          MR. WIESE:  Nothing further.

21          JUDGE ROSAS:  Charging Party, anything?

22          MR. RYAN:  No, your Honor.  Thank you.

23          JUDGE ROSAS:  Cross?

24          MS. HILL:  Yes.

25

1                    CROSS EXAMINATION

2    BY MS. HILL:

3        Q.    Looking at --

4              MR. WIESE:  Sorry to interrupt you.

5    Would you like the affidavit before the cross?

6              MS. HILL:  Sure.

7              MR. WIESE:  Okay.

8              JUDGE ROSAS:  Let's go off the record.

9                   (Whereupon, a discussion was had

10                    off the record.)

11             JUDGE ROSAS:  Cross?

12   BY MS. HILL:

13       Q.    All right.  Mr. Smith, would you please

14   look at Page 41?

15       A.    Same one we were just on?

16       Q.    Yes, sir.

17       A.    Yep.

18       Q.    You indicated that you hauled that

19   yellow and black John Deere piece of equipment?

20       A.    Yeah.  Very similar, same, yeah.

21       Q.    And you said even that I think you

22   called it the little yellow piece of equipment?

23       A.    Yeah.  Little yellow cart there in

24   front, too.

25       Q.    Correct.  That's a piece of Sunbelt

1  equipment, correct?

2      A.   Yeah.

3      Q.   And so Sunbelt had green equipment; is

4  that correct?

5      A.   Yep.

6      Q.   And Sunbelt had yellow equipment,

7  correct?

8      A.   Yes, and some had other colors if they

9  had bought out from another company and didn't

10  repaint the stuff, yes.

11      Q.   Right.  As you just stated, how long

12  did it usually take to repaint equipment from

13  let's say -- wait until I am finished -- until,

14  you know, after they bought another company and

15  brought in the equipment, how long would it

16  take?

17      A.   Sometimes they never painted anything.

18  They just put numbers on it and use it as that.

19      Q.   So you don't think it's unusual to have

20  a yellow cart in this picture?

21      A.   No.  I worked there for four years.

22      Q.   And if you look at Page 40, sir, is

23  that another picture of the little yellow cart?

24      A.   Yep.

25      Q.   And then to the far right, that's a

1   picture of the piece of equipment that's orange,

2   correct?

3       A.   Yep.

4       Q.   Now, when you say yellow and orange and

5   other colors, would they still have Sunbelt's

6   logo on them?

7       A.   Sometimes, not just numbers.

8       Q.   Just numbers?

9       A.   Sometimes, yeah.

10      Q.   For inventory purposes?

11      A.   Yeah but sometimes those numbers aren't

12  always the Sunbelt numbers they were numbers

13  that were already on from the company that had

14  them before and they would use that number, too,

15  sometimes.  Uh-huh.

16      Q.   Okay.  Did Mr. Pender, Chris Pender,

17  ever participate in the negotiations?

18      A.   No.  He was never there that I know.

19      Q.   Okay.  You participated --

20      A.   I did.

21      Q.   -- in almost all of the negotiations,

22  correct?

23      A.   Yes.

24      Q.   You also mentioned I think this was,

25  just a moment, Page 9, please.  You were

1  identifying the backhoe and the roller as to use

2  your words stuff that you would haul for

3  Sunbelt, correct?

4      A.  Page 9, yep.

5      Q.  And then you also said and also

6  everything in Ahern's yard?

7      A.  Well, everything that looks like that.

8  All the scissors, all that type of equipment.

9  It's the same that Sunbelt had.  Ahern has the

10 same.  United Rentals has the same.

11     Q.  I just want to make sure you didn't

12 haul any of Ahern's equipment, though?

13     A.  No.  That type of equipment, though,

14 Sunbelt has that equipment, Ahern has the same,

15 Franklin has it, United Rentals has the same.

16     Q.  Okay.  You don't remember the names of

17 the to use your words couple of guys in Mr.

18 Pender's office.  Did you speak to those couple

19 of guys later about what Mr. Pender allegedly

20 said?

21     A.  Probably not because I had to get

22 going.  I'd have to pick up some deliveries and

23 sometimes shop is all gone by the time I get

24 back.

25          MS. HILL:  No further questions, sir?

1        JUDGE ROSAS:  Any follow up?

2        MR. WIESE:  No, your Honor.  Not from

3  General Counsel.

4        MR. RYAN:  No, your Honor.  Thank you.

5        JUDGE ROSAS:  Thank you, sir.  You are

6  excused.  Please do not discuss your testimony

7  with anyone until you are advised otherwise.

8  Thank you.

9        THE WITNESS:  Thank you.

10       JUDGE ROSAS:  Thank you.  Have a great

11  day.  Next witness.

12       MR. WIESE:  I'll go retrieve him.

13          (Whereupon, a short recess was

14           taken.)

15       JUDGE ROSAS:  On the record.  Next

16  witness.

17       MR. WIESE:  Counsel for the General

18  Counsel calls Ramon Gutierrez to the stand.

19       JUDGE ROSAS:  Sir, please raise your

20  right hand.

21            (Witness sworn.)

22       JUDGE ROSAS:  Have a seat and state and

23  spell your name and provide us with an address

24  and keep your voice up.

25       THE WITNESS:  My name is Ramon

1  Gutierrez.  R-A-M-O-N, G-U-T-I-E-R-R-E-Z.  I

2  live in 36 -- I mean, excuse me.  3460 South

3  19th Street, Milwaukee, Wisconsin 53215.

4                    RAMON GUTIERREZ,

5  after being first duly sworn, deposeth and saith

6  as follows:

7                    DIRECT EXAMINATION

8  BY MR. WIESE:

9      Q.   Mr. Gutierrez, where do you currently

10 work?

11     A.   I am not working at the moment.

12     Q.   Prior to being unemployed, where did

13 you work?

14     A.   I worked for Environmental Control

15 Industries and -- outside of Foxtown.

16     Q.   Have you worked for Sunbelt Rentals in

17 the past?

18     A.   Yes.  Four years and two months and

19 ten days.

20     Q.   I am going to ask you to keep your

21 voice up a little bit.

22     A.   I'm sorry.

23     Q.   What facility did you work at?

24     A.   Franksville and Racine.

25     Q.   What did you do at the Franksville

1  facility?

2      A.    Well, I was a Mechanic 1.  My job was

3  staging all the orders for the next day, making

4  sure everything was in the proper place for the

5  drivers and helping customers and checking the

6  machines.

7      Q.    When did your employment end with

8  Sunbelt?

9      A.    June 10th of this year.

10     Q.    How did your employment end?

11     A.    They just called me and they told me

12  that I broke some rules and terminated me right

13  then and there.

14     Q.    And when you say "they," who are you

15  talking about?

16     A.    Bryan Anderson, Chris Pender and Bo

17  Bogardus.

18     Q.    Who was your supervisor at Sunbelt?

19     A.    Chris Pender.

20     Q.    Are you aware of any efforts while you

21  were working at Sunbelt or were you aware of any

22  efforts while you were working at Sunbelt to

23  decertify or get rid -- are you familiar with

24  that term decertify?

25     A.    Decertify, is that for the petition?

1    Q.   Yes.

2    A.   Yes.

3    Q.   To get rid of union?

4    A.   Yes.

5         THE REPORTER:  I'm sorry, your Honor.

6    I am struggling a little bit to hear.

7         THE WITNESS:  The petition he is

8    talking about which get a revote on the union.

9    BY MR. WIESE:

10    Q.   And where did you become aware of the

11    efforts to get a revote on the union?

12    A.   I was talking to Mario Rivera.  He said

13    if we could get three signatures, we could get

14    it revoted.  We were tired of having to go

15    through the process.  It was taking forever.

16    Q.   And when -- so I am asking when did you

17    become aware of that?

18    A.   That's when Bryan Anderson came to my

19    bay, I was in the last bay in the back and he

20    told me that the papers were on the wall --

21    sorry.  The paper was up on the wall and if be

22    anybody tells me anything, especially Al, to let

23    him know but at that time I didn't know what he

24    was talking about.  When he walked away I was

25    doing my paperwork and I just walked over to see

1   what he was talking about.

2       Q.   And when did this interaction with the

3   manager Anderson occur?

4       A.   I am going to say -- I am not exactly

5   sure on dates.  I am not sure how you say

6   April maybe but I am not sure.

7       Q.   April of what year?

8       A.   Of this year.

9       Q.   And where were you when Mr. Anderson

10  spoke to you about this paper?

11      A.   I was doing some paperwork in my bay

12  for some machines I just checked in.  I am in

13  the last bay in the building all the way in the

14  back.

15      Q.   Did you approach Mr. Anderson or did

16  Mr. Anderson approach you?

17      A.   He walked up to me when I was doing

18  paperwork and started telling me that everything

19  was done, that the paperwork was up on the

20  wall --

21      Q.   I am going to stop you for a second.

22  I'll ask you what Mr. Anderson said in a second

23  but do you recall what time of day it was when

24  Mr. Anderson approached you?

25      A.   It could have been just a little bit

1  before lunch.  It wasn't that late.

2     Q.   Was anybody else present for this

3  conversation?

4     A.   At that time I was the only one

5  standing there.

6     Q.   So now what do you recall from that

7  interaction with Mr. Anderson?

8     A.   I just recall that I was doing

9  paperwork and he just walked out of nowhere and

10  told me that the papers were up on the wall and

11  by the through doors in the break room, in both

12  of those places and I am looking at him not

13  knowing what he is talking about.  He says if

14  anybody tells me anything especially Al to let

15  him know.  That he is not going to put up with,

16  zero tolerance.  That really blew my mind

17  because I still didn't know what he was talking

18  about.

19     Q.   Okay.  So you were not aware of what

20  paper he was talking about?

21     A.   I wasn't.  Not at the time.

22     Q.   Did you become aware of that?

23     A.   I walked over there to see what he was

24  talking about and I started reading that they

25  had a petition for revote and later on, I found

1  out that they use my signature and I never put

2  my signature on any revote.

3     Q.   I don't want to get into that.  Let's

4  not talk about that, but I do want to ask you

5  with respect to the Al mentioned by Mr.

6  Anderson.  Do you know who he was talking about?

7     A.   That was my coworker.  He works on bay

8  next to me but at that time he was out in the

9  yard servicing a machine.

10     Q.   And do you know Al's last name?

11     A.   Romanowski.

12     Q.   Does Al have any connection to the

13  union?

14     A.   His father was in the union.  His

15  father passed away several years ago.

16     Q.   What, if anything, do you recall saying

17  in response to Mr. Anderson regarding the things

18  that he brought up?

19     A.   I find it funny that he asked me if Al

20  told me anything, so I just joked around.  I

21  said Al tells me anything, I will sock him in

22  the mouth but I was just joking --

23         THE REPORTER:  I'm sorry.  Could you

24  repeat that, please?  Your Honor?

25         THE WITNESS:  Mr. Anderson told me that

1    -- he came in a second time and asked me if Al

2    told me anything and I told him why would he

3    tell me anything.  If he tells me anything, I am

4    going to sock him in the mouth.  I was just

5    joking.

6    BY MR. WIESE:

7        Q.    This remark you recall about socking Al

8    in the mouth, was this during that same

9    interaction that we were just discussing?

10       A.    No.  It was a month or so later he came

11   and asked me if anybody been telling me anything

12   about that paperwork that was on the wall for

13   the revote.

14       Q.    And I am going -- I want to get there

15   in a second but first I want to finish up the

16   first interaction.  Do you recall anything that

17   you said in response to Mr. Anderson the first

18   time he came up to talk to you about this

19   decertification paper?

20       A.    No.  Not that -- I really didn't know

21   what he was talking.

22       Q.    Okay.  Let's go to the second

23   conversation.  Do you recall when that

24   conversation occurred?

25       A.    No.  Actually, that time I was in the

1    front by first bay looking at the computer.

2    When he walked out, he was just walking by and

3    he stopped and he walked up to me and he told me

4    how's everything going?  I said fine.  He said

5    Al or anybody told you anything about that

6    paper?  And that's when he told him that if he

7    told me anything, I would sock him and I started

8    laughing with him.

9        Q.   Who initialed this second encounter?

10       A.   Mr. Bryan -- Mr. Anderson.

11       Q.   Was anybody else present during that

12   interaction?

13       A.   Not at that time.  If they were.  They

14   were too far to way to hear us talk.

15       Q.   Around the period of time of the second

16   interaction, do you recall having any other

17   conversations with Manager Anderson with about

18   the union?

19       A.   Only when one time when I was coming

20   out from having my lunch break and he was

21   walking in he told me your buddies are outside

22   and I said what buddies?  I don't have no

23   buddies in Wisconsin.  I am from California.  He

24   said your union buddies and he pointed at the

25   car outside parked at the corner.  I said they

1  are not my buddies.  I just walked back to the

2  shop.

3      Q.   Was anybody else present for this

4  conversation?

5      A.   Dustin was sitting on his computer

6  where he takes orders in the front.  I don't

7  know his last name and Gary Stamm was in his

8  little office with the door open.  They just

9  peeked over and kept doing the work.

10     Q.   Who initiated this conversation?

11     A.   Mr. Anderson.

12     Q.   When you told Mr. Anderson that you

13 didn't have any boys in Illinois, how did he

14 respond?

15     A.   He said your union buddies.

16     Q.   And did you respond to that?

17     A.   Yes.  When he pointed at the car

18 outside I said they are not my buddies, and I

19 don't want to talk to him about the union.

20 That's not healthy.

21     Q.   Did this conversation stand out to you?

22     A.   Oh, I regret that he came up to me and

23 told me that that day.

24     Q.   Why is that?

25     A.   I feel like he was singling me.  They

1  were always trying to single us out, see how

2  wanted to be union and who didn't, so...

3          THE REPORTER:  I'm sorry, your Honor.

4          JUDGE ROSAS:  Repeat that, sir.

5          THE WITNESS:  I thought he was singling

6  me out.  They always try to find out who was for

7  union and who wasn't and we all had to act

8  neutral for our own benefits.

9  BY MR. WIESE:

10     Q.   Mr. Gutierrez, were you working at

11  Sunbelt at the time of the -- when the union was

12  voted in to represent employees?

13     A.   I was working in the store since the

14  day they opened the doors.

15     Q.   Do you recall approximately when that

16  vote occurred, the first vote?

17     A.   I know it was in February of 2018.

18  Exact date, I can't give you.

19     Q.   Do you recall any managers or

20  supervisors holding any meetings about the union

21  around that time with employees?

22     A.   A couple of days before the vote, they

23  bought us breakfast and they wanted us all in

24  the break room to talk about the union.

25     Q.   And who spoke at that meeting?

1    A.   Bo Bogardus.

2    Q.   What do you recall from that meeting

3 Mr. Bogardus?

4    A.   Well, he told us that he has handled

5 other unions before and he is going to protect

6 us from the union because they just want to take

7 our dues and he also said at the end that if the

8 union does win, that he is just going to close

9 down the store and let everybody go.

10    Q.   How long do you recall that meeting

11 lasting?

12    A.   15 minutes.

13    Q.   After the union election, did you have

14 any conversations with Mr. Bogardus regarding

15 discipline?

16    A.   He called me into the office to lay me

17 off.  He did that to a couple other guys.  He

18 showed he a paper and a box.  He never let me

19 touch it.  He said this is your writeup, and he

20 pulled it back and then he just showed me some

21 pictures of some machines I said I checked in,

22 that they are not going to write me up this

23 time.  This is my freebee and then we talked

24 about why do I want to be from the union.  I

25 told him I wanted a pension.

1    Q.   And when relative to the union vote

2  when did this conversation that you are

3  referencing with Mr. Bogardus take place?

4    A.   The second one or the first one?  The

5  first one was before the vote.

6    Q.   I am talking about the one with the

7  discipline that you just talked about.

8    A.   It was within 30 days because he took

9  over the store and he was our manager for like a

10  month before that.

11    Q.   And where did that conversation take

12  place?

13    A.   In the manager's office.

14    Q.   Was anybody else present besides you

15  and Mr. Bogardus?

16    A.   Chris Pender.

17        MR. WIESE:  Nothing further.

18        JUDGE ROSAS:  Charging Party, anything?

19        MR. RYAN:  No, your Honor.  Thank you.

20        JUDGE ROSAS:  Cross?

21        MS. HILL:  Yes, sir.  Do you have

22  anything to give me?

23        MR. WIESE:  Yes.

24        JUDGE ROSAS:  Off the record.

25

1                    (Whereupon, a discussion was had

2                     off the record.)

3              JUDGE ROSAS:  Okay.  Cross examination?

4                     CROSS EXAMINATION

5    BY MS. HILL:

6        Q.    Mr. Gutierrez, I am Patricia Hill.  I

7    represent the respondent Sunbelt Rentals in this

8    matter and the judge has given me permission to

9    ask you some questions based on the questions

10   you were asked by Mr. Wiese.

11             I would appreciate it, sir, if you

12   could just speak a little bit louder.  I am

13   getting advanced in years and I am just having a

14   little bit problem hearing you, sir.  Okay?

15       A.    Yeah.

16       Q.    Okay.  Thank you, sir.  When you first

17   started working at Sunbelt, was Katie Torgerson

18   your profit center manager?

19       A.    She hired me.

20       Q.    Did you receive any discipline from Ms.

21   Torgerson?

22       A.    I have been verbally but I have never

23   been written up.

24       Q.    At some point in 2019, early in 2019,

25   do you recall a profit center wide meeting

1  regarding the death of a Sunbelt employee in

2  Florida?

3       A.   Yes, ma'am.

4       Q.   And did all of the employees at the

5  profit center in Franksville have to attend this

6  meeting?

7       A.   Yes.

8       Q.   Was that meeting referred to as a

9  safety stand-down meeting?

10      A.   Yes.

11      Q.   And who spoke at that meeting, sir?

12      A.   Bo.

13      Q.   Anyone else?

14      A.   Nothing.  Just Bo and we watched a

15  video.

16      Q.   And you watched a video regarding

17  safety?  Verbal, please.

18      A.   Yes.

19      Q.   Okay.  Thank you.  Did -- Was Mr.

20  Anderson the profit center manager at the time?

21      A.   Yes.

22      Q.   Did Mr. Bogardus and Mr. Anderson

23  indicate during that meeting that safety was a

24  No. 1 concern?

25      A.   I am going to have to stop you there

1    because that's a case pending that I can't

2    answer right now.  I got a case pending that I

3    can't answer that question.

4              MS. HILL:  Okay.  Your Honor --

5              JUDGE ROSAS:  Well, Counsel, is this

6    related to the direct examination?

7              MS. HILL:  It sure is.

8              JUDGE ROSAS:  Just give me a topic.

9              MS. HILL:  He was talking about broke

10   rules.  He was terminated.  Then after that he

11   started talking about all the other discipline.

12   I was going to go into the reason for his

13   termination and by the way, it's my

14   understanding, Mr. Ryan, that the appeal was

15   denied, correct?

16             MR. WIESE:  His termination is not at

17   issue in this case.

18             MS. HILL:  Well, he is giving the

19   impression, sir, that there was no justified

20   reason for his termination and it was all

21   related to the discussions he had with various

22   supervisors about his union's position -- union

23   position, excuse me.

24             JUDGE ROSAS:  Well, he was terminated.

25             MS. HILL:  Far safety violation.

1          JUDGE ROSAS:  That's not before us

2    unless you want to somehow tie any of that to

3    the notion of bias.

4          MS. HILL:  Well, yes, sir.

5          JUDGE ROSAS:  So...

6          MS. HILL:  He gave the impression, sir,

7    on direct examination that he was terminated.

8    Then he starts talking about, oh, Bo talked to

9    me and Mr. Bogardus and Mr. Anderson spoke to me

10   and, you know, they were asking about my union

11   position and things like that.  Well, that

12   indicates that his entire termination was not

13   justified, and I am trying to you might say

14   impeach his testimony regarding that because it

15   was a very justified termination.

16         JUDGE ROSAS:  The objection is

17   sustained with respect to that rationale for a

18   line of questioning.  If you can articulate to

19   me some basis for pursuing possible bias, that's

20   a different story but you'll have to demonstrate

21   that to me; but we just had that as an event,

22   terminated, nothing else.  Nothing else in

23   relation to that and that's not a charge in this

24   case.

25         MS. HILL:  And he also doesn't have a

1  case pending.

2          JUDGE ROSAS:  That's not before me but,

3  again, if you can figure out some aspect of

4  might bear on bias, I'll listen to it.

5  BY MS. HILL:

6     Q.   Okay.  So, Mr. Gutierrez, you were

7  terminated for violating a major safety rule,

8  correct?

9     A.   Yes.  That's true.

10     Q.   And that termination occurred after

11  several what you allege are conversations with

12  Mr. Bogardus and Mr. Anderson regarding your

13  union feelings, correct?

14     A.   It is not correct.  That when I got

15  terminated for was instant termination,

16  supposedly --

17     Q.   Was what?

18     A.   Automatic termination, right then and

19  there.  They terminated me six days later

20  supposedly for -- I don't even know if they

21  terminated because like I got a case pending but

22  it's not about me being terminated.  It's about

23  what happened after I was terminated.  It's

24  something that has nothing to do with you.

25     Q.   Okay.

1     A.   It's for my surgery.  They terminate

2  the day before my surgery.  They just cut me

3  off.  I got two hernias at work.  I can't talk

4  about that.  That's what I am trying to say.

5  It's got something else.

6     Q.  All right.  With respect to Mr.

7  Anderson, did Mr. Anderson do anything with

8  respect to your employment that you show -- that

9  indicate to you that he did not want you to be

10  employed there, sir?

11     A.   Well, they came at me they started

12  making it hard.  They gave me eight forklifts to

13  change six foot forks out to put four foot forks

14  on them and they had to go out the next morning.

15     Q.  Okay.  Just a moment.  Eight forklifts

16  did you say?

17     A.   Yes.  It was for the Billy Joel

18  concert.  They all had six foot forks.  They

19  wanted all the forks off on the skid and

20  strapped.  I had just finished eating lunch and

21  they wanted me to put four footers on there and

22  when I asked for help, it was two hours before

23  they closed, they said they can't get nobody to

24  help me.  The other guys weren't doing nothing.

25  They just didn't want nobody to help me.  That's

1  what I am talking about.

2      Q.   Who were the other people?

3      A.   I asked for Al.  Al was working on a

4  gator that wasn't going nowhere.  He said I

5  can't take Al.  Look what he is doing.  Kyle was

6  sitting right next to him.  He said Kyle can't

7  help you either.  That was Chris Pender that

8  told me that.  He said I can't pull anybody off

9  to help you.

10         They were making it so somebody wants

11  to quit but we didn't quit.  We just kept trying

12  to get past this stuff.

13     Q.   Are you saying that Al and Chris were

14  not working on the pieces of equipment -- Just

15  let me finish.

16         Were Al and Chris working on the pieces

17  of equipment that Mr. Pender and Mr. Anderson

18  said they were working on?

19     A.   Well Chris is Mr. Pender, so he was in

20  his office sitting with Kyle and Al was working

21  on the gator that was broken down for months.

22  It wasn't on no schedule.  It was just a little

23  slow so he was keeping busy.

24     Q.   Just so the record is clear, sir, how

25  long after it was determined that you had

1  violated a major safety rule were you

2  terminated?

3      A.   A month from that -- from that job, a

4  month.

5      Q.   Okay.  Do you know how it came about

6  that Sunbelt learned that you had violated a

7  safety rule?

8          MR. WIESE:  Objection.  Relevance.

9          THE WITNESS:  I wanted --

10         JUDGE ROSAS:  Hold on.  Hold on.

11         THE WITNESS:  I want to answer the

12 question because I didn't know I violated the

13 safety rule.

14         MR. WIESE:  Hold on.  Hold on.

15         JUDGE ROSAS:  I don't see the

16 relevance, Counsel.

17         MS. HILL:  Okay.

18         JUDGE ROSAS:  He was terminated and he

19 has given you the basis.

20         MS. HILL:  Well, sir, I was trying to

21 figure out what he had said.

22         JUDGE ROSAS:  You asked him the basis.

23         MS. HILL:  Right, but he had said

24 something.  I was trying to figure out if he

25 said it was a month later that he had --

 1          JUDGE ROSAS:  Right.  He said a month

 2    later after the -- safety infraction, safety

 3    infraction, right?

 4          MS. HILL:  That's what I was trying to

 5    clarify and then he started talking about it.

 6          JUDGE ROSAS:  Okay.  Okay.

 7    BY MS. HILL:

 8     Q.    You also said that Mr. Bogardus gave a

 9    speech prior to the election, correct?

10     A.    Before the election, yes.

11     Q.    Excuse me.  Before the election.  And

12    in that speech Mr. Bogardus said that the union

13    wanted to take your money for dues, correct?

14     A.    He said that he was going to protect us

15    from the union.  All the union wants to do is

16    take our money, get our dues.  He told us about

17    two other companies that he fought the union

18    with and he wasn't going to let the union get in

19    this company.  It was a long speech.  It was

20    trying to deter us from voting for the union two

21    days before the vote.  This was before the vote

22    trying to get us not to vote, but he didn't tell

23    us not to vote.  He just made it sound bad.

24     Q.    All right.  Then and I apologize.  I

25    was trying to understand what you said about

 1   papers up on the wall.  Did you say there were

 2   papers up on the wall in two places?

 3        A.   There was one in the break room and

 4   there was one on the walk-through doors coming

 5   from the shop to the office.  It was for the

 6   revote.  They had got a revote to put the

 7   petitions up.  There was going to be a revote.

 8        Q.   One in the break room --

 9        A.   One through the walk-in doors when you

10   come in from the --

11        Q.   The swinging doors?

12        A.   Yeah.

13        Q.   And up to the time of your termination,

14   sir, did Mr. Anderson prohibit you from -- stop

15   you from having any benefits that any other

16   employee at Sunbelt could have?

17        A.   Well, that's just hearsay.  So I am not

18   going to answer the question.  We didn't get any

19   benefits at that store.  Every other store in

20   Wisconsin got a raise.  We didn't see nothing.

21        Q.   Okay.

22        A.   That was for sure.

23        Q.   Okay.  But you did get some special

24   money for hardship because of some --

25        A.   I have to apply for it with corporate.

1      Q.   Okay.  And it was Mr. Anderson who

2   suggested to you to do that, correct?

3      A.   It was Rebel, HR, she was there but he

4   is the one that went through with the final

5   agreement with the paperwork that helped me out.

6      Q.   So he helped you prepare the paperwork.

7   Was that wrong for him to do that?

8      A.   I didn't say everything they did was

9   wrong.  I never said that.  They were good

10  people.  It's just they don't like the union and

11  for the record, I still like Sunbelt.  It's a

12  good company.  It's just the new management that

13  came in after Katie, they weren't there to

14  manage us.  They were there to regulate the

15  union.

16     Q.   They were there to what?

17     A.   They were regulating us ever since we

18  work the union.

19     Q.   That's your opinion?

20     A.   We have been working --

21          JUDGE ROSAS:  Sir, there is no

22  question.

23          MS. HILL:  No question pending.  Move

24  to strike.

25          JUDGE ROSAS:  The last part is

1   stricken.

2           MS. HILL:  Thank you, sir.

3   BY MS. HILL:

4       Q.   And you mentioned Gary --

5       A.   Gary Stamm.

6       Q.   -- Stamm.  He was a member of the unit,

7   correct?

8       A.   Him and Mario Rivera, yes.

9           MS. HILL: Okay.  Thank you.  Okay.  No

10  further questions.  Thank you, Mr. Gutierrez.

11          JUDGE ROSAS:  Any redirect?

12          MR. WIESE:  Not from General Counsel,

13  your Honor.

14          JUDGE ROSAS:  Charging Party, anything?

15          MR. RYAN:  Just a second, your Honor.

16                  CROSS EXAMINATION

17  BY MR. RYAN:

18      Q.   Towards the end of your testimony, you

19  mentioned you applied for some hardship benefits

20  from Sunbelt.  Can you help me understand that a

21  little more?

22      A.   Well, I am going through bankruptcy and

23  they cut our hours.  We weren't making that much

24  money and I was complaining about the hours and

25  Rebel was there, HR was there and she told me I

1  could help you with that because I got a

2  handicapped kid and my girl was disabled.  She

3  was in the hospital and at the same time I had

4  just told them I had a hernia.  I had a bubble

5  right here and she helped me with that, so she

6  help me out with my bills.

7      Q.   Rebel was at the office on that day?

8      A.   She was at the office on that day.

9      Q.   And if you know, is this a specific

10  benefit that Sunbelt offers to anybody?

11      A.   I don't know nothing about it.  They

12  just told me they had it and that they could

13  help me.

14      Q.   Did you fill out a form?

15      A.   She faxed me some forms and Mr. Bryan

16  helped me fill them out.

17      Q.   And when about was this?

18      A.   I am going to say it's got to be

19  between March and June.  March -- yeah, between

20  March and June somewhere in between that time

21  right there.

22      Q.   Of 2019?

23      A.   Yeah.

24          MR. RYAN:  Nothing further.  Thank you.

25          JUDGE ROSAS:  Any follow up?

    1            MS. HILL:  Yes, sir.

    2                 RECROSS EXAMINATION

    3    BY MS. HILL:

    4        Q.   You referred to Sunbelt cutting the

    5    hours.  Sunbelt had to reduce the work hours for

    6    the mechanics and the drivers because of the

    7    reduced benefit -- reduced business for the

    8    location, correct?

    9        A.   That's what they said.  We were still

   10    busy.

   11        Q.   Did you look at any of the --

   12        A.   I am the one that stages all the

   13    orders.  Sometimes we would so busy, we didn't

   14    have enough equipment.  We had to get it from

   15    Waukesha.

   16        Q.   But, sir, you had to get equipment from

   17    Waukesha --

   18        A.   Another store because we didn't have

   19    enough.

   20        Q.   Right.  But how often?

   21        A.   From getting stuff from other stores

   22    would be sometimes a couple times a week.

   23        Q.   And that happened in 2018?

   24        A.   That happened in 2019.  2018 -- we were

   25    busy.  Before we voted for the union, we had

1    more work than we could handle.

2        Q.    But starting in March of 2019, is

3    March, April busy seasons for Sunbelt?

4        A.    Yes.  Well, actually, yeah, Sunbelt, as

5    long as there is no snow.

6        Q.    As long as there is no snow?

7        A.    It's basically year around but with the

8    snow, it cuts down on other equipment that can't

9    go out in the snow.

10        Q.    Would you agree that Sunbelt's busiest

11    season is from approximately May through

12    October?

13        A.    No.

14        Q.    No?

15        A.    Some years are better.

16        Q.    Some years are better.  Were you aware

17    of the bannering that the union was doing?

18        A.    Yeah.  They let us know.  Those guys

19    like Tyler and -- they told us --

20            THE REPORTER:  I'm sorry, your Honor.

21            JUDGE ROSAS:  Can you repeat that?

22            THE WITNESS:  Those guys Tyler and Greg

23    would let us know at their job sites because if

24    you go out to the job sites that were being

25    bannered, they talked about it.

1   BY MS. HILL:

2       Q.   Did they tell you what the result was

3   of the bannering at their job sites?

4            MR. WIESE:  Objection.  Hearsay.

5            JUDGE ROSAS:  Sustained unless that's

6   going to be corroborated.  You can -- There is

7   no question.

8            MS. HILL:  Thank you.

9            JUDGE ROSAS:  That's been sustained.

10           MS. HILL:  Okay.  Thank you, Mr.

11  Gutierrez.

12           JUDGE ROSAS:  Anything else.

13           MR. WIESE:  No.  Not from General

14  Counsel.

15           JUDGE ROSAS:  Thank you, sir.  You are

16  excused.  Please do not discuss your testimony

17  with anyone until you are advised otherwise by

18  counsel, all right?

19           THE WITNESS:  Like I said I am from

20  California.  I don't know nobody.  I know my

21  girl and my kid and that's it.

22                  (Whereupon, a discussion was had

23                   off the record.)

24           JUDGE ROSAS:  All right.  On the

25  record.  Next witness.

1          MR. WIESE:  Counsel calls Katie

2    Torgerson to the stand.

3          JUDGE ROSAS:  Please raise your right

4    hand.

5                   (Witness sworn.)

6          JUDGE ROSAS:  Please have a seat.  If

7    you can state and spell your name and provide us

8    with an address.

9          THE WITNESS:  Sure.  It's Katherine

10   K-A-T-H-E-R-I-N-E, last name Torgerson,

11   T-O-R-G-E-R-S-O-N.  Address is 7795 South Drexel

12   Ridge Way, Oak Creek, Wisconsin 53154.

13                KATHERINE TORGERSON,

14   after being first duly sworn, deposeth and saith

15   as follows:

16                DIRECT EXAMINATION

17   BY MR. WIESE:

18     Q.   Ms. Torgerson, are you appearing here

19   today pursuant to a subpoena?

20     A.   Yes.

21     Q.   Where do you currently work?

22     A.   Bob Cat Plus.

23     Q.   Where did you work prior to Bob Cat

24   Plus?

25     A.   Sunbelt Rentals.

```
 1      Q.    What did you do at Sunbelt Rentals?

 2      A.    I started in business development and

 3   then I became a PCM.

 4      Q.    What's a PCM?

 5      A.    Profit center manager.

 6      Q.    How long were you in business

 7   development for?

 8      A.    Approximately two years, maybe a little

 9   more.

10      Q.    What years or what period of time?

11      A.    2015.  I believe June of 2015 until

12   sometime between May and September of 2017.

13      Q.    And what period of time were you the

14   profit center manager at Sunbelt?

15      A.    That would be the May or September

16   of 2017 I believe until March of 2018.

17      Q.    Which profit center were you or which

18   profit center were you the manager of?

19      A.    Franksville, Wisconsin.

20      Q.    What were your responsibilities as the

21   profit center manager at Franksville, Wisconsin?

22      A.    Basically just overseeing the

23   operations of the store, hiring employees,

24   training employees, daily operations.

25      Q.    Did you have disciplinary authority
```

1  over employees?

2      A.    Yes.

3      Q.    Who did you supervise at the

4  Franksville location?

5      A.    The employees, the drivers, mechanics,

6  sales staff, counter staff.

7      Q.    Who did you report to?

8      A.    The district manager.

9      Q.    Who was the district manager when you

10 started as the profit center manager at

11 Franksville?

12     A.    Mark Lancort.

13     Q.    Did that change?

14     A.    Yes.

15     Q.    Who replaced Mr. Lancort?

16     A.    Bo Bogardus.

17     Q.    Do you recall how long Mr. Bogardus was

18 your supervisor?

19     A.    I don't.

20     Q.    While you worked at Franksville, what

21 types of equipment did the facility rent out?

22     A.    A majority of the catalog that they

23 offer, boom lifts, scissor lifts, skid-steers,

24 min excavators, backhoes, excavators,

25 dehumidifiers, saws.  There is a large array of

1   equipment.

2       Q.   What services did the Franksville

3   facility provide to customers?

4       A.   Parts, sales of equipment as well as

5   parts servicing of equipment, renting of

6   equipment.

7       Q.   Did Franksville provide delivery

8   services?

9       A.   Yes.

10      Q.   What division does the Franksville

11  facility fall under or did it fall under when

12  you worked there?

13      A.   General tool.

14      Q.   Were you involved in the opening of any

15  general tool facilities?

16      A.   Yes.

17      Q.   Which facilities?

18      A.   De Pere, Wisconsin; Weston, Wisconsin.

19  I went to Minneapolis but I did not stay and

20  open and then Franksville, as well as a remodel

21  in Sun Prairie.

22      Q.   Over what period of time were you

23  opening the stores?

24      A.   Between 2013 and up until the time

25  Franksville opened and once I opened Franksville

1  or we opened Franksville, then I assumed the

2  role of the PCM and just stayed on there.

3      Q.   Did these facilities rent the same type

4  of equipment as the Franksville facility?

5      A.   Yes.

6      Q.   Did they provide the same types of

7  services?

8      A.   Yes.

9      Q.   Was there any facility that you opened

10 that did not provide the same types of equipment

11 and services as the Franksville facility?

12     A.   Nowhere I worked, no.

13     Q.   Are you aware of a union organizing

14 campaign that took place at the Franksville

15 facility?

16     A.   Yes.

17     Q.   When did you become aware of that

18 campaign?

19     A.   I believe it was February of 2018.

20     Q.   How did you become aware of that union

21 campaign?

22     A.   They came in and basically just advised

23 that the employees had petitioned to organize a

24 union and let us know.

25     Q.   When you say "they," who are you

1  talking about?

2      A.   Two representatives from the 139.

3      Q.   Do you know their names?

4      A.   Mike but I don't know anybody else.

5      Q.   Did you have any knowledge of the union

6  organizing prior to --

7      A.   I did not.

8      Q.   Okay.  What did you do in response to

9  the Local 139 representatives?

10      A.   I contacted my supervisor.

11      Q.   Who was your supervisor at that time?

12      A.   Bill Bogardus.

13      Q.   How did you contact Mr. Bogardus?

14      A.   Via phone.

15      Q.   What do you recall from that initial

16  conversation with Mr. Bogardus?

17      A.   I recall making the call and then we

18  discussed -- I don't know anything in detail

19  what went on on that phone call.  We discussed

20  just advising HR and having conversations.  He

21  told me that he'd get back to me once he talked

22  to HR and his boss and whatnot.

23      Q.   Did you continue to talk to

24  Mr. Bogardus regarding the union after this

25  initial conversation?

 1    A.   Yes.

 2    Q.   How frequently?

 3    A.   I would say daily.

 4    Q.   And during the conversations that you

 5  had with Mr. Bogardus, what do you recall

 6  talking about?

 7    A.   Employee I guess morale is one.  Was

 8  there any behavior issues.  Were people coming

 9  in and doing their jobs.  Was there any

10  congregating.  Things of that nature.  Was it

11  business as usual or was there a disruption.

12    Q.   And after your initial conversation

13  about the union organizing, did Mr. Bogardus

14  visit the Franksville facility?

15    A.   Yes.

16    Q.   When did he start doing that?

17    A.   I would say within the week of being

18  notified.

19    Q.   How frequently did he visit the

20  facility between when you first talked to him

21  about the union and the union vote?

22    A.   I don't recall exactly.  But there was

23  a long stretch of time or a week or longer weeks

24  where he would come in and sit in the conference

25  room every day.

1      Q.    Was this more frequently than

2  Mr. Bogardus had visited the facility in the

3  past?

4      A.    Yes.

5      Q.    How frequently had he visited the

6  facility prior to your bringing up the union

7  with him?

8      A.    Not very often.

9      Q.    Can you quantify that at all?

10     A.    Weeks would go by without seeing him.

11     Q.    Do you recall having any conversations

12  with Mr. Bogardus about what would happen if the

13  union won the election at the Franksville

14  facility?

15     A.    There was comments that were made that

16  were would just kind of come out that he

17  indicated at one point that we'd close -- we'd

18  close the store.

19     Q.    Did Mr. Bogardus say that to you one

20  time or more than one time?

21     A.    There was multiple occurrences.

22     Q.    Do you recall how many times

23  approximately he said that?

24     A.    I don't, no.

25     Q.    Was it more or less than five?

1    A.    More than five.

2    Q.    Are there any specific instances that

3  you can recall when he brought this up?

4    A.    Not specific to a date or anything, no.

5    Q.    What about more generally, any

6  circumstances conversations?

7    A.    Yeah.  When we'd talked in the

8  conference room and whatnot and I know there was

9  commentary made in front of other employees as

10  well as in some management meetings in front of

11  other managers.

12    Q.    When Mr. Bogardus would talk to you

13  about the union, how would he act?

14    A.    I would say he is a very passionate

15  man, very boisterous and loud so I would say in

16  that matter, very, very loud and boisterous

17  about it.

18    Q.    Did he appear upset about the union?

19    A.    Angry might be -- I guess that could be

20  upset, but not happy about it.

21    Q.    Over what period of time was Mr.

22  Bogardus make these remarks about the union?

23    A.    From the time that we were notified of

24  the signatures until the time he made his

25  decision.

1   Q.   Did you have any conversations with

2  Mr. Ryan Bogardus regarding how the union might

3  affect your employment at Sunbelt?

4   A.   Yes.

5   Q.   And when was the first conversation you

6  had about that?

7   A.   A couple weeks after he had come in so

8  within I'd say two to three weeks when he was at

9  the location, I had asked him if I was going to

10  lose -- or if I was going to be fired.

11   Q.   Okay.  And where were you when this

12  conversation took place?

13   A.   We were in the Franksville facility and

14  it would have been it was right near my office.

15   Q.   Was anybody else present for that

16  conversation?

17   A.   No.

18   Q.   And what do you recall being said?

19   A.   He had indicated that the union wasn't

20  helping my cause.

21   Q.   Was this before or after the union

22  election?

23   A.   Before.

24   Q.   What about after the union election?

25  Did you have any conversations with Mr. Bogardus

1   about the union and how it would affect your

2   employment?

3       A.   Just when I was let go.

4       Q.   When did that happen?

5       A.   March of 2018.

6       Q.   How did you become aware that you were

7   being let go?

8       A.   I had made an offer to an employee or

9   candidate and I received a phone call from the

10  candidate explaining to me and questioning me

11  why he received notification and a call advising

12  that the offer had been rescinded and at that

13  point I called Bo Bogardus to question what was

14  going on and I also called Rebel Strohmeyer who

15  was our HR manager to question this and at the

16  time I was on the phone with Bo Bogardus, he

17  indicated that he would come see me and discuss

18  it because on the phone call he went into

19  further depth about changing some things with

20  the store and doing some things and we had done

21  the fleet planning and changing the fleet that I

22  had requested to order.

23      Q.   And did you have a meeting then with

24  Mr. Bogardus?

25      A.   Not about that.

1    Q.    Okay.

2    A.    He came in and dismissed me.

3    Q.    And who was present when you were

4  dismissed?

5    A.    Bogardus and Rebel Strohmeyer.

6    Q.    Where did that meeting take place?

7    A.    In the conference room at the

8  Franksville location.

9    Q.    What do you recall from that meeting?

10    A.    Just going into the conference room and

11  they said that this wasn't easy and

12  unfortunately they needed to let me go.

13    Q.    Did Mr. Bogardus or Ms. Strohmeyer

14  provide any reason for why you were terminated?

15    A.    Wisconsin is an at-will obviously but

16  there was a comment made about how our inventory

17  shortage did not help as well as the union vote.

18    Q.    Who stated?

19    A.    Bo Bogardus.

20         MR. WIESE:  Nothing further.

21         JUDGE ROSAS:  Charging Party?

22         MR. RYAN:  I don't have any questions.

23  Thank you.

24         JUDGE ROSAS:  Cross, Ms. Hill?

25         MS. HILL:  Yes, sir.

1          MR. WIESE:  Would you like affidavits?

2          MS. HILL:  Yes.  I was just going to

3     ask if there was --

4          JUDGE ROSAS:  Off the record.

5               (Whereupon, a short recess was

6                taken.)

7          JUDGE ROSAS:  Respondent, cross

8     examination?

9                    CROSS EXAMINATION

10    BY MS. HILL:

11         Q.   Ms. Torgerson, as you know, I am Pat

12    Hill.  I represent the respondent Sunbelt

13    Rentals, and I am given permission now to ask a

14    few follow-up questions on some of the

15    statements that you made.

16              I wanted to be sure that the record was

17    clear, when you said that you were involved in

18    the opening of the De Pere profit center, the

19    Waukesha -- I believe you said Waukesha --

20         A.   Weston.

21         Q.   Oh, Weston location and you mentioned a

22    couple of others, was that in the role of a

23    profit center manager or as business

24    development?

25         A.   Business development.

 1    Q.    Thank you.  When you became the profit

 2  center manager for the Franksville location

 3  let's say in the first year of you being the

 4  manager there, do you know what percentage of

 5  customer walk-ins you had?

 6    A.    A lot.  I don't know a percentage,

 7  though, no.

 8    Q.    Okay.  Did you ever discuss that with

 9  Mr. Bogardus?

10    A.    Initially it would have been with Mark

11  Lancort and then with Bo Bogardus, both of them,

12  yes.

13    Q.    Do you know a Dan Atwell?

14    A.    Yes.

15    Q.    Did he ever discuss your walk-in

16  business?

17    A.    Yes.

18    Q.    And what did he discuss with you about

19  the walk-in business?

20    A.    He had come to the location to do a

21  parts reset and at that time while Bo Bogardus

22  was at the location, monitoring and whatnot, Dan

23  Atwell had suggested the idea of some sort of

24  drive-through bay for customers to come in

25  through the shop to get equipment loaded and

1  whatnot, so a little reorganization of the yard

2  and the shop itself.

3      Q.   Okay.  And was any of that implemented?

4      A.   Not prior to my leaving, no.

5      Q.   Okay.  Did Mr. Atwell have any

6  suggestions regarding the big equipment at your

7  profit center?

8      A.   That all came in the conversation of

9  reducing the size of equipment that would be

10  offered to -- and not have anything larger than

11  a certain size forklift or certain size boom

12  left, et cetera.

13     Q.   When you say a certain size, do you

14  recall what size, ma'am?

15     A.   I believe the boom lift was nothing

16  bigger than 60-foot and the forklift was nothing

17  bigger than a 6,000-pound shooting boom

18  forklift, variable forklift, whatever term they

19  are using or everybody is using these days.

20     Q.   At the time of the union election, how

21  did the hourly rate for your mechanics and

22  drivers compare to the hourly rate for the other

23  profit centers in Wisconsin?

24     A.   I had the highest paid staff in the

25  state.

1      Q.   And you also had some testimony about

2  making an offer to a candidate?

3      A.   Uh-huh.

4      Q.   For what position, ma'am?

5      A.   Technician.

6      Q.   And then you said the offer was

7  rescinded but I wasn't sure if you meant it was

8  Rebel or Bo.

9      A.   Rebel made the call to the candidate to

10  rescind the offer.

11      Q.   Did you talk to Rebel to get an

12  explanation why it was rescinded?

13      A.   Yes.

14      Q.   And what, if anything, was her

15  response?

16      A.   That they do not rescind offers often,

17  however, in this case, it was rescinded because

18  Jason Mayfield did not approve of the position

19  and when I asked further and drilled into it

20  because I had the approvals, it was done through

21  requisition which was approved and we had the

22  conversation of the offer that I was going to

23  make and I was given the approval, Bo Bogardus

24  had a further conversation and indicated to me

25  that he misunderstood Jason.  When Jason said

1    no, he thought he said yes and so on and so

2    forth.

3         Q.   Okay.  So the approval that you saw for

4    this candidate was it from Mr. Bogardus or was

5    it from Mr. Mayfield?

6         A.   I went to Bo Bogardus for approval and

7    then continued to make a verbal offer to the

8    candidate and make the, you know, formal offer

9    to the candidate at which time he was contacted

10   at a later time indicating the offer was being

11   rescinded.

12        Q.   You also mentioned something about an

13   inventory shortage.  Did they explain what the

14   inventory shortage was?

15        A.   I was present for it, so I know what it

16   was.  It was our annual inventory and it was

17   off.

18        Q.   By how much?

19        A.   I don't recall the exact amount.  If I

20   had to guess in my recollection, it was probably

21   around $16,000.

22        Q.   And had you had -- was that your first

23   inventory as profit center manager?

24        A.   No.

25        Q.   Was it the second one you had as a

1   profit center manager?

2       A.   No.

3       Q.   Third one?

4       A.   No.

5       Q.   So you have --

6       A.   I would say there were at least --

7   there were three for sure, maybe -- I am not

8   sure if there were more, but, yes.

9       Q.   Did you have any inventory shortages

10  for the previous inventory counts?

11      A.   Yes.

12      Q.   What dollar amount?

13      A.   I don't recall.

14      Q.   And when you refer to Mike from the

15  139, referring to the gentleman in the blue

16  shirt at the end of the table there?

17      A.   Yes.

18          MS. HILL:  Okay.  No further questions

19  at this time, your Honor.

20          JUDGE ROSAS:  Any follow up?

21          MR. WIESE:  Yes, your Honor, briefly.

22              REDIRECT EXAMINATION

23  BY MR. WIESE:

24      Q.   There was some discussion about an

25  individual named Dan Atwell?

1    A.    Yes.

2    Q.    What is his position?

3    A.    I believe operations manager.

4    Q.    Had you had any dealings with Mr.

5  Atwell prior to the union --

6    A.    Yes.

7    Q.    -- election?  Okay.

8    A.    He was my immediate supervisor when I

9  first started with the company.

10    Q.    The conversations about changing the

11  type of equipment at the Franksville facility,

12  did those occur -- did those start before or

13  after you became aware of the union?

14    A.    After.

15    Q.    With respect to the offer that we were

16  talking about, the rescinded offer, do you

17  recall that testimony?

18    A.    Yes.

19    Q.    What -- the employee that you had made

20  an offer to, what position was that?

21    A.    Technician.

22    Q.    Is that different from a mechanic?

23    A.    That's the same.

24    Q.    During your time working at

25  Franksville, did you rescind any other offers or

1    were any other offers rescinded besides the

2    offer for this technician?

3        A.    Not through -- not at my location, no.

4    I don't know about any others.

5            MR. WIESE:  Nothing further.

6            JUDGE ROSAS:  Charging Party, anything?

7            MR. RYAN:  Just briefly.

8                    CROSS EXAMINATION

9    BY MR. RYAN:

10        Q.    What was the reason for the offer being

11   rescinded, if you know?

12        A.    That the regional vice president did

13   not approve of the offer and when the district

14   manager contacted him to go over the offer that

15   I was extending to the candidate, there was a

16   misunderstanding that he thought he said yes but

17   he said no in a phone call after that.

18        Q.    Other than do you know why the district

19   manager did not approve or regional manager?

20        A.    I do not know why.  I never had a

21   conversation with the regional manager about it

22   personally.

23            MR. RYAN:  I don't have anything

24   further right now.  Thank you.

25            JUDGE ROSAS:  Anything else?

1                    RECROSS EXAMINATION

2    BY MS. HILL:

3         Q.    The Dan Atwell report, was that a

4    verbal report or was that a written report?

5         A.    What report?

6         Q.    About moving the equipment, changing,

7    you know --

8         A.    It was just a conversation.

9         Q.    Conversation.

10        A.    Correct.

11        Q.    Do you recall if he ever had a written

12   report?

13        A.    I never saw one, no.

14        Q.    And this conversation, do you have a

15   date for when it was?

16        A.    No.  It was during the time that they

17   came up to do the parts reset and he was in the

18   conference room with another gentleman and there

19   was ideas being thrown around about how to help

20   with the large walk-in traffic and again, with

21   the drive-through bay and then potentially

22   limiting the size of the employment.

23        Q.    And you said that Mr. Atwell was your

24   supervisor at one point?

25        A.    When I started with the company, he was

1    -- he was operations manager.  He was

2    essentially the one that hired me and I reported

3    to him for my assignments.

4        Q.   Did you have any problems working with

5    him during your career at Sunbelt?

6        A.   No.

7            MS. HILL:  No further questions.

8            JUDGE ROSAS:  Anything else?

9            MR. WIESE:  No, your Honor.

10           MR. RYAN:  No, your Honor.

11           JUDGE ROSAS:  Thank you, ma'am.  You

12   are excused.  Please do not discuss your

13   testimony with anyone until you are advised

14   otherwise by counsel, all right?  Go off the

15   record.

16                (Whereupon, a discussion was had

17                 off the record.)

18           JUDGE ROSAS:  On the record.  Next

19   witness.

20           MR. WIESE:  Counsel calls Kyle

21   McKellips to the stand.

22           JUDGE ROSAS:  Raise your right hand.

23                (Witness sworn.)

24           JUDGE ROSAS:  Please have a seat.

25   State and spell your name and provide us with an

 1  address.

 2          THE WITNESS:  Okay.  My name is Kyle

 3  McKellips, M-C-K-E-L-L-I-P-S.  And my address is

 4  8420 204th Circle in Bristol, Wisconsin.

 5                    KYLE McKELLIPS,

 6  after being first duly sworn, deposeth and saith

 7  as follows:

 8                  DIRECT EXAMINATION

 9  BY MR. WIESE:

10      Q.   Mr. Ryan McKellips, where do you

11  currently work?

12      A.   I currently work for Michael's in their

13  foundations department.

14      Q.   Where did you work prior to Michael's?

15      A.   Sunbelt Rentals in Franksville,

16  Wisconsin.

17      Q.   What period of time did you work for

18  Sunbelt Rentals in Franksville?

19      A.   From January 2018 until August 10,

20  2019.

21      Q.   What did you do for Sunbelt?

22      A.   I -- I was their road technician so I

23  would go out into the field and do the repairs

24  for them as necessary what I could repair out on

25  site or also do services for them and I would

 1    also do work in the shop when I was available

 2    for it.

 3        Q.    Did you work with anyone else in the

 4    shop?

 5        A.    It was usually just giving them a hand

 6    if they needed it or helping them look at a part

 7    but typically everybody that was on the shop

 8    floor.

 9        Q.    Who else was on the shop floor?

10        A.    It would be Mario Rivera, Ray

11    Gutierrez, Al Romanowski, Chris Pender.

12        Q.    What types of equipment did you work on

13    for Sunbelt?

14        A.    If Sunbelt rented it, I would work on

15    it if it was at our shop and needed to be

16    prepped for rental so that could be as simple as

17    a drill that needed to be checked in or some

18    lawn equipment, lawnmower, an aerator, all the

19    way up to a loader, excavator, skid-steers,

20    scissor lifts, everything they had.

21        Q.    And generally what types of work were

22    you doing on the equipment that you worked on?

23        A.    A lot of services, oil -- basic oil

24    changes and troubleshooting for equipment,

25    troubleshooting and repair of equipment that was

1  broken down either while being used or due to

2  wear and tear on it.

3      Q.   Who did you report to?

4      A.   I reported to Chris Pender.

5      Q.   How did your employment end at Sunbelt?

6      A.   It ended with them bringing me to the

7  conference room so they called me back to the

8  shop.  I was out on a service call at the time

9  and said that we needed to have a meeting.  When

10 they brought me back in, brought me into the

11 conference room at the Franksville store and

12 told me that they were going to be restructuring

13 the shop and that they no longer needed any

14 mechanics.

15     Q.   Okay.  Who called you?

16     A.   That was Bryan.  Bryan called me.

17     Q.   And do you know what was Bryan's

18 position?

19     A.   He was the branch manager.

20     Q.   And then when you arrived at the store,

21 where did you go?

22     A.   I waited in the front area of the sales

23 area for about an hour and then they brought me

24 into the conference room that was in the front

25 area.

1     Q.    When you say "they," who?

2     A.    That was Bryan and Bo that was in the

3     meeting in person.

4     Q.    Do you know Bo's last name?

5     A.    I can't really say it but I think it

6     was Bogardus.

7     Q.    Was anybody else present in the

8     meeting?

9     A.    There was Bryan, there was Bo and then

10    Rebel was on a phone.

11    Q.    Were there any union representatives

12    present at the meeting?

13    A.    No.

14    Q.    What do you recall from the meeting?

15    A.    They brought me in.  They -- like I

16    said, they said that they were restructuring the

17    store, that they no longer needed equipment --

18    needed any mechanics because of this

19    restructure.  That they were no longer going to

20    be delivering equipment.  That they were only

21    going to rent small tools, stuff that, what they

22    described to me as with these small tools was

23    stuff that customers could pick up in their

24    vehicle or that they could rent a trailer from

25    us and just take it away.  Nothing that needed

1    to be delivered.

2        Q.   And who said all of this?

3        A.   That was Bryan.

4        Q.   Okay.  Do you recall Mr. Bogardus

5    saying anything during that meeting?

6        A.   We talked for a little while about

7    the -- my tools that were there because all of

8    my tools were in the service truck, about my

9    phone.  It was the only phone I was using at the

10   time and it had a lot of personal information on

11   it and I was asking him about if I was able to

12   get information off of it and they told me that

13   I would have to come back at a later time for

14   it.

15       Q.   And what about Ms. Strohmeyer?  Do you

16   recall her saying anything during that meeting?

17       A.   She offered -- she said that if need

18   be, I could -- that Sunbelt was really willing

19   to rent an outside storage facility for my tools

20   and move them there if need be.  Just asking me

21   to give up my phone, the keys to the shop and to

22   the truck and that I was no longer needed.

23       Q.   How long did that meeting last?

24       A.   I would say about a half hour, 40

25   minutes.

1    Q.   How did the meeting end?

2    A.   That was me telling them that I needed

3  to lock up the truck and secure my tools that I

4  had.  That I gave them my all the keys.  I gave

5  them the phone.  They thanked me for all the

6  work I did for them and handed me a letter, I

7  guess just written layoff and send me on my way.

8    Q.   Okay.  After you were terminated, did

9  you see any Sunbelt trucks out on the road?

10    A.   Yes.  Between March and June two weeks

11  after, I seen -- oh, I can't remember his name

12  now.  Comb-over, Gary, Gary Stamm.  That was it.

13  I seen him driving a semi truck on the road.

14    Q.   Okay.  And where did this occur?

15    A.   That was on the freeway on 94 about --

16  it was probably only a few miles south of

17  Highway K going northbound.

18    Q.   How far away was that from the

19  Franksville facility?

20    A.   It was probably maybe about four or

21  five miles.

22    Q.   Who is Gary Stamm?

23    A.   He was in charge of dispatch

24  essentially the rental equipment delivery of

25  that store.  That was my understanding of his

1  position.  He do driving and he would also set

2  up the outside hauling of the store.

3      Q.   How could you tell that it was Mr.

4  Stamm driving the truck?

5      A.   It was his haircut.

6      Q.   How long did you see Mr. Stamm?

7      A.   It was just a few moments.  I was

8  getting off my exit.

9      Q.   Did seeing Mr. Stamm driving a Sunbelt

10 truck did that stand out to you in any way in

11 that time?

12     A.   Yes, just because they said they

13 weren't going to be doing any delivering.

14     Q.   Was -- Go ahead.

15     A.   There wasn't any equipment, but I

16 didn't see any other reason why he would have

17 the semi truck if he wasn't delivering or

18 picking up.

19     Q.   Was there a trailer behind the truck?

20     A.   Yes.

21     Q.   Now, if you were terminated, did you

22 return to the Franksville shop for any reason?

23     A.   I returned the next day and I actually

24 managed to pick up my tools.  I wasn't very

25 comfortable with them being there with all the

1    chaos that was going on in the store.  I

2    returned a few other times after that.  I'd say

3    probably a couple weeks after I was terminated,

4    I actually came by because I left some tools

5    behind.  I talked to Chris for a little while.

6    He was still there as the service manager.

7        Q.   Where did you talk with Chris?

8        A.   I talked to him a little bit in the

9    front by the sales and then in the back he was

10   showing me what he was still doing there.

11       Q.   When you say in the back, was that in

12   the shop?

13       A.   In the service, yeah, in the shop.

14       Q.   And when you went back to the shop with

15   Mr. Pender, what did you see?

16       A.   A lot of equipment was moved around.

17   Stuff was still getting worked on.

18       Q.   What types of equipment did you see

19   getting worked on?

20       A.   The first time there was a 50 tillable

21   there that was getting worked on.  There was a

22   bunch of scissor that were getting looked at.

23   Skid-steers were getting cleaned.

24       Q.   This equipment -- was this equipment in

25   the shop at the time you were terminated?

1    A.    No.  There was a lot of stuff that was

2  moved around.  I think the 50 tillable might

3  have still been in there but it was definitely

4  moved around and it looked like it was getting

5  worked on.

6    Q.    Could you tell what type of work was

7  being done on the equipment that you could see?

8    A.    The skid-steers were mainly just

9  getting washed from what it looked like but the

10  cabs were up.  There was mud that was getting

11  washed out because they get destroyed on rent.

12  There was a scissor lift that had its brakes

13  taken apart because they needed to be cleaned.

14  Other scissor lifts were in the air drying out.

15    Q.    Had you worked on the brakes on scissor

16  lifts when you worked at Sunbelt?

17    A.    Yes.

18    Q.    What about washing skid-steers?

19    A.    Yes.

20    Q.    And the other work that you described

21  that was being done on the scissor lift, had you

22  done that work?

23    A.    Yes.

24    Q.    After you and Mr. Pender got into the

25  shop, did you talk to one another?

1    A.    Yes.  We talked about he apologized for

2  the way things had gone.  He gave me my tools

3  back and he told me about how he was still

4  working on equipment.  He was stressed out about

5  it because it's a lot to do.  Showed me some of

6  the things -- I could only stay for a little

7  bit.  I think I was there for maybe 30 minutes.

8    Q.    And what did he show you while he was

9  there or while you were there with him?

10    A.    The first time he showed me it was

11  mainly stuff like the scissor lifts and we just

12  kind of pointed it out.  I think there was a

13  generator there.  He was telling me he was

14  getting ready to do a service on it.

15          The second time I showed up, though, he

16  was actively tearing apart a UTV to replace the

17  front drive shafts on it or the half shafts is

18  what I call them.

19    Q.    Okay.  So the first time you visited

20  the facility, that was -- was that the day after

21  your termination?

22    A.    That was probably about a week and a

23  half after I was terminated.  The next day I

24  came up I picked up my tools but that was a

25  Friday and nobody had any time to talk.

1      Q.    Okay.

2      A.    It was chaotic that day.

3      Q.    So going back to the second time then

4    that you visited the facility, was that the time

5    when you talked with Mr. Pender about the UTV?

6      A.    Yes.  So he had it in the shop.  It was

7    up on jack stands and he said that the customer

8    had done a lot of damage to it.  It was at an

9    Amazon site in Oak Creek and it needed a bunch

10   of new plastic put on it, needed new half shafts

11   put onto it and he was going to be working on it

12   for a while.

13     Q.    And what, if anything, else do you

14   recall from your conversation with Mr. Pender

15   that day?

16     A.    Mainly that he was stressed out.  They

17   were asking a lot of him.

18     Q.    Was there any discussion about the

19   Waukesha store?

20           MS. HILL:  Objection.

21           JUDGE ROSAS:  Sustained.  Leading.

22   BY MR. WIESE:

23     Q.    Is there anything else that you recall

24   from that conversation with Mr. Pender?

25     A.    Not that day, no.

 1      Q.   Is there a document that would help to

 2  refresh your recollection?

 3      A.   I could possibly look through texts on

 4  my phone when I talked to him or --

 5      Q.   Do you recall giving an affidavit to

 6  the --

 7           MS. HILL:  Objection.

 8           JUDGE ROSAS:  What was the original

 9  question?

10           MR. WIESE:  I asked him if there is a

11  document that would help to refresh his

12  recollection and then --

13           JUDGE ROSAS:  About what?

14           MR. WIESE:  What?

15           JUDGE ROSAS:  What was the original

16  question?

17           MR. WIESE:  The original question I am

18  asking him if there is anything else that he

19  recalls from his conversation that we have been

20  talking about with service manager Chris Pender.

21           JUDGE ROSAS:  Okay.  Overruled.  Go

22  ahead.  He asked you about an affidavit.

23           THE WITNESS:  Okay.

24  BY MR. WIESE:

25      Q.   Do you recall giving an affidavit to

1    the NLRB?

2        A.   Yes.  Uh-huh.

3        Q.   Do you recall discussing this

4    conversation with Mr. Pender as part of that

5    affidavit?

6        A.   I have had a few conversations but yes.

7    That was one of them.

8        Q.   Would this affidavit help to refresh

9    your recollection as to that conversation?

10       A.   Absolutely.

11       Q.   Okay.  Mr. McKellips, I am going to

12   have you review Paragraphs 11 and 12 of your

13   affidavit, beginning on Page 3 going over to

14   Page 4.

15       A.   Okay.

16       Q.   Just review that and let me know when

17   you are done.

18       A.   Are you referring to this when it's

19   talking about last Wednesday?

20       Q.   I am not going to have you read the

21   affidavit yet into the record.

22       A.   Okay.

23       Q.   Are you done reviewing that document?

24       A.   Absolutely.

25       Q.   Okay.  Thank you.  Mr. McKellips, is

1  your recollection now refreshed as to the

2  remainder of that conversation with Mr. Pender?

3      A.    Uh-huh.

4      Q.    And so what else do you recall from

5  that conversation?

6      A.    Well, actually, there wasn't much more

7  in that conversation but I have called him and

8  talked to him over the phone a few times --

9      Q.    Okay.

10     A.    -- since that.  I know I did talk to

11  him once about, you know, he told me that he was

12  no longer going to be working for the

13  Franksville store and the reason for that is

14  they -- I don't know who it was that said he

15  wasn't being effective enough but he was not

16  getting enough work done is what his

17  understanding was and what he told me, not

18  enough equipment was getting repaired, he wasn't

19  working enough hours.  He was salaried, so he

20  was trying to keep it 8- to 10-hour days so that

21  he had time with his family.

22          So the resolution was that he was going

23  to stop being the manager.  He was going to go

24  up to the Waukesha store and become a mechanic

25  again, and that they were going to bring

1  somebody else down and what we discussed was

2  potentially two people down to continue working

3  at that shop.

4      Q.   When did that telephone conversation

5  occur?

6      A.   That was -- that was a few months ago

7  now.  I honestly couldn't give auto specific

8  time to that.

9      Q.   Okay.  I'd like to direct your

10  attention there is a binder of exhibits in front

11  of you there, and I'd like to direct your

12  attention to General Counsel Exhibit 25.  Are

13  you on it?  I'd like to turn to Page 2, 3 and 4

14  of that document.

15      A.   Yes.

16      Q.   What's happening in these pictures?

17      A.   That's Chris Pender holding a grease

18  gun on Page 2 and he is greasing this skid-steer

19  on Page 3 and it looks like he is just looking

20  over the equipment on Page 4.

21      Q.   All right.  The grease gun that he is

22  holding, did you use grease guns when you worked

23  for Sunbelt?

24      A.   Yes.

25      Q.   How often?

1      A.   Enough to where I bought my own.

2      Q.   If you go to Page 6 of the exhibit,

3   what type of truck is that, the white truck in

4   that picture?

5      A.   That is we called it our backup service

6   truck.

7      Q.   Did you use that service truck like

8   that when you worked there?

9      A.   Yes.

10     Q.   How frequently?

11     A.   At least I would say 5 to 10 days a

12   month depending on how many hours I would need

13   it to run.

14     Q.   If you turn to Page 14, do you

15   recognize that piece of equipment the Vermeer

16   piece of equipment in the middle?

17     A.   Yes.  That's the Vermeer 12-inch wood

18   chipper.

19     Q.   Is that piece of equipment being worked

20   on, can you tell?

21     A.   I don't see anybody working on it, but

22   I mean, it's halfway in and out the door so

23   somebody definitely brought it up to do

24   something to it.

25     Q.   Is that in the bay in the maintenance

1    shop at the Franksville facility, can you tell?

2        A.   Yes.

3        Q.   If you look at Pages 16 through 20, is

4    there -- can you tell in any of these pictures

5    is there maintenance work being done?

6        A.   On 16 and 17, Chris is working on I

7    believe that's a GR 20 scissor or stack lift.

8        Q.   Can you tell what he is doing based off

9    of the pictures?

10       A.   He is more than likely checking the

11   water level in the batteries.

12       Q.   Is that something that you did when you

13   worked for Sunbelt?

14       A.   Yes.

15       Q.   Okay.  And what about the remaining

16   pictures, 18, 19 and 20?

17       A.   I don't know who that is in 18.  It's

18   hard to tell, and I don't know what he is doing

19   on the other side of the door on 19, and on 20

20   it looks like Chris is doing a functions check

21   or playing with the controls.

22       Q.   Is that something that you did --

23       A.   Yes.

24       Q.   -- for those types of lifts?  If you go

25   to Page 24, do you recognize this piece of

1  equipment?

2      A.   Yes.  That's a 375 compressor.

3      Q.   Is that piece of equipment being worked

4  on?

5      A.   Yes.

6           MS. HILL:  Objection.  You said that

7  piece of equipment.  I believe there has been

8  some testimony about two pieces of equipment.

9  BY MR. WIESE:

10     Q.   Okay.  With respect to Page 24 --

11          MS. HILL:  Yes, sir.

12          THE WITNESS:  The one in the shop is a

13 375 and the one outside is a lawnmower.

14 BY MR. WIESE:

15     Q.   Thank you.  With respect to the piece

16 of equipment inside the shop, does that piece of

17 equipment appear to be being worked on?

18     A.   Yes.

19     Q.   How can you tell?

20     A.   The doors are open which you shouldn't

21 have the doors open if you are using the

22 equipment.  It's kind of dangerous for it.  It

23 makes it overheat and you would only really have

24 it open for inspection and the maintenance.

25     Q.   And when you are talking about the door

1    being open, is that the angle piece going off

2    the machine on the left-hand side?

3        A.    Yes.

4        Q.    Did you work on these generators when

5    you worked at Sunbelt?

6        A.    Generators and compressors.

7        Q.    Compressors.   Thank you.

8            MR. WIESE:  Nothing further.

9            JUDGE ROSAS:  Charging Party, anything?

10           MR. RYAN:  Nothing further.  Thank you.

11           JUDGE ROSAS:  Cross?

12           MS. HILL:  Yes, sir.  Anything you want

13   to show me, sir?

14           MR. WIESE:  Yep.

15           JUDGE ROSAS:  Off the record.

16               (Whereupon, a short recess was

17                taken.)

18           JUDGE ROSAS:  This affidavit May 1,

19   2019 even though it's leading to the RD, relates

20   sufficiently to the testimony regarding what he

21   was told about the restructuring so, again, he

22   just -- he has just testified about what he was

23   told and he has been asked questions about the

24   equipment that was there and there is some

25   statements there about the equipment so show

1    that to counsel.  These have nothing -- These

2    just have to do with decert paper business.

3              MR. WIESE:  I am going to make a copy

4    of this statement while you are reviewing

5    because I don't have enough for myself and the

6    witness in case you need it.

7              MS. HILL:  Okay.

8              JUDGE ROSAS:  All right.  Respondent,

9    cross?

10                   CROSS EXAMINATION

11   BY MS. HILL:

12       Q.   Mr. McKellips, I am Patricia Hill.  I

13   represent Sunbelt Rentals, the respondent in

14   this matter and the judge has given me

15   permission to ask a few follow-up questions.

16              First of all, the photographs that you

17   were asked to testify about, had you seen those

18   photographs prior to today, sir?

19       A.   Yes.  When I met with Tyler here

20   before.

21       Q.   And other than for these affidavits,

22   you met with Mr. Wiese?

23       A.   Eric?  Your last name is Wiese.

24       Q.   Tyler Wiese.  I'm sorry.  His name is

25   Tyler.

1    A.    No.  I met with a gentleman named Eric

2  to make the affidavit.

3    Q.    But you also met with Tyler?

4    A.    Yes.

5    Q.    And when was that?

6    A.    That was last week.

7    Q.    And he showed you the photographs that

8  you were talking about today?

9    A.    Yes.

10    Q.    Now, when you met with Tyler and saw

11  the photographs that you just testified about,

12  had you seen the photographs prior to that?

13    A.    No.

14    Q.    Now, have you discussed these

15  photographs with Mr. Pender?

16    A.    No.

17    Q.    Did you tell Mr. Pender you were going

18  to be testifying today?

19    A.    No.

20    Q.    I believe you said that you had several

21  conversations with Mr. Pender, correct?

22    A.    Yes.

23    Q.    Would you consider Mr. Pender a friend

24  of yours?

25    A.    Yes.

VERITEXT LEGAL SOLUTIONS

1801 MARKET STREET -  SUITE 1800 - PHILADELPHIA PA 19103 -- 888-777-6690
Case 2:20-cv-00181-JPS    Filed 03/02/20    Page 842 of 1306    Document 12-1

1    Q.    Both of you are veterans, correct?

2    A.    Yes.

3    Q.    And with respect to your layoff, in

4    that meeting, were you told that you were being

5    laid off or terminated?

6    A.    Laid off.

7          MS. HILL:  Okay.  Does he have the

8    other exhibits?

9          MR. WIESE:  Yes.

10   BY MS. HILL:

11   Q.    The big stack of documents there in a

12   binder.

13   A.    Yes.

14   Q.    Okay.  Thanks.  Would you please look

15   at Exhibit 20?  And if you would please review

16   that and when you are finished reviewing it,

17   please look up, sir.

18   A.    Is there any specific part I should be

19   or just this whole document?

20   Q.    If you can just review it and I was

21   going to ask you some questions about it.

22   A.    Okay.

23         JUDGE ROSAS:  Do you want him to

24   memorize it or what are we doing?

25         MS. HILL:  Just to be familiar with it.

1          JUDGE ROSAS:  Are you familiar with it,

2    sir?  Do you know what this document is about?

3          THE WITNESS:  This is my release

4    document stating --

5    BY MS. HILL:

6        Q.   Well, wait until I ask a question,

7    okay?  You indicated at the meeting in the

8    conference room with Bo and with Bryan that you

9    were given some paperwork?

10       A.   Yes.

11       Q.   Okay.  That Exhibit No. 20, was not

12   part of the paperwork that you received,

13   correct?

14       A.   No.

15       Q.   How did you receive that piece of

16   paperwork?

17       A.   That was -- I received that I believe

18   in an E-mail from the union, I believe from you,

19   Mike?  I cannot remember exactly who the E-mail

20   was from and they asked me to sign it and this

21   was something that was done outside of my

22   control for separation.

23       Q.   Okay.  Now, if you would please look at

24   the Exhibit 57, sir, just the first page of

25   Exhibit 57.

1      A.   This is on the front.  I got 56.

2           MS. HILL:  Is 57 there?

3           MR. WIESE:  I don't believe it's in the

4  binder.

5           MS. HILL:  Where is 57?

6           MR. WIESE:  It should be loose up

7  there.  There are some papers next to it.

8           JUDGE ROSAS:  Here you go, sir.

9           THE WITNESS:  Thank you.

10 BY MS. HILL:

11     Q.   Just the first page, sir.

12     A.   Okay.

13     Q.   All right.  Is this first page of

14 Exhibit 57 the paperwork that you received at

15 the meeting in the conference room with Bryan

16 and Bo?

17     A.   No.

18     Q.   Did you ever receive this piece of

19 paper, sir?

20     A.   No.

21     Q.   You are not familiar with it the an

22 all?

23     A.   This is the first time I am seeing it.

24     Q.   Okay.  Were you told -- Thank you.

25 Were you told that you were eligible for rehire

1  during that meeting with Bryan and Bo?

2      A.   Yes.

3      Q.   And did anyone during that meeting

4  indicate to you how you could go about to apply

5  for another job with Sunbelt?

6      A.   We talked about -- because I asked them

7  instead of a layoff if I would be willing to

8  transfer to a different store to stop any sort

9  of layoff because I just sold my house and they

10  said no, but you -- essentially going through

11  standard channels of hiring or applying for a

12  position online and in person to try and get in

13  at another store.

14      Q.   Did they indicate that at that time

15  they didn't have any open positions that you

16  could transfer to?

17      A.   No, they didn't.

18      Q.   Okay.  Now, you stated in your

19  testimony that the Franksville location would

20  only rent small tool.  Did -- Which of the two

21  gentlemen said that?

22      A.   That was Bryan I believe.

23      Q.   Did he say small tool or small

24  equipment?

25      A.   I believe he used the term tool, but

1    I'm not a hundred percent on which actual word

2    it was.

3        Q.   Did Bo or Bryan -- Bo and Bryan did not

4    define small tool or small equipment, correct?

5        A.   No.  I believe -- actually, no, they

6    did do that in that meeting, yes.  It was stuff

7    that customers could take on their own, was my

8    understanding in what they said.

9        Q.   And Mr. Pender did repair equipment

10   prior to your layoff, correct?  And I am just

11   referring to the Franksville location.

12       A.   Yes.

13       Q.   And he did wash equipment at the

14   Franksville location prior to your layoff,

15   correct?

16       A.   Yes.  He said he was helping us.

17       Q.   And if I heard you correctly, sir, when

18   you saw Mr. Stamm in the semi that was on 94

19   going south of Highway K, you did not know what

20   he was doing; is that what you testified to?

21       A.   No.  I didn't know if he was coming

22   from dropping something off, going to pick up.

23   I just mainly remember seeing him and wondering

24   why he was still driving.

25       Q.   Oh, in any of the photos in Exhibit 25

1    that you were looking at, do you see the UTV

2    that you said Mr. Pender was working on?

3        A.   I don't see them in the pictures.

4        Q.   And because I notice that Tyler was

5    trying to determine which was the first time

6    that you were you went back to the profit center

7    and the second time.  The first time if I

8    understood you correctly was a week and a half

9    after the layoff, correct?

10       A.   Yes.  And it was not there then.

11       Q.   What wasn't there?

12       A.   The UTV wasn't there.

13       Q.   Okay.  And then the second time that

14   you went back to the profit center, how long was

15   that after your layoff?

16       A.   I would say that was closer to a month

17   after.

18       Q.   And because of when -- I'm sorry.  Just

19   a moment.  And between the first visit a week

20   and a half later and you believe a month later

21   for the second visit to the profit center,

22   equipment from the Franksville location had been

23   moved out, correct?

24       A.   Yes.

25       Q.   Oh.  Picture of the backup repair truck

1    Page 6 of 45.  This one should be in the binder.

2       A.   Of exhibit --

3       Q.   The photos.  Yeah.  Page 6 of

4    Exhibit 45 -- oh, 25.

5       A.   Exhibit 25.  Okay.  Okay.  The service

6    truck.

7       Q.   You said this was the backup service

8    truck?

9       A.   Yes.

10       Q.   And how do you know that this is the

11   backup service truck for the Franksville

12   location?

13       A.   At the time, I was the only service

14   tech.  I use an F450 because it had more room

15   for my tools and all my tools would not fit in

16   this truck.

17       Q.   Because this is an F250?

18       A.   Yes and much smaller compartments to

19   it.

20       Q.   Okay.  Were there other F250 repair

21   trucks for other profit centers?

22       A.   Yes.

23       Q.   So I am trying to figure out is how do

24   you know this is the one for Franksville?

25       A.   The million number.  The other ones

1    from the other stores were they had smaller

2    numbers to them.

3        Q.   Thank you.  That's what I was trying to

4    determine.  And for this particular photograph,

5    you don't see any employee in it or working on

6    it, correct?

7        A.   No.

8        Q.   Prior to your layoff, did you ever see

9    Mr. Pender working on a wood chipper such as the

10   Vermeer wood chipper that you see on Page 14?

11       A.   I know that I have seen him giving

12   assistance but never on his own I don't think

13   for a wood chipper.  That I think that's my

14   understanding was what he liked to do was to

15   give assistance and make sure that we were at

16   least learning because it's such a vast variety

17   of equipment, it's hard to know everything about

18   it all.

19       Q.   And Mr. Pender was a very good teacher

20   to you, correct?

21       A.   Yes.

22       Q.   And Mr. Romanowski was a parts

23   replacement mechanic, correct?

24       A.   That's what some people called him,

25   yeah.

1     Q.    Would you call him that, sir?

2     A.    Some days.  Some days.  He would get --

3  it would be very frustrating.

4     Q.    Okay.  The wood chipper when it came

5  back from a customer, would it have to get

6  washed off?

7     A.    Yes.

8     Q.    And is that something that equipment

9  rental specialist or even Mr. Pender could clean

10  up?

11     A.    Yes.

12     Q.    And you have seen even Mr. Anderson

13  washing off equipment such as the wood chipper,

14  correct?

15     A.    I don't think I have ever seen Mr.

16  Anderson washing equipment.

17     Q.    Have you -- and you have seen Mr.

18  Anderson delivering equipment prior to your

19  layoff, correct?

20     A.    Yes.  Mainly if it was going to another

21  store area, he would get it there or bring it to

22  that customer.

23     Q.    And you -- and prior to your layoff,

24  you saw all of the outside sales representatives

25  delivering equipment or picking up equipment and

1    returning it to the profit center, correct?

2        A.    Yes.

3        Q.    Looking at Page 15 of 45, do you

4    recognize -- I'm sorry.  Are you there, sir?

5        A.    Yes.

6        Q.    Do you recognize that white pickup

7    truck?

8        A.    Bryan drove one just like it.

9        Q.    But you don't know if this is his?

10        A.    No, I don't.  He kept it pretty clean.

11    I couldn't tell if it was that one.  It looks

12    like it, though.

13            JUDGE ROSAS:  Counsel, I am going to

14    start limiting you now to the photographs that

15    were shown to this witness on direct, okay?

16            MS. HILL:  Yes, sir.

17    BY MS. HILL:

18        Q.    And, sir, did you take advantage of the

19    job postings to look for a job another job with

20    Sunbelt?

21        A.    I did not, no.

22        Q.    And why not, sir?

23        A.    I was a little bitter about what had

24    happened.  It took me a good while to get out

25    back up on my feet.  I was -- like I said, I was

1  in the middle of buying a house and selling a

2  house so I was living out of my in-laws for a

3  while so I was just like I need to get me back

4  together first before I do that.

5      Q.   And you said you worked for Michael's?

6      A.   Yes.  They are -- well, I work in their

7  foundations department right now, so I work on a

8  tug and barge right now.

9      Q.   And is that a job that you were able to

10  get through your connections at Sunbelt or

11  through the union?

12          MR. WIESE:  Objection, your Honor.

13  Relevance.

14          JUDGE ROSAS:  Sustained.

15          MS. HILL:  No further questions --

16          JUDGE ROSAS:  All right.  Any follow

17  up?

18          MS. HILL:  -- at this time.

19          MR. WIESE:  Briefly, your Honor.

20                  REDIRECT EXAMINATION

21  BY MR. WIESE:

22      Q.   With respect to Page 6 of General

23  Counsel Exhibit 25, you testified that you could

24  identify that this truck here was the backup

25  truck from the Franksville facility

1    specifically?

2        A.    Yes.

3        Q.    How could you tell that?

4        A.    The unit number.  There was a million

5    number.  I put that sticker on there.

6        Q.    Where is that sticker located on the

7    truck?

8              MS. HILL:  It's right on the side of

9    the door.

10             MR. WIESE:  What?

11             THE WITNESS:  It's on the door there.

12   BY MR. WIESE:

13       Q.    Okay.  Below the Sunbelt Rentals?

14       A.    Yes.

15       Q.    Okay.  Thank you.

16             MR. WIESE:  Nothing further.

17             JUDGE ROSAS:  Charging Party, anything?

18             MR. RYAN:  Just real quickly staying on

19   that one photograph.

20                   CROSS EXAMINATION

21   BY MR. RYAN:

22       Q.    You said this was the backup truck?

23       A.    Yes.

24       Q.    So it wasn't used daily?

25       A.    No.

1     Q.   Where would it typically be parked when

2  it's not in use?

3     A.   Outside the gate.

4     Q.   Outside the gate on the parking lot?

5     A.   Where the employees usually park over

6  by the dumpsters on the north side.

7     Q.   Okay.  And can you tell from this

8  photograph where it's parked at the moment?

9     A.   That is parked right outside the -- it

10  looks like the shipping door on the south side,

11  the middle overhead door.

12        MR. RYAN:  Nothing further.  Thank you?

13        JUDGE ROSAS:  Any follow up, Counsel?

14        MS. HILL:  No, sir.

15        JUDGE ROSAS:  Okay.  All right.  Thank

16  you, sir.  That concludes your testimony.

17  Please do not discuss your testimony with anyone

18  until you are advised by counsel or otherwise,

19  okay?

20        THE WITNESS:  All right.

21        JUDGE ROSAS:  You have a good day.  All

22  right.  Off the record.

23            (Whereupon, a discussion was had

24             off the record.)

25        JUDGE ROSAS:  Back on the record.  All

1    right.  So at this time, General Counsel, you

2    have no further witnesses subject to your review

3    of documents?

4              MR. WIESE:  That's correct.

5              JUDGE ROSAS:  Okay.  Yet to be produced

6    pursuant to the Special Master report.  My

7    understanding from Judge Steckler is that she is

8    still proceeding diligently to complete that

9    review.  She has issued two portions of it but

10   that's a small fraction of the entirety of those

11   documents so what we'll do is upon receipt of

12   her completed review, Master's -- Special Master

13   report that is complete of all of the documents

14   that are claimed to be privileged, I will

15   convene the parties for a conference call to

16   reset a date for the resumption, okay?  Any

17   questions at this time?

18             MR. WIESE:  No.

19             MS. HILL:  No, sir.

20             JUDGE ROSAS:  Okay.  Off the record.

21             (Hearing adjourned at 5:20 p.m.

22             sine die.)

23

24

25

1                         CERTIFICATE

2

3

4

5           This is to certify that the attached

6    proceedings before the National Labor Relations

7    Board (NLRB), Region 18 - Subregion 30, in the

8    matter of SUNBELT RENTALS, INC., Case Nos.

9    18-CA-236643 and 18-CA-238989, in Milwaukee,

10   Wisconsin, on December 18, 2019, was held

11   according to the record, and that this is the

12   original, complete, and true and accurate

13   transcript that has been compared to the

14   recording, at the hearing, that the exhibits are

15   complete and no exhibits received in evidence or

16   in the rejected exhibit files are missing.

17

18           PAULA ERICKSON, CSR, RPR

19           License No. 084-003899

20

21

22

23

24

25

# OFFICIAL REPORT OF PROCEEDINGS

## BEFORE THE

## NATIONAL LABOR RELATIONS BOARD

In the Matter of:                    Case No.:    18-CA-236643
                                                  18-CA-238989
                                                  18-CA-247528
SUNBELT RENTALS, INC.

                     **Respondent**

And

INTERNATIONAL UNION OF
OPERATING ENGINEERS LOCAL 139,
AFL-CIO
                     **Charging Party**

Place:    Milwaukee, WI
Date:    02/18/20
Pages:   855-1089
Volume:  4

## OFFICIAL REPORTERS

**Veritext Legal Solutions**
**Mid-Atlantic Region**
**1801 Market Street – Suite 1800**
**Philadelphia, PA 19103**
**888-777-6690**

```
 1                UNITED STATES OF AMERICA

 2         BEFORE THE NATIONAL LABOR RELATIONS BOARD

 3                 REGION 18 - SUBREGION 30

 4   _____

 5   In the Matter of:              |

 6   SUNBELT RENTALS, INC.,         |

 7              Respondent,         |

 8      and                        | Case Nos.: 18-CA-236643

 9   INTERNATIONAL UNION OF         |        18-CA-238989

10   OPERATING ENGINEERS LOCAL 139, |        18-CA-247528

11   AFL-CIO,                       |

12              Charging Party.     |

13   _____|

14

15

16

17

18       The above-entitled matter came on for hearing

19   pursuant to notice, before ADMINISTRATIVE LAW JUDGE

20   MICHAEL ROSAS, at the National Labor Relations Board,

21   Subregion 30, 310 West Wisconsin Avenue, Suite 450W,

22   Milwaukee, Wisconsin, on Tuesday, February 18, 2020,

23   at 9:30 a.m.

24

25
```

```
 1                    A P P E A R A N C E S

 2

 3   On behalf of the General Counsel:

 4        MR. TYLER J. WIESE, ESQ.
          NATIONAL LABOR RELATIONS BOARD
 5        Eighteenth Region
          Federal Office Building
 6        212 3rd Avenue S, Suite 200
          Minneapolis, Minnesota 55401
 7        (952) 703-2891
          tyler.wiese@nlrb.gov
 8
     On Behalf of the Respondent:
 9
          MS. PATRICIA J. HILL, ESQ.
10        SMITH, GAMBRELL & RUSSELL, LLP
          50 North Laura Street
11        Jacksonville, Florida 32202
          (904) 598-6100
12        pjhill@sgrlaw.com

13   On behalf of the Charging Party:

14        MR. PATRICK N. RYAN, ESQ.
          BAUM, SIGMAN, AUERBACH & NEUMAN, LTD.
15        200 West Adams Street, Suite 2200
          Chicago, Illinois 60606
16        (312) 236-4316
          pryan@baumsigman.com
17
     Also Present:
18
          MICHAEL ERVIN
19        Union organizer

20

21

22

23

24

25
```

```
1                    I N D E X

2
                                                    VOIR
3   GENERAL COUNSEL          DX    CX    RDX   RCX   DIRE
    WITNESSES:
4

5   ROBERT BOGARDUS, III     --    --    866   897    --

6   JASON MAYFIELD           --    --    898   --     --

7   BRYAN S. ANDERSON        905   909   --    --     --

8

9

10  RESPONDENT
    WITNESSES:
11

12  ROBERT BOGARDUS, III     914   925   931   933    --

13  JASON MAYFIELD           935   1017  1024  --     --
                                   1022
14
    BRYAN S. ANDERSON        1028  1080  1086  --     1070
15                                 1084                1071

16

17

18

19

20

21

22

23

24

25
```

```
1               E X H I B I T S

2

3    EXHIBIT              FOR IDENTIFICATION    IN EVIDENCE

4    GENERAL COUNSEL

5      *  GCX 5L                293                  296
          GCX 47                862                  866
6         GCX 60                910                  --
          GCX 61                862                  866
7         GCX 62                862                  866
          GCX 63                862                  866
8         GCX 64                862                  866
          GCX 65                862                  866
9         GCX 66                862                  866
          GCX 67                862                  866
10        GCX 68                862                  866
          GCX 69                862                  866
11        GCX 70                862                  866
          GCX 71                862                  866
12        GCX 72                862                  866
          GCX 73                862                  866
13        GCX 74                862                  866
          GCX 75                862                  866
14        GCX 76                862                  866
          GCX 77                862                  866
15        GCX 78                862                  866
          GCX 79                862                  866
16        GCX 80                862                  866
          GCX 81                862                  866
17        GCX 83                862                  866
          GCX 84                862                  866
18

19

20

21

22

23

24

25
```

```
 1   (Exhibits continued.)

 2

 3   EXHIBIT                 FOR IDENTIFICATION      IN EVIDENCE

 4   RESPONDENT

 5      R 4                       947                   948
        R 6                       992                   998
 6      R 7                       916                   918
        R 8                      1039                  1071
 7      R 9                      1054                  1080
        R 10                     1059                  1061
 8      R 12                      939                   946
        R 13                      939                   946
 9      R 14                      939                   946
        R 15                      939                   946
10      R 16                      939                   946
        R 17                      939                   946
11      R 18                      939                   946
        R 19                      939                   946
12      R 20                      939                   946
        R 21                      939                   946
13      R 22                      939                   946
        R 23                      939                   946
14      R 24                      939                   946
        R 25                      939                   946
15      R 26                      939                   946
        R 27                      939                   946
16      R 28                      939                   946
        R 29                      939                   946
17      R 30                      939                   946
        R 31                      939                   946
18      R 32                      939                   946
        R 33                      939                   946
19      R 34                      939                   946
        R 35                      939                   946
20      R 36                      939                   947
        R 37                      939                   947
21      R 38                      939                   947
        R 39                     1062                  1063
22

23

24

25
```

1          P R O C E E D I N G S

2                                    (Time Noted: 9:45 a.m.)

3          JUDGE ROSAS:  All right.  This is the

4    continuation in the matter of Sunbelt Rentals, Inc.,

5    Case 18-CA-236643, et al.

6          Counsel for GC, do you have any other documents

7    or witnesses that you need to call or introduce?

8          MR. WIESE:  Yes, your Honor.  First before I

9    introduce any new documents, I would like to flag that

10   General Counsel Exhibit 5L, which were the Union's

11   bargaining notes from the June 5th, 2019 bargaining

12   session, were inadvertently excluded from the record in

13   the case.

14         JUDGE ROSAS:  June 26th?

15         MR. WIESE:  It's June -- June 6th, I believe, of

16   2019.

17         MS. HILL:  I thought it was June 5th.

18         MR. WIESE:  June 5th it might be.  Yeah, it is,

19   it's June 5th of 2019.

20         JUDGE ROSAS:  They were inadvertently omitted?

21         MR. WIESE:  That's correct.

22         JUDGE ROSAS:  From where?

23         MR. WIESE:  From the record, if you look at the

24   record in the case from the court reporter.

25         JUDGE ROSAS:  Were they offered and received?

1          MR. WIESE:  They were.

2          JUDGE ROSAS:  But they're not in the record,

3   they're not mentioned in the record?

4          MR. WIESE:  That's correct.

5          JUDGE ROSAS:  Do you have a page in the

6   transcript where they were referenced?

7          MR. WIESE:  Yes.  293.

8          JUDGE ROSAS:  Is that right, Counsel?

9          MS. HILL:  I'm double checking, yeah.  I'm going

10  to assume --

11         JUDGE ROSAS:  He says that it's referenced at

12  transcript Page 293.

13         MS. HILL:  Okay.  It's "L, M, N and O."

14         JUDGE ROSAS:  Now, the Index does indicate GCX 5F

15  to O, so wouldn't that include 5L?

16         MR. WIESE:  Yes, that's correct.

17         MS. HILL:  Yeah.

18         MR. WIESE:  But if you look at the exhibits that

19  were provided.

20         MS. HILL:  That they cited in the beginning?

21         JUDGE ROSAS:  It's more in the nature of

22  housekeeping --

23         MS. HILL:  Yeah.

24         JUDGE ROSAS:  -- because the transcript refers to

25  it, and it's referenced in the Index, so that's not a

1  concern.

2      MR. WIESE:  Okay.  But it's missing.

3      JUDGE ROSAS:  You'll give it to the reporting

4  agency, and they'll just, I guess, have it bound as a

5  separate -- or it can be included with any additional GC

6  documents that are received this week.  Okay?

7      MR. WIESE:  All right.  Thank you, your Honor.

8  And I'd like to offer General Counsel Exhibit 47, along

9  with General Counsel Exhibits 61 to 81, and then I

10  believe 83 and 84.

11      MS. HILL:  Okay.  Give me those numbers again,

12  please, sir.  You said 47.  This is only one page of a

13  very long document.

14      MR. WIESE:  Yes.  I'm just offering the first

15  page of that document.

16      MS. HILL:  And then you said 61?

17      MR. WIESE:  That's correct, 61.

18      MS. HILL:  62, then 63 all the way through to the

19  end in this package?

20      MR. WIESE:  Yes, except there is no General

21  Counsel Exhibit 82.

22      JUDGE ROSAS:  So these are the exhibits that you

23  referenced off the record that have been culled or

24  selected from those that were produced by the Respondent

25  that were subject to in camera inspection?

1          MR. WIESE:  That's correct, your Honor, with the

2     exception of General Counsel Exhibit 47 which was

3     offered and inadvertently not introduced at the start of

4     the -- or during our initial hearing.

5          MS. HILL:  Okay.  So what you're saying is

6     General Counsel 47, back in December you were going to

7     offer this, just this single page?

8          MR. WIESE:  That's correct.

9          MS. HILL:  The one objection I have, your Honor,

10    is that it's not a complete document.  This is only the

11    cover page for a multiple-page document.  The best

12    evidence is to have the complete document.

13         JUDGE ROSAS:  What does that do for us?

14         MR. WIESE:  The reason that I'm offering this

15    document has to do with the handwriting on the document.

16    And I didn't want to clutter up the record.  I mean as

17    Ms. Hill indicated, the overall document, I think it's

18    over 100 pages.

19         JUDGE ROSAS:  As an exemplar?  It's basically

20    being introduced as an exemplar?

21         MR. WIESE:  No.  For the substance of what's

22    handwritten on the document.

23         JUDGE ROSAS:  The handwriting on the document by

24    whom?  Do we know?

25         MR. WIESE:  No.

1    JUDGE ROSAS:  We don't know.

2    MS. HILL:  Well, with respect to this particular

3  document, the pages that come after it, your Honor, have

4  the same handwriting on them, on not every single page,

5  but on many of the pages, so I still suggest that to get

6  the full context of this, the witness may need, and it

7  would be appropriate for best evidence, to have the

8  whole document.

9    JUDGE ROSAS:  So that's a cover page for --

10   MS. HILL:  Yes, sir.  This is the draft agreement

11 that the negotiation team was working on.  The person

12 who wrote this wrote notes on this and on the subsequent

13 pages.

14   JUDGE ROSAS:  Okay.  But they're different notes?

15   MS. HILL:  Not the same wording.  The same

16 handwriting, the same person.

17   JUDGE ROSAS:  The same handwriting.  And is this

18 draft going to be introduced or has it been introduced?

19   MR. WIESE:  The entire document hasn't been

20 introduced.  I wasn't intending on introducing the

21 entire document.

22   JUDGE ROSAS:  Do you have a copy of it, Counsel?

23   MS. HILL:  Yes, sir.

24   JUDGE ROSAS:  Well, you can introduce it then.

25 We'll receive the first page, for whatever purposes

1  counsel seeks to establish, over objection.

2       MR. WIESE:  And your Honor, with respect to the

3  remaining documents, which are General Counsel Exhibits

4  61 through 81, and then General Counsel Exhibits 83 and

5  84, those are all documents that have been pulled from

6  the privilege production.

7       MS. HILL:  Your Honor, without looking to see if

8  some of these e-mails were part of a long e-mail thread

9  or chain, and depending on how he uses this, I don't

10  have an objection to these being introduced, but I may

11  raise an objection when it's being used and I'd look at

12  the complete report.  I have one binder here, a second

13  binder here.  If there are more e-mails that were

14  connected to these, I might raise an objection.

15       JUDGE ROSAS:  Well, he's not calling any

16  witnesses, right?

17       MR. WIESE:  No.  I am, your Honor.

18       MS. HILL:  He is.

19       JUDGE ROSAS:  You're calling some witnesses now?

20       MS. HILL:  Yes, sir.

21       MR. WIESE:  Yes, that's correct.

22       JUDGE ROSAS:  Okay.  So you have no objection to

23  them being received per se?

24       MS. HILL:  Per se.

25       JUDGE ROSAS:  All right.  So they've been

1  received without objection, 61 through 81 and 83 and 84

2  as well as GC 47.

3          (GCX 47, 61-81 and 83-84 were received.)

4          JUDGE ROSAS:  Do you have a witness?

5          MR. WIESE:  Yes.  I'll call Bo Bogardus to the

6  stand.

7          MS. HILL:  Let me go get him.

8          (Pause in the proceedings.)

9          THE WITNESS:  Good morning.  How are you all

10  doing?

11          JUDGE ROSAS:  Good morning, Mr. Bogardus.  I'll

12  remind you you're still under oath.

13          THE WITNESS:  Yes, sir.

14                    REDIRECT EXAMINATION

15  BY MR. WIESE:

16      Q    Morning.

17      A    Morning, sir.

18      Q    There's a folder in front of you, Mr. Bogardus.

19  Do you see that?

20      A    Yes, sir.

21      Q    Okay.  We're going to be going through some of

22  the documents in there.  So I'd like to start with

23  General Counsel Exhibit 61 which should be, I believe,

24  the second page in there.

25      A    Where would I see the -- oh, okay.  GCX?

1     Q    Yes.

2     A    Okay.  I got it now.

3     Q    Thank you.  So Mr. Bogardus, this is an e-mail

4    chain between yourself and Ms. Hill and a couple other

5    individuals from Sunbelt, is that accurate?

6     A    Yes.

7     Q    And you sent this e-mail around the time of the

8    union organizing campaign at the Franksville facility,

9    is that right?

10    A    Yes.

11    Q    And going to the first line of that e-mail,

12   there's a reference to someone named "Katie."  Do you

13   see that?

14    A    Yes.

15    Q    And that individual, that's Katie Torgerson, is

16   that right?

17    A    Yes, sir.

18    Q    And she was the profit center manager for the

19   Franksville facility at that time?

20    A    Yes, sir.

21    Q    And the information about the pro union and pro

22   Sunbelt individuals, did you obtain that information

23   from Ms. Torgerson?

24    A    I believe I did, yes.

25    Q    Did you direct Ms. Torgerson to obtain that

1    information?

2       A    I did not.

3       Q    Do you have any idea how she obtained that

4    information?

5       A    I do not.

6       Q    You didn't follow up with her at all?

7       A    No, sir.

8       Q    Do you know why she sent it to you?

9       A    When she got the letter --

10           MS. HILL:  Objection.

11           JUDGE ROSAS:  What's the basis?

12           MS. HILL:  It asks for speculation.

13           JUDGE ROSAS:  I'll sustain that.

14           You can rephrase, try it again.

15   BY MR. WIESE:

16      Q    How did you get this information from Ms.

17   Torgerson?

18      A    When I talked to Katie about the -- being

19   whatever is served, when Mike or whoever it was that

20   brought it in, I asked her who she talked -- the impetus

21   if you will.

22      Q    And after you received this e-mail from Ms.

23   Torgerson, did you engage in any efforts to identify who

24   the union's porters were at the Franksville facility?

25      A    No, sir.

1    Q    Not at all?

2    A    No, sir.

3    Q    If you go to the top of the e-mail and the

4    individuals that were cc'd on that e-mail, I see someone

5    named "Cheryl Black" there.  Do you see that?

6    A    Yes, sir.

7    Q    Ms. Black is the chief Human Resources officer

8    for Sunbelt, is that correct?

9    A    I'm not exactly sure of her title, but yes, she's

10   the head of Human Resources.

11        MR. WIESE:  And I guess I'd request a stipulation

12   as to Ms. Black being a 211 supervisor, manager.  She's

13   head of HR for the entire organization.

14        MS. HILL:  She is the vice president of Human

15   Resources.  I believe you have testimony from Ms.

16   Strohmeyer about her, too.

17        MR. WIESE:  Right, that's correct.

18        MS. HILL:  So I don't know why we have to

19   stipulate, but if you need a stipulation for that, okay.

20        MR. WIESE:  So we have a stipulation on that?

21        MS. HILL:  That she is a manager for Sunbelt.

22        MR. WIESE:  Okay.  Thank you.

23   BY MR. WIESE:

24   Q    Mr. Bogardus, do you normally include Cheryl

25   Black on e-mails that you send?

1    A    Only when they're related to HR.

2    Q    So if you have an e-mail related to an HR issue,

3  you send it to Cheryl Black?

4    A    Occasionally.  Not on all matters.

5    Q    Okay.  Outside of this union organizing campaign,

6  how often had you e-mailed Cheryl Black?

7    A    I don't know.  A dozen, a dozen or more.  Not a

8  lot.

9    Q    Is there a reason you started including her on

10  e-mails during the union organizing campaign?

11    A    Yeah.

12    Q    What reason was that?

13    A    She's the VP of HR.  She needed to know.

14    Q    Looking at the names of the employees in this

15  e-mail, these are all bargaining unit employees at the

16  Franksville facility, is that correct?  When I say that,

17  the names below, pro union and pro Sunbelt.

18    A    I'm not sure about Richter's status because I

19  think he was out on workers' comp.

20    Q    Besides Mr. Richter, what about the rest of the

21  employees?

22    A    Yes.

23    Q    Let's turn to the next exhibit, General Counsel

24  62.  So looking -- again, this is an e-mail that you

25  sent, correct?

1    A    Yes, I believe so.

2    Q    And you sent this e-mail again around the

3    beginning of the union organizing campaign at the

4    Franksville facility?

5    A    Yes, sir.

6    Q    Looking at the first line of that e-mail, it

7    references "several conversations with members of our

8    team."  Do you see that?

9    A    Yes, sir.

10   Q    What were those conversations about?

11   A    A lot of -- you know, just general stuff.

12   Q    Did they have anything to do with the union?

13   A    There was some questions if I remember correctly,

14   yes, sir.

15   Q    And the "members of our team" that are referenced

16   there, who are those individuals?

17   A    I honestly can't tell you.  I don't know.

18   Q    Were any of them employees at the Franksville

19   facility?

20   A    I was not at the Franksville facility for the

21   inventories.

22   Q    And then if you go down to the second paragraph

23   of that e-mail, there's a reference to something called

24   "this Racine event."  Do you see that?

25   A    Yep.

1    Q    And the Racine event that you're referencing is

2    the union filing an election petition at the Franksville

3    facility, is that correct?

4    A    That would be correct.

5    Q    And then if you go to the very last line of the

6    e-mail below the redacted portion but above the second

7    redacted portion.

8    A    Uh-huh.

9    Q    Do you see that sentence there, "In Racine it is

10   the drivers, Richter and Smith, that are driving the

11   organizing initiative"?

12   A    Yes, sir.

13   Q    And Mr. Richter is a bargaining unit employee or

14   was?

15   A    When he was employed.  I don't know what you call

16   it when he's on workers' comp.  I mean he's still an

17   employee, but --

18   Q    So just to clarify, he was a driver at the

19   Franksville facility who was on workers' comp at that

20   time?

21   A    That is correct.

22   Q    And you identified Mr. Richter as someone driving

23   the organizing campaign?

24   A    I didn't know that I was saying -- I guess I did

25   say he was driving the organizing initiative.  I don't

1    know if that's exactly what I meant.  My understanding

2    was that they were very both pro union.

3        Q    How did you find out that Mr. Richter was very

4    pro union?

5        A    Others within the organization told me.

6        Q    Did you ask any employees about Mr. Richter?

7        A    I did not.

8        Q    What about the Mr. Smith there, that's a

9    reference to Jamie Smith, correct?

10       A    That is correct.

11       Q    He's another driver or was a driver at the

12   Franksville facility?

13       A    That is correct.

14       Q    How did you identify him as a leading union

15   organizer?

16       A    The guys voluntarily told me.  I did not ask.

17   They told me.

18       Q    Who told you?

19       A    A number of the drivers.

20       Q    At the Franksville facility?

21       A    No.

22       Q    They would be at other facilities?

23       A    Yes.

24       Q    Which facilities?

25       A    Pretty much every one of the GT locations in the

1    state.

2        Q    And this is because Mr. Smith was talking to the

3    other employees about the union at these facilities?

4            MS. HILL:  Objection, speculation.

5            JUDGE ROSAS:  I'll allow it.  It's cross.

6            You can answer if you know.

7            THE WITNESS:  I -- he was reaching out to them.

8    I don't know exactly what those conversations were, but

9    several of them asked me to have him stop making those

10   calls, whatever they were about.

11   BY MR. WIESE:

12       Q    Okay.  Let's go to the next document, General

13   Counsel Exhibit 63.  So this is again another e-mail

14   that you sent around the time of the union organizing

15   campaign at Franksville, is that correct?

16       A    Yes.

17       Q    And the very first line of this e-mail makes

18   reference to someone named "Gary Stamm."  Do you see

19   that?

20       A    I do.

21       Q    Okay.  And you identify him as, it looks like,

22   senior ERS at Racine?

23       A    Correct.

24       Q    What does ERS stand for?

25       A    Equipment rental specialist.

1    Q    And the Racine that you're identifying there,

2    that's the Franksville facility, is that correct?

3    A    Correct.

4         JUDGE ROSAS:  Now, this is cross examination.

5    We've had an abundance of testimony, Counsel, so let's

6    just -- I know you're trying to get some clarification

7    from the documents that's not otherwise evident from

8    them, so let's keep it very lean.  Okay?

9    BY MR. WIESE:

10   Q    If we go down to the very last line of the e-mail

11   above the redacted portion, there's a reference to union

12   propaganda purveyors.  Do you see that?

13   A    Yes, sir.

14   Q    Who are those individuals?

15   A    I can't tell you.  I don't know them.

16   Q    Who did you believe the union propaganda

17   purveyors were when you wrote that?

18   A    Members of 139 already.

19   Q    So not employees, these are --

20   A    No.

21   Q    Now, let's turn to General Counsel Exhibit 64.

22   This is again another e-mail chain that you sent, is

23   that correct, Mr. Bogardus?

24   A    Yes.

25        MS. HILL:  Excuse me.  Could we just let the

1  witness review the entire exhibit before he starts

2  questioning.  Would that be okay, your Honor?

3       JUDGE ROSAS:  Well, these are all obvious e-mails

4  so far, so I'll let him at least dash into that, have

5  the witness look at whatever he's asking about, the

6  substance of it.

7       Next question.

8  BY MR. WIESE:

9    Q   So can you look at Page 2 of this exhibit, the

10 second half of that page.  It's an e-mail from yourself

11 to Ms. Hill cc'ing Jason Mayfield.  Do you see that?

12   A   Yes.

13   Q   And the second line of that e-mail references the

14 "'Yes' vote this past Tuesday at 776."

15      That was the union vote at the Franksville

16 facility, is that correct?

17   A   I just -- I guess if you could define union vote,

18 you know.

19   Q   The vote where employees voted to be represented

20 by Local 139.

21   A   Yes, yes.

22   Q   Okay.  And then if you go down to the next

23 paragraph, you reference some drivers from Racine,

24 "Smith and Schuls."  Do you see that?

25   A   Yes, sir.

1    Q    And those are both drivers at the Franksville

2    facility?

3    A    Yes, sir.

4    Q    The "Schuls" there, who is that in reference to?

5    A    Troy Schuls.

6    Q    And you were documenting communications that

7    Mr. Smith and Mr. Schuls had with drivers at other

8    profit centers, is that correct?

9    A    That is correct.

10    Q    If you go over to Page 3 of the document.  The

11    top line of that e-mail there, there's a reference to

12    "fine fellows in Racine."  Do you see that?

13    A    Yes.

14    Q    Who were the "fine fellows" that you're

15    referencing there?

16    A    Smith and Schuls.

17    Q    And when you referred to them as "fine fellows,"

18    were you being literal or sarcastic?

19    A    Literal.

20    Q    You referred to them as "fine fellows"?

21    A    Yeah.

22    Q    It didn't upset you at all that they were talking

23    about the union with other employees at other profit

24    centers?

25    A    It bothered me that they were doing it on our

1  time and using our cell phones.  I had a problem with

2  that.

3      Q   How did you know that they were using Sunbelt

4  phones during working hours?

5      A   The other drivers told me.

6      Q   And then if you go down to the last paragraph on

7  Page 3, there's a reference between -- or a phone call

8  between yourself and someone named "Jason."  Do you see

9  that?

10     A   Yes, sir.

11     Q   That individual is Jason Mayfield, is that

12 correct?

13     A   That is correct.

14     Q   And the phone calls that you had with him that

15 are referenced in the e-mail, those were about the

16 union, is that right?

17     A   Jason and I talk pretty much daily.  It could

18 have been about the union, it could have been about any

19 number of things.

20     Q   So you don't recall specifically whether those

21 conversations had anything to do with the union?

22     A   I don't.

23     Q   And if you go to the very last line of that

24 e-mail, there's a reference to "started the weekend off

25 in a good mood."  Do you see that?

1    A    Yes, sir.

2    Q    Were you being literal there?

3    A    Define literal I guess.

4    Q    Well, did you mean what you said or were you

5    being sarcastic?

6    A    I honestly don't remember how I felt.  It was

7    good to know what was going on, but I don't remember to

8    be honest.

9    Q    If you go back now to Page 1 of that exhibit, and

10   we're working backwards here.  So if you go to the first

11   paragraph below the bullet points in that e-mail that

12   you sent --

13   A    Yeah.

14   Q    -- there's a reference to "a fair amount of

15   propaganda."  Do you see that?

16   A    Yes, sir.

17   Q    The propaganda there is the Franksville drivers

18   talking to drivers at other profit centers, is that

19   correct?

20   A    That is correct.

21   Q    And you were concerned about the fact that these

22   drivers were talking to their co-workers at other profit

23   centers?

24   A    During working hours regarding something outside

25   of our business, yes.

1    Q   Were you concerned specifically about the fact

2  that they were talking about the union?

3    A   To me that's a personal issue at that point.  We

4  had not signed anything with the union, so their

5  personal issues should have been on their personal

6  hours.

7    Q   Were you concerned about the fact that they were

8  sharing specific benefits that the union might have been

9  promising them?

10         MS. HILL:  Objection, form, speculation.

11         MR. WIESE:  I'm asking the witness what he was

12  concerned about.

13         JUDGE ROSAS:  If you know.

14         THE WITNESS:  No, not really.

15  BY MR. WIESE:

16    Q   And if you'd go to the last paragraph of that

17  e-mail, the very last sentence there, you make reference

18  to the fact that yourself and the other profit center

19  managers were going to make yourselves more available

20  and approachable.  Do you see that?

21    A   Yes, sir.

22    Q   The reason you were doing that was because of the

23  union organizing campaign at Franksville, is that right?

24    A   No.  The main reason was that we needed to be

25  closer to our teams.

1    Q   And you sent this e-mail right after the union

2    vote, isn't that correct?

3    A   It seems to be a few days after, yeah.

4    Q   And you talk about this being a special effort

5    that you were making around that time, is that right?

6    A   We always make an effort to stay with teams.

7    It's a small group.  We don't overpopulate our PCs with

8    too many people, and we ask them to work diligently.

9    And it's important that we develop those relationships

10   so we know who we're working with and they know who

11   they're working with.

12   Q   But your request to make the profit center

13   managers and yourself more available didn't have

14   anything to do with the union vote?

15   A   I wouldn't say that it didn't have anything to do

16   with it.  It's just something that we needed to make

17   sure we were making ourselves available as possible.

18   Q   And that was triggered in part by the union vote

19   at Franksville?

20   A   I'd say in part, yes, sir.

21   Q   Let's turn to General Counsel Exhibit 65.  I'd

22   like to start at the bottom of Page 1 of that exhibit.

23   Do you see the acronym "VDOS" there?

24   A   Yes.

25   Q   What does that stand for?

1    A    VDOS.

2    Q    What does VDOS stand for?

3    A    That's our driver operator -- it's the software

4    we use to track the trucks and to schedule and follow

5    through with deliveries for customers and pickups.

6    Q    If you go over to Page 2 of the exhibit, there's

7    a reference in the first bullet point to an individual

8    named "Ray Campbell."  Do you see that?

9    A    Yes.

10   Q    Who is Mr. Campbell?

11   A    Ray is the -- I don't know his exact title.  He's

12   the manager for our telematics group.

13   Q    What does the telematics group do?

14   A    They handle all of the vehicle tracking for DOT

15   and for the efficiency of the delivery piece, delivery

16   pickup.

17   Q    And the second line in your e-mail, you make

18   reference to "keep the request quiet," do you see that,

19   the second line in that bullet point?

20   A    Yeah.

21   Q    Okay.  You were concerned about the request that

22   you made to Mr. Campbell being kept quiet, is that

23   accurate?

24   A    I honestly don't know what I was concerned about.

25   Ray works out of Fort Mill, and I didn't necessarily

1  want him talking to everybody at Fort Mill about what we

2  were doing.

3      Q   And the next line, "get us what we need," do you

4  see that?

5      A   Yes.

6      Q   What were you hoping to get from Mr. Campbell?

7      A   There's a -- part of that is a tracking mechanism

8  so we can know where the trucks are.  It helps us when

9  we're trying to align emergency pickups with deliveries,

10 and we know where the trucks are and being able to

11 commit to our customers when we can do that.

12     Q   And this e-mail about Mr. Campbell, this came in

13 the context of communications about Franksville

14 employees sharing information with employees at other

15 profit centers, is that accurate?

16     A   With the focus being on where they are on our

17 dime and our time.

18     Q   And you wanted Mr. Campbell to keep that

19 request -- your request to him quiet?

20         MS. HILL:  Objection, asked and answered.

21         JUDGE ROSAS:  Sustained.

22 BY MR. WIESE:

23     Q   Going to the second bullet point, there's an

24 individual named "Katherine Flannery."  Do you see that?

25     A   Yes.

1    Q    Who is Ms. Flannery?

2    A    She is the manager of our wireless division,

3    takes care of the cell phones and the digital for us.

4    Q    And the second sentence there, you're making

5    reference to her gathering cell phone information during

6    the prior union campaign.  Do you see that?

7    A    I don't know that that was a prior union

8    campaign.  I do know what Berner was doing.

9    Q    He was trying to bring in the union at another

10   facility, is that right?

11   A    On our phones, on our time and aggressively

12   pursuing drivers who asked me to have him stop.

13   Q    Okay.  And profit -- PC 366, which profit center

14   is that?

15   A    Sun Prairie.

16   Q    What was the result of Mr. Berner's efforts to

17   bring in the union at that profit center?

18   A    It didn't happen.

19   Q    Then if you go to the very top e-mail in this

20   chain, it's an e-mail from Mr. Mayfield to yourself on

21   Page 1.  Do you see that there?

22   A    Yes.

23   Q    This is a request from Mr. Mayfield to you to

24   spend time at this PC starting on Monday, is that right?

25   A    Correct.

1    Q    Which PC was that?

2    A    That would be Racine, Franksville.

3    Q    And then he was requesting that you hold benefit

4  meetings at each of the other profit centers in your

5  district, is that right?

6    A    That is correct.

7    Q    When was the last time you held such benefit

8  meetings at all of the profit centers?

9    A    I hadn't been here a year at this point, so I had

10  never had that opportunity in Wisconsin.

11    Q    And did you in fact go around and visit each

12  profit center?

13    A    Yes, we did.

14    Q    When you say "we," who else?

15    A    We brought in the HR folks.

16    Q    Who from HR?

17    A    Rebel.

18    Q    That's Rebel Strohmeyer?

19    A    Yes.

20    Q    Go to General Counsel Exhibit 66.  Looking at the

21  first line of this e-mail, it says, "BTW - we parted

22  ways with Katie yesterday," is that right?

23    A    Yes.

24    Q    And the "Katie" reference there, that's Katie

25  Torgerson?

1    A    Correct.

2    Q    She was a profit center manager at the

3    Franksville facility?

4    A    Correct.

5    Q    And then after she was terminated, you served as

6    the acting profit center manager at that facility?

7    A    Correct.

8    Q    How long did you serve in that position for?

9    A    Three -- roughly 90 days, give or take.

10    Q    Go over to General Counsel Exhibit 67.  This is

11    an e-mail -- or the top e-mail here is between yourself

12    and Ms. Strohmeyer referencing union talk.  Do you see

13    that?

14    A    To Ms. Strohmeyer?

15    Q    Yeah.  At the very top e-mail, so from Bo

16    Bogardus to Rebel Strohmeyer on 67.

17    A    Okay.

18    Q    Is that accurate?

19    A    Yeah.

20    Q    Okay.

21    A    It appears to be.

22    Q    And you're telling Ms. Strohmeyer that you're

23    going to press for more details when conversing with

24    PCMs?

25    A    That's what it says.

1    Q   And the details that you're pressing for there,

2   those are details about conversations about the union,

3   is that right?

4           MS. HILL:  Objection, form.

5           JUDGE ROSAS:  What's the basis?

6           MS. HILL:  I think what he needs to do is lay

7   the -- have him review the e-mail chain there before

8   asking that kind of a question.  This is what I

9   suggested before.

10          JUDGE ROSAS:  Repeat the question.  Repeat the

11  question.

12  BY MR. WIESE:

13   Q   I was asking -- Mr. Bogardus, the details that

14  you're asking for in your e-mail, those details concern

15  conversations about the union, is that correct?

16          JUDGE ROSAS:  Overruled.

17          You can answer if you know.

18          THE WITNESS:  Let me read the e-mail first and

19  I'll --

20          MR. WIESE:  Of course.

21          THE WITNESS:  -- try to get back to what I was

22  thinking at the time.

23          It appears, the best logic I can make of it, is

24  that apparently one of the Green Bay drivers approached

25  the -- and again, this is a lot of supposition, okay?

 1        JUDGE ROSAS:  I don't want you guessing, sir.

 2        MS. HILL:  Right.

 3        JUDGE ROSAS:  Only if you know.

 4        THE WITNESS:  All right.  Then I'm not going to

 5   guess.

 6   BY MR. WIESE:

 7     Q    So you don't recall what the details were that

 8   you were pressing?

 9     A    I don't.

10     Q    Okay.  Let's go to General Counsel Exhibit 68.

11   And this is an e-mail chain from September of 2018

12   concerning the scheduling of collective bargaining

13   negotiations with the union, is that accurate?

14     A    Uh-huh.

15     Q    So I'd like to focus on the top e-mail here,

16   specifically the second paragraph, there's a reference

17   to an individual named "Dan asking for more meetings

18   than one per month."  Do you see that?

19     A    Yes.

20     Q    And the "Dan" referenced there, is that -- that's

21   Dan Marsolek, is that correct?

22     A    That would be, yes.

23     Q    And he's a member of the union's negotiating

24   team, is that right?

25     A    Yes.

1    Q   And he requested to meet more than once a month,

2   was requesting to do so?

3    A   Yes.

4    Q   And if you go down a little further in that

5   e-mail, you refer to Mr. Marsolek's offer as a generous

6   offer.  Do you see that?

7    A   Yes.

8    Q   Were you being sarcastic there?

9        MS. HILL:  Objection.  It requires speculation.

10   This e-mail is from a year and a half ago.

11       JUDGE ROSAS:  I'll sustain it.

12   BY MR. WIESE:

13   Q   Let's go to General Counsel Exhibit 69.  Starting

14   from the very top of this e-mail, there's an individual

15   named "Scott Causey" listed, do you see that, in the

16   "To:" line in the top e-mail there?

17   A   Yes.

18   Q   Who is Mr. Causey?

19   A   He's in Fort Mill.  I can't tell you exactly what

20   he does.

21   Q   And that e-mail references an attachment, do you

22   see that there, the top e-mail?

23   A   Yes.

24   Q   If you go to Page 3 of the exhibit.  Does this

25   appear to the attachment to that e-mail?

1    A    Yes.

2    Q    And this flier here was something that the union

3    created, is that correct?

4    A    It's going to be a supposition.  I guess.  I

5    don't know.

6    Q    Well, looking at the document, does it appear to

7    be something that the union created?

8         MS. HILL:  Objection, speculation.

9         JUDGE ROSAS:  Sustained.

10        MS. HILL:  How about just asking if --

11        JUDGE ROSAS:  Sustained.  It speaks for itself.

12   BY MR. WIESE:

13   Q    Did Sunbelt agree to have the union post these

14   fliers?

15   A    By somebody asking did I agree?

16   Q    Yes.

17   A    No, I didn't agree.

18   Q    To your knowledge, did anyone from Sunbelt agree

19   to have these fliers?

20   A    To my knowledge, no.

21   Q    Go over to General Counsel Exhibit 70.  This is

22   another e-mail chain regarding the scheduling of

23   collective bargaining negotiations, is that correct?

24   A    Correct.  It appears to be, yes.

25   Q    And these -- this e-mail chain appears to be

1   regarding scheduling negotiations in November and

2   December of 2018?

3      A   Uh-huh.

4      Q   And the union was asking to meet twice in

5   December of 2018, is that accurate?

6      A   That's what it appears to be, yes.

7      Q   And you declined to meet twice that month, is

8   that right?

9      A   Yes.

10     Q   All right.  Let's skip over General Counsel

11  Exhibit 71 and go to General Counsel Exhibit 72.  So in

12  this e-mail, in the first line, there's a reference to

13  "NGU 139."  Do you see that?

14     A   Yes, I do.

15     Q   What does "NGU" stand for?

16     A   In my parlance, it stands for no good union.

17     Q   Go to General Counsel Exhibit 73.  This e-mail is

18  regarding scheduling negotiations in January of 2019, is

19  that correct?

20     A   Yes, I believe so.

21     Q   And those negotiations in January of 2019 had

22  been cancelled by Sunbelt, is that right, the scheduled

23  negotiations?

24     A   I'm going to believe, yes.

25     Q   Well, did you attend negotiations in January of

1    2019 with the union?

2        A    I'd have to look through my notes to be

3    absolutely certain.

4        Q    And this e-mail references a court hearing on a

5    Monday, is that right?

6        A    Yes.

7        Q    And you didn't in fact attend that court hearing,

8    is that right?

9        A    It was rescheduled on whatever day I sent this to

10   Pat.

11       Q    So there wasn't a court hearing then in January

12   of 2019 that you attended?

13       A    No.

14       Q    If you go to General Counsel Exhibit 74.  If you

15   go to Page 2 of the document, it appears to be an e-mail

16   that you sent to two individuals named "Brick" and

17   "Russ."  Do you see that?

18       A    Yes.

19       Q    Who are those individuals?

20       A    Eric Brickson at the time was the PCM for the Sun

21   Prairie location.

22       Q    And what about Russ?

23       A    Russ is the salesperson for the Madison area.

24       Q    If you go over to General Counsel Exhibit 75.

25   This is an e-mail that you sent, correct?

1    A    Yes, sir.

2    Q    And that e-mail contained the letter on Page 2 of

3    the exhibit, is that right?

4    A    Yes, sir, I believe so.

5    Q    And the "McGowan" that's listed in your e-mail on

6    the first page, that's Terry McGowan, is that right?

7    A    Yes, sir.

8    Q    And he's the business manager of Local 139?

9    A    I guess that's his title.  That's what it says on

10   the letter.

11   Q    When you refer to his letter as a "wonderful

12   communication," are you being sarcastic?

13        MS. HILL:  Objection, speculation.

14        JUDGE ROSAS:  Sustained.

15        MS. HILL:  Thank you.

16   BY MR. WIESE:

17   Q    Skip over to General Counsel Exhibit 78.  This is

18   an e-mail chain here regarding a decertification

19   election at local -- or excuse me, at the Franksville

20   profit center.  Does that look right?

21   A    These are old eyes and old glasses and I'm not

22   sure.  I can't tell from the pictures.

23   Q    Well, I'm looking at 78.  Sorry.  Skipping over

24   76 and 77.

25   A    Oh, okay.  Sorry.  I wasn't -- sorry about that.

1    Q    That's okay.

2    A    Okay.

3    Q    So this -- if you go over to Page 2 of the

4    exhibit, there's a reference to an election being put on

5    hold, do you see that --

6    A    Yes.

7    Q    -- at the top of Page 2?

8    A    Uh-huh.

9    Q    And that was a decertification election at the

10   Franksville facility?

11   A    I believe that is, yes.

12   Q    And if you go to the top e-mail which is one that

13   you sent to Ms. Hill, correct?

14   A    It appears so, yes.

15   Q    It references a planning session for shedding

16   this pariah called 139.  Do you see that?

17   A    I do see that.

18   Q    And the pariah that you're referencing there,

19   that's Local 139?

20   A    Correct.

21   Q    And you referred to Local 139 as a pariah because

22   that's how you felt about them?

23        MS. HILL:  Objection.

24        JUDGE ROSAS:  Sustained.

25   ///

1    BY MR. WIESE:

2        Q    The "planning session" that's referenced there,

3    did that planning session take place?

4        A    Not that I recall.

5        Q    Go over to General Counsel Exhibit 80.  Going to

6    the bottom of Page 3 over to Page 4.  So again, we're

7    skipping 79, going over to 80.

8            This is an e-mail that you sent regarding a

9    conversation between Kyle McKellips and manager Chris

10   Pender, is that right?

11       A    What was the question again, please, sir?

12       Q    So your e-mail at the bottom of Page 3 going over

13   to Page 4 references a conversation between service

14   manager Chris Pender and employee Kyle McKellips?

15       A    Yes.

16       Q    And then it references the union finding out

17   about that conversation, is that accurate?

18       A    Yes.

19       Q    And you deduced that it was Al Romanowski who

20   told the union about this based off of your e-mail?

21       A    Yes.

22       Q    That was because you believed Mr. Romanowski was

23   someone who would share this information with the union?

24       A    Yes.

25       Q    Go back now to the very first exhibit, General

1  Counsel Exhibit 47, so go back to the very beginning.

2      A   47?

3      Q   Uh-huh.

4      A   I start at 61.

5          MR. WIESE:  May I approach, your Honor?

6          JUDGE ROSAS:  (Nods head.)

7  BY MR. WIESE:

8      Q   It should be this one right here?

9      A   Oh, I didn't see that.  Where would you find the

10 number on it?  Oh, I see it.

11     Q   It's very small.

12     A   Sorry about that.

13     Q   That's okay.  I'm looking at the handwriting on

14 this document.  Do you recognize that handwriting?

15     A   Yes.

16     Q   Whose handwriting is that?

17     A   It is my scroll.

18     Q   Can you read what that handwriting says.

19     A   It looks like "12 month - non majority.

20 Employees say no to union."

21     Q   And then above that, what does it say?

22     A   "Start 3/16/18."

23     Q   Do you recall what occurred on 3/6 of '18?

24     A   I believe that was our first negotiating session

25 with -- I think -- or was that -- that might have been

1    the election.

2            MR. WIESE:  Nothing further.

3            JUDGE ROSAS:  Charging Party?

4                      RECROSS EXAMINATION

5    BY MR. RYAN:

6      Q   If I can just have you take a look at General

7    Counsel Exhibit 74 and the line that talks about "the

8    bounds of the 776 market."

9            What's your understanding of the 776 market?

10     A   The area that the Racine store covered.

11     Q   And what is that area?

12     A   Essentially the south -- the south, southeast

13   part of the state, Kenosha, up to just south of the

14   airport, over toward Whitewater, down to the Illinois

15   line.

16           MR. RYAN:  That's all I had.  Thank you.

17           JUDGE ROSAS:  Counsel, any follow-up?

18           MS. HILL:  No cross.

19           JUDGE ROSAS:  Okay.  Thank you, sir.  You're

20   excused.  You're not to discuss your testimony with

21   anyone until you're advised otherwise by counsel.

22           All right.

23           MR. WIESE:  Counsel calls Jason Mayfield.

24           JUDGE ROSAS:  Off the record.

25           (Pause in the proceedings.)

1          JUDGE ROSAS:  Morning, sir.

2          THE WITNESS:  Morning, your Honor.

3          JUDGE ROSAS:  Mr. Mayfield, I'll remind you

4     you're still under oath.

5          THE WITNESS:  Yes, sir.

6          JUDGE ROSAS:  General Counsel.

7          MR. WIESE:  Thank you, your Honor.

8                    REDIRECT EXAMINATION

9     BY MR. WIESE:

10         Q    Good morning, Mr. Mayfield.

11         A    Morning.

12         Q    So if you look on the table in front of you,

13    there's a manila folder.

14         A    Yes.

15         Q    And there's some documents in that folder that

16    we're going to be going through in there that are

17    labeled on the bottom center of each page, and they

18    should be in order.  And I'd like to start by asking you

19    about General Counsel Exhibit 64.  So it will say GCX 64

20    on the bottom middle of the page.

21         A    It's cut off, but it says GCX 47.

22         Q    Right.  So if you go through those documents,

23    they should be in order, and there should be a General

24    Counsel Exhibit 64.

25         A    Okay.

 1    Q   So I'd like to turn to the last page of that

 2   exhibit, Page 3.  The bottom two lines of that e-mail,

 3   do you see that?

 4    A   I do.

 5    Q   Okay.  And that e-mail is making reference to a

 6   phone call, is that right, or a series of phone calls?

 7    A   I assume based on it says "phone calls."

 8    Q   And those were phone calls between yourself and

 9   Mr. Bogardus?

10    A   I do not recall.

11    Q   Let's go over to the next document then, General

12   Counsel Exhibit 65.  I want to look at the top e-mail

13   there from yourself to Ms. Hill and Mr. Bogardus.  Do

14   you see that there?

15    A   I do.

16    Q   And in this e-mail, you're requesting

17   Mr. Bogardus to visit each of the profit centers in his

18   district, is that right?

19    A   Yes.

20    Q   Had you requested Mr. Bogardus to do this prior

21   to this e-mail?

22    A   This is something we do regularly.

23    Q   But had you requested Mr. Bogardus specifically

24   to conduct these sort of meetings?

25    A   I don't recall.

1    Q    Skip ahead a little bit and go over to General

2    Counsel Exhibit 69.  Are you there?

3    A    Yes.

4    Q    So attached to this e-mail is a flier on Page 3

5    of the document.  Do you see that flier?

6    A    I do.

7    Q    Do you recognize this flier?

8    A    No.

9    Q    You've never seen this before?

10   A    I don't recall.  There's been a lot of fliers.

11   Q    Do you recall whether Local 139 offered to

12   solicit business on behalf of Sunbelt?

13   A    Can you repeat the question.

14   Q    Do you recall Local 139 ever offering to solicit

15   business on behalf of Sunbelt?

16   A    Define solicit business.

17        MR. WIESE:  Your Honor, I object.  It's

18   nonresponsive.

19        JUDGE ROSAS:  Keep trying to elicit a response,

20   Counsel.

21   BY MR. WIESE:

22   Q    Did Local 139 -- do you recall Local 139 ever

23   offering to speak to contractors on behalf of Sunbelt?

24   A    Handbill or speak?

25   Q    Handbill.

1    A    Yes.

2    Q    To handbill in a positive manner towards Sunbelt?

3    A    I don't recall.

4    Q    And looking at the flier on Page 3.  Does this

5    appear to be a positive flier or a negative flier?

6         MS. HILL:  Objection, opinion, speculation.

7         JUDGE ROSAS:  Rephrase.

8    BY MR. WIESE:

9    Q    Can you read the top three lines of this flier

10   silently.

11   A    Yes.

12   Q    Having reviewed those lines, does this flier

13   appear to be a positive flier towards contractors?

14   A    "Patronage" could be interpreted as positive.

15   Q    Do you recall being involved in any conversations

16   regarding this flier and whether Sunbelt would consent

17   to it being sent out to contractors?

18   A    Not that I recall.

19   Q    Look over to General Counsel Exhibit 71.  This is

20   an e-mail chain regarding scheduling negotiations with

21   the union in November of 2018, is that accurate?

22   A    Yes.

23   Q    And the union was requesting to meet twice in

24   December of 2018, isn't that right?

25   A    That would be inferred based on Page 2, not Page

1  1.

2      Q   Okay.  If you look at Page 2, the union is

3  requesting to meet twice in December, is that right?

4      A   They're asking if we'd be willing to meet for

5  negotiations.

6      Q   On December 10th and then December 18th, correct?

7      A   Yes.

8      Q   And your position was that you could schedule one

9  meeting in December, is that right?

10     A   It says that we can schedule one meeting next

11  month based on holidays and vacations.

12     Q   And that's what happened, right, the parties only

13  met for negotiations once in December 2018?

14     A   Correct.

15     Q   If you skip ahead a little bit now to General

16  Counsel Exhibit 76.  This is an e-mail concerning

17  collective bargaining negotiations with Local 139, is

18  that correct?

19     A   Yes.

20     Q   And you were -- your e-mail is requesting that

21  negotiations be done by 2:00, is that right?

22     A   Yes.

23     Q   And that was 2:00 p.m. in the afternoon, is that

24  right?

25     A   Correct.

1    Q    And that's what happened at negotiations on March

2  21st, is that right?

3    A    I don't recall.

4    Q    If you go over to General Counsel Exhibit 79.

5  This is an e-mail chain that you were involved in

6  regarding a union meeting, is that correct?

7    A    I'd be speculating.

8    Q    So from the face of the e-mail, which is titled

9  "Monday's Union Meeting," you can't identify whether

10  this is regarding a union meeting?

11    A    It appears that way.

12    Q    The bottom e-mail here, which is from March 28th

13  of 2019 from Mr. Anderson, references "fishing for

14  information."  Did you instruct Mr. Anderson to fish for

15  information about this meeting?

16    A    I did not.

17    Q    Besides the e-mails you received from

18  Mr. Anderson, did you receive any other information

19  about this union meeting?

20    A    Not that I recall.

21        MR. WIESE:  Nothing further.

22        JUDGE ROSAS:  Charging Party?

23        MR. RYAN:  Nothing at this time, your Honor.

24        JUDGE ROSAS:  Okay.

25        MS. HILL:  No follow-up.

1          JUDGE ROSAS:  Thank you, sir.  You're excused.

2    Please do not discuss your testimony with anyone until

3    you're advised otherwise by counsel.  All right?

4          THE WITNESS:  Thank you, your Honor.

5          MR. WIESE:  I'll call Bryan Anderson to the

6    stand.

7          JUDGE ROSAS:  Okay.  Off the record.

8          (Recess.)

9          JUDGE ROSAS:  Back on the record.  Next witness.

10         MR. WIESE:  Thank you, your Honor.  I'll call

11   Bryan Anderson.

12         JUDGE ROSAS:  Sir, you previously testified?

13         THE WITNESS:  No.

14         JUDGE ROSAS:  You did not.  Please raise your

15   right hand.

16         (Whereupon,

17                     BRYAN S. ANDERSON,

18   was called as a witness by and on behalf of the General

19   Counsel and, after having been duly sworn, was examined

20   and testified as follows:)

21         THE WITNESS:  Yes.

22         JUDGE ROSAS:  Please have a seat.  State and

23   spell your name and provide us with an address.

24         THE WITNESS:  Bryan S. Anderson, B-R-Y-A-N,

25   middle initial S., Anderson, A-N-D-E-R-S-O-N.  510

1    Rolling Meadows Drive, North Fond du Lac, Wisconsin,

2    54937.

3                        DIRECT EXAMINATION

4    BY MR. WIESE:

5        Q    Mr. Anderson, my name is Tyler Wiese.  I'm an

6    attorney with the National Labor Relations Board.  I'm

7    going to be asking you a couple of questions today.

8    Okay?

9        A    Okay.

10       Q    So if you look in front of you, there should be a

11   manila folder.

12       A    Uh-huh.

13       Q    And if you open that up, I'm going to ask you

14   just a few questions about some of the documents in

15   there.

16       A    Okay.

17       Q    If you open it up, and you look at the bottom of

18   each page, there should be a GCX and then a number after

19   it.  Do you see that?

20       A    Yep.

21       Q    And if you go a little bit further back in the

22   packet, there should be a GCX 77.

23       A    All right.

24       Q    They should be in order.  Let me know when you

25   get there.

1    A    I am there.

2    Q    And looking at the first page of this exhibit, it

3  looks like it's an e-mail from pcm776, Manager Racine,

4  Wisconsin.  Is that your e-mail address or was that your

5  e-mail address?

6    A    At the time it was, yes.

7    Q    And you sent that e-mail to Ms. Hill and then

8  someone named Dana Cote.  Is that how you pronounce

9  that?

10    A    That is my belief, yes.  I think I was just

11  replying to an e-mail.

12    Q    Do you know who -- is it Mr. or Mrs. Cote?

13    A    I do not know.

14         MS. HILL:  Your Honor, if I could, it's my

15  assistant, okay.  That's all I -- is that who --

16         MR. WIESE:  Yes.

17         MS. HILL:  Okay.  Thank you.

18  BY MR. WIESE:

19    Q    And looking at the e-mails here, it appears

20  there's a series of pictures in those e-mails, is that

21  right?

22    A    Yes, sir.

23    Q    And you took those pictures?

24    A    I did.

25    Q    And those pictures contain the notice of the

1  decertification election at the Franksville facility?

2     A    That is correct.

3     Q    All right.  Let's go to General Counsel Exhibit

4  79 now.

5     A    Okay.

6     Q    And this appears to be an e-mail exchange between

7  yourself and Mr. Mayfield, is that correct?

8     A    Yes, sir.

9     Q    And looking at the bottom e-mail there, the March

10  28th, 2019, 8:03 a.m., you wrote that you're "fishing

11  for information."  Do you see that?

12     A    I do see that, sir.

13     Q    And you were fishing for information about a

14  union meeting, is that correct?

15     A    Yes, sir.

16     Q    Did someone direct you to fish for that

17  information?

18     A    No, sir.

19     Q    Why were you fishing for information about the

20  union meeting?

21     A    A lot of people were telling me about this, and

22  when they tell me about this, I ask questions.

23     Q    And when you say "people," who are you talking

24  about?

25     A    I don't recall specifically.

1    Q   Would they have been employees at the Franksville

2  facility?

3    A  I don't recall, sir.

4    Q  So you have no recollection at all about who was

5  talking about this union meeting at this time?

6    A  That is correct, sir.

7    Q  If you go to the top e-mail here which is one

8  from yourself to Mr. Mayfield with a couple of people

9  cc'd, it makes reference to there being a lot of people

10  at that meeting.

11    A  Uh-huh.

12    Q  Do you see that?  How did you get that

13  information?

14    A  I do not recall.

15    Q  Did you witness that meeting?

16    A  I did not.

17    Q  The second line makes reference to "fishing for

18  more information."  Do you see that?

19    A  I do see that, sir.

20    Q  Did you in fact fish for more information about

21  that meeting?

22    A  I don't recall.

23    Q  Did you have any other communications with any

24  other Sunbelt managers that you can recall regarding

25  that union meeting?

1    A    No.

2    Q    So just this e-mail?  This is it?

3    A    I believe so, yes.

4         MR. WIESE:  Nothing further.

5         JUDGE ROSAS:  Charging Party, anything?

6         MR. RYAN:  No, your Honor.

7         JUDGE ROSAS:  Anything?

8         MS. HILL:  Yes, just to follow up on something

9    that the witness said.

10                      CROSS EXAMINATION

11   BY MS. HILL:

12   Q    Mr. Anderson, this indicates "pcm776."  Was that

13   your title at some point?

14   A    That is correct, PC0776 manager, yes.

15   Q    And at the time of this e-mail exchange, you were

16   the profit center manager at the Franksville location?

17   A    Yes, ma'am.

18   Q    And when were you no longer a manager at the

19   Franksville location?

20   A    It would be August of 2019.

21        MS. HILL:  Thank you.  Just to make the record

22   clear, your Honor, on this.

23        JUDGE ROSAS:  Anything else?

24        MR. WIESE:  No, your Honor.

25        MR. RYAN:  No, your Honor.

 1          JUDGE ROSAS:  Thank you, sir.  You're excused,

 2    sir.  You're not to discuss your testimony with anyone

 3    unless you're otherwise advised by counsel.  All right?

 4          THE WITNESS:  Yes, sir.

 5          JUDGE ROSAS:  All right.  Thank you.

 6          General Counsel, any other witnesses?

 7          MR. WIESE:  No, your Honor.

 8          JUDGE ROSAS:  General Counsel rests?

 9          MR. WIESE:  Your Honor, before resting, I'd like

10    to reoffer General Counsel Exhibit 60 which are the

11    bargaining notes that you made a privilege ruling on

12    earlier.  I would request that they be included in a

13    rejected exhibit file.

14          JUDGE ROSAS:  Had I ruled on that on the record?

15          MS. HILL:  You ruled on the record, sir, that

16    546, the back page, that that did include attorney

17    communications and to exclude it because these were my

18    notes.

19          JUDGE ROSAS:  Okay.

20          MS. HILL:  These are not part of the official

21    record.

22          JUDGE ROSAS:  All right.  The objection is

23    sustained.  The exhibit -- General Counsel 60 is placed

24    in the rejected exhibit folder.

25          MR. WIESE:  Okay.

1          JUDGE ROSAS:  Okay.  Anything else?

2          MR. WIESE:  No, your Honor.  General Counsel

3   rests.

4          JUDGE ROSAS:  Charging Party, anything?

5          MR. RYAN:  We do not have anything to offer at

6   this time.  We reserve the right though in the future

7   to --

8          JUDGE ROSAS:  All right.  Counsel for Respondent,

9   you're on.

10         MS. HILL:  I am on, your Honor.  If you can give

11   me a moment to look at my notes.

12         JUDGE ROSAS:  Okay.  We're off the record.

13         (Pause in the proceedings.)

14         JUDGE ROSAS:  All right.  We're on.

15         MS. HILL:  It is often said that there are three

16   certainties in life, death, taxes and that two attorneys

17   will disagree as to what the facts in the law are for a

18   case.  It's the latter situation that we have presently

19   in front of you.

20         In Mr. Wiese's opening statement, he stated that

21   Sunbelt frustrated the bargaining by continual delays in

22   scheduling the negotiations and during the negotiations,

23   that the parties could not engage in an honest exchange

24   of proposals.

25         The evidence from the 139 and from Sunbelt has

1    demonstrated, and will demonstrate, that the parties

2    agreed to numerous significant proposals in every

3    bargaining session.  Due to the union's dislike for the

4    modern convenience called e-mail, the parties' progress

5    was slowed down considerably.  The evidence will show

6    that the union had an archaic disdain even for using

7    direct deposit.  The evidence from Local 139 and Sunbelt

8    has, and will continue, to demonstrate that the union

9    demanded that Sunbelt only provide it with written

10   proposals.

11        You will hear that three Sunbelt employees

12   discussed and finalized each proposal, while a fourth

13   member of the Sunbelt negotiation team typed the

14   proposal and cut down a rain forest in order to provide

15   Local 139 what it demanded; however, 139 provided verbal

16   proposals.

17        You have heard, and will hear, how repeatedly

18   inept Local 139's negotiation team was with respect to

19   its preparation for negotiations and during the

20   negotiations themselves.

21        The evidence from Local 139 and Sunbelt will

22   clearly demonstrate that Sunbelt provided explanations,

23   or to use the words in the complaint and in the charges,

24   quote, "justifications," close quote, for its proposals.

25   Sunbelt will show that it repeatedly and carefully

1  explained to Local 139 what Sunbelt's business was all

2  about.

3        The evidence will demonstrate that the

4  decision-maker for the reorganization of the Franksville

5  profit center did not, and does not, have a scintilla of

6  union animus and did not retaliate against the union

7  because of the ULPs filed by Local 139.  The

8  overwhelming evidence will lay out the effect of the

9  bannering and the picketing on the Franksville location

10  and Sunbelt's competition.

11        You will repeatedly hear that business was

12  diverted from Sunbelt to Sunbelt's competitors, all of

13  which are nonunion.  One of those competitors has a long

14  history of closing its doors when a union wins a

15  representation election.

16        You have heard, and will continue to hear, that

17  the bargaining unit at the time of the reorganization

18  included two mechanics who were given the opportunity to

19  apply for jobs at other locations but failed to do so.

20  The evidence presented will clearly demonstrate that the

21  union failed those two employees by refusing to bargain

22  on two occasions regarding the reorganization.

23        The evidence has shown, and will continue to

24  demonstrate, that the Franksville profit center is doing

25  work in accordance with the past practice and the

1  information provided to the Local 139 during our August

2  bargaining sessions.  There was a large-scale

3  restructuring of the Franksville business based on the

4  actions of the 139.  Accordingly, there's no evidence

5  that Sunbelt did anything unlawful.  Thank you.

6            JUDGE ROSAS:  Okay.  Off the record.

7            (Lunch recess.)

8            JUDGE ROSAS:  Counsel --

9            MS. HILL:  Yes, sir.

10           JUDGE ROSAS:  -- first witness.

11           MS. HILL:  Yes.  Mr. Bogardus, please.

12           JUDGE ROSAS:  And sir, you've been previously

13  sworn.

14           THE WITNESS:  Yes, sir.

15                      DIRECT EXAMINATION

16  BY MS. HILL:

17    Q   Mr. Bogardus, on or about March 22nd, 2019, did

18  you instruct any of the Sunbelt employees to tell you

19  about union activities of other Sunbelt employees?

20    A   No, ma'am.

21    Q   On or about April 22nd or 23rd, 2019, did you

22  interrogate any Sunbelt employees at any of the

23  locations in Wisconsin about their union sympathies?

24    A   No, ma'am.

25    Q   On or about April 22nd or 23rd, 2019, did you

1  interrogate Sunbelt employees in Wisconsin about their

2  union activities?

3      A   No, ma'am.

4      Q   Did you attend all of the negotiation sessions?

5      A   Yes, ma'am.

6      Q   How was Sunbelt first notified about the

7  negotiations?

8      A   When you say "first notified," are you talking

9  about the notification that the union or the -- yeah,

10 that the guys that signed the cards that there was going

11 to be a vote or the negotiation fees?

12     Q   The -- and I apologize for the poor question.

13         When were you first notified by the 139 that they

14 wanted to actually, after the election, actually wanted

15 to sit down to negotiate a contract?

16     A   Middle of March, give or take, I guess, a week or

17 so after the election.

18     Q   And do you recall what Sunbelt's response was to

19 that?

20     A   We were coming up on year-end.  Our year-end's in

21 April, and that's a very busy time, our fiscal year,

22 it's a very busy time for us, so we asked for a little

23 bit of forbearance to get through that piece, and then

24 we can try to get negotiations scheduled immediately.

25     Q   And why was that a busy time of the year, sir?

1    A   It's the end of our fiscal year.  We're coming

2   out of the winter lull, if you will, on the General Tool

3   side, and the activity level is picking up significantly

4   at the same time as we're closing out the fiscal year,

5   so it makes it very, very challenging for the managers

6   as we're trying to close out the old year and work our

7   way through the new year.

8    Q   And did you prepare anything, any documents, any

9   notes or anything during negotiation sessions?

10    A   Yes, I've got my notes that I put together as we

11   were having those conversations.

12    Q   Okay.  Now, I believe in the NLRB's case in

13   chief, they showed you a document that was -- it looked

14   like a cover of a union contract, and you identified

15   handwriting on that, sir.

16    A   Correct.

17    Q   Would you please look at Respondent's -- and you

18   should have a binder there.

19    A   Yes.

20    Q   Okay.  And look at No. 7, please.

21    A   Okay.

22    Q   And do you recognize that, sir?

23    A   Yes.

24    Q   Now, there appears to be quite a few pages there,

25   correct?

1    A    Yes, ma'am.

2    Q    All right.  And what is that?  And I'm referring

3    to -- and if you look at the lower right-hand corner,

4    you'll see some numbers.  The first one should be I

5    believe about -- with the cover and then the very last

6    one, maybe around 1389, I believe.

7    A    You're talking about the very last one in Tab 7?

8    Q    Yes, sir, under Tab 7.

9    A    Yes, 1389 are the last four digits.

10   Q    Okay.  Any of the handwriting on those pages not

11   yours, sir?

12   A    I'll be a minute.

13        Are there pages that are supposed to be blank?

14   Q    Which one are you referring to, sir?

15   A    There's pages that are blank.  1271 are the last

16   four digits.

17   Q    I think that was the last page of the proposal

18   most likely.

19   A    1275, the same.

20   Q    But no handwriting on those two blank pages,

21   correct?

22   A    No.  1279, 1283, no handwriting, and they're

23   blank.  I just want to make sure you know they're

24   blanks.

25   Q    Uh-huh.  They're numbered?

1    A    Yes.  1357 has got notes from me in the top, but

2  at the bottom, I believe that was Steve Buffalo and

3  Jason on the wording on the bottom of that page.

4    Q    Thank you.

5    A    Other than the one called out, those all appear

6  to be my notes.

7         MS. HILL:  Your Honor, Respondent requests to

8  admit what has been marked as Respondent's Exhibit No.

9  7, sir.

10        JUDGE ROSAS:  Any objection?  Voir dire?

11        MR. WIESE:  No objection, your Honor.

12        JUDGE ROSAS:  Respondent's 7 is received.

13        MS. HILL:  Thank you, your Honor.

14        (Respondent's 7 was received.)

15  BY MS. HILL:

16    Q    At any time between March 1st of 2018 and the

17  present, were you ever told that Sunbelt did not have an

18  intention of reaching an agreement with Local 139?

19    A    No, ma'am.

20    Q    Did 139 ask to negotiate wages?

21    A    Yes, ma'am.

22    Q    And did Sunbelt agree to negotiate wages?

23    A    Pursuant to all other articles being negotiated,

24  yes.

25    Q    Did Sunbelt refuse to negotiate with the Local

1  139 at reasonable times?

2     A  Not that I'm aware, no.

3     Q  Did Sunbelt refuse to negotiate with the Local

4  139 at reasonable places?

5     A  No, ma'am.

6     Q  Did the union ever -- Local 139 ever ask the

7  Sunbelt negotiating team to negotiate someplace else?

8     A  They suggested their -- their hall or perhaps a

9  hotel a couple times.  I don't remember the dates.

10    Q  And do you recall why Sunbelt did not agree to

11 that suggestion?

12    A  The union at the very beginning required any

13 proposals, any counters that Sunbelt was to make had to

14 be made in writing, and it was determined that the

15 smartest thing we could do is use the facility there at

16 776, Racine, the Franksville store, because we had a

17 conference room that -- the climate control of the air

18 could be better, but beyond that, we happened to put all

19 of our counterproposals in writing.  It was easier for

20 us to work out of Bryan's office, as the PCM, work out

21 of his office and print up the proposals and be able to

22 take copies back in for review.

23    Q  Thank you.  Did the union ever ask Sunbelt for

24 justifications for the proposals that Sunbelt made?

25    A  My head tells me yes, but I can't cite chapter

1   and verse.

2       Q   Was the -- who was on the union's negotiating

3   team?

4       A   You had Jamie Smith, there was the Sunbelt

5   driver, Mike Ervin, Greg West, Steve Buffalo and Dan

6   Marsolek.

7       Q   And did that negotiating team change from time to

8   time?

9       A   If I remember correctly, Mr. McGowan came in I

10  think once or maybe twice, but I'm sure he was there

11  once.

12      Q   Was there ever a time that the union's

13  negotiating team was not prepared for negotiations?

14          MR. WIESE:  Objection, leading.

15          JUDGE ROSAS:  I'll allow that.

16          You can answer if you know.

17          THE WITNESS:  It didn't seem like they had

18  reviewed several times, that they had reviewed what we

19  had done previously.  Quite frankly, it was left up to

20  us to bring back the notes and to review, I guess, or to

21  give an overview of what we'd done the last time as we

22  went into the next negotiating session.

23  BY MS. HILL:

24      Q   You mentioned that Mr. McGowan was at one,

25  perhaps two negotiation sessions.  Do you recall

1   anything that Mr. McGowan said at a negotiation session?

2       A   You know, there was a couple times that -- a

3   couple things that I remember.  One of them was, you

4   know, we can give you Foxconn.  Well, my opinion was

5   that we weren't going to pursue Foxconn.  We were going

6   to pursue the local contractors' business to develop a

7   support -- a firm foundation for that store, so him

8   spouting on that he was going to be able to do that

9   didn't mean anything to me.

10          There's something that's tickling my head, but I

11  can't -- it's not strong enough for me to really make --

12  voice an opinion on it.

13      Q   With respect to Foxconn, I believe you had

14  testified earlier about budget, that the Franksville

15  location had a budget, correct?

16      A   That is correct.

17      Q   Were you involved in preparing the budget?

18      A   I was involved in preparing the budget for fiscal

19  year -- our fiscal year starts in May, so I would have

20  been involved in the fiscal year '19 and fiscal year

21  '20.

22      Q   During any of those budgets that you helped to

23  prepare, was Foxconn part of that budget?

24      A   No.

25      Q   Sir, are you aware of a decertification petition

1    that was filed with the National Labor Relations Board?

2        A    Yes, ma'am.

3        Q    And what do you know about that decertification

4    petition, sir?

5        A    When the union decided to start their bannering,

6    or whatever it is they call it, informational service,

7    we started seeing equipment come back because of the

8    threats of the union allegedly made to our customers.

9    The customers were the ones who told us they made those

10   threats.

11           We had -- yeah, Mario Rivera came when the

12   equipment -- came to me when the equipment started

13   coming back, and he said something to the effect -- I

14   won't go into Mario's exact vernacular -- what are they

15   doing.

16           And I said well, you know, it's one of the things

17   that they can do is advertise that there's a dispute

18   between us and the union.  Okay, what can I do about

19   that.  I said call the NLRB.  And he said what's that.

20   I said you're going to have to call the NLRB.

21       Q    Did you ask anyone, any of the Sunbelt employees

22   to file a decertification petition?

23       A    No, ma'am.

24       Q    Now, Mr. Bryan Anderson became the profit center

25   manager at the Franksville location approximately when,

1  sir?

2     A    June, July of '18, late June, early July.

3     Q    When Mr. Anderson started, did you have anything

4  to do with training him, getting him up to speed on the

5  Franksville location?

6     A    Bryan had been the operations manager for the

7  district for a couple of years prior to me coming out,

8  and he had very solid fleet knowledge, very solid

9  operations guy, so he didn't really need a lot of help

10  from me.  In fact, I just kind of stayed out of his way

11  so he could get his job down.

12     Q    You talk about fleet.  When Mr. Anderson started,

13  did he -- did you discuss with him the fleet for the

14  Franksville location?

15     A    Based on what was going on with the negotiations

16  and the perception of where we were, we did not choose

17  to increase the fleet.  In fact, we started to pull it

18  down.

19     Q    Was the customer -- how did the customer base for

20  Franksville compare to the other profit centers in

21  Wisconsin?

22     A    It had a similar contractor base, but there was a

23  base of smaller contractors, home builders and

24  homeowners that would rent smaller equipment because

25  it's a pretty handy location right there off the 94, so

1    we had a -- we had a walk-in presence there that we

2    didn't have in other places.

3         Q    Did you attend the July 2019 negotiation session?

4         A    Yes, ma'am.

5         Q    Can you describe what it was?

6         A    If I remember correctly, that was where you were

7    supposed to have gotten an Excel -- or not an Excel

8    file, a Word file of the TA'd agreement -- or the

9    agreement, you know, that would have been TA'd prior to

10   so that we could review it.

11        The folks on the union side were upset,

12   perturbed, they were not happy with the fact that you

13   didn't have that, but from what I understand, you did

14   not receive it.

15        Q    And approximately how long did that negotiation

16   session last?

17        A    Well, after we determined that we hadn't got the

18   file, and there wasn't really anything to go over, and I

19   was called a liar by Mr. Marsolek, I think it all lasted

20   maybe eight to ten minutes.

21        Q    Did you ever hear -- first of all, do you know

22   Chris Pender?

23        A    Yes.

24        Q    Did you ever hear Mr. Pender say that the union

25   would not get into the Franksville profit center?

1    A    I did not -- I've never heard Chris say that, no.

2    Q    Were you involved in the decision to reorganize

3    the Franksville location in August of 2019?

4    A    I was advised that it was going to happen, yes.

5    Q    And who advised you of it?

6    A    Jason Mayfield.

7    Q    Do you recall when you were advised of that?

8    A    A couple of days before.

9         MS. HILL:  No further questions of this witness,

10   your Honor, at this time.

11        JUDGE ROSAS:  Cross?

12        MR. WIESE:  Can I have a couple minutes to

13   prepare, your Honor?

14        JUDGE ROSAS:  Sure.  Off the record.

15        (Pause in the proceedings.)

16                      CROSS EXAMINATION

17   BY MR. WIESE:

18   Q    Mr. Bogardus, I'd like to have you look at -- it

19   would be Page 1358 of Respondent's Exhibit 7 which you

20   testified were your bargaining notes.

21   A    Yes.

22   Q    Let me know when you're there.

23   A    I'm good.

24   Q    And if you flip through the following pages of

25   that document, you would agree with me that this was the

1  union's proposal that they made at the June 5th, 2019

2  bargaining session, does that sound right?

3      A   I'm going to hedge and say that I dated it as of

4  7/2 because that's when we reviewed it, so I don't know

5  if you're asking if this was the one they produced on

6  the 25th and we reviewed it on the 2nd.

7      Q   Okay.  And I guess that gets to my point.  You do

8  recall reviewing this document on July 2nd, 2019?

9      A   Yes.

10     Q   And that was before the July 9th bargaining

11 session?

12     A   Yes.

13     Q   Who did you review that document with?

14     A   If I remember correctly, we were going through

15 this pretty much line-by-line, article-by-article, and

16 that's where I was making my notes, you know, that it

17 matched and it was definitely -- as we were getting

18 through that, Pat made the suggestion --

19         MS. HILL:  Ah, objection, move to strike,

20 attorney-client privilege.  Sorry.

21         JUDGE ROSAS:  So you continue from that point on

22 after consultation with your attorney.

23         THE WITNESS:  It was determined that the smartest

24 attack would be to have a -- have the union produce the

25 digital file, you know, the Word file for comparison.

1  BY MR. WIESE:

2      Q    And along besides Ms. Hill, who else was present

3  for that review?

4      A    Bryan Anderson was there, and I'm pretty certain

5  Jason was there.  I think all four of us were there.

6      Q    And you went through this proposal line-by-line

7  then?

8      A    For the most part.

9      Q    I'm going to have you look at the binder with the

10 General Counsel exhibits, so it should be in front of

11 you.  The black one up there.

12     A    I don't know what this page is.

13     Q    That's okay.  I'm going to have you first look at

14 General Counsel Exhibit 7A, please.

15     A    Okay.

16     Q    Are you there?

17     A    Yes.

18     Q    Okay.  And if you'll turn over to Page 2 of that

19 document.

20     A    Okay.

21          MS. HILL:  I'm going to object, beyond the scope.

22          JUDGE ROSAS:  What does this relate to as far as

23 his direct examination?

24          MR. WIESE:  It relates to the collective

25 bargaining negotiations which he made -- he testified

1    about as part of his direct.

2            JUDGE ROSAS:  Give me some specifics.

3            MR. WIESE:  Well, there were broad-sweeping

4    statements about what the union -- whether the union

5    requested justifications for any proposals, whether --

6            JUDGE ROSAS:  Okay.  This is related to that

7    question?

8            MR. WIESE:  It's related to the proposals that

9    were made at the bargaining table.  I believe that it's

10   within the scope because, again, the collective

11   bargaining negotiations were discussed in broad-sweeping

12   terms.

13           I would like to ask this witness some specific

14   questions about specific proposals and whether he has

15   any recollection of discussions around those proposals

16   and whether justifications were provided.

17           JUDGE ROSAS:  Okay.  Overruled.

18           You can answer.

19           THE WITNESS:  You'll have to give it to me again.

20   BY MR. WIESE:

21      Q   Okay.  Not a problem.  So looking at General

22   Counsel Exhibit 7A, Page 2 --

23      A   Right.

24      Q   -- this is identified as an employer proposal

25   that was made on May 22nd, 2018.  Do you recognize this

1  document as such?

2     A   Yes.

3     Q   And this was the union's proposal for dues at

4  that time?  Or excuse me.  The employer's proposal?

5     A   Yes.

6     Q   And looking below that, there's a notation TA

7  6-28-18.  Do you recall there being a tentative

8  agreement over this proposal?

9     A   I didn't see it in mine, so I don't recall.

10     Q   Okay.  So I'd like to have you turn now to

11  General Counsel Exhibit 7H.

12     A   Okay.

13     Q   This was identified as a Sunbelt proposal on

14  February 21st of 2019.  Do you recognize it as such?

15     A   Given the fact that I see the date here and the

16  proposal, I'd have to say yes, but do I remember this

17  specific, no.

18     Q   So you don't recall on February 21st Sunbelt

19  presenting this proposal during the collective

20  bargaining negotiation?

21     A   I do not recall, no.

22     Q   Do you recall any discussion about dues at the

23  February 21st, 2019 negotiation?

24     A   There were a couple of discussions, and I don't

25  know if it was the 21st, but yeah, there were dues

1    discussions.

2        Q    Do you recall whether any Sunbelt negotiators

3    highlighted any changes that were in this proposal in

4    General Counsel Exhibit 7H from prior dues proposals?

5            MS. HILL:  Objection, form, foundation.

6            JUDGE ROSAS:  Repeat that.

7    BY MR. WIESE:

8        Q    I asked the witness do you recall whether any

9    negotiators from Sunbelt highlighted any changes in

10   General Counsel Exhibit 7H, dues proposal, from any

11   prior dues proposals?

12           JUDGE ROSAS:  Do you understand the question?

13           THE WITNESS:  I think.  Did we revise the -- what

14   was it, the 29th?  Here's what I remember, okay.  I'll

15   just tell you exactly what I remember as far as the

16   dues.

17   BY MR. WIESE:

18       Q    Sure.

19       A    I had no intention of ever collecting them.  That

20   was up to the union.  Now, obviously there are others

21   that could have overrode me, but that's where I was.

22       Q    Did you state that to the union at the bargaining

23   table?

24       A    I don't know that I did and I don't know that I

25   didn't.

1          MR. WIESE:  Nothing further.

2          JUDGE ROSAS:  Charging Party?

3          MR. RYAN:  I don't think I have anything at this

4     time.  Thank you, your Honor.

5          JUDGE ROSAS:  Any redirect?

6          MS. HILL:  Yes, sir.

7                    REDIRECT EXAMINATION

8     BY MS. HILL:

9     Q    Mr. Bogardus, if you would look at General

10    Counsel Exhibit 7H.

11    A    Okay.

12    Q    I believe you were just looking at that.

13    A    Yes, ma'am.

14    Q    Is the handwriting in the upper left-hand corner

15    yours, sir?

16    A    No, ma'am.

17    Q    And I believe he asked you about 7A also in the

18    same binder.

19    A    Yes.

20    Q    Is the handwriting on that page yours?

21    A    No, ma'am.

22    Q    So sitting here today, you don't know if the

23    information written on this is correct?

24    A    I do not.

25    Q    Now, if you would please look at Respondent's

1    Exhibit 7.  This is the one in the other binder, and

2    it's --

3        A    Oh.

4        Q    -- the one with your notes in it that you

5    identified -- there you go.

6        A    Okay.

7        Q    And Mr. Wiese asked you about Pages 1358 to 1386.

8    Now, directing your attention to Page 1372 of this

9    exhibit, sir.

10       A    Yes, ma'am.

11       Q    What are the dates that you have written in the

12   right-hand column?

13       A    "7/9/19."

14       Q    And is that the date when you had personally

15   reviewed this?

16       A    Wherever you see my initials and you see a date,

17   that's the date that I read it and initialed it.

18       Q    And when you said that you had reviewed it

19   line-by-line, you're referring to you yourself did it,

20   correct?

21       A    Yes, ma'am.

22       Q    And looking at 1387, this is all your

23   handwriting, correct?

24       A    Give me a second to get there, please.

25            Yes, ma'am.

1    Q   And this would reflect what you referred to as a

2   short negotiation session on July 9th, correct?

3    A   Yes, ma'am.

4        MS. HILL:  No further follow-up questions, your

5   Honor.

6        JUDGE ROSAS:  Any further cross?

7        MR. WIESE:  Just briefly, your Honor.

8                    RECROSS EXAMINATION

9   BY MR. WIESE:

10   Q   Mr. Bogardus, if you'll look at Page 1360 of

11  Respondent Exhibit 7.

12       MS. HILL:  Now we're definitely beyond the scope.

13       JUDGE ROSAS:  Well, Respondent 7 -- you're

14  following up on counsel's questions on redirect, I

15  assume?

16       MR. WIESE:  Correct, right.

17       MS. HILL:  I didn't ask about this one.

18       JUDGE ROSAS:  Well, let's see where it goes.  You

19  can move to strike.

20  BY MR. WIESE:

21   Q   So looking at your handwriting on the right-hand

22  side of this document, I just want to clarify that.

23  That says "7/2/19," is that correct?

24   A   That is correct.

25   Q   And that would reflect the date that you reviewed

1    this document?

2        A    That is correct.

3        Q    Along with other members of your bargaining team?

4        A    I've got it in my head that we were sitting at

5    the table going through these.

6        Q    And you were sitting at the table going through

7    it on July 2nd of 2019?

8        A    Yes.

9            MR. WIESE:  Nothing further.

10           JUDGE ROSAS:  Charging Party, anything?

11           MR. RYAN:  Nothing further, your Honor.

12           MS. HILL:  And move to strike because we did

13   not -- I did not ask questions about this particular

14   document, page.

15           JUDGE ROSAS:  Well, do you want to proffer that

16   line?

17           MR. WIESE:  We were asking about the document as

18   a whole, and we should be able to ask about any portion

19   of the document.

20           JUDGE ROSAS:  In terms of what he signed, whether

21   he saw it that day or initialed it that day, that's

22   fine.  I'll receive it.  Overruled.

23           MS. HILL:  All right.

24           JUDGE ROSAS:  Okay.  Is that it for this witness?

25           MS. HILL:  That's it.

1      JUDGE ROSAS:  Thank you, sir.  You're excused.

2  Please do not to discuss your testimony with anyone

3  until you're advised by counsel that the case is closed

4  or otherwise.  Okay?

5      THE WITNESS:  Okay.  Thank you.

6      JUDGE ROSAS:  Thank you.

7      THE WITNESS:  Am I good to go?

8      MS. HILL:  You're good to go.

9      JUDGE ROSAS:  Off the record.

10      (Pause in the proceedings.)

11      JUDGE ROSAS:  We're back on the record?

12      MS. HILL:  Yes, sir.

13      JUDGE ROSAS:  All right.  Next witness, Counsel?

14      MS. HILL:  Next witness for the Respondent is

15  Jason Mayfield.

16      JUDGE ROSAS:  Mr. Mayfield, I'll remind you that

17  you're still under oath.

18      THE WITNESS:  Yes, sir.  Thanks, your Honor.

19                 DIRECT EXAMINATION

20  BY MS. HILL:

21    Q   Mr. Mayfield, currently who is the district

22  manager in Wisconsin?

23    A   I am the acting district manager.

24    Q   And why is that?

25    A   We're searching for a replacement.

1   Q   How many interviews have you had for the job?

2   A   A handful already.

3   Q   And when you started as the regional vice

4   president, who was the profit center manager for

5   Franksville?

6   A   Katie.

7       JUDGE ROSAS:  Counsel, we have a lot of this out

8   already, so you can lead on perfunctory stuff.  Okay?

9       MS. HILL:  Okay.

10  BY MS. HILL:

11  Q   After Ms. Torgerson left Franksville as the

12  profit center manager and Mr. Anderson came in, were

13  there any substantive changes to the profit center at

14  Franksville?

15  A   Like?

16  Q   Well, for example, employees.

17  A   There were several employees already there at the

18  time that Bryan Anderson took over.

19  Q   Anything to do with the fleet?

20  A   There were fleet adjustments being made.

21  Q   And why?

22  A   In a prior model that was reviewed for that

23  location, that location displayed a uniqueness about it

24  in that the fleet composition could be more based around

25  small equipment, small tools and increase their

1  profitability.

2      Q    What do you mean increase profitability?

3      A    The area which that store was situated allowed

4  for a lot of will call, small equipment-type rental

5  opportunities as to create customer convenience, where a

6  lot of other stores nationwide let's just say don't have

7  those same opportunities.

8          Customers are constantly going by on the

9  thoroughfare, on the highway there, and they would go in

10 and pick up equipment or we'd be able to deliver

11 equipment in the immediate geography.

12     Q    Well, you discussed small equipment.  The large

13 equipment -- that location when Mr. Anderson started had

14 large equipment, too, correct?

15     A    It did.

16     Q    Did you make any changes to the large equipment

17 there?

18     A    Yeah.  The large equipment was being shifted out

19 in order to transition into a more profitable location.

20 It was found that those larger assets may have been

21 suppressing some of their opportunities.

22     Q    Could you explain that because -- all right.  A

23 big piece of equipment --

24     A    Yeah.

25     Q    -- would rent -- you would agree it would rent

1  for more money than let's say a small light tower?

2      A    Yes, that is true.   The larger assets do generate

3  larger dollars in revenue or sales if you will.   The

4  smaller ones may generate a lesser dollar amount, but a

5  greater return based on the first cost of the machine of

6  what you paid for it.

7      Q    Could you explain that, please.

8      A    So if you had an asset or a unit that cost

9  $10,000, over its life you could generate a 100 percent

10  or a 200 percent return in the first year of useful

11  life.   A $200,000 piece of equipment, you may only

12  generate $30,000 on its first year of life.   Larger

13  dollars, lesser returns.

14     Q    And why were you making that adjustment between

15  the large and the small equipment at Franksville?

16     A    So there's a region operations manager, Dan

17  Atwell, that Dan Atwell in the past, in 2000 -- even

18  going back to 2018 had done a model where he had broken

19  down the different types of compositions and which ones

20  produce the greatest return, and it was identified that

21  that was an opportunity.

22     Q    As part of the negotiation team for Sunbelt, what

23  information did the Local 139 ask Sunbelt to provide?

24     A    I'm sorry.   Could you repeat the question.

25     Q    As a member of Sunbelt's negotiation team, what

1    information did Sunbelt's negotiation team get -- what

2    were they requested to produce to the 139?

3        A    Positions, hourly wages, hours worked, two years

4    of history on how many hours they did work over that

5    12-month period.

6        Q    And did Sunbelt's negotiation team produce that?

7        A    Yes.

8            MS. HILL:  All right.  Now, your Honor and

9    Mr. Wiese, I don't know how you want to handle this,

10   perhaps a stipulation, because we have the two binders

11   of the handbook, the policy, the -- lots of information

12   about benefits that was provided to the union.  As I

13   said before, Mr. Ervin had said that he had received a

14   lot of that information before even the first

15   negotiation session.

16           Can we stipulate that those Exhibits 36, 37, 38

17   and the job descriptions, 12 through 15, and then the

18   benefits, 16 through 38, that includes the safety manual

19   also, could we stipulate to those being exhibits?

20           JUDGE ROSAS:  Has General Counsel seen these?

21           MR. WIESE:  Well, they were just --

22           MS. HILL:  Yes, they've been produced before.  He

23   has the binders.

24           JUDGE ROSAS:  So you're familiar with the

25   exhibits that she's referencing?

 1          MR. WIESE:  Well, I don't know if I've seen all

 2     of these documents, your Honor.

 3          JUDGE ROSAS:  Let's just go through them.  Let's

 4     just go through them.  Are you going to ask him

 5     questions about each of these or you're going to bypass

 6     this?

 7          MS. HILL:  Well, I can ask him questions about

 8     them.

 9          JUDGE ROSAS:  No.  If the General Counsel

10     stipulates to their receipt, is that going to obviate

11     the need for questioning --

12          MS. HILL:  Oh, yes --

13          JUDGE ROSAS:  -- or are you going to have

14     questioning about them?

15          MS. HILL:  -- yeah, absolutely.

16          JUDGE ROSAS:  Okay.  Why don't we go off the

17     record.  Why don't you look at this stuff.

18          (Discussion held off the record.)

19          JUDGE ROSAS:  Back on record.

20          All right.  So do we have a stipulation?

21          MR. WIESE:  I object to the relevance of all of

22     this information.  I mean it's thousands of pages of

23     documents that there's no information request at issue

24     in this case.  I mean we haven't pled a failure to

25     provide information by Sunbelt.

1       I don't know why we need to burden the record
2  with again thousands of pages of policy information in
3  order to -- in order to establish that the employer
4  provided information to the union when that's not an
5  issue in this case.
6       JUDGE ROSAS:  Okay.  Relevance, what's the
7  relevance?
8       MS. HILL:  Relevance is, number one, they're
9  accusing Sunbelt of not being prepared, not having
10 justifications for its proposals and also, you know, not
11 providing them with information for negotiations that
12 would be productive.
13      Sunbelt provided the job descriptions, the
14 information that Mr. Mayfield just discussed, when it
15 was requested.  All the benefit information, that was
16 provided prior to the first negotiation session.  The
17 handbook was, too.  And so those policies, procedures,
18 benefits, everything provided a justification for the
19 positions that Sunbelt had for their proposals during
20 negotiation.  This is very relevant.
21      And if I could also add, your Honor, one of the
22 allegations is that Sunbelt was bargaining with no
23 intention of reaching an agreement.  We provided a lot
24 of documents, the handbook, things like that.
25 Everything indicated that Sunbelt was ready to reach an

1  agreement with the union.  And we can also have this

2  witness testify about these type of documents being

3  produced throughout his region.

4          JUDGE ROSAS:  Are the documents dated?

5          MS. HILL:  As to when they were given to the

6  union?

7          JUDGE ROSAS:  Correct.

8          MS. HILL:  These exhibits are not.  But they were

9  provided to the union during negotiations.  We can have

10  the union representatives on Thursday go into great

11  detail about that.  Mr. Ervin I believe --

12          JUDGE ROSAS:  What are the exhibits?

13          MS. HILL:  Okay.  Job descriptions --

14          JUDGE ROSAS:  No.  Give me the numbers of the

15  Respondent's exhibits.

16          MS. HILL:  They are R 12, 13, 14, 15.  Those are

17  the job descriptions.

18          JUDGE ROSAS:  Hold on.  12, 13, 14, 15, okay.  I

19  see these.  Go ahead.  These are dated.

20          MS. HILL:  All right.

21          JUDGE ROSAS:  Well, these are not dated, but --

22          MS. HILL:  They were provided.

23          JUDGE ROSAS:  So if these go into the record, do

24  we know when they were provided?

25          MS. HILL:  During one of the negotiation

1   sessions.  Off the top of my head, your Honor, I'm
2   sorry, I cannot give you that date.
3          JUDGE ROSAS:  So you're going to have that
4   clarified through a witness?
5          MS. HILL:  I can.
6          JUDGE ROSAS:  Do you have any doubt that these
7   were provided?
8          MR. RYAN:  No, your Honor.  They were provided.
9          JUDGE ROSAS:  Okay.  It's just a question of
10  when.
11         MR. WIESE:  No, your Honor.
12         JUDGE ROSAS:  Okay.  So it's a question of
13  when --
14         MS. HILL:  And it was during negotiations, those
15  were.
16         JUDGE ROSAS:  Okay.
17         MS. HILL:  The benefits were provided prior to
18  the first negotiation session.  Mr. Ervin can -- I can
19  check his testimony, but I believe he testified --
20         JUDGE ROSAS:  Well, there has to be some context.
21  You're going to provide context as to the date for each
22  of these at some point?
23         MS. HILL:  Well, I can, yes, your Honor.
24         JUDGE ROSAS:  Okay.  We don't --
25         MS. HILL:  All right.  We know when the first

1  negotiation session was.  Everyone has discussed that

2  quite a bit, has testified to it.  The union had this by

3  the first negotiation session.

4       MR. RYAN:  Yes.

5       JUDGE ROSAS:  These were produced on one

6  occasion, on one specific occasion?

7       MS. HILL:  Yes, all these benefits, right, so

8  that --

9       JUDGE ROSAS:  All right.  So these will be

10  received contingent on that date being established

11  before the record closes.

12       MS. HILL:  Before someone other than Mr. Ervin --

13       JUDGE ROSAS:  Before the record closes.

14       MR. RYAN:  I'm sure we can find that date and

15  stipulate to it.

16       JUDGE ROSAS:  All right.  That's 13, 14 and 15,

17  right?

18       MS. HILL:  Okay.

19       JUDGE ROSAS:  And then what --

20       MS. HILL:  Well, that is -- what he was just

21  saying, all the benefits and that, that's Exhibits 16

22  through 35.

23       JUDGE ROSAS:  These are Respondent's?

24       MS. HILL:  Respondent's, yes, sir.  There's a

25  table of contents that has a brief description along

1   with the Bates numbers for it.

2       JUDGE ROSAS:  Okay.  So we don't have dates on

3   these documents either?

4       MS. HILL:  Some of them, yes, sir, they do have

5   effective dates on them.  Do they indicate the date that

6   they were presented to the union?  No.  Will witnesses

7   know -- be able to testify that they were presented

8   before the first session?  Yes, sir.

9       JUDGE ROSAS:  Okay.  So Respondent 16 through 35,

10  General Counsel and Charging Party, do you have any

11  doubt that these were the documents that were provided

12  at some juncture during bargaining?

13      MR. WIESE:  I'll defer to the Charging Party on

14  that.

15      MR. RYAN:  We'll confirm they were provided, and

16  I can -- the union would stipulate that they were

17  provided by -- along with a letter dated May 14 of 2018

18  was when we were received them.

19      JUDGE ROSAS:  Okay.  16 through 35 --

20      MS. HILL:  That's what I was thinking that they

21  were --

22      JUDGE ROSAS:  Okay.  So 16 through 35 will be

23  received.

24      MR. RYAN:  And actually, your Honor, that date

25  applies to 12 through 15 as well.

1          JUDGE ROSAS:  It does, okay.

2          MS. HILL:  Yes.

3          MR. RYAN:  All of these --

4          JUDGE ROSAS:  Okay.  So that takes care of that.

5    12 through 15 are received over objection, as well as 16

6    through 35.

7          Is there an objection there, Counsel?

8          MR. WIESE:  The same objection as to relevance.

9          JUDGE ROSAS:  Okay.  So that's overruled.

10         (Respondent's 12-35 were received.)

11         MS. HILL:  Okay.  And then we have the

12   information handbook, Mr. Ryan, and also the policies

13   and safety manual.

14         MR. RYAN:  Correct, those were also provided on

15   the 14th.

16         JUDGE ROSAS:  What exhibits are these?

17         MS. HILL:  Yeah, 36, 37, 38, sir.

18         JUDGE ROSAS:  General Counsel?

19         MR. WIESE:  The same objection, relevance.

20         JUDGE ROSAS:  And you said the date is

21   specifically May?

22         MR. RYAN:  Yes.  These were also provided May 14

23   of 2018.

24         JUDGE ROSAS:  All right.  General Counsel, you

25   object to their receipt?

1          MR. WIESE:  Yes.

2          JUDGE ROSAS:  It's not relevant because you

3      didn't file an information request or failure to provide

4      information charge?

5          MR. WIESE:  That's correct, your Honor.

6          JUDGE ROSAS:  Okay.  Overruled.  I'll receive all

7      these documents.

8          (Respondent's 36-38 were received.)

9          Okay.  Do you have any other questions of this

10     witness?

11         MS. HILL:  Yes, sir, quite a few.

12         JUDGE ROSAS:  Okay.

13     BY MS. HILL:

14     Q    And Mr. Mayfield, you prepared notes based on the

15     negotiation sessions you attended, correct?

16     A    Yes.

17     Q    Would you please -- there are two binders in

18     front of you.  One is marked for Respondent's exhibits

19     and one for -- I believe it says General Counsel or

20     maybe --

21     A    General Counsel in blue, Respondent's in black.

22     Q    Okay.  Look at the black one, please, and go to

23     the tab R 4, sir.  And do you recognize what is R 4,

24     sir?

25     A    These are my negotiation notes.

```
 1    Q   And they're all in your handwriting, sir?

 2    A   Yes.

 3        MS. HILL:  Sir, your Honor, at this point I would

 4   like to have admitted Exhibit 4, R 4.

 5        MR. WIESE:  One minute.

 6        JUDGE ROSAS:  Objection?  Voir dire?

 7        MR. WIESE:  One minute, your Honor.

 8        JUDGE ROSAS:  Sure.

 9        MR. WIESE:  No objection.

10        JUDGE ROSAS:  Charging Party, anything?

11        MR. RYAN:  No objection.

12        JUDGE ROSAS:  Okay.  Respondent's 4 is received.

13        MS. HILL:  Thank you, your Honor.

14        (Respondent's 4 was received.)

15   BY MS. HILL:

16    Q   Mr. Mayfield, when was the first negotiation

17   session between Sunbelt Rentals and Operating Engineers

18   139?

19    A   May 22nd.

20    Q   Of what year, sir?

21    A   2018.

22    Q   Thank you.

23        JUDGE ROSAS:  Sir, are you looking at a document?

24        THE WITNESS:  Am I supposed to, sir?

25        JUDGE ROSAS:  No, unless she needs you to refresh
```

1    recollection.  I'm assuming questions are based on your

2    present recollection.

3          MS. HILL:  Right, present recollection.  I was

4    going to ask him to review certain ones if he didn't

5    remember precisely.

6    BY MS. HILL:

7     Q   To the best of your recollection, sir, what was

8    discussed during that first negotiation session?

9     A   We went through the current state of the Local

10   139, members, retirees, percentage of the pension

11   funded, table of contents.  That's what I recall.

12    Q   Was anything else discussed?

13    A   I don't recall.

14    Q   And did the union provide any documents to

15   Sunbelt for that first negotiation session?

16    A   It was a -- their proposal for a CBA.

17    Q   Was that the first time that you had seen their

18   proposal for the Collective Bargaining Agreement, sir?

19    A   Yes.

20    Q   Was there anything else that the union had

21   provided to Sunbelt's negotiation team that day?

22    A   There was a list given to us of how the

23   negotiation sessions would take place.

24    Q   All right.  If you would please look at the other

25   binder and look at General Counsel Exhibit 15.

1    A    Okay.

2    Q    All right.  Do you recognize General Counsel

3  Exhibit No. 15?

4    A    Yes.

5    Q    What are these?

6    A    These are the Negotiating Committee Ground Rules.

7    Q    Is this the document you just referred to as

8  being given to you at the first session?

9    A    Yes, ma'am.

10    Q    Did you agree to these ground rules?

11    A    We did not agree with the ground rules.  We

12  agreed that this was historically the ground rules you

13  would see in negotiations.

14    Q    All right.  Looking at this document, sir, was

15  there any discussion about any of the language in this

16  document?

17    A    One of the things that comes to mind was all

18  caucuses should be limited to approximately 20 minutes.

19  That's based on each negotiation, each negotiation being

20  different from another.  Some may take five minutes,

21  some may take 20, some may take 40.  Whatever's required

22  in order to come to a proposal.

23    Q    Did Sunbelt's negotiation team discuss that

24  particular ground rule with the union during that first

25  session?

1    A    That I recall, yes, ma'am.

2    Q    Any other ground rules that the Sunbelt team

3    discussed with the union?

4    A    It was identified that we were not a sand and

5    gravel company, of which this ground rule stated that

6    Janesville Sand & Gravel and union locations of service.

7    That wasn't us.

8    Q    Any other of these ground rules that was

9    discussed?

10    A    Yeah, we went through several, several.  One of

11    them that was mentioned was the parties shall decide all

12    language proposals before discussing wages.

13    Q    And what did you understand that to mean?

14    A    That economics would be at the final stages, if

15    you will, of a negotiation.  Everything prior would be

16    worked out at that time.

17    Q    And you testified back in December that you had

18    been involved in negotiation sessions at other locations

19    in your region.

20         For those negotiations, had the union ever

21    presented Negotiating Committee Ground Rules or

22    something similar to this?

23    A    No, ma'am.

24    Q    Now, sir, if you would please look at General

25    Counsel Exhibit 6A.  Look at the 6 tab.  It says GCX,

1   and just look at the A.

2       A    Okay.

3       Q    Now, you stated that the union had a Collective

4   Bargaining Agreement that had been presented at the

5   first session.  Was this it?

6       A    From what I recall.

7       Q    And it had the word draft across it?

8       A    I do not recall a draft across it.

9       Q    But something similar to this as you recall?

10      A    Yes.

11      Q    The Collective Bargaining Agreement that the

12  union presented, was it presented in advance of the

13  first negotiation session via e-mail or regular mail?

14      A    No.

15      Q    So it was presented at the first session in a

16  hard copy, correct?

17           MR. WIESE:  Objection, leading.

18           JUDGE ROSAS:  He's already answered.

19           MS. HILL:  Thank you.

20  BY MS. HILL:

21      Q    Do you recall what proposals Sunbelt provided to

22  the union for the first negotiation session?

23      A    I do not.

24      Q    Would it refresh your recollection if you looked

25  at your notes from the first negotiation session?

1    A    Yes.

2    Q    All right.  If you would do so, sir.

3    A    Okay.

4    Q    Reviewing your notes, did that help to refresh

5    your recollection as to what proposals Sunbelt had given

6    to the union?

7    A    Yes.

8    Q    And without looking at your notes, sir, what

9    proposals were those, sir?

10   A    We discussed the review of GPS and the use of

11   jamming devices, and that it had been known that

12   vehicles with GPS, from time to time the drivers have

13   found to be using the jamming devices and how that's --

14   it's illegal, and we wanted to ensure that it made its

15   way into the CBA.

16   Q    So was that the explanation given to the union

17   for having that proposal?

18   A    Yes, ma'am.

19   Q    Any other proposals?

20   A    We talked about dues and how the dues would be

21   paid directly to Sunbelt or would they need to be paid

22   to the Local 139.

23   Q    And do you recall what Sunbelt's proposal was for

24   that?

25   A    We asked that they be paid directly to the 139.

1    Q    Did Sunbelt's negotiation team explain why they

2  wanted that proposal?

3    A    Yeah, because of the cost, the variable cost

4  attached with it for the company to process the dues and

5  then turn around and write a check to the Local 139.

6    Q    For that first negotiation session, where did

7  Sunbelt caucus?

8    A    At the Franksville PC, profit center.

9    Q    Did Sunbelt ask the union any questions regarding

10  their proposal?

11    A    Why they hadn't been submitted in advance of.

12    Q    And did anyone on the union's negotiating team

13  explain why?

14    A    The reasoning was they don't negotiate via

15  e-mail.

16    Q    Were they asked why it couldn't have been mailed?

17    A    I do recall, but I don't remember what the

18  response was.

19    Q    What was the result of the union not providing

20  the draft CBA ahead of time?

21    A    I don't recall.

22    Q    What was the result of the union requiring

23  written proposals from Sunbelt?

24    A    So that it was documented.

25    Q    And was Sunbelt required to provide written

1  proposals for all of the negotiation sessions?

2     A    Not all.  Some were arrived through verbal

3  agreements/TAs.

4     Q    Now, did you attend the second session of

5  negotiating with the union?

6     A    I did.

7     Q    Do you recall when that was?

8     A    It was in June.

9     Q    And do you recall what was discussed at that

10  time, sir?

11    A    I don't recall the specifics.

12    Q    Would any document refresh your recollection as

13  to what was discussed, sir?

14    A    Yes.

15    Q    And what would that be?

16    A    My negotiation notes.

17    Q    Okay.  Would you please review those, sir.

18    A    Okay.

19    Q    And do those notes refresh your recollection,

20  sir, as to what was discussed in that second negotiation

21  session?

22    A    Yes.  There was a lot discussed, so specific to

23  each one, probably not.

24    Q    All right.  Can you generally -- so when you say

25  "a lot," how many -- do you have an idea of how many

1  proposals?

2    A    On average, we would touch on 22 to 30 different

3  negotiables in any given meeting.

4    Q    And for the second negotiation session, were

5  Sunbelt's proposals given to the union in writing, sir?

6    A    Yes.

7    Q    You heard the discussion regarding Sunbelt's

8  employee handbook being given to the union.  Is that

9  something that you, as part of the negotiation team for

10 other Sunbelt negotiations sessions with other unions,

11 is that something that you do, too, to give the union --

12   A    Provide a handbook?

13   Q    Yes.

14   A    Yes, ma'am.

15   Q    And why?

16   A    It establishes what our rules and policies and

17 procedures are in regards to the management of the

18 employees so that we have kind of a baseline to work

19 from.

20   Q    During the second session, was discipline

21 discussed?

22   A    Yes.

23   Q    And what was discussed about that?

24   A    Well, one of them was how do you deal with if you

25 have an altercation in the PC between a BA and an

1  employee and what our experience has been in the past by

2  having those engagements in the location.

3      Q   And what else was said, if anything, regarding

4  those interactions between employees and the union

5  regarding dues?

6      A   Well, we've had physical altercations, so we've

7  asked that those conversations be taken off-site.

8      Q   Oh, is Sunbelt a contractor?

9      A   No, ma'am.

10      Q   How would you define contractor?

11      A   Someone whose labor is hired directly to perform

12  a job or a task.

13      Q   And how would you describe Sunbelt?

14      A   As a service provider.

15      Q   Did you ever have to define those, you know,

16  contractor and what Sunbelt did to the union?

17      A   We did.

18      Q   Do you recall when?

19      A   If I recall, it was the second or fourth meeting,

20  and it was built -- one of the negotiables was built

21  around hours worked.  So if we were open six out of

22  seven days, a lot of times on Saturdays, depending on

23  how someone was scheduled, that would be on regular time

24  for a Saturday.  Historically for a contractor, all

25  Saturdays can be overtime.

1    Q   If you would please look at General Counsel

2  Exhibit 7A, sir.  Do you recognize this document, sir,

3  this exhibit?  Excuse me.

4    A   Yeah.  A CBA.

5    Q   Any of the handwriting on this yours, sir?

6    A   No.

7    Q   Looking at Page 3 of 4 of this exhibit, sir, do

8  you see a notation of 7/16/18?

9    A   Can you repeat that?

10    Q   All right.  Look at Page 3 of 4.  Those numbers

11  will appear in the lower right-hand corner of 7A.

12    A   Okay.

13    Q   All right.  And about a third of the way from the

14  bottom, do you see a date and some handwriting there?

15  This is 7A.

16    A   On Page 3, I see Management Rights at the top.

17  Is that the one?

18        MS. HILL:  Okay.  Your Honor, may I approach?

19        JUDGE ROSAS:  Yes.

20        MS. HILL:  Thank you.  Okay, I'll try to remember

21  theirs is blue.

22        THE WITNESS:  Okay.

23  BY MS. HILL:

24    Q   Looking at these pages, any of the handwriting on

25  these pages yours, sir?

1      A    No, ma'am.

2      Q    Looking at 3 of 4.

3      A    Okay.

4      Q    Do you see the date 7/16/18?

5      A    I do.

6      Q    Pat Ryan ok with?

7      A    Yes.

8      Q    That name, Pat Ryan, is that a familiar name to

9   you?

10     A    I never heard of him or her.

11     Q    Did the union at any time have to discuss any of

12  Sunbelt's proposals away from the -- after a negotiation

13  session?

14     A    Yes.

15     Q    And what was the reason for that?

16     A    They asked they check with their counsel.

17     Q    And as a result of the union having to wait to

18  talk to counsel about proposals, did that speed up or

19  slow down negotiations?

20         MR. WIESE:  Objection, leading.

21         JUDGE ROSAS:  Rephrase.

22  BY MS. HILL:

23     Q    Okay.  As a result of the union having to confer

24  with their attorney on proposals presented by Sunbelt,

25  how did that impact the negotiations?

1    A   It would have hindered or slowed down the

2  process.

3    Q   With respect to the GPS, was that proposal agreed

4  to by both parties?

5    A   Yes.

6    Q   At that June negotiation session, were any

7  proposals TA'd?

8    A   Yes.

9    Q   Do you recall how many, sir?

10    A   No.

11    Q   But more than one would you say?

12    A   Yes.

13    Q   Do you recall when the next negotiation session

14  was?

15    A   July.

16    Q   And did you attend that?

17    A   Yes.

18    Q   Do you recall what was discussed during that

19  negotiation session, sir?

20    A   I do not.

21    Q   Would your negotiation notes refresh your

22  recollection regarding the session?

23    A   Yes, ma'am.

24    Q   If you would please review those.

25    A   The black binder, right?

1    Q    Yes.

2    A    I don't have that one in here.

3    Q    Okay.  It's not in there?

4    A    No.

5    Q    All right.  What was the next date for a

6    negotiation session in 2018?

7    A    August.

8    Q    Okay.  And do you recall what was discussed

9    during that negotiation session?

10   A    I do not recall the specifics.

11   Q    All right.  Would your negotiation notes refresh

12   your recollection, sir?

13   A    Yes.

14   Q    Then please do so, and then when you're finished,

15   look up, and then I'll ask questions.

16   A    Okay.

17   Q    And did you have enough time to refresh your

18   recollection regarding the August negotiation session,

19   sir?

20   A    Yes.

21   Q    How was that negotiation session started?  What

22   was discussed?

23   A    Terry McGowan was in attendance.

24   Q    For all of the negotiation sessions, how did they

25   start?

1    A   With a safety moment.

2    Q   And what is a safety moment?

3    A   Identifying an at-risk opportunity and finding

4  ways to use that or leverage that conversation to

5  prevent future incidents.

6    Q   Whose idea was it to have a safety moment?

7    A   Sunbelt's.

8    Q   And why is that?

9    A   It's a requirement that we had across the

10  organization so as to bring awareness in each and every

11  session we have, whether it's a negotiation session or

12  whether it's three or more attendees in any given

13  meeting across the organization.

14    Q   At any of the negotiation sessions that you

15  attended with 139, did any member of the union

16  negotiating team object to the safety moment?

17    A   No.

18    Q   Did any of the negotiation team from the union

19  ever tell you that the safety moment was a waste of

20  time?

21    A   No.  There was usually 50/50 participation and

22  what could be made better using that incident and that

23  description.

24    Q   And based on your review of your notes to refresh

25  your recollection, what was discussed during the August

1  negotiation session?

2      A   We discussed the bulletin board, where the

3  bulletin board would have to be placed, conceptually

4  what would be placed on the board.  Besides the board,

5  we had follow-up discussions on GPS, tools, the

6  description of the tools that would be in the article

7  itself, and the level of detail of which those tools

8  would be provided, and then days of pay if I recall.

9      Q   When you say "days of pay," are you referring to

10  when the payday would occur or something else?

11     A   Whether it would be a weekly or biweekly payout.

12     Q   Anything else that you recall from that session?

13     A   Just cause and determining when a -- a

14  determination would be a just cause and what agreements

15  were reached.

16     Q   Were the proposals that were discussed during the

17  sessions up to this date and including August, were

18  those the same type of provisions that you negotiated at

19  any other location with the union in your region?

20     A   Very similar provisions in nature while each

21  one's its own, all right.  When you're collecting --

22  when you're negotiating a CBA, it's a living document,

23  so each negotiable article or provision would be

24  discussed within itself.

25     Q   For your region, do you have Collective

1    Bargaining Agreements at union locations by profit

2    center or some other means?

3        A    Profit center.

4        Q    And for the Local 150, is that contract per

5    profit center?

6        A    That one's done at a district wide.

7        Q    And why is that?

8        A    That's what the agreement was when it was

9    initially signed several years ago.

10       Q    Before you became the VP for the region?

11       A    Pre several VPs.

12       Q    All right.  The next negotiation -- oh, excuse

13   me.  For August, were any provisions tentatively agreed

14   to?

15       A    Yes, ma'am.

16       Q    Do you recall approximately how many?

17       A    I don't.

18       Q    But your notes would truthfully reflect which

19   proposals had been TA'd?

20       A    Yes, ma'am.

21       Q    Thank you.  Do you recall when the next

22   negotiation session was?

23       A    I don't.

24       Q    If you would please look at your notes and see

25   when was the next negotiation session that you attended?

1    A   In October.

2    Q   Was there a negotiation session between the

3  August session that you attended and the October

4  session?

5    A   Yes.

6    Q   And when was that?

7    A   In September.

8    Q   And did you attend that?

9    A   I did not.

10    Q   And why not, sir?

11    A   I had another engagement.

12    Q   And do you recall what it was?

13    A   I don't.

14    Q   Who had authority for that September negotiation

15  session to agree to any proposals that were negotiated?

16    A   I had given the authority to Bo Bogardus, the

17  district manager.

18    Q   Do your notes reflect every single proposal that

19  was made during these negotiation sessions?

20    A   Several, not all.

21    Q   And it doesn't -- do your notes reflect what each

22  person on each negotiation team stated?

23    A   No.

24    Q   For October, do you recall what topics were

25  discussed?

 1    A    I do not.

 2    Q    Okay.  What would reflect your recollection --

 3  refresh your recollection?

 4    A    If I could look at the notes.

 5    Q    Okay, go ahead, look at the notes.  When you're

 6  finished, please look up.

 7         Did that refresh your recollection about what was

 8  discussed during the October negotiation sessions?

 9    A    Yes, ma'am.

10    Q    And what was discussed?

11    A    The drug policy or drug amendment and then

12  several articles in between.

13    Q    Sir, if you would please look at the blue binder

14  now, please, and look at General Counsel's Exhibit 6C.

15    A    Okay.

16    Q    All right.  In 6C, do you see numbers in the

17  lower right-hand corner, Pages 1 through 4 -- or 1 of 4?

18  Excuse me.

19    A    So I see Exhibit A and G.

20    Q    Okay.  Do you see --

21    A    Exhibit 6A and G.

22    Q    Do you see 6C?

23    A    Maybe I'm missing something.  I don't see it.

24         MS. HILL:  Okay.  Your Honor -- Mr. Wiese, I

25  believe that that one was admitted, or am I wrong, 6C?

1        MR. WIESE:  Yes, it should be in there.

2        MS. HILL:  It was.

3   BY MS. HILL:

4     Q   It's not in the binder, sir?

5     A   No, ma'am.

6        MS. HILL:  Your Honor, do you mind if I give him

7   6C?  Is that all right?

8        JUDGE ROSAS:  Uh-huh.

9        MS. HILL:  All right.  Here we go.  May I

10  approach?

11       JUDGE ROSAS:  Yes.

12       THE WITNESS:  Okay.

13  BY MS. HILL:

14    Q   All right.  Mr. Mayfield, is any of the

15  handwriting on that exhibit yours, sir?  I think on the

16  first page in the upper -- like the middle there's some

17  handwriting.  Is any of that yours?

18    A   No, ma'am.

19    Q   Do you recall if those -- if 6C reflects what was

20  discussed during the October 23rd negotiation session?

21    A   I would have to defer back to my notes.

22       MS. HILL:  Your Honor, may he?

23       JUDGE ROSAS:  (Nods head.)

24       MS. HILL:  Yes, okay.

25       THE WITNESS:  Yes.

1  BY MS. HILL:

2    Q   And the paid time off policy, was that something

3  that had been given to the union?

4    A   Yes.

5    Q   And at some point during the negotiation

6  sessions, was that policy approved?

7    A   Yes.

8    Q   Did the union make any changes to that proposal

9  from Sunbelt?

10    A   Yes.

11    Q   And do you recall what changes were made?

12    A   I do not.

13    Q   But Sunbelt agreed to some of the union's

14  revisions to that proposal, sir?

15    A   I don't recall.

16        MS. HILL:  All right.  Now, if it's all right,

17  your Honor, may I approach to retrieve my copy?

18        JUDGE ROSAS:  (Nods head.)

19        MS. HILL:  Thank you.

20  BY MS. HILL:

21    Q   Do you recall when the next negotiation session

22  was held, sir?

23    A   November -- December.

24    Q   All right.  What would refresh your recollection,

25  sir, as to when the negotiations were held?

1    A    My notes.

2    Q    If you would please look at your notes, sir.  And

3   when you're finished reviewing them, then please look

4   up.

5    A    Okay.

6    Q    All right.  And did reviewing your notes refresh

7   your recollection as to what was discussed during the

8   negotiations?

9    A    Yes.

10    Q    And what was discussed by the parties during that

11   December session?

12    A    Their health program, their pension program, boot

13   policy.

14    Q    And did Sunbelt have to prepare any written

15   proposals during that session?

16    A    Yes.

17    Q    And do you recall how many?

18    A    I do not.

19    Q    Do you recall how long it took to prepare those

20   negotiations -- those proposals?

21    A    More than 20 minutes.

22    Q    And was the union available when Sunbelt was

23   finished preparing those negotiation proposals?

24    A    Not that I recall.

25    Q    And why not?

1    A    I don't recall.

2    Q    Were any negotiations held in -- oh, excuse me.

3    For December, did the union request anything from

4    Sunbelt during that session?

5    A    I don't recall.

6    Q    When was the next negotiation session?

7    A    February.

8    Q    And who attended it?

9    A    Terry, Michael Ervin, Dan, Greg and Steve.

10   Q    And do you recall anything that Dan said during

11   that negotiation session?

12   A    I do not.

13   Q    Would anything refresh your recollection

14   regarding what he might have said?

15   A    Yes.

16   Q    All right.  What is it?

17   A    Notes.

18   Q    Would you please review your notes from February

19   of 2019, sir.

20   A    Okay.

21   Q    All right.  First of all, when did the

22   negotiations start that day?

23   A    9:00 a.m.

24   Q    Did they -- at any time did negotiations start

25   later than 9:00 a.m., any of the sessions?

1    A    I don't recall.

2    Q    Did you ever arrive late for any of the

3    negotiations?

4    A    Yes.

5    Q    And do you recall when that happened?

6    A    Yeah, one of them was -- I was 11 minutes late.

7    Q    And why were you 11 minutes late, sir?

8    A    Traffic, road construction.

9    Q    Did the union say anything about your lateness?

10   A    Yes.

11   Q    And what was said and by whom?

12   A    By Dan.  Dan had made the statement that I need

13   to leave earlier, and I asked Dan, I said well, how

14   early is early, is it four hours, five hours, and Dan

15   just said that you need to leave earlier.

16   Q    Did the negotiations continue after that?

17   A    Yes, ma'am.

18   Q    Did you apologize for being 11 minutes late?

19   A    I did.

20   Q    And what did the union propose during this

21   February negotiation session?

22   A    I don't recall.

23   Q    Were any economics discussed during the February

24   negotiation session?

25   A    Yes.

```
 1    Q    And what economics?

 2    A    401k, retirement/pension, health, the fringe

 3    benefits.

 4    Q    And what was Sunbelt's response to that?

 5    A    That we had yet to TA all of the language prior

 6    to moving into economics.

 7    Q    All right.  And so you said that Mr. McGowan

 8    attended one of the sessions in February, correct?

 9    A    Yes.

10    Q    How many negotiation sessions were there in

11    February of 2019, I'm sorry?

12    A    Two.

13    Q    Okay.  And how would you describe Mr. McGowan's

14    participation in the session that he attended in

15    February?

16    A    It slowed down the productivity of the meeting.

17    Q    And why do you say that, sir?

18    A    A lot of times it was general discussion points

19    for the first 45 minutes of Terry being at the meeting,

20    and then after the initial 45 minutes, we'd get into the

21    provisions and negotiations.

22    Q    Do you recall anything specific that Mr. McGowan

23    stated during that February session he had attended?

24    A    Yeah.  That he could assist with the Foxconn

25    project and having us be represented on Foxconn if we
```

1   were the -- his union conciliary [sic].

2       Q   And what, if anything, was Sunbelt's response to

3   that?

4       A   We weren't interested.

5       Q   And why weren't you interested?

6       A   Foxconn was never a project that we sought out or

7   identified as a job we intended to support.  If we were

8   going to support it, we were going to do it peripherally

9   versus intimately.

10      Q   And do your notes properly reflect all the

11  proposals that were tentatively agreed to in February?

12      A   No.

13      Q   They're not accurate?

14      A   They're accurate, but not all the negotiables and

15  provisions that we discussed.

16      Q   Okay.  But the ones that were TA'd you reflected

17  in your notes?

18      A   I don't recall.

19      Q   When was the next session?

20      A   I don't recall the date.  I'd have to look in my

21  notes.

22      Q   Please look at your notes and refresh your

23  recollection, sir.

24      A   February 21st.

25      Q   Okay.  So that was the second session --

1    A    Yes.

2    Q    -- for February?  And do you are recall how long

3    that session lasted?

4    A    I'd have to look at my --

5    Q    Okay.

6    A    Well past 2:00 o'clock.

7    Q    And were proposals -- articles of the Collective

8    Bargaining Agreement, were they TA'd?

9    A    Yes.

10    Q    After the February 21st, 2019 negotiation

11    session, when was the next one, if you recall?

12    A    March.

13    Q    And did you take notes from that session, sir?

14    A    Yes.

15    Q    And was there a safety moment for that session?

16    A    Yes.

17    Q    Do you recall what was discussed?

18    A    A recent incident we had at Sunbelt Rental with a

19    passing of one of our teammates or colleagues.

20    Q    Did anyone object to that safety moment, sir?

21    A    No, ma'am.

22    Q    And for that session, were any provisions

23    tentatively agreed to by the parties?

24    A    Yes.

25    Q    How would you describe the amount of work done by

1    the parties on that particular day in March 2019?

2        A    Can I reflect in my notes?

3        Q    Yes, sir.

4        A    We covered a lot of ground.

5        Q    Any proposals that you recall that were

6    significant for the agreement?

7        A    A myriad of them.  Three pages of notes.

8        Q    Okay.  And do you believe that your notes

9    accurately reflect the provisions that were TA'd on that

10   day?

11       A    Several of them, yes.

12       Q    When was the next session?

13       A    April.

14       Q    And you attended that session?

15       A    Yes.

16       Q    And did you take notes from that negotiation

17   session?

18       A    Yes.

19       Q    Do you recall what proposals were discussed

20   during that session?

21       A    I do not recall.

22       Q    Would your notes refresh your recollection, sir?

23       A    Yes.

24       Q    Please review them.

25       A    Okay.

1    Q    Sir, did your notes refresh your recollection as

2 to what proposals were discussed?

3    A    Yes, ma'am.

4    Q    And what proposals were discussed?

5    A    Hours for overtime, whether it was hours in a

6 day, hours in a week, as well as dues, central pension,

7 health insurance.

8    Q    So some economics were discussed during this

9 session, correct?

10    A    Yes, ma'am.

11    Q    Did Sunbelt explain why -- well, first of all,

12 what was Sunbelt's proposal regarding a retirement plan?

13    A    A proposal they would use the 401k.

14    Q    And why did Sunbelt -- did Sunbelt explain to the

15 union why it was making the proposal regarding the 401k?

16    A    Yes.

17    Q    And what was its explanation?

18    A    Because the 401k is within the employee's control

19 to manage, while the pension is out of their control and

20 there's always a risk of funding, of not being funded.

21    Q    Was there ever a time when the union provided

22 Sunbelt with a proposal that had errors in it?

23    A    Yes.

24    Q    Could you explain that, sir.

25    A    Well, there was times that we had already TA'd

1    provisions and articles.  At one point they provided

2    us -- they provided us a set of documents that had what

3    they had said needed to be TA'd still, and in reviewing

4    the document, we had found they already TA'd them in

5    prior sessions.

6        Q    And how was that relayed to the union that there

7    were errors in their proposal?

8        A    Well, we had reviewed it during our caucus and

9    then walked over to them, explained to them that several

10   of these, when we went back through our notes and

11   reviewed them, had already been TA'd.

12       Q    Do you recall the time frame for the entire

13   negotiation session for April 30th of 2019?

14       A    I do not.

15       Q    When was the next session?

16       A    May.

17       Q    Do you want to look at your notes to see?

18       A    Sorry.  June.

19       Q    Around during the June negotiation session, who

20   from Sunbelt was there?

21       A    Bryan Anderson, Bo Bogardus, myself, counsel.

22       Q    What proposals were discussed during that

23   session?

24       A    Health, pension, as well as several others.

25       Q    What did the -- what proposal did the union

1    present to Sunbelt for that session?

2        A    I don't recall.

3        Q    Would your notes refresh your recollection?

4        A    Yes.

5        Q    Okay.  If you would please review.

6        A    We discussed the next negotiation dates, wages.

7    Towards the end of the meeting, Mr. Ervin was going to

8    send over a series of TA agreements for us to review.

9        Q    All right.  Would you please now look in the blue

10   binder for General Counsel Exhibit No. 12, sir.

11       A    Okay.

12       Q    All right.  Now, the first page is blank, sir.  I

13   would like you -- I'd direct your attention to the

14   second page of this.

15       A    I only have one page.

16       Q    Oh, okay.  All right.  Does your page have a

17   table of contents?

18       A    Yes.

19       Q    Okay.  Do you recall seeing this document prior

20   to today, sir?

21       A    Yes.

22       Q    And what is this document?

23       A    The table of contents of the various articles.

24       Q    And there seems to be a date at the bottom,

25   6/5/19.  Do you see that, sir?

1    A    Yes.

2    Q    Do you recall seeing this on June 5th, 2019?

3    A    Yes.

4    Q    And how did it come about that you saw this

5  document on June 5th, 2019?

6    A    It was submitted to us at the time in the

7  meeting.

8    Q    Who submitted it?

9    A    I do not recall.

10    Q    Do you have any handwriting on this document,

11  sir?

12    A    I do.

13    Q    Please identify it.

14    A    Lower left-hand corner.

15    Q    Okay.  And what handwriting is yours?

16    A    It's just to the right of where it says 6/5/19,

17  and just above the line that -- where it says Sun Belt,

18  where it's broken up.

19    Q    Is that the correct spelling for Sunbelt?

20    A    No, ma'am.

21    Q    Do you know who wrote that?

22    A    Steve Buffalo.

23    Q    And the handwriting below that, do you recognize

24  that?

25    A    I do not.

1    Q    Is that the correct spelling for Sunbelt?

2    A    Yes.

3    Q    And do you recall why Steve Buffalo was involved

4    in this document, sir?

5    A    I do not.

6    Q    Okay.  Do you recall at any time -- all right.

7    I'll direct your attention to the top of this page, this

8    exhibit, and you see it says Pat Hill issued 2-24 and

9    then 6-5-19?

10    A    Yes.

11    Q    Do you recall having an issue with respect to

12    this particular exhibit, sir, this proposal?

13    A    Yes.

14    Q    And what was the issue?

15    A    The sorting of the articles.

16    Q    Explain the sorting of the articles, sir.

17    A    They weren't aligned with what had been TA'd and

18    understood as our articles through negotiations.

19    Q    All right.  So what did Sunbelt tell the union as

20    a result of that?

21    A    That it would need to be framed up and structured

22    the way it was agreed to.

23    Q    Did this table of contents have additional pages

24    with it or was this a stand-alone document?

25    A    There was other pages with it.

1    Q    And what were those pages?

2    A    The TA provisions broken out with every article

3    on its own separate page.

4    Q    Okay.  And did anyone from Sunbelt's negotiation

5    team review the language in there?

6    A    Yes.

7    Q    And what was determined, if anything?

8    A    That several of the articles that were being

9    asked for us to TA had already been TA'd through prior

10    sessions.

11    Q    Anything else about the wording in it?

12    A    I don't recall.

13    Q    All right.  When was the next negotiation

14    session?

15    A    July.

16    Q    And did you attend that one, sir?

17    A    Yes.

18    Q    Did you participate in the negotiation session

19    itself?

20    A    Towards the second half of that meeting.

21    Q    All right.  Would you please look at your

22    negotiation notes to refresh your recollection about

23    that session, sir.

24    A    Yes.

25    Q    And what page did you find your notes for the

1  July negotiation session?

2      A    July 9th.

3      Q    And the document number on the bottom, if you

4  could read that into the record.

5      A    Sunbelt-01534.

6      Q    Did you arrive on time for the start of the

7  negotiation session?

8      A    No, ma'am.

9      Q    And what happened once you did arrive?

10     A    The meeting had been adjourned because of the

11  emotions that flared, so it was stated that a break

12  needed to be taken.  That's what happened.

13     Q    Did you have any conversations with anyone from

14  the union's negotiation team?

15     A    After?

16     Q    (Nods head.)

17     A    Yes.

18     Q    With whom?

19     A    Steve Buffalo.

20     Q    And where did that discussion occur?

21     A    In the conference room at the Franksville

22  location.

23     Q    And what did you discuss with Mr. Buffalo?

24     A    The unprofessionalism that took place during that

25  meeting, and that Steve suggested that maybe we

1  establish another day, and we all agreed another day

2  would be the right thing to do with the flaring of the

3  emotions that were taking place.

4     Q   Did you agree when the next negotiation session

5  would be?

6     A   We did.

7     Q   And when would the next negotiation session be?

8     A   I'd have to reflect in my notes.

9     Q   All right.  If you would please do so, sir.

10    A   August.

11    Q   Thank you, sir.  Up until this negotiation

12 session, July 9th, 2019, had either the union or Sunbelt

13 stated that the parties had reached an impasse?

14    A   No, ma'am.

15    Q   To the best of your knowledge, did the union at

16 any time inform you that it had contacted Federal

17 Mediation and Conciliation Service for assistance with

18 the negotiations?

19    A   No.

20        MS. HILL:  Your Honor, we've been going at this

21 for quite some time.  Could we take a break, please?

22        JUDGE ROSAS:  Sure.  We'll take five.

23        MS. HILL:  Thank you.

24        (Recess.)

25        JUDGE ROSAS:  Okay.  Back on the record.

1        MS. HILL:  Thank you, your Honor.

2   BY MS. HILL:

3    Q   August 8th, 2019, sir --

4    A   Yes.

5    Q   -- what was that negotiation session used for, if

6   you recall?

7    A   For the announcement of the reorganization of the

8   location.

9    Q   For the location meaning Franksville?

10   A   Yes, ma'am.

11   Q   All right.  Would you please look at the blue

12  binder, General Counsel Exhibit No. 17, sir.

13   A   Okay.

14   Q   Is that your signature on this letter, sir?

15   A   Yes.

16   Q   How was this letter sent to the union, sir?

17   A   Via e-mail.

18   Q   Explain how the process of the negotiation

19  session on August 8th, 2019, how -- who started it?

20   A   Well, we started off with a safety moment at

21  which point -- I don't recall specifically.  Mario

22  Rivera was mentioned as far as a safety -- used as a

23  safety moment.

24   Q   All right.  Did at any time on August 8th, did

25  the 139 ask to negotiate reorganization?

1          MR. WIESE:  Objection, your Honor.  The witness

2     appears to be reading off of his notes while he's

3     testifying.

4          JUDGE ROSAS:  Repeat the question.

5     BY MS. HILL:

6     Q    Okay.  At any time did anyone from Local 139

7     during the August 8th negotiation session ask to

8     negotiate the reorganization itself?

9     A    Can you repeat the question.

10    Q    During the August 8th, 2019 negotiation

11    session -- and you said that was regarding the

12    reorganization?

13    A    Yes, ma'am.

14    Q    Did anyone from the Local 139 ask to negotiate

15    the reorganization itself?

16    A    No.

17    Q    What was discussed by Sunbelt during the August

18    8th, 2019 negotiation session?

19    A    Establishing the next meeting that would take

20    place.

21    Q    Did anyone from Sunbelt discuss what the

22    reorganization was about?

23    A    Yes.

24    Q    And who discussed that?

25    A    We all discussed it, Local 139 and Sunbelt.

1    Q    All right.  Who from Sunbelt discussed it?

2    A    I did.

3    Q    What did you tell the union about the

4    reorganization during this session?

5    A    That we'd be transitioning the location from a

6    heavy, small equipment or general tool-type rental house

7    to a small equipment, will call-type operation.

8    Q    Did Sunbelt ask the union at any time during this

9    session if they wanted to negotiate the reorganization?

10   A    We had asked if they had questions multiple

11   times.

12   Q    And did the union ask any questions about the

13   reorganization?

14   A    No.

15   Q    During the session, did the union ask how quickly

16   big equipment was going to be moved out of the

17   Franksville profit center?

18   A    Not that I recall.

19   Q    During the August 8th negotiation session, did

20   the union ask how the small equipment was going to be

21   maintained?

22   A    It was just described to be similar to like a

23   Home Depot-type model where anything that required a

24   gross vehicle weight rating of 10,000 pounds or less

25   would be used for deliveries and the check-ins would be

1   done by counter personnel for small equipment that was

2   returned.

3       Q    Did the union ask how would the preventive

4   maintenance be handled for the small equipment at that

5   location?

6       A    Not that I recall.

7       Q    Did the union ask how the small equipment at that

8   location would be cleaned?

9       A    Not that I recall.

10      Q    Did any of the TA provisions that the parties had

11  developed through all the negotiations before August

12  8th, did any of those sessions discuss how equipment

13  could be moved out of the profit center in Franksville?

14      A    Yes.

15      Q    Explain that.

16      A    Well, it was identified that from time to time an

17  ERS would be utilized or any personnel at the PC would

18  be utilized, outside of a technician or driver or the

19  collective bargaining group, that an ERS or inside sales

20  representative would be the one checking in equipment.

21      Q    Could you explain what an ERS is.

22      A    Yeah.  Equipment rental specialist.

23      Q    And did the parties discuss what type of

24  equipment an ERS could deliver or pick up or move?

25      A    Yeah.  Within the requirements of their license,

1  so 10,000 pounds or less for an ERS or a sales

2  representative, even management.

3     Q   When you say a "sales representative," what are

4  you referring to, what position?

5     A   An outside sales rep.

6     Q   And how many ERS's did the Franksville location

7  have as of August 8th?

8     A   I don't recall.

9     Q   Do you recall a Gary Stamm?

10    A   Yes.

11    Q   And who was he?

12    A   Gary was a driver for us at one point in time in

13 part of the collective bargaining group, and then Gary,

14 when we had an opening, applied for an ERS position for

15 the operations side of the business.

16    Q   And he eventually did get that position?

17    A   Yes.

18    Q   Do you recall when he was moved into that

19 position?

20    A   I do not recall.

21    Q   Prior to August 8th of 2019, did OSRs actually

22 move equipment that was less than 10,000 pounds?

23    A   Yes.

24    Q   Prior to August 8th, 2019, did any of the ERS's

25 move equipment less than 10,000 pounds?

1    A    Yes.

2    Q    And during -- and that occurred during the time

3    that the contract was being negotiated with the 139?

4    A    Yes.

5    Q    At any negotiation session, did the union

6    complain about either the ERS's or the outside sales

7    representatives moving equipment that was less than

8    10,000 pounds?

9    A    No.

10   Q    During the session on August 8th of 2019, did you

11   describe the kind of equipment that would be kept, you

12   know, the size of the equipment that would be kept at

13   the Franksville profit center?

14   A    Yes.

15   Q    And what did you -- how did you describe it to

16   the union?

17   A    It was a myriad of different types of equipment.

18   Anything that can be hauled on a gross vehicle weight

19   rating of less than 10,000 pounds.  It could have been a

20   skid-steer, it could have been a roller, it could have

21   been a tiller.  It went through various descriptions.

22   Q    Did the union -- any of the members of the union

23   negotiation team ask any questions about that?

24   A    No.

25   Q    Who made the decision to reorganize the

1   Franksville profit center?

2       A   I did.

3       Q   Did you receive input from Mr. Bogardus to make

4   that decision?

5       A   No.

6       Q   Did you receive input from Mr. Bryan Anderson?

7       A   No.

8       Q   Why did you -- when did you make the decision to

9   reorganize the Franksville profit center?

10      A   August 5th.

11      Q   2019?

12      A   Yes, ma'am.

13      Q   Did the decision to reorganize that profit center

14  have anything to do with unfair labor practice charges

15  filed by the union?

16      A   No.

17      Q   What was it based on?

18      A   At that point we had been down -- we were down 30

19  percent from prior years' earnings, and it continued to

20  decline at a precipitous fall, and it didn't look like

21  the -- the trends were all indicating it wasn't going to

22  get any better or improve from the state it was at.

23          July historically had always been a jumping-off

24  point for strong revenue growth and equipment on rent or

25  utilization.  That July, there was no indicators that it

1   was going to improve from the state it was at.

2   Q   Well, what was causing this decline in revenue

3   and profitability?

4   A   The Local 139's influence through bannering and

5   demonstrations on the market to not use Sunbelt.

6   Q   Had Sunbelt ever done this kind of -- set up this

7   kind of a profit center before?

8   A   We've had other examples of that within Sunbelt.

9   And one of our biggest competitors runs that model

10  consistently throughout a thousand plus locations.

11  Q   And which location is that -- or which company is

12  that?  Excuse me.

13  A   United Rentals.

14  Q   Had you ever worked at United Rentals?

15  A   I did.

16  Q   And you were familiar with that?

17  A   Yes.  I ran an area at one point of United

18  Rentals.

19  Q   During this August 8th negotiation session, did

20  you tell the union where the big equipment, bigger than

21  the 10,000 pounds, where it was going to be going?

22  A   Not that I recall.

23  Q   Did the union ask where would the equipment

24  greater than 10,000 pounds go?

25  A   No.

1    Q   If you would please look at the blue binder, sir.

2   Oh, I'm sorry, black binder, black binder.  Sorry.  And

3   look at Exhibit 6, sir.

4    A   Okay.

5    Q   All right.  Do you recognize this document, sir?

6    A   Yes.

7    Q   And what does this -- what is this document, sir?

8    A   It's what we refer to as an ROI template.

9    Q   What does ROI stand for?

10   A   Return on investment.

11   Q   All right.  And what does this particular ROI

12  refer to?

13   A   To the serialized assets that are owned.

14   Q   Owned by what?

15   A   By the profit center.

16   Q   Which profit center?

17   A   Franksville, PC 776.

18   Q   And it indicates in about the fourth column "From

19  Loc."  Does that mean from location?

20   A   Yes.

21   Q   Okay.  And that's all of the Franksville

22  location.  And it says the "To Territory."  And that

23  column indicates what?

24   A   That would indicate who has in their possession

25  at that time.

1     Q    Now, if you look about the middle of the page, it

2 indicates another column, "To District name, To Loc."

3 And "Loc" means what?

4     A    Location.

5     Q    And "Date transferred."

6     A    Uh-huh.

7     Q    So what does -- what do those two columns

8 indicate?

9     A    The date that the unit was transferred.

10    Q    From what to what?

11    A    Well, this one shows a lot of August dates from

12 the originally owned -- the owning location to the new

13 location.

14    Q    And the owning location was which profit center?

15    A    Franksville.

16    Q    And the new owning location is what?

17    A    It's several different locations.

18    Q    Are all of these in your region?

19    A    Yes.

20    Q    Are all of these locations in the State of

21 Wisconsin?

22    A    Yes.

23    Q    Now, to the right, that would be three columns

24 over from the "Date transferred," there's a

25 "Description."

1    A   Uh-huh.

2    Q   Is that the description of the piece of equipment

3  being transferred, sir?

4    A   Yes.

5    Q   Are those pieces of equipment listed there on the

6  first and second pages, are those pieces of equipment,

7  and it might take you a moment to go through them, are

8  those pieces of equipment over 10,000 pounds, or I

9  should say 10,000 pounds or greater, sir?

10    A   Yes.

11    Q   Do you see any pieces of equipment less than

12  10,000 pounds being transferred from the Franksville

13  location to another location in Wisconsin?

14    A   Yeah.  A saw cutter.

15    Q   Just one saw cutter.  And where did it go?

16    A   PC 1006.

17    Q   And that is?

18    A   Fond du Lac.

19    Q   Fond du Lac.  And why was this equipment

20  transferred, sir?

21    A   Because this location was no longer going to own

22  that business model.  It was transitioning the type of

23  business it was going to do going forward.

24    Q   And at any time during the negotiations on August

25  8th, did you tell the union when you thought all of the

1  equipment would be transferred to other -- the big

2  equipment would be transferred to other locations?

3      A   I don't recall.

4      Q   Did Sunbelt use outside haulers at the

5  Franksville location before the union election, if you

6  know?

7      A   Yes.

8      Q   And they did use them?

9      A   Yes.

10     Q   Did Sunbelt use outside haulers during the

11  negotiations with the 139?

12     A   Yes.

13     Q   Did the 139 ever complain to Sunbelt that outside

14  haulers were being used?

15     A   No.

16     Q   Do you currently have assigned to the Franksville

17  profit center any pieces of equipment that are 10,000

18  pounds or greater?

19     A   Not that I recall.

20     Q   What is a teardown?

21     A   Referring to maintenance?

22     Q   Yes, sir.

23     A   So a teardown would be if you had to, you know,

24  dismantle a machine, the engine, the axles, that type of

25  repair.

1    Q    For someone who is not a mechanic, I'm going to

2    put it in layman's terms.  Would that be a really big

3    overhaul of a piece of equipment, sir?

4    A    Yes.

5    Q    All right.  Did the Franksville location handle

6    those type of teardowns?

7    A    Yes.

8    Q    And did they ever source it out?

9    A    Yes.

10   Q    And how would you describe what would constitute

11   a reason for outsourcing a teardown?

12   A    It was beyond our scope and ability in what we

13   were accustomed to doing, as well as availability of

14   manpower.

15   Q    During your negotiation sessions with the 139,

16   did you intend to reach a collective bargaining

17   agreement with the union?

18   A    Yes.

19   Q    And did Sunbelt at any time during negotiations

20   negotiate wages?

21   A    Yes.

22   Q    And what was Sunbelt's proposal to the union?

23   A    Wages would stay as is and then open at the end

24   of 12 months.

25   Q    So a wage reopener --

1    A    Yes.

2    Q    -- after the first year?

3    A    Yes.

4    Q    And did you or someone on Sunbelt's team provide

5    an explanation for that proposal?

6    A    I don't recall.

7         JUDGE ROSAS:  Counsel, are you offering

8    Respondent's Exhibit 6?

9         MS. HILL:  Yes, I was going to ask to have it

10   admitted.

11        MR. WIESE:  No objection, your Honor.

12        MR. RYAN:  No objection.

13        JUDGE ROSAS:  Okay.  Just a couple of questions.

14        MS. HILL:  I do appreciate you reminding me, your

15   Honor.

16        JUDGE ROSAS:  So facility 776 is in Region 9?

17        THE WITNESS:  Yes, sir, your Honor.

18        JUDGE ROSAS:  And over at the extreme right where

19   it refers to "Region," it refers to Region 920?

20        THE WITNESS:  That's the cost center that

21   identifies Region 9.

22        JUDGE ROSAS:  That's another facility within

23   Region 9?

24        THE WITNESS:  No.  That is the representation of

25   Region 9.  It's just the cost center of the region.

1        JUDGE ROSAS:  The code that's given to that?

2        THE WITNESS:  That's right, yep.

3        JUDGE ROSAS:  Okay.  And these transfers of

4  equipment range chronologically from July 1st through

5  October 4th, 2019?

6        THE WITNESS:  Yes, your Honor.

7        JUDGE ROSAS:  Okay.  All right.  So Respondent 6

8  is received.

9        MS. HILL:  Thank you, your Honor.

10        (Respondent's 6 was received.)

11  BY MS. HILL:

12     Q    Sir, has Local 139 filed any election petitions

13  for any of the other General Tool profit centers in the

14  State of Wisconsin, sir?

15     A    No.

16     Q    Did the union ever suggest to Sunbelt's

17  negotiation team that the negotiations be held at a

18  location other than Sunbelt's profit center in

19  Franksville?

20     A    They offered just prior to the first meeting, but

21  after that, no.

22     Q    And what was Sunbelt's response?

23     A    We felt the Franksville location was central and

24  the best place to hold a meeting.

25     Q    Did the union ever ask to stop negotiations

1  early, earlier than had been scheduled by the parties?

2      A    Yes.

3      Q    Could you explain that, sir.

4      A    Yeah.  On one occasion they had an event that

5  they had to attend to.  I don't recall the specifics.

6  It was either a funeral or some type of party they were

7  putting together for some of their members.

8      Q    And where did Sunbelt caucus during negotiation

9  sessions?

10     A    In the profit center manager's office.

11     Q    And why there?

12     A    It was available, and there was enough room to

13 house the four of us.

14     Q    Other than the conference room where the two

15 parties met and the union negotiated, was there any

16 other room at the profit center where negotiations could

17 have been held?

18     A    No.

19     Q    Did the union ever claim during negotiation

20 sessions that Sunbelt was unprepared?

21     A    Not that I recall.

22     Q    Was the union ever unprepared for negotiations?

23     A    Yes.

24     Q    Could you explain how they were unprepared?

25     A    Yeah.  At one of the negotiation sessions, we had

1  ended the prior one with the agreement that the TA

2  provisions would be e-mailed over, and then when we had

3  that follow-up meeting, negotiation session, they were

4  supposed to be e-mailed, and they were never e-mailed,

5  and that caused a disruption to that meeting, and then

6  it was found out later that they were supposed to be

7  e-mailed, and they never were.

8      Q    Are there any other examples of how the union was

9  not prepared?

10     A    There were agreements that were TA'd that we were

11  being asked to review again, to be TA'd again.

12     Q    And who asked Sunbelt to review them again?

13  Anyone in particular on the union's team?

14     A    Well, Mike Ervin had handed us the documents to

15  be reviewed and TA'd, and that's when we had started

16  going through them in our caucus and found out that we

17  had TA'd several of them already.

18     Q    Any other examples, sir, that you can recall?

19     A    Not that I recall.

20     Q    What other unions do you work with in your

21  region, sir?

22     A    Five others.

23     Q    And what are they?

24     A    The Local 18, Local 324, Local 150, and 139.  I

25  forget one.

1    Q    Have you ever in the approximately two years that

2    you've been a regional vice president for Region 9, have

3    you ever had to negotiate a brand-new contract?

4    A    Yes.

5    Q    How many times?

6    A    Twice.

7    Q    Where?

8    A    With the Local 18 and the Local 324.

9    Q    For Local 18, where was that contract negotiated?

10   A    That was Findlay, Ohio.

11   Q    Do you recall how long it took to get a contract

12   at that location?

13   A    That one was roughly 18 months.

14   Q    With respect to 324, where was that contract?

15   A    Kalamazoo, Michigan.

16   Q    How long did it take to reach an agreement for

17   that location?

18   A    Six months.

19   Q    Other than for Local 139, sir, did you have any

20   other unfair labor practice charges filed within your

21   region?

22   A    No.

23   Q    For the Findlay location -- you mentioned that

24   every profit center's Collective Bargaining Agreement is

25   a little different.  How would you compare Local 18's

1    contract for Findlay to the Kalamazoo contract?

2        A    They're different.

3        Q    Do you recall how they're different?

4        A    There's a myriad of articles and provisions that

5    are different from one another.  Everyone's negotiated

6    on its own.

7        Q    With respect to benefits, were they identical for

8    both?

9        A    No.

10       Q    How did they differ?

11       A    Sunbelt benefits versus a local benefits.

12       Q    So which of these profit centers has Sunbelt's

13   benefits in the Collective Bargaining Agreement?

14       A    Findlay.

15       Q    And Kalamazoo has the 324's in it?

16       A    Yes.

17       Q    How many contracts do you have with the 324?

18       A    Six.

19       Q    And have you -- in those other five contracts,

20   you're including Kalamazoo in it?

21       A    Yes.

22       Q    The other five contracts, are those all renewals?

23       A    Kalamazoo was not.  The others are renewals.

24       Q    For those other profit centers, are all of them

25   on 324's benefits?

1        MR. WIESE:  Objection, your Honor, relevance.

2        JUDGE ROSAS:  Sustained.

3   BY MS. HILL:

4    Q   With respect to the 150, that is a single

5   contract for many locations, sir?

6    A   Yes.

7    Q   And that one, did you have to negotiate the

8   renewal on that one?

9    A   Yes.

10    Q   You've mentioned briefly that there was an issue

11   with the -- I think you used the term climate control in

12   the conference room at the Franksville location.

13        Who brought it to the attention of you that there

14   was an issue with the temperature there?

15    A   I don't recall.

16    Q   Was it too hot or too cold, or what was the

17   issue?

18    A   I remember it being cold.

19    Q   And was anything done to correct the situation?

20    A   Yeah.  The profit center manager brought in a

21   portable heater.

22    Q   Did the union object to the portable heater being

23   there?

24    A   No.

25    Q   Did the union ask to end the negotiations early

1   because of the temperature?

2       A   No.

3       Q   Are you aware of any issues relating to the

4   operations of the men's restroom during the

5   negotiations?

6       A   Can you repeat that, please.

7       Q   Are you aware of any issues relating to the

8   operations of the men's restroom at the Franksville

9   profit center?

10      A   It was reported by one of the -- Local 139 there

11  was an issue with one of the toilets.

12      Q   And what was done to correct that issue?

13      A   It was fixed.

14      Q   Did the union ever complain about the length of

15  time that Sunbelt spent during caucuses?

16      A   No.

17      Q   During the caucuses that you said occurred in

18  Mr. Anderson's office, did Sunbelt spend any of the --

19  the negotiation team spend any time on personal matters?

20      A   No.

21      Q   Generally, what were the hours of negotiations

22  for the two parties?

23      A   8:00 to 2:30.

24      Q   Were personal matters discussed during

25  negotiation sessions?

1    A    Yes.

2    Q    Could you describe that, sir.

3    A    Asking Greg his experience as a local military

4  member, a veteran, having him share a little bit of his

5  story, and then thanking him during that session for his

6  services.

7    Q    Any other personal matters that were raised by

8  the parties?

9    A    During the first session, getting to know the

10  Local 139, and Mr. Ervin, realizing that he's a

11  professor, a teacher at one of the local schools.

12    Q    Did you think that those two discussions with

13  Mr. West and with Mr. Ervin were a waste of negotiation

14  time?

15    A    No.  I think it's part of the negotiations to get

16  to know the other parties.

17    Q    Does that occur at your other negotiations?

18    A    Yes.

19    Q    You know Chris Pender, correct?

20    A    Yes.

21    Q    Are you aware of Mr. Pender interrogating any

22  Sunbelt employees?

23    A    No.

24    Q    Are you aware of any -- of Mr. Anderson

25  interrogating any Sunbelt employees about their union

Page 1006

1    sympathies or activities?

2    A    No.

3    Q    You mentioned that at one of the sessions,

4    someone on the union's negotiating team raised an issue

5    regarding Mario Rivera?

6    A    Yes.

7    Q    Do you recall what the issue was?

8    A    That Mario had threatened or alleged to have made

9    a statement that would have been perceived as

10   threatening to one of the local members.

11   Q    And when did that alleged threat occur, sir?

12   A    I don't recall.

13   Q    Did they identify it, when it occurred?  Did the

14   union identify it?

15   A    The date?

16   Q    The date, yes.

17   A    It was the weeks leading up to that negotiation

18   session.  I don't recall the date.

19   Q    Did Sunbelt indicate to the union what it would

20   do regarding their issue with Mr. Rivera?

21   A    Yeah.  We thanked them for sharing that and

22   bringing it to our attention, and then that a full

23   investigation would be done on it.

24   Q    And was a full investigation done on it?

25   A    Yes.

1    Q    Do you know who conducted that investigation?

2    A    Yes.

3    Q    Who did?

4    A    Rebel Strohmeyer.

5    Q    And did Ms. Strohmeyer report to you what the

6    results were of her investigation?

7    A    Yes.

8    Q    And what was the result of that investigation?

9    A    That it was benign.

10   Q    Did you inform the union of that, sir?

11   A    We informed them that an investigation was done,

12   and nothing was found of note.

13   Q    Was there any other safety issue raised by the

14   union during the negotiations?

15   A    Yes.

16   Q    And what was that, sir?

17   A    That there was a driver -- allegedly there was a

18   driver that was not wearing a harness at the time of

19   loading a piece of equipment.

20   Q    Did they provide you with any additional

21   information regarding the driver?

22   A    Yeah.  They had sent over a photo.

23   Q    And what was done based on receiving that photo,

24   sir?

25   A    We responded back to Dan looking for clarity,

1  because the photo that was given to us didn't give us

2  the details needed to discern or determine who it was.

3      Q   Did that photo have a date on it?

4      A   I don't recall.

5      Q   Did Mr. Marsolek provide you -- or provide anyone

6  at Sunbelt with additional information regarding that

7  photo?

8      A   He did not.

9      Q   What else did Sunbelt do with respect to that

10 photo?

11     A   We just went back around to everybody and made

12 sure everybody understood the policies, procedures and

13 requirements, more so as a coaching or a mentoring

14 moment than anything else, but we couldn't identify who

15 it was, so we don't know if it happened or not.

16     Q   So did you give an investigation of that photo to

17 anyone or -- in particular?

18     A   I don't know.  That would have been done by Bryan

19 Anderson.

20     Q   Which companies have received the business that

21 Sunbelt has lost due to the bannering and inflatables?

22         MR. WIESE:  Objection, relevance.

23         MS. HILL:  It's relevant for purposes of the

24 justification for the reorganization of this location.

25 The competition is right across the street from -- one

1    of the locations is right across the street from Sunbelt

2    and, you know, equipment is being -- we have photographs

3    of equipment supposedly leaving Sunbelt's yard maybe

4    from the competition.

5         JUDGE ROSAS:  Okay, hold on, because that would

6    have to come in the form of testimony.

7         Is General Counsel and Charging Party disputing

8    the rationale for the reorganization?

9         MR. WIESE:  I mean we would -- it's unlawful,

10   yeah.

11        JUDGE ROSAS:  Is there justification, is there

12   proper justification?

13        MR. WIESE:  Yeah, I mean --

14        JUDGE ROSAS:  All right.  I'm going to overrule

15   the objection, but you can renew your objection based on

16   testimony.  Okay?

17        MR. WIESE:  Thank you, your Honor.

18        JUDGE ROSAS:  Overruled.

19        You can answer.

20        THE WITNESS:  Ahern and United Rentals.

21   BY MS. HILL:

22    Q   Aren't they unionized by the Local 139, to the

23   best of your knowledge?

24    A   They are not.

25        JUDGE ROSAS:  What did you say, 800?

1          THE WITNESS:  Ahern.

2          JUDGE ROSAS:  Ahern?

3          MS. HILL:  Yeah.  A-h-e-r-n.

4          THE WITNESS:  Sorry about that.

5   BY MS. HILL:

6     Q    All right.  You've discussed the August 8th

7   negotiation session, sir.  Were there any other

8   negotiation sessions after that?

9     A    The following week.

10    Q    Again, that was held at the Franksville location?

11    A    Yes.

12    Q    And what was discussed during that negotiation

13  session?

14    A    The severance for the two remaining bargaining

15  unit members.

16    Q    And was there actual negotiation regarding the

17  amount of the severance?

18    A    Yes.

19    Q    Did Sunbelt change its proposal to reflect the

20  union's suggested revision?

21    A    Yes.

22    Q    Now, the two individuals who received the

23  severance, they were both in the bargaining unit,

24  correct?

25    A    Yes.

1    Q    Did they -- were they eligible for rehire?

2    A    Yes.

3    Q    And do you know who informed them of their

4    layoff?

5    A    Yes.  That would have been the manager.

6    Q    Mr. Anderson?

7    A    Yes.

8    Q    Were you present during -- when the two

9    individuals were informed about their layoff?

10    A    Not in the office itself, but I was on the

11    premises.

12    Q    Were they -- the two individuals, were they

13    permanently laid off?

14    A    No.

15    Q    Are they eligible for rehire?

16         MR. WIESE:  Objection, leading.

17         JUDGE ROSAS:  Sustained.

18    BY MS. HILL:

19    Q    What is their status with respect to their

20    layoff, sir?

21    A    They could be rehired.

22    Q    And how would they have to go about doing that,

23    sir?

24    A    Apply.

25    Q    To the best of your knowledge, sir, have either

1   of those individuals applied for a position within

2   Sunbelt?

3       A   Not that I'm aware of.

4       Q   There has been some testimony about a position

5   called operations manager.

6       A   Uh-huh.

7       Q   Are you familiar with that, sir?

8       A   Yes.

9       Q   And does Wisconsin have an operations manager?

10      A   Yes.

11      Q   Where?

12      A   In Franksville, Wisconsin.

13      Q   Whose decision was it to have an operations

14  manager for Franksville?

15      A   Mine.

16      Q   And why did you decide to have an operations

17  manager?

18      A   The location, with the recent influence in the

19  market, couldn't sustain a full-on profit center manager

20  anymore.  They didn't have the ability to support that

21  position.

22      Q   So if it doesn't have a full-time profit center

23  manager, what does it have?

24      A   It has an operations manager.

25      Q   And is that operations manager supervised

1  directly by you or by someone else?

2      A    No.  They are overseen by the manager out of

3  Waukesha.

4      Q    And who was that, sir?

5      A    Robert Rivera.

6      Q    So the operations manager is physically located

7  at the Franksville location, correct?

8      A    Yes.

9      Q    Was he a Sunbelt employee prior to becoming the

10  operations manager?

11      A    Yes.

12      Q    And where was he employed?

13      A    In -- at the Pump & Power HVAC location in

14  Waukesha.

15      Q    And what position did he hold there?

16      A    He was the ERS there.

17      Q    With respect to -- you said the profit center

18  manager at Sun -- at Waukesha supervises him, correct?

19      A    Yes.

20      Q    Are you referring to the General Tool profit

21  center manager?

22      A    Yes.

23      Q    Are there still outside sales representatives at

24  the reorganized Franksville profit center?

25      A    Yes.

1    Q    During the negotiations on August 8th and August

2    16th, 2019, did the union ask what was going to happen

3    to the outside sales representatives?

4    A    Not that I recall.

5    Q    What is the role of the outside sales

6    representatives at the reorganized Franksville profit

7    center?

8    A    To prospect and identify and develop new business

9    and sustain existing business.

10    Q    Did you authorize the transfer of any of the

11    Franksville employees who were in the bargaining unit at

12    Franksville before the reorganization?

13    A    No.

14    Q    Mario Rivera, you said there was a complaint made

15    by the union regarding him and there was an

16    investigation of it.

17         What position did Mr. Rivera hold at the

18    Franksville location?

19    A    He was a technician.

20    Q    Inside shop?

21    A    Yes.

22    Q    And where is Mr. Rivera currently working, if you

23    know?

24    A    Climate Control.

25    Q    And when did he move into Climate Control?

1    A    I don't recall.

2    Q    Are there any mechanics or drivers at the

3   Franksville location currently?

4    A    No.

5    Q    Are you aware of the decertification petition

6   that was filed with the NLRB regarding the Franksville

7   location?

8    A    Yes.

9    Q    How did you become aware of it?

10   A    Through the posting that was put in the shop.

11   Q    So the first time was when you saw the posting?

12   A    Yes.

13   Q    Did you ask anyone to file that decertification

14   petition?

15   A    No.

16   Q    Did you consult with Mr. Pender over the decision

17   to reorganize the Franksville profit center?

18   A    No.

19   Q    Through any of the negotiation sessions that you

20   attended, did you hear the union complain about Jamie

21   Smith's work hours being reduced?

22   A    I don't recall.

23   Q    Did you consult with Mr. Bogardus at all

24   regarding the reorganization of that profit center?

25   A    No.

1        MS. HILL:  Okay.  If could I have a minute, your

2   Honor.

3        JUDGE ROSAS:  Sure.

4        MS. HILL:  Okay.  A couple more questions.  I'm

5   sorry, your Honor.

6   BY MS. HILL:

7    Q   First, during negotiations with 139, did you ever

8   hear them discuss the National Training Fund?

9    A   Yes.

10   Q   Explain what you heard them discuss regarding the

11  National Training Fund.

12   A   Can you repeat the question.

13   Q   What did the union discuss regarding the National

14  Training Fund?

15   A   What it was used for and where it's at.

16   Q   Anything of -- was it one of their proposals?

17   A   Yes.

18   Q   And what was their proposal regarding that Fund?

19   A   I don't recall.

20   Q   Was it to contribute money?

21   A   Yes.

22   Q   What, if anything, was Sunbelt's response to

23  that?

24   A   That we have our own internal training that we

25  run our technicians and drivers through, so we would

1    elect to run them through that program as opposed to

2    contributing to the National Training Fund in Texas.

3        Q    Did the union at any time during negotiations

4    indicate that the training that Sunbelt provided its

5    drivers and mechanics was inadequate?

6        A    No.

7        Q    Did the union ever say that they wanted to caucus

8    someplace other than in the conference room?

9        A    Not that I recall.

10           MS. HILL:  No further questions at this time,

11   your Honor.  Pass the witness.

12           JUDGE ROSAS:  Cross?  Do you need a few minutes?

13           MR. WIESE:  Yeah, five minutes.

14           JUDGE ROSAS:  Okay.  We'll go off the record and

15   take a break.

16           Please don't discuss your testimony with anyone.

17           THE WITNESS:  Thank you, your Honor.

18           (Recess.)

19           JUDGE ROSAS:  Back on the record.

20           General Counsel, cross examination.

21           MR. WIESE:  Thank you, your Honor.

22                        CROSS EXAMINATION

23   BY MR. WIESE:

24       Q    Mr. Mayfield, besides Ms. Hill, did you discuss

25   your testimony with anybody else?

1    A    No.

2    Q    Did you review any documents in preparation for

3    your testimony today?

4    A    No.

5    Q    Did you review any portion of the transcript from

6    the December hearing prior to testifying today?

7    A    No.

8    Q    With respect to the September 2018 bargaining

9    session with the union, that was the one that you

10   testified about that you did not attend, do you recall

11   that?

12   A    Yes.

13   Q    All right.  Do you recall how soon before that

14   September session you became aware that you wouldn't be

15   attending that session?

16   A    I don't recall.

17   Q    Was it ahead of that session that you knew that

18   you wouldn't be attending?

19   A    I don't recall.

20   Q    Did you inform the union ahead of time that you

21   wouldn't be attending that session?

22   A    I informed my counsel.

23   Q    Besides your counsel, did you inform anybody

24   else?

25   A    Not that I recall.

1    Q   To your knowledge, did any member of Sunbelt's

2  negotiating team inform the union ahead of the September

3  negotiating session that you wouldn't be attending?

4    A   I don't know.

5    Q   There was some discussion on your direct about

6  dues checkoff.  Do you recall that discussion?

7    A   Yes.

8    Q   And some payroll costs that may be associated

9  with that?

10    A   Yes.

11    Q   Who handles the payroll for Sunbelt?

12    A   It's handled out of our support office back east.

13    Q   And is that -- when you say "our support office,"

14  is that a Sunbelt support office?

15    A   Yes.

16    Q   So that's handled internally?

17    A   Yes.

18    Q   So to implement dues checkoffs, you wouldn't be

19  paying a company outside of Sunbelt to implement those

20  deductions, is that correct?

21    A   Depending on who prints off the checks.  I don't

22  know who prints off the checks, but --

23    Q   But outside of the checks being printed off, to

24  the extent they are printed off, that's all handled

25  internally by your payroll department?

 1    A   I don't know.

 2    Q   If you look at Respondent Exhibit 6 which is in

 3   the black binder.

 4    A   Okay.

 5    Q   So if you can identify which column in this

 6   document indicates where the equipment is located?  I

 7   guess I'm just confused about that.

 8        MS. HILL:  Time frame?

 9        MR. WIESE:  At the time the document was created,

10   I guess.

11        THE WITNESS:  I don't see a date on when the

12   document was created, but the time of which the transfer

13   occurred is archived.

14   BY MR. WIESE:

15    Q   Okay.  And then to the left of that date, so the

16   column -- there's a column "Date transferred," and then

17   to the left it says "To Loc."

18    A   Yes.

19    Q   And that would be the location that it was

20   transferred to?

21    A   Yes.

22    Q   All right.  And then if you go to the far right

23   of the document, the column that says "Cur Loc" --

24    A   Uh-huh.

25    Q   -- do you see that one?

1    A    I do.

2    Q    What's the difference between those -- the "To

3  Loc" column and the "Cur Loc" column?

4    A    It's one of the same.  It's where it's going and

5  then where it currently sits, which would be the same.

6    Q    I'm going to have you turn to the blue binder

7  now.  I'd like to have you look at what's been marked as

8  General Counsel Exhibit 7H.

9    A    Which page?

10   Q    Page 1 of that document.

11   A    Okay.

12   Q    This has been identified as Sunbelt's proposal

13 regarding dues from the February 1st, 2019 negotiations.

14 Do you recall this proposal being presented by Sunbelt

15 at those negotiations?

16   A    Yes.

17   Q    Okay.  And who presented this proposal for

18 Sunbelt?

19   A    My counsel.

20   Q    Did anyone from the Sunbelt negotiating team

21 highlight any differences in this proposal from prior

22 dues proposals made by Sunbelt?

23   A    I don't recall.

24   Q    Do you recall if there were any differences in

25 this proposal from prior dues proposals made by Sunbelt?

1    A    Yeah, I don't recall.

2         MR. WIESE:  Nothing further.

3         JUDGE ROSAS:  Charging Party, anything?

4         MR. RYAN:  Just a couple questions, your Honor.

5                    CROSS EXAMINATION

6    BY MR. RYAN:

7    Q    Mr. Mayfield, do you know how much it costs for

8    Sunbelt to deduct dues from wages?

9    A    I do not.

10   Q    But that was the basis for declining dues

11   checkoff?

12   A    It was administrative costs with any additional

13   ancillary attached to a payroll check, right.

14   Q    Right.  So in the reorganization, part of that

15   was eliminating the service department, is that correct?

16   A    Based on the reorganization, it did justify

17   having a service department.

18   Q    Was the service manager terminated at the same

19   time?

20   A    No.  He was retained.

21   Q    And why was he kept as opposed to the bargaining

22   unit employees?

23   A    They're still administrative processes that have

24   to be checked off and reviewed to ensure that the

25   equipment, whether small, like a paint sprayer or a

1   breaker, was meeting the check-in requirements.

2      Q   You mentioned operations manager at Franksville.

3   When did the operations manager come in?

4      A   I don't recall the exact date.

5      Q   Do you know a month?

6      A   September.

7      Q   And what's that person's name?

8      A   Mike.

9      Q   Do you know his last name?

10     A   I don't recall Mike's last name.

11     Q   If I can have you look in the blue binder,

12  Exhibit 12, General Counsel Exhibit 12.

13     A   Page 1?

14     Q   Yes.  So I think you testified this was part of a

15  larger document that Mr. Ervin had provided at the June

16  meeting?

17     A   Yes.

18     Q   Did Mr. Ervin explain the purpose of that

19  document?

20     A   Was to review those items that had been

21  provisions that had yet not to be TA'd.

22     Q   Was it to confirm what had been TA'd?

23     A   Well, there was both.  There was conflicting.

24  There were some that had already been confirmed and

25  there were some that were not.

1    Q   So that it makes sense to have a unified document

2   where everybody could ultimately agree yes, we've TA'd,

3   no, we haven't?

4    A   No.  It made sense to go over and review the ones

5   that we had yet to TA, but if we had already TA'd them,

6   why would we be wasting that time during the

7   negotiations to review something that was already agreed

8   to?

9    Q   But it sounds like there was confusion over what

10  was TA'd?

11   A   There was no confusion on Sunbelt's side of what

12  was TA'd.

13       MR. RYAN:  I don't think I have anything further

14  right now.

15       JUDGE ROSAS:  Any redirect?

16       MS. HILL:  Yes, sir.  I just want to make sure

17  that the record is clear on this.

18                  REDIRECT EXAMINATION

19  BY MS. HILL:

20   Q   At any time during the negotiations time period,

21  did Sunbelt provide the union with a draft agreement

22  that contained all of the TA'd provisions?

23   A   Can you ask that again.

24   Q   At any time during the year and a half of

25  negotiating with the 139, did Sunbelt provide the union

1    with a draft Collective Bargaining Agreement that had

2    the TA provisions in it?

3         A    I don't recall.

4         Q    And then with respect to the General Counsel's

5    Exhibit 12, I believe you testified that you said this

6    page was part of a bigger document that had the -- what

7    the union said were the TA provisions but on separate

8    pages, is that correct, sir?

9         A    Yes.

10        Q    And with respect to not just this one page for

11   General Counsel's Exhibit 12, I want to make sure I

12   understood your testimony that you believe the entire

13   document that the union had given Sunbelt, in addition

14   to the table of contents, that there was no confusion on

15   Sunbelt's side regarding what was TA'd, correct?

16        A    Correct.

17        Q    The issue of I believe you said in your earlier

18   testimony regarding those provisions was to make sure

19   that the language that was in the union's agreement

20   mirrored the language that was previously TA'd, is that

21   correct?

22             MR. WIESE:  Objection, leading.

23             JUDGE ROSAS:  Rephrase.

24   BY MS. HILL:

25        Q    All right.  The issue raised by Sunbelt with

1  respect to the TA provisions and the union's proposal to

2  sign off on that is part of General Counsel's Exhibit

3  12, can you describe what the issue or the concern was

4  that Sunbelt had with respect to that?

5    A   Yeah.  We identified that the language wasn't

6  aligned with prior TA'd provisions, so once we initially

7  found the one, then we started going through the others,

8  and we found additional ones besides the initial one.

9    Q   And so what, if anything, did Sunbelt say to the

10 union with respect to those differences?

11   A   Well, we communicated what was identified and

12 that further vetting was needed in order to ensure that

13 all of the language mirrored what had been TA'd at that

14 point.

15   Q   So at that point did Sunbelt make a request of

16 the union regarding that further vetting?

17   A   Yes.

18   Q   What did Sunbelt ask?

19   A   That those -- that that be reviewed to ensure it

20 was aligned with what we agreed to prior, TA'd prior.

21   Q   And to do that comparison, did Sunbelt make a

22 request of the union?

23   A   Yes.

24   Q   And what was that request?

25   A   To do that review and then e-mail over what the

1    adjustments were.

2        Q    The service manager, you stated on cross

3    examination that he was needed to check in equipment.

4            Prior to the reorganization, did the service

5    manager check in equipment?

6        A    Yes.

7        Q    During negotiation sessions, did the union ever

8    complain about the service manager checking in

9    equipment?

10       A    No.

11           MS. HILL:  Okay.  Nothing further.

12           JUDGE ROSAS:  Any follow-up?

13           MR. WIESE:  No, your Honor.

14           MR. RYAN:  No, your Honor.

15           JUDGE ROSAS:  Thank you, sir.  You're excused.

16   Please don't discuss your testimony with anyone until

17   counsel tells you the case is over.  All right?

18           THE WITNESS:  Thank you, your Honor.

19           JUDGE ROSAS:  Off the record.

20           (Discussion held off record.)

21           JUDGE ROSAS:  Back on the record.

22           And this is Mr. Anderson?

23           MS. HILL:  Yes, sir.

24           JUDGE ROSAS:  Sir, I'll remind you that you're

25   still under oath.

1        THE WITNESS:  Okay.

2                  DIRECT EXAMINATION

3   BY MS. HILL:

4    Q    Mr. Anderson, what is your -- what were your job

5   responsibilities when you started working at the

6   Franksville location in 2018?

7    A    To oversee the operations of the Franksville

8   operation.

9    Q    And what did that entail, sir?

10    A    Management of the sales staff, the service staff

11   and overall business out of that facility.

12    Q    When you mention "staff," what were your

13   responsibilities with respect to the staff?

14    A    To manage the sales operations and the people.

15    Q    Did you have the authority to hire, fire and

16   discipline at the Franksville location?

17    A    Yes.

18    Q    When you started at Franksville, what were your

19   priorities?

20    A    First and foremost, to make sure that each

21   employee goes home at night.  You know, in our industry,

22   we operate a lot of large equipment, and it can kill

23   somebody, so my number one priority is to make sure that

24   each employee is working in the safest manner as

25   possible and to make sure that everybody goes home to

1    their family at the end of the day.

2       Q    Other priorities after that?

3       A    To drive revenue for the company.

4       Q    The equipment at your location at Franksville

5    when you started there, how would you describe it, sir?

6       A    Kind of a hodgepodge.  I mean we had a lot of big

7    equipment, we had a lot of small equipment.  We had a

8    very profitable business.

9       Q    With respect to the big equipment, when you

10   started there, what did you do with respect to the big

11   equipment?

12      A    Can you repeat the question.

13      Q    Okay.  What, if anything, did you do with respect

14   to the big equipment at your profit center?  This is

15   when you started as a profit center manager at

16   Franksville.

17      A    Yeah.  We rented big equipment.

18      Q    And how would you describe the division of your

19   equipment, big and small?

20      A    I would say we had a pretty fair mix, big and

21   small.  Obviously, you know, the big equipment would pay

22   our bills.  The small equipment would generate the

23   profit for the company.

24      Q    What do you mean "generate the profit"?

25      A    There's higher returns on the smaller equipment

1  than there is with the bigger equipment.  There's higher

2  costs, and there's a very competitive market with

3  respect to the larger equipment.

4      Q   Did you -- you just described sort of a theory of

5  how to run the Franksville location.  Based on that, did

6  you make any adjustments to your fleet?  This is when

7  you started.

8      A   Yeah, when I had first got there, there was a

9  plan in place, something that Mr. Bogardus referenced as

10  a pro forma, and basically it was a plan to alter the

11  fleet at the location to make it more profitable for the

12  company.

13      Q   What was to be done to alter -- to change it?

14      A   They were going to be getting rid of more of the

15  larger stuff and focusing more on the smaller stuff to

16  generate more profit.

17      Q   Was he -- now, he was the district manager.

18      A   Right.

19      Q   Did you have access to his ideas for the other

20  profit centers in the state?

21      A   No.  Just Franksville.  He -- he called the

22  meeting, and he kind of showed us what the plan was.  It

23  was something that was put together by our director of

24  operations, Dan Atwell, and, in my opinion, it made all

25  the sense in the world because we had a high volume of

1  foot traffic, and the smaller equipment generates more

2  profit, so with all respect -- I mean it was going to

3  generate a higher return kind of thing.

4      Q    And what was your experience at Franksville based

5  on that what you call foot traffic?

6      A    We generated a lot of revenue based off of

7  walk-in customers.  We would average anywhere between

8  100 to $150,000 a month in revenue simply from walk-in

9  customers swiping credit cards.

10     Q    Now, you're the profit center manager you said at

11 Fond du Lac I believe you said, correct?

12     A    Correct.

13     Q    How does that compare, that dollar value, to Fond

14 du Lac?

15     A    It doesn't even come close to comparing.  We

16 probably have a tenth of their walk-in business.

17     Q    And you said credit cards.  So people who would

18 walk in --

19     A    People who would just walk in and want to rent

20 equipment, small equipment, weed whackers, chainsaws,

21 floor grinding equipment, things that just can simply be

22 loaded into the back of their vehicle, and then they

23 would just pay for it, and then they would leave.

24     Q    Did Franksville ever have a 35,000 pound

25 excavator in its fleet?

1    A    No, not that I can ever remember.

2    Q    And what is the color of Sunbelt's equipment?

3    A    Green.

4    Q    Are there any other colors for Sunbelt equipment?

5    A    Yes.  We do also have OEM-colored equipment as

6  well.

7    Q    Would you please define OEM for the record.

8    A    Original equipment manufacturer.

9    Q    What does that mean for purposes of your fleet?

10    A    So, for example, John Deere equipment is

11  generally yellow and gray.  That would be considered an

12  OEM color.

13    Q    Did you have that colored equipment in your

14  fleet?

15    A    Yes.

16    Q    Any other colors?

17    A    Many other colors.  A lot of Skyjack and JLG

18  scissors.  Their OEM colors would be orange and gray and

19  white.

20    Q    Any other colors?

21    A    Yes.  Genie scissors are blue and white.  We also

22  had some of them.  We had a very mixed fleet with

23  respect to color.

24    Q    You're discussing Franksville, correct?

25    A    I'm discussing -- well, that is correct, that is

1   Franksville, but that is pretty much any one of our

2   stores has the same.

3      Q   I was going to ask at Fond du Lac, do you have --

4      A   Fond du Lac also has OEM-colored equipment.

5   Anytime we are in a pinch and we need machines and

6   there's no time to paint it green, we take it how we can

7   get it so we can get it to the customers and make money

8   with it.

9      Q   On or about March 22nd, 2019, did you instruct

10   Sunbelt employees to tell you about the union activities

11   of other Sunbelt employees?

12      A   No.

13      Q   On or about April 22nd or 23rd of 2019, did you

14   interrogate any of Sunbelt's employees about their union

15   sympathies?

16      A   Absolutely not.

17      Q   And why not?

18      A   Because it's just something you do not do.  I was

19   trained to not to do that.

20      Q   On or about April 22nd or 23rd, did you

21   interrogate Sunbelt employees about their union

22   activities?

23      A   No.

24      Q   Did Franksville have a territory?

25      A   They did.

1    Q    And what was that territory?

2    A    The southeastern portion of the Wisconsin state.

3    It would basically go down to the Illinois border up

4    to -- right about that Greenfield, southern Milwaukee --

5    or I'm sorry.  It would be right about that Greenfield

6    line, and then it would go west over and down like in

7    the Lake Geneva area.

8    Q    Was that the territory for Franksville during

9    your entire time as the profit center manager there?

10   A    Yes.  They did do some alterations to the

11   territory, I don't recall exactly what month, but they

12   were very minute changes, just simply to make it to

13   where it would be per zip code and not necessarily

14   highway line.

15        All of the reporting, the Dodge Reports, all of

16   these market studies that we would get were all done by

17   zip codes, so we were just trying to align them a little

18   bit better.

19   Q    When you started as the profit center manager at

20   Franksville, how many mechanics did you have?

21   A    Just a moment.  Let me think about that.

22        I believe there was five.

23   Q    And were they all employees of Sunbelt?

24   A    Yes.

25   Q    And you took over from Ms. Torgerson, correct?

1    A   Katie Torgerson, correct.

2    Q   And when you started, what was the condition of

3   the shop?

4    A   It was a mess simply put.  The mechanics there,

5   they -- they weren't all that mechanically inclined.

6   Some people would reference to them as maybe some like

7   parts changer.  They could never really fix anything.

8   They weren't the kind of mechanics that knew to just

9   touch these two wires together and the machine would

10   function again.  We would throw thousands of dollars of

11   parts at machines.

12       And when I also got -- right when I first got

13   there, they had outsourced a lot of that -- those

14   repairs because of the quality you can say of the

15   mechanics, the skill set of the mechanics.

16    Q   The what?

17    A   The skill set.

18    Q   Thank you.  When you're talking about outsourcing

19   the repairs of the equipment, did that end once you

20   became the profit center manager?

21    A   No.

22    Q   Do you have a dollar amount as to how much you

23   spent per month for outsourcing?

24    A   So they were partaking in a program called tech

25   on loan with Terex Services.  Prior to my getting there,

1  from December of 2017 to March of 2018, they spent

2  somewhere in the neighborhood of about 50 to $60,000

3  with Terex Services, having them fix the equipment and

4  do the repairs that were outside of the skill set of our

5  current employees.

6      Q   And you said a tech on loan.  What does that

7  mean?

8      A   That's simply just a company that provides a

9  mechanic to you, a technician.

10     Q   So where was that tech -- that technician, that

11 mechanic located?

12     A   He was gone by the time I got there.  I was just

13 kind of cleaning up the tail end of the invoices when I

14 got there.  That's why I know how much it costs.  He was

15 there from December to March.

16     Q   So he was physically at the Franksville property?

17     A   He was working at the Franksville location.

18     Q   One of your job responsibilities, did it include

19 the budget, preparing the budget?

20     A   Yes.

21     Q   How did you prepare -- first of all, let's start

22 off, which budget -- which year did you prepare a budget

23 for?

24     A   The fiscal year -- fiscal year '19.  Sunbelt runs

25 on a fiscal year, so it's a little bit challenging to --

1    Q    From when to when?

2    A    So it would be March -- or I'm sorry, May 1st,

3    2018 through April 31st, 2019.

4    Q    When do you work on the budget for a profit

5    center?

6    A    I don't know the exact dates.  I'm thinking it's

7    generally some -- somewhere between like Februaryish I

8    believe is when we do them.  I'm doing them right now.

9    Q    All right.  So you only did one budget for

10   Franksville, correct?

11   A    For Franksville, correct.

12   Q    All right.  Now, what does a budget consist of?

13   A    All the revenues, all of the costs and, you know,

14   ultimately profits.

15   Q    Is fleet included as part of that?

16   A    Yep, fleet would be considered a cost on the

17   budget.

18   Q    Is there anytime during the year that there's an

19   adjustment to the fleet for -- or was there an

20   adjustment to the fleet for Franksville between the time

21   you started at Franksville to let's say June 1st of

22   2019?

23   A    So when I first started there, they had this pro

24   forma they were calling it which was a fleet plan to

25   decrease the amount of larger equipment and increase

1    or -- yeah, increase the amount of smaller-type

2    equipment that was going to generate more profit.

3         We actually began executing that strategy in May

4    of 2018, maybe early June of 2018.  We actually moved

5    about I think between 2 and $3,000,000 worth of

6    equipment, we started executing it, and then we got

7    instructions from Mr. Mayfield to basically halt on

8    that.

9    Q    Did he give you a reason for halting on it?

10   A    No, he did not.

11   Q    When you say you moved it, where did it get moved

12   to?

13   A    It got moved to -- well, some of it -- most of it

14   was moved to the Waukesha location, but it was moved to

15   other locations within the state.

16   Q    Did you participate in the negotiations with the

17   139?

18   A    I did, yes.

19   Q    Now, there are two binders, one that's blue, one

20   that's black.

21   A    Yep.

22   Q    The blue one, I'll refer to exhibits in there as

23   the General Counsel exhibits.  The black ones are going

24   to be Sunbelt's exhibits.

25   A    Okay.

1    Q   And I would like you to look at Sunbelt

2   Exhibit --

3    A   Black, right?

4    Q   Black, right.  No. 8, sir.

5    A   Black number what, I'm sorry?

6    Q   8.  There should be a numbered tab with a No. 8

7   on it, sir.  If you would review it, and when you're

8   finished reviewing it, look up.

9    A   Okay.

10    Q   Do you recognize these documents?

11    A   I do.

12    Q   What are they, sir?

13    A   They're my notes from that session.

14    Q   And if you would look at 1411 through 14 -- just

15   a moment, I've got to get to the last page -- 1423.

16    A   1411 -- are you talking about these numbers on

17   the bottom?

18    Q   On the bottom right-hand corner.

19    A   1411 through what?

20    Q   1423, sir.

21    A   I didn't.  I just looked at the first two.

22    Q   If you would look at the rest of them, and I'll

23   ask you a couple more broader questions.  Okay?

24    A   Okay.

25    Q   And let me give you one instruction.  While

1  you're reviewing it, will you please see if all the

2  handwriting is yours.

3      A    Okay.

4      Q    Is all the handwriting on these pages yours, sir?

5      A    As far as I can see, yes.

6      Q    All right.  Now, this indicates the first day for

7  negotiations for these notes was October 23rd, 2018,

8  correct?

9      A    Correct.

10     Q    Were there negotiations prior to October 23rd,

11  2018, sir?

12     A    There was.

13     Q    Do you recall the first negotiation session that

14  you attended?

15     A    I do.

16     Q    And do you recall who attended from the union?

17     A    Not exactly.

18     Q    Okay.  Who do you recall at least as of right

19  now?

20     A    I recall myself, Jamie Smith, Mike Ervin, Steve

21  Buffalo, I believe Terry McGowan was present, and Greg

22  West and Dan, you, Jason, Bo and myself.

23     Q    If you would please look at the blue binder and

24  look at GCX 15.  They are numbered -- they have numbered

25  tabs on them.

1    A    GCX 15?

2    Q    Yes, sir.

3    A    I don't see it.

4         MS. HILL:  Your Honor, may I approach?

5         JUDGE ROSAS:  Uh-huh.

6         THE WITNESS:  Oh, I take that back.

7         MS. HILL:  Okay.  Never mind.

8         THE WITNESS:  Okay.  15.  Okay.

9    BY MS. HILL:

10   Q    Do you recognize Exhibit 15, sir?

11   A    I do.

12   Q    What is that, sir?

13   A    Some ground rules for the negotiations, ground

14   rules if you will.  This was presented to us from the

15   union.

16   Q    Was this something that the union wanted Sunbelt

17   to agree to?

18   A    Yes.

19   Q    Did Sunbelt agree to these ground rules?

20   A    Yes.

21   Q    Do you recall any of the discussions regarding

22   the ground rules?

23   A    No.

24   Q    Did you miss any of the negotiation sessions?

25   A    Yes.

1    Q    When did -- which ones?

2    A    September.

3    Q    September.   Why?

4    A    For the birth of my daughter.

5    Q    During any of the period of time that the

6  negotiations were going on at your profit center, did

7  anyone in management at Sunbelt tell you that Sunbelt

8  did not intend to reach an agreement with Local 139?

9    A    No.

10    Q    Do you recall any discussion during that first

11  negotiation session regarding location for caucusing?

12    A    Location for caucusing?

13    Q    For caucusing.

14    A    Yes.   We told them we were going to caucus in my

15  office.

16    Q    And do you recall what Sunbelt told the union

17  regarding where they can caucus?

18    A    In the -- to negotiate in our conference room

19  where we were negotiating.

20    Q    Did your profit center in Franksville have any

21  other location where the union could caucus?

22    A    No.

23    Q    And how did the negotiations --

24    A    I mean --

25    Q    Oh, I'm sorry.

1    A    -- I suppose they could have caucused in our

2  break room, but it would have been inconvenient because

3  if employees needed to eat lunch, that wouldn't have

4  worked.

5    Q    And did all the employees eat lunch at the same

6  time?

7    A    No.

8    Q    You had staggered --

9    A    We had staggered schedules.

10    Q    How did the negotiation sessions start?

11    A    With a safety moment.

12    Q    Did you ever present a safety moment?

13    A    I did.

14    Q    And what was the topic?

15    A    Deer.  If I'm not mistaken, I believe it was

16  right around the time when hunting was going on, so we

17  talked about keeping your eyes open for deer because

18  they were on the move at that time.

19    Q    Is there any other time during the year that

20  there should be a concern about deer?

21    A    During the rut.  In my opinion, during the rut,

22  usually, you know, September, late August, September,

23  and then right around hunting season, too, or pretty

24  much from late August all the way through February,

25  because hunting in Wisconsin takes place through almost

1    that entire time.

2       Q    Did the union ever complain that Sunbelt was not

3    prepared to negotiate?

4       A    Not that I can recall.

5       Q    Was the union ever not prepared for negotiations?

6       A    I can remember on many occasions when they were

7    not.

8       Q    Could you explain that further, sir.

9       A    There was a time Steve Buffalo didn't even show

10   up with his notebook.  I mean he came with nothing.

11   There were times when their -- their documents didn't

12   match our documents.  There were, you know, occasions

13   when they were talking amongst themselves where their

14   notes didn't match each others.  It was a fairly regular

15   occurrence.

16      Q    Did the union ever spend time during negotiations

17   discussing personal things?

18      A    Yes.

19      Q    Okay.  Can you explain that.

20      A    I remember a time when Mr. Ervin was talking

21   about him teaching a labor relations class.  I also

22   remember a time when Greg West was talking about how he

23   doesn't believe in direct deposit or e-mail.

24      Q    And as a result of Mr. West not believing in

25   e-mail, did that have an impact on Sunbelt for

1  negotiation purposes?

2  A  It absolutely did.  There was a lot of things

3  that could have been handled in advance that were not

4  able to be done because they -- he didn't believe in

5  e-mail.  There were documents that could have been

6  e-mailed or exchanged in advance so that we could have

7  been more prepared when we came to the sessions.

8  Q  Did the union provide justifications for the

9  proposals that it made to Sunbelt?

10  A  Justifications for its proposals?

11  Q  Yeah.  Explain their proposals.

12  A  No.

13  Q  Did Sunbelt demand from the union that it explain

14  or provide a justification for its proposals?

15  A  Yes.

16  Q  And when was that?

17  A  Well, pretty much throughout the bulk of the

18  sessions.  We pretty much always explained reasoning for

19  why we -- for example, there was many times when they

20  were asking for us to move to economics, and we politely

21  explained to them that we were not going to move to

22  economics until all noneconomic things were taken care

23  of.

24  Q  Now, directing your attention to General Counsel

25  Exhibit No. 15.

1    A    Okay, yep.

2    Q    Did these ground rules address that situation?

3    A    If I'm not mistaken, there's something in here

4  that says --

5         JUDGE ROSAS:  Do you need him to read from the

6  document or can we just refer to it?

7         MS. HILL:  Can I direct his attention to it, your

8  Honor?

9         JUDGE ROSAS:  (Nods head.)

10 BY MS. HILL:

11   Q    I'm directing your attention to 7, item 7.

12   A    There it is.  "The parties shall decide all

13 language proposals before discussing wages."

14   Q    And that was from the union, correct?

15   A    That is correct.  Another thing that I'll point

16 out is No. 5, "Negotiation sessions should average two

17 hours, not to exceed three hours."  I can't ever

18 remember one time that we were in that room for less

19 than three to four hours.

20   Q    During Sunbelt's caucuses, did Sunbelt's

21 negotiation team ever have questions for the union?

22   A    Yes.

23   Q    Do you remember a particular situation?

24   A    Not off the top of my head.

25   Q    Did the union ever mail its proposals to Sunbelt,

1   not e-mail, but just regular U.S. mail?

2      A   No.

3      Q   Did the 139 ask to negotiate wages?

4      A   Yes.

5      Q   Did Sunbelt agree to negotiate wages?

6      A   Yes, once all noneconomic proposals had been

7   agreed upon.

8      Q   Did Sunbelt refuse to negotiate at the times --

9   the times, not the dates, the times that the union

10  requested?

11     A   Yeah.  Pretty much in every negotiation sessions,

12  we set a date and a time for the next meeting.  That

13  was, you know, one of the first things that we would do.

14     Q   But did Sunbelt refuse to do that?

15     A   No.

16     Q   Was there a problem with the temperature in the

17  conference room where negotiations were held?

18     A   Yes.

19     Q   And could you explain that situation.

20     A   So there was one day -- one of the coldest days

21  of the winter where it was pretty cold in the conference

22  room.  I contacted Southport Heating & Cooling and had

23  them come out and take a look, and I also brought in a

24  space heater to make sure that the -- to help with

25  respect to the temperature in the room.

1  Q   And did the union complain about the temperature

2  after the space heater was brought in?

3  A   Yes.

4  Q   After it was brought in?

5  A   Yes.

6  Q   They still did?

7  A   Yes.

8  Q   Were you present when the union raised two safety

9  concerns, one involving a driver and another involving

10 Mr. Mario Rivera?

11 A   I remember the Mario situation.  They had

12 mentioned that -- somebody said that Mario was

13 threatening to shoot somebody.

14 Q   And who made that allegation?

15 A   I don't recall.  I think it was Greg West.

16 Q   Do you recall a concern about a driver who wasn't

17 using the proper safety precautions?

18 A   I do.

19 Q   And what do you recall about that, sir?

20 A   They sent me a picture from a pretty far away of

21 a driver operating a manlift with no harness.  On

22 several occasions I asked them for the date and the time

23 so that I could investigate it, and they never really

24 did provide me a date and a time.  They were very vague

25 in their response like oh, sometime in this month, and

1  for me to go back and review a month's worth of
2  surveillance footage was very time consuming.  In fact I
3  tried, but I was unsuccessful in locating that footage.
4      Q    So you were the one who conducted the
5  investigation into that particular allegation from the
6  union?
7      A    That is correct.
8      Q    Did you delegate that investigation to anyone
9  else?
10     A    No.
11     Q    Were you present during the negotiations
12 regarding the reorganization and the layoff of two
13 individuals working at the Franksville location?
14     A    Yes, I was.
15     Q    During that negotiation session, did the union
16 ask when the big equipment would be removed?
17     A    No, they did not.
18     Q    Did the union ask how the equipment at the
19 Franksville location would be washed?
20     A    No, they did not.
21     Q    Did the union ask who would perform the
22 preventive maintenance on equipment at Franksville after
23 the reorganization?
24     A    I don't think so.
25     Q    Did the union ask which pieces of equipment would

1    be left at the Franksville location?

2        A    No.

3        Q    When did you find out about the reorganization?

4        A    That day.

5        Q    The day of the negotiations?

6        A    The day of the negotiation sessions, Jason

7    Mayfield pulled me aside and said this is what we're

8    doing here today, we're going to be laying off these two

9    employees.

10       Q    Now, there has been some testimony about an issue

11   relating to the men's restroom.  Could you please

12   explain.

13       A    I can.  It looked -- well, it was brought to my

14   attention by the union that our toilet was not

15   functional.  When I went in there and I looked, it

16   appeared that somebody had removed the chain from the

17   flush handle.  So I simply just put the chain back on

18   the flush handle and the issue was fixed.

19       Q    Had there been any issues with the men's toilet

20   prior to that negotiation session?

21       A    No, nor was there after.

22       Q    With respect to determining the budget that you

23   had to prepare, did you -- what did you look at to help

24   you make the determination for what you referred to as

25   revenue and profitability?

1    A    We use several market study reports, one of which

2   is called Dodge Reports.  That just simply tells us how

3   much construction spend is going to be spent in that

4   market on construction.

5        Another report that we have access to is what

6   they basically call a Put in Place report, and a Put in

7   Place report, it basically does the same thing as the

8   Dodge Report, it just tells you how much construction

9   dollars are going to be spent in these markets.

10       And then we would also look at, you know, past

11  and historical growth rates and, you know, our support

12  office expectations, and then we would line it

13  altogether with the budget.

14   Q    So you say you were working on the budget for

15  Franksville in February --

16   A    Uh-huh.

17   Q    -- of 2019, correct?

18   A    Right.

19   Q    And it was to be finalized by when?

20   A    Generally they give you about four weeks to

21  complete a budget, anywhere between three and four

22  weeks.

23   Q    With respect to that budget, how did Franksville

24  do after it was -- the budget was implemented?

25   A    So after the budget was implemented -- you know,

1    the store prior to 2/2018 -- well, prior to about June,

2    July of 2018, the store historically performed very

3    well, anywhere between 30 and 40 percent growth rate.

4         After the union, you know, ramped up their

5    bannering activities, those numbers decreased very, very

6    rapidly.  Last I looked, they were at a negative 47

7    percent decrease rate in revenue.

8    Q    And when was the last time that you looked at the

9    revenue?

10   A    About a week ago.

11   Q    In June of 2019, how did the Franksville profit

12   center compare to the budget, if you recall?

13   A    Significantly under budget.

14   Q    Double digits?

15   A    It's hard to say for that exact month, but I can

16   tell you that -- all I can tell you is that it was

17   decreasing at a very rapid pace.  It was at a 40 percent

18   upswing, and it went to a minus 47 percent decrease

19   over -- basically from approximately I would say May

20   until this point.

21   Q    In the summer of 2019, did the driver work any

22   overtime?

23   A    Can you please refer to which driver.

24   Q    Okay.  Which drivers did you have employed in the

25   summer of 2019?

 1    A    In the summer of 2019, we had one driver, Jamie

 2    Smith.

 3    Q    And to the best of your recollection, did he work

 4    any overtime?

 5    A    As the revenue was decreasing, we had to align

 6    the overtime rate with that, so it's my recollection

 7    that he probably did not work overtime.  In some

 8    instances I don't know that he got 40 hours.

 9    Q    Did Mr. Smith complain to you that he was not

10    working enough overtime or he wanted to --

11    A    No.  Jamie was the kind of employee, he never

12    wanted to work any overtime, he never wanted to do

13    anything extra.  He was only -- he was only working

14    there for the insurance.

15    Q    Is that what he told you, sir?

16    A    He's made comments about that, yeah.

17    Q    Did Mr. Smith indicate to you during the summer

18    of 2019 or maybe the spring through the summer of 2019

19    that he wanted his work schedule changed?

20    A    He did.

21         MR. WIESE:  Objection, relevance.

22         JUDGE ROSAS:  Sustained.

23    BY MS. HILL:

24    Q    Okay.  With respect to Mr. Smith, and you said

25    that you didn't believe that he was working overtime,

1   was he still a full-time employee --

2      A    Yes.

3      Q    -- who could get the benefits that he requested?

4      A    Yep.

5      Q    Did you have any discussions with the union about

6   making -- reducing Mr. Smith's hours?

7      A    I did not.

8      Q    At any of the negotiation sessions, did the union

9   complain about Mr. Smith's hours being reduced?

10     A    They did not.  I will say that --

11          JUDGE ROSAS:  There's no question, sir.

12          THE WITNESS:  Oh, okay.  I'm sorry.

13  BY MS. HILL:

14     Q    With respect to the negotiations, did Mr. Smith

15  attend the negotiation sessions that you were at?

16     A    He did.

17     Q    Looking at Exhibit -- and this is going to be in

18  the black binder, sir.

19     A    Okay.

20     Q    Exhibit 9, sir.

21     A    Okay.

22     Q    Now, this is -- it starts at 0024 and goes to 46.

23  Do you see that, sir?

24     A    Yes.

25     Q    Do you recognize the first two pages of this

1    exhibit, sir?

2      A    I do.

3      Q    Page one, what is this, sir?

4      A    It's the lost revenue due to bannering.

5      Q    Did you prepare this, sir?

6      A    I did not.

7      Q    Who did?

8      A    Bo Bogardus.

9      Q    Did you help him with this, sir?

10     A    I gave him -- okay, so every time a piece of

11   equipment was called off due to -- and when I say called

12   off, I mean the rental period was ended, I had my

13   employees keeping those rental contracts in a folder, so

14   I gave Mr. Bogardus what I had with respect to equipment

15   that was removed from job sites due to bannering.

16     Q    Are these documents that start on 0026 to 0046,

17   are those the documents that you say you put in a

18   folder?

19     A    Yes.  There's a -- yes.

20     Q    Were there any additional documents that were in

21   the folder?

22     A    Not to my knowledge.

23     Q    And to the best of your knowledge -- oh, page two

24   of this exhibit, sir, did you prepare this?

25     A    No.

1     Q    Do you know who did?

2     A    I believe Mr. Bogardus.

3     Q    To the best of your knowledge, sir, are the

4 numbers that are reflected on the first page of this

5 exhibit accurate?

6     A    I would say at some point they probably were.

7 Now, the number is going to be much greater because I

8 believe this was probably prepared months and months

9 ago.

10     Q    While you were at the profit center at

11 Franksville, did you ever deliver equipment?

12     A    Yes.

13     Q    During negotiations, did the union ever complain

14 that you delivered equipment?

15     A    No. In fact we had -- I'm thinking we had TA'd a

16 proposal anything 10,000 pounds or less could be

17 delivered by anybody at the facility.

18     Q    And the piece of equipment or the equipment that

19 you did deliver, sir, was that less than 10,000 pounds?

20     A    Yes.

21     Q    Did you ever tell one of the laid-off bargaining

22 unit mechanics that Sunbelt would be starting over?

23     A    No.

24     Q    Did you ever tell one of the laid-off bargaining

25 unit mechanics that Sunbelt would be hiring new

1    employees?

2        A    No.

3        Q    Did you ever tell one of -- or both of the

4    laid-off bargaining unit mechanics that they could

5    reapply for any new positions that would open up in the

6    district?

7        A    Can you repeat the question, please.

8        Q    Did you ever tell either or perhaps both of the

9    bargaining unit mechanics who were laid off that they

10   could apply for any open position within the district?

11       A    I told them that they were both eligible for

12   rehire, and then I encouraged them to apply for any open

13   positions that they felt they were qualified for.

14       Q    Did you authorize the transfer of any of the

15   employees in the bargaining unit during the two to three

16   weeks prior to the reorganization?

17       A    No.

18       Q    What position did Mario Rivera hold with Sunbelt?

19       A    He was a mechanic.

20       Q    At which location?

21       A    At the Franksville location.

22       Q    At the time of the reorganization, was Mr. Rivera

23   still employed at the Franksville location?

24       A    I believe so.

25       Q    In what position?

1    A    Mechanic.

2    Q    Was he physically working at the location at that

3    time?

4    A    Yes.

5    Q    Do you know where he currently works?

6    A    At the Climate Control Division in Waukesha.

7    Q    And how did that come about?

8    A    There was an open requisition -- they were hiring

9    for a mechanic, and he applied for the mechanic position

10   over there.

11   Q    Did you have anything to do with getting him

12   transferred to that location?

13   A    No.

14   Q    Gary Stamm, do you know him?

15   A    I do.

16   Q    At the time of the reorganization, what position

17   did he hold?

18   A    Equipment rental specialist.

19   Q    How did it come about that he held that position?

20   A    He -- he was an ERS at a point in time prior to

21   my taking over the PC in Franksville.  He then would --

22   right when I first got there, he was requesting a pay

23   increase, a very substantial pay increase because he had

24   some other offers from some other companies, and we

25   essentially told him that the only way we were going to

1  be able to get him the money that he was looking for was

2  to become a driver, and he was a driver for a period of

3  time.  I don't recall.

4       And then we had an equipment rental specialist

5  quit and go to work for a different company, and at that

6  point in time, Gary Stamm applied for the ERS, equipment

7  rental specialist, position, and he was the most

8  qualified candidate for the job.

9  Q   So when he was working as a driver, was he part

10 of the bargaining unit, the group of people who would be

11 covered by the contract being negotiated with the 139?

12 A   He would have been, yeah.

13 Q   Are you aware of a decertification petition that

14 was filed with the National Labor Relations Board?

15 A   I am.

16 Q   And how did you find out about that, sir?

17 A   I was served with some papers from the National

18 Labor Relations Board that there was a decertification

19 petition filed.

20 Q   Would you please look in the black binder,

21 Exhibit 10, sir.  And if you would look at all the

22 documents that are in that tabbed section, sir.

23      JUDGE ROSAS:  Counsel, please refer to exhibits

24 as General Counsel's or Respondent's exhibits, in

25 addition to whatever other designation, but just so the

1    record is clear.

2          MS. HILL:  Okay.  Respondent's Exhibit 10, sir,

3    in the black binder.

4          THE WITNESS:  Yep, got it.

5    BY MS. HILL:

6    Q    Would you please look at all the pages for that.

7          Do you recognize these documents, sir?

8    A    I do.

9    Q    Are these the documents that you referred to as

10   the first time you --

11   A    Yes.

12   Q    -- learned about the decertification?

13   A    Uh-huh.

14   Q    Now, if would you please look -- and please look

15   at the numbers on the lower right-hand corner, sir --

16   A    Yes.

17   Q    -- at 1502.

18   A    Okay.

19   Q    Is any of the handwriting yours, sir?

20   A    No.

21   Q    And in particular, I just want to verify, looking

22   at about a quarter of the way down, section 3a, it

23   appears to be your name there, correct?

24   A    Uh-huh.

25   Q    Is that your handwriting, sir?

1    A    It is not.

2    Q    What, if anything, did you do when you received

3    what has been marked as Respondent's 10, sir?

4    A    I posted it up in the common areas of the

5    building where it had the most foot traffic.

6         MS. HILL:  Your Honor, at this point I would like

7    to have Respondent's Exhibit 10 admitted.

8         MR. WIESE:  I guess I have no objection.  I'd

9    just like to note that it appears to be the same

10   document as General Counsel Exhibit 38.

11        JUDGE ROSAS:  Any objection, Charging Party?

12        MR. RYAN:  No objection.

13        JUDGE ROSAS:  Respondent's Exhibit 10 is

14   received.

15        MS. HILL:  Thank you.

16        (Respondent's 10 was received.)

17   BY MS. HILL:

18   Q    Now, sir, I apologize, what if anything did you

19   do with this?

20   A    I posted it.  I posted it in the break room, I

21   posted it by the time clock, and I posted it on the door

22   between the shop and the showroom.

23   Q    And why did you post it there, sir, at those

24   three locations?

25   A    Because on the bottom of Page R 10, it actually

1   says that it's required to.

2       Q   But why at those particular locations?

3       A   So that every -- I mean those were the most

4   commonly used areas in the building, and I wanted to

5   make sure that everybody saw it.

6       Q   Sir, if you would look at the same binder you're

7   in, if you would look at Respondent's 39.

8       A   Where's that?

9       Q   Tab 39.  It's right behind 15, sir.

10      A   I got it, yep.

11      Q   Do you recognize the three pages of that Exhibit

12  R 39, sir?

13      A   Yes, I do.

14      Q   What are those photographs of, sir?

15      A   On page 39, as I stated, I posted it between the

16  doors of the shop and the showroom, so that would be

17  page 30 -- I'm sorry, Sunbelt 0231.  The picture of 0232

18  is posted in the break room.  And 0233, you can see it

19  posted it there next to the -- on the door next to the

20  punch clock.

21          MS. HILL:  Your Honor, at this point I request

22  that R 39 be admitted.  These are the color copies of

23  what had been the earlier part of another exhibit that

24  General Counsel used.

25          MR. WIESE:  No objection.

1      MR. RYAN:  No objection.

2      JUDGE ROSAS:  Respondent's 39 is received.

3      (Respondent's 39 was received.)

4  BY MS. HILL:

5      Q   Did you ever have a discussion with Mr. Gutierrez

6  about the decertification petition, sir?

7      A   No.

8      Q   Did you ever ask Mr. Gutierrez if his signature

9  was on the decertification petition?

10     A   No.

11     Q   Did Mr. Gutierrez ever tell you that his

12  signature had been forged on any document that was in

13  the profit center?

14     A   No.

15     Q   Mr. Anderson, did you have any input as to who

16  was going to be laid off from your profit center?

17     A   No.

18     Q   And who did?

19     A   Jason Mayfield, our regional vice president.

20     Q   And who is Chris Pender?

21     A   Chris Pender was our service manager.

22     Q   Was he also -- as a service manager, what were

23  his responsibilities?

24     A   To oversee the operation of the shop and provide

25  mentor to the guys that were working in the shop.

1    Q    So when you say guys in the shop, you're

2  referring to the shop mechanics?

3    A    The mechanics, yeah.

4    Q    Did your location have mechanics who were not in

5  the shop?

6    A    We had one mechanic that also assumed the

7  responsibility of fixing the equipment that had issues

8  in the field as well.

9    Q    And what was his title?

10   A    I believe it was road mechanic.  I can't remember

11 if he was a road mechanic or if he was just a shop

12 mechanic assuming those responsibilities.

13   Q    Was that individual mentored by Mr. Pender?

14   A    Yes.

15   Q    Did you ever hear Mr. Pender say anything

16 derogatory about the union?

17   A    No.

18   Q    Did you ever hear Mr. Pender say that the union

19 would not get into the Franksville profit center?

20   A    No.

21   Q    Who assigned work to the shop mechanics and to

22 the individual who would also be out on the road

23 repairing things?

24   A    Can you repeat the question.

25   Q    Who assigned the tasks, the jobs, the repairs

1    that had to be done in the shop to the mechanics?

2    A    Chris.

3    Q    Mr. Pender?

4    A    Yes.

5    Q    When Mr. Stamm became an equipment rental

6    specialist, did he make any deliveries prior to the

7    layoffs?

8    A    Yes.

9    Q    Did any other Sunbelt employee, other than the

10   drivers and you said Mr. Stamm and yourself, make

11   deliveries prior to the layoffs?

12   A    Yes.

13   Q    Who was that?

14   A    Our two sales reps, Tyler Sadowske and Ryan

15   Marifke.

16   Q    Now, did any of the mechanics, shop mechanics

17   ever make any deliveries?

18   A    Yes.

19   Q    Who did?

20   A    Pretty much everybody in the building did at some

21   point in time, so Al, Kyle, Mario, they've all made

22   deliveries.

23   Q    Did Mr. Pender ever do -- handle any of the

24   preventive maintenance on Sunbelt equipment in

25   Franksville prior to the layoffs?

1      A    Yes.

2      Q    Did Sunbelt equipment at the Franksville location

3   have to get washed, cleaned up?

4      A    Yes.

5      Q    Who handled that, sir?

6      A    Everybody.

7      Q    Did you?

8      A    There were times when I did.

9      Q    During the negotiations, did you have to wash any

10  of the equipment?

11     A    Can you repeat the question.

12     Q    During the negotiations that covered several

13  months, did you ever have to wash any of the equipment

14  at your location?

15     A    During the negotiation sessions?

16     Q    Not during the sessions, but that time period.

17     A    Yes.

18     Q    Did you ever hear the union negotiating team

19  complain that you or Mr. Stamm or Mr. Pender were taking

20  work hours away from the bargaining unit members?

21     A    No.

22     Q    Other than the preventive maintenance, did Mr.

23  Pender do any repair work of equipment?

24     A    Yes.

25     Q    Could you describe that, please.

1     A    His skill set was much more advanced than some of

2    the mechanics we had in the shop, so he would handle

3    some of those bigger repairs.

4     Q    Did you have to use outside haulers?

5     A    Yes, very frequently.

6     Q    Could you define just frequently, sir.

7     A    Prior to me getting to -- well, prior to me

8    taking over the Franksville facility, they spent

9    anywhere between -- and these are rough numbers -- 75

10   and $100,000 in outside hauling over the course of a

11   year prior to me getting there.  It then continued.  We

12   were spending call it, I don't know, anywhere between 15

13   to 20,000 a month in outside hauling while I was there.

14   So yes.

15    Q    Did you hire additional drivers to handle that

16   rather than having you use outside haulers?

17    A    During my tenure, no.

18    Q    And why not?

19    A    So obviously -- well, as I was coming in, I was

20   still trying to get a feel for the business, and we

21   would generally try to keep an eye on the number, the

22   outside hauling number for a period of time to make sure

23   that it's consistent before we go and hire another

24   employee.

25         Right about the time that you would consider

1  yourself -- or consider it to be consistent enough to

2  maybe justify hiring another driver, the revenues

3  started tanking due to the bannering activities from the

4  union, so I guess you can say that we just never got

5  there.

6      Q   When you started as the profit center manager,

7  how many drivers were there?

8      A   Two.

9      Q   And those two drivers were who?

10     A   Jamie Smith and Troy Schuls.

11     Q   Okay.  Was Mr. Schuls there at the time -- at the

12 time of the reorganization?

13     A   No.

14     Q   Why wasn't he?

15     A   He had been terminated.  He was delivering a

16 piece of equipment to the airport when they asked --

17         MR. WIESE:  Objection, relevance.

18         MS. HILL:  Well, to show that it wasn't --

19 because there had been some allegations about trying to

20 get rid of bargaining unit members without

21 justification.

22         JUDGE ROSAS:  When was he terminated?

23         THE WITNESS:  I believe he was terminated -- I

24 don't remember the exact month.  I'm guessing May.

25         JUDGE ROSAS:  2019?

1    THE WITNESS:  2000 -- it would be 2019.

2    JUDGE ROSAS:  Overruled.

3    You can answer.

4    THE WITNESS:  Mr. Troy Schuls was delivering a

5    piece of equipment to the airport when they asked for

6    some identification in order to allow him into the

7    airport.  When they ran his driver's license, it was

8    suspended due to failure to pay a fine, and here we have

9    this guy sitting in a commercial motor vehicle with no

10   license.  That was a big deal, and we did terminate him

11   for that.

12   BY MS. HILL:

13   Q    Did the union, during any of the negotiation

14   sessions after that termination, demand an explanation

15   for the termination?

16   A    No.

17   Q    Was Mr. Schuls ever discussed during any of the

18   negotiation sessions?

19   A    No.

20   Q    And what position did Mr. Gutierrez have at your

21   profit center?

22   A    Mechanic I.

23   Q    And why was he terminated?

24   A    For operating a manlift with no harness.

25   Q    During the negotiation sessions that you

1    attended, did the union demand an explanation for why he

2    was terminated?

3        A    No.

4            MS. HILL:  Your Honor, if I could have a couple

5    minutes, I'll try to keep it very brief, just to review

6    my outline, sir.

7            JUDGE ROSAS:  Sure.

8            (Recess.)

9            JUDGE ROSAS:  On the record.

10           Anything else, Counsel?

11           MS. HILL:  Sir, before I pass the witness, I

12   would like to move to have Respondent Exhibit 8 and

13   Respondent Exhibit 9 admitted into evidence, sir.

14           JUDGE ROSAS:  Any objection?

15           MR. WIESE:  Voir dire, please.

16           JUDGE ROSAS:  Sure.

17                    VOIR DIRE EXAMINATION

18   BY MR. WIESE:

19       Q    Mr. Anderson, with respect to Respondent's

20   Exhibit 8, which is in the black binder again and I

21   believe you identified as your bargaining notes --

22       A    Yes.

23       Q    -- are these all the bargaining notes that you

24   took?

25       A    Yes.

1    Q    Were there sessions that you attended that you

2    didn't take bargaining notes?

3    A    No.  I just misplaced them and I don't know where

4    they are, so I gave them everything that I could find.

5    Q    Okay.

6    A    There's a possibility that when I left the profit

7    center in Racine or Franksville, that I may have left

8    them there.

9    Q    But these are the only bargaining notes you have?

10   A    Yes.

11        MR. WIESE:  No objection to Respondent's 8.

12        MR. RYAN:  No objection.

13        JUDGE ROSAS:  Respondent's 8 is received.

14        (Respondent's 8 was received.)

15        MS. HILL:  And No. 9.

16        MR. WIESE:  Voir dire, please.

17                    VOIR DIRE EXAMINATION

18   BY MR. WIESE:

19   Q    Looking at page -- I guess it would be page one

20   of the exhibit, Sunbelt 0024 there.

21   A    Yes.

22   Q    The redacted information next to "Lost Revenue,"

23   do you know what that information was?

24   A    I don't recall.

25   Q    What about the redacted information on the

1    right-hand side of the document below "Total $ Lost"?

2    A    I don't recall.

3    Q    Going over to page three of Respondent's Exhibit

4    9, Sunbelt-0026, the redacted information on this page,

5    do you know what that information is?

6    A    Pricing.

7    Q    Is that information --

8    A    And the name of the person that ordered it.

9    Q    With respect to the pricing information, would

10    that information exist in a non-redacted form at

11    Sunbelt?

12    A    Yes.

13    Q    And if you go through the rest of the exhibit

14    from 26 to the end, is it that same pricing information

15    that's redacted?

16    A    Pricing and the name, yeah.

17        MR. WIESE:  I'll object with respect to General

18    Counsel Exhibit 9.  It's not the best evidence.  It's

19    redacted.  There's unredacted copies that exist.

20        MS. HILL:  Excuse me.  It's Respondent's Exhibit

21    9.

22        MR. WIESE:  Thank you.  Sorry.

23        MS. HILL:  And then with respect to the redacted,

24    we already told General Counsel and the union that we

25    were going to keep the pricing out, it's confidential

1  information, and considering the fact that business was

2  going to the competitors and these documents were being

3  produced, that we didn't want these to be given to the

4  competitors for pricing information.

5          JUDGE ROSAS:  The table --

6          MS. HILL:  And it's not even relevant for

7  purposes of --

8          JUDGE ROSAS:  Well, the table or cover page to

9  Respondent's 9, that is a compilation, that page and the

10 second page, I assume.  With respect to all of the --

11 actually, there's not that many.

12         So the underlying information that's reflected on

13 this chart, Mr. Anderson, the first page of Respondent's

14 Exhibit 9 --

15         THE WITNESS:  Okay, yep.

16         JUDGE ROSAS:  -- where is this gotten from?

17         THE WITNESS:  Where was it gotten from?

18         JUDGE ROSAS:  Uh-huh.

19         THE WITNESS:  I can't answer that because I

20 didn't produce it.

21         MS. HILL:  Your Honor, I suggest that perhaps

22 Mr. Bogardus has already testified about it and --

23         JUDGE ROSAS:  About Respondent's 9?

24         MS. HILL:  Well, not Respondent's, but one of

25 their exhibits, they were asked about it, he was asked

1  about it, and there's information about it.  He was

2  asked about rounding and everything else about it, too,

3  sir.

4       We were trying to show that Mr. Anderson has

5  provided at least, as he said, these documents that were

6  put into a folder and given to Mr. Bogardus based on a

7  request from Mr. Bogardus for this.

8       JUDGE ROSAS:  Mr. Anderson, you generated page --

9  this first page, Respondent's Exhibit 9?

10      THE WITNESS:  No.

11      JUDGE ROSAS:  No, he did not.

12      MS. HILL:  This is Mr. Anderson.

13      JUDGE ROSAS:  Mr. Anderson, you did not give this

14 to Mr. Bogardus?

15      THE WITNESS:  I did not.

16      JUDGE ROSAS:  Okay.  So who generated this

17 document?

18      MS. HILL:  Pages one and two by Mr. Bogardus,

19 okay.

20      JUDGE ROSAS:  But he didn't testify about this

21 specific document.

22      MS. HILL:  Yes, sir, he did.

23      JUDGE ROSAS:  He did?

24      MS. HILL:  Yes.

25      JUDGE ROSAS:  Respondent's 9, is that the same

1    one in his testimony?

2         MS. HILL:  Well, General Counsel's equivalent

3    exhibit.  It's in one of theirs.  I'm sorry, your Honor,

4    I can't remember which one.

5         JUDGE ROSAS:  So you have a counterpart to this

6    Respondent's 9?

7         MR. WIESE:  That's correct, with -- again,

8    with -- so I have a counterpart of pages one and two of

9    Respondent's Exhibit 9 which are marked as --

10        JUDGE ROSAS:  So you don't have an objection with

11   respect to pages one and two?

12        MR. WIESE:  Only with respect to I guess the --

13   to the redacted portion of information which --

14        JUDGE ROSAS:  Is your copy redacted?

15        MR. WIESE:  It is.  And Respondent -- I believe,

16   and correct me if I'm wrong, but the transcript reflects

17   that Respondent's counsel was going to inform me of what

18   that redacted information is, and we were going to fix

19   that issue once we resumed the trial, which has not

20   happened.

21        JUDGE ROSAS:  That's the description of a

22   document at the top or something else after "Lost

23   Revenue"?  I mean it's not an amount, is it?

24        MS. HILL:  Your Honor, I'm sorry, I don't recall.

25   I don't know if it states -- I don't know -- I apologize

1    sincerely to your Honor, I just do not remember.

2         JUDGE ROSAS:  But this is a counterpart to your

3    exhibit, right?

4         MS. HILL:  Yes.

5         MR. WIESE:  That's correct.

6         JUDGE ROSAS:  It's in the same identical form?

7         MR. WIESE:  That's correct.

8         JUDGE ROSAS:  So it is what it is.  But the

9    initial documents that are redacted as to amounts?

10        MS. HILL:  Yes, sir.  That's pricing.  That's

11   something --

12        JUDGE ROSAS:  Sure.

13        MS. HILL:  It's not book value.  It's something

14   that you can find just on the website.  These are

15   negotiated between Sunbelt and particular customers,

16   sir.

17        JUDGE ROSAS:  And these are evidence of a loss or

18   a justification for the steps taken by the Respondent,

19   correct?

20        MS. HILL:  Yes, sir.

21        JUDGE ROSAS:  Okay.  See, the way we handle this

22   is through a confidentiality order that I issue.

23   They're entitled -- you can't have your cake and eat it,

24   too.  This can't go into evidence as evidence of some

25   numerical evidence that isn't evident here.  If you want

1  to establish that.  I'm going to sustain the objection

2  at this point.  If you want to offer the unredacted

3  version of this, then I will reconsider this document,

4  and that document can be placed into an envelope that

5  will be marked --

6        MS. HILL:  A sealed envelope.

7        JUDGE ROSAS:  -- under seal, okay.

8        MS. HILL:  Your Honor, if I'm not mistaken, early

9  on in the proceedings, I had asked for some sort of

10 confidentiality regarding the pricing.  I think I saw a

11 nodding from one of them.

12       As long as it's going to be under seal and for

13 your eyes only or the Board's eyes and it doesn't go any

14 further than that, you know, we can provide --

15       JUDGE ROSAS:  We do it all the time.

16       MS. HILL:  Absolutely.

17       JUDGE ROSAS:  Okay.  So what I'm going to do is

18 I'm going to receive this, let's do it that way, I'm

19 going to receive it conditioned upon the submission into

20 evidence, but to be placed under seal the unredacted

21 version of the rest of Respondent's Exhibit 9, pages

22 three through the end.  Okay?

23       MS. HILL:  Okay.  Your Honor, with respect to --

24 we've discussed the numbers and the confidentiality

25 regarding that.  The name of the individual, because you

1  see it's blackened out, it's redacted at "Ordered By,"

2  is there any reason why that has to be redacted -- has

3  to be unredacted?  Excuse me.

4         JUDGE ROSAS:  Excuse me.  You're saying it's

5  what, it's what?

6         MS. HILL:  We redacted the name of the individual

7  who ordered it.  If you look in the --

8         JUDGE ROSAS:  Why is that confidential?  That's

9  an employee?

10        MS. HILL:  No.  It's a customer's name.

11        JUDGE ROSAS:  Oh, a customer's name, I see.

12        MS. HILL:  Yes, sir.

13        JUDGE ROSAS:  Lost revenue by one customer?

14        MS. HILL:  Okay.  You have the name of the

15  customer, but the individual --

16        JUDGE ROSAS:  I'm talking about the very first

17  page.

18        MS. HILL:  Oh, the first page.  No, no, no.  I'm

19  talking about --

20        JUDGE ROSAS:  Oh, there's no issue there.  I'm

21  sorry.  I was on the wrong page.

22        MS. HILL:  These are the numbers, yeah, these are

23  the numbers that you said can be under seal.

24        JUDGE ROSAS:  No.  Well --

25        MS. HILL:  Can we leave -- do we have to unredact

1  the name of the --

2      JUDGE ROSAS:  I don't think we need --

3      MS. HILL:  Thank you.

4      JUDGE ROSAS:  -- I don't think we need the names

5  of the customers.

6      MS. HILL:  Thank you.

7      JUDGE ROSAS:  Just the amounts.

8      MS. HILL:  Thank you, sir.

9      MR. WIESE:  Your Honor, with respect to page one

10 of the exhibit, are you also ordering an unredacted

11 version of that?

12     JUDGE ROSAS:  But you're telling me that you put

13 it into evidence.

14     MR. WIESE:  I did, with the understanding that we

15 would be provided information about what had been

16 redacted and that that issue would be --

17     JUDGE ROSAS:  Fair enough.  Show it to counsel

18 and see if it's worthwhile for anything, if it's

19 something that's relevant.  I mean maybe after you show

20 it to them.  If it doesn't have to do with revenue

21 itself, it's not a revenue amount, I mean it's not

22 relevant in the ultimate mix, but, you know, if it's --

23 maybe it's something else that's of some importance to

24 you, but -- first show that to counsel, and obviously

25 they're under, you know, a confidentiality order with

1 respect to any of that information as well, to the

2 extent that you show them what that is.

3        MS. HILL:  Okay.

4        JUDGE ROSAS:  Okay.  They're not to divulge that

5 to the client or anything.  So the entire document is

6 being received conditionally on counsel being shown the

7 original unredacted version.

8        (Respondent's 9 was received.)

9        JUDGE ROSAS:  Okay.  Next.

10        MS. HILL:  At this point, now that we have that

11 resolved, your Honor, we'll pass the witness.

12        JUDGE ROSAS:  Okay.  How much cross do you have?

13        MR. WIESE:  It looks like about ten minutes or

14 so.

15        JUDGE ROSAS:  Okay.  Why don't we go ahead.

16        You'd rather get this over with, correct?

17        THE WITNESS:  I drove two hours to get here.

18        JUDGE ROSAS:  All right.

19                    CROSS EXAMINATION

20 BY MR. WIESE:

21    Q   Mr. Anderson, so you -- at the time you became

22 the profit center manager of the Franksville facility,

23 Local 139 already represented the mechanics and drivers

24 at that facility, is that correct?

25    A   Yes.

1    Q    You testified about something called a pro forma.

2    Do you recall talking about that?

3    A    Yeah.

4    Q    And this was something that was put together by

5    Mr. Bogardus, is that --

6    A    Atwell.

7    Q    Dan Atwell?

8    A    Dan Atwell.  He's our director of operations.

9    Q    Is that a written document?

10    A    It was a spreadsheet.

11    Q    And when were you provided this?

12    A    At some point -- I believe it was in May of 2018.

13    Q    Does that document still exist?

14    A    Yes.  I don't have a copy of it, but Mr. Bogardus

15    has a copy of it.  I never was provided a copy of it.

16    We had a meeting where it was -- they presented it to

17    me, but I never actually had a copy of it.

18    Q    And that meeting was in about May of 2018, is

19    that -- does that sound about right?

20    A    Yeah.

21    Q    Okay.  And the pro forma plan that was presented

22    in May of 2018, was that focused solely on the

23    Franksville facility?

24    A    Yes.

25    Q    You also talked a little bit about preparing

1    budgets for fiscal years.  Do you recall that testimony?

2        A    Yeah, uh-huh.

3        Q    So you prepared the budget for fiscal year 2019

4    which went from May 1st of 2018 to April 31st of 2019.

5    Does that sound right?

6             JUDGE ROSAS:  It would be April 30.

7    BY MR. WIESE:

8        Q    Yeah, I may have misspoken.  April 30th of 2019?

9        A    That's correct.

10       Q    What about the fiscal year 2020 budget that went

11   from May 1st of 2019, the currently ongoing April 30th

12   of 2020, were you involved in creating that budget?

13       A    I was only ever involved in preparing one budget

14   during my tenure at -- I may be getting my years messed

15   up because it's very confusing when you're dealing with

16   fiscal years versus calendar years.  In fact, I wish we

17   ran on a calendar year, but we don't, but I've only ever

18   prepared one budget.

19       Q    Do you recall when you started -- when you became

20   the profit center manager at the Franksville facility?

21       A    May of 2018.

22       Q    So with respect to the reorganization at the

23   Franksville facility, you testified that you found out

24   about that through a conversation with Mr. Mayfield, is

25   that correct?

1    A    That's correct.

2    Q    And Mr. Mayfield told you that employees would be

3  laid off as part of that reorganization?

4    A    Yes.

5    Q    And Mr. Mayfield -- you had that conversation

6  with Mr. Mayfield before the August 8th, 2018 bargaining

7  session -- 2019?

8    A    Yes.  He mentioned it when he got there,

9  obviously behind closed doors.

10    Q    You talked about the Franksville facility being

11  under budget.  Do you recall that testimony?

12    A    Under budget, yes.

13    Q    Okay.  And that would be reflected in documents

14  kept by Sunbelt?

15    A    Yes.

16    Q    Like a Consolidated Income Statement, would that

17  contain that information?

18    A    Sure, yes.

19    Q    Is that the primary place where that information

20  would be kept?

21    A    Not typically.  It would be reflected on our

22  monthly financial statements.  We had our finance

23  department put this document together to simplify the

24  data.

25    Q    When you say "this document," which document?

1    A    This Consolidated Income Statement.  He compiled

2  it all into one document to make it very easy to

3  identify the missing of the budget.

4    Q    And when you say "he," who are you talking about?

5    A    I believe it was prepared by a gentleman by the

6  name of Luke Barcley who is our region finance manager.

7         MR. WIESE:  Nothing further.

8         JUDGE ROSAS:  Charging Party?

9         MR. RYAN:  Just a couple questions.

10                     CROSS EXAMINATION

11 BY MR. RYAN:

12   Q    Mr. Anderson, you mentioned Dodge Reports --

13   A    Yes.

14   Q    -- are used in the budget?

15   A    Yep.

16   Q    Do you know what the Dodge Reports are saying

17 about the construction market since the reorganization?

18   A    The Franksville market is thriving.  It's a very

19 hot market if you will.

20   Q    You also talked about some of the costs of using

21 outside haulers?

22   A    Uh-huh.

23   Q    I think you mentioned after you came in, you were

24 spending 15 to 20,000 a month on outside haulers?

25   A    Roughly.

1    Q   Did that number stay fairly consistent through

2  August of 2019?

3    A   Yes.

4    Q   And then you mentioned the discharge of

5  Mr. Gutierrez.  Do you know, did the union take any

6  action in response to this charge?

7    A   Did they --

8        MS. HILL:  Yeah, objection.

9        JUDGE ROSAS:  What's the basis?

10       MS. HILL:  The form, action.  Maybe define it for

11  him.

12       JUDGE ROSAS:  Yeah, if you know.

13       THE WITNESS:  Did they take any action?

14       JUDGE ROSAS:  Do you understand or --

15       THE WITNESS:  I don't understand.

16       JUDGE ROSAS:  Okay.  Rephrase.

17  BY MR. RYAN:

18    Q   Do you know if the union filed an unfair labor

19  practice charge over his discharge?

20    A   I believe they did.

21       MR. RYAN:  I don't have anything further.  Thank

22  you.

23       JUDGE ROSAS:  Any redirect?

24       MS. HILL:  Yes, sir.

25  ///

1                    REDIRECT EXAMINATION

2    BY MS. HILL:

3       Q    Mr. Anderson, you lifted a document.  Is there an

4    exhibit number to it?

5       A    Yes.  It's GCX 30.

6       Q    Thank you.  I saw it flash, I didn't know what it

7    was, so thank you.

8            JUDGE ROSAS:  And that was the document relating

9    to --

10           THE WITNESS:  Consolidated Income Statement

11   Trend.

12           JUDGE ROSAS:  Okay.

13   BY MS. HILL:

14      Q    And you indicated that the monthly outside hauler

15   fees remained consistent through 2019, correct?

16      A    Yes.

17      Q    And what did you attribute that to?

18      A    Well, there was -- there was times when we would

19   send our driver home for the day, and then orders would

20   come up after the fact once he had gone home, so we

21   contacted the outside hauler to make the deliveries for

22   us.

23      Q    Did you ever try to get -- when you refer to the

24   driver, who are you referring to?

25      A    Jamie Smith.

1    Q    Did you ever contact Mr. Smith to get him to come

2  back?

3    A    I did not.

4    Q    And why is that?

5    A    Because Mr. Smith was the kind of person that did

6  not want to work.  He basically -- if you ever asked him

7  if he wanted to work overtime, he would say no.  He

8  would gripe about having to do the runs that he was

9  assigned.  And quite frankly, it was just easier to

10  contact an outside hauler.

11    Q    You indicated that sometimes a customer would

12  call after Mr. Smith would go home.  How much of

13  Sunbelt's -- how much advanced notice do you have, on

14  average, for -- just a moment -- for responding to a

15  customer's request for equipment?

16    A    Above 80 percent of our orders at Sunbelt Rentals

17  come in with less than 24-hours notice, so I would say a

18  very, very large amount of orders would be customers

19  calling in saying I need it right now or I need it very

20  soon.  Does that answer the question?

21        MS. HILL:  That answered the question.  Thank you

22  very much, sir.  No further questions.

23        JUDGE ROSAS:  Any follow-up?

24        MR. WIESE:  No, your Honor.

25        JUDGE ROSAS:  Charging Party, anything?

1          MR. RYAN:  No, your Honor.

2          JUDGE ROSAS:  Thank you, sir.  You're excused.

3    Please do not discuss your testimony with anyone until

4    you're advised by counsel that the case is over.  All

5    right?

6          THE WITNESS:  Okay.

7          JUDGE ROSAS:  Thank you.  Have a good night.

8          MS. HILL:  Your Honor, there was an issue getting

9    back in to the witness room.  He left his personal

10   effects in there.

11         JUDGE ROSAS:  We're off the record.

12              (End of proceedings at 5:12 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATION

2

3

4        This is to certify that the attached proceedings

5   before the National Labor Relations Board (NLRB), Region

6   18, Subregion 30, in the matter of SUNBELT RENTALS,

7   INC., Case Nos. 18-CA-236643, 18-CA-238989 and

8   18-CA-247528, at Milwaukee, Wisconsin, on February 18,

9   2020 was held according to the record, and that this is

10  the original, complete, and true and accurate transcript

11  that has been compared to the recording, at the hearing,

12  that the exhibits are complete and no exhibits received

13  in evidence or in the rejected exhibit files are

14  missing.

15

16

17

18

19

20                    KATHY P. PABICH, CSR

21

22

23

24

25

# OFFICIAL REPORT OF PROCEEDINGS

## BEFORE THE

## NATIONAL LABOR RELATIONS BOARD

In the Matter of:                                    Case No.:     18-CA-236643
                                                                   18-CA-238989
                                                                   18-CA-247528
SUNBELT RENTALS, INC.

                              Respondent

And

INTERNATIONAL UNION OF
OPERATING ENGINEERS LOCAL 139,
AFL-CIO
                              Charging Party

Place:     Milwaukee, WI
Date:      02/19/20
Pages:     1090-1301
Volume:    5

## OFFICIAL REPORTERS

**Veritext Legal Solutions**
**Mid-Atlantic Region**
**1801 Market Street – Suite 1800**
**Philadelphia, PA 19103**
**888-777-6690**

1           UNITED STATES OF AMERICA

2      BEFORE THE NATIONAL LABOR RELATIONS BOARD

3           REGION 18 - SUBREGION 30

4  _____

5  In the Matter of:              |

6  SUNBELT RENTALS, INC.,         |

7           Respondent,           |

8     and                         | Case Nos.: 18-CA-236643

9  INTERNATIONAL UNION OF         |        18-CA-238989

10 OPERATING ENGINEERS LOCAL 139, |        18-CA-247528

11 AFL-CIO,                       |

12          Charging Party.       |

13 _____|

14

15

16

17

18      The above-entitled matter came on for hearing

19 pursuant to notice, before ADMINISTRATIVE LAW JUDGE

20 MICHAEL ROSAS, at the National Labor Relations Board,

21 Subregion 30, 310 West Wisconsin Avenue, Suite 450W,

22 Milwaukee, Wisconsin, on Wednesday, February 19, 2020,

23 at 8:33 a.m.

24

25

```
 1                 A P P E A R A N C E S

 2

 3   On behalf of the General Counsel:

 4        MR. TYLER J. WIESE, ESQ.
          NATIONAL LABOR RELATIONS BOARD
 5        Eighteenth Region
          Federal Office Building
 6        212 3rd Avenue S, Suite 200
          Minneapolis, Minnesota 55401
 7        (952) 703-2891
          tyler.wiese@nlrb.gov
 8
     On Behalf of the Respondent:
 9
          MS. PATRICIA J. HILL, ESQ.
10        SMITH, GAMBRELL & RUSSELL, LLP
          50 North Laura Street
11        Jacksonville, Florida 32202
          (904) 598-6100
12        pjhill@sgrlaw.com

13   On behalf of the Charging Party:

14        MR. PATRICK N. RYAN, ESQ.
          BAUM, SIGMAN, AUERBACH & NEUMAN, LTD.
15        200 West Adams Street, Suite 2200
          Chicago, Illinois 60606
16        (312) 236-4316
          pryan@baumsigman.com
17
     Also Present:
18
          MICHAEL ERVIN
19        Union organizer

20

21

22

23

24

25
```

1                    I N D E X

2
                                              VOIR
3   RESPONDENT        DX    CX    RDX   RCX    DIRE
    WITNESSES:
4

5   ROBERT RIVERA    1093  1121  1131  1133    --
                           1129
6
    REBEL STROHMEYER 1134  1149   --    --     --
7                          1150

8   CHRISTOPHER PENDER 1152 1161  --    --     --

9   MARIANO RIVERA   1171  1189   --    --     --
                           1194
10
    STEVEN BUFFALO   1199   --    --    --     --
11
    DANIEL MARSOLEK  1270   --    --    --     --
12

13

14                 E X H I B I T S

15

16
    EXHIBIT          FOR IDENTIFICATION   IN EVIDENCE
17

18  GENERAL COUNSEL

19     1(LL)                 1281            1281

20

21  RESPONDENT

22     R 11                  1139            1148
       R 40                  1199            1202
23

24

25

VERITEXT LEGAL SOLUTIONS
1801 MARKET STREET - SUITE 1800 - PHILADELPHIA PA 19103 -- 888-777-6690

 1                  P R O C E E D I N G S

 2                              (Time Noted: 8:33 a.m.)

 3          JUDGE ROSAS:  Next witness.  On the record.

 4          MS. HILL:  Robert Rivera, sir.

 5          (Whereupon,

 6                      ROBERT RIVERA,

 7     was called as a witness by and on behalf of the

 8     Respondent and, after having been duly sworn, was

 9     examined and testified as follows:)

10          JUDGE ROSAS:  Please have a seat.  Please state

11     your name and provide us with an address.

12          THE WITNESS:  Yes.  Robert Rivera.  And the

13     address is W231 N1125 County Highway F, as in Frank,

14     Waukesha, Wisconsin, 53186.

15                      DIRECT EXAMINATION

16     BY MS. HILL:

17     Q    Mr. Rivera, who is your employer, sir?

18     A    Sunbelt Rentals.

19     Q    Since when have you worked for Sunbelt?

20     A    August of 2014.

21     Q    What positions have you held, sir, with Sunbelt?

22     A    Outside sales representative and profit center

23     manager.

24     Q    When did you become a profit center manager?

25     A    Approximately one year after I started.

1    Q   About 2015?

2    A   Correct.

3    Q   Which location were you assigned to as a profit

4  center manager when you started?

5    A   Waukesha.

6    Q   And which division are you in?

7    A   General Tools.

8    Q   Do you currently hold the position of profit

9  center manager?

10   A   Yes, I do.

11   Q   What is the territory for your -- currently for

12  your Waukesha profit center?

13   A   The south side of Milwaukee to Port Washington,

14  and from the lakefront to the Whitewater area.

15   Q   Are you familiar with the Franksville profit

16  center?

17   A   Yes.

18   Q   And how are you familiar with it?

19   A   I'm the profit center manager for that location

20  as well.

21   Q   So you're handling two profit centers at the same

22  time?

23   A   Correct.

24   Q   When did you become the profit center manager for

25  Franksville?

1    A    In August of 2019.

2    Q    Does your Waukesha profit center, does its

3    territory also include Franksville's territory?

4    A    No.  We have separate territories.

5    Q    Are you familiar with the reorganization of the

6    Franksville profit center?

7    A    Yes.

8    Q    How did you learn about it?

9    A    I was notified by Jason Mayfield.

10    Q    And what did Mr. Mayfield tell you?

11    A    He told me that we are going to reorganize that

12    location and asked me to be the profit center manager

13    for that location as well.

14    Q    Did he give you any specifics about how it was

15    going to be reorganized?

16    A    Yeah.  He says -- he said because of the volume

17    of that store has such high cash transactions anyway,

18    that we're going to basically be more or less like a

19    satellite location.

20    Q    Approximately when did Mr. Jason have --

21    Mr. Mayfield have this conversation with you?

22    A    It was in August.

23    Q    Do you know Mario Rivera?

24    A    Yes.

25    Q    And who is he?

1    A   He is my brother.

2    Q   Are you aware of where -- who does Mr. Mario

3 Rivera work for?

4    A   He works for Bo Bogardus at the Climate Control

5 Division.

6    Q   And do you know when he started working for

7 Climate Control?

8    A   I'm honestly not sure of the date.

9    Q   Did he work for any other division for Sunbelt?

10    A   He was with General Tools, Racine, Franksville.

11    Q   Do you know how Mario was able to get transferred

12 to Climate Control?

13    A   He worked for a few years with Bo Bogardus when

14 Bo was the district manager for our General Tools, so he

15 knew him from prior, and the position was open, so I

16 would speculate that's how he applied for it.

17    Q   Well, we don't want you to speculate, but did you

18 have -- did you help Mario in any way to get that

19 transfer to Climate Control?

20    A   No.  I have no dealings with Climate Control.

21    Q   When did you hear about Mario's transfer to

22 Climate Control?

23    A   It would have been in August, because he was no

24 longer at that -- in Franksville when I got there.

25    Q   How many days per week do you physically work in

1  the Franksville location?

2      A    One to two days basically.

3      Q    And then the rest of the time you're physically

4  at the Waukesha profit center?

5      A    Correct.

6      Q    Does the Franksville profit center currently have

7  a shop foreman?

8      A    No.  They have a service manager.

9      Q    What are the job responsibilities for a service

10 manager?

11     A    To do the administrative work, filing warranties,

12 doing work orders, billing customer damage, ordering

13 parts, checking in equipment.

14     Q    And when you say "checking in equipment," what

15 does that entail?

16     A    When rental equipment is returned by a customer

17 or transferred from a different location, just to make

18 sure everything is in safe operating conditions.

19     Q    Does it ever require when a piece of equipment is

20 returned, that it has to be cleaned?

21     A    Yes.

22     Q    All right.  Are there any actual tests that a

23 service manager would do on a piece of equipment that

24 would come into the shop after a rent?

25     A    We have what's called SMF, a safety data sheet.

1  They go through the checked box and make sure each piece

2  is safe and operating before the next rental.

3      Q    And do you have a service manager at your

4  location, sir?

5      A    Yes, I do.

6      Q    In Waukesha?

7      A    Yes.

8      Q    Okay.  And do the job responsibilities for the

9  two locations for a service manager differ?

10     A    Not really, no.

11     Q    Does the service manager in Waukesha ever have to

12  clean, you know, wash up a piece of equipment that's

13  been returned?

14     A    Yes.

15     Q    And does that happen also in Franksville?

16     A    Yes.

17     Q    And did that happen before the reorganization of

18  Franksville, if you know?

19     A    It happens everywhere.

20     Q    When you've worked for Sunbelt, did you work

21  anywhere else for Sunbelt other than in Wisconsin?

22     A    Yes.  Coral Springs, Florida.

23     Q    And what position did you have there, sir?

24     A    Profit center manager.

25     Q    Does the Waukesha profit center have walk-in

1   customers?

2       A   Waukesha, yes.

3       Q   Do you have any idea what percentage of their

4   customers?

5       A   Very minimal.  20, 25 percent.

6       Q   How does that compare to the Franksville

7   location?

8       A   The Franksville location is high cash

9   transactions which is, I would say, over 60 to 70

10  percent.

11      Q   When you were the profit center manager just for

12  the Waukesha profit center, did you deliver equipment?

13      A   Yes.

14      Q   What type of equipment?

15      A   Small equipment.

16      Q   How would you define small equipment?

17      A   Anything that I can put in the back of a pickup

18  truck or tow on my hitch.

19      Q   And the weight on something like that, sir?

20      A   It would have to be under 10,000 pounds.

21      Q   And as the, I guess you would say, part-time

22  profit center manager for the Franksville location, have

23  you had to deliver any equipment from that location?

24      A   Yes.

25      Q   And what type of equipment?

1    A    Small, small items that can fit on the back of my

2  truck, I guess.

3    Q    For the -- what positions at the Franksville

4  location report to you?

5    A    All of the positions.

6    Q    And those are?

7    A    The ERS, equipment rental specialist, OSRs,

8  outside sales representatives, operational manager, and

9  the service manager.

10   Q    Do your outside sales representatives for the

11  Franksville profit center deliver equipment?

12   A    Yes.

13   Q    And again, what type?

14   A    The same as I do.

15   Q    Do you know Chris Pender?

16   A    Yes.

17   Q    And what position does Mr. Pender currently have?

18   A    He is a shop mechanic at the Waukesha location.

19   Q    Prior to working as a shop mechanic at the

20  Waukesha location, where did he work?

21   A    Franksville service manager.

22   Q    Did you ever hear Mr. Pender make any comments

23  about the union never getting into the Franksville

24  location?

25   A    No, ma'am.

1    Q    Were you aware that Sunbelt and Local 139 were

2  engaged in negotiating a labor contract?

3    A    Yes.

4    Q    Did anyone at Sunbelt tell you that Sunbelt was

5  not going to reach an agreement with the 139?

6    A    No, ma'am.

7    Q    Now, you mentioned that you have an operations

8  manager for the Franksville location.  Whose decision

9  was it to have an operations manager?

10    A    That was a discussion that Jason Mayfield, my

11  boss, and myself had in order to keep me to be able to

12  keep focus on Waukesha, so assist me at that location,

13  so we came up with a right-hand man, an operational

14  position, assistant manager.

15    Q    Do you have an operations manager for your

16  Waukesha location?

17    A    No, I do not.

18    Q    Sir, what is the weight of a skid-steer?

19    A    8 to 9,000 pounds.

20    Q    And what is a weight of a track skid loader?

21    A    Roughly the same, 8 to 9,000 pounds.

22    Q    Does the Franksville location have a road

23  technician?

24    A    No, it does not.

25    Q    Does your Waukesha location have one?

1     A    Yes, they do.

2     Q    Do you have one or more than one?

3     A    I have three.

4     Q    And when did you hire each of those road

5    technicians?

6     A    The first was 2015.  The second one was

7    roughly -- that was 2015.  And the last one was January

8    of 2020.

9     Q    How did you go about acquiring a third road tech

10   in January of 2020?

11    A    We posted the position internally and externally

12   and did interviews.

13    Q    Where was this job posting externally?

14    A    To my knowledge, Indeed and various other,

15   LinkedIn.

16    Q    And when you post -- since you've been the profit

17   center manager for the Waukesha location, have you had

18   to post externally for jobs other than just this road

19   tech?

20    A    Yes.  The process has been the same since I

21   started five years ago.

22    Q    So for five years, anytime you need a new job to

23   be filled, you would post it internally and on the same

24   external sites, correct?

25    A    Correct.

1    Q    Do you know Kyle McKellips?

2    A    Kyle McKellips, a mechanic for Racine, yes.

3    Q    Okay.  And how many external candidates applied

4  for the job as the road tech?

5    A    At least a half a dozen.

6    Q    Was Mr. McKellips one of them?

7    A    No, not to my knowledge.

8    Q    Did an Al Romanowski apply for the road tech

9  position that was posted and you filled in January of

10  2020?

11    A    No, he did not.

12    Q    The candidate who was ultimately hired in January

13  of 2020, was he an internal or external candidate?

14    A    External.

15    Q    Sir, you have two binders in front of you.  I

16  would like you to please open the blue binder, and

17  you'll see tabs on the side.  They're numbered.  Would

18  you please go to 25.

19        JUDGE ROSAS:  General Counsel's 25.

20        THE WITNESS:  Page 1.

21  BY MS. HILL:

22    Q    For 25, do you see a series of pictures, sir,

23  colored photographs?

24    A    Yes, I do.

25    Q    All right.  Now, you're going to see -- in the

1   bottom middle of the page, you'll see GCX 25, then over

2   to the right of that, you'll see in white, it says Page

3   1 of 45.

4       A    Yes.

5       Q    I'm going to be referring to certain pages by the

6   numbers over on that right side.  Okay?

7       A    All right.

8       Q    All right.  Let's start on Page 1, sir.  What

9   pieces of equipment do you see in that photograph?

10      A    I see a track skid-steer and an air compressor.

11      Q    Now, you've already identified the weight for the

12  track skid-steer.  What is the weight for that

13  particular air compressor, if you know, sir?

14      A    It would have to be around 2500 pounds.

15      Q    I'm sorry, one more time, I couldn't --

16      A    About 2500 pounds.  It looks like a 260 air

17  compressor.

18      Q    Thank you.  If you would please go to Page 5.

19      A    Okay.

20      Q    Do you see any equipment there?

21      A    There's something on the upper deck.  I don't

22  know what that is.

23      Q    Would you please turn to Page 6.  What do you see

24  there, sir?

25      A    A service truck.

1    Q    And do you recognize where this service truck is

2    located?

3    A    In this picture?

4    Q    In this picture.

5    A    It looks like it's outside one of the bays near

6    the front gate.

7    Q    Of which profit center?

8    A    Racine, 776.

9    Q    Now, is this service truck assigned to Racine

10   currently?

11   A    No, it is not.

12   Q    Where is it assigned to?

13   A    Waukesha.

14   Q    Do you know when it was assigned to Waukesha?

15   A    It would have been September, October time frame.

16   Q    Thank you.  If you would please turn to Page 7,

17   sir.  There seems to be a Sunbelt truck there, correct?

18   A    Yes.

19   Q    Can you identify the piece of equipment on the

20   flatbed of the truck?

21   A    That is a micro backhoe.

22   Q    Do you know the weight for that piece of

23   equipment, sir?

24   A    Roughly 2,000 pounds.

25   Q    Which profit center, if you know, is this piece

1    of equipment assigned to?

2        A    It's Waukesha.

3        Q    And would this be a piece of equipment that would

4    be considered a small, small equipment?

5        A    Yes.

6        Q    Now, if you would please turn to Page 9, sir.

7    Can you identify the pieces of equipment on that flatbed

8    there, sir.

9        A    A micro backhoe.  Some skid-steer tires.  It

10   looks to be a one-ton micro roller.  That's all I can

11   make out.

12       Q    Any of the pieces of equipment on -- you said one

13   piece was one ton, so 2,000 pounds?

14       A    Correct.

15       Q    And you already identified the weight for the

16   micro backhoe.

17            The tires, how much would they weigh, if you

18   know?

19       A    Roughly, if there's four on there, maybe, you

20   know, 5, 600 pounds.

21       Q    So would the total weight of all of the equipment

22   on this vehicle be less than 10,000 pounds?

23       A    Yes, ma'am.

24       Q    All right.  If you would please look at Page 10.

25   Is that a Sunbelt truck, sir?

1    A    No, it is not.

2    Q    Can you determine whose vehicle that is?

3    A    That's a Paccar from Ryan Enterprise.

4    Q    You said Ryan Enterprise?

5    A    Correct.

6    Q    What piece of -- or pieces of equipment do you

7    see on this vehicle?

8    A    A small -- a small boom lift, two scissor lifts

9    and a roller.

10   Q    Any of this equipment, to the best of your

11   knowledge, assigned to the Franksville location?

12   A    Without looking at the asset numbers, I can't

13   tell you.

14   Q    Are there any booms at the Racine location?

15   A    No, ma'am.

16   Q    Page 11, sir.  What pieces of equipment do you

17   see here, sir?

18   A    From left to right, I see a small Genie lift, a

19   yellow hybrid scissor lift, a walk-behind trencher, air

20   compressor, it looks like a walk-behind rototiller.

21   That's good.

22   Q    That red piece of equipment near the orange

23   cones, what is that, sir?

24   A    It looks like a walk-behind either rototiller or

25   like Harley rig.

1    Q    You mentioned a yellow hybrid, is that correct?

2    Is that what you called one of those pieces?

3    A    Yes, in the left bay.

4    Q    And why isn't that piece of equipment green?

5    A    Because hybrid -- we have several hundred pieces

6    of hybrid that are still factory color from the

7    acquisition of Milwaukee High Lift.

8    Q    That walk-behind I believe you said tiller, the

9    red piece of equipment --

10    A    Correct.

11    Q    -- why isn't that green, sir?

12    A    That's factory color.  That's how -- that's how

13    we order it.  That's how it comes.

14    Q    And that's how it stays?

15    A    Correct.

16    Q    Are any of the pieces of equipment that you

17    identified in this photograph, sir, do they weigh in

18    excess of 10,000 pounds?

19    A    Definitely not.

20    Q    If you would please turn to Page 14, sir.

21    A    Okay.

22    Q    What equipment do you see in this photograph,

23    sir?

24    A    On the left is a zero-turn Toro lawnmower and a

25    Vemeer wood chipper.

1    Q    Now, this lawnmower appears to be bigger than the

2    last one you identified.  Does this one weigh more than

3    10,000 pounds?

4    A    No.  About 2500 pounds, 2,000 pounds.

5    Q    And the wood chipper, how much does that weigh?

6    A    It looks to be roughly a nine-inch chipper.  I

7    would say probably 6,000, 7,000 pounds.

8    Q    Page 15, sir.  All right.  There appears to be at

9    least two vehicles there, sir.  It looks like a trailer

10   on the far right, and then there's a white vehicle.  Do

11   you recognize the white pickup truck?

12   A    It looks like my operations manager's truck for

13   Racine.

14   Q    What is that piece of green equipment on the

15   trailer, sir, behind the white truck?

16   A    That's a Tennent T20 super scrubber.

17   Q    How much does that piece of equipment weigh, sir?

18   A    It's made out of plastic, so 2,000 pounds.

19   Q    Page 16, sir.  What is that piece of equipment,

20   sir?

21   A    That looks to be an AWP-30S.

22   Q    Can you recognize which profit center this is at?

23   A    That looks like the south door of the Racine

24   location.

25   Q    And can you determine what is being done to this

 1  piece of equipment?

 2     A   Not exactly.

 3     Q   Okay.  And do you know the approximate weight for

 4  this piece of equipment?

 5     A   15 -- it would be like 1,000 pounds.

 6     Q   And do you recognize -- I realize it's not a very

 7  flattering picture of the individual there.  Do you

 8  recognize the person there, sir?

 9     A   I can't.  There's no face.  I can just see a hat.

10     Q   Page 23, sir.

11     A   Okay.

12     Q   What is the piece of equipment connected to the

13  white pickup truck?

14     A   That is a light tower.

15     Q   How much does that weigh?

16     A   Around 2500 pounds.

17     Q   Do you recognize the white truck that is pulling

18  it?

19     A   It looks like my outside sales rep, Tyler, his

20  truck.

21     Q   All right.  Page 24.  Do you see a -- in the

22  foreground, do you see a piece of equipment there, sir?

23     A   That's that zero-turn Toro lawnmower.

24     Q   You can see some green it looks like through an

25  open door behind it.  Can you determine what that is,

1  sir?

2     A   No, I cannot.  It has a Wacker symbol on it,

3  that's it.

4     Q   If you would turn to Page 25, please.  I'll try

5  starting by color.  The orange piece of equipment, what

6  is that?

7     A   That's a backhoe loader.

8     Q   And why is this piece of equipment -- it looks

9  like it's not on a truck or anything, it's just sitting

10  there on the ground.  Why is it there?

11     A   That's a -- I asked the same question when I got

12  there, and it was a customer purchased it and staged

13  there waiting for them to set up trucking.

14     Q   How long did it take until the customer picked it

15  up?

16     A   Looking at the time of the picture, it was August

17  28th -- I'm sorry, October 28th, and I started in August

18  there, so several months.

19     Q   But eventually did the customer pick it up?

20     A   Yes, ma'am.

21     Q   And did the customer arrange for the hauling of

22  it?

23     A   Correct.

24     Q   Any of the other green pieces of equipment that

25  you see, and there appears to be a Chrome-colored one in

1 front, a trailer, actually two of them there, any of

2 those pieces of equipment 10,000 pounds or more, sir?

3  A No, ma'am.

4  Q Page 26, sir.  What pieces of green equipment do

5 you see there, sir?

6  A I see two -- two skid loaders there.

7  Q How much do they weigh, if you know, sir?

8  A Approximately 8 to 9,000 pounds.

9  Q The piece of equipment that's black and has

10 "Deere" on it, what is that?

11  A It's a mini excavator.

12  Q Any idea how much that weighs, sir?

13  A No.  I cannot see a model.  I do not know.

14  Q Page 20 -- let's see, that would be Page -- I'm

15 going over some of these, your Honor, and I'm trying not

16 to be cumulative on this, your Honor.

17   29, what pieces of equipment do you see here,

18 sir?

19  A I see a rough-terrain forklift, and on the left,

20 an aerial tow-behind boom, possibly two of them, a Deere

21 mini excavator, and a Bobcat mini excavator.

22  Q All of these pieces of equipment 10,000 pounds or

23 less, sir?

24  A No.

25  Q Okay.  Which one isn't?

1    A    The rough-terrain forklift would be heavier than

2    that.

3    Q    And why is that one there, sir?

4    A    To my knowledge, it was a customer pickup and

5    return that they did themselves.

6    Q    So they dropped it off there?

7    A    Correct.

8    Q    And did that rough-terrain piece of equipment

9    stay there or did it go someplace else?

10   A    No.  It has to leave there.  It's not allowed

11   there.

12   Q    Page 30, sir.  And in fact 30, 31 and 32, do they

13   appear to be the same piece of equipment?

14   A    Yes.  Different angles.

15   Q    What is this equipment on the trailer?

16   A    The scissor lift is in the back and then a boom,

17   aerial boom in the front.

18   Q    Is that a Sunbelt truck that's hauling it?

19   A    No.  That's Putter's Trucking.

20   Q    That's an outside hauler?

21   A    Yes, ma'am.

22   Q    Do you know which profit center this -- these

23   three photographs are of?

24   A    Where this is located?

25   Q    Yes.

1    A    Franksville.

2    Q    So why is Putter picking up this equipment or

3  dropping it off?

4         MR. WIESE:  Objection, speculation.

5  BY MS. HILL:

6    Q    If you know.

7         JUDGE ROSAS:  If you know.

8  BY MS. HILL:

9    Q    Yeah.

10   A    Not offhand.

11   Q    Okay.  Page 33, sir.  What pieces of equipment do

12 you see here, sir?

13   A    There's a Cushman cart, a --

14   Q    Is that the white one on the left?

15   A    Correct, from left to right.

16   Q    Okay.  Why isn't that one green?

17   A    It's a Cushman color.  It could be yellow.  It

18 could be white.  To my knowledge, I'm not even sure if

19 we have any green ones that we own.

20        JUDGE ROSAS:  Cushman what?

21        THE WITNESS:  Cart.

22 BY MS. HILL:

23   Q    And continue on.  I'm sorry.

24   A    And then a stump grinder, a Toro Dingo, a small

25 tilt trailer, another stump grinder, on the ground and

1    one on the trailer, a chipper, wood chipper, and a

2    roller.

3        Q    That roller on the far right, how much does that

4    weigh?

5        A    That would be --

6        Q    If you know.

7        A    Not exactly.

8        Q    All right.  Let's go to Page 35, sir.  There

9    appears to be a piece of orange equipment there, and

10   what is that?

11       A    That is a 260 Sullivan compressor.

12       Q    How much does that weigh, sir?

13       A    2600 pounds.

14       Q    Over to the far left, there appears to be it

15   looks like some sort of scoop.  What is that, sir?

16       A    That is a power buggy.

17       Q    And how much does that weigh, sir, if you know?

18       A    Roughly about 1,000 pounds.

19       Q    Any of the pieces of equipment that you see here,

20   sir, if you know, do they weigh more than 10,000 pounds?

21       A    The ones I can identify, no.

22       Q    All right.  I think that should do it for the

23   equipment photographs, sir.  You can close up that

24   binder, please.

25            Do you know a company by the name of Pirtek,

1    P-I-R-T-E-K?

2        A    Yes, ma'am.

3        Q    And what is that?

4        A    That's a repair shop that we use.

5        Q    When you say "we use," which profit center?

6        A    Most of them, Waukesha, Fond du Lac, Franksville,

7    I believe Wausau all use them.

8        Q    Since when?

9        A    Four, five years.

10       Q    What does Pirtek do for those locations?

11       A    They repair mainly hydraulic hoses and cylinders.

12       Q    So something that some of the equipment uses?

13       A    Correct.

14       Q    All right.  With respect to the customers for the

15   Franksville location, are you familiar with the customer

16   base for that location?

17       A    Will you rephrase the question.

18       Q    Okay.  You have OSRs at that location, correct?

19       A    Yes.

20       Q    Those OSRs call on customers --

21       A    Correct.

22       Q    -- out in the field, correct?

23       A    Yes.

24       Q    Sometimes referred to as the OSRs kicking the

25   dirt to bring in the business?

1          MR. WIESE:  Objection, leading.

2          JUDGE ROSAS:  Sustained.  Stricken.

3    BY MS. HILL:

4      Q    With respect to those OSRs, are you familiar with

5    the customers that they call on?

6      A    Yes.

7      Q    Have any of the customers that have been called

8    on at the Franksville location, have they stopped doing

9    business with Sunbelt at that location?

10     A    Yes.

11     Q    For your Waukesha profit center, are you aware of

12   any customers that your location has lost?

13     A    Yes.

14     Q    Do you know how it came about that the customers

15   were lost at your Waukesha location?

16     A    The customers notified my outside sales reps and

17   they've also said to myself either through a caller

18   saying they don't want to be harassed with the

19   inflatables and the signs and the picketers, so until we

20   get things resolved, they're not going to do business

21   with us.

22     Q    Have you attempted to regain the business from

23   those customers?

24     A    No.

25     Q    For the -- and I'm referring first to the

1    Waukesha location.  Have you tried or requested your

2    staff to try to recover the business from the

3    Franksville location?

4       A    Yes.

5       Q    Have they been successful?

6       A    No.

7       Q    What have you requested -- what methods have you

8    suggested to your OSRs to try to recover the lost

9    customers?

10      A    Calling customers.  Just think outside the box.

11      Q    Just keep contacting the customers?

12      A    Correct.

13      Q    All right.  Gary Stamm, do you know him?

14      A    Yes.

15      Q    What position does he hold?

16      A    Equipment rental specialist.

17      Q    At which location?

18      A    Franksville.

19      Q    So basically at Franksville he is behind the

20   counter?

21           MR. WIESE:  Objection, leading.

22           JUDGE ROSAS:  I'll allow that.

23           THE WITNESS:  Yes.

24   BY MS. HILL:

25      Q    Does Mr. Stamm have any other responsibilities

1    other than working at the counter?

2    A    He washes equipment, checks in equipment, handles

3    the outside hauler, dispatching.

4    Q    And you indicated you have ERS's at your Waukesha

5    location, too?

6    A    Correct.

7    Q    Do your ERS's at the Waukesha location do

8    anything different from what Mr. Stamm does?

9    A    They do exactly the same thing.

10    Q    Are you familiar with United Rentals?

11    A    Yes.

12    Q    Are you familiar with NES?

13    A    I knew of them.

14    Q    Was there an NES location in Wisconsin?

15    A    On the north side of Milwaukee.

16    Q    And is that NES location still in existence?

17    A    No, it is not.

18    Q    And what happened to it?

19    A    It got purchased by United Rentals.

20    Q    And then what happened?

21    A    They closed the location down.

22    Q    And do you know why it was closed down?

23         MR. WIESE:  Objection, relevance.

24         MS. HILL:  To show a little bit of why the 139

25    has been sending the work -- the business over to

1  United.

2       JUDGE ROSAS:  Okay.  All right.  All right.  We

3  know where you're going with it.

4       MS. HILL:  Yep.

5       JUDGE ROSAS:  And you're talking about what time

6  period?

7       MS. HILL:  I can ask what time period that was.

8       JUDGE ROSAS:  All right.  Go ahead.

9  BY MS. HILL:

10    Q   All right.  Do you recall when United purchased

11  NES?

12    A   It would have been roughly five, five years ago.

13    Q   And how long after the purchase did United close

14  it down?

15    A   Shortly after that, four or five years ago.

16    Q   Was that a unionized facility?

17    A   To my knowledge, yes.

18    Q   Do you know which union?

19    A   (Shakes head.)

20       MR. WIESE:  Objection, relevance.

21       JUDGE ROSAS:  I'll allow it.

22       MS. HILL:  Well, he just answered it.

23       JUDGE ROSAS:  You don't know?

24       THE WITNESS:  No, I do not know.

25       MS. HILL:  Okay.  No further questions at this

1    time.  I pass the witness.

2            JUDGE ROSAS:  Cross?

3            MR. WIESE:  Five minutes, please.

4            JUDGE ROSAS:  Sure.  Off the record.

5            (Recess.)

6            JUDGE ROSAS:  All right.  Back on the record.

7            Are you ready, General Counsel?

8            MR. WIESE:  Yes, yes, I am.  Thank you.

9                        CROSS EXAMINATION

10   BY MR. WIESE:

11       Q    Good morning, Mr. Rivera.  My name is Tyler

12   Wiese.  I'm the attorney with the NLRB.  I'm going to be

13   asking you a couple of questions today.  Okay?

14       A    All right.

15       Q    Did you speak with anyone besides Ms. Hill in

16   preparation for your testimony today?

17       A    No, sir.

18       Q    Did you review any documents in preparation for

19   your testimony today?

20       A    Documents, no.

21       Q    Did you review any transcripts?

22       A    No.

23       Q    With respect to the territories of the stores

24   that we talked about, the Franksville and Waukesha

25   territories or stores, who covers the southern portion

1   of Milwaukee, the area south of Milwaukee down to

2   Illinois?

3       A   That's Franksville.

4       Q   And what about if there is large equipment that

5   needs to go to that territory, who covers that?

6       A   Whatever location has the equipment available.

7       Q   And that would include the Waukesha store?

8       A   Mostly Waukesha and Sun Prairie.

9       Q   And those would be other Sunbelt stores, correct?

10      A   Correct.

11      Q   There's no union employees at either one of those

12  stores?

13      A   No, sir.

14      Q   Are you familiar with any other profit center

15  managers who cover two Sunbelt stores?

16      A   I'm told -- this came up for conversation.

17  Michigan has one.  I believe Ohio has one.  There are

18  various in parts of the country.

19      Q   You mentioned that you had a discussion with

20  Jason Mayfield about hiring an operations manager at the

21  Franksville location.  Do you recall that testimony?

22      A   Yes, yes.

23      Q   Okay.  When did you have that discussion with

24  Mr. Mayfield?

25      A   It was the early part of August.

1    Q    Did Local 139 come up at any point during that

2  discussion?

3    A    No.  It was just about operating the store.

4    Q    What was that?

5    A    It was just about operating the store.

6    Q    Okay.  Who is the current service manager at the

7  Franksville location?

8    A    John Sheridan.

9    Q    When did Mr. Sheridan start?

10    A    That position or with Sunbelt?

11    Q    With that position.

12    A    To the best my memory here, maybe December.

13    Q    December of what year?

14    A    2019.

15        MS. HILL:  May I interrupt for a moment.  I hear

16  some noise out here.  It may be my witnesses.  I want to

17  put them in the room, please.

18        (Pause in the proceedings.)

19  BY MR. WIESE:

20    Q    Prior to the current service manager, the prior

21  manager was an individual named Chris Pender, is that

22  correct, at Franksville?

23    A    Yes, sir.

24    Q    When did Mr. Pender's tenure at Franksville end?

25    A    When John started.  It was a switch.

1    Q    Did you terminate Mr. Pender?

2    A    No, sir.

3    Q    He resigned, is that right?

4    A    He transferred to Waukesha.

5    Q    Did you have any conversations with Mr. Pender

6  about why he was transferring to Waukesha?

7    A    I spoke to him about performance.

8    Q    Did he mention anything to you about how many

9  hours he was having to work at the Franksville store?

10    A    No.

11    Q    Are you aware of how many hours he was having to

12  work at the Franksville store?

13    A    He was salaried.  He had no set hours.

14    Q    I understand that, but are you aware of how many

15  hours he was having to work at the Franksville store as

16  a service manager?

17    A    To my knowledge, between 8:30, quarter to 9:00,

18  so roughly 4:00, 4:30.

19    Q    How did you track that?

20    A    Through asking employees and being there visually

21  seeing it.

22    Q    So you mentioned that the Waukesha location had

23  to hire a third road technician in about January of

24  2020?

25    A    Correct.

1    Q    Were you involved in making the decision to hire

2    a third road technician at Waukesha?

3    A    Yes.

4    Q    And the basis for that decision was because you

5    had a lot of road repair work to do, is that accurate?

6    A    Yes.

7    Q    What happens if a machine from the Franksville

8    location breaks down out in the field?

9    A    We hire companies like Pirtek that was mentioned

10   earlier or Roland Machinery, outside sources.

11   Q    Have you ever assigned a road technician from

12   Waukesha to repair equipment in the field from the

13   Franksville facility?

14   A    Yes.

15   Q    How often?

16   A    No more than any other store.  I don't know.  We

17   service -- we help Fond du Lac, we help Sun Prairie, and

18   we help Franksville weekly.

19   Q    Weekly?

20   A    Yeah.

21   Q    And the road technicians from the Waukesha store,

22   those are all nonunion road technicians?

23   A    Yes, sir.

24   Q    To your knowledge, they were doing the same work

25   as the road technicians at the Franksville store were

1    doing when Franksville had a road technician?

2        A    Yes.

3        Q    If we go to General Counsel Exhibit 25, there's

4    some pictures.

5        A    Is it in the binder?

6        Q    Yeah.  It's in the blue binder.  They were the

7    pictures you were going over earlier.

8        A    Okay.

9        Q    If you'll go to Page 7 of that document.  Let me

10   know when you're there.

11       A    Yes.

12       Q    Okay, you are.  The orange piece of equipment on

13   the back of the trailer there, I think you had -- what

14   piece of --

15       A    Backhoe, micro backhoe.

16       Q    Thank you.  You testified that that piece of

17   equipment is now at the Waukesha store, is that correct?

18       A    Yes.  Or rented hopefully.

19       Q    But it would be part of the Waukesha store's

20   inventory?

21       A    Yes.

22       Q    Okay.  How many micro backhoes like this do you

23   have at the Waukesha store?

24       A    I tend to keep one or two there.

25       Q    And how could you identify that this particular

1  micro backhoe is at the Waukesha store?

2     A    That's Ryan Helmer, my driver driving that truck,

3  and Racine didn't have one of these units down there.

4     Q    So your driver, Ryan Helmer, was taking this from

5  Racine to the Waukesha store, is that what was going on

6  here?

7     A    An internal transfer, yes.

8     Q    If you'll go to Page 29 now of this same exhibit.

9     A    Yes.

10    Q    Talking about that piece of equipment to the far

11 left, I think you identified it as a rough-terrain

12 forklift.  Do you see that?

13    A    Yes, I do.

14    Q    So you mentioned that that piece of equipment is

15 not allowed at Franksville --

16    A    Correct.

17    Q    -- is that accurate?

18    A    Yes.

19    Q    Who told you that?

20    A    Jason Mayfield.

21    Q    Where is that piece of equipment now?

22    A    Not there.  I don't know where.

23    Q    Is it at your Waukesha store?

24    A    It could be.  It could be anywhere.  We transfer

25 between locations.  This time of year with utilization

1 now, it could be in Ohio for all we know.

2    Q   If a customer wants a piece of large equipment in

3 the southern Milwaukee area, who absorbs the

4 transportation costs for that?

5    A   The store does writing the contract, so it would

6 be Waukesha, Franksville, Fond du Lac.

7    Q   So if it's a larger piece of equipment going from

8 Waukesha to the southern Milwaukee market, that would be

9 more expensive for the Waukesha store than it would be

10 for the Franksville store, is that correct?

11    A   Rephrase it.

12    Q   I'll break it down a little bit.  So Waukesha is

13 located to the -- is it the west of Milwaukee, is that

14 correct?

15    A   Yeah.  Milwaukee -- like south Milwaukee is

16 almost the halfway point between the Franksville

17 location and the Waukesha location all the way up to the

18 airport.

19    Q   So if a customer wanted a piece of equipment

20 south of Milwaukee, it would be further -- there would

21 be -- it would be a further transportation to go from

22 Waukesha to that location than from Franksville to that

23 location, is that correct?

24    A   Not to Milwaukee, not to south Milwaukee, but

25 once you get to Oak Creek, then it would be closer to

1  Franksville.

2      Q   So there are locations that are closer to

3  Franksville than Waukesha, correct?

4      A   As far as job sites?

5      Q   Yes, where customers are renting equipment.

6      A   Yeah, they rent them all over the place.

7      Q   And so if a customer wants to rent a piece of

8  equipment from the -- any location that's further from

9  Waukesha than it would be from the Franksville store,

10 that cost would be absorbed by the Waukesha store?

11     A   Yes, sir.

12         MR. WIESE:  Nothing further.

13         JUDGE ROSAS:  Charging Party?

14         MR. RYAN:  Yes, just a couple questions.

15         THE WITNESS:  Do I leave the book open or no?

16                     CROSS EXAMINATION

17 BY MR. RYAN:

18     Q   You know, why don't we start on that General

19 Counsel Exhibit 25, Page 29 while it's still in front of

20 you.

21     A   Okay.

22     Q   The Deere equipment in the back there --

23     A   Yeah.

24     Q   -- what is that again?

25     A   It's a -- it's a mini excavator.  I can't tell

1   what size or anything.

2       Q    So you don't know the weight on that one?

3       A    No.

4            JUDGE ROSAS:  What page?

5            MR. RYAN:  Page 29.  That's all I have for that.

6            THE WITNESS:  Okay.

7   BY MR. RYAN:

8       Q    I think in your direct testimony, you mentioned

9   that the Franksville location was doing 60 to 70 percent

10  cash transactions?

11      A    Yes, sir.

12      Q    What does the other 30 to 40 percent consist of?

13      A    It would be mainly key accounts, in state, out of

14  state.

15           JUDGE ROSAS:  I'm sorry.  What kind of accounts?

16           THE WITNESS:  Key, K-E-Y, strategic accounts.

17  BY MR. RYAN:

18      Q    And what is that?  Can you explain that to me a

19  bit more?

20      A    That would be like a customer, like Fenmore

21  that's based out of Madison doing work in that

22  territory, or a customer like Day & Zimmermann, you

23  know, from out of state working at a power plant, you

24  know, it would be large contract, Walsh Construction

25  working on I-94.

1    Q   All right.  For those key accounts, are they

2   coming to Franksville to pick up the equipment or is

3   that being delivered?

4    A   It's a mixture.

5    Q   A mixture.  But equipment is still being

6   delivered out of the Franksville location?

7    A   Yes, sir.

8    Q   What's the name of that operations manager?

9    A   Michael Schwaiger.

10    Q   I'm sorry.  What was the last name?

11    A   Schwaiger, S-C-H-W-A-I-G-E-R.

12        MR. RYAN:  I think that's all I have.  Thank you

13   very much.

14        JUDGE ROSAS:  Any redirect?

15        MS. HILL:  Yes, sir.

16                    REDIRECT EXAMINATION

17   BY MS. HILL:

18    Q   Mr. Rivera, you were asked several questions

19   about the territory for Waukesha and for Franksville and

20   the big equipment, the equipment more than 10,000

21   pounds.

22        Do you know, based on the fact that the big

23   equipment's no longer in Franksville, some of it went to

24   Waukesha, has that increased the business for the Franks

25   -- for the Waukesha location?

1     A    Increased, no.

2     Q    It has not?

3     A    No.

4     Q    Do you know what percentage of dollar amount of

5  business Franksville had at the time you took over as

6  the profit center manager just dealing with the big

7  equipment, anything over 10,000 -- 10,000 pounds or

8  more?

9     A    No.  I have no reason to ask for it.

10    Q    So even with the business that you are handling

11  out of Waukesha for the big equipment, your revenue has

12  not increased, just taking over from the Franksville

13  location?

14    A    I see what you're saying.  Yes, yes.

15    Q    Okay.  And what percentage?

16    A    I don't have a percentage.

17    Q    A dollar amount?

18    A    I would say 150 to $200,000 a month.

19    Q    And is that the same amount of business that the

20  Waukesha location had been doing prior to you getting

21  that business?

22    A    The market has been up and down.  It's hard to

23  tell where -- the increases, where they came and where

24  the decreases came from.

25    Q    And the key accounts, strategic accounts that you

1    were referencing --

2       A    Yes.

3       Q    -- the equipment that they might pick up at the

4    Franksville location, are you referring to the 10,000 --

5    less than 10,000 pounds?

6       A    Yes.

7       Q    And with respect to Mr. Schwaiger, approximately

8    when did he become the operations manager?

9       A    Approximately September, late August, early

10   September.

11          MS. HILL:  Thank you.

12          No further questions, your Honor.

13          JUDGE ROSAS:  Any follow-up?

14          MR. WIESE:  No, your Honor.

15          JUDGE ROSAS:  Charging Party?

16          MR. RYAN:  Just really quickly.

17                        RECROSS EXAMINATION

18   BY MR. RYAN:

19      Q    The equipment being delivered out of Franksville

20   now, has any of it -- well, let me ask.  Sorry.

21          How is equipment being delivered out of

22   Franksville say within the past month?

23      A    Through Putter's Trucking, the outside service.

24          MR. RYAN:  Thank you.

25          JUDGE ROSAS:  Any follow-up?  Anything?

1          MS. HILL:  No, sir.

2          JUDGE ROSAS:  Okay.  Thank you.

3          Sir, you're excused.  Please do not discuss your

4   testimony with anyone unless you're advised by counsel

5   that the case is over.

6          THE WITNESS:  Okay.  Thank you.

7          JUDGE ROSAS:  Thank you.  Have a good day.

8          Off the record.

9          (Recess.)

10         JUDGE ROSAS:  On the record.  Morning.

11         Your next witness.

12         MS. HILL:  Rebel Strohmeyer.  She testified

13  before, your Honor.

14         JUDGE ROSAS:  I'll remind you that you're still

15  under oath.

16                    DIRECT EXAMINATION

17  BY MS. HILL:

18      Q    Since the last time you testified, Ms.

19  Strohmeyer, have any of your responsibilities changed?

20      A    No.

21      Q    Were you part of the decision to reorganize the

22  Franksville profit center into a will call facility?

23      A    No, I was not.

24      Q    When did you learn about it?

25      A    On the afternoon of August 5th.

1    Q    And who informed you?

2    A    My director, Vicky Gibson.

3    Q    And after being informed by Ms. Gibson, did you

4    speak to anyone else within Sunbelt about the

5    reorganization?

6    A    Not until the next morning.

7    Q    And who did you speak to then?

8    A    Jason Mayfield.

9    Q    And what did you and Mr. Mayfield discuss?

10    A    I had e-mailed him a draft of a letter notifying

11    the union of the reorganization for him to review and

12    sign and deliver to the union so that the next

13    negotiation session that was scheduled for that

14    Thursday, it could be used to bargain the

15    reorganization.

16    Q    And did you have anything to do with that letter

17    to the union after discussing it with Mr. Mayfield?

18    A    I did not.

19    Q    What was your next role with respect to the

20    reorganization?

21    A    I was involved in drafting the separation notice

22    for the two employees that were eliminated, and I was

23    involved in drafting a letter to them just kind of

24    spelling out what was happening with the reorganization,

25    and the elimination of their position, and what they

1    could expect insofar as wages and Cobra and PTO payouts

2    and those sorts of things.

3        Q    And with respect to the separation notice, you

4    prepared the whole thing?

5        A    Yes.

6        Q    Did anyone revise it after you prepared it?

7        A    No.

8        Q    Based on that separation notice, were the

9    employees -- were the two employees eligible for rehire?

10       A    Yes.

11       Q    What was your next involvement with respect to

12   the two employees who were being laid off?

13       A    I called in for both of their separation

14   meetings.  They were both met with individually with

15   Bryan Anderson and Bo Bogardus, and I was on the phone

16   for those conversations so that I could cover the HR

17   portion of those conversations.

18       Q    Could you please explain what the HR portion of

19   that conversation involved.

20       A    Yes.  So they received a separation notice, and

21   then they received the letter that I had drafted just

22   notifying them that they would be paid through the next

23   Friday, through August 16th, so I explained how that

24   would work, when they would receive their next checks.

25   I gave them each their respective balance for their PTO

1  payouts.  I talked about the process for Cobra.  And I

2  also reminded them that they were eligible for rehire.

3  And in the letter it stated where they would be able to

4  find those job postings since they were no longer able

5  to review the internal postings for Sunbelt.

6       Q   Do you recall which conversation occurred first?

7       A   Kyle McKellips occurred first.

8       Q   For Mr. McKellips' conversation, did he ask any

9  questions?

10      A   He did ask if I could provide him with his final

11  paystubs.  He had a -- he was working on a mortgage for

12  a new home or a loan approval, and I told him -- I made

13  sure he had my contact information, and I said once

14  those paystubs are finalized, I'll send them to you, and

15  we exchanged contact information.  Those were the only

16  questions that I recall that were directed towards me.

17          JUDGE ROSAS:  Counsel --

18          MS. HILL:  Sorry.

19          JUDGE ROSAS:  -- there was pretty thorough

20  testimony on the General Counsel's case by this witness

21  regarding the layoff process, so I'm going to ask you to

22  be selective on what you need to ask her.  All right?

23  We have testimony with respect to General Counsel's

24  Exhibits 17, 19, 20, 32, 33, 46 and 57.  Go ahead.

25  ///

1  BY MS. HILL:

2    Q   With respect to Mr. McKellips' telephone

3  conversation, did Mr. Anderson say anything during that

4  conversation?

5    A   Not that I can recall.

6    Q   Do you know what, if any -- oh, did Mr. McKellips

7  have any personal property?

8    A   Oh, we did discuss -- one of the items that we

9  did discuss collectively was the tools, so what the

10  employees would need to do in order to secure their

11  tools, and we arranged for -- to kind of make some

12  pick-up arrangements for those.

13      I do recall there was a discussion with

14  Mr. McKellips about he didn't have a place to store his

15  tools, and so they were working out an arrangement with

16  him about, you know, possibly transporting them to a

17  temporary facility to store his tools while he was in

18  transition.

19    Q   With respect to these two individuals, are you

20  aware of whether Mr. McKellips or Mr. Romanowski have

21  applied for any open positions at Sunbelt?

22    A   They have not applied for any open positions, or

23  as of last week, I checked with the senior recruiting

24  manager for the northeast territory, and I asked him to

25  run a report, just to make sure, against their names,

1    socials and employee IDs, and there was nothing in the

2    system for them that they had applied for any positions

3    within Sunbelt since their separation.

4        Q    Now, the judge just discussed several exhibits

5    that had been discussed in December with you, and what I

6    would like you to do, there are two binders in front of

7    you, the blue binder has the General Counsel's exhibits,

8    the black binder has the Respondent's exhibits.  I would

9    like you to turn to the black binder, and please look at

10   Exhibit -- Respondent Exhibit 11 if you would, please.

11       A    Okay.

12       Q    Do you recognize what Respondent's Exhibit 11 is?

13       A    It's a requisition for an HVAC position at our PC

14   1179 which is a Climate Control facility.

15       Q    And what is the significance of this particular

16   requisition with respect to the Franksville location?

17       A    This requisition was the one that was filled with

18   a transfer for Mario Rivera.

19       Q    So the hiring manager for that Watertown location

20   was Mr. Bergdoll?

21       A    Yes.

22       Q    And is this the requisition that Mr. Mario Rivera

23   ultimately assumed or filled I should say?

24       A    Actually, no.  So there was -- I work for the GT

25   side.  Climate Control is separate.  Mr. Rivera was in

1    the process of transferring to this location, 1179 in

2    Watertown, and he had applied for the position on the

3    morning of August 5th, his transfer was initiated on

4    August 7th, that morning, and later that day he was

5    injured at our PC in Racine, and he was already in

6    process to transfer to this position.  He had -- was

7    going to fill this position with an effective date of

8    August 8th.

9           But when he was injured and he was out, that --

10   his transfer didn't finalize, so when I talked to

11   Climate Control to kind of see what happened since that

12   position was still open and posted, there was another

13   candidate whose actually listed on this, Brandon

14   Tetzlaff, who lived in the Watertown area, and they

15   ended up filling this position with him, because in the

16   interim, while Mario was out with his injury, on August

17   30th, there was an HVAC technician at the Waukesha

18   location that resigned effective August 30th, Rodney

19   Reed, and so Climate Control made the ultimate decision

20   that they had this qualified candidate, Brandon

21   Tetzlaff, who they filled their position at Watertown,

22   and in the best interest of Mario, and the position in

23   Waukesha being closer to his home, they filled the

24   position in Waukesha with Mario.

25       Q    Thank you.  Are you familiar with an employee at

1  the Franksville location by the name of Jamie Smith?

2      A    Yes.

3      Q    Did you have any communications, whether verbal

4  or via e-mail, with Mr. Smith?

5      A    During his employment?

6      Q    Yes, ma'am, I'm sorry, during his employment?

7      A    Yes.

8      Q    And what was that with respect to?

9      A    I spoke with Mr. Smith on multiple occasions.  I

10  sat in on one of his disciplinary discussions.  And I

11  was also part of a discussion that he had in June of

12  2019 in which he was interested in pursuing further

13  education.

14     Q    What type of education?

15     A    I'm not exactly sure what classes he was taking,

16  but he was inquiring about modifying his schedule, and I

17  was providing information on Sunbelt's tuition

18  assistance program.

19     Q    Did he discuss with you what the -- the modified

20  work schedule he was looking for?

21     A    He was looking -- I believe it was two to three

22  afternoons a week he wanted to be off at a certain time

23  in the middle of the afternoon.

24     Q    Are you the person who can handle the

25  rescheduling of an individual's work schedule?

 1    A    I am not, but I did discuss that with his manager

 2    at the time, Bryan Anderson.

 3    Q    As part of your responsibilities in Human

 4    Resources, are you responsible for investigations?

 5    A    Yes.

 6    Q    Were you assigned the task of any investigations

 7    in the summer of 2019 for the Franksville location?

 8    A    Yes.

 9    Q    What did that entail?

10    A    I received information on August 8th that there

11    was concern that Mario Rivera had made some threatening

12    remarks directed towards either a member or a collective

13    unit of the 139, and so my responsibility, I called the

14    other employees at the location to ask them general

15    questions about anything that they may have heard, any

16    threatening remarks and then specific questions if they

17    heard Mario make any kind of threatening remarks or

18    language.

19    Q    What was the result of your investigation?

20    A    I spoke to -- that day, August 8th, I spoke to

21    Kyle McKellips, Al Romanowski and the service manager at

22    the time, Chris Pender, and none of them had any

23    specific information.

24         Kyle, he stated that -- he was the first one that

25    I spoke to, and he stated that he didn't know of

1 anything specific, and that it had just been a tense
2 time around that location, and in closing, he told me
3 that he was feeling very scatterbrained.

4    And when I talked to Chris Pender, he said that
5 all of the guys had made remarks from time to time, it
6 was just, you know, a difficult time, but he couldn't
7 recall anything specific from Mario.

8    And when I talked to Al Romanowski, he said he
9 doesn't speak to Mario, and that he hadn't heard
10 anything, and then he shared some frustration that he
11 said that Mario doesn't always wear steel-toed shoes,
12 but that was it.

13    And Mario was out at the time, he was in the
14 hospital at that time, it was immediately the day after
15 his injury, so I didn't speak with him until August 15th
16 on the telephone, and I asked him if he had ever made
17 any kind of threatening remarks or anything like that,
18 and Mario said he didn't make anything towards any
19 person.

20    He did say in passing in the presence of Kyle at
21 one time that they were at the PC, they were looking
22 out -- just kind of looking out the roll-up doors, and
23 he said somebody should shoot that air balloon, and I
24 asked him what he meant by that, and he said that big
25 rat, but no person, no unit, no identified anything

1    else.

2        Q    And as a result of interviewing the three

3    co-workers and Mr. Rivera, what was your determination?

4        A    I typed up all my notes and shared them with

5    Jason Mayfield, and I told him that after speaking to

6    all of those employees and asking them specific

7    questions, that there was no -- no one could recall any

8    specific remarks made by Mario that were perceived to be

9    threatening.

10       Q    As the HR professional assigned to the

11   Franksville location, were you involved in any way in

12   the separation of Katie Torgerson?

13       A    I was there at her termination meeting, and I

14   drove her home after her separation.

15       Q    Did -- who else attended the separation meeting?

16       A    Bo Bogardus.

17       Q    Did Mr. Bogardus say in that meeting with Ms.

18   Torgerson that the reason for her termination was in any

19   way related to the union?

20       A    No, not that I can recall.

21       Q    With respect to your responsibilities in

22   Michigan, are you familiar with the Collective

23   Bargaining Agreements there?

24       A    Yes.

25       Q    Is there one agreement for the entire state?

1    A    No.  Each union location in Michigan has its own

2  contract.

3    Q    Are they identical?

4    A    No.

5    Q    All right.  If you would please turn to the blue

6  binder, and it's -- and your Honor, yes, I know she was

7  asked very briefly about this exhibit in December, but

8  I'm going to ask it --

9          JUDGE ROSAS:  And the witnesses, the employees

10  affected by those actions reflected in the exhibits

11  testified, and to the extent that there was no

12  conflicting testimony, it would be cumulative.  So

13  again, I ask you to be selective in what you need to

14  elicit from her.

15          MS. HILL:  I'm trying, sir.  Thank you.

16  BY MS. HILL:

17    Q    Is there a section of this exhibit that is --

18          JUDGE ROSAS:  Hold on one second.  You're

19  offering Respondent's 11?

20          MS. HILL:  Oh, yes, sir.  Thank you very much,

21  sir.  Sorry.

22          JUDGE ROSAS:  Okay.  Any objection?

23          MR. WIESE:  No objection, your Honor, from the

24  General Counsel.

25          MR. RYAN:  No objection.

1          JUDGE ROSAS:  Let me just understand what it is.

2    So it's a requisition?

3          THE WITNESS:  Oh, I'm sorry, I didn't hear the

4    number.

5          JUDGE ROSAS:  Respondent's Exhibit No. 11 is the

6    requisition --

7          MS. HILL:  Going back in the --

8          THE WITNESS:  In the black --

9          MS. HILL:  The black, yes.

10          THE WITNESS:  Okay.

11          JUDGE ROSAS:  -- to fill a position?

12          THE WITNESS:  Yes.

13          JUDGE ROSAS:  And there's a whole bunch of pages.

14    What's with all the pages that are basically blank,

15    except for I guess the running tabulation along the

16    extreme right-hand margin?

17          THE WITNESS:  So our HR information system is

18    called Workday, and this report -- and this is a

19    recruiting report.  This isn't usually part of my

20    responsibility.  Recruiting is separate.  But when you

21    bring up a requisition number, you have the opportunity

22    to download a report that shows the history of that

23    requisition, and this is just what it looks like when

24    you convert that to a PDF.

25          JUDGE ROSAS:  Okay.  And this may have been

1   established earlier in the testimony, but as far as the

2   operations of the company is concerned, obviously the

3   General Tool component of it is obvious as far as what

4   the company's business is, but what is the Climate

5   Control operations of the company?  The company does

6   HVAC servicing?

7           THE WITNESS:  So Climate Control, and my main

8   understanding of what they do because I'm in General

9   Tool, is they do have heating units, and they'll install

10  temporary heating and air for buildings under renovation

11  or just units for --

12          JUDGE ROSAS:  Oh, like at construction sites --

13          THE WITNESS:  It can be construction sites, yes.

14          JUDGE ROSAS:  -- trailers, things of that sort?

15          THE WITNESS:  Yes.

16          JUDGE ROSAS:  I see.  But they're not an HVAC

17  company?

18          THE WITNESS:  They're not an HVAC company,

19  although a majority of their technicians are HVAC

20  certified so that they can install some of the more kind

21  of complex heating units and stuff, because some of them

22  will tie into a building's existing heating unit, like

23  when it's under renovation or something like that is my

24  understanding.

25          JUDGE ROSAS:  Okay.  All right.  So Respondent's

1    11 is received.

2           MS. HILL:  Thank you, sir.

3           (Respondent's 11 was received.)

4    BY MS. HILL:

5       Q   All right.  Blue binder, Exhibit 46.

6       A   It goes from 40 to 47.

7           MS. HILL:  What happened to 46?

8           MR. WIESE:  Oh, I think it's in the front

9    actually.  I apologize for that.  There should be a

10   color copy in there behind a big sheet of paper.

11          THE WITNESS:  Oh, okay.

12          MR. WIESE:  Sorry about that.

13          MS. HILL:  Thanks.

14          THE WITNESS:  This one?

15          MR. WIESE:  Yes.

16   BY MS. HILL:

17      Q   All right.  You were asked just a very short

18   question regarding this particular policy.  This Section

19   5 of the personnel and payroll administration policies

20   and procedures, is anything there relevant to layoffs?

21      A   There is a Section 5.8.3 that starts with layoffs

22   and requires that managers must contact the Human

23   Resources Department prior to performing a layoff.

24      Q   All right.  Did Sunbelt follow this policy with

25   respect to Mr. McKellips' layoff?

 1     A    My understanding would be yes, because I received

 2   the first notification from my director, which is the

 3   territory director of HR, Vicky Gibson, regarding the

 4   layoff.

 5     Q    And did Sunbelt follow this policy with respect

 6   to the layoff of Mr. Romanowski?

 7     A    Yes.

 8     Q    Did you review this layoff section of this policy

 9   prior to the meetings with the two individuals who were

10   laid off at the Franksville profit center?

11     A    Yes.

12          MS. HILL:  No further questions.  Pass the

13   witness.

14          JUDGE ROSAS:  Okay.  General Counsel?

15          MR. WIESE:  Just two minutes quick to review my

16   notes.  I'll be quick.

17          JUDGE ROSAS:  Do you need a restroom break or

18   anything?

19          THE WITNESS:  No.

20          MR. WIESE:  I'm ready, your Honor.

21          JUDGE ROSAS:  Okay.  General Counsel.

22                    CROSS EXAMINATION

23   BY MR. WIESE:

24     Q    Good morning, Ms. Strohmeyer.  Just a couple of

25   brief questions.

1         Besides Ms. Hill, did you speak with anyone else

2    in preparation for your testimony today?

3    A    No.

4    Q    Did you review any documents in preparation for

5    your testimony today?

6    A    I did.

7    Q    Which documents?

8    A    I reviewed my last affidavit, the affidavit

9    regarding the reorganization, and I reviewed some of my

10   documentation, the separation notices and the letters

11   that were given to those employees, Kyle and Al.

12   Q    And are those the documents that we had talked

13   about in your testimony back in December?

14   A    Yes.

15   Q    Okay.  Did you review any transcripts?

16   A    No.

17        MR. WIESE:  I have nothing further.

18        JUDGE ROSAS:  Charging Party?

19        MR. RYAN:  Just a couple quick questions.

20                  CROSS EXAMINATION

21   BY MR. RYAN:

22   Q    When you were talking about the investigation

23   about Mario Rivera, you said that you spoke with Kyle

24   and Chris on August 8th?

25   A    Yes.

1    Q    Was that before or after the conversation about

2   the layoff of Kyle and --

3    A    Oh, it was before.

4    Q    It was before.

5    A    It was early that morning.

6         MR. RYAN:  Nothing further.  Thank you.

7         JUDGE ROSAS:  Anything?

8         MS. HILL:  No redirect.

9         JUDGE ROSAS:  Thank you, ma'am.  You're excused.

10  Please do not discuss your testimony with anyone until

11  you're advised by counsel that the case is over.  All

12  right?

13        THE WITNESS:  Okay.  Thank you.

14        JUDGE ROSAS:  Off the record.

15        (Pause in the proceedings.)

16        JUDGE ROSAS:  On the record.

17        MS. HILL:  This is Chris Pender, your Honor.

18        And that's the witness stand over there.

19        JUDGE ROSAS:  Sir, please raise your right hand.

20        (Whereupon,

21                 CHRISTOPHER WANE PENDER,

22  was called as a witness by and on behalf of Respondent

23  and, after having been duly sworn, was examined and

24  testified as follows:)

25        THE WITNESS:  Yes, sir.

1          JUDGE ROSAS:  Please have a seat, state and spell

2     your name and provide us with an address.

3          THE WITNESS:  It's Christopher Wane Pender

4     spelled C-h-r-i-s-t-o-p-h-e-r W-a-n-e P-e-n-d-e-r.

5     Address is West 231 North 1125 County Highway F,

6     Waukesha, Wisconsin, 53186.

7          MS. HILL:  Thank you, sir.

8                    DIRECT EXAMINATION

9     BY MS. HILL:

10    Q    Thank you, sir.  Who is your employer?

11    A    Sunbelt Rentals.

12    Q    How long have you worked for Sunbelt?

13    A    A little over six years.

14    Q    What is your current title, sir?

15    A    Mechanic level III.

16    Q    And which division of Sunbelt?

17    A    General Tools.

18    Q    Where do you work as a mechanic III, sir?

19    A    At the Waukesha store, PC 365.

20    Q    Since when?

21    A    I started back there the 11th of November of

22    2019.

23    Q    Before working as a mechanic III, what was your

24    position?

25    A    I was a service manager at PC 776 in Franksville.

1    Q    Did you have an office at the Franksville

2    location?

3    A    Yes.

4    Q    Where was it located?

5    A    Right outside the shop.

6    Q    Sir, there's two binders sitting there, and if

7    you would please look at the black binder --

8    A    All right.

9    Q    -- and it's the very first exhibit.  It should

10   indicate Respondent 1 or R 1?

11   A    Page 1 here, yes.

12   Q    All right.  And where would your office be with

13   respect to this drawing, if you can even figure that

14   out, sir?  This is not to scale.

15   A    Right, right.  So where it says "hallway" into

16   the shop --

17   Q    Yes, sir.

18   A    -- my office was actually on the back side inside

19   the shop, and there was a --

20        JUDGE ROSAS:  Referring to the left-hand

21   column -- left-hand side of the page?

22        THE WITNESS:  Correct.  Where it says "office,"

23   my office was on the other side of that wall.

24   BY MS. HILL:

25   Q    Okay.  So you shared a wall there?

1    A    Correct.

2    Q    And it had a door?

3    A    Yes.

4    Q    And from when to when did you work at the

5    Franksville location?

6    A    June of '18, I believe, to November 11th of 2019.

7    Q    Do you know Kyle McKellips?

8    A    Yes.

9    Q    And how do you know him?

10   A    He was my road mechanic.

11   Q    What kind of relationship did you have with

12   Mr. McKellips?

13   A    I would say a very good one.  He's a great

14   mechanic.

15   Q    Did you mentor him?

16   A    Yes, I did.

17   Q    Did you ever meet with Mr. McKellips in your

18   office?

19   A    Yes, I did.

20   Q    I'll try to speak up.  I'm sorry.

21   A    That's okay.

22   Q    And when you met with him in your office, was the

23   office door closed?

24   A    Yes.

25   Q    Did you ever question Mr. McKellips regarding his

1    union affiliation while he was in your office?

2       A    No, ma'am.

3       Q    In December of 2018 or January of 2019, did you

4    tell any of the employees at the Franksville location

5    that the union was not going to get in at that location?

6       A    No.

7       Q    The same time frame, December 2018 or January

8    2019, did you ever tell any of the employees at the

9    Franksville location that the union was not going to

10   happen?

11      A    No.

12      Q    December 2018, January '19, did you ever threaten

13   the Sunbelt employees at Franksville that it would be

14   futile for them to select the union as their bargaining

15   representative?

16      A    No.

17      Q    As a service manager, what were your

18   responsibilities at the Franksville location?  And let's

19   put it prior to the reorganization.

20      A    There was -- I had to deal with purchasing of

21   parts, ordering parts, assigning job duties on a daily

22   basis, dealing with warranty repairs, outside vendors,

23   doing repairs for us, making sure that the shop was

24   running efficiently.  If my mechanics had an issue

25   working on something, they could come to me, and I would

1  assist them.  I work very hard to try and teach them

2  things that I knew that they didn't to make them a

3  better mechanic.

4      Q    Could you give an example of some of the things

5  that you had to teach the two -- the mechanics you had?

6      A    Let's see.  There was a rough-train scissor lift

7  that we had three different service calls on, and no one

8  could figure out what was going on with it, so I brought

9  it into the bay closest to the office so if I need to

10  answer the phone, I could attend to my other duties as

11  well.

12      So I had the engine out, I was looking at

13  everything, and I started it and was kind of running it

14  through its paces, and I noticed that there was a wire

15  that was just simply loose, and it was the oil pressure

16  sensor wire.

17      And so I brought everybody together, I used it as

18  a teaching moment, because when we go through and look

19  at equipment, we have to look at everything so that it

20  operates as it should when it's on the job site, and

21  they're like holy cow, I never would have guessed it was

22  that, I would have started over here, over there.  I

23  said well, this is where your issue is, it's a running

24  issue, it's not anything else, it's an engine issue, so

25  this is where we need to start.  Everybody's like holy

1   cow, that's a great idea.

2      Q    When you said you gathered everybody, could you

3   please name the people who are everybody.

4      A    Kyle, Mario, Al and Ray.

5      Q    And Ray, you're referring to Mr. Gutierrez?

6      A    Yes.

7      Q    And who was the -- who were the -- who was the

8   person, who were the people that said holy cow, I never

9   would have thought of that?

10     A    Ray, Al and Kyle.

11     Q    You also said that you assigned job duties.  Are

12  you referring to the four individuals you just

13  identified?

14     A    Yes.

15     Q    The warranty work that had to be done, was that

16  done in the profit center or outside of the profit

17  center?

18     A    There was some warranty work that was done inside

19  the profit center and some that was required to be done

20  by the dealers themselves.

21     Q    And you said sometimes vendors had to do repairs?

22     A    Yes.

23     Q    Is that outside of the warranty work?

24     A    Yes.

25     Q    Did any of the mechanics, Mr. McKellips,

1   Mr. Rivera, Mr. Gutierrez, Mr. Romanowski, did they ever

2   complain about the equipment that you were sending out

3   to vendors to repair or the warranty work that had to be

4   done outside of the shop?  Did they ever say don't send

5   it out there, we'll do it?

6       A    I don't remember.

7       Q    You just explained a moment of -- or an incident

8   in which you were teaching the other mechanics about

9   repairing something.

10          Did you ever repair equipment yourself?

11      A    Yes.

12      Q    All by yourself?

13      A    Yes.

14      Q    Did any of the mechanics who worked with you, did

15  they ever complain that you should not be doing that

16  work, that they should be doing it?

17      A    No.

18      Q    Did you ever do -- could you explain what

19  preventive maintenance is.

20      A    Basically we go through the piece of equipment

21  from top to bottom and make sure that all electrical

22  connections are tight, oil -- it has oil, hydraulic oil,

23  trans fluid, we check batteries, it has a rollover

24  protection system, make sure that there's no cracks, you

25  know, bends, anything like that that's going to, you

1  know, limit it from doing its purpose.

2      Every piece of equipment we have, it has a

3  checklist on it, and we simply go through and make sure

4  piece by piece what needs to be done and looked at, and

5  you put your hands on every machine, every part of it.

6  Q   And when you said "we," it sounds as if you also

7  did preventive maintenance?

8  A   Yes.

9  Q   Did you ever use the preventive maintenance as a

10  way of teaching the other mechanics then in your shop?

11  A   Yes.

12  Q   Did you ever deliver equipment when you were

13  service manager at the Franksville location?

14  A   Yes.

15  Q   The equipment that you did deliver, was it more

16  than 10,000 pounds?

17  A   No.

18  Q   Did you ever tell any of your employees that your

19  bosses at the Franksville location were telling you you

20  were not getting enough work done?

21  A   No.

22  Q   Do you recall a -- this is when you were a

23  service manager at Franksville.  Do you recall a Billy

24  Joel concert?

25  A   No.

1    Q   I'll try to refresh your recollection about this.

2    Mr. Gutierrez, do you recall telling Mr. Gutierrez to

3    switch six-foot forks with four-foot forks on eight

4    forklifts?

5    A   I remember that there was a big order, but I

6    don't remember who I specifically said to switch forks.

7    Q   Did you have any problems working with Mr.

8    Gutierrez?

9    A   No.

10   Q   Ranking the mechanics in your shop, sir, from

11   top, you know, the best to not the best, how would you

12   rank them, sir?

13       MR. WIESE:  Objection, relevance.

14       JUDGE ROSAS:  I'm going to sustain that.

15   BY MS. HILL:

16   Q   Okay.  Are you familiar with Pirtek?

17   A   Yes.

18   Q   Did you work with Pirtek at your Franksville

19   location?

20   A   Yes, I did.

21   Q   Is that one of the outside vendors you were

22   referring to?

23   A   Yes, ma'am.

24   Q   Okay.  And what did they do?

25   A   They repaired hydraulic lines for us.

1     Q    Would those hydraulic lines be on small and large

2  equipment?

3     A    Yes.

4     Q    Do you use Pirtek at your Waukesha location?

5     A    Yes, we do.

6     Q    For the same type of work?

7     A    Yes, ma'am.

8          MS. HILL:  No further questions.

9          JUDGE ROSAS:  General Counsel, cross?

10         MR. WIESE:  Just a minute.

11         JUDGE ROSAS:  Sure.  Off the record.

12         (Pause in the proceedings.)

13         JUDGE ROSAS:  Okay, back on.

14                     CROSS EXAMINATION

15  BY MR. WIESE:

16    Q    Good morning, Mr. Pender.  My name is Tyler

17  Wiese.  I'm an attorney with the National Labor

18  Relations Board.  I'm going to be asking you a couple

19  questions today.  Okay?

20    A    Okay.

21    Q    Your current position as a mechanic III at the

22  Waukesha store -- do I have that right?

23    A    Yes, sir.

24    Q    Do you have any disciplinary authority in that

25  position?

1    A    No.

2    Q    Do you assign employees work in that position?

3    A    No, sir.

4    Q    Do you hire employees?

5    A    No, sir.

6    Q    Do you have any other supervisory duties in that

7  position?

8    A    No, sir.

9    Q    Did you speak with Ms. Hill prior to testifying

10 today?

11   A    Yes.

12   Q    When did you speak with her?

13   A    Last week.

14   Q    Where did that conversation take place?

15   A    At the Waukesha store.

16   Q    Who was present for that conversation?

17   A    Myself and my lawyer.

18   Q    When you say your lawyer, who are you talking

19 about?

20   A    Ms. Hill.

21   Q    Did Ms. Hill advise you of the purpose of your

22 questioning?

23   A    Yes.

24   Q    And what did she say?

25        MS. HILL:  Objection.  This is -- as he said, Mr.

1 Pender asked me to represent him for this hearing.

2        JUDGE ROSAS:  That's not covered -- that's not --

3 that's outside the privilege?

4        MR. WIESE:  I didn't realize that Ms. Hill was

5 representing Mr. Pender in a personal capacity.

6        MS. HILL:  He asked to have -- well, without

7 disclosing attorney-client privilege, he just said "my

8 lawyer."

9        JUDGE ROSAS:  I mean is there a difference

10 between 211, 213 supervisors and managers and employees

11 that are under the control of the company for purposes

12 of, you know, the attorney-client discussions,

13 consultations?

14        MR. WIESE:  Yes, there are.  I mean there's

15 ethical concerns.  There's also I mean Board protections

16 that apply to nonsupervisory employees being questioned

17 by company attorneys that I'm trying to elicit testimony

18 about, but --

19        JUDGE ROSAS:  Are you talking about the Johnnie's

20 Poultry?

21        MR. WIESE:  That's correct.

22        JUDGE ROSAS:  Okay.  What I'm going to allow you

23 to do is to ask him leading questions relating to

24 Johnnie's Poultry specifically.  All right?

25        MR. WIESE:  Okay.

1  BY MR. WIESE:

2  Q  Mr. Pender, were you advised -- you were advised

3  by Ms. Hill of the purpose of your questioning at the

4  Waukesha facility?

5  A  Yes.

6  Q  Okay.  And did Ms. Hill advise you that your

7  participation in the questioning was voluntary?

8  A  No.

9  Q  Did Ms. Hill state that you would be free from

10  reprisal based off of your answers to her questions?

11  A  I don't understand that.

12  Q  Did she tell you that you would not be retaliated

13  against in any way based off your answers to her

14  questions?

15  A  I guess I don't understand what you're saying,

16  what you're trying to ask me.  I apologize.

17  Q  No.  That's okay.

18  A  So basically what -- let me see if I can

19  understand what you're saying to me is that because of

20  what I'm saying at this stand is not going to affect my

21  job?

22  Q  That's correct.

23  A  Yeah, that's not going to affect my job at all.

24  Q  And were you told that by Ms. Hill --

25  A  Yes.

1    Q    -- at this meeting?

2    A    Yes.

3    Q    Okay.  Thank you.  Did you speak with anybody

4  else besides Ms. Hill in preparation for your testimony

5  today?

6    A    No.

7    Q    Did you review any documents in preparation for

8  your testimony today?

9    A    Yes.

10   Q    What documents?

11   A    I saw some pictures.

12   Q    Okay.  If you look at General Counsel --

13        MS. HILL:  The blue binder.

14        MR. WIESE:  Thank you.

15 BY MR. WIESE:

16   Q    In the blue binder, Exhibit 25.

17   A    Yes, sir.

18        JUDGE ROSAS:  She didn't ask him any questions

19 about the pictures.

20        MS. HILL:  Right.  I was just --

21        JUDGE ROSAS:  I mean you can ask him what he's

22 looked at, but --

23        MR. WIESE:  Yeah.

24        MS. HILL:  Right.

25        MR. WIESE:  I'm not going to get into the

1   details.  I'm going to have him identify.

2   BY MR. WIESE:

3       Q   Are these the pictures you looked at as best you

4   can tell?

5       A   Yes.

6       Q   Do you recall looking at any other pictures

7   besides the ones in General Counsel Exhibit 25?

8       A   No, sir.

9       Q   Did you review any transcripts in preparation for

10  your testimony today?

11      A   No, sir.

12      Q   You talked about an outside vendor called Pirtek.

13  Am I saying that right?

14      A   Yes.

15      Q   Okay.  And they specialize in hydraulic lines?

16      A   Yes.

17      Q   Do they perform any other repairs for Sunbelt

18  outside of hydraulic lines?

19      A   They do just about everything hydraulic.  So if

20  there was an O-ring leak, they would repair that.  They

21  make hoses for us.

22      Q   But that's all limited to hydraulic work?

23      A   Correct.

24      Q   So if it was engine work, for example, that

25  wouldn't go to Pirtek?

1    A    That wouldn't go to Pirtek.

2    Q    And your current position as a mechanic III at

3    Waukesha, is that an hourly position?

4    A    Yes.

5    Q    Your service manager position at Franksville,

6    that was a salary position?

7    A    Yes.

8    Q    It was your decision to transfer from the

9    Franksville store to the Waukesha store, is that

10   correct?

11   A    Yes.

12   Q    Your decision, was that based on, in any way, the

13   number of hours you were working at the Franksville

14   store?

15   A    Between my commute and my young family at home,

16   it made more sense to take a position back in Waukesha.

17   Q    After the mechanics were laid off at the

18   Franksville store, were you working more hours as a

19   service manager?

20   A    Yes, a little bit.

21   Q    Did your job duties change after the mechanics

22   were laid off?

23   A    Yes.

24   Q    Were you doing more maintenance work than you

25   were prior to when the mechanics were laid off?

1    A   Yes.

2        MS. HILL:  Objection.

3        JUDGE ROSAS:  Overruled.

4        You can answer.

5        THE WITNESS:  Yes.

6  BY MR. WIESE:

7    Q   How much more?

8    A   Not a ton more, but there was an extra bit of

9  work.  I lost four mechanics.

10   Q   And you were doing the maintenance work that had

11 previously been done by those four mechanics?

12   A   Yes.

13       MR. WIESE:  Nothing further.

14       JUDGE ROSAS:  Charging Party?

15       MR. RYAN:  I don't think I have anything.  Thank

16 you.

17       JUDGE ROSAS:  Okay.  Any redirect?

18       MS. HILL:  Just a moment, your Honor.

19       No further questions.

20       JUDGE ROSAS:  Okay.  Thank you.  Sir, you're

21 excused.  Please do not discuss your testimony with

22 anyone until you're advised by counsel that the case is

23 over.  All right?

24       THE WITNESS:  Certainly.

25       JUDGE ROSAS:  Have a good day.

1          Off the record.

2          (Recess.)

3          JUDGE ROSAS:  On the record.

4          MR. WIESE:  Your Honor, based off of the

5    testimony of Mr. Pender regarding the Johnnie's Poultry

6    issue, I request to amend the complaint to include an

7    allegation that Ms. Hill's questioning of Mr. Pender

8    violated Section 81 of the Act.

9          JUDGE ROSAS:  Opposition?

10          MS. HILL:  Yes, sir.  With respect to Mr. Pender,

11    he was going to be a witness prior to the -- his

12    transfer.  He -- in fact, we were going to have him

13    testify in December if we could have gotten the -- you

14    know, everything moving along fast enough.  And after

15    his move, I did go through the proper procedure to ask

16    him questions.  I will leave it at that.  I asked him do

17    you want -- you know, do you understand what this is

18    about, do you understand this and all of that, your

19    Honor.

20          JUDGE ROSAS:  Okay.  All right.  The motion is

21    granted.  It's fairly routine these things come up

22    during testimony.  So the complaint will be deemed

23    amended.  What I would ask you to do, I don't know if

24    you have the capacity at the facility here to do it, is

25    to have an amended complaint showing the redline or not.

1          MR. WIESE:  Yeah, I think I can figure out some

2     sort of a documentary solution to it.  So you would like

3     a redline --

4          JUDGE ROSAS:  Either a redline version after

5     lunch or a separate amendment to the complaint.

6          MR. WIESE:  Okay.  Yes, I will do that, your

7     Honor.

8          JUDGE ROSAS:  Okay.  Next witness.

9          MS. HILL:  Yes.

10         (Pause in the proceedings.)

11         MS. HILL:  This is Mario Rivera, your Honor.

12         JUDGE ROSAS:  Okay.  On the record.

13         Sir, do you want to come up here.

14         MS. HILL:  Over there is the witness box.

15         THE WITNESS:  Here?

16         MS. HILL:  Yes, sir.

17         JUDGE ROSAS:  Sir, please raise your right hand.

18         (Whereupon,

19                    MARIANO RIVERA,

20    was called as a witness by and on behalf of the

21    Respondent and, after having been duly sworn, was

22    examined and testified as follows:)

23         THE WITNESS:  Yes, sir.

24         JUDGE ROSAS:  Please have a seat.  State and

25    spell your name and provide us with an address.

1        THE WITNESS:  My name is Mariano Rivera,

2   M-A-R-I-A-N-O R-I-V-E-R-A.  My address is 1743 South

3   25th Street, Milwaukee, Wisconsin.  Zip code?

4        JUDGE ROSAS:  That's fine.

5                     DIRECT EXAMINATION

6   BY MS. HILL:

7   Q   Mr. Rivera, who is your employer?

8   A   Sunbelt Rentals.  Climate Control.  Sorry.

9   Q   Pardon?

10  A   Sunbelt Rentals.  Climate Control.

11  Q   All right.  Please explain what Climate Control

12  does.

13  A   Climate Control is a specialty group.  We work in

14  heaters and air conditioners only.  We specialize in

15  that, and that's what we do.

16  Q   Since when?

17  A   I honestly don't recall a date.  It was August.

18  Q   Of which year, sir?

19  A   Of this year.

20  Q   Of 2020 or 2019?

21  A   2019.  Sorry.

22  Q   Thank you.  How long have you worked for Sunbelt?

23  A   Approximately five years.

24  Q   And what positions have you held?

25  A   I worked as a skid-steer mechanic -- excuse me.

1  I'm sorry.  In the company of Sunbelt or in all

2  companies?

3      Q   Yes, sir, in the company Sunbelt.

4      A   I was a mechanic for skid-steers.  I also went to

5  General Tools.  I worked in heaters, because I was the

6  only one qualified to do heaters for them at the time.

7  We didn't have a Climate Control center, so I was the

8  one they called in the middle of the night.  And I also

9  worked in various jobs.  Pretty much everything in the

10 general store.

11     Q   With respect to your Climate Control position,

12 where physically do you work?

13     A   Where physically?  I work at the Waukesha Climate

14 Control center.

15     Q   When you worked for the General Tool Division,

16 which location?

17     A   I worked at the Racine store, PC 776.

18     Q   When you were in at the Franksville location, did

19 you participate in the election regarding the union?

20     A   Yes, ma'am.

21     Q   And in March of 2019, so last year, sir, did

22 anyone in Sunbelt's management ask you to report the

23 union activities of any other Sunbelt employee?

24     A   No.  I've never had a conversation with any of

25 the managers the whole time, even up until now, about

1  the union.

2      Q   On or about April 22nd or 23rd, 2019, did you

3  hear anyone in Sunbelt's management interrogate Sunbelt

4  employees about union sympathies?

5      A   No.

6      Q   How did you go about being transferred from the

7  Climate Control -- excuse me -- from General Tool to the

8  Climate Control Division?

9      A   If there's a job -- I'm sorry I laugh, because if

10  there's a job posting, and Sunbelt -- any employee of

11  Sunbelt is usually considered first on the list to move

12  on within the company to grow, and I'm always looking.

13  I'm still looking.  You can go out of state.  You can

14  move into different -- if you want to go warmer, you

15  want to go colder.  You can pick where you want to go,

16  what stores have openings.

17          Basically I'm still looking, even though I just

18  moved, I've been there for a while.  But I saw that

19  Climate Control had an opening.  And I'm sure you're all

20  aware that I had double knee replacements, and General

21  Tools is a little hard on double knee replacements

22  trying to crawl on the ground.

23          Climate Control is a specialty, so it's kind of

24  like the more you know, the less you have to do, so to

25  speak, and I mean that with a great -- let me tell you,

1  that's huge, and I needed something less stressful on my

2  knees, and Climate Control had an opening in Wisconsin.

3        I was actually looking for Florida, because I'm

4  trying to relocate to Florida eventually, and I saw

5  Florida had an opening in Climate Control and Wisconsin,

6  and my wife does not want to move right now, so I -- and

7  I know Bo was transferred into that.  Me and Bo have a

8  great relationship.

9        And I applied online, I believe it was like 5:00

10 in the morning, because I get up to go to work early,

11 and I saw the opening for Climate Control, and I jumped

12 on that right away.  I remember the time, but I can't

13 remember the date, but it was 5:00 o'clock in the

14 morning, and I applied.

15       And I waited for a response, because there was an

16 opening in flooring, which is another less stressful

17 job, and I had considered that prior to Climate Control,

18 but that's a little more demanding, too.  So Climate

19 Control was right up my alley.

20       I called Bo.  We set up an interview.  So I would

21 be working away from the Milwaukee region.  I was

22 actually hired to work in the Watertown store which is

23 75 miles away from home, but it's less work on my knees.

24    Q   Did your brother, Robert Rivera, have anything to

25 do with you getting the Climate Control job?

1    A    No.  My brother has his own job to do.  I don't

2    talk to him much.  We don't talk about work.  That's two

3    different areas.

4    Q    Did anyone in the General Tool Division help you

5    to get that job in Climate Control?

6    A    No, I -- no.

7    Q    All right.  When did you hear that you were able

8    to -- that you did get the job in Climate Control?

9    A    I'm sorry, I can't remember the date, but it was

10   in the summer.  The Climate Control area was in August

11   sometime, I believe.

12   Q    You mentioned a knee replacement.  Was that --

13   was that around the time that you moved from General

14   Tool to Climate Control?

15   A    No.  I did try to work at the General Tools for a

16   little bit with it, and it was just very painful.

17   Q    And when did you learn about the Franksville

18   profit center being reorganized?

19   A    It was after I came back from the hospital.  I

20   fell down and broke two ribs prior to -- my last day

21   actually would have been the last day I was working.  I

22   fell down and broke two ribs guarding the machine, and I

23   didn't even know anything about it, so it would have

24   been after that.  Two weeks after my last day.  I don't

25   really have a time frame, but it was definitely right

1    after it happened, because when I went back to doing

2    paperwork, I found out they were restructured.

3        Q    And who informed you?

4        A    I think everybody at the counter, I believe,

5    because I came in with the paperwork, and I asked

6    where's everybody at, and that's at that time when all

7    this happened.

8        Q    When you say the people at the counter, who are

9    you referring to?

10       A    Dustin I believe was there.  Bryan was not there

11   at that present time.  Dustin.  There's another -- I

12   forgot his name.  I worked with him for a while.  I'm

13   sorry.

14       Q    His position?

15       A    Dustin was our CSR, he was our counter guy, and

16   you walk into the front door, so he's the first one to

17   greet when you come in.

18       Q    Sir, are you aware a decertification petition was

19   filed with the National Labor Relations Board?

20       A    Yes.  That was me.  I filed that.

21       Q    How did you know what to do?

22       A    Well, it's kind of funny because I really didn't

23   know.  I came to this building here.  I went online to

24   figure out how to -- you know, where to start, and I got

25   a phone number for the NLRB, and I talked to a lady or a

 1   gentleman from the office over here around the corner.

 2        I'm sorry, I'm not very familiar with this

 3   building or the people here.  The lady on the phone said

 4   she'd walk me through every step I needed to know how to

 5   do this, and if I had any questions, that she would help

 6   me fill out the paperwork through -- she did most of it

 7   by the phone, and she said she could mail me a copy of

 8   anything I needed help with.  And then I talked to a

 9   gentleman from the NLRB about it.

10        And the NLRB actually helped me with the paper --

11   you know, how to do it, and she walked me step-by-step

12   through it, and then I pretty much filed it like that

13   through them.  I didn't have a clue at first until I

14   talked to the NLRB, and they pretty much helped me about

15   it and told me what I had to do.  They said I needed at

16   least three signatures, and I was able to -- or two

17   signatures and myself would be enough to file -- to file

18   a petition for that.

19     Q    Okay.  So the other two signatures, how did you

20   go about getting signatures?

21     A    Well, I was on the phone actually with the NLRB

22   when I asked -- I was talking to the NLRB, and they told

23   me what I had to do, and they said I had to do it on my

24   own, you know, my own writing, ask for a reelection, ask

25   would they be willing to participate in a reelection,

1    and that's not a -- that's what the person on the phone

2    asked me to write down, and I wrote it all down, and she

3    said make sure I got the date on there, and the

4    signatures have to be clear and legible, and I said

5    okay, and then I wrote out the paper.

6            I went up to pretty much everybody there that was

7    working at that day, and I needed two signatures, and I

8    figured I didn't really need to push it past that.  And

9    the papers stated that -- I don't have a copy of it.

10   I'm sure the NLRB has a copy of it somewhere.  And it

11   was a very blunt, we're looking -- I would like to know

12   if you're willing to sign for a reelection.

13           And as I explained to the people, everyone that I

14   talked to, this is on your own.  I need you to be a

15   hundred percent sure.  This is not a formal contract.

16   This is just stating that you're willing to take it back

17   to the table.

18           And I also explained to everyone at that present

19   time, at the time of vote, you do whatever you want, all

20   I'm asking for is your signature to help me bring it

21   back to the table so we have an open election and see if

22   we can remove the union, so to speak, from our facility,

23   and I said but this is not saying that, because you sign

24   this, the union's not going to be there.  We have to go

25   through a reelection.  You will have the right to vote

1  any way you want.  I says you don't have to sign this

2  paper as well.  I said this is all on you at any time.

3  I talked to Ray --

4          MR. WIESE:  I'm going to object, your Honor.  I

5  don't want to -- I don't want to get into testimony

6  about who signed decertification paperwork.

7          JUDGE ROSAS:  Ray is who?

8          THE WITNESS:  Sorry?

9          MS. HILL:  Last name.

10         JUDGE ROSAS:  That's another employee?

11         THE WITNESS:  Yes, sir.

12         MS. HILL:  Yeah, he testified in December.

13         JUDGE ROSAS:  Ray testified in December?

14         MS. HILL:  Yes.

15         JUDGE ROSAS:  Hold on a second.

16         MS. HILL:  Could you give his last name.

17         JUDGE ROSAS:  What's the last name?

18         THE WITNESS:  Guzman?

19         MS. HILL:  Gutierrez.

20         THE WITNESS:  Gutierrez.  Sorry.

21         JUDGE ROSAS:  He was called by the General

22  Counsel?

23         MS. HILL:  I believe so.

24         MR. WIESE:  Yes, yes, he was called, your Honor.

25         JUDGE ROSAS:  Okay.  I'm going to allow some

1    leeway here since there was testimony that was elicited

2    by the General Counsel.  I don't have the specific

3    questions that were asked, but to the extent that any of

4    the hearsay that's to be elicited from this questioning

5    is corroborated is one thing, it's also useful, for one,

6    to compare it to the testimony previously as far as what

7    the witness called by the General Counsel testified to.

8          So I'm going to overrule the objection.  Again,

9    with respect to any hearsay, any weight ultimately given

10   to it will depend on corroboration in the record.

11   Overruled.

12         MR. WIESE:  Your Honor, just a quick

13   clarification.  So with regard to testimony about

14   employees who signed the decertification paper, is that

15   limited solely to employees who already testified here?

16   Because that's what we're getting into here.

17         JUDGE ROSAS:  So when we're dealing with hearsay

18   in these proceedings, only reliable hearsay is

19   admissible.  Reliable can be -- reliability can be

20   established in any one of several ways, most commonly by

21   virtue of the out-of-court proponent in a statement

22   having been cross-examined.  Sometimes there's

23   documentation, something else.

24         I mean I'm not going to provide a definitive list

25   of what it might be, but I think -- I think the subject

1  matter was generally addressed by the General Counsel,

2  so I'm going to provide some leeway here, and we'll see

3  where it all falls.

4        MR. WIESE:  And, your Honor, just to clarify, my

5  objection is not to any hearsay portion of his

6  testimony.  My objection is to disclosing Section 7

7  activity by employees in the context of an open hearing.

8  I mean that's --

9        JUDGE ROSAS:  With respect to the

10 decertification?

11       MR. WIESE:  With respect to who signed a

12 decertification petition.

13       MS. HILL:  Your Honor, if I may.  May I?

14       JUDGE ROSAS:  Uh-huh.

15       MS. HILL:  All right.  With respect to

16 Mr. Gutierrez, he raised some very serious allegations

17 about his signature on the petition.  He --

18       MR. WIESE:  That are not the subject of this case

19 here today.

20       MS. HILL:  Well --

21       MR. WIESE:  That was a charge that was filed and

22 investigated and --

23       JUDGE ROSAS:  The -- go ahead.  I'm not going to

24 get into the focus of his testimony with respect to the

25 paperwork that was on the wall.  But anyway, Counsel,

1    complete your statement.

2         MS. HILL:  Okay.  It was basically -- that was

3    one of the prongs of his testimony.  He also indicated

4    that there was pressure put on him to do various things,

5    and he identified --

6         JUDGE ROSAS:  By his supervisor.

7         MS. HILL:  By his supervisor.  Also some pressure

8    put on him by Mr. Rivera, Mario Rivera, not Mr. Robert

9    Rivera.

10        JUDGE ROSAS:  All right.  You know what, I'm

11   going to overrule the objection.

12        You can answer.  Do you recall the question?

13        THE WITNESS:  Yes.  We -- excuse me, sir, if you

14   want, I won't mention any names, but I went to --

15        JUDGE ROSAS:  What was the question?  Hold on.

16   What was the question?

17        MS. HILL:  Okay.  Do you want to repeat the

18   question.

19        (Record read as follows:

20          "Question:  So the other two signatures, how

21        did you go about getting signatures?")

22        JUDGE ROSAS:  The question was how did you get

23   the signatures, okay.  So you want to ask him how did he

24   get the signatures?

25        MS. HILL:  That was the question.

1           JUDGE ROSAS:  So can you talk generally about the

2    process by which --

3           THE WITNESS:  Yes.

4           JUDGE ROSAS:  -- you went to get the signatures

5    without first divulging the conversation that you had

6    with any individuals.  If counsel wants to pursue that,

7    then that would be the next question.  But just how did

8    you go about it?

9           THE WITNESS:  Okay, sir.  I went to the employees

10   on my own with the paper I wrote out, and I asked

11   everyone that I'm filing for a petition, I need to get

12   signatures, would you be willing to sign this, this

13   isn't -- and there's a long answer that goes along with

14   that which means you're not responsible at the time of

15   the election, this is just to get your signature on the

16   paperwork to have me open up the -- the petition so we

17   can go back to the table, sir.

18   BY MS. HILL:

19      Q    Okay.  Did you threaten any of the employees to

20   sign, sir?

21      A    No.  I asked.

22      Q    And did Mr. Bogardus ask you to get the paperwork

23   to prepare that decertification?

24      A    No.  Mr. Bogardus was never involved.  This was

25   me and the NLRB was the one who told me what to do.  The

1  people in the office next door is the ones who told me

2  what to do and how to do it.  They didn't know I was

3  coming until I told them that I filed the paperwork with

4  the NLRB.

5     Q   Did Mr. Bryan Anderson ask you to file any of the

6  paperwork with the NLRB?

7     A   No.

8     Q   All right.  Now, sir, there are two binders in

9  front of you.

10    A   Yes, ma'am.

11    Q   I would like you to look at the black binder,

12 sir, and if you would look at Respondent's Exhibit No.

13 10, sir.

14    A   From the National Labor Relations Board?

15    Q   Yes, sir.

16    A   Yes.

17    Q   All right.  Now, if you would please look at --

18 I'm trying to get the page.  If you'd look at the lower

19 right-hand corner, there's a series of numbers and

20 letters, and at the very end you'll see 1502.  Would you

21 go to that page, sir.

22         JUDGE ROSAS:  What's the exhibit?

23         MS. HILL:  This is Respondent's 10, sir.  This

24 was used before in a previous witness.

25         THE WITNESS:  Respondent's 10, would that be the

1   Bryan Anderson?

2   BY MS. HILL:

3       Q   1502.  At the very top, you'll see an "RD

4   Petition" typed out there.

5           May I approach, your Honor?  No.  You will.

6   Okay.  Thank you, sir.

7           I'll give you a moment to look at that, sir.

8   A   Yes, ma'am.

9       Q   All right.  Do you recognize this page, sir?

10  A   Yes.

11      Q   Is any of the handwriting and printing on this

12  document yours, sir?

13  A   Yes.  My signature, my title and the date.

14      Q   All right.

15  A   And the date for the election.  I'm sorry.  The

16  date -- the date for the -- the election date, that was

17  what came in the mail that I gave to Bryan so we could

18  post for the company for everyone, because we have to do

19  that.  That's what I was told by one of these guys.

20      Q   When you say "one of these guys," do you mean the

21  NLRB?

22  A   Yeah.  I don't know if they're here or not.  It

23  was on the phone.  I'm sorry.

24      Q   So looking at Section 11, that's your handwriting

25  in Section 11b, c and d, correct?

1    A    Yes, ma'am.  That's the date.

2    Q    And then looking up near the top in Section 3a,

3    "Bryan Anderson PCM 776," is that your handwriting, sir?

4    A    No.

5    Q    Do you recognize that handwriting?

6    A    Yeah.  That's Bryan's handwriting.

7    Q    Okay.  And the e-mail address there, do you

8    recognize that handwriting?

9    A    Yes.

10   Q    And do you recognize -- I'm sorry.  You seem to

11   be studying it some more.

12   A    Yes.  I'm sorry.

13   Q    And do you recognize that handwriting, sir?

14   A    Yes.

15   Q    Okay.  Is it your handwriting?

16   A    No.

17   Q    The pages that are in this Exhibit 10, did you

18   receive these, sir?

19   A    I believe this is the one -- yeah, this is I

20   believe what they sent me in the mail.

21   Q    Okay.  Well, looking back at the page with your

22   handwriting on it, sir --

23   A    Yes.

24   Q    -- did you put your handwriting on there while

25   you were in the NLRB office?

1    A   It was twice I was here, I believe I came here

2   twice I filled out paperwork.  I couldn't tell you which

3   one was which.

4    Q   Okay.  Thank you.  Now, sir, I know you're going

5   to be asked this on cross examination, so I'll get it

6   upfront.

7        Did you receive a subpoena to appear here today?

8    A   A subpoena, yes.

9    Q   A piece of paper?

10   A   Yes.

11   Q   Yes.  All right.  Did I meet with you to prepare

12  you for today?

13   A   I don't know what you --

14   Q   Oh, did I meet with you prior to today?

15   A   Yes.

16   Q   Okay.  At that meeting, did I ask you if -- did I

17  tell you you did not have to talk to me?

18   A   Yes.

19   Q   Did I tell you that you could hire an attorney to

20  represent you?

21   A   Yes.

22   Q   Did you indicate to me that you wanted me to

23  represent you?

24   A   Yes.

25   Q   Did you -- and you're an hourly employee,

1    correct?

2        A    Yes.

3        Q    And the division that you work in, is it union or

4    nonunion?

5        A    Nonunion.

6        Q    Did your location already have a union election?

7        A    Climate Control?

8        Q    Climate Control, yes, sir.

9        A    I wouldn't know because I just got there.  I

10   can't elaborate on that.

11       Q    So you don't remember if there was one there

12   before you came?

13       A    No.

14       Q    Okay.  Would you please indicate what

15   certifications you have that make you qualified to work

16   in Climate Control, sir?

17       A    Well, I was in -- as I said earlier in testimony,

18   I was the heating guy for the general stores before they

19   had a Climate Control center.  Before they bought this

20   company called Temp-Air, which is a heating company

21   Sunbelt purchased, I was the guy that on the freeways

22   fixing the heaters for the general stores.  So when they

23   opened up the Climate Control center, that was a flag

24   that I already knew what I was doing.  And I worked for

25   Lincoln Contractors prior to that for 14 years, and

1   Lincoln Contractors is known all over the state as a

2   heating -- just a heating contractor for the

3   construction.

4       Q   So do you have licenses or certifications for --

5       A   I have a -- I was certified through Lincoln as a

6   gas line installer, and I was looking for my card, and I

7   could not find it, but I should be registered as a gas

8   line installer for natural -- you know, to hook up the

9   lines to the -- to buildings, because you have to have a

10  -- you have to be certified in order to tap into a

11  meter.

12          MS. HILL:  No further questions at this time.  I

13  pass the witness.

14          JUDGE ROSAS:  Cross examination?

15          MR. WIESE:  Just one minute, your Honor.  Off the

16  record.

17          JUDGE ROSAS:  Sure.

18          (Pause in the proceedings.)

19          MR. WIESE:  I'm ready to go.

20          JUDGE ROSAS:  Okay.

21                      CROSS EXAMINATION

22  BY MR. WIESE:

23      Q   Good morning, Mr. Rivera.

24      A   Good morning.

25      Q   My name is Tyler Wiese.  I'm an attorney with the

 1    National Labor Relations Board.  I'm going to ask you a

 2    couple questions.

 3            So first, picking up with your conversation that

 4    you referenced with Ms. Hill regarding your testimony,

 5    when did that conversation take place?

 6       A    What do you mean?  I'm sorry.

 7       Q    When did you talk with Ms. Hill about your

 8    testimony today?

 9       A    The testimony today?

10       Q    Yeah.

11       A    Actually I don't recall the date.  I don't recall

12    the date.  About a week.

13       Q    About a week ago?

14       A    So to speak, right.

15       Q    Where did that conversation take place?

16       A    Oh, at my shop.

17       Q    At the Waukesha Climate Control?

18       A    Climate Control center.

19       Q    Did Ms. Hill advise you or tell you why she was

20    asking you questions?

21       A    She said that --

22            MS. HILL:  Ah, I'm going to -- I thought we laid

23    the foundation that he asked me to be his attorney, and

24    I believe that you prefaced it about the -- preparing

25    for the hearing today.

1       JUDGE ROSAS:  Overruled.

2       You can answer.

3       MS. HILL:  Go ahead.

4       THE WITNESS:  I'm sorry.  I kind of got lost

5  there for a minute.

6  BY MR. WIESE:

7    Q   I can repeat the question if you'd like.

8    A   Yes, please.  Thank you.

9    Q   Did Ms. Hill tell you why she was questioning

10  you?

11    A   She just said it would be a series of questions

12  from both you guys.

13    Q   Did she say what the questions were going to be

14  about?

15    A   No.

16    Q   Did Ms. Hill tell you that your answers to her

17  questions would not affect your job at Sunbelt?

18    A   My job was never questioned about anything from

19  anyone in the company.

20    Q   Did Ms. Hill tell you that during your

21  conversation with her?

22    A   No.

23    Q   In preparation for testifying today, did you

24  speak with anybody else regarding your testimony besides

25  Ms. Hill?

 1     A    No.

 2     Q    Did you review any documents in preparation for

 3    your testimony today?

 4     A    No.  This is the first I've seen this.

 5     Q    You didn't look at any transcripts prior to your

 6    testimony today?

 7     A    No.

 8     Q    So you mentioned that you were a skid-steer

 9    mechanic for a while, is that correct?

10     A    Yes, sir.

11     Q    And was that with Sunbelt?

12     A    Sunbelt Rentals, 776.

13     Q    That was at the Franksville facility?

14     A    Yes.

15     Q    And your job was to fix skid-steers?

16     A    Anything.  Pretty much any of the equipment that

17    came through, it's our job to fix.  We really didn't

18    have a special assignment to a particular machine.  One

19    day you're fixing a lawnmower, the next minute you're

20    fixing a bulldozer.  Whatever it took.

21     Q    And skid-steers were one of the pieces of

22    equipment that you would regularly fix at the

23    Franksville facility?

24     A    I worked on them, yes.  Well, we all worked on

25    them.

1    Q    When you say "we" there, you're talking about the

2    mechanics at Franksville?

3    A    Yes, sir, I am.

4    Q    You talked a little bit about an individual named

5    Bo Bogardus.  Do you recall that?

6    A    Yes, sir.

7    Q    Did you ever talk with Mr. Bogardus about the

8    decertification petition that you filed with the NLRB?

9    A    Did I talk to him?  I didn't talk to him.  I

10   filed the petition, and the paper came in the mail, and

11   I gave the paper to Bryan or Bo, I can't recall which

12   one, but I bring them the paper that I was sent after

13   the signatures were filed to -- I don't want to make the

14   question too long because last time you got kind of mad.

15   I gave Bo and Bryan the paper that was given to me by

16   you -- by the NLRB.  That's you, right?

17   Q    Yes.

18   A    Okay.

19   Q    So before you filed the paper --

20   A    Before, no.

21   Q    -- with the NLRB, did you talk with Mr. Bogardus

22   about decertifying the union?

23   A    No.

24   Q    You never asked him any questions about how to

25   get rid of the union?

 1     A    No.  I got the answers from you guys.  I talked

 2   to two people in your company.  They should have it on

 3   file who I --

 4     Q    I don't want to get into your conversations about

 5   it.

 6     A    I'm sorry.  That's why I thought --

 7     Q    No, no.  That's okay.

 8          Nothing further.

 9          JUDGE ROSAS:  Charging Party?

10          MR. RYAN:  Just a couple quick questions.

11                    CROSS EXAMINATION

12   BY MR. RYAN:

13     Q    Mr. Rivera, if you can open that binder again,

14   the document we were looking at.

15     A    This one here?

16     Q    Yes.

17     A    Chapter 10?

18     Q    Yes.

19     A    Page five?

20     Q    Yes.

21     A    Yes, sir.

22     Q    I just wanted to make sure I understood the

23   timing and the sequence.  You said that the handwriting

24   for Mr. Anderson, that was -- that he filled that in?

25     A    Yeah.

1    Q   Do you remember if he -- when he filled that in?

2    A   It says on the corner the "Date Filed," the 22nd.

3  I honestly don't know.  Oh, it had to have been in front

4  of me because I signed it and I dated it myself.

5    Q   So he filled that in before you filed the

6  petition?

7    A   Not before I filed the petition.  This is after

8  the petition was filed.  Because I filed the petition,

9  and then I brang it back to the PC and told him what I

10  got.

11    Q   Okay.  So his name was blank when you --

12    A   Yeah.

13    Q   And then about two-thirds of the way down where

14  it talks about election details in that Section 11 --

15    A   Line "6:00 AM"?

16    Q   Yes.

17    A   Yes, sir.

18    Q   You put in that information?

19    A   That's me, yes.  That's the time that we set up

20  for that.

21    Q   When you say "we set up," who?

22    A   I talked to them and asked what would be a

23  convenient time, because I had to ask that it went into

24  what's the procedure of our workload, because you can't

25  have an election when there's work going on and bring

1   people in.  The last time when the union -- can I

2   mention the union?  Is that okay?

3      Q   Uh-huh.

4      A   When we had the election, it was organized so it

5   was at a morning where it's not inconveniencing the

6   daily work schedule, and it was early morning as well,

7   so I didn't want to interrupt normal business hours and

8   have somebody miss the election to be fair to everyone

9   that wasn't involved in the signatures.  That's what I

10  was thinking of when I tried to make this.

11     Q   When you stay "we," we came up with this time,

12  who else?

13     A   Well, I talked to Bryan, because Bryan was our

14  store manager, and I had to -- I had to get permission

15  to get a decent time where it's not going to affect the

16  business, and he would be the only one who would know

17  what time frame, because we start at staggered hours,

18  and it wouldn't have been fair to have an election

19  without all the employees being able to make it.

20     Q   Okay.  But that information was in there before

21  you signed the bottom of it?

22     A   Yes.

23         MR. RYAN:  Thank you very much.  I don't have

24  anything further.

25         THE WITNESS:  Thank you.

1          JUDGE ROSAS:  Any redirect?

2          MS. HILL:  No, sir.

3          JUDGE ROSAS:  Thank you, sir.  You're excused.

4    Please do not discuss your testimony with anyone until

5    you find out from counsel that the case is over.  All

6    right?

7          THE WITNESS:  Okay.  Thank you, sir.

8          JUDGE ROSAS:  All right.  Have a good day.

9          THE WITNESS:  You, too.  Stay warm.  If you guys

10   need heat, call me.  I'm out there all day long.

11         JUDGE ROSAS:  All right.  Anything else, Counsel,

12   on your case?

13         MS. HILL:  His people.

14         JUDGE ROSAS:  Your people, okay.  Off the record.

15         (Lunch recess.)

16         JUDGE ROSAS:  On the record.  Respondent.

17         MS. HILL:  Sir, there's some noise out there.  Do

18   you mind if I -- are those your people out there?

19         MR. WIESE:  No.

20         MS. HILL:  Do we know who they are?

21         MR. WIESE:  I don't know.

22         MS. HILL:  All right.  The next witness, sir, is

23   again pursuant to a subpoena.  It's Mr. Steven Buffalo.

24         MR. WIESE:  Your Honor, before Mr. Buffalo gets

25   called to the stand, just a housekeeping item regarding

1    the Johnnie's Poultry issue.  I would request leave to

2    amend the complaint to include a similar allegation for

3    Mr. Rivera, and I have drafted a written amendment to

4    the complaint that I'd like to offer at this time.

5            MS. HILL:  Could we do this at the end?  We have

6    witnesses who are here who are being inconvenienced.

7            JUDGE ROSAS:  Well, you're on notice that

8    counsel's going to do this, so --

9            MS. HILL:  Yeah, we know.

10           JUDGE ROSAS:  Yes, that's fine.

11           MS. HILL:  After the witnesses.

12           JUDGE ROSAS:  That's fine.  That's fine.

13           MS. HILL:  I've been told repeatedly by Mr. Ryan

14   they're busy.

15           JUDGE ROSAS:  Absolutely.

16           So please raise your right hand.

17           (Whereupon,

18                    STEVEN BUFFALO,

19   was called as a witness by and on behalf of the

20   Respondent and, after having been duly sworn, was

21   examined and testified as follows:)

22           THE WITNESS:  I do.

23           JUDGE ROSAS:  Please have a seat.  Please state

24   and spell your name and provide us with an address.

25           THE WITNESS:  Steven Buffalo, S-T-E-V-E-N

1    B-U-F-F-A-L-O.   26504 Roosevelt Lane, Wind Lake,

2    Wisconsin.

3                         DIRECT EXAMINATION

4    BY MS. HILL:

5        Q    Thank you, sir.  Who is your employer?

6        A    Operating Engineers Local 139.

7        Q    How long have you worked for the 139?

8        A    Fifteen years.

9        Q    What positions have you held over those 15 years?

10       A    Business agent, district manager, and current

11   position is chief of staff and financial secretary.

12       Q    How long have you held your current position?

13       A    Four years.

14       Q    Were you part of the union's negotiation team

15   with respect to the Franksville profit center for

16   Sunbelt Rentals?

17       A    Yes.

18       Q    Did you miss any of the negotiation sessions?

19       A    There was -- there was a couple meetings that I

20   missed.

21       Q    All right.  There are two binders in front of

22   you, sir.  One is blue.  One is black.  What I would

23   like you to do right now, sir, is turn to the black

24   binder.  Turn to the very last exhibit there that

25   there's a tab with the No. 40.  On the first page at the

1   bottom, do you see R 40?

2       A   Uh-huh.

3       Q   All right.  And the number is 571 down there.

4       A   Correct.

5       Q   All right.  What I'm going to be doing when I ask

6   you questions is directing your attention to those

7   numbers at the bottom right.  Do you understand?

8       A   Uh-huh.

9       Q   Thank you.  All right.  The first general

10  question is would you look at from starting at 572 to

11  the very end, 693, of this exhibit, sir.

12          And just so you know what I'm going to be asking

13  is is all of the handwriting on these pages yours, sir?

14      A   I can't quite read the numbers on the bottom

15  because they're all blacked out on this one, but --

16          MS. HILL:  May I approach, please?

17          JUDGE ROSAS:  Hold on.

18          MS. HILL:  Oh, okay.  Is there a copy problem?

19          JUDGE ROSAS:  That would be the page following

20  686, so presumably 687.

21          MS. HILL:  Oh, because of the page, yes.

22          THE WITNESS:  All of the handwritten notes.

23  BY MS. HILL:

24      Q   Okay.  So all the handwritten notes are yours?

25      A   Yes.

1    Q   And do you recognize this document?

2    A   Yes.

3    Q   And what is this, all these pages?

4    A   They're negotiations.

5    Q   Your copy?

6    A   A copy of -- yeah, the handouts of what I

7 received and my notes.

8    Q   And your notes, correct?

9    A   (Nods head.)

10    MS. HILL:  Your Honor, at this time, it seems a

11 little strange to ask this question, but this witness is

12 considered adverse, and I may ask leading questions.

13    JUDGE ROSAS:  Absolutely.  Go ahead.

14    MS. HILL:  Thanks so much.

15 BY MS. HILL:

16    Q   With respect to -- is there any document, any

17 page in this exhibit that you don't recognize as being

18 part of your negotiation notes with the proposals, sir?

19    A   To the extent of what I'm seeing here, no.  These

20 are all my notes.

21    Q   All of them.

22    Now, your Honor, at this point I would move to

23 admit Respondent's Exhibit 40 into evidence.

24    MR. WIESE:  No objection.

25    MR. RYAN:  No objection.

1      JUDGE ROSAS:  Respondent's 40 is received.

2      MS. HILL:  Thank you.

3      (Respondent's 40 was received.)

4  BY MS. HILL:

5      Q   Sir, 572, what is this, sir?

6      A   That is the Negotiating Committee Ground Rules.

7      Q   At the bottom, the handwriting there that you

8  already said is yours, what does it state?

9      A   "Handed out."

10     Q   So this was handed out when?

11     A   On 5/22.

12     Q   2018?

13     A   Yep.

14     Q   Now No. 4, why is that number circled, sir?

15     A   Well, because we had asked for -- obviously we

16  asked for a 20-minute caucus throughout the

17  negotiations, and that didn't happen.

18     Q   Okay.  Which of the negotiation sessions was this

19  handed out at?

20     A   It was the first one.

21     Q   The first one.  So you didn't have any caucuses

22  at that time, correct?

23     A   (Shakes head.)

24     Q   Verbal, please.

25     A   No.

1    Q    Okay.  With respect to No. 4, so when did you

2  circle that?

3    A    I probably circled it after your first caucus.

4    Q    Sir, are you guessing?

5    A    No.

6    Q    All right.  So you said it was after the first

7  caucus?

8    A    Yeah.

9    Q    Why did you scratch out No. 13?

10    A    You know what, I don't recall, Pat.

11    Q    No. 7, it states, "The parties shall decide all

12  language proposals before discussing wages."  Is that

13  correct?

14    A    Yes.

15    Q    Who did you hand this out to?

16    A    To Sunbelt and yourself, Boregard [sic], Jason,

17  and I think his name was Bryan.

18    Q    Mr. Anderson?

19    A    Yes.  And obviously our side had it.

20    Q    At this point in the negotiations, did the union

21  ask -- at the time that this was handed out, did the

22  union ask that all proposals not be sent by e-mail?

23    A    Yes.

24    Q    And why was that?

25    A    Because we typically don't negotiate through

1  e-mails.

2    Q   Could documents, proposals be submitted to the

3  other side via regular U.S. Mail?

4    A   No.

5    Q   Was that discussed?

6    A   No.

7    Q   And why not?

8    A   I don't think it was brought up.

9    Q   Did the union's caucuses last longer than 20

10  minutes?

11    A   I'm sure there was a few, but it wasn't to the

12  extent of 45 minutes to an hour.

13    Q   And the negotiation sessions averaged -- were

14  supposed to average approximately two hours, correct?

15    A   I think that's what we asked for.

16    Q   But the sessions lasted longer than just two

17  hours, correct?

18    A   The negotiating sessions?

19    Q   Yes, sir.

20    A   Some did.  Some didn't.

21    Q   Did Sunbelt agree to what is entitled Negotiating

22  Committee Ground Rules?

23    A   No.

24    Q   Did they explain why?

25    A   I don't recall.

1    Q    No. 11 states, "No public statement shall be made

2    by either side until final agreement or impasse is

3    reached."

4         The union never declared an impasse, correct?

5    A    No.

6    Q    That is incorrect or correct?

7    A    No.  That is correct, we never -- no, we never

8    came to an impasse.

9    Q    And -- by the way, what was your role on the

10   negotiating team?

11   A    I was assisting as the negotiating team.

12   Q    So who was the head of the negotiating team?

13   A    That would be Mike Ervin.

14   Q    Now, sir, if you would please look in the blue

15   binder.  Keep the black one open, please.  If you'd look

16   in the blue binder and look at Exhibit -- and this is

17   going to be called General Counsel Exhibit 15, sir.

18   A    I got it.

19   Q    Okay.  All right.  Negotiating Committee Ground

20   Rules, what is this, sir?

21   A    That is the Negotiating Committee Ground Rules

22   that we handed out to Sunbelt.

23   Q    All right, sir.  If you would please look at No.

24   3 on General Counsel Exhibit No. 15, and it states,

25   "Meetings will alternate between Janesville Sand &

1   Gravel and Union locations of choice."

2       A   Uh-huh, yes.

3       Q   Okay.  Would you look at Respondent's Exhibit 40,

4   No. 3, Page 572.  Is the language there identical?

5       A   No.

6       Q   Why not?

7       A   Because we were negotiating with Sunbelt, and we

8   were -- then we were negotiating with Janesville Sand &

9   Gravel.

10      Q   But, sir, you already said that General Counsel

11  Exhibit 15 was handed out to Sunbelt.  Which one, was it

12  General Counsel Exhibit 15 or was it Respondent's

13  Exhibit 40?

14          MR. WIESE:  Objection, your Honor, relevance.

15          MS. HILL:  Big relevance, sir.

16          JUDGE ROSAS:  Do you know the other one she's

17  referring to?

18          THE WITNESS:  The first one?

19          JUDGE ROSAS:  Respondent's 40.

20          MS. HILL:  Right, Page 572.

21          THE WITNESS:  Yeah, that --

22  BY MS. HILL:

23      Q   Those are not identical ground rules, correct?

24      A   No, they're not.  Well, when it -- when it comes

25  obviously to the names of the companies, Janesville Sand

1  & Gravel and Sunbelt.

2      Q   Well, sir, isn't it true that General Counsel's

3  Exhibit 15 was the one that was actually handed out to

4  Sunbelt's negotiating team?

5      A   I can't recall, Pat.

6      Q   And you're -- the copy from your notes, No. 572,

7  was never handed out to Sunbelt, was it?

8      A   It was.

9      Q   Sir, do you recall a discussion during

10 negotiations on that first day in May of 2018 regarding

11 Janesville Sand & Gravel and that was not relevant to

12 Sunbelt?

13     A   I don't recall, Pat.

14     Q   Now, sir, I want you to look again at your notes

15 that you said were yours from 540 -- excuse me, in

16 Exhibit 40, Respondent's Exhibit 40, and will you

17 confirm that these were the actual proposals and

18 documents that were exchanged between the parties?

19         MR. RYAN:  Your Honor, I'm going to object.

20 That's a rather broad question.

21         JUDGE ROSAS:  The proposals that are contained

22 within Pages 571 to 693?

23         MS. HILL:  Well, I have skipped 571 because that

24 seems to be the union cover sheet, sir, so I started at

25 572.

1          JUDGE ROSAS:  Take your time and look through it

2  and if you know.

3          THE WITNESS:  I mean obviously there are some

4  pages that I did not write on, but for the most part,

5  it's my handwriting and it's my notes.

6  BY MS. HILL:

7     Q   If you would please look at Respondent's Exhibit

8  No. 40, Page 588.

9     A   Uh-huh.

10    Q   And what is this, sir?

11    A   Dues and assessments to the union.

12    Q   Was this a proposal from Sunbelt to the union?

13    A   Yes.

14    Q   And did Sunbelt provide a justification for this?

15    A   I don't recall, Pat.

16    Q   Would you agree that this provision, this

17  proposal is an important part of the Collective

18  Bargaining Agreement?

19    A   They're all important parts, Pat.

20    Q   I'm asking, sir -- move to strike his response

21  and ask him to respond to my question, sir.

22          JUDGE ROSAS:  Given the nature of the question,

23  I'll accept the answer.

24  BY MS. HILL:

25    Q   Then I'll repeat my question.  Is this particular

1   proposal an important aspect of the Collective

2   Bargaining Agreement?

3       A   Yes.

4       Q   Was it a waste of time for Sunbelt to get this

5   proposal to the union?

6       A   No.

7       Q   Was this proposal ultimately TA'd by the parties?

8       A   Only because it's not hand -- my -- my

9   handwritten note on there says just "ok."  Pat, I can't

10  recall if it was TA'd or not.

11      Q   Looking at 589, sir.  Is this a proposal from

12  Sunbelt to the union?

13      A   Yes, it is.

14      Q   Did Sunbelt explain the reason for this proposal?

15      A   Yes, they did.

16      Q   What was that reason?

17      A   Safety.

18      Q   And was this an important proposal for the

19  Collective Bargaining Agreement?

20      A   Yes, it is.

21      Q   Did the parties agree to this proposal?

22      A   That I can't recall because I don't have anything

23  written on that page.

24      Q   590.  Was this one of Sunbelt's proposals?

25      A   Yes.

1    Q    And Sunbelt explained the reason for this

2  proposal, correct?

3    A    Yes.

4    Q    What is your handwriting next to the typed

5  proposal?

6    A    It says "safety."  It was rules and safety, and I

7  okayed it.

8    Q    Was this proposal ultimately agreed to by the

9  parties?

10    A    I don't recall.

11    Q    591, sir.  This is Sunbelt's proposal, correct?

12    A    Yes.

13    Q    And Sunbelt explained the reason for this

14  proposal, correct?

15    A    Yes, they did.

16    Q    And this was given to the union on May 22nd,

17  2018, correct?

18    A    Correct.

19    Q    Again, this was another important part of the

20  Collective Bargaining Agreement, correct?

21    A    Can I just take a second to read it?

22    Q    Sure.

23    A    Yes.

24    Q    All right.  If you would please look at 592.  And

25  before I ask questions, please read this and then look

1  up, sir.

2      Do you recognize this proposal as coming from

3  Sunbelt?

4      A   Yep.

5      Q   Did Sunbelt explain the reason for this proposal,

6  sir?

7      A   Yes.

8      Q   Was this proposal ultimately agreed to by the

9  parties?

10     A   No.

11     Q   Was a similar agreement ultimately decided --

12  agreed to by the parties, sir?

13     A   You know, Pat, I believe there was.  I can't -- I

14  can't say a good yes or no.

15     Q   Would you please read what your handwriting is

16  just above the "Local 139" typed at the bottom of the

17  page, sir.

18     A   Oh, on "Sept 13, 9:00" o'clock.

19     Q   Oh, "9:00 am"?

20     A   Yeah, "9:00 am."  I don't know what that was for

21  to be honest.

22     Q   593, sir.  This was one of Sunbelt's proposals,

23  correct?

24     A   Yes.

25     Q   It was given to the union on May 26th, 2018,

1  correct?

2     A   Yes.

3     Q   What proposal did the union give Sunbelt on

4  May -- for the May negotiation session and for the June

5  26th negotiation session?

6     A   Gee, I don't recall, Pat.

7     Q   And you don't see anything in your file folder

8  here that's been marked as Respondent's Exhibit 40?

9     A   No.

10    Q   Looking still at 593, sir.  Did Sunbelt provide

11 an explanation or a reasoning or justification for this

12 proposal, sir?

13    A   Yeah, yes.

14    Q   I see a "TA."  Did that mean that on June 26th,

15 2018 the parties agreed to this?

16    A   Yes.

17    Q   You would agree that this discrimination

18 provision for the Collective Bargaining Agreement was an

19 important part of the agreement, correct?

20    A   Yes, yes.

21    Q   Looking -- this is going to be a two-page section

22 that I will be asking you questions about, so please

23 review both pages, 594, 595, sir.

24        This was a proposal that was given to the union

25 by Sunbelt on June 26th, 2018, correct?

1    A    Yes.

2    Q    Would you please look at the handwriting just

3  below and read it out loud, please, at "6-26-18" on 594.

4    A    I scribbled "will counter," and then --

5    Q    And to the right of that.

6    A    "Let's talk to legal.  Need to run the numbers."

7  And "No," we didn't TA it.

8    Q    On that day?

9    A    On that day.

10    Q    Ultimately did the parties agree to a

11  paid-time-off provision for the Collective Bargaining

12  Agreement?

13    A    No.

14    Q    With respect to 595, the writing there, what does

15  that reflect below the final typed line there?

16    A    Obviously we wanted to replace it with our

17  proposal.

18    Q    And what was your proposal?

19    A    I can't recall, Pat.

20    Q    Well, sir, is there a document in your file there

21  in front of you as Respondent's 40 that would refresh

22  your recollection, sir?

23        MR. RYAN:  Your Honor, the witness has answered

24  the question.

25        MS. HILL:  I'm trying to refresh his

1   recollection.  He said he didn't recall.

2          JUDGE ROSAS:  Go ahead.

3          THE WITNESS:  I'm confused.  Do you want me to

4   look in the blue book or the black book?

5   BY MS. HILL:

6      Q   In the black book, because you said your

7   negotiation folder --

8      A   Uh-huh.

9      Q   -- or file, excuse me, is --

10     A   Uh-huh.  Oh, I'm sorry.  Yeah, I got you.

11     Q   -- in this document?

12     A   Yes.

13     Q   Okay.

14     A   Could you please repeat the question again,

15  please.

16     Q   Did you counter with this proposal from Sunbelt

17  with a union's proposal for it?

18     A   This is 595 we're talking about, right?

19     Q   Well, 594 or 595.  It's a two-page proposal.

20     A   Yeah, we did counter.

21     Q   And could you identify the page number.

22     A   Page 577.

23     Q   Okay.  Was 577 given to Sunbelt before or after

24  Sunbelt's proposal?

25     A   It was after your proposal to us.

1     Q    When?

2     A    I don't -- I don't recall, Pat.

3     Q    And which proposal or combination of proposals

4  was finally agreed to by the parties?

5     A    You know, I don't think we agreed to any of them

6  because it was part of economics.

7     Q    Sir, you said you think.  Do you know, sir?

8     A    No, I don't recall, Pat.

9     Q    Sir, if you could please look at 673, 674.

10    A    Yes.

11    Q    What are those two pages, sir?

12    A    Paid Time Off.

13    Q    Are those two pages -- do those two pages reflect

14 the Paid Time Off provision of the Collective Bargaining

15 Agreement that the parties agreed to, tentatively agreed

16 to?

17    A    I -- I don't recall, Pat.

18    Q    596, sir.

19    A    Yes.

20    Q    This was a -- this was Sunbelt's proposal to the

21 union, correct?

22    A    Yes.

23    Q    This provision -- this proposal does not have a

24 date on it.  Do you know when it was given to the union?

25    A    I don't.

1    Q    And you would agree that Management Rights is an

2    important part of any Collective Bargaining Agreement,

3    correct?

4    A    It depends.

5    Q    Which side of the --

6    A    Yes.

7    Q    -- table you're on?

8    A    Yes.

9    Q    All right.  But even for the union it can be an

10   important part?

11   A    Oh, absolutely.

12   Q    All right.  It states at the top "Will discuss,

13   get back to them."  So who did you have to discuss this

14   with?

15   A    Our negotiating team.

16   Q    So this was a note to discuss it on the day it

17   was presented or later?

18   A    I don't recall that.

19   Q    Is there anything in your file folder there that

20   would refresh your recollection as to when you discussed

21   this to get back to Sunbelt on?

22   A    I don't think so, Pat.

23   Q    597, sir.  This was another proposal from Sunbelt

24   to the union?

25   A    Uh-huh, yes.

1    Q    And this one's marked as "#6," sir.  If you would

2    look to Page 592, this was marked as proposal "#1" for

3    June 26th, 2018.

4         Would "#6" be the proposal that was given to the

5    union on June 26th, 2018?

6    A    I would say yes.

7    Q    And all of these proposals that we've seen so far

8    for June 26th, 2018 were handed to the union at the

9    beginning of the negotiation session, correct?

10   A    At the beginning of the negotiation session?

11   Q    On June 26th, 2018.

12   A    Yeah, I don't recall that.

13   Q    Anything in your file folder that would refresh

14   your recollection, sir?

15   A    No.

16   Q    598.  This was the seventh proposal given to the

17   union by Sunbelt, correct?

18   A    Yes.

19        MR. WIESE:  Your Honor, objection, this is

20   cumulative testimony.  This is now the sixth, I believe,

21   if I'm counting correctly, the sixth witness who's

22   testifying about these collective bargaining

23   negotiations.  I mean there's no reason to have a sixth

24   witness go through blow-by-blow what happened at the

25   bargaining table.  If there's specific questions or

1  contradictions that Ms. Hill sees and wants to elicit,

2  then that may be appropriate, but just going through

3  blow-by-blow is cumulative.

4      MS. HILL:  No, sir.  This is the first time we've

5  seen Mr. Buffalo's notes.  He was the, I believe, the

6  senior person at that table.  He is the person who, as

7  Mr. Mayfield said, spoke to him in July of 2019.  It

8  wasn't the rest of the team.  It was Mr. Buffalo.

9      And these were the -- we haven't had other

10  witnesses testify as to when these proposals were given

11  to the union, you know, what was discussed, that type of

12  thing.  Even Mr. Ervin's testimony didn't go over this,

13  and this is straight from Mr. Buffalo's file, and I

14  think --

15      JUDGE ROSAS:  Hold on one second, hold on.

16      Counsel, are you saying that it's cumulative

17  based on the evidence that the Respondent has produced?

18      MR. WIESE:  And that counsel --

19      JUDGE ROSAS:  No.  Based on the testimony that

20  the Respondent has produced?

21      MR. WIESE:  Yes, your Honor.  Respondent's called

22  three witnesses to talk about this Collective

23  Bargaining, correct.

24      JUDGE ROSAS:  With this specificity?  I don't

25  recall with this specificity regarding proposals.

1          MR. WIESE:  The opportunity to present testimony

2     regarding the specificity of proposals was available and

3     not taken.  I don't understand why we need another

4     witness to go through blow-by-blow his negotiating notes

5     when, again, we've had five witnesses testify about this

6     already.

7          JUDGE ROSAS:  The concept you're referring to

8     about the opportunity having passed, that's a whole

9     different situation.  That doesn't apply here.  This is

10    not cumulative with respect to the Respondent's case.

11    And I don't recall the General Counsel's proposals.

12         I know that Mr. Ervin got into all of the

13    proposals as well, but the Respondent's entitled to

14    explore that on their case.  Obviously we're going to

15    have this testimony from Mr. Buffalo, and from here on

16    out, I'll see if there's any further cumulative

17    testimony from the witnesses that will follow to be

18    called by the Respondent.  So the objection is

19    overruled.

20         Do you remember the question?

21         THE WITNESS:  Please repeat the question.

22         MS. HILL:  She's the court reporter.  She's going

23    to read it back.

24         (Record read as follows:

25            "Question:  This was the seventh proposal given

1        to the union by Sunbelt, correct?

2          Answer:  Yes.")

3   BY MS. HILL:

4     Q   And we're on 598.  Okay?

5     A   Uh-huh.

6     Q   Sunbelt explained the justification for this

7   proposal, correct?

8     A   Yes.

9     Q   Could you please read your, and no offense to

10  your handwriting, sir, at the bottom there what you

11  have.

12    A   That we TA'd that one, and we agreed to put it in

13  the shop lunch room.  And I think the reason we agreed

14  for that so you didn't put it in the men's bathroom or

15  the ladies bathroom where no one could see it.

16    Q   But was the -- there was never a discussion about

17  having it in the restrooms, correct?

18    A   No, there was no discussion about that.

19    Q   Right, because --

20    A   But we wanted to be specific as to where we

21  wanted it.

22    Q   Right.  Wasn't there a discussion about having it

23  in the break room versus near one of the time clock

24  areas in the shop?

25    A   I don't recall that, Pat.  I don't know where

1   your bulletin boards are in that location.

2      Q   Okay.  599, please.  And this was the eighth

3   proposal for June 26th, 2018, correct?

4      A   Yes.

5      Q   And Sunbelt provided a justification for this

6   proposal, correct?

7      A   Yes.

8      Q   With respect to this proposal, was it ultimately

9   TA'd by the parties?

10     A   I can't recall.

11     Q   Would you please -- and I apologize, the

12  numbering at the bottom there, and this was produced by

13  the union, it's a little bit cut off, but it looks as if

14  it's "6/26/18" in the upper right-hand corner.

15     A   Uh-huh.

16     Q   All right.  It's your handwriting on this page,

17  correct?

18     A   Uh-huh.

19     Q   Could you make a verbal, please.

20     A   Yes.  I'm sorry.

21     Q   You misspelled "Sun Belt," correct?

22     A   I don't think I did.

23     Q   Don't you think it's important to have the

24  employer's name spelled correctly for any Collective

25  Bargaining Agreement?

1    A    In my opinion, it is spelled correct.

2    Q    In any of -- and in Local 139's proposal to

3  Sunbelt, it referenced Sunbelt as a contractor, correct?

4    A    I do recall that coming up, that it was

5  referenced in some -- I can't remember which one, Pat,

6  but I do -- I do recall you corrected us by calling you

7  a contractor.

8    Q    And did Sunbelt explain the difference --

9    A    Yes.

10    Q    -- between Sunbelt and a contractor?

11    A    Yes, you did.

12    Q    And the union agreed to Sunbelt's request to

13  change it to employer, correct?

14    A    Yes.

15    Q    If you would look at 602, this would be three

16  pages past what you were looking at, at the very top it

17  appears to have "Jamie" written.

18    A    Uh-huh.

19    Q    What is your last note below "12:45 Back"?

20    A    Boy, I've got terrible handwriting.  Put

21  negotiations with Sunbelt.  That's the date of 2005.  I

22  don't know -- I don't know what my intent was for that.

23    Q    Thank you.  Please turn to the next page, sir.

24  All right.  And the questions are going to be regarding

25  603, 604 and also 605.  Now, 603, 604 and 605, these

1   were given to the union by Sunbelt on July 25th, 2018,

2   is that correct?

3        A    Yes.

4        Q    And Sunbelt provided a reason or justification

5   for each of the proposals here, correct?

6        A    Yes.

7        Q    Sunbelt provided the union with a copy of its

8   handbook, correct?

9        A    I think so, Pat.  I'm not quite sure if I have

10  that.  I think you might have just given it to the lead

11  negotiator.  I'm not sure.

12       Q    Okay.  With respect to 605, do you recall reading

13  Sunbelt's handbook for purposes of understanding

14  Sunbelt's volunteerism, funeral leave, jury duty,

15  victims of domestic violence and time off for voting

16  policies?

17       A    Yes.

18       Q    Your handwriting there, could you please read it.

19       A    "Volunteerism, for what does your cause on the

20  employment laws.  See these policy's!  State fed laws

21  for victims of domestic violence."

22       Q    Did you have to have this proposal reviewed by

23  anybody before you could TA it?

24       A    Yes.

25       Q    And who did that?

1      A    That would have been the negotiating team.

2      Q    No one else?

3      A    No.

4      Q    Did you ever have any of the proposals reviewed

5   by anyone outside of the negotiating team?

6      A    Yes.  Our legal department.

7      Q    And who's in your legal department?

8      A    It would be Pat Ryan.

9      Q    That's the entire department?

10     A    Baum, Sigman out of Chicago is the entire

11   department.

12     Q    603, it appears that you have written some TAs

13   here, correct?

14     A    Yes.

15     Q    And these were TA'd on July 25th, 2018?

16     A    I'm assuming so, Pat.  I'm not sure.

17     Q    Anything in your file, Exhibit 40, that would

18   refresh your recollection, sir?

19     A    I'm just trying to find the just cause page.

20          Do you know what page that is, Pat.

21          MR. RYAN:  No.

22   BY MS. HILL:

23     Q    The two Pats can't answer your question.

24     A    I know.  Okay, I'm sorry, I'll just have to tell

25   you I can't recall, Pat.

1    Q   Okay.  Please turn to 606 and 607, sir.  These

2   notes are from August 8th of 2018, is that correct, sir?

3    A   I can't tell you on the first page because I

4   don't have it -- I don't have it marked.  My written

5   notes, right?

6    Q   Correct, in the upper right-hand corner.

7    A   It's not on my sheet.

8    Q   Okay.  The note that you're looking at, does

9   that -- look at the top -- the left-hand side, a spiral

10  notebook, you see the spiral there, and then

11  "Jamie-Steward."

12   A   You said 607?

13   Q   It would be 606, I believe, 607.  The two pages

14  before 608.

15   A   "8/8/18"?

16   Q   "8/8/18."

17   A   Okay.

18   Q   So these are your notes from that date, correct?

19   A   Yes.

20   Q   And 139 made a verbal counterproposal to

21  Sunbelt's just cause proposal by suggesting felonious

22  acts, correct?

23   A   Yes.

24   Q   So it was permitted to have the union give verbal

25  proposals, but Sunbelt's proposals had to be in writing,

1    correct?

2        A    I don't recall that.

3        Q    Do you recall anything from this particular

4    negotiation session that would indicate to you that

5    Sunbelt was unprepared for negotiation, sir?

6        A    No.

7        Q    Looking at 608, at the top it looks -- it appears

8    to have "8-8-18," correct?

9        A    Uh-huh.

10       Q    And verbal, please.

11       A    Yes.  I'm sorry.

12       Q    And "TA."  So this proposal for Management Rights

13   was ultimately TA'd on August 8th, correct?

14       A    Uh-huh, yes.

15       Q    609, sir.  And I'm going to be asking you

16   questions on this all the way to 632.

17            609 the parties TA'd on August 30th?

18       A    Yes.  The only thing we -- we TA'd it with the

19   changes that I had written down on there.

20       Q    And which are the changes?

21       A    "Replace primary w/ lawful."

22       Q    Then 610, was this TA'd that day or just

23   discussed?

24       A    That was just discussed.

25       Q    And this the union would agree is an important

1  part of any Collective Bargaining Agreement, correct?

2     A    Yes.

3     Q    Was Sunbelt unprepared for this negotiation

4  session on August 30th, 2018?

5     A    Pat, I don't recall.

6     Q    Do you recall any session when Sunbelt was

7  unprepared?

8     A    All of them.

9     Q    Then explain to me how you just said you don't

10 recall them being unprepared for August 30th, but all of

11 them Sunbelt was unprepared for?

12    A    Because it was our intention to have written

13 proposals for you, and when we asked for returned

14 written proposals from you, we never got them, and when

15 we did get them, we caucused for, you know, hours on end

16 while you were out making the proposals for us.

17    Q    But do you recall Sunbelt giving you proposals at

18 the beginning of any of the negotiation sessions, sir?

19    A    Not every session.

20    Q    Do you recall Sunbelt giving you written

21 proposals at the beginning of any of the negotiation

22 sessions, sir?

23    A    Yes.

24    Q    And specifically for this session, do you

25 recall --

1    A   I don't recall, Pat.

2    Q   611 to 612.  This is another proposal to Sunbelt

3   to the union on August 30th, 2018, correct?

4    A   Uh-huh, yes.

5    Q   And some of the sections of this article were

6   TA'd that day?

7    A   Some of them were, yes.

8    Q   Looking at 612, what is the significance of the

9   "ERT" that you have written in the -- about the middle

10  of the page on the right-hand column?

11   A   I think that was an acronym that Sunbelt uses.

12   Q   For what?

13   A   I can't recall.  I don't know why I would put

14  "ERT" down there.

15   Q   Do you know what it stands for?

16   A   I do not know what it stands for.

17   Q   Okay.  613, sir.  This was another proposal from

18  Sunbelt to the union on August 30th, 2018, correct?

19   A   Yes.

20   Q   Your notes indicate "Proposed the word changes."

21  What do you mean by that?

22   A   I don't know if it was the seven business days --

23  I don't know if it was business days or working -- or

24  working days.

25   Q   And again, you have "Sun Belt" misspelled on this

1    page, correct?

2         A    I don't think I do, Pat.

3         Q    Now, sir, let's go to 614.  This was another

4    proposal from Sunbelt to the union, correct?

5         A    I didn't spell that one right either I noticed.

6    It is correct, yes.

7         Q    And looking just above the date that's typed near

8    the bottom, it indicates "Sunbelt Rentals reserves the

9    right to modify or withdraw this proposal."

10         Would you agree that Sunbelt is spelled properly

11    there?

12         A    I don't know.

13         Q    And the Article 9, if you look at 615, was

14    ultimately TA'd by the parties?

15         A    Yes.

16         Q    It was TA'd December 8th, 2018, correct?

17         A    Yes.  TA'd with the addition of "business."

18         Q    Versus?

19         A    "Workday."

20         Q    With respect to 616, 617, this was a proposal

21    given to the union on August 30th, 2018, correct?

22         A    Yes.

23         Q    And it was also discussed later on September

24    27th, 2018?

25         A    Yes.

1    Q    And some of these sections of this article were

2    TA'd by the parties on August 30th, 2018?

3    A    Yes.

4    Q    And Sunbelt provided the union with the

5    justification for this proposal?

6    A    Yes.

7    Q    618, sir, and this continues to 620.  This was

8    another proposal from Sunbelt to the union, and this one

9    was August 30th, 2018, correct?

10   A    Right.

11   Q    This was again discussed September 27th, 2018,

12   correct?

13   A    Correct.

14   Q    Sections 18.4, 18.5, 18.6, 18.7, 18.8, 18.9,

15   18.10, 18.12 were all TA'd by the parties, correct?

16   A    Correct.  Can I make a clarification though?

17   Q    Yes, sir.

18   A    I noticed ERT stands for emergency repair team

19   which is your acronym.

20   Q    I'm just asking what it stood for when you had it

21   there.

22   A    Now I know what it stands for.

23   Q    And what refreshed your recollection, sir?

24   A    Because I'd written down the acronym myself,

25   "Emergency Repair Team."

```
 1    Q    Where?

 2    A    On 619, Section --

 3    Q    That refreshed your recollection, correct?

 4    A    Yeah.  I know it wasn't -- I do know it wasn't

 5  our acronym.

 6    Q    With respect to Sections 18.3, 18.4 that appear

 7  on 619, these sections of the article had to be

 8  discussed with legal, correct, your legal department,

 9  correct?

10    A    Wait, go back, you said 18 --

11    Q    18.13, 18.14 on 619.

12    A    Yeah, you said 18.3 and 18.4.

13    Q    Sorry, sir.  18.13, 18.14.

14    A    Yes, it had to be discussed with legal.

15    Q    So did you discuss it with legal on -- during

16  this negotiation session on August 30th?

17    A    No.

18    Q    So that had to delay any further discussion

19  regarding these sections until the next negotiation

20  session?

21    A    I don't recall, Pat.

22    Q    Well, sir, you couldn't discuss on August -- in

23  August, correct?

24    A    No.

25    Q    You couldn't -- well, let me put it a different
```

1    way.

2        Could you discuss these two sections in August of

3    2018 during the negotiation session?

4    A   We couldn't discuss it as a negotiating team

5    because there was legal precedence there that -- and I'm

6    not a lawyer, so reading some of that, we needed to get

7    a second opinion.

8    Q   So you couldn't call the legal department?

9    A   Pat, I can't recall.  We might have called.  I

10   can't recall.  We may have.

11   Q   If anything in your notes refreshes your

12   recollection later on, please let me know.

13   A   I will.

14   Q   621.  This one you were a little bit more

15   specific about.  In the upper left-hand corner, it says

16   "Received" at "12:27 pm" on "8-30-18."  Now, this is

17   a -- is this a revised proposal from the earlier general

18   proposal that you saw on 618 and 19 and 20?

19   A   I think this was a counter to your proposal.

20   Q   So when you say -- was this from Sunbelt or from

21   the union?

22   A   This is from -- this was from Sunbelt.

23   Q   So there were two versions of Article 18 given to

24   the union on -- during the August 30th, 2018 session,

25   correct?

1    A    I don't recall, Pat.

2    Q    But you agree there were two different ones on

3  that day?

4    A    I don't recall.

5    Q    Well, looking at the notes, your notes and the

6  language there.

7    A    Yes.

8    Q    Yes.  Are they identical?

9    A    Do you actually want me to go back to that

10  Article 18 and read the first one you gave?

11    Q    Well, I'm just asking you.

12         JUDGE ROSAS:  No.  Only if you recall from

13  looking at it.

14         THE WITNESS:  I don't recall.

15  BY MS. HILL:

16    Q    Looking at 624, sir.  This one indicates it was

17  TA'd, correct?

18    A    Yes.

19    Q    And this was TA'd on 8-30 of 2018?

20    A    Yes.

21    Q    And you received it -- what's the time there?

22    A    I think it's "10:30."

23    Q    Sitting here today, you don't know how many

24  versions of this Sunbelt gave to you during that

25  negotiation session, correct?

1    A   I do not recall.

2    Q   626.  Were the handwritten words that you have

3 written here the union's verbal suggested revisions to

4 this proposal, sir?

5    A   No.  They were just my notes.

6    Q   Did they become verbal proposals to the union --

7 to Sunbelt, excuse me, from the union?

8    A   I don't recall, Pat.

9    Q   628, sir.  You have notation "Received."  What

10 time is that?

11   A   It looks like received on "8:58 AM."

12   Q   That was on August 30th?

13   A   August 30th, '18.

14   Q   And there's a notation here of parentheses "(c)

15 Include Step 3."  Was that the union's counterproposal?

16   A   I do believe.

17   Q   And who gave that proposal to Sunbelt?

18   A   We did.

19   Q   Was it someone in particular?

20   A   Oh, Mike Ervin.

21   Q   And it was TA'd "10:12" is that?

22   A   Yes, uh-huh.

23   Q   On the same day.

24       629, this was TA'd also on 8-30 of 2018, correct?

25   A   Yes, with the revisions.

1    Q   And those revisions were proposals from the

2   union, correct?

3    A   Yes.

4    Q   And Sunbelt agreed to them?

5    A   Yes.

6    Q   Did the union provide Sunbelt with a written

7   proposal reflecting your handwritten notes there?

8    A   I do believe we did.

9    Q   On the same day?

10    A   No.  The first meeting.

11    Q   Okay.  So a previous meeting with a negotiation

12   session?

13    A   No.  It would have been the first meeting.

14    Q   Okay.  The first negotiation session in May?

15    A   Yes.

16    Q   Okay.  So you're saying that Sunbelt's proposal

17   on 629 was the counter to that one, correct?

18    A   Yes.

19    Q   But after Sunbelt's proposal here and you have

20   written out "lawful, lawful, lawful" on those areas, did

21   you give this revised proposal to Sunbelt in writing?

22    A   I don't recall, Pat.

23    Q   633, sir, to 635.  The first two pages, those are

24   your handwritten notes?

25    A   Yes.

1    Q    And these are your notes from September 27, 2018,

2   and they reflect the various provisions that were

3   discussed, is that correct?

4    A    Yes.

5    Q    What is the -- at the bottom of 633, you have an

6   asterisk with some language there.  What does that say?

7    A    I don't know.

8    Q    Can you read any of it?

9    A    "Add no" -- I don't know -- it's "Equipment

10   Specialist shall displace."

11    Q    Was that a proposal?

12    A    No, it wasn't a proposal.

13    Q    What was it?

14    A    It might have been -- it might have been a

15   counter to your proposal.

16    Q    And 634, were these your verbal counterproposals

17   to Sunbelt's proposals for those sections?

18    A    No.

19    Q    What were those?

20    A    I think those were just my notes that I was

21   writing down as Mike was speaking.

22    Q    Turning to 635.  So on September 27, 2018, the

23   articles and sections reflected here that -- where you

24   have the TA in the left column --

25    A    Yes.

1    Q    -- those were all the proposals that had been

2    TA'd that day, correct?

3    A    Yes.

4         JUDGE ROSAS:  We've established that that's what

5    his notes indicate all along, so --

6         MS. HILL:  Good.

7         JUDGE ROSAS:  -- do we need to do that for

8    every -- every page?

9         MS. HILL:  Well, I want to make it very clear

10   what was done on each -- in each negotiation session,

11   which negotiation session there was actually TA

12   proposals, because part of the Board -- the Board's

13   issue is that, and I can get the language out, that

14   there weren't proposals -- significant proposals were

15   not generated, the parties did not negotiate and get

16   agreed-upon proposals --

17        JUDGE ROSAS:  Yeah, it's fine, it's fine.  I

18   recall the allegation that the Respondent wanted to

19   discuss items that had been previously TA'd.

20        MS. HILL:  Well, that, plus the underlying one

21   that Sunbelt didn't even make proposals that were

22   significant or part of the -- that became part of the

23   agreement.

24        JUDGE ROSAS:  Okay.  All right.  So let's try to

25   move through this.

1      MS. HILL:  I am.

2  BY MS. HILL:

3      Q    638, this is from October 23rd, 2018.  These were

4  Sunbelt Rentals' proposals to the union on that day,

5  correct?

6      A    Yes.

7      Q    You don't have the times for these, correct?

8      A    I do not.

9      Q    And sitting here today, you don't remember when

10  they were given to the union?

11      A    I don't recall.

12      Q    On this particular day, did Sunbelt provide the

13  union with a copy of the sample safety quiz?

14      A    I think you did.

15      Q    And was that a --

16      A    Can I retract that?

17      Q    Okay.

18      A    No, you didn't.

19      Q    Did the union ever get a copy of the sample

20  safety quiz?

21      A    No.

22      Q    Did the union ever get a copy of the take ten?

23      A    I don't recall.

24      Q    Did the union ever get a copy of the

25  accommodation form for employees?

1    A    I don't recall.

2    Q    And sitting here today, you still -- you're

3    saying it did not happen that Sunbelt gave the union a

4    copy of the sample quiz, safety quiz?

5    A    They didn't give it to me personally, Pat, so

6    I --

7    Q    Well, did they give it to someone on the team,

8    someone on the negotiation team?

9    A    I don't -- probably.

10   Q    When Sunbelt gave the union proposals at the

11   sessions that you attended, did each member of the

12   union's team, negotiation team get a copy?

13   A    Of your proposals?

14   Q    Of Sunbelt's proposals, yes.

15   A    Yes.

16   Q    640, this is from October 25th, 2018, correct?

17   A    Yes.

18   Q    And this reflects sections of various articles

19   that were TA'd that day?

20   A    Yes.

21   Q    Over in the left-hand corner next to Article

22   18.11, can you read that, sir.

23   A    "Ask Pat" -- I don't know if that -- if it didn't

24   quite get copied, but I think the "Sunbelt" is spelled

25   correctly, and it says "from?  Ask Pat for it."  Is it

1   spelled correctly?

2         MS. HILL:  Mr. Ryan, I had suggested that the

3   original notes be available in case anything was not

4   copied completely.  Do you have his original notes so he

5   could look at that?

6         MR. RYAN:  I do not have them here.

7         MS. HILL:  Okay.  Thank you, sir.

8   BY MS. HILL:

9      Q   640 -- let me see, what's next.

10         At some point did the union agree that

11   non-personnel -- non-union personnel could deliver

12   equipment weighing 10,000 pounds or less?

13     A   No.

14     Q   If you would please look at 640, sir.

15     A   Yes.

16     Q   And look at 17.7.  Is that a "TA" next to that?

17     A   Apparently it was open and then we TA'd it.

18     Q   So at some point it was TA'd, sir, correct?

19     A   Yes.

20     Q   And your handwriting underneath says

21   "non-bargaining unit member"?

22     A   Yes.

23     Q   So you agree that the parties agree that

24   non-union personnel or employees could deliver equipment

25   weighing 10,000 pounds or less, correct?

1    A    Rephrase that question again, please.

2    Q    17.7, the parties agreed that non-bargaining unit

3  members or employees for Sunbelt could deliver equipment

4  weighing 10,000 pounds or less, correct?

5    A    I'm trying to think if we countered on that, Pat.

6    Q    Well, what was the TA provision then?

7    A    That's what I'm trying to think, and I can't

8  recall.

9    Q    Anything in your note file that would indicate or

10 refresh your recollection, sir?

11   A    Maybe.  I don't know.

12   Q    642, sir.  This provision was TA'd on October

13 23rd, 2018?

14   A    Yes.

15   Q    And 643, sir, does that refresh your recollection

16 as to whether Sunbelt gave the union a copy of the

17 accommodation request form?

18   A    Yes.

19   Q    And was that an important document for the union

20 to be aware of?

21   A    Yes.

22   Q    Was it a waste of time for Sunbelt to do that?

23   A    I don't think it was a waste of time, no.  Safety

24 is never a waste of time.

25   Q    645, sir, this is "2/21/19," upper right-hand

1  corner.

2      A    645 you said?

3      Q    Yes, sir.

4      A    Again, my notes are blacked out.

5      Q    Well, the numbers are at the bottom, but --

6      A    Yes.

7      Q    -- if you would look at the next page at 646.

8      A    Uh-huh.

9      Q    So the page before that, "2/21/19."

10     A    Yep.

11     Q    And these -- who from the union attended this

12  session?

13     A    That day our business manager, Terry McGowan,

14  attended.

15     Q    And what was the purpose of Mr. McGowan attending

16  that session?

17     A    He wanted to sit in in the negotiations.

18     Q    Where in your notes on this day is that

19  reflected?

20     A    It says "TMC."

21     Q    Thank you.  And what, if anything, did

22  Mr. McGowan state during this session?

23     A    I think Mr. McGowan was a little perturbed at the

24  fact the way this -- our bargaining unit was being

25  treated by Sunbelt.

1    Q    Meaning what?

2    A    Meaning the delays, the long caucuses.

3    Q    What do you mean by he was perturbed by long

4 caucuses?

5    A    Well, obviously Mr. McGowan is the business

6 manager, so we would report to him the ongoing

7 negotiations that we were having and explain to him the

8 difficulties we were having with Sunbelt.

9    Q    Who did that reporting, sir?

10    A    All of us, the whole negotiating team.

11    Q    Okay.  Who was the spokesperson during the

12 discussions with Mr. McGowan?

13    A    Mr. Mike Ervin.

14    Q    You didn't say anything?

15    A    I might have said something, Pat.

16    Q    Sitting here today, you don't remember?

17    A    I don't recall.

18    Q    What was the purpose of the bannering, sir?

19         MR. RYAN:  Objection, your Honor, relevance.

20         JUDGE ROSAS:  There was bannering, correct?

21         THE WITNESS:  Yes.

22         JUDGE ROSAS:  There was bannering?

23         THE WITNESS:  Yes.

24         JUDGE ROSAS:  Okay.

25    ///

1    BY MS. HILL:

2        Q    And the purpose?

3             JUDGE ROSAS:  Sustained.

4    BY MS. HILL:

5        Q    Did Mr. McGowan discuss the bannering?

6        A    No.

7        Q    He discussed the increased economic pressure that

8    was going to be placed on Sunbelt by the union, correct?

9             MR. WIESE:  Objection, vague.

10            JUDGE ROSAS:  Overruled.

11            If you recall.

12            THE WITNESS:  I don't recall.

13   BY MS. HILL:

14       Q    Now, Mr. McGowan was -- this wasn't the first

15   time Mr. McGowan attended a negotiation session,

16   correct?

17       A    It was the first time with Sunbelt.

18       Q    How many times did Mr. McGowan attend negotiation

19   sessions?

20       A    With Sunbelt?

21       Q    With Sunbelt, yes.

22       A    One time.

23       Q    Was he -- do you know if he attended a

24   negotiation session that you did not attend?

25       A    No, he did not.

1    Q   Your notes on -- unfortunately the numbers are

2  not copied.  If you look at -- the last number that you

3  can read is 646, that's the next several pages, you

4  can't read the numbers, but those are all your notes

5  from negotiation sessions, correct?

6    A   Yes.

7    Q   Did you write everything that was said in your

8  notes?

9    A   Yes.

10   Q   So you didn't eliminate any comment by any of the

11 participants, correct?

12   A   No.  I'm not the best note-taker there is, but I

13 know I didn't write everything down.

14   Q   And Sunbelt did make a proposal regarding wages,

15 correct?

16   A   I don't recall, Pat.

17   Q   Okay.  Perhaps if you would look at 65 -- I think

18 this is 656.  Look for 658 and then go back two pages.

19   A   In my written notes, right?

20   Q   In your handwritten notes, yes, sir.

21   A   Uh-huh.

22   Q   At the very top, I think it has "6/5/19"?

23   A   Yep.

24   Q   Okay.  And Sunbelt made a proposal regarding

25 wages, correct?

1    A    In my notes you did.

2    Q    Did it provide a justification for its proposal?

3    A    No, not from what I wrote down.  Not in my

4   written notes anyway.

5    Q    Did you always write down the justification that

6   Sunbelt gave for different proposals?

7    A    I did not.

8    Q    Sunbelt also made a proposal regarding health

9   insurance, correct?

10   A    Yes.

11   Q    Sunbelt also made a proposal regarding pension,

12   correct?

13   A    Yes.

14   Q    And Sunbelt had provided the union with copies of

15   the plan documents relating to the pension and the

16   health insurance, correct?

17   A    I do believe you did, Pat.

18   Q    And that was before the first negotiation

19   session, correct?

20   A    Yes.

21   Q    If you would look at the next page, sir, after

22   the "6/5/19," would you please read what you have

23   written here.

24   A    "Back from caucus 12:43.  Our TA proposal 1-8 are

25   good.  We will need counter proposal before we review

1   any more TA's."  And then I have written down that "Greg

2   - we will ask for the next date."

3      Q   And below that?

4      A   "Updated information on health and wages."

5      Q   What did that mean?

6      A   I think the intent was to get the updated

7   information on our wages and benefits.

8      Q   Oh, from your --

9      A   From us.

10      Q   Okay.  All right.  If you would please look at

11   658 to 686, sir.

12      A   Uh-huh.

13      Q   And what is this, sir?

14      A   This is the -- this is the agreement between

15   Sunbelt Rentals and International Union of Operating

16   Engineers.

17      Q   Who prepared these pages, sir?

18      A   We did.

19      Q   Was this given to Sunbelt prior to the

20   negotiation session?

21      A   This date on 6/5/19?

22      Q   This 658 through 686.

23      A   Well, it was initially given to you in the

24   Collective Bargaining Agreement in the first meeting.

25      Q   That was a proposal, correct?

1    A    Right.

2    Q    But you agree that 658 through 686 was the

3  union's version of what the two parties had tentatively

4  agreed to, correct?

5    A    Yes, yes.

6    Q    Now, Sunbelt, at the request of the union, had

7  already prepared a Collective Bargaining Agreement that

8  reflected all of the proposals that the parties had

9  tentatively agreed to, correct?

10    A    Yes.

11    Q    The difference between Sunbelt's if you want to

12  call it version of the tentatively agreed proposal and

13  this one was each article in the union's version was on

14  a separate page, correct?

15    A    Yes.

16    Q    Who presented 658 through 686?

17    A    Mike Ervin.

18    Q    What, if anything, did Sunbelt -- Sunbelt's

19  negotiation team say in response to receiving this

20  document, sir?

21    A    Well, initially they said they didn't have

22  anybody on their negotiating team that could -- that had

23  the authority to agree to this.

24    Q    Mr. Mayfield was at this session, correct?

25    A    Yes, he was.

1    Q   Okay.  And wasn't it true that Sunbelt wanted to
2    compare the language in this -- the union's version to
3    what Sunbelt had provided to the union earlier in the
4    year?
5    A   Yes.
6    Q   And Sunbelt requested from Mr. Ervin a Word
7    version of this to do a comparison, correct, to do it
8    quickly?
9    A   I don't recall, Pat.
10   Q   Did you ever observe any of the Sunbelt's
11   negotiation team in caucus in Mr. Anderson's office when
12   they were conducting any personal work rather than
13   caucusing?
14   A   A time or two Bryan was out -- I think he was
15   trying to run the profits there as the manager.
16   Q   Okay.  Now, let me step back.  The Sunbelt
17   negotiation team negotiated in Mr. Anderson's office,
18   correct?
19   A   Yes.
20   Q   Did you ever observe what was going on in
21   Mr. Anderson's office when Sunbelt was caucusing?
22   A   No.
23   Q   Since on or about August 29th, 2018, when did the
24   union request to meet at a location other than the
25   Franksville profit center?  This is since August 29th,

1    2018, sir.

2        A    When did we request it?

3        Q    Yes.

4        A    I'm sorry.  Please rephrase the question.

5        Q    Okay.  Since on or about August 29th, 2018, when

6    did the union request to meet for negotiations at a

7    location other than Franksville profit center?

8        A    It was our first meeting.

9        Q    But after that.

10       A    I don't think we proposed anything after because

11   Sunbelt was very specific that we had to stay at this

12   profit center because of business, because you had

13   Bryan, your manager, had to run the store while we were

14   negotiating.

15       Q    During negotiations or when, sir?

16       A    It was during negotiation.

17       Q    And it was -- and how often did you personally

18   observe him handling --

19       A    Oh, I don't -- I don't -- I can't give a number,

20   but I recall a couple of times.

21       Q    A couple of times?

22       A    Yeah.  You can also make the argument that I seen

23   Boregard [sic] walking around out there, too.

24       Q    Walking around where?

25       A    Well, beyond -- you've got the desk there, I mean

1    he was -- and I don't know if he was doing any business,

2    but you're asking me if I've seen them walking around

3    out there, and yes.

4        Q    No, I didn't ask that question, sir.

5        A    All right.  Rephrase your question.

6        Q    Okay.  Look at R 1.  It's in the black binder.

7    It's in the first exhibit.

8        A    Blue binder?

9        Q    Black, black.  In the front, R 1.

10       A    Yes.

11       Q    Okay.  That has been entered as an exhibit, it's

12   not to scale, but when you say that Mr. Bogardus was

13   walking around, could you identify on that where he was

14   walking around?

15       A    No, I can't.

16       Q    Do you recall?

17       A    No, I don't recall.  You had asked me if I'd seen

18   him, and I just replied yes, I did see him.

19       Q    Since on or about August 29th, and keep that R 1

20   out, please, when did Sunbelt's bargaining team members

21   perform work in the shop?  Do you see where the "shop"

22   is?

23       A    I guess I don't.  R 1?

24       Q    That drawing, right.

25       A    Oh, I'm sorry, yeah, here it is.  Yes.

1    Q   Okay.  I'll ask the question again.  Since on or

2  about August 29th, 2018, when did Sunbelt's bargaining

3  team members perform work in the shop?  Do you see

4  where -- it indicates where the "shop" is?

5    A   I don't think any -- I don't recall anybody

6  working in the shop.

7    Q   Did you -- do you have any first-hand information

8  regarding the allegation that on or about December of

9  2018 or January 2019, that Chris Pender told employees

10  that the union was not going to get in and that the

11  union was not going to happen?

12    A   I do not.

13    Q   Do you have any firsthand information that on or

14  about December 2018 or January 2019, that Chris Pender

15  threatened employees at the Franksville profit center

16  that it would be futile for them to select the union as

17  their bargaining representative?

18    A   I do not.

19    Q   Do you have any firsthand information, sir, that

20  on or about April 22nd or 23rd, that Mr. Anderson

21  interrogated employees about their union sympathies?

22    A   I do not.

23    Q   Do you have any firsthand information that on or

24  about April 22nd or 23rd of 2019, that Mr. Anderson

25  interrogated employees at the Sunbelt Franksville

1    location about their union activities?

2       A    I do not.

3       Q    What is Sunbelt's fiscal year?

4       A    2018?

5       Q    What is the fiscal year for Sunbelt?

6       A    Is it June to June?

7       Q    With respect to -- did the -- do you recall the

8    negotiation sessions starting with a safety moment?

9       A    Yes.

10      Q    Did you think the safety moment was a waste of

11   time, sir?

12      A    No, absolutely not.  And you actually provided us

13   to do a safety moment also.

14      Q    And did the union take advantage of that offer?

15      A    Yes, yes, we did.

16      Q    At any time between March 1st of 2018 and the

17   present, did you receive any information that Sunbelt

18   did not have an intention of reaching an agreement with

19   Operating Engineers 139?

20      A    No.

21      Q    What percentage of Sunbelt's business out of

22   Franksville comes from walk-in customers?

23      A    I don't know.  I don't know.  Walk-in as far as

24   what do you --

25            JUDGE ROSAS:  There's no question.

 1        THE WITNESS:  Okay.

 2   BY MS. HILL:

 3    Q    Okay.  With respect to walk-in customers, do you

 4   know how Sunbelt, at the Franksville location, received

 5   business from customers?

 6    A    No.

 7    Q    And the 139 had represented one other equipment

 8   rental company, correct?

 9    A    Yes.

10    Q    And that was NES that was acquired by United,

11   correct?

12    A    Yes.

13    Q    And after United acquired that company, shortly

14   thereafter, United closed that location, correct?

15        MR. WIESE:  Objection, relevance.

16        JUDGE ROSAS:  Sustained.

17   BY MS. HILL:

18    Q    And the 139 negotiating team asked to stop

19   negotiations early during the December negotiation

20   session, correct?

21    A    I don't recall, Pat.

22    Q    Would your notes reflect that, sir?

23    A    Do you have a specific one you want me to look

24   at?

25    Q    Well, it's the December negotiation session, sir.

1    2018, sir.

2        A    Did you say December?

3        Q    Yes, sir.

4        A    I don't recall, Pat.

5        Q    And there was one negotiation session where you

6    did not have the draft CBA that everyone was referring

7    to, correct?

8        A    Yeah, I do recall that.

9        Q    And Sunbelt provided you with a copy of it?

10       A    I don't recall that.

11       Q    But you did get a copy of --

12       A    Well, I might have got it from the negotiating

13   team, from my -- from our negotiating team.

14       Q    And the union, for several of these suggested

15   provisions that Sunbelt made, the union would not agree

16   to them because they were not the same as in your other

17   CBAs, correct?

18       A    Please rephrase that question.

19       Q    Okay.  For some of the proposals that Sunbelt

20   made to the union, the union did not agree to them

21   because the language in the proposals did not -- was not

22   the same as --

23       A    No.

24       Q    -- the language in other CBAs?

25       A    No.

1    Q    Do you recall March 21st, 2019 when you asked

2    Sunbelt for a clean copy of Sunbelt's February 2019

3    proposals because you did not have them?

4    A    I don't recall, Pat.

5    Q    You attended a negotiation session in July of

6    2019, correct, with Sunbelt?

7    A    Can I look in my notes?

8    Q    Sure.  I think it may be 687, if you look right

9    after -- because your notes don't have a legible number

10   on them.

11   A    And what was the date you were asking?

12   Q    You attended the negotiation session July 9th,

13   2019, correct?

14   A    Yes, I did, yes.

15   Q    And how long did that last?

16   A    It looks like it lasted one hour and ten minutes.

17   Q    Do you recall if the negotiation session had to

18   maybe perhaps take a break after about nine, ten

19   minutes?

20   A    Yes.

21   Q    And is that reflected in your notes?

22   A    Oh, yeah, it is.  Now I see it.

23   Q    With respect to that session, was there a

24   discussion regarding Mr. Smith's termination?

25   A    Yes.

1    Q    Did you have a separate meeting with Mr. Mayfield

2    after the negotiation session took a break?

3    A    I don't think we took a break.  I think we ended

4    the negotiation session.

5    Q    Well, do you recall a break after about nine or

6    ten minutes?

7    A    Yes.  It wasn't with Mr. Mayfield.  It was with

8    you, Pat.

9    Q    All right.  It wasn't just with me based on your

10   notes, correct?

11   A    Well, if you recall when -- when --

12   Q    Well, let's go back to your notes.  Who was the

13   there for the beginning of the negotiations?

14   A    Just you and Bo.

15   Q    Why do you have Bryan written here?

16   A    That was -- because I know Jason did not show up

17   until like 9:37 that morning.

18   Q    But --

19   A    Bryan might have been there.  I can't recall.

20   Q    Now, there was a break after about nine or ten

21   minutes, correct?

22   A    Correct.

23   Q    When Mr. Mayfield did show up at the profit

24   center, did you meet with him without the rest of the

25   negotiating team?

1    A    I met with you and him.

2    Q    Okay.  But Mr. Mayfield was there when you had a

3    discussion, correct?

4    A    Yes.

5    Q    And during that discussion, what was the topic?

6    A    The topic was the adversarial start of the

7    meeting.

8    Q    Did it also discuss Mr. Smith's termination?

9    A    I don't recall, Pat.

10   Q    Do you recall claiming that Mr. Smith had

11   never -- had told you that he had one -- he had missed

12   one safety quiz and was terminated?

13   A    I do recall that only because Sunbelt said they

14   would never terminate an employee for not passing a

15   safety quiz.

16   Q    Did Sunbelt inform you during that meeting that

17   he had several disciplinary write-ups prior to his

18   termination?

19   A    Yeah, I do believe he did.

20   Q    And Sunbelt offered to provide the union --

21   A    Yes.

22   Q    -- with copies of all the disciplinary actions,

23   correct?

24   A    Yes.

25   Q    And Sunbelt requested to receive an electronic

1   version of the TA proposals, correct?

2       A   Yes.

3       Q   And the union -- you, on behalf of the union,

4   said there would be a TA -- there would be an electronic

5   version sent to Sunbelt, correct?

6       A   Well, it was that whole -- what was it, 60 --

7       Q   658?

8       A   659 or 658, yes.

9       Q   To the end of 686, correct?

10      A   Yes.

11      Q   If you would look at 659, sir.  Is any of the

12  handwriting on this yours, sir?

13      A   Yes.

14      Q   Could you identify it, please.

15      A   I wrote "Sun Belt."  I underlined -- or I

16  underlined, and underneath that underline I put "Sun

17  Belt" and "Accept" and "Reject."  Then "Tentative

18  Agreement."  And there was also another underline with

19  the "IUOE Union 139," and my signature above it.

20      Q   Above it.  The handwriting under the signature

21  line to the left, is that all of yours?

22      A   No.

23      Q   Any of it's yours?

24      A   Some of it's mine.

25      Q   Which?

1    A    "Sun Belt, Incorporated."

2    Q    Okay.  "Sun Belt Rentals, Incorporated" or the

3    "Sun Belt" --

4    A    You, Pat, you were the one that wrote "Rentals"

5    in there.

6    Q    Okay.  But the handwriting below?

7    A    Is mine.

8    Q    Okay.  And the handwriting above that, two words

9    for "Sun Belt," is that your handwriting?

10   A    "Sun Belt," yes.

11   Q    As two words?

12   A    Yes.

13   Q    Thank you.  And 660 is just a copy --

14   A    Yes.

15   Q    -- of 659, correct?

16   A    Yes.  Just for the record, I did not write "as

17   two page numbers."  That's not my writing.

18   Q    Oh, okay.

19   A    I do believe that is your writing.

20   Q    Okay.  I just asked for your handwriting, sir.

21   A    You asked if it was all my writing on that page.

22   Q    Okay.  But you wrote "Accept, Reject," the two

23   boxes.  Is that your "X" in "Reject"?

24   A    Yes.

25   Q    And you wrote "Tentative Agreement," correct?

1    A   Oh, wait, wait, let's -- "Accept" and "Reject."

2  I think that was your "X" to -- that references as to

3  those page numbers.

4    Q   Okay.  But sitting here today, are you positive,

5  sir?

6    A   I'm not positive.

7    Q   Thank you, sir.  And you wrote the date on it,

8  correct?

9    A   Yes, because that was our first official

10  authorized TA.

11    Q   What is your definition of authorized TA?

12    A   Somebody signing off on it, initialing it.

13    Q   Because there was the earlier version of TA

14  provisions that the union had reviewed and said they

15  were accurate, correct?

16    A   Yep.

17    Q   And in fact Mr. McGowan said trust, but verify,

18  correct?  He wanted to review --

19    A   Yes.

20    Q   -- the written proposals, correct?

21    A   Yes.

22    Q   All right.  And you attended the negotiation

23  sessions in August with Sunbelt, correct?

24    A   Yes.

25    Q   And based on the negotiation sessions in

1   August -- well, how many were there that you recall?

2       A    Probably two.

3       Q    And the parties negotiated the severance for two

4   individuals who were being laid off, correct?

5       A    Yes.

6       Q    And the amount of severance that was proposed by

7   Sunbelt was -- the counterproposal from the union was

8   for an increased amount, correct?

9       A    Yes.

10      Q    And the parties agreed to the increased amount

11  for the two individuals being laid off, correct?

12      A    Yes.

13      Q    And during the negotiation sessions, Sunbelt

14  asked the union if it had any questions, correct?

15      A    Yes.

16      Q    And the parties discussed what the business was

17  going to be at the Franksville location based on the

18  reorganization, correct?

19      A    Yes.

20      Q    And it was Mr. Mayfield who led the discussion

21  regarding the reorganization, correct?

22      A    Yes.

23      Q    And Mr. Mayfield informed the union that the

24  Franksville location was going to be a will call

25  location?

1    A    Yes.

2    Q    And the equipment was going to be under 10,000

3    pounds at that location?

4    A    I don't recall that.  I don't recall the poundage

5    or size of the equipment.

6    Q    And the union did not ask when would the big

7    equipment be removed from the Franksville location?

8    A    I don't recall us asking that question.

9    Q    And the union did not ask how the equipment was

10   going to be repaired at that location, correct?

11   A    I think we did, Pat.

12   Q    Where in your notes, sir?

13   A    I'm just -- off the top of my head, I mean, you

14   know, the whole -- the whole thought was that you were

15   going to be laying these people off and you were going

16   to be, you know -- our thought was to have such a big

17   repair facility like that, that you would not use it to

18   repair anything there.

19   Q    And so -- but the parties did not discuss having

20   the equipment that needed to be repaired sent to outside

21   vendors, correct?

22   A    You did discuss or you did not discuss?

23   Q    Did not discuss.

24   A    Right.

25   Q    And the parties did not discuss preventive

1   maintenance that had to be provided for the equipment at

2   the Franksville location?

3       A    No.

4       Q    And Mr. Mayfield indicated that the reason for

5   the reorganization at the Franksville location was

6   because of the economic impact from the bannering and

7   the inflatables that the union was using, correct?

8       A    I don't recall that.

9       Q    And Mr. McGowan at one point during one of the

10  negotiation sessions indicated that the bannering and

11  inflatables would continue, correct?

12      A    I don't recall that, Pat.

13      Q    Was the union's negotiating team surprised that

14  the impact of the bannering and inflatables was to

15  decrease business at the Franksville location?

16          MR. RYAN:  Objection.

17          MR. WIESE:  Objection, relevance.

18          JUDGE ROSAS:  Repeat the question.

19          (Record read.)

20          JUDGE ROSAS:  You're going to have to rephrase

21  that.

22  BY MS. HILL:

23      Q    Were you surprised, sir, that the impact of the

24  bannering and inflatables created a decrease in business

25  for the Franksville location?

1    A   No.

2    Q   And was the purpose of the bannering and the

3  inflatables to decrease the business at Franksville?

4        MR. RYAN:  Objection, your Honor, relevance.

5        JUDGE ROSAS:  I'll allow it.

6        If you know.

7        THE WITNESS:  No.

8  BY MS. HILL:

9    Q   What was the purpose?

10    A   To let the public know that we were trying to

11  negotiate an agreement with five members, five employees

12  that wanted to be union.

13    Q   But your signs did not indicate there were five

14  employees who wanted to be unionized?

15    A   No, it didn't say that.

16    Q   Your signs for the inflatables indicated that

17  Sunbelt should take their southern ways south of the

18  Mason-Dixon line, correct?

19        MR. WIESE:  Objection, relevance.

20        JUDGE ROSAS:  I'm going to sustain the objection.

21  BY MS. HILL:

22    Q   And one of the -- what was the purpose then of

23  the language on the signs for the inflatables?

24    A   Pat, I --

25        MR. RYAN:  Objection, your Honor.

1        JUDGE ROSAS:  Sustained.  It was bannering.

2        MS. HILL:  But it was to educate, so I want to

3   know what was the language on the banners.

4        MR. RYAN:  Your Honor, the bannering is a subject

5   of another proceeding.

6        JUDGE ROSAS:  If you recall the language.

7        THE WITNESS:  I don't recall the language.

8   BY MS. HILL:

9    Q   Did you ever see the language on the signs?

10   A   I probably have, but I don't recall them.  I

11  wasn't part of -- again, we have an organizer that does

12  that.

13   Q   And that's Mr. Ervin, correct?

14   A   Yes.

15   Q   So you didn't have to supervise Mr. Ervin's work,

16  correct?

17   A   I did not.

18   Q   Sunbelt informed the union that both of the

19  employees would be eligible -- who were being laid off

20  at the Franksville location, the two mechanics, that

21  they were eligible for rehire, correct?

22   A   Yes.

23   Q   And Sunbelt informed the union who they could

24  contact to get information regarding Cobra and rehiring,

25  correct?

1    A   I don't recall, Pat.

2    Q   And your notes, do they reflect that?

3    A   My notes reflect it.

4    Q   Pardon?

5    A   My notes do reflect that we agreed to the Cobra.

6  But I'm sorry, just rephrase your question one more

7  time.

8    Q   Okay.  Did Sunbelt tell the union who their two

9  bargaining union members could contact if they had

10 questions regarding Cobra, paid time off, anything

11 relating to being -- applying for new jobs?

12   A   I don't -- I can't remember, Pat.

13   Q   Okay.  And your notes do not reflect?

14   A   No, that's what I'm saying, I do not see it in

15 there.

16   Q   Your note -- and I'm sorry, I don't have the

17 number on this one.  It is -- it looks like about the

18 fourth from the end.  What --

19   A   Would that be the date "8/16"?

20   Q   "8/16."  And this was the second negotiation

21 session regarding the severance for the individuals,

22 correct?

23   A   I do believe so.

24   Q   Were any safety issues raised during this time?

25   A   I don't recall.

1    Q    Could you --

2    A    Can you rephrase that question as to what are

3  you --

4    Q    Did the union raise any safety issues during this

5  negotiation session?

6    A    I don't recall.

7    Q    Would you please look -- read out loud what you

8  have written here below -- right across from "Jason" on

9  that line there.  It looks like "I ask."  8/16/19, your

10  notes.

11    A    "Ask date for week of Aug 19th," is that what

12  you're asking for?

13    Q    No.  I'm -- in the upper right-hand corner it

14  says "8/16/19."  Do you have that one?

15    A    Oh, I'm sorry, there it is, yes.

16    Q    And then you see over in the left-hand margin

17  "Jason"?

18    A    Yep.

19    Q    Would you please read aloud the next three lines.

20    A    "I ask about the response letter and an

21  explanation of her time frame" and the "Response to

22  letter."

23    Q    And what were you referring to?

24    A    Obviously I asked for a letter from you to send

25  to us.

1    Q    From Sunbelt?

2    A    Yes.

3    Q    Regarding what?

4    A    I don't recall, Pat.

5         MS. HILL:  All right.  No further questions at

6    this time.  Pass the witness.

7         MR. RYAN:  Can we take a break, your Honor?

8         JUDGE ROSAS:  Okay.  A few minutes.

9         (Recess.)

10        JUDGE ROSAS:  On the record.  Cross examination?

11        MR. WIESE:  Not from the General Counsel, your

12   Honor.

13        JUDGE ROSAS:  Charging Party, anything?

14        MR. RYAN:  No questions, your Honor.

15        JUDGE ROSAS:  Thank you, sir.  You're excused.

16   Please do not discuss your testimony with anyone until

17   you're advised by counsel that the case is closed.  All

18   right?

19        THE WITNESS:  Thank you.  I'll just close this

20   binder here.

21        JUDGE ROSAS:  Okay.  Next witness.

22        MS. HILL:  Is Dan here?

23        THE WITNESS:  Do I stay or do I have to leave?

24        JUDGE ROSAS:  Daniel Marsolek?

25        MS. HILL:  Yeah.

1          THE WITNESS:  Can I stay or do I have to leave?

2          JUDGE ROSAS:  Go ask your attorney.

3          THE WITNESS:  Okay.  Sorry.

4          JUDGE ROSAS:  Mr. Marsolek, I'll remind you

5  you're still under oath.

6          THE WITNESS:  Yes, sir.

7                    DIRECT EXAMINATION

8  BY MS. HILL:

9     Q    Thank you, sir.  Mr. Marsolek, did you take any

10 photos of customers walking up to or into the Sunbelt

11 profit center in Franksville?

12    A    If I did, it wasn't intentional.  I don't know

13 what the customers or what employees were.  There's

14 people in the pictures.

15    Q    Did you speak to any of the people who were

16 walking up to or walking into the Franksville profit

17 center?

18    A    No, ma'am.

19    Q    Did you speak to Craig Putter from Putter

20 Transportation, sir?

21         MR. RYAN:  Objection.  Can I get some time frame?

22         JUDGE ROSAS:  Provide a time frame.

23         MS. HILL:  Well, it was at the Bradford High

24 School project, that might help with the time frame,

25 because I'm not exactly sure when he --

1          JUDGE ROSAS:  What year?

2          MS. HILL:  It would have been 2019.

3          MR. RYAN:  What's the relevance of a conversation

4   there?

5          JUDGE ROSAS:  We'll find out.  Overruled.

6          THE WITNESS:  I believe I did speak with him,

7   yes.

8   BY MS. HILL:

9      Q   And it was Mr. Craig Putter himself, correct?

10     A   I don't know who it was.  It was a truck driver.

11     Q   And did you -- and what do you recall telling

12  that individual?

13         MR. RYAN:  Objection, relevance.

14         JUDGE ROSAS:  Let's see what the question is.

15  Reserve on that for the moment.

16         MS. HILL:  What the answer is?

17         JUDGE ROSAS:  We have to get some foundation.  Go

18  ahead.

19  BY MS. HILL:

20     Q   Okay.  What did you say to the individual?

21     A   I handbilled him and handbilled --

22         JUDGE ROSAS:  I'm sorry.  What?

23         THE WITNESS:  A handbilled the truck driver, and

24  there was someone else there as well, I don't know who

25  it was, that was part of the construction site, so I

1    handbilled that gentleman as well.

2    BY MS. HILL:

3        Q    Okay.  I just want to reserve your answer to

4    Putter Transportation, okay.  So the other individual

5    you don't believe was with Putter Transportation?

6            JUDGE ROSAS:  It hasn't been established that it

7    was Putter Transportation, Counsel.

8            MS. HILL:  I thought he said the driver or did I

9    miss --

10           JUDGE ROSAS:  A driver, correct.

11           THE WITNESS:  A driver, yes.

12           JUDGE ROSAS:  A driver, right.

13   BY MS. HILL:

14       Q    Okay.  Did he have the Putter Transportation logo

15   on his uniform or shirt?

16       A    I don't recall.

17       Q    You took photographs of individuals walking on

18   Franksville profit center property after the

19   reorganization, individuals who were wearing Sunbelt

20   shirts or high-vis vests, correct?

21       A    High-vis, yes.

22       Q    Did you speak to any of those individuals?

23       A    No, ma'am.

24       Q    During one of the negotiation sessions that you

25   attended, Sunbelt provided the union with a copy of the

1  safety quiz, correct?

2      A   Yes, I believe so.

3      Q   Do you have firsthand information, sir, that on

4  or about December of 2018 or January of 2019, that

5  Mr. Chris Pender told Franksville employees that the

6  union was not getting in at that location?

7      A   I don't have any knowledge of any of that, no.

8      Q   Do you have -- do you know of Chris Pender?

9      A   I don't physically -- I don't know him

10 personally, no, I don't.

11     Q   You never talked to him?

12     A   I don't believe so, no.

13     Q   Do you have any firsthand information that on or

14 about December 2018 or January 2019, that Mr. Chris

15 Pender threatened Franksville employees by stating it

16 would be futile for them to select the union as their

17 bargaining representative?

18     A   I have no idea of that, no.

19     Q   Do you have any firsthand information that

20 Mr. Bryan Anderson on or about April 22nd or April 23rd

21 of 2019 interrogated Franksville employees about their

22 union sympathies?

23     A   I don't know anything about that, no.

24     Q   Do you have any firsthand information that on or

25 about April 22nd or 23rd of 2019, that Mr. Anderson

1   interrogated Franksville employees about their union

2   activities?

3      A   No, ma'am, I don't.

4      Q   All right.  You have two binders in front of you.

5      A   Yes.

6      Q   One is the blue and one is the black.  Would you

7   please look at -- in the blue binder under No. 15, sir.

8      A   15?

9      Q   Yes, sir.

10     A   Okay.

11     Q   All right.  If you would go to the second page of

12  this exhibit, sir.  It's the one -- the first page

13  should have at the bottom Exhibit GC 15, but then if you

14  go to the second page, you'll see in the middle of the

15  page GCX 15.  Do you see that, sir?

16     A   I do not have that, no.

17     Q   I thought it was --

18         MR. RYAN:  I thought it was a one page.

19         MS. HILL:  I have -- it was given to me with the

20  second page on it.  This one?  Yeah.  Here.  This is how

21  you gave it to me, sir.

22         JUDGE ROSAS:  Off the record.

23         MS. HILL:  Off the record.  I'm sorry.

24         (Discussion held off the record.)

25  ///

1  BY MS. HILL:

2      Q   This was what was given to me.  If you would look

3  at Exhibit 15, one page like this, sir.

4      A   Yes, Negotiating Committee Ground Rules?

5      Q   Correct.  And then if you would please look --

6  and keep that open, sir, if you would.  If you would

7  look in the black binder, the very last exhibit, it's

8  Exhibit 40 in that black binder.

9      A   The very last page?

10     Q   Well, it's not the last page.  It's the last

11 exhibit, sir.  It's No. 40.  There should be a tab.

12     A   I see it.

13     Q   Okay.  Now, go to the second page there, sir.

14     A   Okay.

15     Q   Which of these two documents was given to Sunbelt

16 during negotiation sessions?

17     A   I would have to refer back to something.  I don't

18 know.  They look very similar.

19         JUDGE ROSAS:  Well, the documents speak for

20 themselves, Counsel.  You've going to have to try to

21 take him to the next level.

22         MS. HILL:  Okay.  I was about to, sir.

23 BY MS. HILL:

24     Q   If you look at GCX 15, sir.  That's in the blue

25 binder.

1    A    Yes.

2    Q    All right.  Look at and read to yourself the

3  wording after No. 3.

4    A    Uh-huh.

5    Q    Does that refresh your recollection as to whether

6  this version was given to Sunbelt during negotiations?

7    A    Which one are we referring to?

8    Q    The blue binder --

9    A    Blue binder.

10   Q    -- okay, No. 3, sir, "Meetings will alternate

11  between Janesville Sand & Gravel and the Union locations

12  of choice."

13       Does that refresh your recollection that that was

14  the version that was given to Sunbelt?

15   A    I would find it hard to believe that we would

16  give that to you being that it's not Sunbelt, it's

17  Janesville Sand & Gravel.

18   Q    Do you recall negotiations --

19   A    I remember -- I remember giving you a document,

20  yes.  Whether it was this one or not, I don't know.

21   Q    Okay.  Thank you, sir.  You can close both of

22  those binders, sir.

23       Do you recall a negotiation session in December

24  of 2019 in which the union said that it had to end

25  negotiations early because it had a conflict for later

1  in the day?

2      A    That would be tough to pin it down to that day.

3  There was a lot happening in those negotiation sessions.

4  If I had notes to refer to or something I could, but I

5  don't.  I don't remember.

6      Q    Okay.  You have your own notes that reflect

7  everything that was said?

8      A    I don't -- no, I don't have any notes, no.

9      Q    Okay.  And -- well, perhaps no notes with you in

10 front of you, but did you take notes?

11     A    I was not the note-taker, no.

12     Q    At any time between March 1st of 2018 and the

13 present, were you told that Sunbelt did not have an

14 intention of reaching an agreement with Local 139, sir?

15     A    No.  By who?

16     Q    By anyone, sir.

17     A    No.

18     Q    Do you know what percentage of the business at

19 the Franksville profit center came from walk-in

20 customers?

21     A    No, ma'am.

22     Q    During one of the negotiation sessions in August

23 of 2019, do you recall raising two issues regarding

24 safety violations by Sunbelt employees?

25     A    It's hard to pin down an exact date.  I --

1    Q    I'm not asking for an exact date, so let's try it

2    a different way, sir.

3    A    You said August of --

4    Q    Let's try it a different way, sir.

5         Do you recall at any negotiation session you

6    stating that a driver for Sunbelt had violated a safety

7    rule?

8    A    Yes, I believe I did.

9    Q    And what did that safety violation involve?

10   A    If it's the same one I'm thinking, I believe it

11   was a tie-off situation with a truck driver.

12   Q    Meaning a tether?

13   A    Being tied off to a lift, a safety -- a safety

14   harness to a lift, while on the lift.

15   Q    And did you provide the location for that alleged

16   safety violation to anyone on Sunbelt's negotiation

17   team?

18   A    I believe I did, yes.

19   Q    And what -- where did your say it occurred?

20   A    Maybe not the location, but I did give the

21   negotiation team a picture of the safety violation.

22   Q    Did you provide the negotiation team the date for

23   that photograph?

24   A    I thought I did, but I can't be sure.  Bryan

25   Anderson is the one I gave it to.  He asked for it.

1    Bryan Anderson asked for it.  I gave it to him.

2       Q   But sitting here today, sir, do you remember

3    giving it to him?

4       A   Yeah, I do.  He asked for it.

5       Q   And what was the date?

6       A   The date of -- when I gave it to him?

7       Q   No.  When the picture was taken.

8       A   That I don't know.

9           MS. HILL:  No further questions at this time of

10   this witness, your Honor.

11          JUDGE ROSAS:  General Counsel?

12          MR. WIESE:  No cross.

13          JUDGE ROSAS:  Charging Party?

14          MR. RYAN:  I don't have anything either.

15          JUDGE ROSAS:  Thank you, sir.  You're excused.

16   Please do not discuss your testimony with anyone until

17   you're advised the case is closed.  Okay?

18          THE WITNESS:  Yes.

19          JUDGE ROSAS:  Thank you.  Have a good day.

20          THE WITNESS:  You, too.

21          MS. HILL:  No further questions of any witness.

22          JUDGE ROSAS:  You're done with the union's

23   witnesses?

24          MS. HILL:  The individuals from the union, yes,

25   sir, I am.

1          JUDGE ROSAS:  Okay.  So does the Respondent rest?

2          MS. HILL:  Yes, sir.

3          JUDGE ROSAS:  Okay.  Any rebuttal?

4          MR. WIESE:  Not substantive, your Honor, just a

5     couple of issues before we close.

6          JUDGE ROSAS:  Okay.  Anything on your part?

7          MR. RYAN:  No, your Honor.

8          JUDGE ROSAS:  Okay.  Go ahead.

9          MR. WIESE:  First of all, with respect to the

10    Johnnie's Poultry's issue -- Johnnie's Poultry issues

11    that we discussed earlier, I prepared an Amendment to

12    the Consolidated Complaints addressing both of those

13    alleged violations which I'd like to offer.

14         JUDGE ROSAS:  What do you have?

15         MR. WIESE:  What?

16         JUDGE ROSAS:  What do you have?  What are you

17    offering?

18         MR. WIESE:  General Counsel's 88.

19         JUDGE ROSAS:  What's that?

20         MR. WIESE:  It's the Amendment -- the written

21    Amendment to the Complaint.

22         JUDGE ROSAS:  Yeah, I know.  So it will be marked

23    General Counsel's Exhibit --

24         MR. WIESE:  88.

25         JUDGE ROSAS:  No.

1          MR. WIESE:  Okay.

2          JUDGE ROSAS:  I'm playing the alphabet in my mind

3    here.

4          MR. WIESE:  You'd like it as part of --

5          JUDGE ROSAS:  General Counsel's Exhibit 1(LL) in

6    the formal papers.  Show it to counsel so she can state

7    her position on the record.  And let me look at a copy

8    of it.

9          MS. HILL:  This is false.  That isn't what the

10   witnesses said.  This isn't true.

11         JUDGE ROSAS:  It's denied?

12         MS. HILL:  It is completely and totally denied.

13         JUDGE ROSAS:  And you object to the Amendment --

14         MS. HILL:  I object to --

15         JUDGE ROSAS:  -- as prejudicial, all that stuff,

16   right?

17         MS. HILL:  That, and wrong dates, wrong

18   information, wrong allegations.  Denied.

19         JUDGE ROSAS:  Okay.  Overruled.  It will be

20   received in the record.  The record will have to tell me

21   what the answer is.

22         (GCX 1(LL) was received.)

23         JUDGE ROSAS:  Okay.  Is there anything else?

24         MS. HILL:  And when do you want the record to

25   reflect that, sir?

1          JUDGE ROSAS:  What's that?

2          MS. HILL:  When do you want the record to reflect

3     that, sir?

4          JUDGE ROSAS:  Well, it's part of the pleadings

5     now.

6          MS. HILL:  Yes, sir.  I know, sir.

7          JUDGE ROSAS:  So in the -- well, I'm going to

8     address the briefing in a minute.

9          MS. HILL:  Thank you, sir.

10          MR. WIESE:  One more outstanding issue.  With

11     respect to Respondent's Exhibit 9, which was a document

12     that was introduced in a redacted form yesterday, I

13     believe that the final admission of the document was

14     subject to an unredacted form being provided under seal.

15          JUDGE ROSAS:  That was the financial information

16     on some customer invoices, Counsel?

17          MS. HILL:  And I am really sorry, sir, but I had

18     over 1,080 photographs presented yesterday to me by the

19     union to review for purposes of direct examination today

20     and trying to be able to revise it, I didn't get to it.

21          JUDGE ROSAS:  All right.  Do you have it in your

22     possession somewhere?

23          MS. HILL:  The redacted?

24          JUDGE ROSAS:  No.  The unredacted version?

25          MS. HILL:  The unredacted, no, no.

1          JUDGE ROSAS:  Okay.  You'd have to get that from

2     the company?

3          MS. HILL:  I would have to get it from the

4     company, yes.

5          JUDGE ROSAS:  Okay.  The record is going to be

6     closed with the exception of that document.  It will be

7     subject to a motion to strike that exhibit in the event

8     that the Respondent does not provide the General Counsel

9     and Charging Party attorneys for their confidential

10    review, and we'll take it from there.

11         But what I envision is that there will be a

12    protective order, assuming there's no -- there's no

13    issue about it going into evidence, obviously I'll hear

14    whatever objections or arguments there are, and should I

15    need to make a ruling, I'll issue a ruling in writing.

16         But assuming the document is provided and

17    received, it will go under seal pursuant to a protective

18    order.  And the amounts will not be referenced in any

19    briefing, nor referenced in any decision to be issued by

20    me, and it won't be accessible to the public nor put up

21    on the electronic filing system of the National Labor

22    Relations Board.

23         Okay.  Is there anything else?

24         MR. WIESE:  Just one clarification, your Honor.

25    If the amounts reflected in the underlying documents are

VERITEXT LEGAL SOLUTIONS

1801 MARKET STREET -  SUITE 1800 - PHILADELPHIA PA 19103 -- 888-777-6690
Case 2:20-cv-00181-JPS    Filed 03/02/20    Page 1288 of 1306    Document 12-1

1   different than what is in the summary documents, are you

2   allowing us to make arguments there without actually

3   naming the numbers?

4           JUDGE ROSAS:  Now, I asked some questions about

5   this yesterday.  They were the two initial sheets that

6   had --

7           MS. HILL:  Something redacted.

8           JUDGE ROSAS:  No.  Summary amounts.  I think it

9   was a customer's name was redacted?

10          MS. HILL:  Okay.  We're looking at --

11          JUDGE ROSAS:  Respondent's 9.

12          MS. HILL:  -- Respondent's 9, and we're looking

13  at 0026 for the financial information on some of these

14  pages.  I'm not going to identify which ones in

15  particular.  Some have the back of the contract.  But it

16  also has "Ordered By" and the individual's name

17  redacted.

18          MR. WIESE:  Right.

19          MS. HILL:  Okay.  And then in the first page of

20  this exhibit, the -- at the top, "Lost Revenue," and

21  below -- in the far right column header, that redaction

22  the Board wants included.  That's my understanding of

23  what you want, right?

24          MR. WIESE:  Right.  So I would like an unredacted

25  copy of 0024 and then the financial information --

 1           JUDGE ROSAS:  Well, see, I was asking yesterday

 2    for clarification if the amounts that are shown on Page

 3    24 and 25 of Exhibit -- of Respondent's Exhibit 9 were a

 4    compilation of transactional amounts that follow in that

 5    exhibit, and I got the impression that they weren't.

 6           MS. HILL:  Correct.  And the first two pages had

 7    already been testified to as a separate General Counsel

 8    exhibit in the direct examination of Mr. Bogardus,

 9    correct?

10           MR. WIESE:  That's correct.  And there was

11    testimony -- or not testimony, but statements made about

12    providing an unredacted copy at that time.

13           MS. HILL:  All right.  Let's get to the numbers,

14    that's what his Honor was just questioning.

15           JUDGE ROSAS:  Let me just throw out a concept,

16    okay, and the concept is -- well, first of all, the

17    testimony was that this document, the first two pages of

18    Respondent's 9, was printed out by was it Mr. Mayfield

19    or Mr. Anderson?

20           MR. WIESE:  I think it was Mr. Bogardus.

21           JUDGE ROSAS:  Mr. Bogardus.

22           MS. HILL:  Mr. Bogardus said he created this.  He

23    was questioned about the numbers, and he said they were

24    rounded, so therefore --

25           JUDGE ROSAS:  Did he generate this for the

 1  litigation?

 2        MS. HILL:  No.

 3        JUDGE ROSAS:  He generated it at some point

 4  during the bargaining?

 5        MS. HILL:  No, no.

 6        JUDGE ROSAS:  When did he generate it?

 7        MS. HILL:  All right.  If you want specifics, I

 8  need to go to this, the transcript, your Honor.

 9        JUDGE ROSAS:  Okay.

10        MS. HILL:  Okay.

11        JUDGE ROSAS:  While you're doing that, let me

12  just explain.  If it's a data compilation based on other

13  information, presumably the General Counsel subpoenaed

14  that information, any information that this table would

15  have been based on --

16        MR. WIESE:  Yes.

17        JUDGE ROSAS:  -- then in all likelihood I assume

18  it would have been covered by a subpoena, so they'd be

19  entitled to that information.

20        If the information that's contained on the first

21  two pages isn't supported by the rest of this document,

22  what is it based on?  Is it something he just asked the

23  computer to generate?

24        MS. HILL:  All right.  Let me go to his testimony

25  regarding Respondent's -- excuse me, General Counsel's

1  Exhibit 28.

2        MR. WIESE:  Yep.  It's on 662 and 663.

3        JUDGE ROSAS:  What does General Counsel's 28 have

4  to do with Respondent's 9?  Is it the same thing?

5        MR. WIESE:  It's the same thing as the first

6  page.

7        JUDGE ROSAS:  Oh, and we had discussed that, that

8  you had put that into evidence.

9        MS. HILL:  Okay.  What is Respondent's Exhibit 9

10 is what was kept in the regular course of keeping

11 business documents at one of the profit centers.  It was

12 produced pursuant to -- this one was probably your

13 subpoena at the beginning.

14        MR. WIESE:  Well, it was produced during the

15 unfair labor practice investigation.

16        MS. HILL:  That's right, because this one has the

17 particular 28 on it.

18        JUDGE ROSAS:  So the Board investigator requested

19 information, and this information was generated for the

20 investigator?

21        MR. WIESE:  That's correct.

22        JUDGE ROSAS:  Okay.  And any subpoena that

23 requested information relating to revenue or the subject

24 of this document, which is Respondent's 8 [sic] as well

25 as General Counsel's 28, 28, would have been produced,

1  but none exists because this is all he generated,

2  correct?

3      MS. HILL:  He only generated --

4      JUDGE ROSAS:  The first two pages.

5      MS. HILL:  The first two pages, yes, sir.

6      JUDGE ROSAS:  Which is also the entirety of

7  General Counsel's 28, the first two pages?

8      MS. HILL:  Yes, sir.

9      JUDGE ROSAS:  All right.  So that's that.  So

10  again, the correlation of the remainder of Respondent's

11  8 [sic] to the first two pages.

12      MS. HILL:  Okay.  Mr. Anderson testified that he

13  was asked by Mr. Bogardus to give him the contracts in

14  which customers requested equipment to be returned to

15  the profit center due to the bannering and/or

16  handbilling, that type of activity, sir.

17      Mr. Anderson testified yesterday, and correct me,

18  gentlemen, if I'm wrong on this, that he put some, he

19  wasn't sure if he put all of them, of the contracts in a

20  folder, and he put it with what he had received from

21  Mr. Bogardus.

22      Am I wrong on that, gentlemen?

23      MR. WIESE:  I recall the testimony coming in a

24  little differently than that, that these were the

25  documents that were relied on by, and I can't remember

1  if it was Mr. Anderson or Mr. Bogardus who said this,

2  but these documents were relied on in creating the

3  summaries that's in front of us.

4       MS. HILL:  Mr. Bogardus was not asked about these

5  contracts, correct, or am I wrong?

6       MR. WIESE:  I cannot recall at this time.  Sorry.

7       MS. HILL:  Okay.  I believe that it was

8  Mr. Anderson who testified about 28 through the end of

9  this.  He said he did not know -- you asked him

10 questions about the numbers on the chart, and he did not

11 know how those were created by Mr. Bogardus.  He had

12 nothing to do with that.  He did what he had to -- he

13 was requested to do by Mr. Bogardus by collecting these

14 contracts.

15      JUDGE ROSAS:  I'm checking to see if you asked

16 Mr. Bogardus about Respondent's 9.  Did you?

17      MS. HILL:  Sir, right now, unless I looked at my

18 outline, I couldn't tell you.

19      JUDGE ROSAS:  I'm just checking.  Give me a

20 second.

21      I don't see that.  Okay.  So do you have

22 yesterday's transcript?

23      MS. HILL:  No, sir.

24      JUDGE ROSAS:  Oh, because he testified --

25      MS. HILL:  He testified yesterday.

1          JUDGE ROSAS:  He testified yesterday and --

2          MS. HILL:  Right.

3          JUDGE ROSAS:  -- Respondent's 9 was just

4    introduced yesterday.

5          MS. HILL:  Correct.  But I believe it was

6    introduced in Mr. Anderson.

7          JUDGE ROSAS:  Through Anderson.  Okay.  Well, I

8    think it's simple to just do this.  The top redacted

9    portion of Page 24 was a customer, the name of a

10   customer, is that what that was?

11         MS. HILL:  As I said in response to a question, I

12   don't know, sir.

13         JUDGE ROSAS:  That was clarified on the record.

14   Let's put it this way --

15         MR. WIESE:  May I --

16         JUDGE ROSAS:  -- any amounts that reflect --

17         MS. HILL:  Sir, I don't know.

18         Mr. Wiese, I don't know.

19         JUDGE ROSAS:  So I think --

20         MR. WIESE:  Your Honor, I believe, and I

21   apologize for interrupting, but I believe that the

22   customers we were talking about started on Page 26 next

23   to the "Ordered By."  Do you see those redactions up

24   there?  I recall that that's --

25         JUDGE ROSAS:  That's what that was.

1          MR. WIESE:  That is the customer's name, correct?

2          MS. HILL:  The individual's name.

3          MR. WIESE:  The individual's name.

4          MS. HILL:  Correct.

5          MR. WIESE:  And I don't want that information.  I

6     don't even need that information.

7          JUDGE ROSAS:  No, so -- well, okay.

8          MS. HILL:  Okay.  So no, he doesn't wasn't the

9     name of the customer's employee, put it that way.

10         JUDGE ROSAS:  So General Counsel and Charging

11    Party are entitled to verify whether the -- what

12    relationship, if any, the redacted financial information

13    on Pages 26 through 45 have to do with the first two

14    pages of Respondent's 9, okay?  It's as simple as that.

15         MS. HILL:  How are the attorneys going to

16    determine that, sir?

17         JUDGE ROSAS:  What's that?  Whether there was any

18    relationship?

19         MS. HILL:  Whether there's a relationship

20    between -- because they had the opportunity to ask

21    Mr. Bogardus --

22         JUDGE ROSAS:  No.  Mr. Anderson you mean?

23         MS. HILL:  No.  Mr. Bogardus is the one who

24    introduced the first two pages, and that was through --

25         JUDGE ROSAS:  Bogardus introduced the first two

1    pages of Respondent's 9?

2              MS. HILL:  Yes.

3              JUDGE ROSAS:  I don't see any reference to

4    Respondent's 9 in Mr. Bogardus' testimony.

5              MS. HILL:  Okay.  If you look in December, in

6    General Counsel's Exhibit 28.  Is that correct?

7              JUDGE ROSAS:  Oh.

8              MR. WIESE:  Yes, that's right, that's when the

9    document was initially introduced.

10             MS. HILL:  And that's when he was asked questions

11   about it, and then the remainder of the pages in

12   Respondent's 9 were from Mr. Anderson, okay.

13   Mr. Anderson did not know, because he was asked, what

14   was -- you know, was this used for Mr. Bogardus' report,

15   and he did not know, correct?

16             MR. WIESE:  I honestly don't recall.

17             JUDGE ROSAS:  He didn't know --

18             MS. HILL:  Yeah.

19             JUDGE ROSAS:  -- I think that sounds right.

20   Again, General Counsel introduced General Counsel's 28

21   back in December which is the first two pages of

22   Respondent's 9.

23             MS. HILL:  Correct.

24             JUDGE ROSAS:  But your version of Respondent's 9

25   has additional Pages 26 through 46 and --

1          MS. HILL:  Because they were in the regular
2    course of how the business -- these business documents
3    were kept in a file folder.

4          JUDGE ROSAS:  But the inference is that they have
5    some relationship to the first two pages, the
6    information on the first two pages of Respondent's 9,
7    correct?

8          MS. HILL:  Okay.  Based on what Mr. Anderson
9    said, he had received the two pages.  He just kept them
10   in the file folder, and because they were kept that way,
11   your Honor, that's how I presented them, and
12   Mr. Anderson said he didn't have anything to do with
13   those first two pages.  These he was asked by
14   Mr. Bogardus to collect, and he put them in a file
15   folder that just happened to also include these first
16   two pages, sir.

17         JUDGE ROSAS:  They're kept in the regular course
18   of business by Mr. Anderson together, so there's a
19   plausible inference that there's some connection between
20   them or not.  To be determined.  So again --

21         MS. HILL:  Do you want to reopen the hearing for
22   questions regarding that, sir?

23         JUDGE ROSAS:  I think Mr. Anderson's testimony
24   was not conclusive in that regard, so -- and you have
25   this exhibit compiled as such, so --

1        MS. HILL:  Because that's how it was delivered.

2        JUDGE ROSAS:  Yeah.  So again, the ruling

3   yesterday was that the exhibit would be received

4   conditionally upon the unredacted version being provided

5   to counsel subject to -- and again, maybe they won't put

6   it into evidence and you won't need -- they can return

7   it to you, and you won't need a protective order, and it

8   won't have to go under seal, or if it's -- they move it

9   into evidence, then it will go into evidence subject to

10  a protective order under seal.

11       MS. HILL:  Okay.  So what the General Counsel and

12  the union's attorney and your Honor want is Pages 26

13  through 46 to have only the numbers provided, correct?

14       JUDGE ROSAS:  Unredacted.

15       MS. HILL:  Unredacted.  Name of course can be

16  redacted.

17       And that's all that you want for this, correct?

18       MR. WIESE:  No, that is not correct, because --

19       MS. HILL:  All right.  Calmly say it.

20       JUDGE ROSAS:  What do you want?

21       MR. WIESE:  I would also like the information

22  that's redacted on General Counsel Exhibit 28 to at

23  least -- General Counsel Exhibit 28, Respondent's

24  Exhibit 9, they're the exact same thing.  I want that

25  information to be provided in an unredacted form, or at

1  least for the redaction to be identified, which is what

2  we agreed to during the first week of the hearing.  And

3  I do have the transcript cites from that handy if you'd

4  like.

5          MS. HILL:  Okay.  I will disagree with one

6  statement from General Counsel is that these two

7  documents, these two pages are not identical, all right.

8  First of all, your -- page two wasn't in your exhibit,

9  or is my exhibit wrong?

10         JUDGE ROSAS:  28 is the first two pages of 9.

11         MR. WIESE:  Just the first page.

12         MS. HILL:  It's the first page.

13         JUDGE ROSAS:  No.  I thought you had the second

14  page also?

15         MS. HILL:  No, not what he gave me.

16         MR. WIESE:  So General Counsel Exhibit 28 is the

17  exact same as the first page of Respondent's Exhibit 9.

18         JUDGE ROSAS:  No.  Oh, it's 29.

19         MR. WIESE:  29 is page two of the exhibit, but --

20         JUDGE ROSAS:  General Counsel's 28 and 29 are the

21  first two pages of Respondent's 9?

22         MR. WIESE:  Correct.

23         MS. HILL:  Correct.  And the second difference is

24  that your exhibit has Page 1 of 1, Respondent's Exhibit

25  9 does not have that, okay, just pointing that out.

1         JUDGE ROSAS:  All right.  So Counsel, you're

2    concerned about the redacted portions of Respondent 9 as

3    being unnecessary as far as producing the unredacted

4    version?

5         MS. HILL:  Well, as I stated yesterday, and I'll

6    state it again today, it's the numbers that Sunbelt is

7    concerned about for the reasons I laid out yesterday.

8         JUDGE ROSAS:  So these are -- these are monetary

9    sums that are redacted presumably?

10        MS. HILL:  On 26 to the end, yes, sir.

11        JUDGE ROSAS:  No, no.  On 24.

12        MS. HILL:  On 24.  As I stated yesterday, I don't

13   know what that --

14        JUDGE ROSAS:  So that's to be determined, that's

15   to be ruled upon by me if it's -- if it's a customer

16   name or some trademark or I don't know what, you know.

17   If they're monetary sums, perhaps that's a different

18   story.

19        MS. HILL:  Okay.  So you have to rule on that.

20        JUDGE ROSAS:  Uh-huh.

21        MS. HILL:  And just so I'm clear, you've already

22   ruled that 26 through the end, once the numbers are

23   unredacted, that that will be considered to be under

24   seal and not to be disclosed by the General Counsel or

25   by the union's attorney, correct, to anyone?

1          JUDGE ROSAS:  Should it go into evidence.  If

2     it's -- if they don't need it to go into evidence, then

3     they can just return it to you or affirm to you that

4     they're -- that they've shredded it.

5          MS. HILL:  Okay.

6          JUDGE ROSAS:  Okay?

7          MS. HILL:  Now, anything else?

8          MR. WIESE:  No.  That was it.  Thank you for your

9     patience.

10          MS. HILL:  Okay.  Now, the next big question is,

11     as I explained to Mr. Wiese, that when we finished

12     yesterday, it was after regular hours at my office,

13     there was no way I could get this done, and we were here

14     early, too, so I could not get these unredacted or

15     anything.

16          JUDGE ROSAS:  Understood.

17          MS. HILL:  All right.  I also was busy, as I said

18     a few minutes ago, with 1,000 some odd pictures to go

19     through.

20          The big question.  When do you want these?

21          JUDGE ROSAS:  Well, you're going to have more or

22     less 35 days for briefing, so when are you in a position

23     to get them from the client?

24          MS. HILL:  As soon as I can get back to the

25     office, and I'll even try to -- what concerns me, sir,

1    is because the first -- the first page is from

2    Mr. Bogardus, and he has had that family emergency, so

3    it might be next week, sir.

4              MR. WIESE:  A week is fine.

5              JUDGE ROSAS:  Yeah.

6              MR. WIESE:  You can get it to me in a week,

7    that's fine.

8              JUDGE ROSAS:  That shouldn't be a problem because

9    you'll -- under the contract, you'll get the transcripts

10   and exhibits in 10 business days and -- within 10

11   business days, you know, 35 days for filing briefs, so a

12   week should be fine.

13             MR. WIESE:  Yeah, yeah.

14             JUDGE ROSAS:  Okay?

15             MS. HILL:  Okay.  Now, there was something that I

16   heard, and I want to understand, if there's -- is the

17   briefing regarding the relationship -- is there going to

18   be briefing regarding the relationship between these two

19   sections of Respondent's 9?  He said he wanted to know

20   the relationship between them.

21             JUDGE ROSAS:  Are you talking about briefing on

22   that issue alone?

23             MS. HILL:  That's what I was -- I thought I heard

24   something --

25             JUDGE ROSAS:  Well, we can have a conference call

1  or we can just discuss it via e-mail --

2       MS. HILL:  Okay.  Is that what you want --

3       JUDGE ROSAS:  -- and I'll make a ruling.

4       MS. HILL:  -- Mr. Wiese?  Maybe I misheard.

5       MR. WIESE:  I just want the evidence in the

6  record in an unredacted form to make whatever arguments

7  that --

8       MS. HILL:  Okay.  Just the evidence you want, you

9  don't want anything else, and then once you get the

10 unredacted document, then you'll decide whether Exhibit

11 9 is admitted or not admitted, correct?

12      JUDGE ROSAS:  Uh-huh, correct.

13      MS. HILL:  Thank you.

14      JUDGE ROSAS:  Okay.  So that concludes the

15 evidence and testimony to be produced in this case,

16 except for the issue that we just discussed with respect

17 to Respondent's Exhibit 9 and General Counsel's Exhibits

18 28 and 29.  I will give the parties until March 20th,

19 2020 to submit proposed findings of fact and conclusions

20 of law for my consideration.  I'll refer the parties to

21 the Board's rules and regulations for the submission

22 thereof.

23      As far as the Charging Party and Respondent are

24 concerned, you'll be forewarned that filing in the

25 electronic filing room, you want to be careful that you

1  don't file it in the Regions portion of the filing room,

2  as you've done up to this point, but in the drop-down

3  selection for the Division of Judges in Washington.

4      And I also request courtesy copies to be e-mailed

5  to me simultaneous with the electronic filing of the

6  proposed findings of fact and conclusions of law.

7      Okay.  There being nothing else?

8      MS. HILL:  Courtesy --

9      JUDGE ROSAS:  Anything else?

10     MS. HILL:  Excuse me.  You said courtesy copy?

11     JUDGE ROSAS:  E-mailed to me

12     MS. HILL:  E-mailed, okay.

13     JUDGE ROSAS:  There being nothing else?  Okay.  I

14  thank counsel for a very courteous, yet tenaciously

15  advocated case on behalf of your clients.  The record is

16  now closed.  Thank you very much.

17          (End of proceedings at 3:11 p.m.)

18

19

20

21

22

23

24

25

```
 1                      CERTIFICATION

 2

 3

 4        This is to certify that the attached proceedings

 5   before the National Labor Relations Board (NLRB), Region

 6   18, Subregion 30, in the matter of SUNBELT RENTALS,

 7   INC., Case Nos. 18-CA-236643, 18-CA-238989, and

 8   18-CA-247528, at Milwaukee, Wisconsin, on February 19,

 9   2020 was held according to the record, and that this is

10   the original, complete, and true and accurate transcript

11   that has been compared to the recording, at the hearing,

12   that the exhibits are complete and no exhibits received

13   in evidence or in the rejected exhibit files are

14   missing.

15

16

17

18                    _____

19

20                    KATHY P. PABICH, CSR

21

22

23

24

25
```