# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

JENNIFER A. HADSALL, Regional
Director of Region 18 of the National
Labor Relations Board, for and on
behalf of the NATIONAL LABOR
RELATIONS BOARD,

Case No. 20-CV-181-JPS

                    Petitioner,

**ORDER**

v.

SUNBELT RENTALS INC.,

                    Respondent.

## 1.     INTRODUCTION

For the purpose of clarity, the Court will provide a description of the administrative process and the different "players" within the National Labor Relations Board ("NLRB"), the agency relevant to this petition. The NLRB has regional offices across the country where unions can file charges alleging illegal behavior.[1] The regional office will investigate the union's allegations and decide whether to issue a complaint. Once a complaint is issued, the regional director will bring the case before an Administrative Law Judge ("ALJ") for a hearing. The ALJ issues a recommended decision, which becomes final if the decision is not appealed. Appeals are considered by the "Board," the adjudicative body that decides unfair labor practice cases brought before it. Under Section 160(j) of the National Labor Relations Act, 29 U.S.C. §§ 151–169 ("Act"), a regional director can petition a district

---

[1] NATIONAL LABOR RELATIONS BOARD, https://www.nlrb.gov (last visited July 29, 2020).

court for an injunction before the ALJ and/or the Board have made a decision on the underlying administrative case.

On February 6, 2020, Petitioner, Jennifer Hadsall, Regional Director of Region 18 ("Director"), for and on behalf of the NLRB, filed a petition for an injunction under Section 10(j) of the Act, 29 U.S.C. § 160(j), pending the final disposition of the Director's administrative complaints against Respondent Sunbelt Rentals, Inc. ("Sunbelt"). (Docket #1). The matter became fully briefed on March 12, 2020. (Docket #14 and #15). The underlying administrative proceedings[2] began in 2019, and two hearings were held before ALJ Michael A. Rosas. (Docket #1 at 3–5). On May 13, 2020, ALJ Rosas issued his decision finding that Sunbelt violated Section 8(a)(1), Sections 8(a)(3) and 8(1), and Sections 8(a)(5) and (1) of the Act, 29 U.S.C. § 158. (Docket #16-1). ALJ Rosas' decision is not binding on this Court, but it does provide the Court with insight into what the Board may decide on the underlying administrative cases. On May 18, 2020, the Director filed ALJ Rosas' decision, along with a letter requesting that the Court grant the Section 10(j) injunction because the Director anticipates many more months of administrative litigation before the Board's final decision is made. (*Id.*)

Upon consideration of the Director's and Sunbelt's submissions, the administrative record, and ALJ Rosas' decision, this Court will grant the Director's petition for an injunction under Section 10(j).

---

[2]Charges were filed by The International Union of Operating Engineers Local 139, AFL-CIO through the NLRB regional office against Sunbelt Rentals, Inc. in cases 18-CA-236643, 18-CA-238989, and 18-CA-247528.

## 2.     RELEVANT FACTS[3]

Sunbelt operates equipment rental facilities throughout the United States, some of which have unions and others do not. This case concerns the Franksville, Wisconsin facility ("Facility") and the maintenance workers and drivers employed there. (Docket #15 at 5). In February 2018, the maintenance workers and drivers filed a petition with the NLRB, seeking representation from The International Union of Operating Engineers Local 139 ("Union"). When District Manager Bo Bogardus ("Bogardus") became aware of the union activity at the Facility, he began calling the Facilities' Profit Center Manager ("PCM"), Katie Torgerson ("Torgerson"), daily and started visiting the Facility on a daily basis, in contrast to his periodic visits before. (*Id.*; Docket #16-1 at 3). While visiting, "Bogardus angrily and loudly warned Torgerson and employees on more than five occasions that [Sunbelt] would close the store if the Union organizing campaign succeeded" and "just before the representation election, Torgerson asked Bogardus if she was going to be fired. He said that the Union was 'not helping [her] cause.'" (Docket #16-1 at 3–4). On March 4, 2018, two days before the election, Bogardus held a mandatory meeting and "expressed his negative view of unions and discussed the ramifications of the election. He told the employees that he had handled unions before and was going to protect them from the Union because it was just interested in collecting dues." (*Id.* at 4). He concluded the meeting "with a warning that if the Union won he would close the [Facility] and terminate its employees." (*Id.*)

---

[3]The facts are largely taken from ALJ Rosas' opinion, (Docket #16-1), as he presided over multiple days of hearings and was able to analyze the credibility of witnesses and the weight of the evidence.

The employees voted in favor of representation by the Union on March 6, 2018, and the Board certified the results on March 13, 2018. (Docket #16-1 at 4). A week later, Bogardus met with Regional Vice President Jason Mayfield ("Mayfield") to discuss changes to the management and operations of the Facility. Bogardus proposed terminating the bargaining unit employees at the Facility. (*Id.* at 6). On March 27, 2018, Bogardus fired Torgerson and told her it was due in part to the "union vote." (*Id.* at 7). Bogardus began serving as the Facilities' acting manager until a replacement, Bryan Anderson ("Anderson"), was hired. (*Id.*; Docket #15 at 6).

On March 29, 2018, the Union requested that Sunbelt start the bargaining process and proposed dates in April. (Docket #16-1 at 7). Sunbelt's chief negotiator, Attorney Patricia Hill ("Hill"), told the Union on April 3, 2018 that Sunbelt was too busy and not available on the April dates proposed, but was available to meet on May 22, 2018. (*Id.*) The Union and Sunbelt met only thirteen times between May 2018 and July 2019, less than once per month. (Docket #15 at 6). The Union "repeatedly requested to meet more frequently and on consecutive days, [Sunbelt] always refused, contending that its negotiators were 'too busy.'" (*Id.*) Sunbelt cancelled three bargaining sessions as well, at least one of which did not need to be cancelled.[4] (*Id.*; Docket #16-1 at 13, 24). During negotiation sessions, Sunbelt

---

[4]Hill told the Union that the January 28, 2019 bargaining session would need to be rescheduled because Bogardus had a court proceeding scheduled the same day. Hill learned of the conflict on January 10th, but waited until the 17th to tell the Union of the conflict. Additionally, Bogardus informed Hill on the 23rd that he no longer had a conflict on the 28th. Hill did not inform the Union that the session on the 28th no longer needed to be rescheduled or that the conflict no longer existed. (Docket #16-1 at 13).

would take extended caucuses and delay the session to wait on another negotiator. (Docket #15 at 6; Docket #16-1 at 8–15). Often, Sunbelt would refuse to confirm tentative agreements in writing. (*Id.*) Additionally, Sunbelt stated that it would not allow a "checkoff"[5] agreement for Union dues at the Facility, despite allowing it at Sunbelt facilities in other states. (Docket #16-1 at 14). Importantly, Sunbelt refused to bargain over wage, health insurance, and pension terms for four months. (*Id.* at 13–15, 26).

After its ninth bargaining session with Sunbelt, the Union filed an initial unfair labor practice charge with the NLRB on February 26, 2019, alleging that Sunbelt had violated Sections 8(a)(1) and (5) of the Act by "engaging in surface bargaining or otherwise bargaining in bad faith." (*Id.* at 14).

Section 8 of the Act, 29 U.S.C. § 158, provides in relevant part that:

**(a) Unfair labor practices by employer**

It shall be an unfair labor practice for any employer—

    (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

    (2) to dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it: Provided, That subject to rules and regulations made and published by the Board pursuant to section 156 of this title, an employer shall not be prohibited from permitting employees to confer with him during working hours without loss of time or pay;

---

[5] A checkoff agreement allows the employer to deduct the union membership dues from employees' pay (with their consent) and pass the money to the union in a lump sum, making collection easier for the union and the employees. ENCYCLOPEDIA.COM, https://www.encyclopedia.com/social-sciences-and-law/law/law/checkoff (last visited July 29, 2020).

Case 2:20-cv-00181-JPS   Filed 08/07/20   Page 5 of 24   Document 18

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . ;

(4) to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter;

(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

29 U.S.C. § 158(a).

On March 21, 2019, a Facility employee, Mariano Rivera ("Rivera"), filed a petition to decertify the Union as the exclusive collective bargaining representative of Sunbelt's employees. (Docket #16-1 at 15). Rivera was assisted by Anderson, who explained the decertification process and helped fill out the form, including Rivera's name and position, as well as the date and time for the decertification election. (*Id.*) Anderson posted copies of the petition in the break room, by the time clock, and by the shop door. (*Id.*) However, the decertification election was stayed because of the pending NLRB charges. (*Id.* at 16). In response to this, Bogardus asked Hill "[i]f nothing changes between now and Monday when would you be able to discuss a planning session for approaches to shedding ourselves of this pariah called 139, [the Union.]" (*Id.*)

On March 28, 2019, Anderson told other high up Sunbelt employees that he was continuing to fish for information regarding the Facilities' employees and the Union. (*Id.*) In late March, Anderson approached employee Ramon Gutierrez ("Gutierrez") in his work area and mentioned that the paper was upon the wall and by the doors of the breakroom, referring to the decertification petition. (*Id.*) Anderson approached

Gutierrez again in his work area in early April and stated that "if anyone talked to him about anything related to the petition, especially Romanowski, that he should report it to him because he was not going to put up with it, 'zero tolerance.'"[6] (*Id.*) Gutierrez responded to Anderson by joking "that if Romanowski told him anything about it, he would 'sock him,' and they both laughed." (*Id.*) Service Manager Christopher Pender ("Pender") was overheard telling employees in his office that it was futile to support the Union because "the Union was never going to get in and it was never going to happen." (*Id.* at 17). On April 3, 2019, the Union filed another charge against Sunbelt, alleging a violation of Section 8(a)(1), (3) and (4) of the Act by interrogating bargaining unit employees regarding the decertification process. (*Id.*)

At the April 30, 2019 bargaining session, the Union tendered its wage, health, pension, and dues checkoff proposals to Sunbelt and requested that Sunbelt provide counterproposals. Sunbelt refused to provide the counterproposals. (*Id.*) By the end of the session, Sunbelt refused to propose any basic wage rates, rejected a dues checkoff, and refused to modify its current pension and health benefits. (Docket #16-1 at 18). On June 5, 2019, the parties met to bargain again. The Union tendered a comprehensive sign-off proposal which indicated the items that had been tentatively agreed to and those that were still open. (*Id.*) Sunbelt reviewed the proposal and stated that there were some items omitted and others that were inaccurate; the Union asked Sunbelt to identify the missing articles in writing, but Sunbelt refused. (*Id.* at 18–19). Gutierrez was fired on June 10,

---

[6]Albert Romanowski ("Romanowski") is a Facility mechanic who joined the Union.

2019 for a rule violation. (*Id.* at 4). Jamie Smith ("Smith"), a Facility employee and member of the Union's negotiating team, was fired on July 1, 2019 after he failed to take a safety quiz. (*Id.* at 6). The July 9, 2019 bargaining session ended quickly after the Union brought up the termination of Smith. (*Id.* at 19). On July 16, 2019, the Union filed more charges, alleging that Sunbelt violated "Sections 8(a)(3), (4), (5) and (1) for its retaliatory discharges of Smith and Gutierrez because they engaged in union activities and filed charges, and without providing the Union with notice and affording it an opportunity to bargain over their discharge." (*Id.*)

Around August 5, 2019, Mayfield decided, without documenting his reasons, that the Facility would be reorganized into a "will-call" store that carried only small equipment for pick up by customers. (*Id.* at 19). The remaining two Union employees at the Facility would be laid off because the store would no longer need mechanics and drivers. (*Id.*) At the time of Mayfield's decision, the Facility's total revenue for June and July had increased over the corresponding period in 2018. (*Id.* at 19–20). On August 7, 2019, Mayfield informed the Union that the August 8th bargaining session would be used "for bargaining the impact for a reorganization at" the Facility. (*Id.* at 20). At the bargaining session, Mayfield told the Union that the Facility was being converted to a will-call location and would not require the services of the two Union mechanics. (*Id.*) The Union did not challenge the decision to reorganize and eliminate the bargaining unit, but instead focused on the effects of the layoffs. (*Id.*) Sunbelt followed through and laid off the remaining two Union mechanics on August 8th and 10th. (*Id.* at 21). Sunbelt informed the employees that they were eligible for rehire, but that they would need to go through the standard application process instead of transferring to other facilities. (*Id.*)

Despite Sunbelt stating that it was going to convert the Facility and would no longer need the services of the Union mechanics, the Facility continued to do most of the same work that would have been done by the terminated mechanics. (*Id.* at 22). Between August 19, 2019 and November 2019, employees at the Facility continued to perform maintenance work in and outside the shop on large pieces of equipment. (*Id.* at 22; Docket #15 at 8). In some instances, Sunbelt contracted repair jobs to non-union employees from nearby facilities in Wisconsin and to third-party contractors. (*Id.*) Further, Pender was required to perform more maintenance work after Sunbelt terminated the Union mechanics. This resulted in much longer hours, in which he still could not get everything done. Eventually, Pender transferred to a mechanic position at a different facility in Wisconsin. (Docket #16-1 at 22–23). Importantly, Sunbelt's revenue, which had been increasing in June and July, decreased dramatically in August and September, after the reorganization. (*Id.* at 23).

### 3.    LEGAL STANDARD

Section 10(j) of the Act authorizes a district court to enter "just and proper" injunctive relief pending the final disposition of an unfair labor practices claim by the Board. *See* 29 U.S.C. § 160(j); *Harrell ex rel. N.L.R.B. v. Am. Red Cross, Heart of Am. Blood Servs. Region*, 714 F.3d 553, 556 (7th Cir. 2013). "An injunction granted under [§] 10(j) is an 'extraordinary remedy' and should be granted only in those situations in which effective enforcement of the Act is threatened by delay in the Board's dispute resolution process." *Lineback v. Irving Ready-Mix, Inc.*, 653 F.3d 566, 570 (7th Cir. 2011) *(*citing *Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 297 (7th Cir. 2001)). Congress enacted § 10(j) as part of the Labor Management Relations Act of 1947 (Taft-Hartley Act) to address cases in which Board procedures

Case 2:20-cv-00181-JPS    Filed 08/07/20    Page 9 of 24    Document 18

can take so long that the Board's remedies become ineffective. *See Kinney v. Pioneer Press*, 881 F.2d 485, 487–88 (7th Cir. 1989) (reviewing legislative history of § 10(j) and companion provision for preliminary injunctions against unions in § 10(l)). "The goal is to protect the integrity of the collective bargaining process and to preserve the Board's power to provide effective remedies for violations despite the 'notoriously glacial' pace of Board proceedings." *Irving Ready-Mix*, 653 F.3d at 570.

The court must consider "the lack of an adequate remedy at law, the balance of potential harms posed by the denial or grant of interim relief, the public interest, and the petitioner's likelihood of success on the merits of its complaint." *Bloedorn*, 276 F.3d at 286. The Director will be entitled to interim relief when:

> (1) the Director has no adequate remedy at law;
>
> (2) the labor effort would face irreparable harm without interim relief, and the prospect of that harm outweighs any harm posed to the employer by the proposed injunction;
>
> (3) "public harm" would occur in the absence of interim relief;
>
> (4) the Director has a reasonable likelihood of prevailing on the merits of his complaint.

*Id.* The Director "bears the burden of establishing the first, third and fourth of these circumstances by a preponderance of the evidence." *Id.* "The second prong is evaluated on a sliding scale: The better the Director's case on the merits, the less its burden to prove that the harm in delay would be irreparable, and vice versa." *Lineback v. Spurlino Materials, LLC*, 546 F.3d 491, 500 (7th Cir. 2008) (citing *Bloedorn*, 276 F.3d at 286–87).

In evaluating the likelihood of success, it is not the court's responsibility "to rule on the merits of the Director's complaint; that is the Board's province. The court's inquiry is confined to the *probability* that the

Director will prevail." *Bloedorn*, 276 F.3d at 287 (emphasis in original). "A district court need only find that the Director has some chance of succeeding on the merits before the Board." *Harrell*, 714 F.3d at 556 (quotations and citations omitted). When an ALJ has made a decision regarding the underlying administrative proceedings after presiding over the merits hearing, the court can use the ALJ's factual and legal determinations as "a useful benchmark against which the Director's prospects of success may be weighed." *Id.* at 288. The court will "give some measure of deference to the view of the ALJ" in determining the likelihood of success. *Spurlino Materials*, 546 F.3d at 502.

4.     **ANALYSIS**

   4.1     **Adequacy of Remedy at Law and Irreparable Harm**

   Section 10(j) relief is an extraordinary remedy to be granted only in "those situations in which the effective enforcement of the NLRA is threatened by the delays inherent in the NLRB dispute resolution process." *Bloedorn*, 276 F.3d at 286. "In § 10(j) cases, the 'adequate remedy at law' inquiry is whether, in the absence of immediate relief, the harm flowing from the alleged violation cannot be prevented or fully rectified by the final Board order." *Am. Red Cross*, 714 F.3d at 557. However, it is widely accepted that the longer the employer avoids bargaining with the union, the more likely it is that participation in the union will be chilled and that the union will not be able to be effective in its representation. *Id.* at 299; *N.L.R.B. v. Electro-Voice, Inc.*, 83 F.3d 1559, 1573 (7th Cir. 1996). "This risk is particularly true in cases involving fledgling unions, where the passage of time is especially critical." *Spurlino Materials*, 546 F.3d at 501.

   In this case, Sunbelt's actions have essentially quashed the employees' ability to form a union and negotiate. It is clear that the Facility

employees knew of Sunbelt's animosity towards unions and the employees; Bogardus and Pender both voiced their animus towards unions and told employees that if the Union prevailed there would be problems. (Docket #16–1 at 3–4, 16–19). Further, the employees that did join the Union were terminated during the negotiation period. (*Id.*) The Union is undeniably a "fledgling union," as it had less than 10 members and was in the preliminary stages of organization. The Seventh Circuit in *Electro-Voice* provided the following informative analysis:

> As time passes the likelihood of union formation diminishes, and the likelihood that the employees will be irreparably deprived of union representation increases. The "dischargees" will seek, and obtain, new employment. Their search may require them to move, or may lead them to a preferable job. Meanwhile, the employees remaining at the plant know what happened to the terminated employees, and fear that it will happen to them. The union's position in the plant may deteriorate to the point that effective organization and representation is no longer possible. As time passes, the benefits of unionization are lost and the spark to organize is extinguished. The deprivation to employees from the delay in bargaining and the diminution of union support is immeasurable. That loss, combined with the likelihood that the Board's ability to rectify the harm is diminishing with time, equals a sufficient demonstration of irreparable harm to the collective bargaining process. For the same reasons we conclude that there is no adequate remedy at law.

*Electro-Voice, Inc.*, 83 F.3d at 1573 (internal citations omitted). The Union's position to negotiate has been drastically reduced by Sunbelt's actions and while waiting for the Board's decision. Without a § 10(j) injunction, the harm may be irreparable–not only because time is passing, but also because the employees saw the aggressive actions taken by Sunbelt against the Union and Union employees.

Sunbelt argues that there is an adequate remedy at law for the Director because there are no employees presently in the bargaining unit and the Director's concerns will not impact newly hired unit employees before or after the Board makes its decision. (Docket #14 at 7). The Court is not persuaded by Sunbelt's arguments. The employees at the Facility saw how Sunbelt dealt with the Union and the employees who wanted to be represented by the Union. It seems illogical to say that there is an adequate remedy at law when a company terminates all of the union represented employees before the Board makes a decision on the pending NLRB charges. "[T]he discharge of active and open union supporters risks a serious adverse impact on employee interest in unionization and can create irreparable harm to the collective bargaining process." *Frankl v. HTH Corp.*, 650 F.3d 1334, 1363 (9th Cir. 2011).

Additionally, Sunbelt states that the Director has already taken too long for there to be a risk of irreparable harm by waiting for the Board to make its final decision. (Docket #14 at 8–9). However, the seven-month period between when the most recent charge against Sunbelt was filed and when the Director sought the § 10(j) injunction is not long enough to defeat the injunction request. None of the cases cited by Sunbelt to support its argument involve § 10(j) injunctions. (Docket #14 at 9 n.2). In contrast, the Director has cited several cases that granted § 10(j) injunctions with longer periods of time before filing for a § 10(j) injunction. *See Spurlino Materials*, 546 F.3d at 491 (nine-months); *Bloedorn*, 276 F.3d at 299 (two years); *Frankl*, 650 F.3d at 1363 (three years); *Overstreet v. El Paso Disposal, L.P.*, 625 F.3d 844, 850, 856 (5th Cir. 2010) (nineteen months); *Muffley v. Spartan Mining Co.*, 570 F.3d 534, 544–45 (4th Cir. 2009) (eighteen months); *Hirsch v. Dorsey Trailers*, 147 F.3d 243, 248–49 (3d Cir. 1998) (fourteen months). Therefore,

the seven-month delay is nothing unusual for § 10(j) injunction cases and is not persuasive in this case.

In balancing the potential irreparable harm of granting and not grating the injunctive relief, the balance goes in favor of the Director. As discussed above, the Director has shown that without injunctive relief, irreparable harm may occur. In contract, Sunbelt has not presented any evidence that granting the § 10(j) injunctive relief would cause Sunbelt irreparable harm. (Docket #14 at 9–10). Thus, like the Seventh Circuit in *Electro-Voice*, this Court finds that the Director does not have an adequate remedy at law and, that without a § 10(j) injunction, the labor effort will suffer an irreparable harm.

### 4.2    Public Harm

"The interest at stake in a § 10(j) proceeding is the public interest in the integrity of the collective bargaining process." *Am. Red Cross*, 714 F.3d at 557. The public interest is furthered in part by ensuring that "an unfair labor practice will not succeed because the Board takes too long to investigate and adjudicate the charge." *Electro-Voice*, 83 F.3d at 1574.

The Director has come forward with evidence in this case that Sunbelt has engaged in unfair labor practices and that there is a substantial risk that those practices will achieve their unlawful goal of quelling union activity without injunctive relief. To the contrary, there is no reason to believe that injunctive relief would have any public cost. "The public interest is harmed when the Board's remedial powers under the NLRA lose their effectiveness with the passage of time." *Lineback v. Printpack, Inc.*, 979 F.Supp. 831, 847 (S.D. Ind. 1997). Therefore, the public interest favors injunctive relief in this case.

### 4.3 Reasonable Likelihood of Success on the Merits

The Court recognizes that it "has no jurisdiction to pass on the merits of the underlying case before the Board," *Electro-Voice*, 83 F.3d at 1567, and that the district court's analysis "should not be taken as a finding in favor of the Director on the merits." *Id.* at 1570. At the same time, *Electro-Voice* and other cases require this Court to evaluate, on a preliminary basis, the Director's likelihood of succeeding on the merits of these charges. This Court considers the likelihood of success on the merits only for the purpose of deciding whether injunctive relief is warranted. After a review of the briefings, evidence, record, and ALJ Rosas' decision, the Court must conclude that the Director has made a "better than negligible" showing that it is likely to succeed on the merits of the unfair labor practices charges. *Id.* at 1568.

#### 4.3.1 Likelihood of Success on Showing Sunbelt Violated Section 8(a)(5) of the Act

The Director has alleged that Sunbelt has violated Section 8(a)(5) in three ways: first, by failing to meet at reasonable times for collective-bargaining negotiations; second, by refusing to discuss wages; and third, by engaging in negotiations without an intent to reach an agreement.

Regarding the first allegation, Section 8(d) of the Act requires the employer and the representative of the employees to meet at reasonable times. 29 U.S.C. § 158(d). A party's refusal to meet at reasonable times violates Section 8(a)(5). In determining this issue, the Board will consider the "totality of the circumstances" including the overall frequency of bargaining sessions, whether the union has requested to meet more frequently, whether the employer has cancelled bargaining sessions, and any justifications offered by the employer for its failure to meet. *See Garden*

Case 2:20-cv-00181-JPS   Filed 08/07/20   Page 15 of 24   Document 18

*Ridge Mgmt., Inc.*, 347 NLRB 131, 132 (2006); *People Care, Inc.*, 327 NLRB 814, 825–26 (1999); *Calex Corp.*, 322 NLRB 977, 977–78 (1997), *enforced*, 144 F.3d 904 (6th Cir. 1998); *Bryant & Stratton Bus. Inst.*, 321 NLRB 1007, 1042 (1996). The Board has routinely found that meeting only once a month does not satisfy the duty to bargain. *See Garden Ridge*, 347 NLRB at 132 (20 bargaining sessions over 11 months violated the Act); *Calex Corp.*, 322 NLRB at 977 (20 sessions over 15 months violated the Act). Additionally, being "busy" isn't a legally sufficient reason for not meeting more frequently. "The fact that Respondent 'had a business to run' or that [employer counsel] was a 'busy and successful lawyer' has not been found by the Board or the courts to allow an employer to evade its statutory obligations to meet at reasonable times." *Bryant & Stratton*, 321 NLRB at 1042.

In this case, Sunbelt only agreed to meet thirteen times over a fifteen-month period. (Docket #15 at 6). The Union "repeatedly requested to meet more frequently and on consecutive days, [Sunbelt] always refused, contending that its negotiators were 'too busy.'" (*Id.*) Sunbelt cancelled three bargaining sessions as well, at least one of which did not need to be cancelled. (*Id.*; Docket #16-1 at 13, 24). Thus, the Court finds that the Director has a better than negligible chance of establishing that Sunbelt violated Section 8(a)(5) of the Act by failing to meet at reasonable times for collective bargaining negotiations.

Regarding the second allegation, Section 8(d) states that the parties must "confer in good faith with respect to wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(d). The Board has held that a party violates Section 8(a)(5) when it refuses to bargain over certain mandatory subjects or delays bargaining over mandatory subjects until the parties reach agreement on other subjects. *John Wanamaker Phila.*, 279 NLRB

1034, 1034–35 (1986); *Adrian Daily Tele.*, 214 NLRB 1103, 1110–12 (1974) (holding that a party's refusal to discuss economic issues until non-economic issues were resolved violated the Act).

In this case, Sunbelt refused to bargain over wage, health insurance, and pension terms for four months, despite the Union bringing it up consistently. (Docket #16-1 at 13–15, 26). The Court finds that the Director has a better than negligible chance of establishing that Sunbelt violated Section 8(a)(5) of the Act by refusing to discuss wages.

Lastly, regarding the third allegation, to determine whether an employer has engaged in overall surface bargaining, it is necessary to examine the totality of the employer's conduct, including its actions at and away from the bargaining table. *Overnite Transp. Co.*, 296 NLRB 669, 671 (1989), *enforced*, 938 F.2d 815 (7th Cir. 1991); *Mid-Continent Concrete*, 336 NLRB 258, 259 (2001), *enforced sub nom.*, *NLRB v. Hardesty Co.*, 308 F.3d 859 (8th Cir. 2002). The Board has considered factors including:

> (1) Refusing to meet on a regular basis with the union and engaging in other dilatory tactics. *Regency Serv. Carts*, 345 NLRB 671, 672–73 (2005) (unlawful for employer to refuse to meet less than once per month, cancel numerous sessions, routinely show up late and end sessions early over union objection); *Bryant & Stratton*, 321 NLRB at 1042.

> (2) Refusing to consider union proposals, without explanation. *John Ascuaga's Nugget*, 298 NLRB 524, 550 (1990), *enforced in rel. part sub nom.*, *Sparks Nugget v. NLRB*, 968 F.2d 991 (9th Cir. 1992); *Regency Serv. Carts*, 345 NLRB at 673.

> (3) Refusing, without justification, to agree to a dues-checkoff provision. *CJC Holdings, Inc.*, 320 NLRB 1041, 1046–47 (1996); *Chester Cty. Hosp.*, 320 NLRB 604, 622 (1995).

> (4) Undermining and denigrating the union in its communications with employees. *Mid-Continent Concrete*, 336 NLRB at 261.

In this case, the Director has a better than negligible chance of showing that Sunbelt engaged in surface bargaining, with no intent to reach an agreement, based on Sunbelt's conduct outside and inside the bargaining sessions. As laid out in Section 2, *supra*, Bogardus openly expressed negative views on unions and told employees that if the Union won, Sunbelt would close the Facility and terminate the employees. (Docket #16-1 at 4). Within a week of the vote on the Union, Sunbelt employees met to discuss terminating unit employees at the Facility. (*Id.* at 6). On March 27, 2018, Bogardus fired Torgerson and told her it was due in part to the "union vote." (*Id.* at 7).

As to negotiations, Sunbelt delayed having the first bargaining session and met less than once per month. During negotiation sessions, on multiple occasions, Sunbelt would take extended caucuses and delay the session to wait another negotiator. (Docket #15 at 6; Docket #16-1 at 8–15). Often, Sunbelt would refuse to confirm tentative agreements in writing. (*Id.*) Additionally, Sunbelt stated that it would not allow a checkoff agreement for Union dues at the Facility, despite allowing it at Sunbelt facilities in other States. (Docket #16-1 at 14). Importantly, Sunbelt refused to bargain over wage, health insurance, and pension terms for four months. (Docket #16-1 at 13–15, 26). Finally, on June 5, 2019, when Sunbelt reviewed the Union's proposal and stated that there were some items omitted and others that were inaccurate, the Union asked Sunbelt to identify the missing articles in writing, but Sunbelt refused. (*Id.* at 18–19). Thus, it is clear that the Director has a better than negligible chance of establishing that Sunbelt violated Section 8(a)(5).

### 4.3.2 Likelihood of Success on Showing Sunbelt Violated Section 8(a)(1) of the Act

The Director argues that the evidence demonstrates a strong likelihood of success in showing that Sunbelt, through Pender and Anderson, unlawfully threatened and interrogated Facility employees in the spring of 2019 in violation of Section 8(a)(1). (Docket #15 at 14). When evaluating if the questioning of employees amounts to unlawful interrogation:

> the Board considers the totality of the circumstances, including whether the employee is an open and active union supporter, whether there is a history of employer antiunion hostility or discrimination, the nature of the information sought, the position of the questioner in the company hierarchy, and the place and method of interrogation. *See Rossmore House*, 269 NLRB 1176, 1178 n. 20 (1984), *affd. sub nom. HERE Local 11 v. NLRB*, 760 F.2d 1006 (9th Cir. 1985).

(Docket #16-1 at 27). Further, the Board has held that questioning an employee regarding their knowledge of a decertification petition can violate the Act, especially if the questioning individual is a high-ranking manager and starts the conversation. *Ernst Home Ctrs., Inc.*, 308 NLRB 848, 855 (1992) (supervisor asking employee if he had heard of recently filed decertification petition violated Act).

Sunbelt managers Pender and Anderson both engaged in conduct that likely violated Section 8(a)(1). Specifically, in March and April 2019, Anderson, a manager, approached subordinate Gutierrez in his work area and talked to him about the decertification petition and asked Gutierrez to tell Anderson if other employees talked to Gutierrez about anything related to the petition. (Docket #16-1 at 16). Additionally, employee Smith overheard Pender telling employees in his office that it was futile to support

the union because "the union was never going to get in and it was never going to happen." (*Id.* at 17). Pender was showing employees the animus towards the Union and discouraged employees from joining the Union. Based upon these facts, this Court finds that the Director has a better than negligible chance of showing that Sunbelt violated Section 8(a)(1) of the Act.

### 4.3.3 Likelihood of Success on Showing Sunbelt Violated Section 8(a)(3) of the Act

Section 8(a)(3) prohibits an employer from taking adverse action against an employee in order to discourage union activities. 29 U.S.C. § 158(a)(3); *Huck Store Fixture Co. v. N.L.R.B.*, 327 F.3d 528, 533 (7th Cir. 2003). The burden shifting analysis for determining whether an employer violated Section 8(a)(3) is provided in *Wright Line, a Div. of Wright Line, Inc., v. Lamoureux*, 251 NLRB 1083 (1980). First, the Director must demonstrate that antiunion animus was a "substantial or motivating factor" in the employer's decision to take adverse action against the employees. *Huck Store Fixture Co.*, 327 F.3d at 533. "Antiunion animus is established by showing that the employees were engaged in union activities, that the employer knew of and harbored animus toward the union activities, and there was a causal connection between the animus and the implementation of the adverse employment action." *Id.* (citing *NLRB v. Clinton Elec. Corp.*, 284 F.3d 731, 738 (7th Cir. 2002)). If the first step is met, then the burden shifts to the employer. The employer must show that it would have taken the adverse action regardless of the employees' unionization efforts. *Id.* The Board will then determine whether the employer's proffered reason did not exist or was not relied upon. *Id.*

In this case, the Director has made a strong showing that Sunbelt violated Section 8(a)(3). It is undisputed that the mechanics terminated

were involved in union activity and that Sunbelt knew about that activity. Further, there is ample evidence that Sunbelt harbored antiunion animus; as stated above, Bogardus openly expressed negative views on unions and told employees that if the Union won, Sunbelt would close the Facility and terminate the employees. (Docket #16-1 at 4). The record shows that Sunbelt did exactly what it threatened to do and terminated Union employees. (*Id.* at 6). Bogardus fired Torgerson in part because of the "union vote." (*Id.* at 7). Further, all Facility Union employees were fired by August 10, 2019.

Pursuant to the burden shifting analysis, the Court next turns to the employer, Sunbelt, to assess the justification offered for firing *all* the members of the bargaining unit. Sunbelt states that the Director failed to establish the presence of antiunion animus and that the Director cannot demonstrate that Sunbelt's reason for reorganizing the Facility is merely a pretext. (Docket #14 at 13). The Court finds that Sunbelt's arguments are not persuasive. As discussed above, the Director is likely to succeed on showing that there was strong antiunion animus. As for Sunbelt's reason for reorganization, the Court finds ALJ Rosas' opinion on this matter persuasive. Sunbelt continued to do many of the same activities at the Facility after terminating the Union mechanics, demonstrating a continued need for the employees that it fired. Additionally, Sunbelt was making more revenue than the year prior and ended up losing money after the Union mechanics were terminated and the Facility was reorganized. (Docket #16-1 at 29–30). Sunbelt "failed to demonstrate how its alleged losses would be remedied by the elimination of the three bargaining unit employees at the [Facility], especially when it also claimed that the union activity also adversely affected the other Wisconsin [profit centers]." (*Id.* at 30). Thus, the Court finds that the Director has a better than negligible

chance of succeeding on its allegation that Sunbelt violated Section 8(a)(3) when it terminated the bargaining unit employees.

**5.    CONCLUSION**

The Court, upon consideration of the Director's and Sunbelt's briefing, the administrative record, and ALJ Rosas' decision, finds that there is a likelihood that the Director will, in the underlying Board proceeding in Board Cases 18-CA-236643, 18-CA-238989, and 18-CA-247528, establish that Sunbelt has engaged in, and is engaging in, acts and conduct in violation of Section 8(a)(1), (3) and (5) of the Act, and that such acts and conduct will likely be repeated or continued unless enjoined. 29 U.S.C. §§ 158(a)(1), (3), (5) and 152(6), (7). Thus, this Court will grant the petition for an injunction under Section 10(j).

Accordingly,

**IT IS ORDERED** that the Director's petition for injunctive relief under Section 10(j), (Docket #1), be and the same is hereby **GRANTED**; and

**IT IS FURTHER ORDERED** that pending final disposition of the matters pending before the Board, this injunction shall enjoin and restrain Sunbelt, its officers, agents, servants, employees, attorneys, and all persons acting in concert or participation with it or them as follows:

1.  Enjoining and restraining Respondent from:

    a.  Refusing to bargain in good faith with the International Union of Operating Engineers Local 139, AFL-CIO (the Union) in the following unit: all full-time and regular part-time mechanics, drivers, and foremen, employed by Respondent at profit center 776 in Franksville, Wisconsin, excluding all other employees, clerical staff, salespeople, managers, guards, and supervisors, as defined in the Act;

    b.  Refusing to meet at reasonable dates and times for bargaining;

c. Refusing to bargain about wages, a mandatory subject of bargaining;

d. Making unilateral changes in terms and conditions of employment of the unit employees without first providing notice to the Union and bargaining in good faith to agreement or impasse, including by transferring bargaining unit work, assigning bargaining unit work to individuals who are not in the bargaining unit, or laying off members of the bargaining unit;

e. Discriminating against employees in order to discourage union or protected concerted activity, including taking any measures to eliminate the bargaining unit such as transferring the work of the bargaining unit, assigning bargaining unit work to individuals who are not in the bargaining unit, or laying off bargaining unit members; and

f. In any other manner interfering with, restraining or coercing employees in the exercise of their Section 7 rights. 29 U.S.C. § 157.

2. Ordering and directing Respondent, pending final Board adjudication to:

a. Recognize the Union as the exclusive collective-bargaining representative of the employees in the unit defined above in paragraph 1(a);

b. Within five (5) days of the issuance of this Order, bargain collectively and in good faith with the Union as the exclusive representative of the employees in the Unit with respect to wages, hours and other terms and conditions of employment;

c. On request, bargain in good faith with the Union on a schedule providing for good-faith bargaining for not less than 24 hours per month and 6 hours per bargaining session, or other schedule to which Respondent and Union have mutually agreed to, until they reach a complete collective-bargaining agreement or a good-faith impasse in bargaining;

d. Within fifteen (15) days of the issuance of this Order, restore the bargaining unit work to the status quo that existed on August 5, 2019, including by transferring unit work back to the Franksville facility, restoring bargaining unit positions and assigning bargaining unit work to unit employees;

e. Within five (5) days of the issuance of this Order, post copies of this Order at its Franksville, Wisconsin facility, in all places where notices to employees are normally posted and maintain those postings during the Board's administrative proceeding free from all obstructions and defacements and grant all employees free and unrestricted access to said postings;

f. Within ten (10) days of the issuance of this Order, hold a mandatory meeting or meetings through video conference, on work time with the above unit of employees, scheduled to ensure the widest possible participation, at which the Order is to be read to the employees by a responsible management official in the presence of a Board Agent, or at Respondent's option, by a Board Agent in that official's presence; and

g. Within fifteen (15) days of the issuance of this Order, file with this Court and serve upon Petitioner a sworn affidavit from a responsible official describing with specificity the manner in which Respondent has complied with the terms of the Court's decree, including the locations of the posted documents and the date and time that the Order was read to employees.

Dated at Milwaukee, Wisconsin, this 7th day of August, 2020.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge